UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Joe Fasano; Altimeo Optimum Fund; Altimeo Asset Management; Individually and On Behalf of All Others Similarly Situated,

**Plaintiffs,**

v.

Guoqing Li; Peggy Yu Yu; Dangdang Holding Company, Ltd.; E-Commerce China Dangdang Inc.; Kewen Holding Co. Ltd.; Science & Culture Ltd.; First Profit Management, Ltd.; Danqian Yao; Lijun Chen; Min Kan; Ruby Rong Lu; Ke Zhang; and Xiaolong Li,

**Defendants.**

Civil. A. No. 16-8759

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT

Plaintiffs Joe Fasano ("Fasano"), Altimeo Optimum Fund, and Altimeo Asset Management (the two Altimeo entities, together "Altimeo"), (all plaintiffs together, "Plaintiffs"), by their attorneys, for their complaint against defendants, individually and on behalf of all others similarly situated as minority stockholders cashed out in the going-private transaction at issue, upon personal knowledge as to themselves, and upon information and belief as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.   This is a class action brought on behalf of former minority common shareholders of E-Commerce China Dangdang, Inc. ("Dangdang" or the "Company") who owned Dangdang common stock at any time between May 28, 2016 and the September 20, 2016 (the "Class

Period") closing of a merger transaction (the "Class").   Plaintiffs seek damages as a result of Dangdang's board of directors agreeing to sell Dangdang (the "Going-Private Merger" or "Merger") to a buyers' group that held 83.6% voting power and included controlling stockholder and Chief Executive Officer, Guoqing Li and his wife, Chairwoman Peggy Yu Yu (the "Controlling Group") on grossly unfair terms that (i) improperly favored Li's group over another all-cash offer and (ii) badly underpaid the Company's minority shareholders.   This action seeks damages breaches of fiduciary duties, violations of U.S. securities law and New York common law, and a quasi-appraisal due to misrepresentations and omissions in the Forms 13E-3 for the Merger.

2. In particular, the Going-Private Merger was fundamentally unfair to Dangdang's minority stockholders for at least the following reasons:

- Dangdang's board accepted a woefully insufficient offer of $6.70 per ADS share from the Controlling Group over a much higher all-cash offer of $8.80 ADS share from an independent third-party bidder;

- Dangdang used a sham Special Committee that entirely failed to engage in arm's-length negotiation with the Controlling Group, as shown by it accepting the Controlling Group reducing its initial offer by 15% from $7.81 per ADS share to $6.70, while the third-party $8.80 per ADS share offer was still pending.

- The Controlling Group refused to condition the Going Private Merger on the approval of the majority-of-minority stockholders, which thereby left the Merger tainted by the coercion of Dangdang's controlling stockholder forcing a woefully insufficient deal upon a hapless Special Committee.

- The Controlling Group refused a "Go-Shop" provision, which would have permitted the Special Committee to test the fairness of the deal in the market by seeing if any third-party bidder would offer a higher price to buy the company.

- The Special Committee improperly discriminated in favor of the Controlling Group by accepting its offer before the Group finalized financing for the Merger, and by permitting the Group to finance the Merger using DangDang's own available cash.   In contrast, the Special Committee faulted the third-party offer of $8.80 per ADS share for lacking "financing certainty."

2

- The Controlling Group and the Special Committee both falsely stated in the Proxy statement for the Merger that the Special Committee had independent Cayman legal counsel form Maples & Calder ("Maples").   But Maples was not independent – it was conflicted because it had recently represented Dangdang, led by controlling stockholder Mr. Li, for its Initial Public Offering of stock on the New York Stock Exchange ("NYSE"). This conflict prejudiced the negotiations.

- Controlling stockholder and CEO Mr. Li improperly obtained a special payment of $10 million in cash from the Going Private Merger, through the Special Committee cashing out his stock options.  But there was no legitimate reason for doing this because Mr. Li's stock in Dangdang was cancelled in the Merger. This $10 million special payment is a clear breach of the duty of loyalty.

- The Merger price was significantly unfair to Dangdang's minority stockholders. As reported by *Bloomberg*, the Controlling Group's original $7.81 offer was 16% below Dangdang's 90-day average trading price prior to the offer, "making it lowest among 42 proposed going-private deals."  Thus, the $6.70 Merger price was a shocking 28% below Dangdang's 90-day average price before the original offer was made.   That is not even close to a fair price.

3. Accordingly, the Going-Private Merger badly fails the heightened entire fairness standard require to validate a merger in which a company is acquired by its controlling stockholder in a related party transaction.  And Dangdang's cashed-out minority stockholders should be awarded damages in the amount of money of the difference between a fair Merger price and the woefully insufficient price at which they were cashed-out in the Merger.

<u>**THE PARTIES**</u>

4. Plaintiff Joe Fasano was an owner of Dangdang common stock by virtue of owning Dangdang American Depositary Shares ("ADS"), each of which represented five common shares of Dangdang prior to the Going Private Merger and during the Class Period.   He is a resident of New York.

5. Plaintiff  Altimeo Optimum Fund is an investment fund that held over 440,000 ADS shares of Dangdang prior to the Going Private Merger and during the Class Period.   Its investment manager is Altimeo Asset Management.

6.  Plaintiff  Altimeo Asset Management is the investment manager and authorized agent of to act on behalf the Altimeo Optimum Fund.

7.  Defendant Guoqing Li ("Li") is the co-founder and director of the Company, and has been the chief executive officer of the Company since inception. As of August 1, 2016, Li held 31.2% of the Company's common stock, and over 75% of the voting power of Dangdang.   Mr. Li was involved in the decision to list the Company on an exchange in New York.

10.  Defendant Ms. Peggy Yu Yu ("Yu") is the co-founder and director of the Company. She has been the executive chairwoman of the Company since its inception.  Mr. Guoqing Li and Ms. Yu are husband and wife.  Ms. Yu was involved in the decision to list the Company on an exchange in New York.

11.  Defendant E-Commerce China Dangdang Inc. ("Dangdang" or the "Company") a leading business-to-consumer e-commerce company in China that is an exempted company with limited liability incorporated under the laws of the Cayman Islands.  Under the Going Private Merger, the Company will continue to exist post-Merger as the surviving entity.   Before the Merger, the Company was listed on the New York Stock Exchange since December 2010.

12.  Defendant Dangdang Holding Company Limited ("Parent") is an exempted company with limited liability incorporated under the laws of the Cayman Islands.  The business address of Parent is in Beijing, China.   Parent was affiliated with the Company and involved in listing it on an exchange in New York.

13.  Defendant Kewen Holding Co. Limited ("Kewen") is a limited company incorporated under the laws of the British Virgin Islands and is principally an investment holding vehicle controlled by Mr. Li. Mr. Li is the sole director and beneficial owner of Kewen.

14.   Defendant Science & Culture International Limited ("SC International") is a limited company incorporated under the laws of the British Virgin Islands.   SC International is principally an investment holding vehicle controlled by Mr. Li.   Kewen holds 60% of the shares in SC International.

15.   Mr. Danqian Yao ("Yao") has been a senior vice president of the Company since December 2011, when it was listed on the NYSE, a New York-located stock exchange.

16.   Defendant First Profit Management Limited ("First Profit") is a limited company incorporated under the laws of the British Virgin Islands and is principally an investment holding vehicle. Defendant Danqian Yao controls First Profit as its sole director.   In the past, First Profit has held 492,500 Class A common shares for and on behalf of certain persons pursuant to share incentive arrangements between the Company and such persons subject to the arrangements.

17.   Defendant Lijun Chen ("Chen") has worked as an executive at the Company since 2014.   He has been a vice president of the Company since January 2016.   Prior to that, Chen served as the Company's business general manager from June 2014.    During that time, the Company was listed on a New York stock exchange.

18.   Defendant Min Kan ("Kan") has worked at the Company as an executive since 2008.   He was a vice president of the Company since January 2014.   Prior to that, Kan served as the Company's business general manager from January 2013 and as a senior director from 2008 to January 2013.   The Company was listed in New York during his employment.

19.   Defendants Li, Yu, Parent, Kewen, SC International, Yao, First Profit, Chen, and Kan are together the "Controlling Group" that bid for and acquired Dangdang in the Going-Private Merger.   As of August 1, 2016, the Controlling Group held 83.6% of the total issued and outstanding votes eligible to vote on the Merger and 35.3% of the Company's common stock.

20.   Defendant Ruby Rong Lu served as Chairwoman of the Special Committee that considered the Going-Private Merger.  She was a director of the Company since 2006.  Ms. Lu was paid $100,000 for serving as Special Committee Chair.  She received approximately $85,000 in annual directors' fees.  She also received at least $20,500 in cash from stock options by virtue of approving the Going-Private Merger.

21.   Defendant Ke Zhang has served as a director of the Company since November 2010. He also served on the Special Committee that considered the Going-Private Merger.  Mr. Zhang was paid $50,000 for serving on the Special Committee.   He also received at least $41,000 in cash for stock options for approving the Going-Private Merger.   And he received annual directors' fees of approximately $85,000 annually.

22.   Defendant Xiaolong Li ("Xiaolong") has served as the Company's director since December 2010.  Xiaolong was paid $50,000 to serve on the Special Committee for the Going-Private Merger.   He was also paid at least $20,500 in cash for stock options upon completion of the Merger.  He also received annual directors' fees of approximately $85,000.

23.   Defendants Ruby Rong Lu, Ke Zhang, and Xiaolong Li, together are defined herein as the Special Committee Defendants.

## JURISDICTION

24.  This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 and 1367 because it involves a U.S. securities law claim for violating § 13(e) of the Securities Exchange Act of 1934 and Rule 13e-3 thereunder.   This Court also has subject matter jurisdiction under 28 U.S.C. §. 1332(d) because this is a class action under Fed. R. Civ. P 23 involving more than $5,000,000 in damages, and the parties are at least minimally diverse, as Defendants reside overseas in China, The Cayman Islands or the British Virgin Islands, whereas the named Plaintiffs reside in New York and France.

25.  This Court has personal jurisdiction over this matter under Fed. R. Civ. P4(k)(1)(A) and N.Y. C.P.L.R. §§ 301, 302(a)(1) and (3).  Under § 301, Defendants conducted repeated and continuous business in New York City by listing the shares of Dangdang on the NYSE on Wall Street in New York City, and continuously operating its business through its NYSE listing.  In addition, under § 302(a)(1) the Defendants, as the Controlling Group effectuating the Going Private Merger, effectuated the Merger (and thus transacted the business at issue) through cashing out millions of ADS shares through the NYSE and the use of an ADS Depositary, the Bank of New York-Mellon, with headquarters on Liberty Street, in New York City.  Further, under § 302(a)(3), the Defendants committed tortious acts and breaches of fiduciary causing harm to Mr. Fasano and other Class Members located in New York and harming the value of Dangdang stock traded in New York on the NYSE.  Moreover, the Defendants purposefully availed themselves of New York law because the Merger Agreement contains a choice of law provision that specifically chooses New York law, except for certain discrete issues.  Paragraph 9.09(a) states "This Agreement shall be interpreted, construed and governed by and in accordance with the Laws of the State of New York without regard to the conflicts of law principles thereof, except…."  (DangDang Form 6-K, Ex. 99.2, *available at* https://www.sec.gov/Archives/edgar/data/1499744/ 000114420416105678/v441291_ex99-2.htm. The Merger involved significant contacts with the New York, and the purposeful use of New York's laws to effectuate the Merger and transact in Company stock.

## **VENUE**

26.  Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district, including:  (i) the Company transacting stock and disseminating statements through the NYSE exchange in this District; (ii)

Defendants effectuating the Going-Private Merger by cashing out ADS Shares using an ADS Depository with headquarters in this District, including by directing ADS shareholders to submit their shares to the ADS Depository in this District; and (iii) Defendants' actions causing harm to the Company's stock price on the NYSE exchange in this District.  Venue is also proper under 28 U.S.C. § 1391(b)(3) because, as shown above in ¶ 25, Defendants are subject to the personal jurisdiction of this Court.

## FACTUAL ALLEGATIONS

A.    **Dangdang's Business Warranted Much Higher Value than the Going-Private Merger Price, as Mr. Li Himself Admitted**

27.    Dangdang is a leading business-to-consumer e-commerce company in China. It is commonly known as the *Amazon.com* of China.  Like *Amazon*, it originally focused on selling books online.  Based on publicly available information, Dangdang is the largest book retailer in China by revenues. As of December 31, 2014, Dangdang offered approximately 1,000,000 book titles. In addition, Dangdang offers other media products and general merchandise on its internet platform, including fashion; apparel; beauty and personal care products; home and lifestyle products; and baby, children and maternity products.  In 2014, Dangdang had 24.3 million active customers, including 13.3 million new customers. Its average daily unique visitors were approximately 4.0 million. Dangdang has also launched an e-Reader product, the *Dangdang* e-Reader, which has expanded its business into digital reading and publishing.

28.    Dangdang was co-founded by Defendants Li and Yu in 2000, and they have retained controlling power over the Company.  As of August 1, 2016, Li was Chief Executive Officer, owned over 31% if Dangdang stock, and held over 75% of the Company's voting power.

29.  On December 8, 2010, DangDang conducted an initial public offering ("IPO") on the NYSE stock market, through which it sold 17 million ADS shares at $16.00 per share. Dangdang's IPO raised $272 million in market capital.

30.  Controlling stockholder Li publicly stated at the time that Dangdang was "undervalued" in the IPO and that Dangdang should have a higher stock price.   Several months later, Li reiterated this point, by publicly claiming that "Dangdang is now extremely undervalued" as of July 12, 2011, when its stock price was trading at $12 per share.   Mr. Li stated that Dangdang should be valued "at a PE [Price-to-Earnings Ratio] of 150x" and "they should give us the 150x valuation."   Li argued that Dandang's proper valuation should remain above the IPO price, at a "$22 Target Price" per share.

31.  In mid-2014, Mr. Li continued to publicly claim Dangdang should be valued above $16 per ADS share.  He told China's *Economic Weekly* magazine in April 2014 that he turned down an offer to sell the Company at $16 per ADS share.  In June 2014, he reportedly posted on a *Weibo* microblogging site (the Chinese version of *Twitter*) that Dangdang was undervalued at its then-trading price of $12.83 per share.   And in mid-August 2014, he again stated on *Weibo* that Dangdang was undervalued at its then-trading price of $14.92 per ADS share.

32.  And in January 2015, Mr. Li yet again told a Chinese television program that Dangdang was significantly undervalued at its then-trading price around $9.00 per ADS share.

33.  But Mr. Li's public tune quickly changed when he abandoned his fiduciary duties for self-interest in July 2015, and submitted a lowball bid to buy out DangDang's minority stockholders and take the Company private.

**B.**      **Mr. Li and the Controlling Group Exploit a Quick Drop in Dangdang's Stock Price to Make a Grossly Unfair Lowball Offer to Buy the Company**

34. Despite publicly claiming that Dangdang was undervalued, Li on July 9, 2015 pounced on a quick drop in Dangdang's stock price, due to a Chinese Stock market crash, to make a lowball offer to buy out DangDang's minority stockholders for just $7.81 per ADS share.

35. In particular, between June 12 and July 8, 2015 China's stock market plunged, losing roughly 35% of its value, measured by the drop in the Shanghai Composite Index.

36. The China market crash caused Chinese internet companies listed in the U.S. to suffer similar declines. As a result, between June 17 and July 8, 2015, Dangdang's stock price dropped 45%, from $11.48 per ADS share to $6.51 per share. This was Dangdang's lowest stock price of the year, by far.

37. Mr. Li and the Controlling Group opportunistically exploited Dangdang's low stock price, by submitting a lowball offer of $7.81 per ADS share to buy out Dangdang's minority stockholders before the U.S. markets opened on July 9, 2015.

38. The opportunistic timing of the Controlling Group's July 9 offer is evident from their submitting it before U.S. markets opened, but after the Chinese Stock market closed with a major 8.1% increase on July 9. Because China was 12 hours ahead of the U.S., the Chinese market closed before U.S. markets opened. The Controlling Group thus submitted its offer before Dangdang's price in the U.S. could increase due to the China market rebound. This gave their offer the false appearance of a premium over Dandang's stock price.

39. In fact, the Controlling Group's July 9 offer offered no real premium, because it was a 16% discount to Dangdang's 90-day average trading price prior to the offer. Further, it was 32% below Dangdang's closing stock price on June 17, 2015, just three weeks before the offer.

40. Indeed, the Controlling Group's July 9 offer of $7.81 per ADS share was so low, that *Bloomberg.com* reported that it was the "lowest" offer it observed "among 42 proposed

going-private deals" compared to 90-day average trading prices, according to public transaction data.   This made the Merger price even worse, since was executed at an even lower price, $6.70 per ADS share, that was 28% below Dangdang's 90-day average price before the first offer.

### C. The Going Private Merger is Evaluated by a Sham Special Committee That Improperly Ignored a Much Higher Third-Party Offer and Capitulated to the Controlling Group Reducing its Offer by 15%, and Rejecting "Go-Shop" and Majority-of-Minority Merger Provisions

41. The Controlling Group's July 9 offer was grossly unfair and inherently coercive, because it was made by a group holding 83.6% of the Company's voting power and comprising the CEO, Chairwoman and co-founders.   But the coerciveness of the offer was evident from the capitulation of the Company's so-called Special Committee to the Controlling Group's major demands during negotiations, and in the Special Committee ignoring a much higher, all-cash offer from a third-party bidder.

42. Upon receiving the offer, the Company appointed a Special Committee to evaluate the offer, comprised of Ms. Lu as Chairwoman, Mr. Zhang, and Xiaolong Li.   But the Special Committee was a sham from inception, for many reasons, including but not limited to:

43. *First*, the Special Committee improperly failed to meaningfully consider a much higher, all-cash offer of $8.80 per ADS share received from a third-party private equity firm iMeigu Capital Management on March 9, 2016 (the "Competing $8.80 Offer").  This offer was a 13% premium over the Controlling Group's initial July 9, 2015 offer.  And this offer was 31.3% higher than the Merger price the Special Committee ultimately accepted.

44. Dangdang stockholders expressed immediate approval for the Competing $8.80 Offer, by sending Dangdang's stock price shooting up to a 2-month high stock price.  This was a bona fide offer from a respected private equity firm with a history of investing in Chinese internet firms.

45. By April 13, 2016, iMeigu Capital Management strengthened its Competing $8.80 Offer by forming a consortium with two other firms, including the Jiangsui Huaxi Group Co. Ltd. (the "Huaxi Group"). The Huaxi Group held approximately $2.5 billion in net assets as of the end of 2014, which meant that the Competing $8.80 Offer consortium had more than enough money to complete their proposed transaction, which would have required roughly $800 million.

46. But the Special Committee never negotiated the Competing $8.80 Offer. It never made a counter-offer. It never tried to drive the Competing $8.80 Offer higher.

47. Instead, the Special Committee left discussions with the Competing $8.80 Offer to its financial advisor, Duff & Phelps Securities, and criticized the Offer's financing as "preliminary."

48. Ultimately, the Special Committee accepted a 31.3% lower offer from the Controlling Group of $6.70 per share, even though the Competing $8.80 Offer remained in place. This was the abandonment of a legitimate, higher offer that would have benefitted Dangdang minority stockholders.

49. *Second*, the Special Committee discriminated against the Competing $8.80 Offer by faulting its financing as "preliminary" while accepting the Controlling Group's much lower $6.70 per share offer on May 28, 2016, without finalized financing.

50. In particular, the Form 13E-3 proxy statement admits that the Special Committee voted to approve the Controlling Group's reduced $6.70 per ADS share offer even though the Group was still seeking "additional equity financing sources" for their offer. (*Id.* at 34.)

51. In fact, the Controlling Group had still not finalized financing in mid-June 2016, weeks after the Special Committee approved its offer over the 31.3% higher Competing $8.80 Offer, for no other reason than allegedly "preliminary financing."

52. Moreover, the Special Committee discriminated against the Competing $8.80 Offer by permitting the Controlling Group to finance their offer in large part out of the "Company's available cash." (*Id.*)  The Controlling Group was suspiciously using the Company's own money to buy it out.   But the Special Committee did not offer to let the Competing $8.80 Offer consortium finance its offer using the Company's available cash.  This was blatant favoritism for an inferior related party offer that was unfair to stockholders

53. *Third*, the Special Committee capitulated when the Controlling Group reduced its initial offer from $7.81 per ADS share to $6.70 in May 2016 – even though the Competing $8.80 Offer had not been withdrawn.

54. The Special Committee had several other options available to it besides capitulation.  It could have just said no to the Controlling Group.  It could have accepted the Competing $8.80 Offer as a better alternative deal.   Or it could have engaged in a combination of the two approaches, to negotiate a higher deal from the Controlling Group.

55. Instead, the Special Committee merely capitulated to the Controlling Group's demand for a much lower price.  It agreed to virtually all of the price drop the Controlling Group demanded, and accepted a $6.70 per ADS share offer despite more money on the table from a legitimate third-party bid.

56. *Fourth*, the Special Committee entirely capitulated to the Controlling Group's refusal to condition the Going Private Merger on the approval of the majority-of-minority stockholders.

57. A majority-of-minority merger approval condition is a widely-known and accepted procedure used to remove the taint of coercion from a controlling stockholder merger proposal.  Controlling stockholder transactions are inherently coercive because the controlling stockholder can force the transaction to be approved using his own voting power.  A controlling stockholder

can also use his voting power to take retribution against any minority stockholders that vote against his offer. Accordingly, a majority-of-minority condition would have empowered Dangdang's minority stockholders to make a free decision on the merits of the Controlling Group's reduced $6.70 per ADS share offer.

58. But Dangdang's controlling stockholder Mr. Li, and the Controlling Group, refused to agree to such a provision to remove the taint of coercion from the Merger.

59. In turn, the Special Committee capitulated to the Controlling Group's demand, and left the Going Private Merger tainted by improper coercion. By failing to obtain a majority-of-the-minority condition, the Special Committee abandoned its fiduciary duties to the Company's minority stockholders. The Special Committee thus also ensured that the Merger would be subject to court review under the heightened "entire fairness" standard applicable to controlling stockholder freeze-out transactions under common law.

60. *Fifth*, the Special Committee also capitulated entirely to the Controlling Group's demand that there be no "Go-Shop" provision in the Merger agreement that would permit the Special Committee to test the fairness of the Controlling Group's agreed-upon offer by shopping it to third party bidders.

61. By failing to obtain a "Go-Shop" provision, the Special Committee failed to obtain a market check on the fairness of the deal. Instead, the Controlling Group was able to obtain approval of its woefully unfair reduced $6.70 offer without facing any real competition to acquire the Company.

62. Especially when combined with the Special Committee's failure to meaningfully negotiate the Competing $8.80 offer, the lack of a "Go-Shop" provision shows that there was never any robust arm's length sales process or negotiation over the Going Private Merger.

Instead, the Special Committee only seriously entertained one bidder – the Controlling Group – and capitulated to that bidder on every major Merger provision, including price, majority-of-minority and the "Go-Shop" provision.   Accordingly, the Merger was plainly unfair to Dangdang's minority stockholders.

63.   *Sixth*, the Special Committee was flawed from inception because its Chairwoman Ms. Lu was biased in favor of the Controlling Group.   Ms. Lu had a relationship with controlling stockholder Mr. Li for at least ten years as a director at Dangdang and before that through contact that led to her initial appointment as director in 2006.   She was further biased through her receipt of $100,000 in Special Committee fees, plus roughly $85,000 in annual directors' fees, and cash payment of $20,500 for stock options through the Merger.   She was particularly reliant on her Dangdang compensation while considering the Controlling Group offer, because she was in the middle of a career change.

64.   In April 2016, while the Special Committee was in the middle of negotiating the Going Private Merger, Ms. Lu moved from DCM Ventures based in Menlo Park, California, to H Capital Ventures, based in Beijing, China.   She needed Dangdang compensation to sustain cash flow during this difficult time of transition, and was thus biased for the Controlling Group.

65.   *Seventh*, the Special Committee was also a sham because it did not have an independent Cayman legal adviser.   Its Cayman legal counsel was Maples.   But Maples was conflicted because it was Company Cayman counsel – as chosen by controlling stockholder Li.   For example, Maples was Company Cayman legal counsel in connection with Dangdang's registration statement for its NYSE IPO.   (Dangdang Form F-1/A Ex. 5.1 (Maples Legal Opinion re validity of Company Stock), *available at* https://www.sec.gov/Archives/edgar/data/1499744/000095012310111515/h04369a4exv5w1.htm).   Maples was also

Cayman counsel for the Company's ongoing employee Share Incentive Plan.  (Dangdang Form S-8 Ex. 5.1 (Opinion of Maples re Shareholder Incentive Plans), *available at* https://www.sec.gov/Archives/edgar/data/1499744/000095012311000162/h04726exv5w1.htm.)

66.   In fact, it appears Maples remained Company counsel through the Going Private Merger, as there is no public indication that it ever formally resigned.  Rather, the Merger public filings show that Maples maintained its relationship with the Company and Mr. Li, the controlling stockholder, through the Merger because Dangdang's registered office in Caymans since January 2000 was at "Maples Corporate Services Limited" in the Cayman Islands.   And after the Merger, when the Controlling Group owned the entire Company, the Merger's surviving company's registered office was also located at "Maples Corporate Service Limited." (Merger Form 13E-3 Ex. 99(A)-(1), Annex A at A-2, *available at* https://www.sec. gov/Archives/edgar/data/1499744/000114420416108643/v442417_ex99a1.htm.)

67.   But the Controlling Group, the Special Committee, and Dangdang all misrepresented Maples's conflict, by falsely stating in the S.E.C. Proxy Merger Forms 13E-3 that engaging "Maples and Calder, as its legal advisor[]" gave the Special Committee "independent control of the sales process."   (*Id.* Ex, 99(A)-(1) at 38.)   This was false.   Maples was not independent because of its conflicting relationship with the Company (dominated by controlling stockholder Li).   Thus, Maples could not give the Special Committee "independent" control of anything.

68.   The Form 13E-3s' misrepresentation of Maples as independent, and the omission of Maples's conflict as Company counsel, were material to a reasonable stockholder.   It was Maples's primary role to advise the Special Committee as to its "key duties, responsibilities and guidelines of the Special Committee, including the Special Committee's fiduciary duties to the shareholders of the Company in the potential going private transaction of the Company."   (*Id.* at

26.)  Indeed, the Special Committee and Dangdang's board identified the alleged independence of Maples's counsel as an important factor that made the Going Private Merger "procedurally fair" to minority stockholders.  (*Id.* at 38.)   Thus, the Special Committee's own words prove the materiality of misrepresenting and omitting Maples's conflict of interest as Company counsel.

### D.   The Going Private Merger Also Pays an Improper Unique $10 Million Payment to Controlling Stockholder by Cashing Out His Stock Options

69.  The Going Private Merger was also unfair because it paid controlling stockholder Mr. Li a unique payment of $10 million in cash in exchange for his stock options.

70.  The Merger documents falsely purport to pay cash for stock options in an even-handed way.  But paying cash for outstanding stock options almost exclusively benefitted Li.

71.  Li held 10,455,770 of the 11,505,770 stock options eligible to be cashed out.  And he received $10 million of the $10.8 million in cash paid by the Company to option-holders as part of the Merger.

72.  Paying Li $10 million in cash was entirely unwarranted, because his (and the rest of the Controlling Group's) stock in Dangdang was to be cancelled through the Going Private Merger.  In exchange for cancellation, Li's Dangdang stock was instead rolled into his ownership percentage of the surviving entity, Dangdang as a privately-owned company.

73.  Because Li's and the Controlling Group's shares were being cancelled in exchange for ownership in the surviving entity, their stock options should also have been cancelled instead of cashed out.

74.  The Company's existing cash should not have been used to cash out a related party controlling stockholder's stock options as part of the Merger.

75.  The $10 million cash payment to Li was unfair to Dangdang's minority stockholders and a clear breach of his duty of loyalty to those minority stockholders.  And the Special Committee aided and abetted his breaches of fiduciary duties in approving this payment.

**E. <u>The Going Private Merger Price Was Seriously Unfair</u>**

76.  As shown above, the Going Private Merger price was seriously unfair to Dangdang's minority stockholders, including for the following reasons:

77.  The Merger price of $6.70 was at least 28% below the Company's 90-day average trading price before the initial Controlling Group offer on July 9, 2015.

78.  The initial July 9, 2015 offer was timed opportunistically right after Chinese markets crashed from June 12 to July 8, losing 35% of their value, and submitted before U.S. markets opened on July 9 when the Chinese stock market had rebounded by 8.1%.   The initial offer was not at a premium to what a normally-operating market's price for Dangdang would have been at the time.

79. Mr. Li's own public statements throughout mid-2014 and early 2015 about Dangdang being significantly undervalued at stock prices of $9-$15 per share prove that the $6.70 per ADS share price was unfair value for the Company.

80.   As reported by *Bloomberg*, the Controlling Group's original $7.81 offer was 16% below Dangdang's 90-day average trading price prior to the offer, "making it lowest among 42 proposed going-private deals."  Thus, the $6.70 Merger price was even worse, because it was a shocking 28% below Dangdang's 90-day average price before the original offer was made.   This reveals the Merger to be predatory and opportunistic.

81. The third-party, all-cash Competing $8.80 Offer submitted by private equity firm iMeigu Capital Management and supported by a consortium of two other firms including the Huaxi Group proves that a bona fide third-party offer would value the Company significantly

18

higher than the Going-Private Merger.  The Competing $8.80 Offer was 31.3% higher than the ultimate Merger price.

82. Given Dangdang's year-over-year revenue growth, it should have attracted Merger valuation ratios closer to similar firms such as JD.com and Amazon.com, both of which were publicly valued much higher than Dangdang was in the Going Private Merger.

### F.   The Going Private Merger is Subject to Heightened Entire Fairness Review Because it Involved Dangdang's Controlling Stockholder Mr. Li

83.  Li was the controlling stockholder of Dangdang prior to the Going-Private Merger, because he owned approximately 31.2% of the Company's outstanding common stock and over 75% of its voting control.  Further, the Controlling Group was a controlling stockholder group because it held over 35.3% of Dangdang's stock and 83.6% of its voting power.

84.  Also, Defendant Li had effective control of Dangdang as its CEO, co-founder, and a Director.

85.  Similarly, Ms. Yu had effective controlling stockholder status through her marriage to Li, and as Chairwoman, co-founder, and Director, and independent owner of an additional 4% of the Company stock above Li's controlling stake.

86.  As the controlling stockholder, Li, Yu and the Controlling Group had the power and exercised such power to acquire the Company's common stock and dictate terms contrary to the Company's minority shareholders' best interests and which do not reflect the fair value of Dangdang's common stock.

87. Further, by refusing a majority-of-minority approval provision, Li and the Controlling Group deprived Dangdang's minority stockholders from counteracting the coercive power of the Controlling Group's controlling stake of the Company.

88.   As such, the transaction is subject to the exacting entire fairness standard under which the Defendants must establish both fair price and fair dealing.

## CLASS ACTION ALLEGATIONS

89.   Plaintiffs brings this action on their own behalf and as a class action under Fed. R. Civ. P 23, on behalf of all former minority stockholders of the Company (except the defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the defendants) who were cashed out in the Going-Private Merger and their successors in interest, who were injured as a result of defendants' actions as more fully described herein (the "Class").

90.   This action is properly maintainable as a class action.

91.   The Class is so numerous that joinder of all members is impracticable.  There were approximately 17 million ADS shares of Dangdang common stock, and millions of shares of non-ADS Dangdang common stock outstanding prior to the Going Private Merger that were not owned by the Controlling Group.

92.   There are questions of law and fact which are common to the Class including, *inter alia,* whether (i) defendants have breached their fiduciary and other common law duties owed by them to plaintiffs and other members of the Class, (ii) defendants negligently misrepresented material facts to the Class prior to the Going-Private Merger; and (iii) defendants violated § 13(e) of the Exchange Act and Rule 13e-3 thereunder through misrepresentations and omissions about Maples's conflict and the fairness of the Merger..

93.   The claims and defenses of Plaintiffs are typical of the claims and defenses of the Class.

94. Plaintiffs are committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiffs' claims are typical of the claims of the other members of the Class and Plaintiffs have the same interests as the other members of the Class as all members of the Class consist of minority shareholders in the Company's common stock.  Accordingly, Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

95. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Among other reasons:  (i) the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members or substantially impair or impede their ability to protect their interests; (ii)  Joinder of all members of the Class is impracticable and, for financial and other reasons, it would be impractical for individual members of the Class to pursue separate claims.

96. Plaintiffs and their counsel anticipate no difficulty in the management of this litigation as a class action

## CAUSES OF ACTION

### COUNT I
### Breach of Fiduciary Duties Against All Defendants

97. Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

98. The Defendants, in violation of their fiduciary duties of care, and loyalty, approved the Going-Private Merger, although it is not entirely fair to the Company's public shareholders.

21

99. By pursuing transactions which are not entirely fair to the Company's public shareholders, the Defendants have violated their fiduciary duties to the public shareholders.

100. The Controlling Group, as a group acting as a controlling shareholder of Dangdang, owed the Company's shareholders, at all relevant times, a duty of entire fairness, a duty of loyalty and a duty not to misuse its own control of the Company for its own ends. As directors and executives of Dangdang, individual members of the Controlling Group had the same duties.

101. By virtue of the acts set forth above, the Controlling Group and the Special Committee Defendants have breached such duties and injured the Class directly.

102. The Special Committee Defendants abandoned their fiduciary duties to the Company and minority stockholders by approving the Going-Private Merger to advance their own financial interests and in furthering their own interests in director and other compensation, as well as to further their relationships with Mr. Li and Ms. Yu as controlling stockholders.

103. The Defendants directly harmed the class, causing at least one-hundred million dollars in damages.

## COUNT II
## Aiding and Abetting Breach of Fiduciary Duties
## Against the Special Committee Defendants

104. Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

105. As directors and members of Dangdang's Special Committee, the Special Committee Defendants owed the Company's shareholders, at all relevant times, a duty of loyalty, a duty of care and a duty of good faith. They also were aware that the Controlling Group had a duty to treat Dangdang's minority stockholders with entire fairness and a duty not to misuse its own control of the Company for its own ends.

106. The Special Committee knowingly approved the Going-Private Merger as an unfair transaction that was procedurally and price-wise unfair to Dangdang's minority stockholders, and gave Mr. Li an improper $10 million unique cash payment from the Company's money.

107. In doing so, the Special Committee aided and abetted the Controlling Group's and the controlling stockholder Mr. Li's breaches of the duty of loyalty.

108. The Special Committee Defendants acted knowingly, and took a substantial step in furtherance of aiding and abetting the Controlling Group's breaches of fiduciary duties by approving a knowingly unfair Merger.

109. In so doing, the Special Committee Defendants directly harmed the class, causing at least one-hundred million dollars in damages.

## COUNT III
## Negligent Misrepresentation (All Defendants)

110. Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

111. Defendants were aware that their statement in Dangdang's Merger Proxy materials and the S.E.C. Forms 13E-3 were to be used by minority stockholders in determining whether to vote for the Merger and whether to exercise appraisal rights to have their shares independently fair-valued by a Court of law.

112. Defendants had fiduciary duties to Plaintiffs as Company Directors, Executives, and as a controlling stockholder group, and that these fiduciary duties included an obligation to provide accurate information.

113. Defendants were aware that Dangdang's stockholders reasonably relied on their statements in Merger proxy materials and Forms 13E-3 in deciding how to vote and whether to exercise appraisal rights.

114.Defendants misrepresented in the proxy materials and in Forms 13E-3 that the Maples firm had a conflict of interest in representing the Special Committee as to the Merger because Maples had acted as counsel to the Company controlled by Mr. Li and the Controlling Group.  Defendants also omitted or concealed Maples's conflict of interest.

115.Defendants also misrepresented the fairness of the merger in the Merger proxy statements and Forms 13E-3.

116.Defendants' negligence and/or lack of due diligence caused their misrepresentations about Maples's conflict of interest as Company and Special Committee counsel, because they knew or should have known about Maples's Company counsel and registered office roles, and should have known about the plain unfairness of the Merger.

117.Plaintiffs relied on Defendants' statements in deciding whether to exercise appraisal rights or otherwise act on the Merger, and have been harmed in losing out on their appraisal rights to get a fair value from the merger, as well as take other action to ensure they were paid fair value in the Merger.

118.As a result, Defendants have directly harmed Plaintiffs as a group in the amount of at least one-hundred million dollars in damages.

**COUNT IV**
**Violation of Section 13(e) of the U.S. Securities Exchange Act of 1934 and Rule 13e-3**
**Thereunder (Against All Defendants)**

119.Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

120.Section 13(e) of the Exchange Act and Rule 13e-3 thereunder make it a securities law violation in a going-private Rule 13e-3 transaction to, among other things, (i) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make

the statements made, in light of the circumstances under which they were made, not misleading; or (ii) engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

121. By virtue of the conduct identified herein, including but not limited to the misrepresentations by the Special Committee Defendants and the Controlling Group Defendants regarding Maples's conflict of interest as Special Committee and Company Counsel and the fairness of the Merger as stated above and in Count III, Defendants have violated § 13(e) and Rule 13e-3 thereunder.

122. As a result, Defendants have directly harmed Plaintiffs in the amount of at least one-hundred million dollar in damages, for which Plaintiffs seek direct and consequential damages.

## COUNT V
## Quasi-Appraisal Claim Against Dangdang, Inc. as Surviving Entity Based on Materially Misleading Disclosures

123. Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

124. Dangdang's proxy materials and Forms 13E-3 made materially misleading disclosures about Maples's conflict of interest as Company and Special Committee counsel, and as to the fairness of the Merger as stated above and in Counts III and IV.

125. As a result, Plaintiffs have been improperly deprived of a meaningful opportunity to exercise their appraisal rights and have the value of their shares determined by the court of law based on standards of fair value.

126. As the pre-Merger and surviving entity, Dangdang had the obligation to provide Plaintiffs with meaningful appraisal rights and pay Plaintiffs any court-determined amount of fair value.

127.Accordingly, Plaintiffs should have the remedy of obtaining quasi-appraisal from Dangdang to put them in the position they would have been had the proxy materials and Forms 13E-3 not contained materially misleading information, and Dangdang should be required to provide the quasi-appraisal remedy.

**DEMAND FOR RELIEF**

WHEREFORE, Plaintiffs and the members of the Class demand judgment against defendants, jointly and severally, as follows:

A.   Declaring that this action is properly maintainable as a class action and certifying Plaintiffs as the representative of the Class;

B.   Awarding Plaintiffs and members of the Class damages resulting from Defendants' multiple breaches of their fiduciary duties owed to the Class;

C. Awarding Plaintiffs and members of the Class damages resulting from Defendants' violations of common law negligent misrepresentation and federal securities law in § 13(e) of the Securities Exchange Act and Rule 13e-3 thereunder;

D.   Awarding compensatory damages against defendants, individually and severally, in an amount to be determined at trial, together with pre-judgment and post-judgment interest at the maximum rate allowable by law, arising from the breach of fiduciary duties from the Going-Private Merger;

E.   Conducting a quasi-appraisal to place Plaintiffs and Class members in the position they would have been but for Defendants' inadequate, and misleading disclosures as to the Going-Private Merger; and awarding Plaintiffs and the Class the difference between the actual Merger consideration paid and fair value of Dangdang shares, as determined by the Court.

F.   Awarding Plaintiff costs and disbursements and reasonable allowances for fees of Plaintiffs' counsel and experts and reimbursement of costs and expenses; and

G.   Granting Plaintiffs and the Class such other and further relief as the Court may deem just and proper.

Date:  November 9, 2016

**SADIS & GOLDBERG LLP**

By:  /s/ Samuel J. Lieberman
Samuel J. Lieberman
Douglas R. Hirsch
Ben Hutman
Sadis & Goldberg, LLP
551 Fifth Avenue, 21st Floor
New York, NY 10176
(212) 573-8164
*Counsel for Plaintiffs*