H2e6fasc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   JOE FASANO, *Individually and*
    *on Behalf of All Others*
4   *Similarly Situated*, et al.,

5                    Plaintiffs,

6            v.                              16 CV 8759(KPF)

7   GUOQING LI, et al.,

8                    Defendants.

9   ------------------------------x
                                        New York, N.Y.
10                                      February 14, 2017
                                        3:00 p.m.
11
    Before:
12
                      HON. KATHERINE POLK FAILLA,
13
                                            District Judge
14
                            APPEARANCES
15
    SADIS & GOLDBERG
16        Attorneys for Plaintiffs
    BY:  DOUGLAS R. HIRSCH
17        BEN HUTMAN
          SAMUEL J. LIEBERMAN
18
    O'MELVENY & MYERS, LLP
19        Attorneys for Defendants
    BY:  ABBY F. RUDZIN
20

21

22

23

24

25

H2e6fasc

|    | |
|----|--|
| 1  | (In open court; case called) |
| 2  | THE DEPUTY CLERK:  Will counsel please identify |
| 3  | yourselves for the record beginning with plaintiff. |
| 4  | MR. LIEBERMAN:  Yes.  For plaintiff, Sam Lieberman of |
| 5  | Sadis & Goldberg, LLP. |
| 6  | THE COURT:  Sir. |
| 7  | MR. HIRSCH:  For plaintiff Douglas Hirsch of Sadis & |
| 8  | Goldberg. |
| 9  | MR. HUTMAN:  Ben Hutman of Sadis & Goldberg as well. |
| 10 | THE COURT:  Which of you should I be directing my |
| 11 | questions to, or do I get to pick? |
| 12 | MR. LIEBERMAN:  You probably do get to pick, but we |
| 13 | would appreciate if you would direct your questions to me, |
| 14 | Judge Failla. |
| 15 | THE COURT:  Thank you, sir. |
| 16 | Go ahead, please. |
| 17 | MS. RUDZIN:  Good afternoon.  Abby Rudzin of O'Melveny |
| 18 | & Myers, LLP, for the corporate defendants. |
| 19 | THE COURT:  Thank you.  Good afternoon to you as well. |
| 20 | This is a premotion conference in this case.  It is |
| 21 | also our initial conference. |
| 22 | Ms. Rudzin, may I please begin with you.  Here is my |
| 23 | question:  As I read the PSLRA, it seems to me that the filing |
| 24 | of the motion that you contemplate would stay discovery and it |
| 25 | would stay proceedings in the case, including the selection of |

H2e6fasc

1    lead plaintiff and lead plaintiff's counsel.

2              Am I misreading the statute?

3              MS. RUDZIN:  Your Honor, I actually haven't thought

4    about that question.  Discovery would be stayed, you Honor.

5    You are not misleading that part; but in terms of whether you

6    can appoint me lead counsel, defendants don't usually have a

7    say in who is lead counsel.  I am not well versed in those

8    provisions.

9              THE COURT:  Fair enough.  I don't know that I am going

10   to be able to persuade you not to bring your motion, but I am

11   wondering if there would be an impact if I were to order it to

12   be filed on a day before March 8th.

13             Mr. Lieberman, I will begin asking questions, unless

14   you want to turn the mic over to Ms. Rudzin.  I would like to

15   know, sir, do you believe that the filing of this motion would

16   require me to stay the selection of lead plaintiff and lead

17   plaintiff's counsel?

18             MR. LIEBERMAN:  No, it does not, your Honor.  The

19   filing of the motion to dismiss is meant to stay discovery.

20   The history of the PSLRA was meant to stop suits, that

21   defendants proceed to strike suits by making sure that a motion

22   to dismiss adjudicates the merits.  Procedurally a lead

23   plaintiff needs to being appointed and lead counsel to act on

24   behalf of the class.  Even though it is before class

25   certification, it gives the courts presumptive seal on who will

H2e6fasc

```
 1    represent the class through the motion to dismiss phase.

 2              So I am not aware of any authority actually holding

 3    that it stops the lead plaintiff process at all.

 4              THE COURT:  Let me ask a followup question then, sir.

 5    As a practical matter it may will be the case that your clients

 6    are the lead plaintiffs and that you are lead plaintiffs

 7    counsel, but I don't know and I will not know until the 8th of

 8    March.  Given that, I should I set up the briefing schedule if

 9    I schedule briefing on defendant's motion so that the -- you

10    are the presumptive lead plaintiff counsel, but we don't know

11    just yet.  Should we wait to figure it out until we set up

12    before we start setting up your response time?

13              MR. LIEBERMAN:  Yes.  Your Honor, raises a good point,

14    which is that is a procedural matter.  Lead plaintiff, lead

15    counsel should be determined before the briefing.  In this case

16    to give some explanation as to why Ms. Rudzin and I started

17    sending letters your way before that process was done, and I

18    understand from your letter where you have indicated that that

19    schedule remains in place, we had just happened to notice as a

20    practical matter that because no one else had filed a motion

21    for lead plaintiff that it did not appear that there was going

22    to be a contest as to this issue and therefore I think as a

23    matter of practicality in moving the case forward that is why

24    the letters started.  As a procedural matter, yes, the cart

25    should not go before the horse.  The Court does need to make a
```

H2e6fasc

1    determination and that determination isn't necessarily one that

2    will happen because no one else opposes.  Although, we haven't

3    seen anyone put anything in indicating a reason why our

4    clients, who have over 400,000 shares involved in the matter,

5    would have any issue being lead plaintiff.  So I think all

6    parties expect that the lead plaintiff, lead counsel are in the

7    room and represented.  However, your Honor raises a good point,

8    which is that really does need to be decided first.

9             THE COURT:  My point really is so much simpler than

10   that, which is we have the proceeding on the 8th of March but

11   if I require the response to be in later March that will be

12   enough time for you if you are lead plaintiff's counsel and for

13   someone else if they are to respond?

14            MR. LIEBERMAN:  You are saying with respect on the

15   motion to dismiss.

16            THE COURT:  Yes, sir.

17            MR. LIEBERMAN:  The Court's schedule of 45 days within

18   submission of the motion that will not be an issue for you us.

19            THE COURT:  All right.

20            (Continued on next page)

21

22

23

24

25

H2EAAFAS2                    Conference

1          MR. LIEBERMAN:  So you're saying with respect to

2     the -- on the motion to dismiss.

3          THE COURT:  Yes, sir.

4          MR. LIEBERMAN:  Yeah, the proposed schedule of 45 days

5     from the submission of the motion, that would not be an issue

6     for us.

7          THE COURT:  All right.  45 days is a little much for

8     me to handle but we'll work that out at some point.  Let me

9     turn back to Ms. Rudzin.

10         Ms. Rudzin, may I -- actually, I'm sorry.  I'm going

11    to go back to Mr. Lieberman for a moment.

12         Mr. Lieberman, in your complaint there are non federal

13    claims.  Do you agree?

14         MR. LIEBERMAN:  That's true.

15         THE COURT:  Are they under new York Law?

16         MR. LIEBERMAN:  There is negligent misrepresentation

17    claims under New York Law, yes.  That's under New York Law.

18    There are some claims for breaches of fiduciary duty which the

19    choice of law may end up getting litigated.

20         THE COURT:  Yes.  And that's where I'm going with

21    this.  Why don't I ask the question more simply, are any of

22    these claims going be to be under law of the Cayman Islands?

23         MR. LIEBERMAN:  That ultimately that's going to be for

24    the Court to decide.

25         THE COURT:  I understand, but should I be deciding

1    that issue or you know where you're going with this.  It is a

2    factor to consider in assessing the viability of the forum of

3    non convenience motion.  So, I'm trying get a sense, if you

4    know that you're going to be raising claims under Cayman

5    Islands law, I just want to know.  What would you be arguing to

6    me?  Would you be arguing that these other non federal claims

7    are subject to New York Law or some other law?

8           MR. LIEBERMAN:  Well, we will be arguing New York Law

9    as to the negligent misrepresentation claims.  We will also put

10   forward reasons why we think New York Law could apply to the

11   fiduciary duty claims.  It is possible the Court will determine

12   that because this was a Cayman registered company that does

13   involve Cayman law as to the fiduciary duty claims.

14          What I'd say about that, your Honor, is this Court and

15   many others have become very familiar with handling

16   international law.  There are issues where you have an expert

17   that comes in.  What we think is important in the U.S. interest

18   is the U.S. securities law claim under Rule 1383 which is that

19   there was a false statement made as to the independence of

20   counsel.

21          And as Judge Cote noted in the Poseiden case that

22   there is a strong U.S. interest in the enforcement of the U.S.

23   securities laws here.  Look, it would be great if every case

24   involved just one application of law.  But one issue that often

25   comes up even if there is some determination that Cayman that

1    could apply as opposed to New York as to certain others would

2    be whether there would be any substantive differences between

3    the two.  There is Cayman authority out there that looks to the

4    law in the United States as to how to handle cases addressing

5    the fair value of a company.  So, it remains to be seen whether

6    there would be a significant difference as to those claims

7    between U.S. law and Cayman law.  But for us, what's prime for

8    us is that, look, you have Mr. Fasano is a New York --

9              THE COURT:  Slow down, please, sir.

10             MR. LIEBERMAN:  Mr. Fasano is a New York resident.

11   He's come to the courts in his home state with claims under

12   U.S. law about the company that made a decision to list in the

13   United States in New York at the New York Stock Exchange.  And

14   it didn't just do that it.  Also chose in ADR depository, the

15   Bank of New York which held as of record over 50 percent of the

16   common stock of Dangdang.  So, for us, the New York, the

17   privacy of New York is important because you have purposeful

18   availables of the New York Stock market and the New York

19   investor base.

20             But then when people decide oh, wait it's not working

21   out for me very much, they just don't like the New York

22   judiciary, the accountability.  So we think that the U.S.

23   securities laws, as well as New York State law which applies,

24   we will argue to the -- we feel quite strong about it,

25   actually, to the common law negligent misrepresentation claim.

```
 1   And as well if it does turn out that it is a Cayman law as --
 2   claim, we think there is still the interest there.  And you
 3   would be way back in the line of judges in this court, in New
 4   York State court who have had to do that because the use of
 5   Cayman as an offshore site is of certain incorporation is
 6   common place in financial services industry and corporations.
 7   So, it would not be a unique situation.
 8            THE COURT:  Sir, do you or your client have any
 9   knowledge or involvement in the parallel action that is
10   currently going on in the Grand Court of Cayman Island?
11            MR. LIEBERMAN:  Our clients are not involved in that
12   action.  We wouldn't call it a "parallel action".
13            THE COURT:  You'd call it another action.
14            MR. LIEBERMAN:  Yes, as to fair value.  Look, that is
15   an appraisal petition where people are not alleging claims of
16   securities law violation.  People are not raising claims of
17   negligent misrepresentation, nor are they even challenging
18   Cayman claims of breach of fiduciary duty.  They're simply
19   asking for their shares to be valued by a court using
20   traditional methods of valuation as the centers from a
21   transaction.  So, it doesn't have a lot in common.
22            One unique thing about the other action is it was
23   filed 19 days after our action.  And it was filed not by
24   plaintiffs.  It was file as a matter of Cayman procedure by
25   defendant Dangdang.  Dangdang filed it.  For all we know
```

H2EAAFAS2                    Conference

1    Dangdang was willing to negotiate with the dissenters and might

2    not have brought that case at all.  Could have negotiated and

3    offered them a fair price.  But having seen our action, they

4    decide oh, let's create a forum shopping opportunity by 19 days

5    after our claim filing an appraisal action overseas.

6            So, from our perspective, we don't view this at all as

7    us coming here and piggybacking on something else going on.  We

8    have different claims.  We have more substantive claims.  In

9    fact, what they usually call a claim like this that goes after

10   claims as to statements made and fiduciary duty issues and

11   negligent misrepresentations that's usually called a plenary

12   proceeding applying to the entire matter where the appraisal

13   petition is much narrower.

14           So, from our perspective we defer to that.  We're

15   first filed.  We're also the one bringing larger claims and we

16   have a much larger class of people.  And there are millions of

17   ADR shares out there over, over ten million ADR shares and

18   there's a large class of people who got squeezed out here.  I

19   understand they are saying, we're a Chinese company that

20   registered in Cayman but they came to the New York Stock

21   exchange and we're looking to go enforce the U.S. securities

22   laws.

23           THE COURT:  Okay.  Thank you very much.

24           Ms. Rudzin, let me hear from you.  I am aware of the

25   Poseiden case that was mentioned by counsel and I'm aware of

H2EAAFAS2                    Conference

1    Judge Nathan's opinion in the Holtzman matter.  I think it's a

2    2015 decision.  And while I know it's sort of an on the one

3    hand, on the other hand, on the other, other hand situation

4    where it is the selection of the plaintiff that the case be

5    here, I appreciate that the plaintiff is in a representative

6    capacity but quite differently from the Holtzman case where the

7    plaintiff was an Ohio resident, we have a New York resident who

8    is our punitive class plaintiff.  So, why shouldn't I give

9    deference to this plaintiff's decision to bring the case here?

10        MS. RUDZIN:  First of all, just so the record is

11   clear, I represent the defendants that prevailed in the

12   Holtzman case.  So, I actually know that quite well.

13        THE COURT:  All right.  The answer is that we could

14   cite or put these on the motion numerous cases where American

15   plaintiffs including domiciled in New York their cases are

16   still subject to form non convenience doctrine.  Being a New

17   York respondent is not the be all and end all.  And I found it

18   curious that Mr. Lieberman kept saying we have 400,000 shares.

19   We have the biggest loss.  When he said that he meant the

20   French hedge fund.  Mr. Fasano only had a few thousands shares.

21   So, their lead plaintiff application is based on we are the

22   biggest shareholder.  And by that they mean the French hedge

23   fund.

24        But even so, being an American plaintiff or being a

25   New York plaintiff is not enough.  There's less deference when

H2EAAFAS2                    Conference

1    the plaintiff is suing in a representative capacity and it's

2    just one factor in the test.

3            THE COURT:  Oh, I know.  We'll talk about the others.

4    I mean I believe that your adversaries have argued that the

5    Cayman Island is a less adequate form because of the absence of

6    contingent fee arrangements, the absence of jury trials in most

7    cases and the substitute service issue.

8            On the contingent fee arrangement counsel will forgive

9    me if I say that's not my biggest concern in this case.  And I

10   also believe the Cayman Island has a fee shifting or sort of

11   English shifting.  So, I am concerned but that can't be my only

12   decision.

13           But the jury trial means something and the U.S.

14   securities laws which I am told are driving this particular

15   litigation must mean something.  So why oughtn't it be here?

16           MS. RUDZIN:  First of all, I haven't thought of this

17   in a while, but a -- of fiduciary duties clients do not always

18   get a jury trial.  I'm not making an argument if that's the

19   case here.  I am just thinking it through.  So that potentially

20   not a dish distinguishing feature at all.

21           Cayman Islands is one of the few jurisdiction that has

22   been repeatedly held to be an adequate alternative forum, so

23   jury trials are not allowed there.  I don't know off the top of

24   my head.  That can't be what makes it an alternative forum

25   because it's been repeatedly held to be an adequate alternative

1   forum.  And a securities claim, first of all, their security

2   claim is not a 10b-5 claim.  It's under 1383 and the court's --

3            THE COURT:  Why don't you just restart that argument

4   please because, obviously, it's important to you so I want to

5   hear it.

6            (Pause)

7            MS. RUDZIN:  The court claim is not the driving claim

8   in this -- It is brought under Rule 1383 and numerous courts,

9   there are cases going both ways that numerous courts have held

10  there's no right of action under that rule.  So it's not even

11  clear that that's a claim at all.  But Mr. Lieberman just stood

12  up and said that their is 13e-3 claim is based on a false

13  statement regarding conflict of counsel.  Meaning, the Cayman

14  counsel that serves as counsel to the special committee.

15           Of course, whether they had a conflict that should

16  have been disclosed is a question of Cayman law.  So even to

17  the extent that's a security claim, it's based on Cayman

18  Islands' a law.  And it's particularly interesting that their

19  complaint pleads that the transaction statement disclosed all

20  of the facts about the Cayman Islands' relationships, the fact

21  that the law firm had previously represented the company and

22  was now representing a special committee, that was disclosed.

23           So the only disclosure claim is that the transaction

24  statement did not use the word "conflict", did not say make

25  the -- judgment that the previous representation meant they had

H2EAAFAS2                    Conference

 1   a conflict.  And that question, I don't think it's a disclosure

 2   claim at all because I think if you give investors the facts

 3   you don't have to give them adjectives on top of the facts.

 4   But whether that's a problem is, obviously, a question of

 5   Cayman Islands law because Cayman Islands counsel are governed

 6   by Cayman Island law

 7            THE COURT:  But to your earlier point about whether or

 8   not this particular provision is a private right of action, it

 9   sounds like you've already got in your mind the 12(b)(6) motion

10   you wish to raise.  So, we're here.  Why not just bring it

11   here?

12            MS. RUDZIN:  Because I don't think -- well, given that

13   most of the claims are governed by Cayman Island law and I

14   wasn't sure where Mr. Lieberman was coming out on that, I think

15   it's pretty well settled in -- internal affairs applies to

16   breach of fiduciary duties claim.  So that's Cayman Island law.

17   That should be decided by a Cayman Island judge.  Yes, we can

18   bring in an expert and prove it and we've got a Cayman Islands

19   expert we can put on in sort of your motion.  But we think the

20   form non motion should come first, not because it's sort of

21   just the right motion to bring now, but also because to the

22   earlier point about lead plaintiff and things if they amend

23   their complaint, has then potentially another motion to

24   dismiss.  And we just think the case shouldn't be in New York

25   at all.  And all of these proceedings about lead plaintiff and

 1   further amended complaints, that's the second question.

 2              The first question is, does the case belong in New

 3   York at all?  So that's why it seemed like a preliminary

 4   motion.  If you're asking us to bring all our arguments now to

 5   do forum non and substantively 12(b)(6) we will need a few more

 6   days.

 7              THE COURT:  I'm not sure I am.  I just did want to

 8   understand that because and perhaps, it's my own enlighted

 9   sense of this court the whole complex, not me personally.  But

10   I would think we'd be able to decide Cayman Island issues.

11              What else would you like me to know in connection with

12   the motion that you'd wish to bring?

13              MS. RUDZIN:  Well, I found the cases that plaintiff

14   cited in their letter interesting because the parties seem to

15   be just talking past each other.  Several of the cases they

16   cited, they're 10b-5 cases.  They're case that arise out of

17   filings that were made in this country, just not this case.

18   The claims here arise out of a merger.

19              And more important in all those cases, Judge Cote's

20   decision the company has the listed company was foreign but it

21   had U.S. operations and U.S. subsidiaries.  That is not the

22   case here.  There are no witnesses, no files, no nothing in the

23   United States.  The only thing in the United States was

24   Mr. Fasano.  But the lead plaintiff application is really on

25   behalf of a French hedge fund since they are the ones that own

1    the four hundred thousand shares.  So, I think if you look at

2    sort of the factors, I'm happy to go over more of them with

3    you.  I think we more than have a good faith basis to bring

4    this motion

5              THE COURT:  I'm not saying you don't.  I'm just

6    wondering whether ultimately it will be successful.  Let me ask

7    you something just while I have you standing.  There's been an

8    application from your adversary regarding service.  Is your law

9    firm willing to accept service on behalf of these defendants

10   named in the plaintiff's letter?

11             MS. RUDZIN:  We are not authorized to do that.  We

12   haven't been engaged by them.

13             THE COURT:  OK.  And so you really cannot speak to the

14   issue of substitute service or alternate service methods.

15             MS. RUDZIN:  Correct.  I will point out again I read

16   the cases they cite in their letter.  And all of them seem to

17   say the plaintiffs need to make a showing that they've actually

18   tried to conduct service.  And of course it has to be necessary

19   to the action.  So, again, in terms of the timing here, if the

20   action doesn't belong in New York we succeed in persuading you

21   that our form non convenience argument is correct, the kind of

22   service issue stuff is all moot.  I think they're all subject

23   to service.  So to me that just seems premature to talk about

24   the substitute service now.

25             THE COURT:  Mr. Lieberman, may I hear from you, sir,

1    in response.

2              MR. LIEBERMAN:  Yes, your Honor.  I think you just

3    stepped onto, stumbled onto, went right for the nub of the

4    issue actually, which is that they want to -- you've asked them

5    why not bring all the merits?  And because they don't want

6    American courts addressing any of the merits.  They want to

7    duck service and they want to duck accountability and just have

8    this go to the Cayman Islands.

9              THE COURT:  I thought Ms. Rudzin said to me if she

10   were fortunate enough to convince me to grant her motion that

11   there wouldn't be a service issue that you are now having.

12             MR. LIEBERMAN:  Granted what?

13             THE COURT:  Well, if the motion to dismiss is based on

14   forum non convenience grounds were to be granted and you were

15   to bring your case in the Cayman, I think what she's saying is

16   the service issues that you've raised to my attention in this

17   letter would not be issues because they're in the Caymans.  Am

18   I misunderstanding that?

19             MR. LIEBERMAN:  Well, she can clarify.  I did not

20   interpret her to saying that and I'll tell you why because

21   cause the Cayman Islands are not where the defendants are

22   situated.  They've retreated to China.  And in fact there is no

23   method or alternative substance or service of process in China.

24   She knows that.  That's why she is here on behalf the entities.

25             And it's very curious to hear her say that because the

1    entities here, we have control -- we've got controlled entity

2    here.  Dangdang has one person, Guoqing Li, who is the first

3    defendant on the caption, he owns over 70 percent of the stock

4    of Dangdang, and I mean the voting control of Dangdang.  He

5    formed a controlling group.  He is controlling the entity.  He

6    actually is the one behind the decisions made as to Dangdang.

7    He, through that entity, has retained the O'Melveny firm.  But

8    he is saying, no, that can't work for service for me.

9           Similarly, his wife was the chairman of the firm.  She

10   was chairman of Dangdang.  She also has as an executive or as

11   someone who is involved with the company and is the wife of the

12   CEO has involvement in that company.

13          Similarly, Mr. Xou owns First Profit.  And he is the

14   person on whose behalf, she's appearing on First Profit but she

15   won't accept service for the man behind it.  What they want to

16   do is hide in China and have no exposure to liability.  She did

17   not say in her letter that there would be service of all of the

18   defendants in Cayman.  I don't think that would be happen.

19   They'd be subject to a similar without the opportunity to

20   substitute service.  They have to go through the Hague and

21   they'd have to drop it off at the Ministry of Justice.  Now we

22   have done that.

23          THE COURT:  Sir, slow down for the court reporter and

24   judge.  Thank you.

25          MR. LIEBERMAN:  I was rushing to say I have been

1    tasking Mr. Hutman with doing the leg work on, in fact getting

2    this dropped, getting service dropped off at Ministry of

3    Justice.  We actually have gotten translations of the

4    complaint.  We've dropped off the summons, complaint and

5    translation of complaint at Chinese Ministry of Justice.

6              THE COURT:  When was that, sir?

7              MR. LIEBERMAN:  I believe January, might have been

8    January 17 but I can get you the exact date.  It was in

9    January.

10             MR. HUTMAN:  Mid to late January.

11             MR. LIEBERMAN:  And we have done it.  But one thing

12   that happens when you drop things off at the Chinese Ministry

13   of Justice, sometimes it get's carried through, sometimes it's

14   not.  There are vagaries of the Chinese system that sometimes

15   prevent service from happening.  Sometimes it happens in a

16   matter of months, but we have provided that.

17             I'll tell you something else we've done.  In the

18   merger agreement, there's a provision of notices as to the

19   merger, and they named the Sherman and Sterling firm "Ms. Tang"

20   and they named the Skadden firm "Ms. Xou" as persons who would

21   be there to take notices as to the merger for the Sherman firm

22   would take it as at special committee and the Skadden firm

23   would take it as to the Byers group.

24             We actually have provided waiver of service documents

25   to them and we've provided the summons and complaint to them by

1    e-mail.  And they said, no, I'm not authorized to accept

2    service.  The phrase "I'm not authorized to accept service"

3    will be heard again and again and again.  But that's why we

4    pointed to the GLG case, technology's case and we pointed to

5    also the case of Stream S-I-C-A-V v. Wang as cases where

6    substitute service was ordered through counsel for the employer

7    for high level employees.

8         THE COURT:  But, sir, when I have had this issue I've

9    allowed substitute service where there were deficiencies in

10   locating or finding an address for a individual which meant

11   that the Hague service would be ineffectual no matter how long

12   we waited here.  However, don't I have to at least give it a

13   chance to succeed before I find alternative service.  I mean,

14   it's not even been a month since these submissions were made

15   with the Ministry Of justice.  So, I'm wondering if this is not

16   perhaps premature.

17        MR. LIEBERMAN:  Your Honor, I think the answer to that

18   is all we want is the efficient administration of justice here.

19   And I'm thinking from scheduling stand --

20        THE COURT:  Sir, I'm going to stop you there.  We all

21   want the efficient administration of justice but the Hague

22   Convention exists because of other important international

23   relations issues.  And I'm just wondering, I don't want you to

24   ask me to just step on the toes of the Chinese Ministry of

25   Justice just because you have not submitted your thing until

 1   the 17th of January or thereabouts.  Please continue.

 2              MR. LIEBERMAN:  Look, I understood, and that is part

 3   of the efficient administration of justice, your Honor, that

 4   you are saying and I hear your point.

 5              I think what I'm concerned about is seriatim or

 6   motions to dismiss coming.  I think -- look, people have dealt

 7   with service through China and it sometimes take a while.  So,

 8   yes, if your Honor thinks that a certain amount of time, I

 9   think that is definitely a prudent exercise of discretion.  I

10   think what you have here are parties who do want to move

11   forward and litigate the matter.  So, I would ask the Court

12   keep both of those goals in mind here because we are almost a

13   month into the Ministry of Justice service area.

14              And look, Ms. Rudzin is the first one to submit a

15   letter here.  She wanted to bring a motion and she is right

16   here.

17              THE COURT:  But she wanted to bring a motion on behalf

18   of the client she's authorized to represent.  You're losing me

19   on this argument, sir.

20              MR. HUTMAN:  I would just like one moment with

21   Mr. Lieberman.

22              MR. LIEBERMAN:  Please do.

23              (Pause)

24              THE COURT:  Please continue, sir.

25              MR. LIEBERMAN:  Look, I understand -- I think our

1    point is that underlying the Hague Convention is also to make

2    sure that foreign nationals have notice and have on opportunity

3    to discover service and are not subject to default judgments

4    because they didn't have adequate notice of the filing of an

5    action.

6              I think as to the executives of Dangdang, I think

7    Mr. Chen, Mr. Kan, Guoquing Li, Mr. Xou and as well as Peggy

8    YuYu, I believe there can't be any real concern here that they

9    don't have notice of the action.  And I mean when you are

10   saying stepping on the toes, you'd be stepping on their toes

11   just by subjecting them to a U.S. court.

12             But they know exactly that this action is pending.

13   There's been nationwide publication about this.  They have

14   counsel who set up for their entity.  So, I think that I

15   understand the desire to have the Hague Convention and give it

16   time.  I'm not saying we're taking an absolute position on this

17   cause I understand the Court's concern.  I would just say going

18   back to first principles of notice and what's underlying the

19   Hague Convention, I think substitute service at some time

20   shortly would not frustrate the purposes behind the Hague

21   Convention.

22             THE COURT:  Good.  Thank you.

23             Ms. Rudzin, I want to hear you in response, please.

24   If you could accept on behalf of the company why can you not

25   accept on behalf of the individuals who are affiliated with

H2EAAFAS2                    Conference

1    certain of those companies?

2            MS. RUDZIN:  I don't think that I have an obligation

3    to accept service on behalf of individual employees or

4    controlling shareholders of corporations.  I think that

5    there's -- and it's the corporate forum and generally the Court

6    respects it.  I'm not going to stand up here and representative

7    I've never spoken to any of these people.

8            THE COURT:  I'd rather you not speak falsely to me.

9    That is fine.

10           Let me ask the question a little bit differently.

11   Recognizing that the corporate forum is a thing to be respected

12   as is the Hague Convention, may I ask you, is Mr. Lieberman

13   correct to the best of your knowledge that the individuals as

14   to whom he seeks service have some awareness of this

15   litigation?

16           MS. RUDZIN:  I can say that I'm sure about the top

17   couple people, the first people.

18           THE COURT:  Mr. Li, Ms. Yuyu?

19           MS. RUDZIN:  Yes.  I don't actually know about the

20   others.  I think some of these were directors of the company

21   before it went private.  So, they are not affiliated with the

22   company at all now.  So I don't think -- I don't actually now.

23   I think it's sort of funny that Mr. Lieberman says that

24   publication somehow gave them notice in the China.  So, I don't

25   know.

1          THE COURT:  They may have a Google newsletter.  I do

2     know.  Did I misperceive what you were saying earlier?  If per

3     chance this case were to find its way in the Cayman Islands,

4     are you telling me these folks, some of whom you don't

5     represent, are all going to be onboard for being defendants in

6     the Cayman Islands?

7          MS. RUDZIN:  No.

8          THE COURT:  I want to understand a little bit more

9     than what you meant to say to me earlier.

10          MS. RUDZIN:  Yes.  I'm sorry.  I was speaking about

11     the defendants here could all be served in Caymans.  I don't

12     know if the Caymans has a procedure like most U.S. states have

13     where executives of a corporation incorporated there can be

14     served in that jurisdiction.  I just don't know off the top of

15     my head.

16          THE COURT:  What you were saying to me is the various

17     entities who have appeared here can appear there?

18          MS. RUDZIN:  Yes.

19          THE COURT:  But there weren't service issues as to

20     them, the service issue as everybody else.  I don't think you

21     meant to but I think you gave me a false impression because I

22     thought that that mattered.  If it turns out they are in the

23     same pickle service-wise if this case is in the Cayman Islands

24     as it is here, they've advanced nothing.  That's not a basis

25     for them to accede to your desire to have it transferred to the

1  Cayman Island.

2            MS. RUDZIN:  That's fair enough.  Sorry if I gave that

3  you false impression.  I think I was just thinking in my head.

4  Ordinarily, I don't know Cayman Islands law but ordinarily you

5  can serve the directors and executives in the state where it's

6  incorporated.  Usually, there's a state statue that says if you

7  agreed to be the director of that Delaware company you agreed

8  to be subject to service on -- I don't know if it's in the

9  Cayman.

10            THE COURT:  All right.  Mr. Lieberman, I have

11  conferences like this for two reasons.  One of them is to see

12  whether if and as appropriate I can persuade a party.  I

13  suspect I'm not going to be able to do that here.  So, the next

14  question is given the motion that is contemplated, does your

15  client want an opportunity to replead anything?  This is not a

16  12(b)(6) motion where those things are much more common.  It

17  would be a different basis.  But I did want to give you the

18  opportunity for your clients to replead if you wished them to

19  do so.

20            MR. LIEBERMAN:  As to the bases that have been set

21  forth in her motion, at this point, I don't have -- I'm not

22  looking to replead.

23            I will note something though that we are contemplating

24  however, which is that form non convenience motions usually do

25  involve some limited discovery into the context with the state.

1    Just from looking at some of the -- even, and there have been

2    several cases where there's been a stay.  It's not a PSLRA stay

3    but the Court issued stay based on ordinary factors that

4    usually go into it and courts have lifted the stay for that

5    limited reason.  It's possible based on what is ultimately put

6    in the pleadings that we may ask for some very limited

7    discovery into the context that people have with the United

8    States and New York in particular and I'll give you an example.

9            We, in going through some the Dangdang public filings

10   but we have to go back to 2010 when we first did the ADR

11   listing, we found a head in underwriting agreement.  And in the

12   underwriting agreement with New York banks they said that they

13   submit to the non exclusive jurisdiction of federal and state

14   courts Dangdang said, as well as the telling --

15           THE COURT:  This is in your letter to me, sir?

16           MR. LIEBERMAN:  Yes.  So they waived form nonissues

17   the Cohen entity and the Dang entity.  They waived form

18   nonissues and they agreed to the New York form or disputes

19   under the underwriting agreement.

20           As to the ADR depository agreement with the Bank of

21   New York Mellon, they had a similar choice of law and choice of

22   forum provision.  And in the merger agreement itself there is a

23   choice of law provision that actually chooses both New York law

24   and Cayman law.  They sort of carve out.  For the laws I like

25   I'm going to choose New York Law and for the laws I don't like

1    in the U.S. I am going to choose Cayman law.

2            THE COURT:  But all parties to the agreement agreed to

3    that, do they not?

4            MR. LIEBERMAN:  All parties to the agreement did agree

5    yes.  And my point about the agreement was, you know it was

6    sauce for the goose when it suited their purposes and now here

7    accountability is coming and now they are saying "no", New York

8    is very inconvenient.  It's the worst place we could be.  So we

9    may want to look for other instances of that to supplement on

10   point.  And there have been cases where a stay has been

11   involved and I really don't know without having more beyond the

12   motion.

13           THE COURT:  Slow down, sir.

14           MR. LIEBERMAN:  I've seen the Holtzman case by judge

15   Nathan.  And as your Honor pointed out, there are some

16   differences including that was solely Cayman claims.  In that

17   case it was also a citizen of Ohio in that case.  And you know

18   I've seen that but I haven't seen all authority.  They are

19   going to put forward or all factors.

20           And I would draw the Court's attention to -- I mean,

21   there was a case Base Metal Trading SA v. Russian Aluminum,

22   2002 WL 987 257, was an instance where the Southern District of

23   New York and Magistrate Judge Maas, albeit, authorized some

24   limited discovery despite having a previously instituted stay.

25   So, there may be some requests for a limited discovery.

1            I understand the PSLRA standards there.  However, we

2    believe that it's a little hard to read into the future.  We

3    would make such a motion if we felt that the circumstances were

4    met and they were presented squarely by the motion.  So that's

5    one issue that could come up.

6            THE COURT:  But how does that impact the schedule that

7    I may be setting regarding the briefing of this motion?  Did I

8    understand that you were asking for 45 days to respond?

9            MR. LIEBERMAN:  It's what the party agreed on.

10            THE COURT:  So the answer is "yes"?

11            MR. LIEBERMAN:  The answer is "yes" in the first

12    instance, yes.  And that is what we're asking for.  There are

13    27 days for reply.

14            THE COURT:  Yeah, I know.  I wasn't thrilled with that

15    either.  Is it your contemplation, sir, that any of the

16    discovery that you've just been suggesting to me might be

17    necessary would be done in that 45 day period?

18            MR. LIEBERMAN:  I think it may.  I mean, look, we'll

19    with we'll be able to get our discovery requests out within

20    five business days, OK?  We'll able to get maybe even four.

21    We'll know what we need upon reading the motion.  Ms. Rudzin is

22    a capable counsel who writes clearly and so we'll know pretty

23    clearly what we are going to need if we need it and then

24    there's a question of how quickly we can get anything back.

25            Look, I'm not looking to do any of the blunder bus or

full-scale discovery into the underlying merits.  It would just
be as to the context because there are some people for whom
some of these entities where we could find out more.  These are
entities that are setup.  One is BDI.  One is in Cayman.  And
what you often find is that one way or another there are some
major dealings with major financial centers.  So, it is
possible that there could be some discovery that's appropriate
in response to your motion

          THE COURT:  All right.  The things that you were just
talking to me about sounded like you were able to access them
through repository republic documents and you didn't need to
actually reach out to --

          MR. LIEBERMAN:  As to the Dang Corporation which is
the main company, I think there is much that I'm able to get
from public filings because they haven't been public filings
since 2010.

          Dang's parent, as well as the Cohen entity and the
Signs and Culture Limited, that can be an issue.

          And if other defendants come in and make similar
motions, that could be an issue because one of the special --
she mentioned opposing -- counsel mentioned the special,
certain special committee members.  There are three defendants
who are former directors who are on the special committee that
vetted deal in a purportedly independent fashion.  One of them
is, her name is Ruby Wang Lu.  And Ms. Lu is currently a

1    director of Yum Brands China Holding Limited which has its

2    principle place of business in Plano, Texas and which also has

3    an agent or service of process that's in Delaware.  And so we

4    already actually have dropped off the service with her there

5    because she's actively conducting business in the United

6    States.

7              And so should Ms. Lu appear at some point and argue

8    forum non we'll point out that she worked at Goldman Sacks in

9    the United States.  She went to John Johns Hopkins.  She sat on

10   the boards of at least four companies that are listed in the

11   United States.  And those are the sorts of things that I think

12   put a little flesh on the bones of what we're trying to say

13   that it's reasonable and to expect that one who deals that much

14   with the United States would be hailed into court here even as

15   a matter of discretion under the forum non convenience.

16             THE COURT:  OK.  Thank you.

17             Ms. Rudzin, your letter is the one that contains the

18   schedule.  You are probably perceiving I am not thrilled with

19   the schedule but I am at base a reasonable judge.  I will

20   listen to reason as to why 45 days and 27 days are needed.

21             MS. RUDZIN:  OK.  Well, I am going to ask you to be a

22   little more reasonable first because we said we were going to

23   file in five days.

24             THE COURT:  I thought it was five days after

25   plaintiff's counsel being appointed lead counsel.  Remember,

1    that's what you are telling me.

2              MS. RUDZIN:  That's fine.  I'm sorry.  I was thinking

3    five days as I mentioned, we're going to be putting in a

4    declaration from the Cayman law expert and we just with

5    schedules and stuff, I just didn't want to have to do it early

6    next week but if we're talking about March 8, that's fine.

7              THE COURT:  Is that not what you suggested to me in

8    your letter of January 27?  I'm looking at page two and look,

9    it's been a very long day for me.  I've had a trial and I may

10   be misreading but I thought it was five days of -- oh, I see.

11             MS. RUDZIN:  I wasn't sure how the earlier discussion

12   we started with interacted with this.

13             THE COURT:  Where is the "or"?  Then five days later

14   of plaintiff counsel -- and defendant being granted permission

15   to file their motion to dismiss on forum non convenience

16   grounds.  Should is that have been an "or"?

17             MS. RUDZIN:  Yes.

18             THE COURT:  Then I feel so much better.  As much as I

19   want the efficient administration you justice, I also want to

20   have a little more time before plaintiff's counsel renews their

21   application for service on a substitute or alternate basis.

22   So, let's make it five days after plaintiff's counsel is

23   appointed lead counsel if that is indeed what happens and we

24   expect it will.

25             And then let's talk to me about the 45 days and the 27

H2EAAFAS2                    Conference

1    days and maybe it's scheduling of parties long planned

2    vacations who knows but --

3            MS. RUDZIN:  Your Honor, Mr. Lieberman asked for 45

4    days and I said "OK".

5            THE COURT:  But then you asked for 27?

6            MS. RUDZIN:  Yes, because originally I proposed 30 and

7    20 and when he said 45, I said give me a little more.  It was

8    just negotiations.  I'm not wedded to either number.

9            THE COURT:  You can be wedded but is not 27 kind of a

10   random number?

11           MS. RUDZIN:  Yes, because it was a little back and

12   forth.

13           THE COURT:  Charming.  OK.

14           Mr. Lieberman, talk to me about the 45 days.

15           MR. LIEBERMAN:  Your Honor, I think where 45 days came

16   from is that we weren't sure when the later of the two dates

17   with the five days would come up and I was operating without

18   knowing exactly when I would be briefing it.  So, I just wasn't

19   sure.

20           I have another matter that is going to summary

21   judgment with cross motions for summary judgment in March so it

22   was a protected matter.

23           Also, somewhere in there is the Jewish holiday of

24   Passover which is going to be I think on the 11th through the

25   19th.  It's something which impacts all three of us and maybe

1   Ms. Rudzin as well and so I was just thinking of that that may

2   get involved there.  And so maybe when you net out the time I

3   might be spending on another motion and the holiday, that would

4   come close to 30 days.

5          THE COURT:  OK.  So let's start with this.  If the

6   filing day for their motion which I will not be able to

7   persuade her not to file even though you should see my

8   skepticism.  I'm not completely, if I thought it had no chance

9   I would be honest with you and tell you had it had no chance.

10  I don't see that.  I'm just skeptical as I'm allowed to be.

11  It's going to be sometime on or about the 13th of March if that

12  is even a weekday.  I am going to make it March 15th as the

13  opening the date for the opening brief.

14         Counsel, tell me and be honest, do you need the 45

15  days?  Do you need 30 days?  Do you need something between

16  that?

17         MR. LIEBERMAN:  I think I am going to say, I am going

18  to ask for the 45 for this reason, for the days we were just

19  talking about the right -- look, you can make an argument that

20  all the real briefing gets done within a certain time period

21  and part of the core time period could be right when Passover

22  begins.  I could tell you that could be something that impacts

23  me.  I think Passover starts on the 11th and that the days that

24  are involved I observe it in a way in which I don't write or

25  come to the office on the 11th or the 12th.  So that would be

H2EAAFAS2                    Conference

1    two prime days.  So I would ask for the time and then it is an

2    eight-day festival, admittedly, with four days that have the

3    primary restrictions on me.  So I would still ask for 45.

4              THE COURT:  OK.  Wow.  You could have just said, yes,

5    I need more time.

6              All right.  March 15th is the day for the opening

7    brief, April 28 for the opposition, May 17 for the reply.

8              Does that work for both sides?

9              MS. RUDZIN:  Yes, thank you.

10             MR. LIEBERMAN:  Yes, your Honor.

11             THE COURT:  OK.  Mr. Lieberman, because you are

12   standing, could you please arrange to get a transcript of this

13   conference.  Just order it in the ordinary course because by

14   the time all briefing is done I'll turn back to it and see what

15   it is we were talking about.

16             MR. LIEBERMAN:  Yes, your Honor.

17             THE COURT:  Also, sir, is there anything we should be

18   discussing this afternoon?

19             MR. HUTMAN:  Your Honor, may we have one moment?

20             THE COURT:  Ms. Rudzin, is there anything else we

21   should be talking about today?

22             MS. RUDZIN:  No.  I'm good.  Thank you.

23             THE COURT:  All right.  Thank you very much.

24             (Pause)

25             MR. LIEBERMAN:  Your Honor, I guess the one thing I'd

H2EAAFAS2                    Conference

1   like to ask your preferences on are, we have the schedule set

2   for the motion.  We also talked today about motion for

3   substitute of service.  How would you like that to be

4   integrated into this, if at all?

5              THE COURT:  You can add something that's not too long

6   to your April 28 briefing if by April 28 nothing has happened.

7              MR. LIEBERMAN:  Correct.

8              THE COURT:  I don't think you are going to need more

9   than about five or six pages to tell me why because there just

10  aren't that many.  I don't think it's an extensive body of law

11  and then it can be responded to and if counsel wishes to

12  respond to it or not.

13             MR. LIEBERMAN:  All right.  And so --

14             THE COURT:  That means you have 30 pages rather than

15  25.  So, 25, 30, 10.

16             MS. RUDZIN:  15.

17             THE COURT:  Fine.  Fine.  OK.  All resolved.

18             MR. LIEBERMAN:  All resolve.

19             THE COURT:  Mr. Hutman gets to talk next time.  If

20  he's here, he gets to speak.  You know that, right?  They

21  didn't bring many O'Melveny minions to talk but he gets to

22  speak next time.

23             Thank you all very much for your patience.  Have a

24  great afternoon.

25                         (Adjourned)