# EXHIBIT 3

EX-99.(A)(1) 2 v442417_ex99a1.htm EXHIBIT (A)-(1)

Exhibit (a)-(1)

**E-Commerce China Dangdang Inc.**

_____, 2016

Shareholders of E-Commerce China Dangdang Inc.

Re: Notice of Extraordinary General Meeting of Shareholders

      You are cordially invited to attend an extraordinary general meeting of shareholders of E-Commerce China Dangdang Inc. (the "Company") to be held on _____, 2016 at [10:00 a.m.] (Beijing Time). The meeting will be held at the Company's office at 21/F, Jing An Center, No. 8 North Third Ring Road East, Chaoyang District, Beijing 100028, People's Republic of China. The attached notice of the extraordinary general meeting and proxy statement provide information regarding the matters to be considered and voted on at the extraordinary general meeting, including at any adjournment thereof.

      On May 28, 2016, the Company entered into an agreement and plan of merger (the "merger agreement") with Dangdang Holding Company Limited, an exempted company with limited liability incorporated under the laws of the Cayman Islands ("Parent"), and Dangdang Merger Company Limited, an exempted company with limited liability incorporated under the laws of the Cayman Islands ("Merger Sub"), pursuant to which Merger Sub will be merged with and into the Company and cease to exist, with the Company continuing as the surviving company (the "surviving company") and becoming a wholly owned subsidiary of Parent (the "merger"). At the extraordinary general meeting, you will be asked to consider and vote upon a proposal to authorize and approve the merger agreement, the plan of merger required to be filed with the Registrar of Companies of the Cayman Islands in connection with the merger (the "plan of merger"), and the transactions contemplated by the merger agreement, including the merger. Copies of the merger agreement and the plan of merger are attached as Annex A to the accompanying proxy statement.

      Each of Parent and Merger Sub is a Cayman Islands exempted company formed solely for purposes of the merger. Parent, at the effective time of the merger, will be beneficially owned by Ms. Peggy Yu Yu, co-founder and executive chairwoman of the board of directors of the Company (the "Board") ("Ms. Yu"); Mr. Guoqing Li, co-founder, a director and chief executive officer of the Company ("Mr. Li"); Dangdang Corporation, a business company with limited liability incorporated under the laws of the British Virgin Islands (the "BVI") ("Holdco") that is ultimately beneficially owned by Ms. Yu and Mr. Li; Kewen Holding Co. Limited, a business company with limited liability incorporated under the laws of the BVI ("Kewen"); Science & Culture International Limited, a business company with limited liability incorporated under the laws of the BVI ("SC International"); First Profit Management Limited, a business company with limited liability incorporated under the laws of the BVI ("First Profit"); Mr. Danqian Yao, senior vice president of the Company ("Mr. Yao"); Mr. Lijun Chen, vice president of the Company ("Mr. Chen"); Mr. Min Kan, vice president of the Company ("Mr. Kan"); and Mr. Junjie He ("Mr. He"), an individual unaffiliated with the Company. Ms. Yu, Mr. Li, Kewen and SC International are collectively referred to as the "Supporting Shareholders". The Supporting Shareholders, First Profit, Mr. Yao, Mr. Chen and Mr. Kan are collectively referred to as the "Rollover Shareholders". Holdco, Parent, Merger Sub and the Rollover Shareholders are collectively referred to as the "Buyer Group".

      As of the date of this proxy statement, the Buyer Group beneficially owns, in the aggregate approximately 35.3% of the total issued and outstanding Class A common shares and Class B common shares of the Company, par value $0.0001 per share (each, a "Share"), including Class A common shares represented by ADSs (as defined below), representing approximately 83.6% of the total number of votes represented by the issued and outstanding Shares. Because the Buyer Group beneficially owns approximately 35.3% of the total issued and outstanding Shares, representing approximately 83.6% of the total number of votes represented by the issued and outstanding Shares, both quorum and an affirmative vote in favor of the transaction are assured with the Buyer Group's vote. If the merger is completed, the Company will continue its operations as a privately-held company and will be beneficially owned by the Buyer Group and Mr. He and, as a result of the merger, the American depository shares, each of which represents five Class A common shares of the Company (the "ADSs"), will no longer be listed on The New York Stock Exchange (the "NYSE") and the American depositary shares program for the ADSs will terminate.

1

Under the terms and conditions of the merger agreement, if the merger is completed, at the effective time of the merger (the "Effective Time"), each Share issued and outstanding immediately prior to the Effective Time, other than (a) 136,477,925 Shares, consisting of 3,135,840 Class A common shares and 13,000,000 Class B common shares held by Ms. Yu, 1,185,000 Class A common shares represented by 237,000 ADSs held by Mr. Li, 21,876,660 Class B common shares held by Kewen, 97,000,000 Class B common shares held by SC International, 210,425 Class A common shares held by First Profit (including 164,000 Class A common shares beneficially owned by Mr. Yao and 46,425 Class A common shares beneficially owned by Mr. Chen, in each case, held of record by First Profit as nominee shareholder), and 70,000 Class A common shares represented by 14,000 ADSs held by Mr. Kan (collectively, the "Rollover Shares"), (b) Shares held by Parent, the Company or any of their subsidiaries, (c) Shares (including Class A common shares represented by ADSs) held by the ADS depositary (as defined below) and reserved for future issuance pursuant to the Company's Share Incentive Plans(as defined below) (Shares described under (a) through (c) above are collectively referred to herein as the "Excluded Shares"), (d) Shares owned by shareholders who have validly exercised and not effectively withdrawn or lost their rights to dissent under the CICL (the "Dissenting Shares"), and (e) Class A common shares represented by ADSs, will be cancelled in exchange for the right to receive $1.34 in cash per Share without interest and net of any applicable withholding tax. At the Effective Time, each ADS issued and outstanding immediately prior to the Effective Time, other than ADSs representing the Excluded Shares, will be cancelled in exchange for the right to receive $6.70 in cash per ADS without interest and net of any applicable withholding taxes (less up to $0.05 per ADS cancellation fees and up to $0.02 per ADS depositary services fees pursuant to the terms and conditions of the deposit agreement, dated December 7, 2010 between the Company and The Bank of New York Mellon (the "ADS depositary") and the holders and beneficial owners from time to time of ADSs issued thereunder, as may be amended from time to time (the "Deposit Agreement")). The Excluded Shares issued and outstanding immediately prior to the Effective Time will be cancelled for no consideration. The Dissenting Shares will be cancelled and each holder thereof will be entitled to receive only the payment of the fair value of such Dissenting Shares in accordance with the CICL.

In addition, at the Effective Time, the Company will terminate the Company's 2004 Share Incentive Plan and 2010 Share Incentive Plan, and all amendments and modifications thereto (collectively, the "Share Incentive Plans"), terminate all relevant award agreements applicable to the Share Incentive Plans, and cancel all options to purchase Shares granted under the Company's Share Incentive Plans (the "Company Options") that are outstanding and unexercised, whether or not vested or exercisable.

At the Effective Time, each vested Company Option that remains outstanding immediately prior to the Effective Time will be cancelled in exchange for the right to receive from the surviving company or one of its subsidiaries, as soon as practicable after the Effective Time, cash in the amount equal to the product of (a) the number of Shares underlying such Company Option multiplied by (b) the excess, if any, of $1.34 over the exercise price payable per Share of such Company Option. If the exercise price per Share of any such Company Option is equal to or greater than $1.34, such Company Option will be cancelled for no consideration. At the Effective Time, each unvested Company Option will be cancelled for no consideration.

The Company and the Buyer Group estimate that the total amount of funds necessary to complete the transactions contemplated by the merger agreement, including the merger, is approximately $_____ million (assuming no exercise of dissenter rights by shareholders of the Company). In calculating this amount, the Company and the Buyer Group did not consider the value of the Excluded Shares, which will be cancelled for no consideration in the merger. The Buyer Group expects to fund the transactions contemplated by the merger agreement, including the merger, through a combination of (i) rollover financing from the Rollover Shareholders of 136,477,925 Shares (including Class A common shares represented by ADSs), (ii) the proceeds from a committed loan facility in an amount of up to $164 million, which is agreed to be arranged by Bank of China Limited, Shanghai Pudong Development Zone Sub-Branch, pursuant to a debt commitment letter, (iii) cash contributions provided by First Profit and Mr. He in the aggregate amount of $15.25 million, pursuant to two equity commitment letters, and (iv) available cash of the Company and its subsidiaries.

2

The special committee of the Board, consisting of three independent directors who are unaffiliated with any member of the Buyer Group or the management of the Company, Ms. Ruby Rong Lu, Mr. Ke Zhang and Mr. Xiaolong Li (the "Special Committee") reviewed and considered the terms and conditions of the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger. On May 28, 2016, the Special Committee unanimously (a) determined that it was fair (both substantively and procedurally) to and in the best interests of the Company's security holders unaffiliated to the Buyer Group (the "unaffiliated security holders"), and declared it advisable, to enter into the merger agreement and the other documents in connection with the merger, including, without limitation, the plan of merger (the "transaction agreements") , (b) recommended that the Board authorize and approve the execution, delivery and performance of the merger agreement and the transaction agreements and the consummation of the transactions contemplated thereby, including the merger, (c) recommended that the Board direct that the authorization and approval of the merger agreement, the plan of merger and the consummation of the transactions contemplated thereby, including the merger, be submitted to a vote at an extraordinary general meeting of shareholders of the Company with the recommendation of the Board that the shareholders of the Company authorize and approve by way of a special resolution the merger agreement, the plan of merger and the consummation of the transactions contemplated thereby, including the merger, and (d) recommended that the Board call an extraordinary general meeting of shareholders of the Company for the purpose of the shareholders authorizing and approving by way of special resolution the merger agreement, the plan of merger and the consummation of the transactions contemplated thereby, including the merger, the date, time and place of which shall be determined by the Special Committee.

On May 28, 2016, the Board (other than Ms. Yu and Mr. Li, members of the Buyer Group, who did not attend, participate in or vote upon matters discussed during the Board meeting, due to their interests in the proposed transaction), acting upon the unanimous recommendation of the Special Committee, (a) determined that it was fair (both substantively and procedurally) to and in the best interests of the unaffiliated security holders, and declared it advisable, to enter into the merger agreement and the transaction agreements, (b) authorized and approved the execution, delivery and performance of the merger agreement and the transaction agreements and the consummation of the transactions contemplated thereby, including the merger, and (c) resolved to direct that the authorization and approval of the merger agreement, the plan of merger and the consummation of the transactions contemplated thereby, including the merger, be submitted to a vote at an extraordinary general meeting of shareholders of the Company with the recommendation of the Board that the shareholders of the Company authorize and approve by way of a special resolution the merger agreement, the plan of merger and the consummation of the transactions contemplated thereby, including the merger.

**After careful consideration and upon the unanimous recommendation of the Special Committee composed solely of directors unrelated to any of the management members of the Company or any member of the Buyer Group, the Board (other than Ms. Yu and Mr. Li, members of the Buyer Group, who did not attend, participate in or vote upon matters discussed during the Board meeting, due to their interests in the proposed transaction) authorized and approved the execution, delivery and performance of the merger agreement and the transaction agreements and the consummation of the transactions contemplated thereby, including the merger, and recommends that you vote FOR the proposal to authorize and approve the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger, the amendment of the authorised share capital of the Company from $100,000 divided into 548,955,840 Class A common shares and 451,044,160 Class B common shares of a par value $0.0001 per share to $100,000 divided into 1,000,000,000 shares with a par value of $0.0001 each and the amendment and restatement of the existing memorandum and articles of association of the Company by their deletion in their entirety and the substitution in their place of a new memorandum and articles of association at the Effective Time, a copy of which is attached as Annex B to the plan of merger, FOR the proposal to authorize each of the members of the Special Committee to do all things necessary to give effect to the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger, and FOR the proposal to adjourn the extraordinary general meeting in order to allow the Company to solicit additional proxies in the event that there are insufficient proxies received at the time of the extraordinary general meeting to pass the special resolutions to be proposed at the extraordinary general meeting.**

The accompanying proxy statement provides detailed information about the merger and the extraordinary general meeting. We encourage you to read the entire document and all of the attachments and other documents referred to or incorporated by reference herein carefully. You may also obtain more information about the Company from documents the Company has filed with the United States Securities and Exchange Commission, (referred to herein as the "SEC"), which are available for free at the SEC's website www.sec.gov.

3

Regardless of the number of Shares you own, your vote is very important. In order for the merger to be completed, the merger agreement, the plan of merger and the transactions contemplated under the merger agreement, including the merger, must be authorized and approved by a special resolution (as defined in the Cayman Islands Companies Law) of the Company's shareholders, which requires an affirmative vote of shareholders representing at least two-thirds of the voting rights of the Shares present and voting in person or by proxy as a single class at the extraordinary general meeting. In considering the recommendation of the Special Committee and the Board, you should be aware that some of the Company's directors or executive officers have interests in the merger that are different from, or in addition to, the interests of the shareholders generally. As of the date of this proxy statement, the Buyer Group beneficially owns approximately 35.3% of the total issued and outstanding Shares, representing approximately 83.6% of the total number of votes represented by the issued and outstanding Shares. Whether or not you plan to attend the extraordinary general meeting, please complete the enclosed proxy card, in accordance with the instructions set forth on your proxy card, as promptly as possible. The deadline to lodge your proxy card is _____, 2016 at _____ a.m. (Beijing Time). Each shareholder has one vote for each Class A common share and ten votes for each Class B common share held as of the close of business in the Cayman Islands on _____, 2016.

Voting at the extraordinary general meeting will take place by poll voting, as the chairman of the Board has undertaken to demand poll voting at the meeting.

As the registered holder of the Class A common shares represented by ADSs, the ADS depositary will endeavor to vote (or will endeavor to cause the vote of) the Shares it holds on deposit at the extraordinary general meeting in accordance with the voting instructions, the form of which is attached as Annex F to the accompanying proxy statement, timely received from holders of ADSs at the close of business in New York City on _____, 2016, the ADS record date. The ADS depositary must receive such instructions no later than 5:00 p.m. (New York City Time) on _____, 2016. If the ADS depositary timely receives voting instructions from an ADS holder which fail to specify the manner in which the ADS depositary is to vote the Shares represented by the holder's ADSs, or if an ADS holder does not timely deliver specific voting instructions to the ADS depositary, the corresponding number of Shares will not be voted.

Holders of ADSs will not be able to attend the extraordinary general meeting unless they cancel their ADSs and become registered in the Company's register of members as the holders of Shares prior to the close of business in the Cayman Islands on _____, 2016, the Share record date. ADS holders who wish to cancel their ADSs need to make arrangements to deliver the ADSs to the ADS depositary for cancellation before the close of business in New York City on _____, 2016 together with (a) delivery instructions for the corresponding Shares (name and address of the person who will be the registered holder of the Shares), (b) payment of the ADS cancellation fees (up to $5.00 per 100 ADSs (or portion thereof) to be cancelled pursuant to the terms of the Deposit Agreement), up to $0.02 per ADS depositary services fees and any applicable taxes, and (c) a certification that the ADS holder either (i) held the ADSs as of the applicable ADS record date for the extraordinary general meeting and has not given, and will not give, voting instructions to the ADS depositary as to the ADSs being cancelled, or has given voting instructions to the ADS depositary as to the ADSs being cancelled but undertakes not to vote the corresponding Shares at the extraordinary general meeting, or (ii) did not hold the ADSs as of the applicable ADS record date for the extraordinary general meeting and undertakes not to vote the corresponding Shares at the extraordinary general meeting. If you hold your ADSs in a brokerage, bank or nominee account, please contact your broker, bank or other nominee to find out what actions you need to take to instruct the broker, bank or other nominee to cancel the ADSs on your behalf. Upon cancellation of the ADSs, the ADS depositary will arrange for the principal Hong Kong office of The Hongkong and Shanghai Banking Corporation Limited, the custodian holding the Shares, to transfer registration of the Shares to the former ADS holder (or a person designated by the former ADS holder). If after the registration of Shares in your name you wish to receive a certificate evidencing the Shares registered in your name, you will need to request the Cayman registrar of the Shares, to issue and mail a certificate to your attention. If the merger is not completed, the Company would continue to be a public company in the U.S. and the ADSs would continue to be listed on the NYSE. The Company's Shares are not listed and cannot be traded on any stock exchange other than the NYSE, and in such case only in the form of ADSs. As a result, if you have cancelled your ADSs to attend the extraordinary general meeting and the merger is not completed and you wish to be able to sell your Shares on a stock exchange, you would need to deposit your Shares into the Company's American depositary shares program for the issuance of the corresponding number of ADSs, subject to the terms and conditions of applicable law and the Deposit Agreement, including, among other things, payment of relevant fees of the ADS depositary for the issuance of ADSs (up to $5.00 per 100 ADSs (or portion thereof) issued) and any applicable stock transfer taxes (if any) and related charges pursuant to the Deposit Agreement.

---

4

Completing the proxy card in accordance with the instructions set forth on the proxy card will not deprive you of your right to attend the extraordinary general meeting and vote your Shares in person. Please note, however, that if your Shares are held of record by a broker, bank or other nominee and you wish to vote at the extraordinary general meeting in person, you must obtain from the registered holder a proxy issued in your name. If you submit a signed proxy card without indicating how you wish to vote, the Shares represented by your proxy card will be voted FOR the resolution to authorize and approve the merger agreement, the plan of merger, and the transactions contemplated by the merger agreement, including the merger, the amendment of the authorised share capital of the Company from $100,000 divided into 548,955,840 Class A common shares and 451,044,160 Class B common shares of a par value $0.0001 per share to $100,000 divided into 1,000,000,000 shares with a par value of $0.0001 each and the amendment and restatement of the existing memorandum and articles of association of the Company by their deletion in their entirety and the substitution in their place of a new memorandum and articles of association at the Effective Time, a copy of which is attached as Annex B to the plan of merger, FOR the resolution to authorize each of the members of the Special Committee to do all things necessary to give effect to the merger agreement, the plan of merger, and the transactions contemplated by the merger agreement, including the merger, and FOR the resolution to adjourn the extraordinary general meeting in order to allow the Company to solicit additional proxies in the event that there are insufficient proxies received at the time of the extraordinary general meeting to pass the special resolutions to be proposed at the extraordinary general meeting, unless you appoint a person other than the chairman of the meeting as proxy, in which case the Shares represented by your proxy card will be voted (or not submitted for voting) as your proxy determines.

Shareholders who dissent from the merger will have the right to receive payment of the fair value of their Shares in accordance with Section 238 of the Cayman Islands Companies Law if the merger is completed, but only if they deliver to the Company, before the vote to authorize and approve the merger is taken at the extraordinary general meeting, a written objection to the merger and subsequently comply with all procedures and requirements of Section 238 of the Cayman Islands Companies Law for the exercise of dissenter rights, a copy of which is attached as Annex C to the accompanying proxy statement. The fair value of your Shares as determined under the Cayman Islands Companies Law could be more than, the same as, or less than the merger consideration you would receive pursuant to the merger agreement if you do not exercise dissenter rights with respect to your Shares.

**ADS HOLDERS WILL NOT HAVE THE RIGHT TO EXERCISE DISSENTER RIGHTS AND RECEIVE PAYMENT OF THE FAIR VALUE OF THE SHARES UNDERLYING THEIR ADSs. THE ADS DEPOSITARY WILL NOT EXERCISE OR ATTEMPT TO EXERCISE ANY DISSENTER RIGHTS WITH RESPECT TO ANY OF THE SHARES THAT IT HOLDS, EVEN IF AN ADS HOLDER REQUESTS THE ADS DEPOSITARY TO DO SO. ADS HOLDERS WISHING TO EXERCISE DISSENTER RIGHTS MUST SURRENDER THEIR ADSs TO THE ADS DEPOSITARY FOR CONVERSION INTO SHARES, PAY THE ADS DEPOSITARY'S FEES REQUIRED FOR THE CANCELLATION OF THEIR ADSs, PROVIDE INSTRUCTIONS FOR THE REGISTRATION OF THE CORRESPONDING SHARES IN THE COMPANY'S REGISTER OF MEMBERS, AND CERTIFY THAT THEY HELD THE ADSs AS OF THE ADS RECORD DATE AND HAVE NOT GIVEN, AND WILL NOT GIVE, VOTING INSTRUCTIONS AS TO THEIR ADSs BEFORE _____(NEW YORK CITY TIME) ON _____, 2016, AND BECOME REGISTERED HOLDERS OF SHARES BEFORE THE VOTE TO AUTHORIZE AND APPROVE THE MERGER IS TAKEN AT THE EXTRAORDINARY GENERAL MEETING (FOR THE AVOIDANCE OF DOUBT, ANY ADS HOLDERS WHO CONVERT THEIR ADSs INTO SHARES AFTER THE SHARE RECORD DATE WILL NOT BE ENTITLED TO ATTEND OR TO VOTE AT THE EXTRAORDINARY GENERAL MEETING, BUT WILL BE ENTITLED TO EXERCISE DISSENTER RIGHTS IF THEY BECOME REGISTERED HOLDERS OF SHARES BEFORE THE VOTE IS TAKEN AT THE EXTRAORDINARY GENERAL MEETING). AFTER CONVERTING THEIR ADSs AND BECOMING REGISTERED HOLDERS OF SHARES, SUCH FORMER ADS HOLDERS MUST ALSO COMPLY WITH THE PROCEDURES AND REQUIREMENTS FOR EXERCISING DISSENTER RIGHTS WITH RESPECT TO THE SHARES UNDER SECTION 238 OF THE CAYMAN ISLANDS COMPANIES LAW. IF THE MERGER IS NOT COMPLETED, THE COMPANY WOULD CONTINUE TO BE A PUBLIC COMPANY IN THE U.S. AND THE ADSs WOULD CONTINUE TO BE LISTED ON THE NYSE. THE COMPANY'S SHARES ARE NOT LISTED AND CANNOT BE TRADED ON ANY STOCK EXCHANGE OTHER THAN THE NYSE, AND IN SUCH CASE ONLY IN THE FORM OF ADSs. AS A RESULT, IF A FORMER ADS HOLDER HAS CANCELLED HIS, HER OR ITS ADSs TO EXERCISE DISSENTER RIGHTS AND THE MERGER IS NOT COMPLETED AND SUCH FORMER ADS HOLDER WISHES TO BE ABLE TO SELL HIS, HER OR ITS SHARES ON A STOCK EXCHANGE, SUCH FORMER ADS HOLDER WOULD NEED TO DEPOSIT HIS, HER OR ITS SHARES INTO THE COMPANY'S AMERICAN DEPOSITARY SHARES PROGRAM FOR THE ISSUANCE OF THE CORRESPONDING NUMBER OF ADSs. SUBJECT TO THE TERMS AND CONDITIONS OF APPLICABLE LAW AND THE DEPOSIT AGREEMENT, INCLUDING, AMONG OTHER THINGS, PAYMENT OF RELEVANT FEES OF THE ADS DEPOSITARY FOR THE ISSUANCE OF ADSs (UP TO $5.00 PER 100 ADSs (OR PORTION THEREOF) ISSUED) AND ANY APPLICABLE STOCK TRANSFER TAXES (IF ANY) AND RELATED CHARGES PURSUANT TO THE DEPOSIT AGREEMENT.**

5

Neither the SEC nor any state securities regulatory agency has approved or disapproved the merger, passed upon the merits or fairness of the merger or passed upon the adequacy or accuracy of the disclosure in this letter or in the accompanying notice of the extraordinary general meeting or proxy statement. Any representation to the contrary is a criminal offense.

If you have any questions or need assistance in voting your Shares or ADSs, please contact the Company's Investor Relations Department at +86-10 5799-2666, or by email at ir@dangdang.com.

Thank you for your cooperation and continued support.

Sincerely,                                                    Sincerely,


Ruby Rong Lu                                              Peggy Yu Yu
Chairperson of the Special Committee                      Chairwoman of the Board

The accompanying proxy statement is dated _____, 2016, and is first being mailed to the Company's shareholders and ADS holders on or about _____, 2016.

6

# E-COMMERCE CHINA DANGDANG INC.

## NOTICE OF EXTRAORDINARY GENERAL MEETING OF SHAREHOLDERS TO BE HELD ON _____, 2016

Dear Shareholder:

Notice is hereby given that an extraordinary general meeting of shareholders of E-Commerce China Dangdang Inc. (the "Company") to be held on _____, 2016 at [10:00 a.m.] (Beijing Time) at the Company's office at 21/F, Jing An Center, No. 8 North Third Ring Road East, Chaoyang District, Beijing 100028, People's Republic of China.

Only registered holders of Class A common shares and Class B common shares of the Company, par value $0.0001 per share, (each, a "Share"), at the close of business in the Cayman Islands on _____, 2016 or their proxy holders are entitled to attend or to vote at this extraordinary general meeting or any adjournment thereof. At the extraordinary general meeting, you will be asked to consider and vote upon the following resolutions:

- as special resolutions:

THAT the agreement and plan of merger, dated as of May 28, 2016 (the "merger agreement"), among the Company, Dangdang Holding Company Limited, an exempted company with limited liability incorporated under the laws of the Cayman Islands ("Parent") and Dangdang Merger Company Limited, an exempted company with limited liability incorporated under the laws of the Cayman Islands and a wholly owned subsidiary of Parent ("Merger Sub") (such merger agreement being in the form attached to the proxy statement accompanying this notice of extraordinary general meeting and which will be produced and made available for inspection at the extraordinary general meeting), the plan of merger (the "plan of merger") among the Company and Merger Sub required to be registered with the Registrar of Companies of the Cayman Islands for the purposes of the merger (such plan of merger being substantially in the form attached to the merger agreement and which will be produced and made available for inspection at the extraordinary general meeting), and the transactions contemplated by the merger agreement, including the merger (the "merger"), the amendment of the authorised share capital of the Company from $100,000 divided into 548,955,840 Class A common shares and 451,044,160 Class B common shares of a par value $0.0001 per share to $100,000 divided into 1,000,000,000 shares with a par value of $0.0001 each and the amendment and restatement of the existing memorandum and articles of association of the Company by their deletion in their entirety and the substitution in their place of a new memorandum and articles of association at the effective time of the merger, a copy of which is attached as Annex B to the plan of merger, be authorized and approved;

THAT each of the members of the Special Committee (as defined below) be authorized to do all things necessary to give effect to the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger; and

- if necessary, as an ordinary resolution:

THAT the extraordinary general meeting be adjourned in order to allow the Company to solicit additional proxies in the event that there are insufficient proxies received at the time of the extraordinary general meeting to pass the special resolutions to be proposed at the extraordinary general meeting.

Please refer to the accompanying proxy statement, which is attached to and made a part of this notice. A list of the Company's shareholders will be available at its principal executive offices at 21/F, Jing An Center, No. 8 North Third Ring Road East, Chaoyang District, Beijing 100028, People's Republic of China, during ordinary business hours for the two business days immediately prior to the extraordinary general meeting.

If you own American depositary shares, each of which represents five Class A common Shares of the Company (the "ADSs"), you cannot vote at the extraordinary general meeting directly, but you may instruct the ADS depositary (as the holder of the Shares underlying the ADSs) how to vote the Shares underlying your ADSs. The ADS depositary must receive such instructions no later than 5:00 p.m. (New York City Time) on _____, 2016 in order to vote the underlying Shares at the extraordinary general meeting. Alternatively, you may vote directly at the extraordinary general meeting if you surrender your ADSs to the ADS depositary, pay the ADS depositary's fees required for the cancellation of the ADSs (up to $5.00 per 100 ADSs (or portion thereof) to be cancelled pursuant to the terms of the ADS deposit agreement), up to $0.02 per ADS depositary services fees and any applicable taxes, provide instructions for the registration of the corresponding Shares, and certify that you have not given, and will not give, voting instructions as to the ADSs (or alternatively, you will not vote the Shares) before the close of business in New York City on _____, 2016, and become a registered holder of Shares by the close of business in the Cayman Islands no later than the Share record date. In addition, if you hold your ADSs through a securities intermediary such as a broker, you must rely on the procedures of the securities intermediary through which you hold your ADSs if you wish to vote at the extraordinary general meeting. Furthermore, if holders of ADSs do not timely deliver specific voting instructions to the ADS depositary, or if holders of ADSs do not timely deliver specific voting instructions to the ADS depositary, the corresponding number of Shares will not be voted.

1

      After careful consideration and upon the unanimous recommendation of the Special Committee composed solely of directors unrelated to any of the management members of the Company or any member of the Buyer Group, the Board (other than Ms. Yu and Mr. Li, members of the Buyer Group, who did not attend, participate in or vote upon matters discussed during the Board meeting, due to their interests in the proposed transaction) authorized and approved the execution, delivery and performance of the merger agreement and the transaction agreements and the consummation of the transactions contemplated thereby, including the merger, and recommends that you vote FOR the proposal to authorize and approve the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger, the amendment of the authorised share capital of the Company from $100,000 divided into 548,955,840 Class A common shares and 451,044,160 Class B common shares of a par value $0.0001 per share to $100,000 divided into 1,000,000,000 shares with a par value of $0.0001 each and the amendment and restatement of the existing memorandum and articles of association of the Company by their deletion in their entirety and the substitution in their place of a new memorandum and articles of association at the Effective Time, a copy of which is attached as Annex B to the plan of merger, FOR the proposal to authorize each of the members of the Special Committee to do all things necessary to give effect to the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger, and FOR the proposal to adjourn the extraordinary general meeting in order to allow the Company to solicit additional proxies in the event that there are insufficient proxies received at the time of the extraordinary general meeting to pass the special resolutions to be proposed at the extraordinary general meeting.

      In order for the merger to be completed, the merger agreement, the plan of merger and the transactions contemplated under the merger agreement, including the merger, must be authorized and approved by a special resolution (as defined in the Cayman Islands Companies Law) of the Company's shareholders, which requires an affirmative vote of shareholders representing at least two-thirds of the voting rights of the Shares present and voting in person or by proxy as a single class at the extraordinary general meeting.

      As of the date of this proxy statement, the Buyer Group beneficially owns approximately 35.3% of the total issued and outstanding Shares, representing approximately 83.6% of the total number of votes represented by the issued and outstanding Shares.

      Regardless of the number of Shares that you own, your vote is very important. Even if you plan to attend the extraordinary general meeting in person, we request that you submit your proxy in accordance with the instructions set forth on the proxy card, which is attached as Annex E to the accompanying proxy statement, as promptly as possible. To be valid, your proxy card must be completed, signed and returned to the Company's offices at 21/F, Jing An Center, No. 8 North Third Ring Road East, Chaoyang District, Beijing 100028, People's Republic of China, attention: Investor Relations Department or alternatively a copy of the completed and signed proxy card may be sent by email to ir@dangdang.com, in each case, so that the proxy card is received by the Company no later than _____, 2016 at ____ a.m. (Beijing Time) (being not less than forty-eight (48) hours before the time appointed for holding the meeting). The proxy card is the "instrument of proxy" and the "instrument appointing a proxy" as referred to in the Company's articles of association. Voting at the extraordinary general meeting will take place by poll voting, as the chairman of the Board has undertaken to demand poll voting at the meeting. Each holder has one vote for each Class A common share and ten votes for each Class B common share held as of the close of business in the Cayman Islands on _____, 2016. If you receive more than one proxy card because you own Shares that are registered in different names, please vote all of your Shares shown on each of your proxy cards in accordance with the instructions set forth on the proxy card.

      Completing the proxy card in accordance with the instructions set forth on the proxy card will not deprive you of your right to attend the extraordinary general meeting and vote your Shares in person. Please note, however, that if your Shares are registered in the name of a broker, bank or other nominee and you wish to vote at the extraordinary general meeting in person, you must obtain from the registered holder a proxy issued in your name.

2

If you abstain from voting, fail to cast your vote in person, fail to complete and return your proxy card in accordance with the instructions set forth on the proxy card, or fail to give voting instructions to your broker, dealer, commercial bank, trust company or other nominee, your vote will not be counted.

When proxies are properly dated, executed and returned by holders of Shares, the Shares they represent will be voted at the extraordinary general meeting in accordance with the instructions of the shareholders. If no specific instructions are given by such shareholders, such Shares will be voted FOR the proposals as described above, unless you appoint a person other than the chairman of the meeting as proxy, in which case the Shares represented by your proxy card will be voted (or not submitted for voting) as your proxy determines.

Shareholders who dissent from the merger will have the right to receive payment of the fair value of their Shares in accordance with Section 238 of the Cayman Islands Companies Law if the merger is consummated, but only if they deliver to the Company, before the vote to authorize and approve the merger is taken at the extraordinary general meeting, a written objection to the merger and subsequently comply with all procedures and requirements of Section 238 of the Cayman Islands Companies Law for the exercise of dissenter rights, a copy of which is attached as Annex C to the accompanying proxy statement. The fair value of their Shares as determined under the Cayman Islands Companies Law could be more than, the same as, or less than the merger consideration they would receive pursuant to the merger agreement if they do not exercise dissenter rights with respect to their Shares.

**ADS HOLDERS WILL NOT HAVE THE RIGHT TO EXERCISE DISSENTER RIGHTS AND RECEIVE PAYMENT OF THE FAIR VALUE OF THE SHARES UNDERLYING THEIR ADSs. THE ADS DEPOSITARY WILL NOT EXERCISE OR ATTEMPT TO EXERCISE ANY DISSENTER RIGHTS WITH RESPECT TO ANY OF THE SHARES THAT IT HOLDS, EVEN IF AN ADS HOLDER REQUESTS THE ADS DEPOSITARY TO DO SO. ADS HOLDERS WISHING TO EXERCISE DISSENTER RIGHTS MUST SURRENDER THEIR ADSs TO THE ADS DEPOSITARY FOR CONVERSION INTO SHARES, PAY THE ADS DEPOSITARY'S FEES REQUIRED FOR THE CANCELLATION OF THEIR ADSs, PROVIDE INSTRUCTIONS FOR THE REGISTRATION OF THE CORRESPONDING SHARES IN THE COMPANY'S REGISTER OF MEMBERS, AND CERTIFY THAT THEY HELD THE ADSs AS OF THE ADS RECORD DATE AND HAVE NOT GIVEN, AND WILL NOT GIVE, VOTING INSTRUCTIONS AS TO THEIR ADSs BEFORE _____ (NEW YORK CITY TIME) ON _____, 2016, AND BECOME REGISTERED HOLDERS OF SHARES BEFORE THE VOTE TO AUTHORIZE AND APPROVE THE MERGER IS TAKEN AT THE EXTRAORDINARY GENERAL MEETING (FOR THE AVOIDANCE OF DOUBT, ANY ADS HOLDERS WHO CONVERT THEIR ADSs INTO SHARES AFTER THE SHARE RECORD DATE WILL NOT BE ENTITLED TO ATTEND OR TO VOTE AT THE EXTRAORDINARY GENERAL MEETING, BUT WILL BE ENTITLED TO EXERCISE DISSENTER RIGHTS IF THEY BECOME REGISTERED HOLDERS OF SHARES BEFORE THE VOTE IS TAKEN AT THE EXTRAORDINARY GENERAL MEETING). AFTER CONVERTING THEIR ADSs AND BECOMING REGISTERED HOLDERS OF SHARES, SUCH FORMER ADS HOLDERS MUST ALSO COMPLY WITH THE PROCEDURES AND REQUIREMENTS FOR EXERCISING DISSENTER RIGHTS WITH RESPECT TO THE SHARES UNDER SECTION 238 OF THE CAYMAN ISLANDS COMPANIES LAW. IF THE MERGER IS NOT COMPLETED, THE COMPANY WOULD CONTINUE TO BE A PUBLIC COMPANY IN THE U.S. AND THE ADSs WOULD CONTINUE TO BE LISTED ON THE NEW YORK STOCK EXCHANGE. THE COMPANY'S SHARES ARE NOT LISTED AND CANNOT BE TRADED ON ANY STOCK EXCHANGE OTHER THAN THE NEW YORK STOCK EXCHANGE, AND IN SUCH CASE ONLY IN THE FORM OF ADSs. AS A RESULT, IF A FORMER ADS HOLDER HAS CANCELLED HIS, HER OR ITS ADSs TO EXERCISE DISSENTER RIGHTS AND THE MERGER IS NOT COMPLETED AND SUCH FORMER ADS HOLDER WISHES TO BE ABLE TO SELL HIS, HER OR ITS SHARES ON A STOCK EXCHANGE, SUCH FORMER ADS HOLDER WOULD NEED TO DEPOSIT HIS, HER OR ITS SHARES INTO THE COMPANY'S AMERICAN DEPOSITARY SHARES PROGRAM FOR THE ISSUANCE OF THE CORRESPONDING NUMBER OF ADSs, SUBJECT TO THE TERMS AND CONDITIONS OF APPLICABLE LAW AND THE ADS DEPOSIT AGREEMENT, INCLUDING, AMONG OTHER THINGS, PAYMENT OF RELEVANT FEES OF THE ADS DEPOSITARY FOR THE ISSUANCE OF ADSs (UP TO $5.00 PER 100 ADSs (OR PORTION THEREOF) ISSUED) AND ANY APPLICABLE STOCK TRANSFER TAXES (IF ANY) AND RELATED CHARGES PURSUANT TO THE ADS DEPOSIT AGREEMENT.**

3

PLEASE DO NOT SEND YOUR SHARE CERTIFICATES OR CERTIFICATES EVIDENCING YOUR ADSs ("ADRs") AT THIS TIME. IF THE MERGER IS CONSUMMATED, YOU WILL BE SENT INSTRUCTIONS REGARDING THE SURRENDER OF YOUR SHARE CERTIFICATES or ADRs.

If you have any questions or need assistance voting your Shares or ADSs, please contact the Company's Investor Relations Department at +86-10 5799-2666, or by email at ir@dangdang.com.

The merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger, are described in the accompanying proxy statement. A copy of the merger agreement and a copy of the plan of merger are included as Annex A to the accompanying proxy statement. We urge you to read the entire accompanying proxy statement carefully.

Notes:

1. Where there are joint holders of any Share any one of such joint holders may vote, either in person or by proxy, in respect of such Share as if he were solely entitled thereto, but if more than one of such joint holders be present at any meeting, the vote of the senior holder who tenders a vote, whether in person or by proxy, will be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority will be determined by the order in which the names stand in the register of members of the Company in respect of the joint holding.

2. The instrument appointing a proxy must be in writing under the hand of the appointer or of his attorney or other person duly authorized in writing or, if the appointer is a corporation, either under seal or under the hand of an officer or attorney or other person duly authorized to sign the same.

3. A proxy need not be a member (registered shareholder) of the Company.

4. The chairman of the extraordinary general meeting may in any event at his or her discretion direct that a proxy card shall be deemed to have been duly deposited. A proxy card that is not deposited in the manner permitted (that is, in accordance with the instructions set forth on the proxy card, which is attached as Annex E to the accompanying proxy statement, or which is otherwise directed by the chairman to be deemed to have been duly deposited) shall be invalid.

5. Votes given in accordance with the terms of a proxy card shall be valid notwithstanding the previous death or insanity of the principal or revocation of the proxy or of the authority under which the proxy was executed, or the transfer of the Share or Shares in respect of which the proxy is given, unless notice in writing of such death, insanity, revocation or transfer was received by the Company at the Company's offices at 21/F, Jing An Center, No. 8 North Third Ring Road East, Chaoyang District, Beijing 100028, People's Republic of China, attention: Investor Relations Department, no later than the commencement of the extraordinary general meeting, or adjourned meeting at which such proxy is used.

BY ORDER OF THE BOARD,

_____

Peggy Yu Yu
Chairwoman of the Board

4

https://www.sec.gov/Archives/edgar/data/1499744/000114420416108643/v442417_ex99a1.htm

**PROXY STATEMENT**
Dated _____, 2016

**SUMMARY VOTING INSTRUCTIONS**

**Ensure that your Shares or ADSs of E-Commerce China Dangdang Inc. can be voted at the extraordinary general meeting by submitting your proxy card or ADS voting instructions card, or by contacting your broker, bank or other nominee.**

*If your Shares are registered in the name of a broker, bank or other nominee*: check the voting instruction card forwarded by your broker, bank or other nominee to see which voting options are available or contact your broker, bank or other nominee in order to obtain directions as to how to ensure that your Shares are voted at the extraordinary general meeting.

*If your Shares are registered in your name*: submit your proxy as soon as possible by signing, dating and returning the accompanying proxy card in the enclosed postage-paid envelope, so that your Shares can be voted at the extraordinary general meeting.

If you submit your signed proxy card without indicating how you wish to vote, the Shares represented by your proxy will be voted in favor of the resolutions to be proposed at the extraordinary general meeting.

*If your ADSs are registered in the name of a broker, bank or other nominee:* check the ADS voting instructions card forwarded by your broker, bank or other nominee to see which voting options are available or contact your broker, bank or other nominee in order to obtain directions as to how to ensure that the Shares represented by your ADSs are voted at the extraordinary general meeting.

*If your ADSs are registered in your name:* submit your ADS voting instructions card as soon as possible by signing, dating and returning the enclosed ADS voting instructions card in the enclosed postage-paid envelope, so that the Shares represented by your ADSs can be voted at the extraordinary general meeting on behalf of the ADS depositary, as the registered holder of the Shares represented by your ADSs.

If you submit your ADS voting instructions card without indicating how you wish to vote, the Shares represented by your ADSs will not be voted.

*If you have any questions, require assistance with voting your proxy card, or need additional copies of proxy materials, please contact the Company's Investor Relations Department at +86-10 5799-2666, or by email at ir@dangdang.com.*

---

**TABLE OF CONTENTS**

| | Page |
|---|---|
| SUMMARY TERM SHEET | 1 |
| The Parties Involved in the Merger | 1 |
| The Merger | 3 |
| Merger Consideration | 3 |
| Treatment of Company Options | 4 |
| Record Dates and Voting | 4 |
| Shareholder Vote Required to Authorize and Approve the Merger Agreement and Plan of Merger | 4 |
| Voting Information | 5 |
| Dissenter Rights | 5 |
| Purposes and Effects of the Merger | 6 |
| Plans for the Company after the Merger | 6 |
| Recommendations of the Special Committee and the Board | 7 |
| Position of the Buyer Group as to the Fairness of the Merger | 8 |
| Financing of the Merger | 8 |
| Limited Guarantee | 8 |
| Support Agreement | 8 |
| Rollover Agreement | 8 |
| Share Ownership of the Company Directors and Executive Officers and Voting Commitments | 9 |
| Opinion of the Special Committee's Financial Advisor | 9 |
| Interests of the Company's Executive Officers and Directors in the Merger | 9 |
| Conditions to the Merger | 10 |
| No Solicitation | 11 |
| Termination of the Merger Agreement | 13 |
| Termination Fee | 14 |
| Material U.S. Federal Income Tax Consequences | 14 |
| Material PRC Income Tax Consequences | 15 |
| Material Cayman Islands Tax Consequences | 15 |
| Regulatory Matters | 15 |
| Accounting Treatment of the Merger | 15 |
| Market Price of the Shares | 15 |
| Fees and Expenses | 16 |
| Remedies | 16 |
| QUESTIONS AND ANSWERS ABOUT THE EXTRAORDINARY GENERAL MEETING AND THE MERGER | 17 |
| SPECIAL FACTORS | 25 |
| Background of the Merger | 25 |
| Reasons for the Merger and Recommendation of the Special Committee and the Board | 35 |
| Position of the Buyer Group as to the Fairness of the Merger | 41 |
| Certain Financial Projections | 44 |
| Opinion of the Special Committee's Financial Advisor | 47 |
| Buyer Group's Purpose of and Reasons for the Merger | 54 |
| Effect of the Merger on the Company | 55 |
| Effect of the Merger on the Company's Net Book Value and Net Earnings | 57 |
| Plans for the Company after the Merger | 58 |
| Alternatives to the Merger | 59 |
| Effects on the Company if the Merger is not Completed | 59 |
| Financing of the Merger | 60 |
| Limited Guarantee | 64 |
| Support Agreement | 64 |
| Rollover Agreement | 66 |
| Remedies | 67 |
| Interests of Certain Persons in the Merger | 67 |
| Related Party Transactions | 70 |
| Fees and Expenses | 71 |
| Voting by the Supporting Shareholders at the Extraordinary General Meeting | 71 |

| | |
|---|---|
| Litigation Related to the Merger | 71 |
| Accounting Treatment of the Merger | 71 |
| Regulatory Matters | 71 |
| Dissenters Rights | 72 |
| Material U.S. Federal Income Tax Consequences | 72 |
| Material PRC Income Tax Consequences | 74 |
| Material Cayman Islands Tax Consequences | 75 |
| MARKET PRICE OF THE ADSs, DIVIDENDS AND OTHER MATTERS | 76 |
| Market Price of the ADSs | 76 |
| Dividend Policy | 76 |
| THE EXTRAORDINARY GENERAL MEETING | 77 |
| Date, Time and Place of the Extraordinary General Meeting | 77 |
| Proposals to be Considered at the Extraordinary General Meeting | 77 |
| Our Board's Recommendation | 78 |
| Quorum | 78 |
| Record Dates; Shares and ADSs Entitled to Vote | 79 |
| Vote Required | 79 |
| Shareholders and ADS Holders Entitled to Vote; Voting Materials | 79 |
| Proxy Holders for Registered Shareholders | 80 |
| Voting of Proxies and Failure to Vote | 81 |
| Revocability of Proxies | 81 |
| Rights of Shareholders Who Object to the Merger | 81 |
| Whom to Call for Assistance | 82 |
| Solicitation of Proxies | 82 |
| Other Business | 82 |
| THE MERGER AGREEMENT AND PLAN OF MERGER | 83 |
| Structure and Completion of the Merger | 83 |
| Memorandum and Articles of Association; Directors and Executive Officers of the Surviving Company | 83 |
| Merger Consideration | 83 |
| Treatment of Company Options | 84 |
| Exchange Procedures | 84 |
| Representations and Warranties | 85 |
| Conduct of Business Pending the Merger | 88 |
| Shareholders' Meeting | 90 |
| No Solicitation | 90 |
| Directors' and Executive Officers' Indemnification and Insurance | 92 |
| Financing | 93 |
| Other Covenants | 94 |
| Conditions to the Merger | 94 |
| Termination of the Merger Agreement | 95 |
| Termination Fee | 97 |
| Remedies | 97 |
| Amendment | 98 |
| PROVISIONS FOR UNAFFILIATED SECURITY HOLDERS | 99 |
| DISSENTER RIGHTS | 100 |
| Requirements for Exercising Dissenter Rights | 100 |
| FINANCIAL INFORMATION | 102 |
| Ratio of Earnings to Fixed Charges | 103 |
| Net Book Value per Share of the Shares | 104 |
| TRANSACTIONS IN THE SHARES AND ADSs | 105 |
| Purchases by the Company | 105 |
| Purchases by the Buyer Group | 105 |
| Prior Public Offerings | 105 |
| Transactions in Prior 60 Days | 105 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT OF THE COMPANY | 106 |
| FUTURE SHAREHOLDER PROPOSALS | 107 |
| CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS | 108 |
| WHERE YOU CAN FIND MORE INFORMATION | 109 |

ANNEX A: Agreement and Plan of Merger     A-1
ANNEX B: Opinion of Duff & Phelps, LLC as Financial Advisor     B-1
ANNEX C: Cayman Islands Companies Law Cap. 22 (Law 3 of 1961, as consolidated and revised) – Section 238     C-1
ANNEX D: Directors and Executive Officers of Each Filing Person     D-1
ANNEX E: Form of Proxy Card     E-1
ANNEX F: Form of ADS Voting Instructions Card     F-1

# SUMMARY TERM SHEET

*This "Summary Term Sheet," together with the "Questions and Answers about the Extraordinary General Meeting and the Merger," highlights selected information contained in this proxy statement regarding the merger and may not contain all of the information that may be important to your consideration of the merger. You should carefully read this entire proxy statement and the other documents to which this proxy statement refers for a more complete understanding of the matters being considered at the extraordinary general meeting. In addition, this proxy statement incorporates by reference important business and financial information about the Company. You are encouraged to read all of the documents incorporated by reference into this proxy statement and you may obtain such information without charge by following the instructions in "Where You Can Find More Information" beginning on page 109. In this proxy statement, the terms "we," "us," "our," and the "Company" refer to E-Commerce China Dangdang Inc. and its subsidiaries. All references to "dollars" and "$" in this proxy statement are to U.S. dollars and all references to "RMB" in this proxy statement are to Renminbi, the lawful currency of the People's Republic of China ("PRC" or "China").*

## The Parties Involved in the Merger

### *The Company*

The Company is an exempted company with limited liability incorporated under the laws of the Cayman Islands and a leading business-to-consumer e-commerce company in China.

Our principal executive offices are located at 21/F, Jing An Center, No. 8 North Third Ring Road East, Chaoyang District, Beijing 100028, People's Republic of China. The Company's telephone number at this address is +86-10 5799-2666.

For a description of the Company's history, development, business and organizational structure, please see the Company's Annual Report on Form 20-F for the year ended December 31, 2015 filed on April 29, 2016, which is incorporated herein by reference. Please see "Where You Can Find More Information" beginning on page 109 for a description of how to obtain a copy of the Company's Annual Report.

### *Ms. Peggy Yu Yu*

Ms. Peggy Yu Yu ("Ms. Yu") is the co-founder and director of the Company, and has been the executive chairwoman of the Company since its inception. Mr. Guoqing Li and Ms. Yu are husband and wife. Ms. Yu is a citizen of the People's Republic of China. The business address of Ms. Yu is c/o E-Commerce China Dangdang Inc., 21/F, Jing An Center, No. 8 North Third Ring Road East, Chaoyang District, Beijing 100028, People's Republic of China. Ms. Yu's business telephone number is +86-10 5799-2666.

### *Mr. Guoqing Li*

Mr. Guoqing Li ("Mr. Li") is the co-founder and director of the Company, and has been the chief executive officer of the Company since its inception. Mr. Li is a citizen of the People's Republic of China. Mr. Li and Ms. Yu are husband and wife. The business address of Mr. Li is c/o E-Commerce China Dangdang Inc., 21/F, Jing An Center, No. 8 North Third Ring Road East, Chaoyang District, Beijing 100028, People's Republic of China. Mr. Li's business telephone number is +86-10 5799-2666.

### *Parent*

Dangdang Holding Company Limited ("Parent") is an exempted company with limited liability incorporated under the laws of the Cayman Islands. The business address of Parent is c/o E-Commerce China Dangdang Inc., 21/F, Jing An Center, No. 8 North Third Ring Road East, Chaoyang District, Beijing 100028, People's Republic of China. Parent's business telephone number is +86-10 5799-2666.

1

### Merger Sub

Dangdang Merger Company Limited ("Merger Sub") is an exempted company incorporated with limited liability under the laws of the Cayman Islands formed solely for the purpose of effecting the merger. The business address of Merger Sub is c/o E-Commerce China Dangdang Inc., 21/F, Jing An Center, No. 8 North Third Ring Road East, Chaoyang District. Beijing 100028, People's Republic of China. Merger Sub's business telephone number is +86-10 5799-2666.

### Holdco

Dangdang Corporation ("Holdco") is a business company with limited liability incorporated under the laws of the British Virgin Islands. It is principally an investment holding vehicle ultimately beneficially owned and controlled by Ms. Yu and Mr. Li. The business address of Holdco is c/o E-Commerce China Dangdang Inc., 21/F, Jing An Center, No. 8 North Third Ring Road East, Chaoyang District, Beijing 100028, People's Republic of China. Holdco's business telephone number is +86-10 5799-2666.

### Kewen Holding Co. Limited

Kewen Holding Co. Limited ("Kewen") is a limited company incorporated under the laws of the British Virgin Islands and is principally an investment holding vehicle controlled by Mr. Li. Mr. Li is the sole director and beneficial owner of Kewen Holding Co. Limited. The business address of Kewen is c/o Offshore Incorporations Limited, P.O. Box 957, Offshore Incorporations Center, Road Town, Tortola, British Virgin Islands. Kewen's business telephone number is +86-10 5799-2666.

### Science & Culture International Limited

Science & Culture International Limited ("SC International") is a limited company incorporated under the laws of the British Virgin Islands and is principally an investment holding vehicle controlled by Mr. Li. Kewen holds 60% of the shares in SC International. The business address of SC International is c/o Offshore Incorporations Limited, P.O. Box 957, Offshore Incorporations Center, Road Town, Tortola, British Virgin Islands. SC International's business telephone number is +86-10 5799-2666.

### First Profit Management Limited

First Profit Management Limited ("First Profit") is a limited company incorporated under the laws of the British Virgin Islands and is principally an investment holding vehicle. Mr. Danqian Yao controls First Profit as its sole director. The business address of First Profit is c/o E-Commerce China Dangdang Inc., 21/F, Jing An Center, No. 8 North Third Ring Road East, Chaoyang District, Beijing 100028, People's Republic of China. First Profit's business telephone number is +86-10 5799-2666.

Historically, First Profit has held Class A common shares for and on behalf of certain persons pursuant to share incentive arrangements between the Company and such persons. For details, see caption titled "Related Party Transactions" of this proxy statement.

### Mr. Danqian Yao

Mr. Danqian Yao ("Mr. Yao") has been a senior vice president of the Company since December 2011. Mr. Yao is a citizen of the People's Republic of China. The business address of Mr. Yao is c/o E-Commerce China Dangdang Inc., 21/F, Jing An Center, No. 8 North Third Ring Road East, Chaoyang District, Beijing 100028. People's Republic of China. Mr. Yao's business telephone number is +86-10 5799-2666.

### Mr. Lijun Chen

Mr. Lijun Chen ("Mr. Chen") has been a vice president of the Company since January 2016. Prior to that, Mr. Chen served as the Company's business general manager from June 2014. From 2011 to June 2014, Mr. Chen worked as the assistant to director at Gold Wall Press of the Secrecy Adminstration Bureau, which is a state-level publishing house that primarily publishes national security-related books and books on social sciences. The business address of Gold Wall Press is No. 3 Lizedong Er Lu, Chaoyang District, Beijing 100102, People's Republic of China. Mr. Chen is a citizen of the People's Republic of China. The business address of Mr. Chen is c/o E-Commerce China Dangdang Inc., 21/F, Jing An Center, No. 8 North Third Ring Road East, Chaoyang District, Beijing 100028, People's Republic of China. Mr. Chen's business telephone number is +86-10 5799-2666.

*Mr. Min Kan*

Mr. Min Kan ("Mr. Kan") has been a vice president of the Company since January 2014. Prior to that, Mr. Kan served as the Company's business general manager from January 2013 and senior director from 2008 to January 2013. Mr. Kan is a citizen of the People's Republic of China. The business address of Mr. Kan is c/o E-Commerce China Dangdang Inc., 21/F, Jing An Center, No. 8 North Third Ring Road East, Chaoyang District, Beijing 100028, People's Republic of China. Mr. Kan's business telephone number is +86-10 5799-2666.

Throughout this proxy statement, Ms. Yu, Mr. Li, Kewen and SC International are collectively referred to as the "Supporting Shareholders". The Supporting Shareholders, First Profit, Mr. Yao, Mr. Chen and Mr. Kan are collectively referred to as the "Rollover Shareholders". Holdco, Parent, Merger Sub and the Rollover Shareholders are collectively referred to as the "Buyer Group".

During the last five years, none of the persons referred to above under the heading titled "The Parties Involved in the Merger," or the respective directors or executive officers of the Company, members of the Buyer Group and their affiliates as listed in Annex D to this proxy statement has been (a) convicted in a criminal proceeding (excluding traffic violations or similar misdemeanors) or (b) a party to any judicial or administrative proceeding (except for matters that were dismissed without sanction or settlement) that resulted in a judgment, decree or final order enjoining the person from future violations of, or prohibiting activities subject to, federal or state securities laws, or a finding of any violation of federal or state securities laws.

**The Merger (Page 83)**

You are being asked to vote to authorize and approve the agreement and plan of merger, dated as of May 28, 2016 (the "merger agreement"), among the Company, Parent and Merger Sub, the plan of merger required to be filed with the Registrar of Companies of the Cayman Islands, substantially in the form attached as Annex A to the merger agreement (the "plan of merger"), and the transactions contemplated by the merger agreement, including the merger (the "merger"). Once the merger agreement and plan of merger are authorized and approved by the requisite vote of the shareholders of the Company and the other conditions to the consummation of the transactions contemplated by the merger agreement, including the merger, are satisfied or waived in accordance with the terms of the merger agreement, Merger Sub will merge with and into the Company, with the Company continuing as the surviving company of the merger (the "surviving company") under the laws of the Cayman Islands as a wholly owned subsidiary of Parent. The Company, as the surviving company, will continue to do business under the name "E-Commerce China Dangdang Inc." following the merger. If the merger is completed, the Company will cease to be a publicly traded company. Copies of the merger agreement and the plan of merger are attached as Annex A to this proxy statement. You should read the merger agreement and the plan of merger in their entirety because they, and not this proxy statement, are the legal documents that govern the merger.

**Merger Consideration (Page 83)**

Under the terms and conditions of the merger agreement, if the merger is completed, at the effective time of the merger (the "Effective Time"), each of the Company's Class A common shares and Class B common shares, par value $0.0001 per share (each a "Share" and collectively, the "Shares"), including Shares represented by American Depositary Shares, each of which represents five Class A common shares (the "ADSs"), issued and outstanding immediately prior to the Effective Time, other than (a) 136,477,925 Shares, consisting of 3,135,840 Class A common shares and 13,000,000 Class B common shares held by Ms. Yu, 1,185,000 Class A common shares represented by 237,000 ADSs held by Mr. Li, 21,876,660 Class B common shares held by Kewen, 97,000,000 Class B common shares held by SC International, 210,425 Class A common shares held by First Profit (including 164,000 Class A common shares beneficially owned by Mr. Yao and 46,425 Class A common shares beneficially owned by Mr. Chen, in each case, held of record by First Profit as nominee shareholder), and 70,000 Class A common shares represented by 14,000 ADSs held by Mr. Kan (collectively, the "Rollover Shares"), (b) Shares held by Parent, the Company or any of their subsidiaries, (c) Shares (including Class A common shares represented by ADSs) held by the ADS depositary (as defined below) and reserved for future issuance pursuant to the Company's Share Incentive Plans(as defined below) (Shares described under (a) through (c) above are collectively referred to herein as the "Excluded Shares"), (d) Shares owned by shareholders who have validly exercised and not effectively withdrawn or lost their rights to dissent under the Cayman Islands Companies Law, as amended (the "CICL") (the "Dissenting Shares"), and (e) Class A common shares represented by ADSs, will be cancelled in exchange for the right to receive $1.34 in cash per Share without interest and net of any applicable withholding tax. At the Effective Time, each ADS issued and outstanding immediately prior to the Effective Time, other than ADSs representing the Excluded Shares, will be cancelled in exchange for the right to receive $6.70 in cash per ADS without interest and net of any applicable withholding taxes (less up to $0.05 per ADS cancellation fees and up to $0.02 per ADS depositary services fees pursuant to the terms and conditions of the deposit agreement, dated December 7, 2010 between the Company and The Bank of New York Mellon (the "ADS depositary") and the holders and beneficial owners from time to time of ADSs issued thereunder, as may be amended from time to time (the "Deposit Agreement")). The Excluded Shares issued and outstanding immediately prior to the Effective Time will be cancelled for no consideration. The Dissenting Shares will be cancelled and each holder thereof will be entitled to receive only the payment of the fair value of such Dissenting Shares in accordance with the CICL. Please see "Dissenter Rights" beginning on page 100 for additional information.

3

**Treatment of Company Options (Page 84)**

At the Effective Time, the Company will terminate the Company's 2004 Share Incentive Plan and 2010 Share Incentive Plan, and all amendments and modifications thereto (collectively, the "Share Incentive Plans"), terminate all relevant award agreements applicable to the Share Incentive Plans, and cancel all options to purchase Shares granted under the Company's Share Incentive Plans (the "Company Options") that are outstanding and unexercised, whether or not vested or exercisable.

At the Effective Time, each vested Company Option that remains outstanding immediately prior to the Effective Time will be cancelled in exchange for the right to receive from the surviving company or one of its subsidiaries, as soon as practicable after the Effective Time, cash in the amount equal to the product of (a) the number of Shares underlying such Company Option multiplied by (b) the excess, if any, of $1.34 over the exercise price payable per Share of such Company Option. If the exercise price per Share of any such Company Option is equal to or greater than $1.34, such Company Option will be cancelled for no consideration. At the Effective Time, each unvested Company Option will be cancelled for no consideration.

**Record Dates and Voting (Page 79)**

You are entitled to attend and vote at the extraordinary general meeting if you have Shares registered in your name in the Company's register of members at the close of business in the Cayman Islands on _____, 2016, the Share record date for voting at the extraordinary general meeting. If you own ADSs on _____, 2016, the ADS record date (and do not cancel such ADSs and become a registered holder of the Shares underlying such ADSs as explained below), you cannot vote at the extraordinary general meeting directly, but you may instruct the ADS Depositary (as the holder of the Shares underlying the ADSs) on how to vote the Shares underlying your ADSs. The ADS depositary must receive your instructions no later than ____ (New York City Time) on _____, 2016 in order to ensure your Shares are properly voted at the extraordinary general meeting. Alternatively, if you own ADSs on the ADS record date, you may vote at the extraordinary general meeting by cancelling your ADSs (and certifying you have not instructed, and will not instruct, the ADS depositary to vote the Shares represented by your ADSs) before _____ (New York City Time) on _____, 2016 and becoming a registered holder of the Shares prior to the close of business in the Cayman Islands not later than _____, 2016, the Share record date. Each outstanding Share on the Share record date entitles the holder to one vote for each Class A common share and ten votes for each Class B common share on each matter submitted to the shareholders for authorization and approval at the extraordinary general meeting and any adjournment thereof. We expect that, as of the Share record date, there will be _____ Shares issued and outstanding and entitled to vote at the extraordinary general meeting. If you have Shares registered in your name on the Share record date, the deadline for you to lodge your proxy card and vote is_____, 2016 at ____ a.m. (Beijing Time). Please see "Summary Term Sheet — Voting Information" below.

**Shareholder Vote Required to Authorize and Approve the Merger Agreement and Plan of Merger (Page 79)**

In order for the merger to be completed, the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger, must be authorized and approved by the affirmative vote of holders of Shares representing at least two-thirds of the voting rights of the Shares present and voting in person or by proxy as a single class at an extraordinary general meeting of shareholders of the Company (the "Requisite Company Vote") in accordance with Section 233(6) of the CICL and the Articles of Association of the Company.

4

As of the date of this proxy statement, the Supporting Shareholders beneficially own approximately 35.2% of the total issued and outstanding Shares of the Company, representing approximately 83.5% of the total number of votes represented by the issued and outstanding Shares. Please see "Security Ownership of Certain Beneficial Owners and Management of the Company" beginning on page 106 for additional information. Pursuant to the terms of the Support Agreement, the Shares (including Class A common shares represented by ADSs) beneficially owned by the Supporting Shareholders as of the date of the Support Agreement and acquired by them thereafter will be voted in favor of the authorization and approval of the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger, at the extraordinary general meeting of shareholders of the Company.

**Voting Information (Page 79)**

Before voting your Shares, we encourage you to read this proxy statement in its entirety, including all of the annexes, attachments, exhibits and materials incorporated by reference, and carefully consider how the merger will affect you. To ensure that your Shares can be voted at the extraordinary general meeting even in the event that you are unable to attend, please complete the enclosed proxy card in accordance with the instructions set forth on the proxy card as soon as possible. The deadline for you to lodge your proxy card is _____, 2016 at _____ a.m. (Beijing Time).

If you own ADSs as of the close of business in New York City on _____, 2016, the ADS record date (and do not cancel such ADSs and become a registered holder of the Shares underlying such ADSs as explained below), you cannot vote at the extraordinary general meeting directly, but you may instruct the ADS depositary (as the holder of the Shares underlying the ADSs) how to vote the Shares underlying your ADSs. The ADS depositary must receive such instructions no later than 5:00 p.m. (New York City Time) on _____, 2016 in order to ensure your Shares are properly voted at the extraordinary general meeting. Alternatively, you may vote at the extraordinary general meeting if you cancel your ADSs and become a holder of Shares prior to the close of business in the Cayman Islands not later than _____, 2016. If you wish to cancel your ADSs for the purpose of voting Shares, you need to make arrangements to deliver your ADSs to the ADS depositary for cancellation before _____ (New York City Time) on _____, 2016 together with (a) delivery instructions for the corresponding Shares (name and address of person who will be the registered holder of Shares), (b) payment of the ADS cancellation fees (up to $5.00 per 100 ADSs (or portion thereof) to be cancelled), up to $0.02 per ADS depositary services fees and any applicable taxes, and (c) a certification that you held the ADS as of the ADS record date and you have not given, and will not give, voting instructions to the ADS depositary as to the ADSs being cancelled or have given voting instructions to the ADS depositary as to the ADSs being cancelled but undertake not to vote the corresponding Shares at the extraordinary general meeting. If you hold your ADSs in a brokerage, bank or nominee account, please contact your broker, bank or other nominee to find out what actions you need to take to instruct the broker, bank or other nominee to cancel the ADSs on your behalf. Upon cancellation of the ADSs, the ADS depositary will arrange for the principal Hong Kong office of The Hong Kong and Shanghai Banking Corporation Limited, the custodian holding the Shares, to transfer registration of the Shares to the former ADS holder (or a person designated by the former ADS holder). If after registration of Shares in your name, you wish to receive a certificate evidencing the Shares registered in your name, you will need to request the registrar of the Shares to issue and mail a certificate to your attention.

If the ADS depositary timely receives voting instructions from an ADS holder which fail to specify the manner in which the ADS depositary is to vote the Shares represented by the holder's ADSs, or if an ADS holder does not timely deliver specific voting instructions to the ADS depositary, the corresponding number of Shares will not be voted.

**Dissenter Rights (Page 100)**

Shareholders who dissent from the merger will have the right to receive payment of the fair value of their Shares if the merger is completed, but only if they deliver to the Company, before the vote on the merger is taken at the extraordinary general meeting, a written objection to the merger and subsequently comply with all procedures and requirements of Section 238 of the CICL for the exercise of dissenter rights. The fair value of your Shares as determined under that statute could be more than, the same as, or less than the merger consideration you would receive pursuant to the merger agreement if you do not exercise dissenter rights with respect to your Shares.

---

5

ADS HOLDERS WILL NOT HAVE THE RIGHT TO EXERCISE DISSENTER RIGHTS AND RECEIVE PAYMENT OF THE FAIR VALUE OF THE SHARES UNDERLYING THEIR ADSs. THE ADS DEPOSITARY WILL NOT EXERCISE OR ATTEMPT TO EXERCISE ANY DISSENTER RIGHTS WITH RESPECT TO ANY OF THE SHARES THAT IT HOLDS, EVEN IF AN ADS HOLDER REQUESTS THE ADS DEPOSITARY TO DO SO. ADS HOLDERS WISHING TO EXERCISE DISSENTER RIGHTS MUST SURRENDER THEIR ADSs TO THE ADS DEPOSITARY FOR CONVERSION INTO SHARES, PAY THE ADS DEPOSITARY'S FEES REQUIRED FOR THE CANCELLATION OF THEIR ADSs, PROVIDE INSTRUCTIONS FOR THE REGISTRATION OF THE CORRESPONDING SHARES IN THE COMPANY'S REGISTER OF MEMBERS, AND CERTIFY THAT THEY HELD THE ADSs AS OF THE ADS RECORD DATE AND HAVE NOT GIVEN, AND WILL NOT GIVE, VOTING INSTRUCTIONS AS TO THEIR ADSs BEFORE _____ (NEW YORK CITY TIME) ON _____, 2016, AND BECOME REGISTERED HOLDERS OF SHARES BEFORE THE VOTE TO AUTHORIZE AND APPROVE THE MERGER IS TAKEN AT THE EXTRAORDINARY GENERAL MEETING (FOR THE AVOIDANCE OF DOUBT, ANY ADS HOLDERS WHO CONVERT THEIR ADSs INTO SHARES AFTER THE SHARE RECORD DATE WILL NOT BE ENTITLED TO ATTEND OR TO VOTE AT THE EXTRAORDINARY GENERAL MEETING, BUT WILL BE ENTITLED TO EXERCISE DISSENTER RIGHTS IF THEY BECOME REGISTERED HOLDERS OF SHARES BEFORE THE VOTE IS TAKEN AT THE EXTRAORDINARY GENERAL MEETING). AFTER CONVERTING THEIR ADSs AND BECOMING REGISTERED HOLDERS OF SHARES, SUCH FORMER ADS HOLDERS MUST ALSO COMPLY WITH THE PROCEDURES AND REQUIREMENTS FOR EXERCISING DISSENTER RIGHTS WITH RESPECT TO THE SHARES UNDER SECTION 238 OF THE CAYMAN ISLANDS COMPANIES LAW. IF THE MERGER IS NOT COMPLETED, THE COMPANY WOULD CONTINUE TO BE A PUBLIC COMPANY IN THE U.S. AND THE ADSs WOULD CONTINUE TO BE LISTED ON THE NEW YORK STOCK EXCHANGE. THE COMPANY'S SHARES ARE NOT LISTED AND CANNOT BE TRADED ON ANY STOCK EXCHANGE OTHER THAN THE NEW YORK STOCK EXCHANGE, AND IN SUCH CASE ONLY IN THE FORM OF ADSs. AS A RESULT, IF A FORMER ADS HOLDER HAS CANCELLED HIS, HER OR ITS ADSs TO EXERCISE DISSENTER RIGHTS AND THE MERGER IS NOT COMPLETED AND SUCH FORMER ADS HOLDER WISHES TO BE ABLE TO SELL HIS, HER OR ITS SHARES ON A STOCK EXCHANGE, SUCH FORMER ADS HOLDER WOULD NEED TO DEPOSIT HIS, HER OR ITS SHARES INTO THE COMPANY'S AMERICAN DEPOSITARY SHARES PROGRAM FOR THE ISSUANCE OF THE CORRESPONDING NUMBER OF ADSs, SUBJECT TO THE TERMS AND CONDITIONS OF APPLICABLE LAW AND THE ADS DEPOSIT AGREEMENT, INCLUDING, AMONG OTHER THINGS, PAYMENT OF RELEVANT FEES OF THE ADS DEPOSITARY FOR THE ISSUANCE OF ADSs (UP TO $5.00 PER 100 ADSs (OR PORTION THEREOF) ISSUED) AND ANY APPLICABLE STOCK TRANSFER TAXES (IF ANY) AND RELATED CHARGES PURSUANT TO THE ADS DEPOSIT AGREEMENT.

We encourage you to read the section of this proxy statement entitled "Dissenter Rights" as well as Annex C to this proxy statement carefully and to consult your Cayman Islands legal counsel if you desire to exercise your dissenter rights.

**Purposes and Effects of the Merger (Page 54)**

The purpose of the merger is to enable Parent to acquire 100% control of the Company in a transaction in which the Company's holders of Shares (including Class A common shares represented by ADSs), other than the holders of Excluded Shares and Dissenting Shares, will be cashed out in exchange for $1.34 in cash per Share or $6.70 in cash per ADS, so that Parent will bear the rewards and risks of the sole ownership of the Company after the merger, including any future earnings and growth of the Company as a result of improvements to the Company's operations or acquisitions of other businesses. Please see "Special Factors—Buyer Group's Purpose of and Reasons for the Merger" beginning on page 54 for additional information.

ADSs representing Shares of the Company are currently listed on the NYSE under the symbol "DANG." It is expected that, immediately following the completion of the merger, the Company will cease to be a publicly traded company and will instead become a privately-held company beneficially owned by the Buyer Group and Mr. He. Following the completion of the merger, the ADSs will cease to be listed on the NYSE, and price quotations with respect to sales of the ADSs in the public market will no longer be available. In addition, registration of the ADSs and the underlying Shares under the Exchange Act will be terminated 90 days after the filing of Form 15 by the Company in connection with the completion of the merger or such longer period as may be determined by the SEC. Accordingly, the Company will no longer be required to file periodic reports with the SEC. Furthermore, following the completion of the merger, the American depositary shares program for the ADSs will terminate. Please see "Special Factors —Effect of the Merger on the Company" beginning on page 55 for additional information.

**Plans for the Company after the Merger (Page 58)**

After the Effective Time, the Buyer Group anticipates that the Company will continue to conduct its operations substantially as they are currently being conducted, except that the Company will cease to be a publicly traded company and will instead be a wholly-owned subsidiary of Parent. Please see "Special Factors—Plans for the Company after the Merger" beginning on page 58 for additional information.

6

**Recommendations of the Special Committee and the Board (Page 35)**

The Special Committee unanimously (a) determined that it was fair (both substantively and procedurally) to and in the best interests of the Company's security holders unaffiliated to the Buyer Group (the "unaffiliated security holders"), and declared it advisable, to enter into the merger agreement and the other documents in connection with the merger, including, without limitation, the plan of merger (the "transaction agreements") , (b) recommended that the Board authorize and approve the execution, delivery and performance of the merger agreement, the transaction agreements and the consummation of the transactions contemplated thereby, including the merger, (c) recommended that the Board direct that the authorization and approval of the merger agreement, the plan of merger and the consummation of the transactions contemplated thereby, including the merger, be submitted to a vote at an extraordinary general meeting of shareholders of the Company with the recommendation of the Board that the shareholders of the Company authorize and approve by way of a special resolution the merger agreement, the plan of merger and the consummation of the transactions contemplated thereby, including the merger, and (d) recommended that the Board call an extraordinary general meeting of shareholders of the Company for the purpose of the shareholders authorizing and approving by way of special resolution the merger agreement, the plan of merger and the consummation of the transactions contemplated thereby, including the merger, the date, time and place of which shall be determined by the Special Committee.

The Board (other than Ms. Yu and Mr. Li, members of the Buyer Group, who did not attend, participate in or vote upon matters discussed during the Board meeting, due to their interests in the proposed transaction), acting upon the unanimous recommendation of the Special Committee, (a) determined that it was fair (both substantively and procedurally) to and in the best interests of the unaffiliated security holders, and declared it advisable, to enter into the merger agreement and the transaction agreements, (b) authorized and approved the execution, delivery and performance of the merger agreement, the transaction agreements and the consummation of the transactions contemplated thereby, including the merger, and (c) resolved to direct that the authorization and approval of the merger agreement, the plan of merger and the consummation of the transactions contemplated thereby, including the merger, be submitted to a vote at an extraordinary general meeting of shareholders of the Company with the recommendation of the Board that the shareholders of the Company authorize and approve by way of a special resolution the merger agreement, the plan of merger and the consummation of the transactions contemplated thereby, including the merger.

**ACCORDINGLY, THE BOARD RECOMMENDS THAT YOU VOTE FOR THE PROPOSAL TO AUTHORIZE AND APPROVE THE MERGER AGREEMENT, THE PLAN OF MERGER AND THE TRANSACTIONS CONTEMPLATED BY THE MERGER AGREEMENT, INCLUDING THE MERGER, THE AMENDMENT OF THE AUTHORISED SHARE CAPITAL OF THE COMPANY FROM $100,000 DIVIDED INTO 548,955,840 CLASS A COMMON SHARES AND 451,044,160 CLASS B COMMON SHARES OF A PAR VALUE $0.0001 PER SHARE TO $100,000 DIVIDED INTO 1,000,000,000 SHARES WITH A PAR VALUE OF $0.0001 EACH AND THE AMENDMENT AND RESTATEMENT OF THE EXISTING MEMORANDUM AND ARTICLES OF ASSOCIATION OF THE COMPANY BY THEIR DELETION IN THEIR ENTIRETY AND THE SUBSTITUTION IN THEIR PLACE OF A NEW MEMORANDUM AND ARTICLES OF ASSOCIATION AT THE EFFECTIVE TIME, A COPY OF WHICH IS ATTACHED AS ANNEX B TO THE PLAN OF MERGER, FOR THE PROPOSAL TO AUTHORIZE EACH OF THE MEMBERS OF THE SPECIAL COMMITTEE TO DO ALL THINGS NECESSARY TO GIVE EFFECT TO THE MERGER AGREEMENT, THE PLAN OF MERGER AND THE TRANSACTIONS CONTEMPLATED BY THE MERGER AGREEMENT, INCLUDING THE MERGER, AND FOR THE PROPOSAL TO ADJOURN THE EXTRAORDINARY GENERAL MEETING IN ORDER TO ALLOW THE COMPANY TO SOLICIT ADDITIONAL PROXIES IN THE EVENT THAT THERE ARE INSUFFICIENT PROXIES RECEIVED AT THE TIME OF THE EXTRAORDINARY GENERAL MEETING TO PASS THE SPECIAL RESOLUTIONS TO BE PROPOSED AT THE EXTRAORDINARY GENERAL MEETING.**

For a detailed discussion of the material factors considered by the Special Committee and the Board in determining to recommend the approval of the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger, and in determining that the merger is fair to and in the best interest of the unaffiliated security holders, please see "Special Factors—Reasons for the Merger and Recommendation of the Special Committee and the Board" beginning on page 35 and "Special Factors—Effect of the Merger on the Company— Primary Benefits and Detriments of the Merger" beginning on page 56. The foregoing summary is qualified in its entirety by reference to these sections.

### Position of the Buyer Group as to the Fairness of the Merger (Page 41)

Each member of the Buyer Group believes that the merger is substantively and procedurally fair to the unaffiliated security holders. Their belief is based upon the factors discussed under the caption "Special Factors—Position of the Buyer Group as to the Fairness of the Merger" beginning on page 41.

Each member of the Buyer Group is making the statements included in this paragraph solely for the purpose of complying with the requirements of Rule 13e-3 and related rules under the Exchange Act. The views of each member of the Buyer Group as to the fairness of the Merger are not intended to be and should not be construed as a recommendation to any shareholder of the Company as to how that shareholder should vote on the proposal to authorize and approve the merger agreement, the plan of merger and the transactions contemplated thereby, including the merger.

### Financing of the Merger (Page 60)

The Company and the Buyer Group estimate that the total amount of funds necessary to complete the transactions contemplated by the merger agreement, including the merger, is approximately $_____ million (assuming no exercise of dissenter rights by shareholders of the Company). This amount includes the cash to be paid to the Company's shareholders and holders of ADSs (other than holders of the Excluded Shares) and holders of vested Company Options in the merger, as well as the costs and expenses in connection with the transactions contemplated by the merger agreement, including the merger. It does not include the value of the Excluded Shares, which will be cancelled for no consideration in the merger.

The Buyer Group expects to fund the transactions contemplated by the merger agreement, including the merger, through a combination of (i) rollover financing from the Rollover Shareholders of 136,477,925 Shares (including Class A common shares represented by ADSs), (ii) the proceeds from a committed loan facility in an amount of up to $164 million, which is agreed to be arranged by Bank of China Limited, Shanghai Pudong Development Zone Sub-Branch, pursuant to a debt commitment letter, (iii) cash contributions provided by First Profit and Mr. He, an individual unaffiliated with the Company, in the aggregate amount of $15.25 million, pursuant to two equity commitment letters, and (iv) available cash of the Company and its subsidiaries.

### Limited Guarantee (Page 64)

On May 28, 2016, concurrently with the execution of the merger agreement, Ms. Yu and Mr. Li entered into a limited guarantee (the "Limited Guarantee") with the Company, pursuant to which Ms. Yu and Mr. Li jointly and severally, absolutely, irrevocably and unconditionally guarantee to the Company the due and punctual payment, performance and discharge of Parent's obligations to pay the Company (a) any termination fee payable by Parent pursuant to the merger agreement, and (b) certain of the payment obligations of Parent and/or Merger Sub pursuant to certain sections of the merger agreement as and when due, provided that the maximum aggregate liability of Ms. Yu and Mr. Li under the limited guarantee, individually or in the aggregate, shall not exceed $29 million.

### Support Agreement (Page 64)

On May 28, 2016, concurrently with the execution of the merger agreement, the Supporting Shareholders entered into the Support Agreement with Parent, pursuant to which each of the Supporting Shareholders agreed, among other things, (i) to vote any and all of their Shares in favor of the authorization and approval of the transactions contemplated by the merger agreement, including the merger, (ii) not to sell, transfer or otherwise dispose of any Shares, and (iii) to receive no cash consideration with respect to certain number of Shares (including Class A common shares represented by ADSs) held by them as set forth in Annex B to the merger agreement, in each case, upon the terms and subject to the conditions of the Support Agreement.

### Rollover Agreement (Page 66)

On May 28, 2016, concurrently with the execution of the merger agreement, First Profit, Mr. Yao, Mr. Chen and Mr. Kan entered into the Rollover Agreement (the "Rollover Agreement") with Parent, pursuant to which each of First Profit, Mr. Yao, Mr. Chen and Mr. Kan agreed to the cancellation of a certain number of Shares (including Class A common shares represented by ADSs) beneficially owned by such person as set forth in Annex B to the merger agreement for no consideration at the Effective Time and to subscribe, or cause his, her or its affiliate to subscribe, for a corresponding number of newly issued ordinary shares of Parent in accordance with the terms of the Rollover Agreement.

8

**Share Ownership of the Company Directors and Executive Officers and Voting Commitments (Page 106)**

As of the Share record date, we expect that the Buyer Group will beneficially own, in the aggregate, approximately _____% of the issued and outstanding Shares, which represents approximately _____% of the total number of votes represented by the issued and outstanding Shares. Please see "Security Ownership of Certain Beneficial Owners and Management of the Company" beginning on page 106 for additional information.

Pursuant to the Support Agreement, the Supporting Shareholders have agreed to vote all of the Shares (including Class A common shares represented by ADSs) they beneficially own as of the date of the Support Agreement and acquire thereafter in favor of the authorization and approval of the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger, at the extraordinary general meeting of shareholders of the Company.

**Opinion of the Special Committee's Financial Advisor (Page 47)**

On May 28, 2016, at a meeting of the Special Committee to evaluate the merger, Duff & Phelps, LLC ("Duff & Phelps") rendered its oral opinion to the Special Committee, subsequently confirmed in writing, to the effect that, as of that date and based on and subject to the assumptions, procedures, factors, limitations and qualifications set forth in Duff & Phelps' written opinion, the merger consideration to be paid to the holders of the Shares (other than the Excluded Shares, the Dissenting Shares and Class A common shares represented by ADSs) and the holders of ADSs (other than ADSs representing Excluded Shares) in the merger was fair, from a financial point of view, to those holders.

**The full text of the Duff & Phelps opinion is attached to this proxy statement as Annex B. The description of the Duff & Phelps' opinion set forth in this proxy statement is qualified in its entirety by reference to the full text of the Duff & Phelps' opinion. Shareholders are urged to read the Duff & Phelps' opinion in its entirety for a description of the procedures followed, assumptions made, matters considered and qualifications and limitations on the review undertaken by Duff & Phelps in connection with the opinion.**

**Duff & Phelps' engagement and opinion were for the benefit of the Special Committee, in its capacity as such, and its opinion was rendered to the Special Committee in connection with its consideration of the merger. Duff & Phelps' opinion was not intended to and does not constitute advice or a recommendation to any shareholder or holder of ADSs, as to how the shareholder or the holder of ADSs should vote or act with respect to the merger or any matter relating thereto.**

Please see "Special Factors—Opinions of the Special Committee's Financial Advisor" beginning on page 47 for additional information.

**Interests of the Company's Executive Officers and Directors in the Merger (Page 67)**

In considering the recommendations of the Board with respect to the merger, the Company's shareholders should be aware that certain of the Company's directors and executive officers have interests in the transaction that are different from, and/or in addition to, the interests of the Company's shareholders and ADS holders generally. These interests include, among others:

- the beneficial ownership of equity interest in Parent by Ms. Yu, Mr. Li and Mr. Yao following the consummation of the merger, as a result of which they will be able to enjoy the benefits from future earnings and growth of the surviving company after the completion of the merger;
- the cash-out of all outstanding and vested Company Options held by certain directors and executive officers of the Company;
- continued indemnification and directors and officers liability insurance to be provided by the surviving company to the directors and executive officers of the Company;
- the monthly compensation of $10,000, which must not exceed $50,000 in aggregate, for each of the members of the Special Committee in exchange for their services in such capacity (or, in the case of the chairperson of the Special Committee, monthly compensation of $15,000, which must not exceed $100,000 in the aggregate) (the payment of which is not contingent upon the completion of the merger or the Special Committee's or the Board's recommendation of the merger); and

9

- the potential continuation of service of the executive officers of the Company with the surviving company in positions that are substantially similar to their current positions, allowing them to benefit from remuneration arrangements with the surviving company.

As of the date of this proxy statement, Ms. Yu, Mr. Li and Mr. Yao, being directors and/or executive officers of the Company and also members of the Buyer Group, collectively and beneficially own 35.5% issued and outstanding Shares, representing approximately 83.6% of the total number of votes represented by the issued and outstanding Shares. All such Shares beneficially owned by Ms. Yu, Mr. Li and Mr. Yao, excluding Shares underlying any vested Company Options held by such persons, will be cancelled in the merger and will not be converted into the right to receive the merger consideration at the Effective Time. After the completion of the merger, the maximum amount of cash payments that Ms. Yu, Mr. Li and Mr. Yao may receive in respect of their Shares and vested Company Options is approximately $10.7 million in the aggregate.

As of the date of this proxy statement, the directors and executive officers of the Company (as set forth in "Security Ownership of Certain Beneficial Owners and Management of the Company" beginning on page 106), as a group (other than Ms. Yu, Mr. Li and Mr. Yao), beneficially own outstanding and vested Company Options to purchase an aggregate of 441,125 Shares issued pursuant to the Share Incentive Plans as of the date of this proxy statement. After the completion of the merger, the maximum amount of cash payments our directors and executive officers (other than Ms. Yu, Mr. Li and Mr. Yao) may receive in respect of their Shares and vested Company Options is approximately $0.2 million in the aggregate.

The Special Committee and the Board were aware of these potential conflicts of interest and considered them, among other matters, in reaching their decisions and recommendations with respect to the merger agreement and related matters. Please see "Special Factors – Interests of Certain Persons in the Merger" beginning on page 67 for additional information.

**Conditions to the Merger (Page 94)**

The obligations of the Company, Parent, and Merger Sub to consummate the transactions contemplated by the merger agreement, including the merger, are subject to the satisfaction or waiver (where permissible) at or prior to the closing of the merger (the "Closing") of the following conditions:

- the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger, having been authorized and approved by holders of Shares constituting the Requisite Company Vote at the shareholders' meeting in accordance with the CICL and the Company's memorandum and articles of association; and

- no governmental authority having enacted, issued, promulgated, enforced or entered any law or award, writ, injunction, determination, rule, regulation, judgment, decree or executive order which is in effect (whether temporary, preliminary or permanent), and has or would reasonably be expected to have the effect of making the merger illegal or otherwise prohibiting the consummation of the transactions contemplated by the merger agreement, including the merger.

The obligations of Parent and Merger Sub to consummate the merger are subject to the satisfaction or waiver (where permissible) at or prior to the Closing of the following additional conditions:

- (i) other than the representations and warranties of the Company relating to capitalization, and authority relative to the merger agreement and fairness, the representations and warranties of the Company contained in the merger agreement (disregarding for this purpose any limitation or qualification by materiality or Material Adverse Effect) being true and correct in all respects as of the date of the merger agreement and as of the Closing, as though made on and as of such date (other than representations and warranties that by their terms address matters only as of a specified date, which shall be true and correct only as of such date), except to the extent such failures to be true and correct would not have a Material Adverse Effect; and (ii) the representations and warranties relating to capitalization and authority relative to the merger agreement and fairness shall be true and correct (except, solely with respect to capitalization, for de minimus inaccuracies) as of the date of the merger agreement and as of the Closing, as though made on and as of such date (other than representations and warranties that by their terms address matters only as of a specified date, which shall be true and correct only as of such date), in each case, interpreted without giving effect to any limitations or qualifications as to materiality or Material Adverse Effect;

10

- the Company having performed or complied in all material respects with all agreements and covenants required by the merger agreement to be performed or complied with by it on or prior to the Closing;

- the Company having delivered to Parent a closing certificate, dated the date of the Closing, signed by a senior executive officer of the Company, certifying as to the satisfaction of the immediately preceding conditions; and

- no Material Adverse Effect having occurred since the date of the merger agreement.

The obligations of the Company to consummate the merger are subject to the satisfaction or waiver (where permissible) at or prior to the Closing of the following additional conditions:

- the representations and warranties of Parent and Merger Sub contained in the merger agreement (disregarding for this purpose any limitation or qualification by materiality) being true and correct in all respects as of the date hereof and as of the Closing, as though made on and as of such date (other than representations and warranties that by their terms address matters only as of a specified date, which shall be true and correct only as of such date), except to the extent such failures to be true and correct, individually or in the aggregate, would not reasonably be expected to prevent the consummation of any of the transactions contemplated by the merger agreement;

- each of Parent and Merger Sub having performed or complied in all material respects with all agreements and covenants required by the merger agreement to be performed or complied with by it on or prior to the Closing; and

- Parent having delivered to the Company a closing certificate, dated the date of the Closing, signed by a director of Parent, certifying as to the satisfaction of the immediately preceding conditions.

## No Solicitation (Page 90)

Neither the Company nor any of its subsidiaries or representatives will, directly or indirectly, (i) solicit, initiate or knowingly encourage or take any other action to knowingly facilitate, any inquiries or the making of any proposal or offer that constitutes, or could reasonably be expected to lead to, any acquisition proposal, (ii) enter into, maintain or continue discussions or negotiations with, or provide any non-public information with respect to the Company or any of its subsidiaries (any of which a "Group Company") to, any person in furtherance of such acquisition proposal, (iii) agree to, approve, endorse or recommend any acquisition proposal or enter into any letter of intent or contract or commitment contemplating or otherwise relating to any acquisition proposal, or (iv) release any third party from, or waive any provision of, any confidentiality or standstill agreement to which the company is a party.

The Company will notify Parent as promptly as practicable (and in any event within twenty-four (24) hours after the Company has knowledge thereof), of any written acquisition proposal or any offer proposal that would reasonably be expected to lead to an acquisition proposal, and will keep Parent informed, on a reasonably current basis (and in any event within twenty-four (24) hours of the occurrence of any material changes, developments, discussions or negotiations) of the status and terms of any such proposal, offer, inquiry, contact or request and of any material changes in the status and terms of any such proposal, offer, inquiry, contact or request. Immediately upon the execution and delivery of the merger agreement, the Company shall cease and cause to be terminated all existing discussions or negotiations with any person conducted heretofore with respect to any acquisition proposal, other than the acquisition proposal publicly announced on March 9, 2016 and subsequently received by the Special Committee (the "Existing Proposal").

At any time prior to the receipt of the Requisite Company Vote, the Company and its representatives may, following the receipt of a written acquisition proposal (provided that such acquisition proposal shall not have been obtained in violation of the above), (i) contact the person or group of persons who has made such acquisition proposal to clarify and understand the terms and conditions thereof and to notify such person of the restrictions under the merger agreement; and/or (ii) provide information in response to the request of, and enter into discussions with, the person or group of persons who has made such acquisition proposal, if prior to providing such information, the Company has received an executed confidentiality agreement, which shall be no less favorable to the Company than the confidentiality agreement among the Company, Ms. Yu and Mr. Li dated August 14, 2015, and shall not include any provision calling for any exclusive right to negotiate with such party or having the effect of prohibiting the Company from satisfying its obligations under the merger agreement, a copy of which shall be provided to Parent; provided that the Company shall make available to Parent all material information concerning the Company and its subsidiaries that is provided to any person or group of persons making such acquisition proposal to the extent not previously provided to Parent and Merger Sub; provided that prior to taking any action described above, the Board shall have determined, in its good faith judgment upon the unanimous recommendation of the Special Committee (after consultation with a financial advisor of internationally recognized reputation and independent legal counsel), that (x) such acquisition proposal constitutes or could reasonably be expected to result in a superior proposal; and (y) failure to provide such information or enter into discussions with such person would be inconsistent with its fiduciary obligations to the Company and its shareholders under applicable law.

---

11

Notwithstanding the foregoing, prior to the receipt of the Requisite Company Vote, the Company may continue to take any of the actions described above with respect to the Existing Proposal, if the Board shall determine, in its good faith judgment upon the recommendation of the Special Committee (after consultation with a financial advisor of internationally recognized reputation and independent legal counsel), that such Existing Proposal constitutes or could reasonably be expected to result in a superior proposal; provided that (i) the Company shall disclose all information which is disclosed to the maker of the existing proposal or any representative thereof to Parent unless previously provided to Parent, (ii) the Company shall have entered into a confidentiality agreement with the maker of the Existing Proposal, which shall have contained a "standstill" provision no less favorable to the Company than that in the confidentiality agreement among the Company, Ms. Yu and Mr. Li dated August 14, 2015, and (iii) in the event that the discussions or negotiations between the Company and the maker of the Existing Proposal regarding the Existing Proposal are terminated by the Company or the maker of the Existing Proposal, the Company shall request that such person promptly return or destroy any confidential material provided to such person or any of its representatives in accordance with the confidentiality agreement between the company and such person.

Neither the Board nor any committee thereof shall (i) (A) change, withhold, withdraw, qualify or modify, or resolve or publicly announce to change, withhold, withdraw, qualify or modify, in a manner adverse to Parent or Merger Sub, the recommendation to authorize and approve the merger agreement, the plan of merger and the transactions contemplated by the merger agreement to the holders of Shares (other than the holders of the Excluded Shares) (the "Company Recommendation"), (B) fail to include the Company Recommendation in the Proxy Statement, (C) approve or recommend, or publicly propose to approve or recommend to the shareholders of the Company, any acquisition proposal or (D) if a tender offer or exchange offer for 15% or more of the outstanding shares of capital stock of the Company is commenced, fail to recommend against acceptance of such tender offer or exchange offer by its shareholders within five (5) business days after commencement (any of the foregoing, a "Change in the Company Recommendation"), or (ii) cause or permit the Company of any of its subsidiaries to enter into any letter of intent, memorandum of understanding, agreement in principle, agreement or other or similar document, Contract or obligation with respect to any acquisition proposal.

Notwithstanding the foregoing, from the date of the merger agreement and prior to the receipt of the Requisite Company Vote, if the Company has received an unsolicited, bona fide written acquisition proposal and the Board determines, in its good faith judgment upon the unanimous recommendation of the Special Committee, upon advice by a financial advisor of internationally recognized reputation and independent legal counsel, that such acquisition proposal constitutes a superior proposal and failure to make a Change in the Company Recommendation with respect to such superior proposal would be inconsistent with its fiduciary duties to the Company and its shareholders under applicable law, the Board may, upon the unanimous recommendation of the Special Committee, (x) effect a Change in the Company Recommendation and/or (y) authorize the Company to (1) terminate the merger agreement in accordance with the terms thereof and (2) immediately prior to, contemporaneously with or immediately following the termination of the merger agreement, enter into or execute any alternative acquisition agreement with respect to such superior proposal, but only if, after (A) providing at least five business days' written notice to Parent advising Parent that the Board has received a superior proposal, indicating that the Board intends to effect a Change in the Company Recommendation and the manner in which it intends (or may intend) to do so, (B) negotiating with and causing its financial and legal advisors to negotiate with Parent and its Representatives in good faith (to the extent Parent desires to negotiate) to make such adjustments in the terms and conditions of the merger agreement so that such acquisition proposal or offer would cease to constitute a superior proposal, and (C) permitting Parent and its representatives to make a presentation to the Board and the Special Committee regarding the merger agreement and any adjustments with respect thereto (to the extent Parent desires to make such presentation); and (iii) following such notices, the Board shall have determined, in its good faith judgment upon the unanimous recommendation of the Special Committee (after consultation with a financial advisor of internationally recognized reputation and independent legal counsel), after considering the terms of any proposed modification or amendment to the merger agreement by Parent, that the acquisition proposal continues to constitute a superior proposal.

**Termination of the Merger Agreement (Page 95)**

The merger agreement may be terminated at any time prior to the Effective Time:

- by mutual written consent of Parent and the Company with the approval of their respective boards of directors (in the case of the Board, upon the unanimous approval of the Special Committee);

- by either Company (upon the approval of the Special Committee) or Parent, if:

  - the merger shall not have been consummated on or before January 28, 2017; provided, that the right to terminate the merger agreement shall not be available to a party if the failure of the merger to have been consummated on or before such date was primarily due to such party's breach or failure to perform in any material respect any of its obligations under the merger agreement;

  - any governmental authority shall have enacted, issued, promulgated, enforced or entered any final or non-appealable order which has the effect of making the consummation of the merger illegal or otherwise preventing or prohibiting the consummation of the transactions contemplated by the merger agreement, including the merger; provided, that the right to terminate the merger agreement shall not be available to a party if the issuance of such final, non-appealable order was primarily due to such party's breach or failure to perform in any material respect any of its obligations under the merger agreement; or

  - the Requisite Company Vote shall not have been obtained at the shareholders' meeting duly convened therefor and concluded or at any adjournment or postponement thereof; provided, that the right to terminate the merger agreement shall not be available to a party if the failure to obtain the Requisite Company Vote was primarily due to such party's breach or failure to perform in any material respect its obligations under the merger agreement.

- by the Company (upon the unanimous approval of the Special Committee), if:

  - prior to the receipt of the Requisite Company Vote, (i) the Board has, upon the unanimous recommendation of the Special Committee, authorized the Company to enter into an alternative acquisition agreement, (ii) immediately prior to, concurrently with or immediately following the termination of the merger agreement, the Company enters into an alternative acquisition agreement with respect to the superior proposal, and (iii) the Company immediately prior to, or concurrently with, such termination pays to Parent in immediately available funds the Company termination fee; provided that the Company shall not be entitled to terminate the merger agreement unless the Company has complied in all material respects with the non-solicitation obligations;

  - a breach or failure in any material respect of any representation, warranty, agreement or covenant of Parent or Merger Sub set forth in the merger agreement, shall have occurred, which breach or failure would give rise to the failure of a condition to the obligations of each party or a condition to the obligations of the Company and as a result of such breach, such condition would not be capable of being satisfied prior to January 28, 2017, or if capable of being cured, shall not have been cured (x) within 30 business days following receipt of written notice by Parent and Merger Sub of such breach or failure to perform from the Company stating the Company's intention to terminate the merger agreement or (y) any shorter period of time that remains between the date the Company provides written notice of such breach and January 28, 2017; provided, however, that, the Company shall not have the right to terminate the merger agreement if the Company is then in material breach of any representations, warranties, agreements or covenants under the agreement that would result in the conditions to the obligations of each party, the condition of true and correct representations and warranties of the Company, or the condition that the Company has complied with all agreements and covenants under the merger agreement, not being satisfied; or

  - if (i) all of the conditions to the obligations of each party and to the obligations of Parent and Merger Sub (other than those conditions that by their nature are to be satisfied by actions taken at the Closing) have been satisfied or waived by the party having the benefit thereof or by Parent and Merger Sub, as the case maybe, (ii) the Company has irrevocably confirmed by notice to Parent that all conditions to the obligations of the Company (other than those conditions that by their nature are to be satisfied by actions taken at the Closing) have been satisfied or that it is willing to waive any unsatisfied condition to the obligations of the Company, and (iii) the merger shall not have been consummated within ten business days after the delivery of such notice.

- by Parent, if:

13

- a breach or failure in any material respect of any representation, warranty, agreement or covenant of the Company set forth in the merger agreement shall have occurred, which breach or failure would give rise to the failure of conditions to the obligations of each party, the condition of true and correct representations and warranties of the Company, or the condition that the Company has complied with all agreements and covenants under the merger agreement, and as a result of such breach or failure, such condition would not be capable of being satisfied prior to January 28, 2017, or if capable of being cured, shall not have been cured (x) within 30 business days following receipt of written notice by the Company of such breach or failure to perform from Parent stating Parent's intention to terminate the merger agreement or (y) any shorter period of time that remains between the date Parent provides written notice of such breach and January 28, 2017; provided, however, that Parent shall not have the right to terminate the merger agreement if either Parent or Merger Sub is then in material breach of any representations, warranties, agreements or covenants hereunder that would result in the conditions to the obligations of each party, the condition of true and correct representations and warranties of the Parent and Merger Sub, or the condition that each of Parent and Merger Sub has complied with all agreements and covenants under the merger agreement, not being satisfied; or

- a Company Triggering Event shall have occurred.

A "Company Triggering Event" occurs if (i) there shall have been a Change in the Company Recommendation; and (ii) the Board shall have recommended to the shareholders of the Company an acquisition proposal or shall have resolved to do so.

**Termination Fee (Page 97)**

The Company will pay to Parent or its designees a termination fee of $14,117,000, if the merger agreement is terminated:

- by Parent where the Company is in breach or failure in any material respect of its representation, warranty, covenant or agreement such that the corresponding condition to the Closing cannot be satisfied, or upon the occurrence of a Company Triggering Event;

- by the Company where (i) the Board has, upon the unanimous recommendation of the Special Committee, authorized the Company to enter into an alternative acquisition agreement, (ii) immediately prior to, concurrently with or immediately following the termination of the merger agreement, the Company enters into an alternative acquisition agreement with respect to the superior proposal; or

- by the Company or Parent where either (i) the merger is not consummated on or before January 28, 2017, or (ii) the Requisite Company Vote is not obtained, and if (A) after the date of the merger agreement and prior to the time of the termination, a bona fide acquisition proposal shall have been made known to the Company or shall have been publicly announced or publicly made known, and not withdrawn and (B) within twelve (12) months after such termination, the Company enters into a definitive agreement with respect to such acquisition proposal.

Parent will pay to the Company a termination fee of $28,234,000, if the merger agreement is terminated:

- by the Company where (i) Parent or Merger Sub is in breach or failure in any material respect of its representation, warranty, covenant or agreement such that the corresponding condition to the Closing cannot be satisfied; or

- by the Company if (i) all of the conditions to the obligations of each party and to the obligations of Parent and Merger Sub (other than those conditions that by their nature are to be satisfied by actions taken at the Closing) have been satisfied or waived by the party having the benefit thereof or by Parent and Merger Sub, as the case maybe, (ii) the Company has irrevocably confirmed by notice to Parent that all conditions to the obligations of the Company (other than those conditions that by their nature are to be satisfied by actions taken at the Closing) have been satisfied or that it is willing to waive any unsatisfied condition to the obligations of the Company, and (iii) the merger shall not have been consummated within ten business days after the delivery of such notice.

**Material U.S. Federal Income Tax Consequences (Page 72)**

For a U.S. Holder (as defined under "Special Factors – Material U.S. Federal Income Tax Consequences"), the receipt of cash pursuant to the merger will be a taxable transaction for U.S. federal income tax purposes. A U.S. Holder will recognize gain or loss for U.S. federal income tax purposes equal to the difference between the amount of cash received in exchange for the U.S. Holder's Shares or ADSs and the U.S. Holder's adjusted tax basis in the Shares or ADSs surrendered. Please see "Special Factors – Material U.S. Federal Income Tax Consequences" beginning on page 72 for additional information. The U.S. federal income tax consequences of the merger to you will depend upon your personal circumstances. You should consult your tax advisors for a full understanding of the U.S. federal, state, local, non-U.S. and other tax consequences of the merger to you.

**Material PRC Income Tax Consequences (Page 74)**

There is uncertainty regarding whether the PRC tax authorities would deem the Company to be a resident enterprise under the PRC Enterprise Income Tax Law (the "EIT Law") or whether PRC tax would otherwise apply to gain recognized by holders of Shares or ADSs that are not PRC tax residents on such holders' receipt of cash for their Shares or ADSs. If the PRC tax authorities were to determine that the Company should be considered a resident enterprise, then the gain recognized on the receipt of cash for the Company's Shares or ADSs by the holders of such ADSs or Shares that are not PRC tax residents could be treated as PRC-source income that would be subject to PRC income tax at a rate of 10% in the case of enterprises or 20% in the case of individuals (subject to applicable tax treaty relief, if any). Furthermore, even in the event that the Company is not considered a resident enterprise, gain recognized on the receipt of cash for Shares or ADSs is subject to PRC tax for any holders of such Shares or ADSs who are PRC resident individuals and may be subject to PRC tax for holders that are non-resident enterprises if the merger is re-characterized as a direct transfer of our subsidiaries that are PRC tax resident enterprises pursuant to Bulletin 7 (as described below under "Special Factors —Material PRC Income Tax Consequences"). However, neither Parent nor Merger Sub intends to withhold any PRC taxes on the consideration provided to non-PRC resident shareholders of the Company in connection with the Merger. You should consult your own tax advisor for a full understanding of the tax consequences of the merger to you, including any PRC tax consequences. Please see "Special Factors -- Material PRC Income Tax Consequences" beginning on page 74 for additional information.

**Material Cayman Islands Tax Consequences (Page 75)**

The Cayman Islands currently has no form of income, corporate or capital gains tax and no estate duty, inheritance tax or gift tax. No taxes, fees or charges will payable (either by direct assessment or withholding) to the government or other taxing authority in the Cayman Islands under the laws of the Cayman Islands in respect of the merger or the receipt of cash for Shares and ADSs under the terms of the merger. This is subject to the qualification that (i) Cayman Islands stamp duty may be payable if any original transaction documents are brought into or executed or produced before a court in the Cayman Islands (for example, for enforcement), (ii) registration fees will be payable to the Registrar of Companies of the Cayman Islands to register the plan of merger and (iii) fees will be payable to the Cayman Islands Government Gazette Office to publish the notice of the merger in the Cayman Islands Government Gazette. Please see "Special Factors – Material Cayman Islands Tax Consequences" beginning on page 75 for additional information.

**Regulatory Matters (Page 71)**

The Company does not believe that any material federal or state regulatory approvals, filings or notices are required in connection with the merger other than (i) the approvals, filings or notices required under the federal securities laws, and (ii) the registration of the plan of merger (and supporting documentation as specified in the CICL) with the Registrar of Companies of the Cayman Islands and, in the event the merger becomes effective, a copy of the certificate of merger being given to the shareholders and creditors of the Company and Merger Sub at the time of the filing of the plan of merger, and notification of the merger being published in the Cayman Islands Government Gazette.

**Accounting Treatment of the Merger (Page 71)**

The merger is expected to be accounted for, at historical cost, as a merger of entities under common control in accordance with Accounting Standards Codification 805-50, "Business Combinations—Related Issues."

**Market Price of the Shares (Page 76)**

On July 8, 2015, the last trading day immediately prior to the Company's announcement on July 9, 2015 that it had received a going-private proposal, the reported closing price of the ADSs on the NYSE was $6.51 per ADS. The merger consideration of $1.34 per Share, or $6.70 per ADS, represents a premium of approximately 2.9% over that closing price.

15

**Fees and Expenses (Page 71)**

      Except for the circumstances where either the Company or Parent is required to pay a termination fee or reimburse expenses as appropriate under the merger agreement, all fees and expenses incurred in connection with the merger agreement and the transactions contemplated by the merger agreement will be paid by the party incurring such expenses, whether or not the merger is consummated.

**Remedies (Page 67)**

      The parties to the merger agreement may be entitled to the payment of a termination fee or the grant of specific performance of the terms of the merger agreement, including an injunction or injunctions to prevent breaches of the merger agreement, in addition to any other remedy at law or equity. Specifically, the Company is entitled to an injunction or injunctions, or other appropriate form of specific performance or equitable relief to enforce Parent's and Merger Sub's obligation to consummate the merger, but only in the event that each of the following conditions has been satisfied: (i) all conditions to the obligations of each party and conditions to the obligations of Parent and Merger Sub (other than those conditions that by their nature are to be satisfied at the Closing) have been satisfied or, if permissible, waived in accordance with the merger agreement, (ii) Parent and Merger Sub have failed to complete the Closing by the date the Closing should have occurred, (iii) the debt financing (or, if applicable, the alternative debt financing) has been funded or will be funded at the Closing in accordance with the terms thereof, and (iv) the Company has irrevocably confirmed by notice to Parent that if specific performance is granted and the debt financing (or, if applicable, the alternative debt financing) is funded, then the Closing will occur. The Company will not be entitled to enforce specially Parent's obligation to consummate the merger if the debt financing has not been funded in the absence of any breach by Parent or Merger Sub of the merger agreement or any financing document.

      While the parties may pursue both a grant of specific performance (including an injunction and injunctions) and monetary damages until such time as the other party pays a termination fee (as applicable under the merger agreement), none of them will be permitted or entitled to receive both a grant of specific performance (including an injunction and injunctions) that results in the Closing and monetary damages.

      Subject to the equitable remedies the parties may be entitled to as discussed above, the maximum aggregate liabilities of Parent, on the one hand, and the Company, on the other hand, for monetary damages in connection with the merger agreement are limited to the Parent termination fee of $28,234,000 and the Company termination fee of $14,117,000, respectively, and reimbursement of certain expenses accrued in the event that Company or Parent fails to pay the applicable termination fee when due and in accordance with the requirements of the merger agreement, as the case may be.

16

## QUESTIONS AND ANSWERS ABOUT THE EXTRAORDINARY GENERAL MEETING AND THE MERGER

*The following questions and answers briefly address some questions you may have regarding the extraordinary general meeting and the merger. These questions and answers may not address all questions that may be important to you as a shareholder of the Company. Please refer to the more detailed information contained elsewhere in this proxy statement, the annexes to this proxy statement and the documents referred to or incorporated by reference in this proxy statement.*

**Q:**     **Why am I receiving this proxy statement?**

**A:**     On May 28, 2016, we entered into the merger agreement with Parent and Merger Sub. You are receiving this proxy statement in connection with the solicitation of proxies by the Board in favor of the proposal to authorize and approve the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger, at an extraordinary general meeting or at any adjournment of such extraordinary general meeting.

**Q:**     **When and where will the extraordinary general meeting be held?**

**A:**     The extraordinary general meeting will take place on _____, 2016 at [10:00 a.m.] (Beijing Time) at the Company's office at 21/F, Jing An Center, No. 8 North Third Ring Road East, Chaoyang District, Beijing 100028, People's Republic of China.

**Q:**     **What am I being asked to vote on?**

**A:**     You will be asked to consider and vote on the following proposals: (a) as a special resolution, to authorize and approve the merger agreement, the plan of merger, and the transactions contemplated by the merger agreement, including the merger, the amendment of the authorised share capital of the Company from $100,000 divided into 548,955,840 Class A common shares and 451,044,160 Class B common shares of a par value $0.0001 per share to $100,000 divided into 1,000,000,000 shares with a par value of $0.0001 each and the amendment and restatement of the existing memorandum and articles of association of the Company by their deletion in their entirety and the substitution in their place of a new memorandum and articles of association at the Effective Time, a copy of which is attached as Annex B to the plan of merger; (b) as a special resolution, to authorize each of the members of the Special Committee to do all things necessary to give effect to the merger agreement, the plan of merger, and the transactions contemplated by the merger agreement, including the merger; and (c) if necessary, as an ordinary resolution, to adjourn the extraordinary general meeting in order to allow the Company to solicit additional proxies in the event that there are insufficient proxies received at the time of the extraordinary general meeting to pass the special resolutions to be proposed at the extraordinary general meeting.

**Q:**     **What is the merger?**

**A:**     The merger is a going-private transaction pursuant to which Merger Sub will merge with and into the Company. Once the merger agreement is authorized and approved by the shareholders of the Company and the other closing conditions under the merger agreement have been satisfied or waived, Merger Sub will merge with and into the Company, with the Company continuing as the surviving company after the merger. Because the Buyer Group beneficially owns approximately 35.3% of the total issued and outstanding Shares, representing approximately 83.6% of the total number of votes represented by the issued and outstanding Shares, both quorum and an affirmative vote in favor of the transaction are assured with the Buyer Group's vote. If the merger is completed, the Company will be a privately-held company beneficially owned by the Buyer Group, and as a result of the merger, the ADSs will no longer be listed on the NYSE, and the Company will cease to be a publicly traded company.

**Q:**     **What will I receive in the merger?**

**A:**     If you own Shares and the merger is completed, you will be entitled to receive $1.34 in cash for each Share (other than the Excluded Shares, the Dissenting Shares and Class A common shares represented by ADSs) you own as of the Effective Time (unless you validly exercise and have not effectively withdrawn or lost your dissenter rights under Section 238 of the Cayman Islands Companies Law with respect to the merger, in which event you will be entitled to the fair value of each Share pursuant to the Cayman Islands Companies Law).

17

If you own ADSs (other than ADSs representing the Excluded Shares) and the merger is completed, you will be entitled to receive $6.70 per ADS (less up to $0.05 per ADS cancellation fees and up to $0.02 per ADS depositary services fees pursuant to the terms of the ADS deposit agreement) in cash, without interest and net of any applicable withholding taxes, for each ADS you own as of the Effective Time unless you (a) surrender your ADS to the ADS depositary, pay the ADS depositary's fees required for the cancellation of ADSs, provide instructions for the registration of the corresponding Shares in the Company's register of members, and certify that you have not given, and will not give, voting instructions as to the ADSs (or, alternatively, you will not vote the Shares) before _____ (New York City Time) on _____, 2016 and become a registered holder of Shares before the vote to authorize and approve the merger is taken at the extraordinary general meeting and (b) comply with the procedures and requirements for exercising dissenter rights for the Shares under Section 238 of the Cayman Islands Companies Law.

Please see "Special Factors – Material U.S. Federal Income Tax Consequences," "Special Factors – Material PRC Income Tax Consequences" and "Special Factors – Material Cayman Islands Tax Consequences" beginning on page 72 for a more detailed description of the tax consequences of the merger. You should consult with your own tax advisor for a full understanding of how the merger will affect your U.S. federal, state, local, non-U.S. and other taxes.

**Q:    How will the Company Options be treated in the merger?**

A:    At the Effective Time, the Company will terminate the Company's Share Incentive Plans, terminate all relevant award agreements applicable to the Share Incentive Plans, and cancel all the Company Options that are outstanding and unexercised, whether or not vested or exercisable.

At the Effective Time, each vested Company Option that remains outstanding immediately prior to the Effective Time will be cancelled in exchange for the right to receive from the surviving company or one of its subsidiaries, as soon as practicable after the Effective Time, cash in the amount equal to the product of (a) the number of Shares underlying such Company Option multiplied by (b) the excess, if any, of $1.34 over the exercise price payable per Share of such Company Option. If the exercise price per Share of any such Company Option is equal to or greater than $1.34, such Company Option will be cancelled for no consideration. At the Effective Time, each unvested Company Option will be cancelled for no consideration.

**Q:    After the merger is completed, how will I receive the merger consideration for my Shares?**

A:    If you are a registered holder of Shares, promptly after the Effective Time (in any event within five business days after the Effective Time), a paying agent appointed by Parent will mail you (a) a letter of transmittal specifying how the delivery of the merger consideration to you will be effected and (b) instructions for effecting the surrender of share certificates in exchange for the applicable merger consideration. You will receive cash for your Shares from the paying agent after you comply with these instructions. Upon surrender of your share certificates or a declaration of loss or non-receipt, you will receive an amount equal to the number of your Shares multiplied by $1.34 in cash, without interest and net of any applicable withholding tax, in exchange for the cancellation of your Shares. The merger consideration may be subject to backup withholding under U.S. federal income tax rules if the paying agent has not received from you a properly completed and signed U.S. Internal Revenue Service ("IRS") Form W-8 or W-9.

If your Shares are held in "street name" by your broker, bank or other nominee, you will receive instructions from your broker, bank or other nominee on how to surrender your Shares and receive the merger consideration for those Shares.

**Q:    After the merger is completed, how will I receive the merger consideration for my ADSs?**

A:    If your ADSs are evidenced by certificates, also referred to as American depositary receipts (the "ADRs"), unless you have surrendered your ADRs to the ADS depositary for cancellation prior to the Effective Time, upon your surrender of the ADRs (or an affidavit and indemnity of loss in lieu of the ADRs) together with a duly completed letter of transmittal (which will be supplied to you by the ADS depositary after the Effective Time), the ADS depositary will send you a check for the per ADS merger consideration of $6.70 (less up to $0.05 per ADS cancellation fees and up to $0.02 per ADS depositary services fees pursuant to the terms of the ADS deposit agreement), without interest and net of any applicable withholding taxes, for each ADS evidenced by the ADRs, in exchange for the cancellation of your ADRs after the completion of the merger. If you hold your ADSs in uncertificated form, that is, without an ADR, unless you have surrendered your ADSs to the ADS depositary for cancellation prior to the Effective Time, the ADS depositary will automatically send you a check for the per ADS merger consideration of $6.70 (less up to $0.05 per ADS cancellation fees and up to $0.02 per ADS depositary services fees pursuant to the terms of the ADS deposit agreement), without interest and net of any applicable withholding taxes, in exchange for the cancellation of each of your ADSs after the completion of the merger.

18

In the event of a transfer of ownership of ADSs that is not registered in the register of ADS holders maintained by the ADS depositary, the check for any cash to be exchanged upon cancellation of the ADSs will be issued to such transferee only if the ADRs, if applicable, are presented to the ADS depositary, accompanied by all documents reasonably required to evidence and effect such transfer and to evidence that any applicable ADS transfer taxes have been paid or are not applicable.

The per ADS merger consideration may be subject to U.S. federal income tax backup withholding under U.S. federal income tax rules if the ADS depositary has not received from the transferee a properly completed and signed IRS Form W–8 or W–9.

If your ADSs are held in "street name" by your broker, bank or other nominee, you will not be required to take any action to receive the net merger consideration for your ADSs as the ADS depositary will arrange for the surrender of the ADSs and the remittance of the per ADS merger consideration to The Depository Trust Company (the clearance and settlement system for the ADSs) for distribution to your broker, bank or other nominee on your behalf. If you have any questions concerning the receipt of the per ADS merger consideration, please contact your broker, bank or other nominee.

**Q:**     **What vote of our shareholders is required to authorize and approve the merger agreement and the plan of merger?**

**A:**     In order for the merger to be completed, the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger, must be authorized and approved by a special resolution of the Company passed by an affirmative vote of shareholders representing at least two-thirds of the voting rights of the Shares present and voting in person or by proxy as a single class at the extraordinary general meeting. At the close of business in the Cayman Islands on _____, 2016, the Share record date for the extraordinary general meeting, we expect that there will be _____ Shares issued and outstanding and entitled to vote at the extraordinary general meeting. Pursuant to the Support Agreement, the Supporting Shareholders have agreed to vote all of the Shares (including Class A common shares represented by ADSs) beneficially owned by them in favor of the authorization and approval of the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger, at the extraordinary general meeting of shareholders of the Company. As of the date of this proxy statement, the Supporting Shareholders beneficially own approximately 35.2% of the total issued and outstanding Shares, representing approximately 83.5% of the total number of votes represented by the issued and outstanding Shares.

**Q:**     **What vote of our shareholders is required to approve the proposal to adjourn the extraordinary general meeting, if necessary, to solicit additional proxies?**

**A:**     The merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger, must be authorized and approved by a special resolution of the Company passed by an affirmative vote of shareholders representing at least two-thirds of the voting rights of the Shares present and voting in person or by proxy as a single class at the extraordinary general meeting. If there are insufficient votes at the time of the extraordinary general meeting to authorize and approve the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger, you will also be asked to vote on the proposal to adjourn the extraordinary general meeting to allow us to solicit additional proxies.

The proposal to adjourn the extraordinary general meeting, if necessary, to solicit additional proxies must be authorized and approved by an affirmative vote of the majority of such shareholders of the Company as, being entitled to do so, vote in person or by proxy as a single class at the extraordinary general meeting.

**Q:**     **How does the Board recommend that I vote on the proposals?**

**A:**     After careful consideration and upon the unanimous recommendation of the Special Committee, our Board recommends that you vote:

- FOR the proposal to authorize and approve the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger, the amendment of the authorised share capital of the Company from $100,000 divided into 548,955,840 Class A common shares and 451,044,160 Class B common shares of a par value $0.0001 per share to $100,000 divided into 1,000,000,000 shares with a par value of $0.0001 each and the amendment and restatement of the existing memorandum and articles of association of the Company by their deletion in their entirety and the substitution in their place of a new memorandum and articles of association at the Effective Time, a copy of which is attached as Annex B to the plan of merger;

19

- FOR the proposal to authorize each of the members of the Special Committee to do all things necessary to give effect to the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger; and

- FOR the proposal to adjourn the extraordinary general meeting in order to allow the Company to solicit additional proxies in the event that there are insufficient proxies received at the time of the extraordinary general meeting to pass the special resolutions to be proposed at the extraordinary general meeting.

**Q:    Who is entitled to vote at the extraordinary general meeting?**

A:    The Share record date is _____, 2016. Only shareholders entered in the register of members of the Company at the close of business in the Cayman Islands on the Share record date or their proxy holders are entitled to vote at the extraordinary general meeting or any adjournment thereof. The record date for ADS holders entitled to instruct the ADS depositary to vote at the extraordinary general meeting is _____, 2016. Only ADS holders of the Company at the close of business in New York City on the ADS record date are entitled to instruct the ADS depositary to vote at the extraordinary general meeting. Alternatively, you may vote at the extraordinary general meeting if you cancel your ADSs by _____ (New York City Time) on _____, 2016 and become a holder of Shares by the close of business in the Cayman Islands on the Share record date.

**Q:    What constitutes a quorum for the extraordinary general meeting?**

A:    The presence, in person or by proxy, of shareholders holding not less than one-third of the voting power represented by the issued and outstanding Shares on the Share record date will constitute a quorum for the extraordinary general meeting.

**Q:    What effects will the merger have on the Company?**

A:    As a result of the merger, the Company will cease to be a publicly traded company and will be beneficially owned by the Buyer Group and Mr. He. Your Shares and/or ADSs in the Company will be cancelled, and you will no longer have any interest in our future earnings or growth. Following consummation of the merger, the registration of our Shares and ADSs and our reporting obligations with respect to our Shares and ADSs under the Exchange Act, will be terminated upon application to the SEC. In addition, upon completion of the merger, our ADSs will no longer be listed or traded on any stock exchange, including the NYSE and the American depositary shares program for the ADSs will terminate.

**Q:    When do you expect the merger to be completed?**

A:    We are working toward completing the merger as quickly as possible and currently expect the merger to close in the second half of 2016. In order to complete the merger, we must obtain shareholder's approval of the merger at the extraordinary general meeting and the other closing conditions under the merger agreement must be satisfied or waived in accordance with the merger agreement.

**Q:    What happens if the merger is not completed?**

A:    If our shareholders do not authorize and approve the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger, or if the merger is not completed for any other reason, our shareholders will not receive any payment for their Shares or ADSs pursuant to the merger agreement nor will the holders of any vested Company Options receive payment pursuant to the merger agreement. In addition, the Company will remain a publicly traded company. The ADSs will continue to be listed and traded on the NYSE, provided that the Company continues to meet the NYSE's listing requirements. In addition, the Company will remain subject to SEC reporting obligations. Therefore, our shareholders will continue to be subject to similar risks and opportunities as they currently are with respect to their ownership of our Shares or ADSs.

Under specified circumstances in which the merger agreement is terminated, the Company may be required to pay Parent a termination fee, or Parent may be required to pay the Company a termination fee or reimburse the Company for its expenses, in each case, as described under the caption "The Merger Agreement and Plan of Merger – Termination Fee" beginning on page 97.

**Q:    What do I need to do now?**

A:    We urge you to read this proxy statement carefully, including its annexes, exhibits, attachments and the other documents referred to or incorporated by reference herein and to consider how the merger affects you as a shareholder. After you have done so, please vote as soon as possible.

**Q:**   **How do I vote if my Shares are registered in my name?**

**A:**   If Shares are registered in your name (that is, you do not hold ADSs) as of the Share record date, you should simply indicate on your proxy card how you want to vote, sign and date the proxy card, and mail your proxy card in the enclosed return envelope as soon as possible but in any event so that it is received by the Company no later than _____ a.m. on _____, 2016 (Beijing Time), so that your Shares will be represented and may be voted at the extraordinary general meeting.

Alternatively, you can attend the extraordinary general meeting and vote in person. If you decide to sign and send in your proxy card, and do not indicate how you want to vote, the Shares represented by your proxy will be voted FOR the proposal to authorize and approve the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger, the amendment of the authorised share capital of the Company from $100,000 divided into 548,955,840 Class A common shares and 451,044,160 Class B common shares of a par value $0.0001 per share to $100,000 divided into 1,000,000,000 shares with a par value of $0.0001 each and the amendment and restatement of the existing memorandum and articles of association of the Company by their deletion in their entirety and the substitution in their place of a new memorandum and articles of association at the Effective Time, a copy of which is attached as Annex B to the plan of merger, FOR the proposal to authorize each of the members of the Special Committee to do all things necessary to give effect to the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger, and FOR the proposal to adjourn the extraordinary general meeting in order to allow the Company to solicit additional proxies in the event that there are insufficient proxies received at the time of the extraordinary general meeting to pass the special resolutions to be proposed at the extraordinary general meeting, in which case the Shares represented by your proxy card will be voted (or not submitted for voting) as your proxy determines. If your Shares are held by your broker, bank or other nominee, please see below for additional information.

**Q:**   **How do I vote if I own ADSs?**

**A:**   If you own ADSs as of the close of business in New York City on _____, 2016, the ADS record date (and do not cancel such ADSs and become a registered holder of the Shares underlying such ADSs as explained below), you cannot vote at the meeting directly, but you may instruct the ADS depositary (as the holder of the Shares underlying your ADSs) how to vote the Shares underlying your ADSs by completing and signing the ADS voting instructions card and returning it in accordance with the instructions printed on it as soon as possible but, in any event, so as to be received by the ADS depositary no later than 5:00 p.m. (New York City Time) on _____, 2016. The ADS depositary will endeavor, in so far as practicable, to vote or cause to be voted the number of Shares represented by your ADSs in accordance with your voting instructions timely received by the ADS depositary. The ADS depositary will not vote or attempt to exercise the right to vote any Shares other than in accordance with signed voting instructions from the relevant ADS holder and, accordingly, Class A common shares represented by ADSs for which no timely voting instructions are received by the ADS depositary will not be voted.

Alternatively, you may vote at the extraordinary general meeting if you cancel your ADSs prior to _____ (New York City Time) on _____, 2016 and become a registered holder of Shares by the close of business in the Cayman Islands on _____, 2016, the Share record date. If you hold your ADSs through a financial intermediary such as a broker, you must rely on the procedures of the financial intermediary through which you hold your ADSs if you wish to vote. If your ADSs are held by your broker, bank or other nominee, please see below.

If you wish to cancel your ADSs for the purpose of voting the corresponding Shares, you need to make arrangements to deliver your ADSs to the ADS depositary for cancellation prior to _____ (New York City Time) on _____, 2016 together with (a) delivery instructions for the corresponding Shares (name and address of person who will be the registered holder of Shares), (b) payment of the ADS cancellation fees (up to $5.00 per 100 ADSs (or portion thereof) to be cancelled), up to $0.02 per ADS depositary services fees and any applicable taxes, and (c) a certification that the ADS holder either (i) held the ADSs as of the applicable ADS record date for the extraordinary general meeting and has not given, and will not give, voting instructions to the ADS depositary as to the ADSs being cancelled, or has given voting instructions to the ADS depositary as to the ADSs being cancelled but undertakes not to vote the corresponding Shares at the extraordinary general meeting, or (ii) did not hold the ADSs as of the applicable ADS record date for the extraordinary general meeting and undertakes not to vote the corresponding Shares at the extraordinary general meeting. If you hold your ADSs in a brokerage, bank or nominee account, please contact your broker, bank or other nominee to find out what actions you need to take to instruct the broker, bank or other nominee to cancel the ADSs on your behalf. Upon cancellation of the ADSs, the ADS depositary will arrange for the principal Hong Kong office of The Hong Kong and Shanghai Banking Corporation Limited, the custodian holding the Shares, to transfer registration of the Shares to the former ADS holder (or a person designated by the former ADS holder). If after registration of Shares in your name you wish to receive a certificate evidencing the Shares registered in your name, you will need to request the Cayman registrar of the Shares, to issue and mail a certificate to your attention.

21

**Q:**     **If my Shares or ADSs are held in a brokerage or other nominee account, will my broker vote my Shares on my behalf?**

**A:**     Your broker, bank or other nominee will only vote your Shares on your behalf or give voting instructions with respect to the Shares underlying your ADSs if you instruct it how to vote. Therefore, it is important that you promptly follow the directions provided by your broker, bank or other nominee regarding how to instruct it to vote your Shares. If you do not instruct your broker, bank or other nominee how to vote your Shares that it holds, those Shares may not be voted.

**Q:**     **What will happen if I abstain from voting or fail to vote on the proposal to authorize and approve the merger agreement and the plan of merger?**

**A:**     If you abstain from voting, fail to cast your vote in person or by proxy or fail to give voting instructions to your broker, dealer, commercial bank, trust company or other nominee, your vote will not be counted.

**Q:**     **May I change my vote?**

**A:**     Yes, you may change your vote in one of three ways.

- first, you may revoke a proxy by written notice of revocation given to the chairman of the extraordinary general meeting before the extraordinary general meeting commences. Any written notice revoking a proxy should be sent to the Company at the Company's offices at 21/F, Jing An Center, No. 8 North Third Ring Road East, Chaoyang District, Beijing 100028, People's Republic of China;

- second, you may complete, date and submit a new proxy card bearing a later date than the proxy card sought to be revoked to the Company no less than 48 hours prior to the extraordinary general meeting; or

- third, you may attend the extraordinary general meeting and vote in person. Attendance, by itself, will not revoke a proxy. It will only be revoked if the shareholder actually votes at the extraordinary general meeting.

If you hold Shares through a broker, bank or other nominee and have instructed the broker, bank or other nominee to vote your Shares, you must follow directions received from the broker, bank or other nominee to change your instructions.

Holders of ADSs may revoke their voting instructions by notification to the ADS depositary in writing at any time prior to 5:00 p.m. (New York City Time) on _____, 2016. A holder of ADSs can do this in one of two ways:

- first, a holder of ADSs can revoke its voting instructions by written notice of revocation timely delivered to the ADS depositary; and

- second, a holder of ADSs can complete, date and submit a new ADS voting instructions card to the ADS depositary bearing a later date than the ADS voting instructions card sought to be revoked.

If you hold your ADSs through a broker, bank or other nominee and you have instructed your broker, bank or other nominee to give ADS voting instructions to the ADS depositary, you must follow the directions of your broker, bank or other nominee to change those instructions.

**Q:**     **What should I do if I receive more than one set of voting materials?**

**A:**     You may receive more than one set of voting materials, including multiple copies of this proxy statement or multiple proxy or voting instruction cards. For example, if you hold your Shares or ADSs in more than one brokerage account, you will receive a separate voting instruction card for each brokerage account in which you hold Shares or ADSs. If you are a holder of record and your Shares or ADSs are registered in more than one name, you will receive more than one proxy card. Please submit each proxy card that you receive.

**Q:**     **If I am a holder of certificated Shares or ADRs, should I send in my share certificates or my ADRs now?**

**A:**     No. After the merger is completed, you will be sent a letter of transmittal with detailed written instructions for exchanging your share certificates for the merger consideration. Please do not send in your certificates now. Similarly, you should not send in the ADRs that evidence your ADSs at this time. Promptly after the merger is completed, the ADS depositary will call for the surrender of all ADRs for delivery of the merger consideration. ADR holders will be receiving a form of letter of transmittal and written instructions from the ADS depositary relating to the foregoing.

22

All holders of uncertificated Shares and uncertificated ADSs (i.e., holders whose Shares or ADSs are held in book entry) will automatically receive their cash consideration shortly after the merger is completed without any further action required on the part of such holders. If your Shares or your ADSs are held in "street name" by your broker, bank or other nominee you will receive instructions from your broker, bank or other nominee as to how to effect the surrender of your share certificates or ADRs in exchange for the merger consideration.

**Q:**     **What happens if I sell my Shares or ADSs before the extraordinary general meeting?**

**A:**     The Share record date for determining shareholders entitled to vote at the extraordinary general meeting is earlier than the date of the extraordinary general meeting and the date that the merger is expected to be consummated. If you transfer your Shares after the Share record date but before the extraordinary general meeting, you will retain your right to vote at the extraordinary general meeting unless you have given, and not revoked, a valid proxy to the person to whom you transfer your Shares, but will transfer the right to receive the merger consideration in cash without interest to such person, so long as such person is registered as the owner of such Shares when the merger is consummated. In such case, your vote is still very important and you are encouraged to vote.

The ADS record date is the close of business in New York City on _____, 2016. If you transfer your ADSs after the ADS record date but before the extraordinary general meeting, you will retain your right to instruct the ADS depositary to vote at the extraordinary general meeting, but will transfer the right to receive the merger consideration in cash without interest to the person to whom you transfer your ADSs, so long as such person owns such ADSs when the merger is consummated.

**Q:**     **Am I entitled to dissenter rights?**

**A:**     Shareholders who dissent from the merger will have the right to receive payment of the fair value of their Shares if the merger is completed, but only if they deliver to the Company, before the vote on the merger is taken at the extraordinary general meeting, a written objection to the merger and they subsequently comply with all procedures and requirements of Section 238 of the Cayman Islands Companies Law for the exercise of dissenter rights. The fair value of their Shares as determined under that statute could be more than, the same as, or less than the merger consideration they would receive pursuant to the merger agreement if you do not exercise dissenter rights with respect to their Shares.

ADS holders will not have the right to exercise dissenter rights and receive payment of the fair value of the Shares underlying their ADSs. The ADS depositary will not exercise or attempt to exercise any dissenter rights with respect to any of the Shares that it holds, even if an ADS holder requests the ADS depositary to do so. ADS holders wishing to exercise dissenter rights must surrender their ADSs to the ADS depositary for conversion into Shares, pay the ADS depositary's fees required for the cancellation of their ADSs, provide instructions for the registration of the corresponding Shares in the Company's register of members, and certify that they held the ADSs as of the ADS record date and have not given, and will not give, voting instructions as to their ADSs before _____ (New York City Time) on _____, 2016, and become registered holders of Shares before the vote to authorize and approve the merger is taken at the extraordinary general meeting (for the avoidance of doubt, any ADS holders who convert their ADSs into Shares after the Share record date will not be entitled to attend or to vote at the extraordinary general meeting, but will be entitled to exercise dissenter rights if they become registered holders of Shares before the vote is taken at the extraordinary general meeting). After converting their ADSs and becoming registered holders of Shares, such former ADS holders must also comply with the procedures and requirements for exercising dissenter rights with respect to the Shares under Section 238 of the Cayman Islands Companies Law.

We encourage you to read the information set forth in this proxy statement carefully and to consult your own Cayman Islands legal counsel if you desire to exercise your dissenter rights. Please see "Dissenter Rights" beginning on page 100 as well as "Annex C – Cayman Islands Companies Law Cap. 22 (Law 3 of 1961, as consolidated and revised) – Section 238" to this proxy statement for additional information.

https://www.sec.gov/Archives/edgar/data/1499744/000114420416108643/v442417_ex99a1.htm

**Q:**     **If I own ADSs and seek to exercise dissenter rights, how do I convert my ADSs to Shares, and when is the deadline for completing the conversion of ADSs to Shares?**

**A:**     If you own ADSs and wish to exercise dissenters' rights, you must deliver the ADSs (or to the extent ADSs are certificated, the ADRs) to the ADS depositary for cancellation before the close of business in New York City on _____, 2016 together with (a) delivery instructions for the corresponding Shares (name and address of the person who will be the registered holder of the Shares), (b) payment of the ADS cancellation fees (up to $5.00 per 100 ADSs (or portion thereof) to be cancelled pursuant to the terms of the Deposit Agreement), up to $0.02 per ADS depositary services fees and any applicable taxes, and (c) a certification that the ADS holder either (i) held the ADSs as of the applicable ADS record date for the extraordinary general meeting and has not given, and will not give, voting instructions to the ADS depositary as to the ADSs being cancelled, or has given voting instructions to the ADS depositary as to the ADSs being cancelled but undertakes not to vote the corresponding Shares at the extraordinary general meeting, or (ii) did not hold the ADSs as of the applicable ADS record date for the extraordinary general meeting and undertakes not to vote the corresponding Shares at the extraordinary general meeting.

You must become a registered holder of the Shares underlying your ADSs and deliver to the Company, before the vote on the merger is taken at the extraordinary general meeting, a written objection to the merger and subsequently comply with all procedures and requirements of Section 238 of the Cayman Islands Companies Law, which is attached as Annex C to this proxy statement, for the exercise of dissenters' rights.

We encourage you to read the information set forth in this proxy statement carefully and to consult your own Cayman Islands legal counsel if you desire to exercise your dissenter rights. Please see "Dissenter Rights" beginning on page 100 as well as "Annex C – Cayman Islands Companies Law Cap. 22 (Law 3 of 1961, as consolidated and revised) – Section 238" to this proxy statement for additional information.

**Q:**     **Will any proxy solicitors be used in connection with the extraordinary general meeting?**

**A:**     No. The Company does not plan to engage a proxy solicitor to assist in the solicitation of proxies.

**Q:**     **Do any of the Company's directors or executive officers have interests in the merger that may differ from those of other shareholders?**

**A:**     Yes. Some of the Company's directors or executive officers have interests in the merger that may differ from those of other shareholders, including:

- the beneficial ownership of equity interests in Parent by Ms. Yu and Mr. Li;

- the potential enhancement or decline of share value of Parent's shares beneficially owned by Ms. Yu and Mr. Li as a result of the merger and future performance of the surviving company;

- continued indemnification, rights to advancement of fees and directors and officers liability insurance to be provided by the surviving company to former directors and executive officers of the Company;

- the monthly compensation of $10,000, which must not exceed $50,000 in aggregate, for each of the members of the Special Committee in exchange for their services in such capacity (or, in the case of the chairpersonman of the Special Committee, monthly compensation of $15,000, which must not exceed $100,000 in the aggregate) (the payment of which is not contingent upon the completion of the merger or the Special Committee's or the Board's recommendation of the merger); and

- the continuation of service of the executive officers of the Company with the surviving company in positions that are substantially similar to their current positions.

Please see "Special Factors – Interests of Certain Persons in the Merger" beginning on page 67 for a more detailed discussion of how some of our Company's directors and executive officers have interests in the merger that are different from, or in addition to, the interests of our shareholders generally.

**Q:**     **How will our directors and executive officers vote on the proposal to authorize and approve the merger agreement and the plan of merger?**

**A:**     Pursuant to the Support Agreement, the Supporting Shareholders have agreed to vote all of the Shares (including Class A common shares represented by ADSs) they beneficially own in favor of the authorization and approval of the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger. As of the Share record date, we expect that the Supporting Shareholders as a group will beneficially own, in the aggregate, _____ issued and outstanding Class A common shares (including Class A common shares represented by ADSs) and _____ Class B common shares, which represents approximately _____% of the total issued and outstanding Shares and approximately _____% of the total number of votes represented by the issued and outstanding Shares.

**Q:**     **Who can help answer my questions?**

**A:**     If you have any questions or need assistance voting your Shares or ADSs, please contact the Company's Investor Relations Department at

+86-10 5799-2666, or by email at ir@dangdang.com.

---

24

# SPECIAL FACTORS

**Background of the Merger**

*Events leading to the execution of the merger agreement described in this Background of the Merger occurred in China and Hong Kong. As a result, China Standard Time is used for all dates and times given.*

The board of directors (the "Board") and senior management of the Company have been reviewing periodically the Company's long-term strategic plan with the goal of maximizing shareholder value. As part of this ongoing process, the Board and senior management of the Company also have periodically reviewed strategic alternatives that may be available to the Company.

On July 9, 2015, Ms. Peggy Yu Yu, co-founder and executive chairwoman of the Company ("Ms. Yu"), and Mr. Guoqing Li, co-founder, chief executive officer and director of the Company ("Mr. Li", together with Ms. Yu, the "Founders"), submitted to the Board a preliminary non-binding proposal letter (the "Proposal Letter") to acquire all of the outstanding Shares of the Company not already beneficially owned by the Founders for $7.812 in cash per ADS, or $1.5624 in cash per Share (the "Proposed Transaction"). The Proposal Letter also stated, among other things, that (i) the Founders beneficially owned approximately 35.9% of all the issued and outstanding Shares of the Company, which represent approximately 83.5% of the aggregate voting power of the Company, (ii) the Founders intended to finance the acquisition with a combination of debt and equity capital, and (iii) the Founders do not intend to sell their stake in the Company to a third party.

Later on July 9, 2015, the Company issued a press release regarding its receipt of the Proposal Letter and subsequently furnished the press release as an exhibit to its current report on Form 6-K on July 10, 2015.

On July 10, 2015, the Board held a telephonic meeting to discuss, among other things, the Proposal Letter. After thorough discussion, the Board determined to establish a Special Committee consisting of Ms. Ruby Rong Lu, Mr. Ke Zhang and Mr. Xiaolong Li, with Ms. Ruby Rong Lu serving as chairwoman of the Special Committee, to consider and evaluate any proposal made by the Founders in connection with the Proposal Letter. The Special Committee was granted, by way of unanimous written resolutions by the Board on July 12, 2015, the power to (a) make such investigation of the proposal from the Founders, the Proposed Transaction and any matters relating thereto as the Special Committee, in its sole discretion, deems appropriate, (b) evaluate the terms of the proposal from the Founders, (c) discuss and negotiate with the Founders and their representatives any terms of the Proposed Transaction and implement the Proposed Transaction as the Special Committee deems appropriate, (d) explore and pursue any alternatives to the Proposed Transaction as the Special Committee, in its sole discretion, deems appropriate, including maintaining the Company's current status as a public company or a potential change of control transaction involving an alternative buyer (an "alternative transaction"), (e) if and when appropriate, negotiate definitive agreements with respect to the Proposed Transaction or any alternative transaction, the execution and delivery of any such agreement being subject, however, to the approval of the Board, (f) report to the Board the recommendations and conclusions of the Special Committee with respect to the Proposed Transaction or any alternative transaction and any recommendation as to whether the final terms of the Proposed Transaction or any alternative transaction are fair to and in the best interests of the shareholders of the Company and should be approved by the Board and, if applicable, by the Company's shareholders, and determinations and recommendations with respect to any other matters requested by the Board, and (g) retain, in its sole discretion, and on terms and conditions acceptable to the Special Committee, such advisors, including legal counsel, financial advisors and outside consultants, as the Special Committee in its sole discretion deems appropriate to assist the Special Committee in discharging its responsibilities.

On July 13, 2015, the Company issued a press release regarding the formation of the Special Committee and subsequently furnished the press release as an exhibit to its current report on Form 6-K on July 14, 2015.

During the course of the next few weeks, the Special Committee considered proposals from and conducted interviews with multiple prospective law firms and investment banks that had expressed interest in being considered for the role U.S. legal advisor and financial advisor to the Special Committee, respectively.

On July 20, 2015, after considering proposals from multiple prospective U.S. legal advisors, the Special Committee determined to retain Shearman & Sterling LLP ("Shearman & Sterling") as its U.S. legal advisor to assist the Special Committee in evaluating and negotiating the Proposed Transaction or any alternative transaction. The Special Committee's decision was based on, among other factors, Shearman & Sterling's qualifications, extensive experience with mergers and acquisitions transactions, including representation of Special Committees in going private transactions, and its significant history of working with China-based companies.

25

On July 20, 2015, the Founders, together with Kewen Holding Co. Limited ("Kewen") and Science & Culture International Limited ("SC International"), which are wholly owned and controlled by the Founders, filed with the SEC a statement on Schedule 13D reporting, among other things, the submission of the Proposal Letter to the Board.

On July 23, 2015, the Special Committee held a telephonic meeting with Shearman & Sterling. The Special Committee reviewed proposals for acting as the financial advisor to the Special Committee submitted by Duff & Phelps and another candidate. The Special Committee carefully evaluated the credentials and qualifications of each candidate, including, among other things, their relevant experience in similar transactions, the negotiation power and skills of the team members, the strategic process management capability and execution skills, independence of each candidate, fee proposals and the knowledge of the Company. After robust discussion, the Special Committee agreed that Duff & Phelps excelled due to its overall competence and experiences, particularly the experience in recent going private transactions of U.S.-listed China-based companies. The Special Committee decided to invite Duff & Phelps to prepare a draft engagement letter for the Special Committee's consideration. The Special Committee, on behalf of the Company, subsequently entered into an engagement letter with Duff & Phelps on July 24, 2015. As part of the engagement, the Special Committee also retained Duff & Phelps Securities, LLC ("DPS"), an affiliate of Duff & Phelps, to act as financial advisor to the Special Committee to provide such financial and market related advice and assistance as deemed necessary by the Special Committee in connection with the Proposed Transaction.

During the meeting, the Special Committee authorized Shearman & Sterling to contact reputable Cayman Islands counsel to submit credentials and proposal for its consideration. After considering the relevant experience and credentials of multiple prospective law firms, the Special Committee subsequently resolved to appoint Maples and Calder as its Cayman Islands legal advisor.

On July 30, 2015, the Special Committee held a telephonic meeting with Shearman & Sterling, Duff & Phelps, DPS and Maples and Calder. Maples and Calder led the Special Committee in a discussion of the key duties, responsibilities and guidelines of the Special Committee, including the Special Committee's fiduciary duties to the shareholders of the Company in the potential going private transaction of the Company. Shearman & Sterling reviewed the process and certain key issues of the going private transaction, including confidentiality, document retention and public disclosure. Shearman & Sterling noted, among other things, that the Special Committee should establish a rigorous and fair process throughout the going-private process, and that the Special Committee should adopt practices throughout their work that are designed to maximize shareholder value.

During the meeting, Shearman & Sterling also advised and the Special Committee agreed that the Company management and employees should be cautious in communications with the Founders or any potential buyer who may have an interest in an alternative transaction involving the Company. The Special Committee then reviewed the draft communication guidelines prepared by Shearman & Sterling and resolved that such communication guidelines be approved and the Company management be instructed to take measures to implement such communication guidelines. The guidelines were subsequently delivered to the management on July 30, 2015 after the meeting.

During the meeting, the Special Committee also discussed with its advisors the communication protocol with respect to potential investor questions and market inquiries in relation to the Proposed Transaction. After discussion, the Special Committee decided that all questions from external parties, such as investors, analysts and media, in relation to the Proposed Transaction should be directed to Duff & Phelps, DPS and Shearman & Sterling who should consult the Special Committee in responding to the questions.

During the meeting, Shearman & Sterling also summarized to the Special Committee the proposed key terms of the confidentiality agreement to be entered into between the Company and the potential buyers. After discussion, the Special Committee authorized Shearman & Sterling to negotiate such confidentiality agreement on behalf of the Company.

During the meeting, Duff & Phelps also provided an overview of the transaction process, the timetable and Duff & Phelps' role as financial advisor to the Special Committee. The Special Committee instructed Duff & Phelps to start its financial due diligence on the Company in order for Duff & Phelps to conduct its preliminary valuation for the Company.

Later that day, Shearman & Sterling sent a draft confidentiality agreement to Skadden, Arps, Slate, Meagher & Flom ("Skadden"), the U.S. legal advisor to the Founders. During the course of the next two weeks, Shearman & Sterling and Skadden negotiated and finalized the terms of the confidentiality agreement.

26

On July 31, 2015, the Company issued a press release regarding the Special Committee's appointment of Duff & Phelps and DPS as its financial advisor and Shearman & Sterling as its U.S. legal advisor and furnished the press release as an exhibit to its current report on Form 6-K.

Throughout the course of the next ten months, the Special Committee held 13 meetings, received the advice of its legal advisors and financial advisor, and reached out to 37 potential transaction partners, including the Founders.

Beginning in early August 2015, the Founders and representatives of China Renaissance Enterprises Limited ("China Renaissance"), the financial advisor of the Founders, held preliminary discussions with multiple potential funding sources regarding the debt financing for the Proposed Transaction.

On August 14, 2015, the Special Committee, on behalf of the Company, entered into the confidentiality agreement with the Founders (the "Confidentiality Agreement"), pursuant to which the Founders are required to obtain the Special Committee's prior consent to negotiate or enter into any agreements with any potential investors in connection with the participation in the Proposed Transaction as a co-investor, member of a buyer consortium or equity financing source.

On August 18, 2015, Duff & Phelps and DPS had a telephone call with Ms. Yu to understand the Founders' financing plan and due diligence process. During the call, Ms. Yu stated that the Proposed Transaction will be financed through both debt and equity financings. Duff & Phelps and DPS were also informed that the Founders had engaged China Renaissance as financial advisor to facilitate the due diligence on the Company by the potential financing sources and other transaction matters.

On August 21, 2015, the Special Committee held a telephonic meeting with Shearman & Sterling, Duff & Phelps and DPS. During the meeting, Duff & Phelps and DPS provided an overview of the Founders' financing plan and due diligence process. Duff & Phelps and DPS reported to the Special Committee that the Founders would finance the Proposed Transaction through both debt and equity financings, and that the Founders had engaged financial advisors to facilitate due diligence by potential financing sources on the Company and other transaction matters.

During the meeting, the Special Committee discussed extensively with its advisors as to whether to perform an active market check or otherwise conduct a broader sale process, and if so, who would be the most likely financial sponsors and strategic entities to be interested in acquiring the Company. The Special Committee noted that (i) the Founders, beneficially owned in the aggregate approximately 83.5% of the voting power in the Company, were committed to only pursuing the Proposed Transaction and did not intend to sell their shares in any alternative transaction, according to the Proposal Letter, and (ii) since the public disclosure of the Proposal Letter on July 9, 2015, there had not been any inquiry from any third party. Taking into account these considerations as well as the significant disruption to the operations of the Company that a broad pre-signing market check may cause, including the potential risk of competitive harm to the Company if strategic buyers conducted due diligence but a transaction did not occur, and the risk of leaks of confidential information, which could create instability among the Company's employees, the Special Committee decided that, rather than actively soliciting every potential buyer identified by Duff & Phelps, it would reach out to a limited number of potential strategic and financial buyers that are most likely interested in a potential transaction involving the Company based on the industry in which they operate or prior investment experiences, as applicable. The Special Committee then discussed with its advisors a list of potential buyers, including global and China-based strategic buyers and financial sponsors, which DPS would contact on behalf of the Special Committee in the market check process. Duff & Phelps then updated the Special Committee on the progress of its financial due diligence on the Company.

Between August 27, 2015 and September 18, 2015, DPS contacted 35 potential buyers, including ten potential strategic buyers and 25 potential financial buyers on behalf of the Special Committee. As of September 18, 2015, the deadline previously notified by DPS to those potential buyers, 30 potential buyers turned down the proposal and five potential buyers hadn't responded to DPS with respect to its enquires.

Between late August and mid-September 2015, based on preliminary discussions with the potential debt financing sources, the Founders identified two candidates, including Bank of China Limited, Pudong Development Zone Sub-Branch (the "Financing Bank") and one other China-based commercial bank, as the most feasible potential sources to provide debt financing for the Proposed Transaction. Following the execution by these potential debt financing sources of a joinder agreement to the Confidentiality Agreement, the potential debt financing sources commenced due diligence on the Company. In addition, the Founders and their representatives engaged in further negotiations with them on the key terms of the debt financing.

On September 14, 2015, Skadden informed Shearman & Sterling of the Founders' intention to use the available cash of the Company and its subsidiaries as one of the sources for payment of the cash consideration in the Proposed Transaction, in addition to potential equity and debt financing.

On September 21, 2015, the Special Committee held a telephonic meeting with Shearman & Sterling, Duff & Phelps and DPS. During the meeting, DPS updated the Special Committee regarding the status of the market check, including the fact that none of the potential buyers contacted by it in the market check process showed an interest in pursuing an alternative transaction with the Company. After discussion with its advisors, the Special Committee concluded that the market check process had reasonably covered the pool of potential buyers that might have an interest in pursuing an alternative transaction with the Company. Although no potential investors contacted by DPS in the market check process indicated interest to DPS or the Special Committee in making an alternative offer, the Special Committee would remain open to consider any alternative proposal that may be made by potential buyers at a later stage.

During the meeting, Shearman & Sterling reported to the Special Committee that the Founders expected to finance the Proposed Transaction with a combination of debt financing, equity financing and available cash of the Company. Shearman & Sterling further reported that the Founders were in touch with several potential debt financing sources, including the Financing Bank. The Special Committee then engaged in discussion with its advisors as to utilization of available cash of the Company as consideration in going-private transactions. After robust discussion with its advisors, the Special Committee determined that although the Company's available cash is a possible financing source for the Founders in the Proposed Transaction, it would need more clarity with respect to the Founders' financing plan before it may reach any conclusion as to an acceptable financing arrangement. The Special Committee instructed DPS to follow up with the Founders to understand the progress and details about the financing plan. Duff & Phelps then updated the Special Committee on the progress of its financial due diligence on the Company. Later that day, a representative of Shearman & Sterling informed a representative of Skadden that the Special Committee's request for additional clarify regarding the Founders' proposed financing plan, and it agreed to consider the use of the available cash of the Company and its subsidiaries as one of the financing sources, together with acceptable debt and/or equity financing.

On October 12, 2015, Skadden sent an initial draft of the merger agreement to Shearman & Sterling.

On October 29, 2015, the Special Committee held a telephonic meeting with Shearman & Sterling, Duff & Phelps and DPS. During the meeting, Shearman & Sterling provided the Special Committee with an overview of the draft merger agreement, and led the Special Committee through a discussion of the key issues and recommended approaches to be adopted by the Special Committee, including: (i) requesting the Founders to provide customary form of limited guarantee, equity commitment letter and debt financing documents, (ii) requesting the Founders to confirm on the treatment of the Company options, (iii) the representations and warranties of the Company should be subject to customary exceptions including matters set forth in the disclosure schedule, the Company's SEC reports or known to the Founders, (iv) requesting for the "majority of minority" provision, which would require the merger agreement and the transactions contemplated thereby be approved by a majority of the Company's shareholders unaffiliated with the Founders, (v) requesting for "go-shop", "fiduciary out" and relevant termination provisions, (vi) removing the closing condition that holders of no more than 5% of the shares have exercised dissenting rights, (vii) considering the available cash covenant required by the Founders in light of the overall financing plan to be proposed by the Founders, and (viii) requesting for termination fees in the event of a termination of the merger agreement under certain circumstances. After robust discussion, the Special Committee instructed Shearman & Sterling to revise the draft merger agreement as recommended by Shearman & Sterling to reflect the Special Committee's position and send it to Skadden for further negotiation. Duff & Phelps then updated the Special Committee on the progress of its financial due diligence on the Company.

On November 9, 2015, Shearman & Sterling sent its comments to the initial draft of the merger agreement to Skadden.

On November 30, 2015, Skadden sent a revised draft of the merger agreement to Shearman & Sterling.

On December 2, 2015, December 26, 2015, January 7, 2016, February 3, 2016 and February 26, 2016 respectively, Skadden sent Shearman & Sterling several requests for the Special Committee's consent to the Founders and their advisors engaging in discussions and negotiations with certain potential equity investors identified in the requests in connection with such potential investors' participation in the Proposed Transaction, pursuant to the terms of the Confidentiality Agreement. The Special Committee, after consideration and review of certain background information of such potential equity investors provided by the representatives of the Founders, consented to all such requests. Each of the potential equity investors, except for one, executed a joinder agreement to the Confidentiality Agreement in form accepted by the Special Committee and started due diligence on the Company. The Founders and their representatives did not provide any confidential information of the Company to the potential investor who did not execute such joinder agreement, and did not engage in further discussions with such investor.

28

Between early December 2015 and late February 2016, the Founders and their representatives continued to negotiate with the two potential debt financing sources on the key terms of the debt financing for the Proposed Transaction. After comparing and analyzing the terms they proposed, the Founders considered the Financing Bank as the preferred potential debt financing source.

On February 22, 2016, a representative of Duff & Phelps had a telephone conversation with a representative of China Renaissance on the status of the Proposed Transaction, during which the representative of Duff & Phelps requested the Founders to provide more detailed information in order for the Special Committee to evaluate the Founders' financing arrangement for the Proposed Transaction, including providing for review draft transaction documents relating to the potential debt and equity financing, as well as the Founders' rationale for proposing to use the available cash of the Company and its subsidiaries for payment of a portion of the merger consideration, as opposed to alternatively using such cash as collateral for the proposed debt financing, which would increase the amount of debt that needs to be borrowed in the debt financing.

On February 26, 2016, in light of the importance of obtaining the Special Committee's affirmation that the Company's available cash may be used for payment of the merger consideration, which may otherwise affect the structure and terms of the debt financing, Skadden sent Shearman & Sterling an email reiterating the Founders' intention to use the Company's available cash as part of the merger consideration, along with cash from debt and equity financing sources. Skadden pointed out in the e-mail, among other things, that (i) the Founders' proposed financing plan contemplated the available cash of the Company would be used for distribution of merger consideration to the Company's shareholders only after the effective time of the proposed merger, at which point, by definition, the Founders would wholly beneficially own the Company as the surviving company of the merger, including its cash asset; (ii) as the available cash of the Company to be used would be readily offshore outside the PRC for payment of the merger consideration without material regulatory or tax burdens, it would not appear justifiable to require the incurrence of a higher debt amount (with a cash collateralized tranche), which would impose substantial additional financing costs, instead of using the same cash directly toward payment of the transaction consideration; and (iii) such proposed use of a target company's available cash balance is not uncommon in recent going private transactions involving China-based companies listed in the United States.

Later that day, the Special Committee held a telephonic meeting with Shearman & Sterling, Duff & Phelps and DPS. DPS provided the Special Committee with an update of the Founders' proposed financing plan, including the progress of the Founders' discussions with potential equity investors with respect to their potential participation in the transaction.

During the meeting, the Special Committee engaged in robust discussion with its advisors regarding the Founders' proposal to use the Company's available cash to pay part of the merger consideration. During the discussion, the Special Committee highlighted the importance of financing certainty and emphasized that any potential utilization of the Company's cash should not affect the Company's business operation in the ordinary course. After discussion, the Special Committee decided that it would need more information, including the information relating to the financial condition of the Company, the financing papers and concrete financing plan to assess the request of utilizing the available cash of the Company, and instructed its advisors to follow up with the Founders and their counsel to collect the relevant information and documents. Duff & Phelps then updated the Special Committee on the progress of its financial due diligence on the Company.

Later that day, after the meeting with the Special Committee, Shearman & Sterling requested Skadden to provide more details regarding the Founders' proposed financing plan, including the terms and conditions of the transaction documents in connection with the financing, for the Special Committee's further consideration. Shearman & Sterling also sent an e-mail to Skadden confirming, among other things, that the Special Committee conceptually does not object to the Founders' proposal to use the Company's available cash to fund the merger consideration, subject to the Special Committee's holistic review of the Founders' financing plan and the final terms and conditions of the transaction documents.

On March 3, 2016, Skadden provided Shearman & Sterling with an initial draft of the debt commitment letter to be issued by the Financing Bank setting forth its commitment to provide debt financing for the Proposed Transaction.

On March 9, 2016, a private equity firm ("Investor A") primarily engaged in secondary market trading of stock of China-based internet companies listed on the U.S. markets announced that it has submitted a preliminary non-binding proposal to acquire all of the outstanding Class A common shares, Class B common shares and ADSs of the Company in an all-cash transaction for $8.8 per ADS or $1.76 per Share (the "Proposed Investor A Transaction"). The Special Committee received Investor A's proposal letter on the same day.

https://www.sec.gov/Archives/edgar/data/1499744/000114420416108643/v442417_ex99a1.htm

On March 10, 2016, the Special Committee held a telephonic meeting with Shearman & Sterling, Duff & Phelps and DPS to discuss the proposal from Investor A. After discussion, the Special Committee instructed DPS to reach out to Investor A to obtain more information about Investor A and its proposal, including its intention, background, transaction experience and capital commitment, and the proposed deal structure, timeline and source of funding of the Proposed Transaction, and to request the Founders to consider increasing the offer price on behalf of the Special Committee. Duff & Phelps then updated the Special Committee on the progress of its financial due diligence on the Company.

On March 11, 2016, DPS sent an email to the Founders requesting the Founders to consider improving the offer price in light of the fact that there has been a recent offer with a superior price, and submitting a revised and improved offer.

On March 14, 2016, DPS held a telephonic meeting with Investor A and discussed, among other things, Investor A's status of financing and proposed timetable for the Proposed Investor A Transaction. Subsequently on March 15, 2016, DPS sent a process letter to Investor A asking Investor A to provide additional information in order for the Special Committee to evaluate the competing bid, including, among other things, detailed information of Investor A, investment position and investment experience, source of funding, capital commitment, structure of transaction and timetable, and future plan with the Company.

On March 18, 2016, Skadden sent Shearman & Sterling an updated draft of the debt commitment letter and a draft term sheet to be attached to the debt commitment letter, reflecting the terms under discussion between the Founders and the Financing Bank.

On March 23, 3016, Shearman & Sterling sent Skadden the Special Committee's comments to the draft debt commitment letter and draft term sheet.

On March 28, 2016, the Founders informed DPS that they still believed the offer price of $7.812 per ADS represented a fair price to the Company's shareholders, and that the Founders had decided not to increase its offer price, citing several factors, including: (i) recent changes in the market and competitive landscape for e-commerce companies in China, which have adversely affected the Company and resulted in, among other things, a year-over-year decline in gross margin in the third quarter of 2015; (ii) the recent economic slowdown in China, as well as expected sustained challenges to the macroeconomic environment, including the depreciation of RMB by over 6% during the period from the announcement of the Proposal Letter on July 9, 2015 to March 28, 2016; (iii) the fact that the offer price of $7.812 per ADS represents a 20% premium over the closing trading price of the Company's ADSs on July 8, 2015, the last trading day prior to the announcement, and a 17% premium over the volume-weighted average closing price of trading days from July 10, 2015 to March 25, 2016; (iv) the high level of volatility that both the U.S. and China stock markets have experienced since July 9, 2015; and (v) the fact that certain going-private transactions involving U.S.-listed, China-based companies that were announced during June and July 2015, the parties reportedly have considered or proposed a substantial reduction in the offer price or even have agreed to such reduction.

On March 29, 2016, Investor A sent its responses to the process letter to DPS. Investor A introduced certain background information regarding Investor A and indicated that it was in discussion with various potential equity investors but had not yet formed a consortium.

On March 30, 2016, the Special Committee held a telephonic meeting with Shearman & Sterling, Duff & Phelps and DPS. DPS provided the Special Committee with an update of Investor A's response to the process letter and its telephone discussions with Investor A. DPS noted that Investor A's proposal was at a preliminary stage which lacked details with respect to financing, and there was uncertainty associated with Investor A's funding, due to its relatively small fund size and lack of committed financing sources. Shearman & Sterling then provided the Special Committee with an analysis of the practicality of the potential transaction structures proposed by Investor A, noting that additional equity investors which had been contacted by Investor A and may potentially form a consortium with Investor A may subject the Proposed Investor A Transaction to PRC regulatory approvals, including PRC anti-trust filing, depending on the type and industry of the potential equity investors.

After robust discussion with its advisors, the Special Committee instructed DPS to follow up with Investor A on the details of financing sources, potential equity partners and feasible transaction structure for the Proposed Investor A Transaction.

30

Duff & Phelps then reported to the Special Committee the current status of its financial due diligence on the Company, in particular the Company's competitive position in the market, the competitors in the industry and the Company's competition strategy. DPS then reviewed the Founders' response to the Special Committee's request for an increase in the offer price and the reasons that the Founders provided for its unwillingness to accept such the request. After discussion, the Special Committee instructed DPS to revisit the question of merger consideration after the analysis on the valuation of the Company is available.

During the meeting, Shearman & Sterling summarized the issues in the revised merger agreement received from Skadden and recommended approaches to be adopted by the Special Committee, including (i) agreeing that the Founders will use the Company's cash as one of the sources of payment of the merger consideration but rejecting the Founders' request that the Company retain a specified minimum cash balance as a closing condition, (ii) keeping the "go-shop" provision to enable the Company to actively solicit proposals within a certain period of time after the execution of the merger agreement, (iii) reinforcing the Company's right to "fiduciary out" in the event of a "superior proposal" in the merger agreement, (iv) rejecting the closing condition that holders of no more than 5% of the shares shall have exercised dissenting rights, and (v) reinstating the "majority of minority" voting provision. After robust discussion, the Special Committee instructed Shearman & Sterling to revise the draft merger agreement as recommended by Shearman & Sterling to reflect the Special Committee's position and send it to Skadden for further negotiation.

On April 1, 2016, Shearman & Sterling sent the revised draft merger agreement to Skadden.

On April 13, 2016, Skadden sent Shearman & Sterling a draft convertible note commitment letter, pursuant to which, one of the potential equity investors approved by the Special Committee pursuant to the Confidentiality Agreement, which is a China-based asset management firm ("Sponsor A"), will subscribe for convertible note(s) of Parent, as well as a description of the Founders' updated financing plan. Shearman & Sterling then clarified with Skadden a few questions on the draft convertible note commitment letter, including questions on the proposed guarantee of Sponsor A's commitment by an affiliate of Sponsor A as well as the conditionality of Sponsor A's funding commitment. On the same day, Skadden also sent Shearman & Sterling the revised drafts of the debt commitment letter and term sheet to be attached to the debt commitment letter.

On the same day, DPS held a follow up call with Investor A. Investor A indicated that two potential investors had joined the buyer consortium but no consortium agreement had been entered so far.

Later on April 13, 2016, the Special Committee held a telephonic meeting with Shearman & Sterling and DPS. Shearman & Sterling reported to the Special Committee the Founders' expected funding arrangement to finance the Proposed Transaction with cash proceeds from Parent's issuance of certain convertible note(s) at or immediately prior to the closing of the merger in addition to debt financing and available cash of the Company and its subsidiary. The Founders proposed that convertible note(s) of Parent will be issued to and subscribed by Sponsor A, and an affiliate of Sponsor A is expected to guarantee the funding commitment of Sponsor A.

During the meeting, DPS reported to the Special Committee its telephone discussions with Investor A after Investor A announced that two potential investors have joined the buyer consortium led by Investor A. DPS noted that, based on DPS' inquiry, the buyer consortium led by Investor A had not been formally formed and the financing and transaction structure for the Proposed Investor A Transaction was still under discussion. DPS further noted that Investor A was in touch with other potential financing sources but had not been able to provide a proposed financing plan or expected timetable for obtaining the financing. The Special Committee noted that, taking into account the financial conditions of the two potential investors that Investor A indicated would join the buyer consortium led by Investor A, the relatively small fund size of Investor A and the limited information provided by Investor A, it is difficult for the Special Committee and its advisors to evaluate the Proposed Investor A Transaction and financing certainty of Investor A's proposal at this stage. The Special Committee instructed DPS to continue to follow up with Investor A on the details of financing sources, potential equity partners and feasible transaction structure and report any updates to the Special Committee for its further consideration.

On April 14, 2016, Skadden sent Shearman & Sterling a draft limited guarantee to be delivered by the Founders in favor of the Company, pursuant to which the Founders guarantee certain obligations of Parent under the merger agreement, including payment of Parent termination fee, when payable.

On April 15, 2016, Shearman & Sterling sent Skadden additional comments to the revised draft debt commitment letter and the revised draft term sheet to be attached to the debt commitment letter.

31

On April 20, 2016, Shearman & Sterling sent Skadden comments to the draft convertible note commitment letter and the draft limited guarantee.

Between mid-February and mid-April 2016, certain members of the management of the Company, including Mr. Danqian Yao, senior vice president of the Company ("Mr. Yao"), Mr. Min Kan, vice president of the Company ("Mr. Kan"), and Mr. Lijun Chen, vice president of the Company ("Mr. Chen"), indicated to the Founders their interest in rolling over certain of their existing equity interests in the Company in exchange for Parent shares to be issued at the closing of the merger, instead of receiving cash consideration for cancellation of such equity interests in the merger. The Founders did not make any commitment with respect to such request and noted that, pursuant to the Confidentiality Agreement, the Special Committee's prior consent would be required before the Founders may engage in further discussions regarding such request.

On April 22, 2016, Skadden sent a revised draft merger agreement to Shearman & Sterling, which, among other modifications, indicated the possibility that certain shareholders who are also members of the management of the Company will roll over their existing equity interests in the Company in exchange for Parent shares to be issued at the closing of the merger, and will not have their equity interests cancelled in exchange for cash consideration.

On April 25, 2016, the Special Committee held a telephonic meeting with Shearman & Sterling and DPS. Shearman & Sterling provided the Special Committee with a review of the issues in the revised merger agreement received from Skadden, including (i) that the Founders had indicated that certain members of the management of the Company had indicated their potential interest in rolling over certain of their existing equity interests in the merger and would require the Special Committee's consent before it engages in further discussion regarding such request, (ii) that the Founders indicated that certain options listed in the Parent disclosure schedule will be cancelled and exchanged into newly issued shares of Parent, provided that a cash amount equal to the exercise price of the options is paid, (iii) deleting the "majority of minority" provision which would require that the merger agreement and the merger be approved by a majority of the shareholders unaffiliated with the Founders, (iv) deleting the "go-shop" provision that would permit the Company to actively solicit acquisition proposals within 45 days of the execution of the merger agreement, (v) requesting that the Company retain cash exceeding a specific amount as a closing condition and as an interim covenant, (vi) requesting as a closing condition that holders of no more than 5% of the shares have exercised dissenting rights, (vii) requesting that the Company enter into an alternative acquisition agreement with respect to the superior proposal for the Company to terminate the merger agreement. Shearman & Sterling then proceeded to propose a few suggestions with respect to revision of the merger agreement, including, subject to the outcome of the valuation analysis, agreeing to the Founders' requests in (iii), (iv) and (vii) above, but rejecting the Founders' requests in (v) and (vi) above. Shearman & Sterling also proposed, in light of Investor A's pending proposal, to include an exception to the non-solicitation obligation of the Company in the merger agreement that the Company will have the right to continue discussing any competing proposal existing at the time of the merger agreement, and that amount of the termination fee of the Company shall be reduced by 50% if any such proposal existing at the time of the merger agreement develops into a superior proposal. After robust discussion, the Special Committee instructed Shearman & Sterling to revise the draft merger agreement as recommended by Shearman & Sterling and send it to Skadden for further negotiation.

During the meeting, DPS provided an update of Investor A's competing proposal to the Special Committee, including development of Investor A's financing. DPS noted that the discussion on potential equity financing relating to Investor A's proposal is still at a preliminary stage and additional financing will be needed for Investor A to complete the Proposed Investor A Transaction. After discussion, the Special Committee instructed DPS to continue to follow up with Investor A as appropriate and to report to the Special Committee if there are any updates.

On April 26, 2016, Shearman & Sterling and Skadden had a telephonic meeting on major issues under the revised drafts of the merger agreement and the ancillary documents. After the discussion, on April 29, 2016, Shearman & Sterling sent Skadden a further revised draft merger agreement.

On May 3, 2016, Skadden sent a revised draft merger agreement, a draft rollover agreement to be entered into by Parent, certain management shareholders, including Mr. Yao, Mr. Chen, Mr. Kan, and First Profit Management Limited ("First Profit"), an affiliate of Mr. Yao (subject to the Special Committee's consent to the request of such shareholders to roll over their equity interests in the merger), and a draft support agreement to be entered into by Parent, the Founders and Kewen and SC International, to Shearman & Sterling.

On May 4, 2016, Skadden sent the revised limited guarantee and convertible note commitment letter, to Shearman & Sterling. Over the course of the next few days, Shearman & Sterling sent its comments on the ancillary documents to Skadden.

32

On May 5, 2016, the Special Committee held a telephonic meeting with Shearman & Sterling, Duff & Phelps and DPS. Shearman & Sterling provided the Special Committee with a review of the key issues in the revised merger agreement received from Skadden on May 3, 2016, including that (i) the request from certain management shareholders, Mr. Yao, Mr. Chen, Mr. Kan, and First Profit that they enter into a rollover agreement with Parent, (ii) each company option vested on or prior to the effective time of the merger will be cashed out, and each company option unvested on or prior to the effective time of the merger will be cancelled for no consideration, (iii) the amount of the termination fee of the Company will equal to 2.5% of the company's equity value and shall be paid within three business days following the termination of the merger agreement, (iv) the amount of the termination fee of Parent will equal to 5% of the Company's equity value and should be paid within ten business days following the termination of the merger agreement, (v) the Company will have the right to continue discussing any competing proposal existing at the time of the merger agreement, and should pay in full a termination fee to Parent if any such proposal existing at the time of the merger agreement develops into a superior proposal, and (vi) the Founders requested as a closing condition that holders of no more than 10% of the shares have exercised dissenting rights. Shearman & Sterling then proceeded to propose a few suggestions with respect to the revised merger agreement, including agreeing to the Founders' requests in (ii), (iii), (iv) and (v) above, but rejecting the Founders' request for a closing condition that holders of no more than 10% of the shares have exercised dissenting rights. After robust discussion, the Special Committee instructed Shearman & Sterling to revise the draft merger agreement as recommended and send it to Skadden for further negotiation.

On May 17, 2016, the Founders sent a revised non-binding proposal to the Board, which revised the proposed offer price of $7.812 per ADS in cash as set forth in the Proposal Letter dated July 9, 2015 to $6.50 per ADS or $1.30 per Share in cash, subject to certain conditions. The Founders stated in the revised proposal that the decision to revise the offer price is necessitated by the tougher than expected market conditions facing the Company and the global economy, including, in particular, that (i) changes in the market for e-commerce companies in China have adversely affected the operating and financial performance of the Company; (ii) the global financial markets have experienced significant volatility recently, including substantial volatility in equity securities markets, which has been reflected in the performance of the Company's ADSs; and (iii) the recent economic slowdown in China and challenges to the macroeconomic environment are expected to be sustained, with the RMB under strong depreciation pressure.

On May 17, 2016, the Company issued a press release regarding its receipt of the revised proposal dated May 17, 2016 and furnished the press release as an exhibit to its current report on Form 6-K.

On May 18, 2016, the Founders, together with Kewen and SC International, filed an amendment to the statement on Schedule 13D, reporting the submission of the revised non-binding proposal to the Board on May 17, 2016.

On May 19, 2016, the Special Committee held a telephonic meeting with Shearman & Sterling, Duff & Phelps and DPS. The Special Committee discussed its proposed response to the revised proposal with its advisors, taking into account the management projections and the valuation of the Company, the current proposed terms in the merger agreement and the debt commitment letter and the reasons for the decrease in the offer price set forth in the revised proposal by the Founders. The Special Committee determined to respond to the Founders with a request for an increase of the Founders' offer price to $7.00 per ADS and instructed DPS to communicate such request to the Founders.

On May 20, 2016, DPS sent an email to the Founders, on behalf of the Special Committee, that conveyed the Special Committee's opinion and requested the Founders to (i) increase the offer price to at least $7.00 per ADS, (ii) permit the Company to actively solicit proposals within 45 days of the execution of the merger agreement, and (iii) remove the closing condition that holders of no more than 10% of the shares have exercised dissenting rights.

On May 22, 2016, the Founders responded to DPS that the Founders continue to believe that the revised offer price of $6.50 in cash per ADS as set forth in the revised proposal dated May 17, 2016 is fair and represents full value to the Company's shareholders; in the interest of moving the process forward, however, the Founders are open to discussing a price that is mutually acceptable, provided that the final merger price is not higher than $6.60 per ADS in cash.

On May 24, 2016, the Special Committee held a telephonic meeting with Shearman & Sterling, Duff & Phelps and DPS to discuss the Founders' response. The Special Committee, after considering the views of its advisors and noting the fact that there had been no development on Investor A's proposal although Investor A had not withdrawn the proposal, determined that it would not accept $6.60 per ADS and resolved that it would request for an increase of the Founders' offer price to $6.80 per ADS. The Special Committee instructed DPS to communicate with the Founders regarding the Special Committee's position that it would not accept $6.60 per ADS and its request for a price increase, which was communicated by DPS on the same day.

33

Later that day, Ms. Ruby Rong Lu, chairperson of the Special Committee, again communicated to Ms. Yu the Special Committee's unanimous view that $6.50 per ADS did not meet what the Special Committee viewed as a fair value for the Company and requested an increase in the offer price to $6.80 per ADS.

On May 25, 2016, the Founders sent an email to the Special Committee stating that after serious consideration, the Founders would be willing to consider increasing the offer price to $6.70 per ADS in cash, and not insisting upon the previously proposed closing condition that no more than 10% of the shares have exercised dissenting rights, provided that the Special Committee would agree to drop the "go-shop" provision.

On May 26, 2016, Skadden informed Shearman & Sterling the updated financing plan of the Founders based on the $6.70 per ADS merger consideration as proposed by the Founders on May 25, 2016. The Founders proposed to finance the merger with a combination of debt financing to be provided by the Financing Bank, rollover financing and the Company's available cash.

Later that day, the Special Committee held a telephonic meeting with Shearman & Sterling, Duff & Phelps and DPS. DPS reported to the Special Committee that the Founders updated its financing plan and proposed to finance the transaction with a combination of debt financing, rollover financing and the Company's available cash. After considering the views of its advisors, and taking into account the results of the market check conducted by DPS previously and the development of Investor A's proposal, the Special Committee decided to accept the revised offer price of $6.70 per ADS and instructed Shearman & Sterling to request a finalized debt commitment letter. The Special Committee also instructed Shearman & Sterling to finalize the merger agreement with Skadden and reject certain terms proposed by the Founders, including the closing condition with respect to the number of dissenting shares.

Later that day, a representative of Skadden had a telephone discussion with a representative of Shearman & Sterling, during which the representative of Skadden indicated that while the Founders believed that the combination of debt financing pursuant to the debt commitment letter and the Company's available cash is sufficient to fund the cash consideration in the merger, the Founders proposed to add a provision in the merger agreement which would permit them to continue to discuss and negotiate alternative financing arrangements to fund the merger with potential additional financing sources, provided that the identities of such additional financing sources and the form of any commitment letters or transaction documents to be entered into with such additional financing sources are provided for in the merger agreement or otherwise approved by the Special Committee following the execution of the merger agreement (the "Additional Financing Provision").

During the next two days, Shearman & Sterling and Skadden continued to negotiate and finalize the merger agreement and the related documentation. Among other modifications, Skadden revised the draft merger agreement by adding the Additional Financing Provision proposed by the Founders.

On May 27, 2016, Skadden provided Shearman & Sterling with the final form of the debt commitment letter to be issued by the Financing Bank with the term sheet attached, and confirmed that the Founders and the Financing Bank were in a position to execute and deliver the debt commitment letter contemporaneously with the execution of the merger agreement.

On May 28, 2016, the Special Committee held a telephonic meeting with Shearman & Sterling, Maples and Calder, Duff & Phelps and DPS. Shearman & Sterling reviewed the fiduciary duties applicable to the Special Committee in connection with the Proposed Transaction, the key terms in the merger agreement and other transaction documents, and the financing arrangement. Among other things, Shearman & Sterling briefly discussed the Founders' latest request for including the Additional Financing Provision in the merger agreement, and noted that pursuant to the proposed provision, the Special Committee would have approval right with respect to the identities of the additional equity financing sources, if any, and the transaction agreements to be entered into with such additional financing sources. Duff & Phelps then presented its financial analyses to the Special Committee and provided its oral fairness opinion, which was subsequently confirmed in writing by delivery of a written opinion dated the same day and attached hereto as Annex B, to the effect that, as of May 28, 2016 and based upon, and subject to, the procedures followed, assumptions made, matters considered and qualifications and limitations on the review undertaken, the merger consideration of $1.34 per Share, or $6.70 per ADS, as applicable, to be received by the holders of Shares (other than the Excluded Shares, the Dissenting Shares and Class A common shares represented by ADSs) and the holders of ADSs (other than ADSs representing the Excluded Shares), respectively, in the merger was fair from a financial point of view to such holders (without giving effect to any impact of the Proposed Transaction on any particular holder of the Shares or ADSs other than in its capacity as a holder of Shares or ADSs). Please see "Special Factors – Opinion of the Special Committee's Financial Advisor" beginning on page 47 for additional information regarding the financial analysis performed by Duff & Phelps and the opinion rendered by Duff & Phelps to the Special Committee. The full text of the written opinion of Duff & Phelps to the Special Committee, dated May 28, 2016, is attached as Annex B to this proxy statement. After considering the presentation of Shearman & Sterling and the presentation of Duff & Phelps, including Duff & Phelps's fairness opinion, and taking into account the other factors described below under the heading titled "– Reasons for the Merger and Recommendation of the Special Committee and the Board", the Special Committee then unanimously (i) determined that it was fair (both substantively and procedurally) to and in the best interests of the Company and its unaffiliated shareholders, and declared it advisable, to enter into the merger agreement and the transaction agreements, (ii) recommended that the Board authorize and approve the execution, delivery and performance of the merger agreement and the transaction agreements and the consummation of the transactions contemplated thereby, including the merger, and (iii) recommended that the Board direct that the authorization and approval of the merger agreement, the plan of merger and the consummation of the transactions contemplated thereby, including the merger, be submitted to a vote at an extraordinary general meeting of the shareholders of the Company with the recommendation of the Board that the shareholders of the Company authorize and approve by way of a special resolution the merger agreement, the plan of merger and the consummation of the transactions contemplated thereby, including the merger.

34

Following the meeting of the Special Committee, the Board convened a meeting with Shearman & Sterling, Duff & Phelps and DPS. The Founders did not attend, participate in, or vote upon any matters discussed during the meeting. The Special Committee provided to the Board an overview of the Proposed Transaction and presented its recommendation to the Board. After considering the proposed terms of the merger agreement, the other transaction agreements and the recommendation of the Special Committee, the Board (i) determined that it was fair (both substantively and procedurally) to and in the best interests of the Company and its unaffiliated shareholders, and declared it advisable, to enter into the merger agreement and the transaction agreements, (ii) authorized and approved the execution, delivery and performance of the merger agreement and the transaction agreements and the consummation of the transactions contemplated thereby, including the merger, and (iii) resolved to direct that the authorization and approval of the merger agreement, the plan of merger and the transactions contemplated thereby, including the merger, be submitted to a vote at an extraordinary general meeting of the shareholders of the Company with the recommendation of the Board that the shareholders of the Company authorize and approve by way of a special resolution the merger agreement, the plan of merger and the consummation of the transactions contemplated thereby, including the merger. See "Special Factors – Reasons for the Merger and Recommendation of the Special Committee and the Board" beginning on page 35 for a full description of the resolutions of the Board at this meeting.

Later that day, the Company, Parent and Merger Sub executed the merger agreement. Concurrently with the execution of the merger agreement, the Founders executed and delivered the limited guarantee to the Company, Parent, the Founders, Kewen and SC International executed the support agreement, and Parent, Mr. Yao, Mr. Chen, Mr. Kan and First Profit executed the rollover agreement. Also on May 28, 2016, Merger Sub and the Financing Bank executed and delivered the debt commitment letter and a customary fee letter in connection with the debt financing provided by the Financing Bank.

On May 31, 2016, the Company issued a press release announcing the execution of the merger agreement, and furnished the press release, the merger agreement and the limited guarantee as exhibits to its current report on Form 6-K.

On June 2, 2016, the Founders, Kewen and SC International, joined by Mr. Yao, Mr. Chen, Mr. Kan and First Profit, filed an amendment to the statement on Schedule 13D, reporting, among other things, the execution of the merger agreement and other transaction documents relating to the merger and the debt financing.

On June 13 and June 15, 2016, respectively, Skadden informed Shearman & Sterling that, pursuant to the Additional Financing Provision in the merger agreement, each of First Profit and Mr. Junjie He ("Mr. He"), an individual investor unaffiliated with the Company or any of the Buyer Group members, proposes to deliver an equity commitment letter , pursuant to which they will commit to fund $15 million and $250,000, respectively, in cash to subscribe for equity interests of Parent in connection with the merger. Skadden also sent the draft equity commitment letters to be issued by First Profit and Mr. He to Shearman & Sterling for consideration by the Special Committee.

On June 15 and June 17, 2016, respectively, Shearman & Sterling send its comments to the draft equity commitment letters to Skadden.

On June 17, 2016, Shearman & Sterling and Skadden finalized the equity commitment letters. Later that day, each of First Profit and Mr. He entered into an equity commitment letter with Parent.

Later that day, the Founders, Kewen, SC International, First Profit, Mr. Yao, Mr. Chen and Mr. Kan filed an amendment to the statement on Schedule 13D reporting the execution and delivery of the equity commitment letters.

## Reasons for the Merger and Recommendation of the Special Committee and the Board

The Special Committee and the Board believe that, as a privately-held entity, the Company's management may have greater flexibility to focus on improving the Company's long-term financial performance without the pressures caused by the public equity market's valuation of the Company and emphasis on short-term period-to-period performance.

35

Additionally, as an SEC-reporting company, the Company's management and accounting staff, which comprises a handful of individuals, must devote significant time to SEC reporting and compliance. The Company is also required to disclose a considerable amount of business information to the public, some of which would otherwise be considered proprietary and competitively sensitive and not disclosed by a non-reporting company. As a result, the Company's actual or potential competitors, customers, suppliers, lenders and vendors all have access to this information which potentially may help them compete against the Company or make it more difficult for the Company to negotiate favorable terms with them, as the case may be.

The Board, acting upon the unanimous recommendation of the Special Committee, which acted with the advice and assistance of our management (other than Ms. Yu, Mr. Li, Mr. Yao, Mr. Chen and Mr. Kan, being members of the Buyer Group) and its financial and legal advisors, evaluated the merger, including the terms and conditions of the merger agreement.

At a meeting on May 28, 2016, the Special Committee unanimously (a) determined that it was fair (both substantively and procedurally) to and in the best interests of the unaffiliated security holders, and declared it advisable, to enter into the merger agreement and the transaction agreements, (b) recommended that the Board authorize and approve the execution, delivery and performance of the merger agreement, the transaction agreements and the consummation of the transactions contemplated thereby, including the merger, (c) recommended that the Board direct that the authorization and approval of the merger agreement, the plan of merger and the consummation of the transactions contemplated thereby, including the merger, be submitted to a vote at an extraordinary general meeting of shareholders of the Company with the recommendation of the Board that the shareholders of the Company authorize and approve by way of a special resolution the merger agreement, the plan of merger and the consummation of the transactions contemplated thereby, including the merger, and (d) recommended that the Board call an extraordinary general meeting of shareholders of the Company for the purpose of the shareholders authorizing and approving by way of special resolution the merger agreement, the plan of merger and the consummation of the transactions contemplated thereby, including the merger, the date, time and place of which shall be determined by the Special Committee.

At a meeting on May 28, 2016, the Board (other than Ms. Yu and Mr. Li, members of the Buyer Group, who did not attend, participate in or vote upon matters discussed during the Board meeting, due to their interests in the proposed transaction ), acting upon the unanimous recommendation of the Special Committee, (a) determined that it was fair (both substantively and procedurally) to and in the best interests of the unaffiliated security holders, and declared it advisable, to enter into the merger agreement and the transaction agreements, (b) authorized and approved the execution, delivery and performance of the merger agreement, the transaction agreements and the consummation of the transactions contemplated thereby, including the merger, and (c) resolved to direct that the authorization and approval of the merger agreement, the plan of merger and the consummation of the transactions contemplated thereby, including the merger, be submitted to a vote at an extraordinary general meeting of shareholders of the Company with the recommendation of the Board that the shareholders of the Company authorize and approve by way of a special resolution the merger agreement, the plan of merger and the consummation of the transactions contemplated thereby, including the merger. A majority of the Company's board of directors who are not employees of the Company voted in favor of the resolutions recommended by the Special Committee.

In the course of reaching their respective determinations, the Special Committee and the Board considered the following substantive factors and potential benefits of the merger, each of which the Special Committee and the Board believed supported their respective decisions, but which are not listed in any relative order of importance:

- the fact that the per Share merger consideration of $1.34 or the per ADS merger consideration of $6.70 represents (i) a premium of 2.9% over the Company's closing price of $6.51 per ADS on July 8, 2015, the last trading day prior to July 9, 2015, the date that the Company announced it had received a "going-private" proposal, (ii) a 11.1% premium over the closing price of $6.03 per ADS on May 27, 2016, the trading day immediately before the execution of the merger agreement, and (iii) a premium of 10.49% and 7.32% to the volume-weighted average closing price of the Company's ADSs during the 20 and 30 trading days prior to the announcement of the execution of the merger agreement, respectively;

- the Company's ADSs traded as low as $5.31 per ADS during the 52-week period prior to the announcement of the execution of the merger agreement;

36

- the possibility that it could take a considerable period of time before the trading price of the ADSs would reach and sustain a per ADS price equal to or greater than the per ADS merger consideration of $6.70, as adjusted for present value, particularly in light of the Board's recognition of the challenges involved in increasing shareholder value as an independent publicly traded company;

- the all-cash merger consideration, which will allow the unaffiliated security holders to immediately realize liquidity for their investment and provide them with a specific amount of cash consideration for their Shares or ADSs;

- the negotiations with respect to the merger consideration and the Special Committee's determination that, following extensive negotiations with the Buyer Group, $1.34 per Share or $6.70 per ADS was the highest price that the Buyer Group would agree to pay, with the Special Committee basing its belief on a number of factors, including the duration and tenor of negotiations and the experience of the Special Committee's advisors;

- the financial analysis reviewed and discussed with the Special Committee by representatives of Duff & Phelps, as well as the oral opinion of Duff & Phelps to the Special Committee on May 28, 2016 (which was subsequently confirmed by delivery of a written opinion of Duff & Phelps dated the same date) with respect to the fairness, from a financial point of view, of $1.34 per Share (or $6.70 per ADS) cash merger consideration to be received by the holders of the Company's Shares (other than the Excluded Shares, the Dissenting Shares and Class A common shares represented by ADSs) and the holders of ADSs (other than ADSs representing the Excluded Shares), respectively, pursuant to the merger agreement, as of May 28, 2016, based upon and subject to the procedures followed, assumptions made, qualifications and limitations on the review undertaken and other matters considered by Duff & Phelps in preparing their opinion. Please see "Special Factors – Opinion of the Special Committee's Financial Advisor" beginning on page 47 for additional information;

- potential adverse effects on the Company's business, financial condition and results of operations caused by recent economic conditions in the PRC, which have resulted in reduced liquidity, greater volatility, widening of credit spreads, lack of price transparency in credit markets, a reduction in available financing and reduced market confidence;

- estimated forecasts of the Company's future financial performance prepared by the Company's management, together with the Company's management's view of the Company's financial condition, results of operations, business and prospects, including, without limitation, the fact that the Company's net revenue increased by approximately 21.8% from 2012 to 2013 and approximately 25.8% from 2013 to 2014, compared to an increase in the Company's net revenue of approximately 17.0% from 2014 to 2015 and a projected increase in the Company's net revenue of approximately 6.6% from 2015 to 2016, indicating that the Company may face uncertain business conditions in China;

- the increased costs of regulatory compliance for public companies;

- the belief of the Special Committee that the terms of the merger agreement, including the parties' representations, warranties and covenants and the conditions to their respective obligations, are reasonable;

- the recognition that, as a privately-held entity, the Company's management may have greater flexibility to focus on improving the Company's long-term financial performance without the pressures caused by the public equity market's valuation of the Company and emphasis on short-term period-to-period performance;

- the recognition that, as an SEC-reporting company, the Company's management and accounting staff, which comprises a handful of individuals, must devote significant time to SEC reporting and compliance;

- the recognition that, as an SEC reporting company, the Company is required to disclose a considerable amount of business information to the public, some of which would otherwise be considered proprietary and competitively sensitive and would not be disclosed by a non-reporting company and which potentially may help the Company's actual or potential competitors, customers, lenders and vendors compete against the Company or make it more difficult for the Company to negotiate favorable terms with them, as the case may be;

- the likelihood that the merger would be completed based on, among other things (not in any relative order of importance):

37

- • the likelihood and anticipated timing of completing the merger in light of the scope of the conditions to completion; and

- • the fact the merger agreement provides that, in the event of a failure of the merger to be completed under certain circumstances, Parent will pay the Company a $28,234,000 termination fee and the guarantee of such payment obligation by Ms. Yu and Mr. Li pursuant to the Limited Guarantees;

- • the ability of the Board, under certain circumstances, to change, withhold, withdraw, qualify or modify its recommendation that the Company's shareholders vote to authorize and approve the merger agreement, and the ability of the Company to terminate the merger agreement if the Board elects a change of recommendation;

- • the ability of the Company, under certain circumstances, to specifically enforce the terms of the merger agreement; and

- • the consideration and negotiation of the merger agreement was conducted entirely under the control and supervision of the Special Committee, which consists of three independent directors, each of whom is an outside, non-employee director and unaffiliated with any member of the Buyer Group or the management of the Company, and that no limitations were placed on the Special Committee's authority.

In addition, the Special Committee and the Board believed that sufficient procedural safeguards were and are present to ensure that the merger is procedurally fair to the unaffiliated security holders and to permit the Special Committee and the Board to represent effectively the interests of such unaffiliated security holders. These procedural safeguards, which are not listed in any relative order of importance, are discussed below:

- • in considering the merger with the Buyer Group, the Special Committee, which consists of three independent directors who are unaffiliated with any member of the Buyer Group or the management of the Company, acted solely to represent the interests of the unaffiliated security holders, and the Special Committee had independent control of the negotiations with the Buyer Group and its legal advisor on behalf of such unaffiliated security holders;

- • all of the directors serving on the Special Committee during the entire process were and are independent directors and free from any affiliation with the Buyer Group or the management of the Company. In addition, none of such directors is or ever was an employee of the Company or any of its subsidiaries or affiliates and none of such directors has any financial interest in the merger that is different from that of the unaffiliated security holders other than (i) the director's receipt of board compensation in the ordinary course, (ii) Special Committee members' compensation in connection with its evaluation of the merger (which is not contingent upon the completion of the merger or the Special Committee's or Board's recommendation of the merger), and (iii) the director's indemnification and liability insurance rights under the merger agreement;

- • following its formation, the Special Committee's independent control of the sale process with the advice and assistance of Duff & Phelps as its financial advisor, and Shearman & Sterling and Maples and Calder, as its legal advisors, each reporting solely to the Special Committee;

- • the Special Committee was empowered to consider, attend to and take any and all actions in connection with the written proposal from the Buyer Group and the transactions contemplated thereby from the date the Special Committee was established, and no evaluation, negotiation, or response regarding the transaction or any documentation in connection therewith from that date forward was considered by the Board for authorization and approval unless the Special Committee had recommended such action to the Board;

- • there are no limitations placed on the Special Committee's authority, including the authority to reject the terms of any strategic transaction, including the merger;

- • the Special Committee held telephonic meetings to consider and review the terms of the merger agreement and the merger;

- • the recognition by the Special Committee and the Board that it had no obligation to recommend the authorization and approval of the proposal from the Buyer Group or any other transaction; and

- • the availability of dissenter rights to the shareholders, other than the Rollover Shareholders, who comply with all of the required procedures under the Cayman Islands Companies Law for exercising dissenter rights, which allow such holders to receive the fair value of their Shares as determined by the Grand Court of the Cayman Islands.

The Special Committee and the Board also considered a variety of potentially negative factors discussed below concerning the merger agreement and the merger, which are not listed in any relative order of importance:

- the fact that authorization and approval of the merger agreement are not subject to the authorization and approval of holders of a majority of the Company's outstanding Shares and ADSs unaffiliated with the Buyer Group;

- the fact that the Company's shareholders, other than the Rollover Shareholders, will have no ongoing equity participation in the Company following the merger, and that they will cease to participate in the Company's future earnings or growth, if any, or to benefit from increases, if any, in the value of the Shares, and will not participate in any potential future sale of the Company to a third party or any potential recapitalization of the Company which could include a dividend to shareholders;

- the restrictions on the conduct of the Company's business prior to the completion of the merger. Please see "The Merger Agreement and Plan of Merger – Conduct of Business Pending the Merger" beginning on page 88 for additional information;

- the risks and costs to the Company if the merger does not close, including the diversion of management and employee attention, potential employee attrition and the potential disruptive effect on business and customer relationships;

- the Company will be required to, under certain circumstances, pay Parent a termination fee of $14,117,000 in connection with the termination of the merger agreement;

- the fact that Parent and Merger Sub are newly formed corporations with essentially no assets, and that the Company's legal remedy in the event of breach of the merger agreement by Parent or Merger Sub is limited to receipt of a termination fee of $28,234,000, and that the Company may not be entitled to a termination fee at all if, among other things, the Company's shareholders do not approve the merger agreement at the extraordinary general meeting. Please see "The Merger Agreement and Plan of Merger – Termination of the Merger Agreement" beginning on page 95 and "The Merger Agreement and Plan of Merger – Termination Fee" beginning on page 97 for additional information;

- the fact that Ms. Yu, Mr. Li and Mr. Yao may have interests in the transaction that are different from, or in addition to, those of the unaffiliated security holders, as well as the other interests of the Company's directors and executive officers in the merger. Please see "Special Factors – Interests of Certain Persons in the Merger" beginning on page 67 for additional information;

- the rights of Parent under the merger agreement not to consummate the merger and/or to terminate the merger agreement if certain events that are not within the Company's control take place, including, among other events, the occurrence of any material adverse effect;

- that while the Special Committee expects to complete the merger, there can be no assurance that all conditions to the parties' obligations to complete the merger will be satisfied and, as a result, it is possible that the merger may not be completed even if Company shareholders approve it;

- the possibility that the merger might not be completed and the negative impact of a public announcement of the merger on the Company's sales and operating results and the Company's ability to attract and retain key management, marketing and technical personnel; and

- the taxability of an all-cash transaction to the unaffiliated security holders.

The forgoing information and factors considered by the Special Committee and the Board are not intended to be exhaustive, but include the material factors considered by the Special Committee and the Board. In view of the wide variety of factors considered by the Special Committee and the Board, neither the Special Committee nor the Board found it practicable to quantify or otherwise assign relative weights to the foregoing factors in reaching its conclusions. In addition, individual members of the Special Committee and the Board may have given different weights to different factors and may have viewed some factors more positively or negatively than others. The Special Committee recommended that the Board authorize and approve, and the Board authorized and approved, the merger agreement, the plan of merger and the consummation of the transactions contemplated by the merger agreement, including the merger, based upon the totality of the information presented to and considered by it.

39

In the course of reaching its conclusion regarding the fairness of the merger to the unaffiliated security holders and its decision to recommend the authorization and approval of the merger agreement, the plan of merger and the consummation of the transactions contemplated by the merger agreement, including the merger, the Special Committee considered financial analyses presented by Duff & Phelps as an indication of the going concern value of the Company. These analyses included, among others, selected public companies analysis, selected M&A transactions analysis and discounted cash flow analysis. All of the material analyses as presented to the Special Committee on May 28, 2015 are summarized below under the caption "Special Factors – Opinion of the Special Committee's Financial Advisor" beginning on page 47. The Special Committee expressly considered these analyses and the opinion of Duff & Phelps, among other factors considered, in reaching its determination as to the fairness of the transactions contemplated by the merger agreement, including the merger.

Neither the Special Committee nor the Board considered the liquidation value of Company's assets because each considers the Company to be a viable going concern business where value is derived from cash flows generated from its continuing operations. In addition, the Special Committee and the Board believe that the value of the Company's assets that might be realized in a liquidation would be significantly less than its going concern value on the following grounds: (i) the realization of value in a liquidation would involve selling many distinct operating entities and such a process would likely be complex and time consuming, as buyers for each asset would need to be found, agreements negotiated and various regulatory approvals would be required, which might delay or impede such a process, (ii) a liquidation of some (but not all) assets would risk leaving unattractive, orphaned assets that would be difficult to monetize, (iii) the tax implications to the Company and its shareholders upon a liquidation are difficult to quantify, and may be significant relative to the tax cost of a sale of the Company as a going concern, (iv) neither the Special Committee nor the Board were aware of any precedents of U.S.-listed PRC companies liquidating their entire business and returning the proceeds to shareholders and (v) liquidation value analysis does not take into account any value that may be attributed to the Company's ability to build and attract new business.

Each of the Special Committee and the Board believes the analyses and additional factors it reviewed provided an indication of the Company's going concern value. The Board and management of the Company have been dedicated to maximizing shareholder value. Taking into account the historical trading prices of ADSs and the current condition of the U.S. stock market, each of the Special Committee and the Board believes that the per Share merger consideration and the per ADS merger consideration offered by the Buyer Group appropriately reflect the intrinsic present value of Shares and ADSs, while allowing sufficient potential for future growth to attract the Buyer Group to enter into the merger agreement and complete the merger. Neither the Special Committee nor the Board considered the Company's net book value, which is defined as total assets minus total liabilities, attributable to the shareholders of the Company, as a factor. The Special Committee and the Board believe that net book value is not a material indicator of the value of the Company as a going concern. The Company's net book value per Share as of December 31, 2015 was approximately $0.33, based on 411,434,410 issued and outstanding Shares as of December 31, 2015. Net book value does not take into account the future prospects of the Company, market conditions, trends in the industry related to film or the business risks inherent in competing with larger companies in that industry. The Company is not aware of any firm offers (other than the proposal from Investor A, please see "Special Factors – Background of the Merger" beginning on page 25 for additional information) made by any unaffiliated person, other than the filing persons, during the past two years for (i) the merger or consolidation of the Company with or into another company, or vice-versa; (ii) the sale or other transfer of all or any substantial part of the assets of the Company; or (iii) a purchase of the Company's securities that would enable the holder to exercise control of the Company.

In reaching its determination that the merger agreement, the plan of merger and the consummation of the transactions contemplated thereby, including the merger, are fair to and in the best interests of the unaffiliated security holders and its decision to authorize and approve the merger agreement, the plan of merger and the consummation of the transactions contemplated thereby, including the merger, and recommend the authorization and approval of the merger agreement, the plan of merger and the consummation of the transactions contemplated thereby, including the merger, by the Company's shareholders, the Board, on behalf of the Company, considered the analysis and recommendation of the Special Committee and the factors examined by the Special Committee as described above under this section and under "Special Factors – Background of the Merger," and adopted such recommendations and analysis. During its consideration of the merger agreement, the plan of merger and the transactions contemplated thereby, including the merger, the Board was also aware that some of the Company's directors and shareholders, including Ms. Yu and Mr. Li, and other employees of the Company, have interests with respect to the merger that are, or may be, different from, or in addition to those of the unaffiliated security holders generally, as described under the section entitled "Special Factors —Interests of Certain Persons in the Merger" beginning on page 67. Except as discussed in "Special Factors – Background of the Merger," "Special Factors – Reasons for the Merger and Recommendation of the Special Committee and the Board." and "Special Factors – Opinion of the Special Committee's Financial Advisor." no director who is not an employee of the Company has retained an unaffiliated representative to act solely on behalf of unaffiliated security holders for purposes of negotiating the terms of the transaction and/or preparing a report concerning the fairness of the transaction.

40

For the foregoing reasons, each of the Company and the Board believes that the merger agreement, the plan of merger and the transactions contemplated thereby, including the merger, are substantively and procedurally fair to and in the best interests of the unaffiliated security holders.

**Position of the Buyer Group as to the Fairness of the Merger**

Under SEC rules governing going-private transactions, each member of the Buyer Group is required to express its belief as to the fairness of the merger to the unaffiliated security holders. The Buyer Group is making the statements included in this section solely for the purpose of complying with the requirements of Rule 13e-3 and related rules under the Exchange Act. The views of the Buyer Group as to the fairness of the merger are not intended to be and should not be construed as a recommendation to any shareholder of the Company as to how that shareholder should vote on the proposal to approve and adopt the merger agreement, the plan of merger and the transactions contemplated thereby, including the merger. The Buyer Group has interests in the merger that are different from, and/or in addition to, those of the other shareholders of the Company by virtue of their continuing interests (or potential continuing interests) in the surviving company after the completion of the merger. These interests are described under "Special Factors — Interests of Certain Persons in the Merger — Interests of the Buyer Group and Mr. He" beginning on page 67.

The Buyer Group believes that the interests of the Company's unaffiliated security holders were represented by the Special Committee, which negotiated the terms and conditions of the merger agreement with the assistance of its independent legal and financial advisors. The Buyer Group attempted to negotiate a transaction that would be most favorable to it, and not to the unaffiliated security holders and, accordingly, did not negotiate the merger agreement with a goal of obtaining terms that were substantively or procedurally fair to the unaffiliated security holders. None of the Buyer Group members or their respective affiliates participated in the deliberations of the Special Committee regarding, nor received any advice from the Special Committee's independent legal or financial advisors as to, the fairness of the merger to the Company's unaffiliated security holders.

Based on their knowledge and analysis of available information regarding the Company, discussions with the Company's senior management regarding the Company and its business and the factors considered by, and findings of, the Special Committee and the Board discussed under "Special Factors—Reasons for the Merger and Recommendation of the Special Committee and the Board" beginning on page 35, and based on the following factors, although the approval of the merger is assured with the vote of the Buyer Group, which beneficially owns approximately 83.6% of the total number of votes represented by the issued and outstanding Shares, the Buyer Group nevertheless believes that the transaction is both substantively and procedurally fair to the unaffiliated security holders.

In particular, the Buyer Group's belief is based on consideration of the following substantive factors, which are not listed in any relative order of importance:

- the fact that the per Share merger consideration of $1.34 or the per ADS merger consideration of $6.70 represents (i) a premium of 2.9% over the Company's closing price of $6.51 per ADS on July 8, 2015, the last trading day prior to July 9, 2015, the date that the Company announced it had received a "going-private" proposal, (ii) a 11.1% premium over the closing price of $6.03 per ADS on May 27, 2016, the trading day immediately before the execution of the merger agreement, and (iii) a premium of 10.49% and 7.32% to the volume-weighted average closing price of the Company's ADSs during the 20 and 30 trading days prior to the announcement of the execution of the merger agreement, respectively;

- the Company's ADSs traded as low as $5.31 per ADS during the 52-week period prior to the announcement of the execution of the Merger Agreement on May 31, 2016;

- notwithstanding that the fairness opinion of Duff & Phelps was delivered to the Special Committee only and none of the Buyer Group members or any of their respective affiliates was entitled to rely or relied on such opinion, the fact that the Special Committee received an opinion from Duff & Phelps to the effect that, as of the date of the opinion and based upon and subject to the procedures followed, assumptions made, matters considered and qualifications and limitations on the review undertaken by Duff & Phelps set forth in Duff & Phelps's written opinion, the merger consideration was fair, from a financial point of view, to the unaffiliated security holders;

41

- the consideration to be paid to the unaffiliated security holders in the merger is all cash, allowing the unaffiliated security holders to immediately realize certainty of value and liquidity for all of their Shares or ADSs, without incurring brokerage and other costs typically associated with market sales;

- the Buyer Group obtained (i) debt financing commitment for the merger with a limited number of conditions attached, thus increasing the likelihood that the merger will be consummated and the merger consideration will be paid to the unaffiliated security holders, and (ii) equity financing commitments provided by First Profit and Mr. He pursuant to the equity commitment letters;

- the termination fee payable by the Company to Parent if the merger agreement is terminated under certain circumstances is $14,117,000, or approximately 2.5% of the Company's total equity value implied by the merger consideration, whereas the termination fee payable by Parent to the Company if the merger agreement is terminated under certain circumstances is twice that, or $28,234,000 or approximately 5% of the Company's total equity value implied by the merger consideration;

- the ability of the Company to terminate the merger agreement and enter into an alternative acquisition agreement with respect to a superior proposal and the ability of the Board to modify or withdraw its recommendation of the merger agreement with respect to a superior proposal;

- the fact that (i) in the market check Duff & Phelps conducted under the direction of the Special Committee, all of the investors deemed to be potentially interested in acquiring the Company and contacted by Duff & Phelps declined or failed to respond to requests to engage in discussions with the Special Committee regarding any such acquisition, (ii) since the Company's receipt of the proposal letter from the Founders on July 9, 2015, none of the Company, the members of the Special Committee or its representatives has received any offer from any third party other than the proposal from Investor A, (iii) the Special Committee has determined that the proposal from Investor A lacks certainty with respect to its financing capabilities and the transaction structure, and (iv) the Buyer Group has no intent to form a consortium with Investor A, introduce Investor A as a potential financing source or otherwise work with Investor A to implement the proposed transaction;

- each of Ms. Yu and Mr. Li has agreed to guarantee the obligations of Parent under the merger agreement to pay the relevant termination fee to the Company and reimburse certain costs and expenses of the Company if the merger agreement is terminated under certain circumstances; and

- the Company has the ability to specifically enforce the terms of the merger agreement and the equity commitment letters under certain circumstances.

In addition, the Buyer Group believes that the merger is procedurally fair to the Company's unaffiliated security holders based on consideration of the following procedure safeguards, which are not listed in any relative order of importance:

- the Special Committee, consisting entirely of independent directors who are unaffiliated with any member of the Buyer Group or the management of the Company, was established and given authority to, among other things, review, evaluate and negotiate the terms of the merger and to recommend to the Board what action should be taken by the Company, including not to engage in the merger;

- members of the Special Committee do not have any interests in the merger different from, or in addition to, those of the unaffiliated security holders, other than (i) the directors' receipt of Board compensation in the ordinary course, (ii) Special Committee members' compensation in connection with its evaluation of the merger (none of which is contingent upon the consummation of the merger or the Special Committee's or Board's recommendation of the merger) and (iii) their indemnification and liability insurance rights under the merger agreement;

- the Special Committee and, acting upon the unanimous recommendation of the Special Committee, the Board (other than Ms. Yu and Mr. Li, members of the Buyer Group) determined that the merger agreement, the plan of merger and the transactions contemplated thereby, including the merger, are in the best interests of the unaffiliated security holders;

42

- the merger was unanimously approved by the Special Committee;

- the Board was fully informed about the extent to which the interests of certain shareholders of the Company who are also members of the Buyer Group in the merger differed from those of the unaffiliated security holders;

- the Special Committee and the Board had no obligation to recommend the approval and authorization of the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger, to the shareholders of the Company;

- the Special Committee retained and was advised by independent legal counsels and independent financial advisor, all of whom are experienced in advising committees such as the Special Committee in similar transactions;

- the merger consideration and other terms and conditions of the merger agreement, the plan of merger and the transactions contemplated thereunder were the result of extensive negotiations between the Buyer Group and the Special Committee and their respective legal and financial advisors over the course of over ten months;

- none of the Buyer Group members participated in or sought to influence the deliberative process of, or the conclusions reached by, the Special Committee or the negotiating positions of the Special Committee;

- under the terms of the merger agreement, in certain circumstances prior to obtaining the Requisite Company Vote, the Company is permitted to provide information to and participate in discussions or negotiations with persons making acquisition proposals (including Investor A under certain circumstances); and

- under the laws of the Cayman Islands, shareholders have the right to dissent from the merger and to receive payment of the fair value of their Shares, which if not agreed will be determined by the Grand Court of the Cayman Islands.

The Buyer Group did not consider the liquidation value of the Company because it considers the Company to be a viable going concern and view the trading history of the Shares as an indication of the Company's going concern value and, accordingly, did not believe liquidation value to be relevant to a determination as to the fairness of the merger. The Buyer Group did not consider net book value, which is an accounting concept, as a factor because it believed that net book value is not a material indicator of the value of the Company as a going concern but rather is indicative of historical costs and therefore not a relevant measure in the determination as to the fairness of the merger. The Buyer Group did not establish, and did not consider, a going concern value for the Shares as a public company to determine the fairness of the merger consideration to the unaffiliated security holders. However, to the extent the pre-merger going concern value was reflected in the pre-announcement price of the Company's Shares, the merger consideration of $6.70 per ADS or $1.34 per Share represented a premium to the going concern value of the Company.

Other than to the extent publicly disclosed in Investor A's announcement regarding its proposal or informed by the Special Committee with respect to such proposal by Investor A, the Buyer Group is not aware of, and thus did not consider, any offers or proposals made by any unaffiliated person, other than the Buyer Group, during the past two years for (a) the merger or consolidation of the Company with or into another company, or vice versa, (b) an acquisition of the Company, (c) a tender offer or other acquisition of any class of the Company's securities, (d) the sale or other transfer of a material amount of the assets of the Company or (e) a purchase of the Company's securities that would enable the purchaser to exercise control over the Company.

The Buyer Group did not consider the purchase prices paid in previous purchases during the past two years as described under "Transactions in the Shares and ADSs" on page 105 (including the purchases made by Mr. Kan) as relevant except to the extent that those prices indicated the trading prices of the ADSs during the applicable periods.

43

The foregoing is a summary of the information and factors considered and given weight by the Buyer Group in connection with its evaluation of the fairness of the merger to the unaffiliated security holders, which is not intended to be exhaustive, but is believed by the Buyer Group to include all material factors considered by it. The Buyer Group did not find it practicable to assign, and did not assign, relative weights to the individual factors considered in reaching its conclusion as to the fairness of the merger to the unaffiliated security holders. Rather, it has made the fairness determination after considering all of the foregoing factors as a whole.

The Buyer Group believes these factors provide a reasonable basis for its belief that the merger is both substantively and procedurally fair to the unaffiliated security holders. This belief, however, is not intended to be and should not be construed as a recommendation by the Buyer Group to any shareholder of the Company as to how such shareholder should vote with respect to the approval and adoption of the merger agreement, the plan of merger and the transactions contemplated thereby, including the merger.

**Certain Financial Projections**

The Company's management does not, as a matter of course, make available to the public future financial projections. However, the Company's management prepared certain financial projections for the fiscal year ending December 31, 2016 through the fiscal year ending December 31, 2022 for the Special Committee and Duff & Phelps in connection with the financial analysis of the Merger. These financial projections, which were based on Company management's estimates of the Company's future financial performance for the periods provided, were prepared by the Company's management for internal use and for use by Duff & Phelps in its financial analyses, and were not prepared with a view toward public disclosure or compliance with published guidelines of the SEC regarding forward-looking information or the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of financial forecasts or U.S. generally accepted accounting principles ("U.S. GAAP").

The financial projections are not a guarantee of performance. In compiling the projections, the Company's management took into account historical performance, combined with estimates regarding gross margin, operating expenses, tax rates, earnings before interest, taxes, depreciation and amortization ("EBITDA") and net income. Although the projections are presented with numerical specificity, they were based on numerous assumptions and estimates as to future events made by management that management believed were reasonable at the time the projections were prepared.

The main assumptions and estimates underlying the financial projections include:

- the growth of the e-commerce industry, the overall supply of, and demand for, books and general merchandise on e-commerce platforms in China, and the development of the Company's new businesses, including the digital reading platform, will continue in line with management's expectations;

- the Company will be able to successfully improve its overall gross margin by changing its product mix and increasing the proportion of product sales with higher gross margins, in accordance with management's strategy and business plans;

- marketing expenses as a percentage of the Company's revenue will slightly decrease due to economies of scale as the Company continues to grow, while fulfillment expenses (including depreciation and amortization) as a percentage of the Company's revenue will increase in 2016 and 2017 due to the expected change of product mix and then decrease over the following five years due to economies of scale;

- technology and content expenses, as well as general and administrative expenses (including depreciation and amortization) as a percentage of the Company's revenue, will remain stable;

- interest income will increase in line with management's expectations due to increases in cash and cash equivalents;

- capital expenditures will increase in line with management's expectations due to construction of new warehouses;

- the exchange rate between the U.S. dollar and the RMB will remain constant over the forecast period; and

44

- China's overall economy and regulatory environment will remain stable, with no material change in competition or industry regulations adversely affecting the Company and the e-commerce market in which the Company operates.

The foregoing information is not, however, fact and should not be relied upon as being necessarily indicative of actual future results. In addition, factors such as industry performance, the market for the Company's existing and new products, the competitive environment, expectations regarding future acquisitions or any other transaction and general business, economic, regulatory, market and financial conditions, all of which are difficult to predict and beyond the control of management, may cause actual future results to differ materially from the results forecasted in these financial projections.

In addition, the projections do not take into account any circumstances or events occurring after the date that they were prepared. For instance, the projections do not give effect to the merger or any changes to the Company's operations or strategy that may be implemented after the time the projections were prepared. We cannot assure you that the projections will be realized or that actual results will not be significantly different from those contained in the projections.

Neither the Company's independent registered public accounting firm, Ernst & Young Hua Ming LLP ("EY"), nor any other independent accountants have examined, compiled or performed any procedures with respect to the financial projections or any amounts derived therefrom or built thereupon and, accordingly, they have not expressed any opinion or given any form of assurance on the financial projections or their achievability. The EY report accompanying the Company's audited consolidated financial statements included in the Company's Annual Report on Form 20-F for the year ended December 31, 2015 incorporated by reference in this proxy statement refers exclusively to the Company's historical information and does not cover any other information in this proxy statement and should not be read to do so. The financial projections included in this proxy statement are included solely to give shareholders access to certain information that was made available to the financial advisor and are not included for the purpose of influencing any shareholder to make any investment decision with respect to the Merger, including whether or not to seek appraisal for his, her or its Shares.

The following table shows the financial projections prepared by our management and considered by the Special Committee in connection with their analysis of the Merger and Duff & Phelps in connection with the delivery of its fairness opinion:

### Management Projections

### Fiscal Year Ending December 31,

| | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E | 2022E |
|---|---|---|---|---|---|---|---|
| | | | (RMB in millions except percentages) | | | | |
| **Net Revenues** | 9,925 | 10,947 | 12,207 | 13,447 | 14,727 | 16,001 | 17,276 |
| *% Growth* | *6.6%* | *10.3%* | *11.5%* | *10.2%* | *9.5%* | *8.6%* | *8.0%* |
| **Gross Profit** | 1,788 | 2,064 | 2,357 | 2,610 | 2,857 | 3,101 | 3,336 |
| *% Margin* | *18.0%* | *18.9%* | *19.3%* | *19.4%* | *19.4%* | *19.4%* | *19.3%* |
| **Operating Expenses** [*] | 1,690 | 1,901 | 2,103 | 2,291 | 2,481 | 2,623 | 2,795 |
| **EBITDA** | 171 | 234 | 329 | 386 | 450 | 546 | 608 |
| *% Margin* | *1.7%* | *2.1%* | *2.7%* | *2.9%* | *3.1%* | *3.4%* | *3.5%* |
| **Income from Operations** | 99 | 163 | 254 | 319 | 376 | 478 | 541 |
| *% Margin* | *1.0%* | *1.5%* | *2.1%* | *2.4%* | *2.6%* | *3.0%* | *3.1%* |
| **Net Income** | 140 | 208 | 310 | 377 | 345 | 432 | 492 |
| *% Margin* | *1.4%* | *1.9%* | *2.5%* | *2.8%* | *2.3%* | *2.7%* | *2.9%* |

[*] Management projected operating expenses include depreciation and amortization.

45

Certain of the prospective financial information prepared by the Company and included in the Company Projections may be considered non-U.S. GAAP financial measures. These non-U.S. GAAP measures are presented because management believes that they are useful financial indicators of the Company's performance. The Company's non-U.S. GAAP operating expenses, non-U.S. GAAP income from operations, non-U.S. GAAP net income and non-U.S. GAAP EBITDA vary from the most comparable U.S. GAAP financial measures in that the non-U.S. GAAP measures do not include share-based compensation expenses. These non-U.S. GAAP measures should not be relied upon as alternatives to results prepared and presented in accordance with U.S. GAAP. Such measures are not defined under U.S. GAAP and, accordingly, non-GAAP financial measures should not be considered in isolation from, or as a substitute for, financial information presented in compliance with GAAP, and non-GAAP financial measures as used by the Company may not be comparable measurements to results reported or forecasted by other companies.

A reconciliation of the non-GAAP measures with the most comparable financial measures calculated and presented in accordance with GAAP is set forth below.

| | U.S. GAAP Reconciliation of Company Projections | | | | | | |
| | Fiscal Year Ending December 31, | | | | | | |
| RMB in millions | 2016E | 2017E | 2018E | 2019E | 2020E | 2021E | 2022E |
|---|---|---|---|---|---|---|---|
| **1. Operating Expenses** | | | | | | | |
| Non-U.S. GAAP operating expenses | (1,690) | (1,901) | (2,103) | (2,291) | (2,481) | (2,623) | (2,795) |
| Share-based compensation | (10) | (10) | (10) | (10) | (10) | (10) | (10) |
| U.S. GAAP operating expenses | (1,699) | (1,911) | (2,112) | (2,300) | (2,491) | (2,632) | (2,804) |
| **2. Income from Operations** | | | | | | | |
| Non-U.S. GAAP income from operations | 99 | 163 | 254 | 319 | 376 | 478 | 541 |
| Share-based compensation | (10) | (10) | (10) | (10) | (10) | (10) | (10) |
| U.S. GAAP income from operations | 89 | 153 | 244 | 309 | 366 | 469 | 531 |
| **3. Net Income** | | | | | | | |
| Non-U.S. GAAP net income | 140 | 208 | 310 | 377 | 345 | 432 | 492 |
| Share-based compensation | (10) | (10) | (10) | (10) | (10) | (10) | (10) |
| U.S. GAAP net income | 131 | 199 | 300 | 368 | 335 | 423 | 483 |
| **4. EBITDA** | | | | | | | |
| Non-U.S. GAAP EBITDA | 171 | 234 | 329 | 386 | 450 | 546 | 608 |
| Share-based compensation | (10) | (10) | (10) | (10) | (10) | (10) | (10) |
| U.S. GAAP EBITDA | 161 | 224 | 319 | 376 | 440 | 536 | 598 |

**NONE OF THE COMPANY OR ITS AFFILIATES, ADVISORS, OFFICERS, DIRECTORS OR REPRESENTATIVES HAS MADE OR MAKES ANY REPRESENTATION TO ANY SHAREHOLDER OR OTHER PERSON REGARDING THE ULTIMATE PERFORMANCE OF THE COMPANY COMPARED TO THE INFORMATION CONTAINED IN THE PROJECTIONS OR THAT PROJECTED RESULTS WILL BE ACHIEVED.**

**BY INCLUDING IN THIS PROXY STATEMENT A SUMMARY OF ITS INTERNAL FINANCIAL PROJECTIONS, THE COMPANY UNDERTAKES NO OBLIGATIONS TO UPDATE, OR PUBLICLY DISCLOSE ANY UPDATE TO, THESE FINANCIAL PROJECTIONS TO REFLECT CIRCUMSTANCES OR EVENTS, INCLUDING UNANTICIPATED EVENTS, THAT MAY HAVE OCCURRED OR THAT MAY OCCUR AFTER THE PREPARATION OF THESE PROJECTIONS, EVEN IN THE EVENT THAT ANY OR ALL OF THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS ARE SHOWN TO BE IN ERROR OR CHANGE, EXCEPT TO THE EXTENT REQUIRED BY APPLICABLE FEDERAL SECURITIES LAW.**

The financial projections are forward-looking statements. For information on factors which may cause the Company's future financial results to materially vary, please see "Cautionary Note Regarding Forward-Looking Statements" beginning on page 108, and "Item 3. Key Information— D. Risk Factors" included in the Company's Annual Report on Form 20-F for the fiscal year ended December 31, 2015, incorporated by reference into this proxy statement.

**Opinion of the Special Committee's Financial Advisor**

Pursuant to an engagement letter, the Special Committee retained Duff & Phelps as its financial advisor to deliver a fairness opinion in connection with the merger. Duff & Phelps is an internationally recognized financial services firm that, among other things, is regularly engaged in the investment banking business, including the valuation of businesses and securities in connection with mergers and acquisitions, private placements of securities, and other investment banking services.

At the meeting of the Special Committee on May 28, 2016, Duff & Phelps rendered its oral opinion (which was confirmed in writing later that same day) to the Special Committee that, as of that date and based upon and subject to the procedures followed, assumptions made, matters considered and qualifications and limitations on the review undertaken by Duff & Phelps, the per Share merger consideration to be received by the holders of the Shares (other than the Excluded Shares, the Dissenting Shares and Class A common shares represented by ADSs) and the per ADS merger consideration to be received by the holders of ADSs (other than ADSs representing the Excluded Shares) in the merger were fair, from a financial point of view, to such holders (without giving effect to any impact of the merger on any particular holder of the Shares or ADSs other than in their capacity as holders of Shares or ADSs). No limitations were imposed by the Special Committee upon Duff & Phelps with respect to the investigations made or procedures followed by it in rendering its opinion.

The full text of the written opinion of Duff & Phelps dated May 28, 2016, which sets forth the procedures followed, assumptions made, matters considered and qualifications and limitations on the review undertaken, is attached as Annex B to this proxy statement and is incorporated herein by reference. The summary of the opinion of Duff & Phelps set forth in this proxy statement is qualified in its entirety by reference to the full text of such opinion. The shareholders of the Company are urged to read the opinion in its entirety. Duff & Phelps' written opinion is addressed to the Special Committee (in its capacity as such), is directed only to the per Share merger consideration and the per ADS merger consideration to be paid in the merger and does not constitute a recommendation to any shareholder of the Company as to how such shareholder should vote or act with respect to the merger or any other matter.

In connection with its opinion, Duff & Phelps made such reviews, analyses and inquiries as it deemed necessary and appropriate under the circumstances. Duff & Phelps also took into account its assessment of general economic, market and financial conditions, as well as its experience in securities and business valuation in general, and with respect to similar transactions in particular. Duff & Phelps' procedures, investigations and financial analyses with respect to the preparation of its opinion included, but were not limited to, the items summarized below:

- Reviewed the Company's annual reports and audited financial statements on Form 20-F filed with the SEC for the years ended December 31, 2013, December 31, 2014 and December 31, 2015 and unaudited financial statements for three months ended March 31, 2015 and March 31, 2016;

- Reviewed a detailed financial projection model for the years ending December 31, 2016 through 2022, prepared and provided to Duff & Phelps by management of the Company, upon which Duff & Phelps has relied, with the consent of the Special Committee, in performing its analysis (the "Management Projections");

- Reviewed other internal documents relating to the history, past and current operations, financial conditions, and probable future outlook of the Company, provided to Duff & Phelps by management of the Company;

47

- Reviewed a letter dated May 4, 2016 from the management of the Company, which made certain representations as to the Management Projections and the underlying assumptions for the Company (the "Management Representation Letter");

- Reviewed documents related to the proposed transaction, including a draft of the merger agreement dated May 27, 2016;

- Discussed the information referred to in paragraph 1 above and the background and other elements of the proposed transaction with the management of the Company;

- Discussed with Company management its plans and intentions with respect to the management and operation of the business;

- Reviewed the historical trading price and trading volume of the ADSs and the publicly traded securities of certain other companies that Duff & Phelps deemed relevant;

- Performed certain valuation and comparative analyses using generally accepted valuation and analytical techniques including a discounted cash flow analysis, an analysis of selected public companies that Duff & Phelps deemed relevant, an analysis of selected transactions that Duff & Phelps deemed relevant, and a review of premiums paid in selected transactions that Duff & Phelps deemed relevant; and

- Conducted such other analyses and considered such other factors as Duff & Phelps deemed necessary or appropriate.

In performing its analyses and rendering its opinion with respect to the merger, Duff & Phelps, with the Special Committee's consent:

- Relied upon the accuracy, completeness, and fair presentation of all information, data, advice, opinions and representations obtained from public sources or provided to it from private sources, including Company management, and did not independently verify such information (or assume any responsibility or liability for independently verifying such information);

- Relied upon the fact that the Special Committee, the Board and the Company have been advised by their respective counsel as to all legal matters with respect to the proposed transaction, including whether all procedures required by law to be taken in connection with the proposed transaction have been duly, validly and timely taken;

- Assumed that any estimates, evaluations, forecasts and projections including, without limitation, the Management Projections, furnished to Duff & Phelps were reasonably prepared and based upon the best currently available information and good faith judgment of the person furnishing the same, and Duff & Phelps has relied upon such information in performing its analysis and expresses no view or opinion with respect to such estimates, evaluations, forecasts or projections or their underlying assumptions;

- Assumed that the information relating to the Company and the proposed transaction supplied by the Company to Duff & Phelps, and the representations made by Company management regarding the Company and the proposed transaction, either orally or in writing, are complete and accurate in all material respects, did not and does not omit to state a material fact in respect of the Company and the proposed transaction necessary to make the information not misleading in light of the circumstances under which the information was provided;

- Assumed that the representations and warranties made by all parties in the merger agreement and in the Management Representation Letter are true and correct and that each party to the merger agreement will fully and timely perform all covenants, undertakings and obligations required to be performed by such party;

- Assumed that the final versions of all documents reviewed by Duff & Phelps in draft form, including the merger agreement, conform in all material respects to the drafts reviewed;

- Assumed that there has been no material change in the assets, liabilities, financial condition, cash flows, results of operations, business, or prospects of the Company since the date of the most recent financial statements and other information reviewed by Duff & Phelps, and that there is no information or facts that would make the information reviewed by Duff & Phelps incomplete or misleading;

- Assumed that all of the conditions required to implement the proposed transaction will be satisfied and that the proposed transaction will be completed in a timely manner in accordance with the merger agreement without any amendments thereto or any waivers of any terms or conditions thereof, and in a manner that complies in all material respects with all applicable laws;

48

- Assumed that all governmental, regulatory or other consents and approvals necessary for the consummation of the proposed transaction will be obtained without any undue delay, limitation, restriction or condition that would have a material effect on the Company or the contemplated benefits expected to be derived in the proposed transaction; and

- Assumed any adjustments to the merger consideration pursuant to the merger agreement will not be material to our analyses or the opinion.

To the extent that any of the foregoing assumptions or any of the facts on which the opinion is based prove to be untrue in any material respect, the opinion cannot and should not be relied upon for any purpose. Furthermore, in Duff & Phelps' analysis and in connection with the preparation of the opinion, Duff & Phelps has made numerous assumptions with respect to industry performance, general business, market and economic conditions and other matters, many of which are beyond the control of any party involved in the proposed transaction and as to which Duff & Phelps does not express any view or opinion in the opinion, including as to the reasonableness of such assumptions.

Duff & Phelps has prepared its opinion effective as of the date thereof. The opinion is necessarily based upon the information made available to Duff & Phelps as of the date thereof and market, economic, financial and other conditions as they exist and can be evaluated as of the date thereof, and Duff & Phelps disclaims any undertaking or obligation to (i) advise any person of any change in any fact or matter affecting the opinion which may come or be brought to the attention of Duff & Phelps after the date thereof or (ii) update, revise or reaffirm the opinion after the date thereof.

Duff & Phelps did not evaluate the Company's solvency or conduct an independent appraisal or physical inspection of any specific assets, properties or liabilities (contingent or otherwise) of the Company nor was Duff & Phelps provided with any such appraisal or evaluation other than the contents of the Management Representation Letter. Duff & Phelps did not undertake an independent analysis of any potential or actual litigation, regulatory action, possible unasserted claims or other contingent liabilities, to which the Company is or may be a party or is or may be subject, or of any governmental investigation of any possible unasserted claims or other contingent liabilities to which the Company is or may be a party or is or may be subject.

Duff & Phelps has not been requested to, and did not, (i) initiate any discussions with, or solicit any indications of interest from, third parties with respect to the proposed transaction, the assets, businesses or operations of the Company, or any alternatives to the proposed transaction, (ii) negotiate the terms of the proposed transaction, and therefore, Duff & Phelps has assumed that such terms are the most beneficial terms, from the Company's perspective, that could, under the circumstances, reasonably be negotiated among the parties to the merger agreement and the proposed transaction, or (iii) advise the Special Committee or any other party with respect to alternatives to the proposed transaction.

Duff & Phelps is not expressing any opinion as to the market price or value of the Shares or ADSs (or anything else) after the announcement or the consummation of the proposed transaction (or any other time). The opinion should not be construed as a valuation opinion, a credit rating, a solvency opinion, an analysis of the Company's credit worthiness, as tax advice, or as accounting advice. Duff & Phelps has not made, and assumes no responsibility to make, any representation, or render any opinion, as to any legal matter. Duff & Phelps expressly disclaims any responsibility or liability in this regard.

In rendering its opinion, Duff & Phelps is not expressing any opinion with respect to the amount or nature or any other aspect of any compensation payable to or to be received by the Company's executive officers, directors, or employees, or any class of such persons, relative to the merger consideration, or with respect to the fairness of any such compensation. In addition, the opinion does not address the fairness to, or any other consideration of, the holders of any class of securities, creditors or other constituencies of the Company, other than the holders of the Shares (other than the Excluded Shares, the Dissenting Shares and Class A common shares represented by ADSs) and the holders of ADSs (other than ADSs representing the Excluded Shares).

Duff & Phelps' opinion is furnished solely for the use and benefit of the Special Committee in connection with its consideration of the proposed transaction and is not intended to, and does not, confer any rights or remedies upon any other person, and is not intended to be used, and may not be used, by any other person or for any other purpose, without Duff & Phelps' written consent. The opinion (i) does not address the merits of the underlying business decision to enter into the proposed transaction versus any alternative strategy or transaction; (ii) does not address any transaction related to the proposed transaction; (iii) is not a recommendation as to how the Special Committee, the Board, the Company, or any shareholder should vote or act with respect to any matters relating to the proposed transaction, or whether to proceed with the proposed transaction or any related transaction, and (iv) does not indicate that the merger consideration is the best possibly attainable under any circumstances; instead, it merely states whether the merger consideration is within a range suggested by certain financial analyses. The decision as to whether to proceed with the proposed transaction or any related transaction may depend on an assessment of factors unrelated to the financial analysis on which the opinion is based. The opinion should not be construed as creating any fiduciary duty on the part of Duff & Phelps to any party.

49

Set forth below is a summary of the material analyses performed by Duff & Phelps in connection with the delivery of its opinion to the Special Committee. This summary is qualified in its entirety by reference to the full text of the opinion, attached hereto as Annex B. While this summary describes the analyses and factors that Duff & Phelps deemed material in its presentation to the Special Committee, it is not a comprehensive description of all analyses and factors considered by Duff & Phelps. The preparation of a fairness opinion is a complex process that involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods to the particular circumstances. Therefore, a fairness opinion is not readily susceptible to partial analysis. In arriving at its opinion, Duff & Phelps did not attribute any particular weight to any analysis or factor considered by it, but rather made qualitative judgments as to the significance and relevance of each analysis and factor. Accordingly, Duff & Phelps believes that its analyses must be considered as a whole and that selecting portions of its analyses and of the factors considered by it in rendering the fairness opinion without considering all analyses and factors could create a misleading or incomplete view of the evaluation process underlying its opinion. The conclusion reached by Duff & Phelps was based on all analyses and factors taken as a whole, and also on the application of Duff & Phelps' own experience and judgment.

The financial analyses summarized below include information presented in tabular format. In order for Duff & Phelps' financial analyses to be fully understood, the tables must be read together with the text of each summary. The tables alone do not constitute a complete description of the financial analyses. Considering the data below without considering the full narrative description of the financial analyses, including the methodologies and assumptions underlying the analyses, could create a misleading or incomplete view of Duff & Phelps' financial analyses.

*Discounted Cash Flow Analysis*

Duff & Phelps performed a discounted cash flow analysis of the estimated future unlevered free cash flows attributable to the Company for the fiscal years ending December 31, 2016 through December 31, 2022, with "free cash flow" defined as cash generated by the business that is available either to reinvest or to distribute to security holders. The discounted cash flow analysis was used to determine the net present value of estimated future free cash flows utilizing a weighted average cost of capital as the applicable discount rate. For the purposes of its discounted cash flow analysis, Duff & Phelps utilized and relied upon the Management Projections, which are described in this proxy statement in the section entitled "Special Factors— Certain Financial Projections" beginning on page 44. The costs associated with the Company being a publicly listed company were excluded from the financial projections because such costs would likely be eliminated as a result of the Merger, and non-recurring income and expenses were also excluded.

Duff & Phelps estimated the net present value of all cash flows attributable to the Company after fiscal year 2022 (the "Terminal Value") using a perpetuity growth formula assuming a 5.0% terminal growth rate, which took into consideration an estimate of the expected long-term growth rate of the Chinese economy and the Company's business. Duff & Phelps used discount rates ranging from 15.25% to 18.25%, reflecting Duff & Phelps' estimate of the Company's weighted average cost of capital, to discount the projected free cash flows and the Terminal Value. Duff & Phelps estimated the Company's weighted average cost of capital by estimating the weighted average of the Company's cost of equity (derived using the capital asset pricing model) and the Company's after-tax cost of debt. Duff & Phelps believes that this range of discount rates is consistent with the rate of return that security holders could expect to realize on alternative investment opportunities with similar risk profiles.

Based on these assumptions, Duff & Phelps' discounted cash flow analysis resulted in an estimated enterprise value for the Company of RMB2,090.9 million ($318.9 million) to RMB2,727.7 million ($416.0 million) and a range of implied values of the Company's ADSs of $5.99 to $7.13 per ADS.

*Selected Public Companies and Merger and Acquisition Transactions Analyses*

Duff & Phelps analyzed selected public companies and selected merger and acquisition transactions for purposes of estimating valuation multiples with which to calculate a range of implied enterprise values of the Company. This collective analysis was based on publicly available information and is described in more detail in the sections that follow.

50

The companies utilized for comparative purposes in the following analysis were not directly comparable to the Company, and the transactions utilized for comparative purposes in the following analysis were not directly comparable to the merger. Duff & Phelps does not have access to nonpublic information of any of the companies used for comparative purposes. Accordingly, a complete valuation analysis of the Company and the merger cannot rely solely upon a quantitative review of the selected public companies and selected transactions, but involves complex considerations and judgments concerning differences in financial and operating characteristics of such companies and targets, as well as other factors that could affect their value relative to that of the Company. Therefore, the selected public companies and selected merger and acquisition transactions analysis is subject to certain limitations.

*Selected Public Companies Analysis.* Duff & Phelps compared certain financial information of the Company to corresponding data and ratios from publicly traded companies in the business to consumer e-commerce industry that Duff & Phelps deemed relevant to its analysis. For purposes of its analysis, Duff & Phelps used certain publicly available historical financial data and consensus equity analyst estimates for the selected publicly traded companies. The eight companies included in the selected public company analysis in the business to consumer e-commerce industry were:

| US-Listed Chinese eCommerce Companies | • | JD.com, Inc. |
| | • | Vipshop Holdings Limited |
| | • | Jumei International Holding Limited |
| **Global eCommerce Companies** | • | YOOX Net-A-Porter Group S.p.A. |
| | • | ASOS Plc |
| | • | boohoo.com plc |
| | • | Overstock.com Inc. |
| | • | MySale Group plc |

Duff & Phelps selected these companies for its analysis based on their relative similarity, primarily in terms of business model, to that of the Company.

The tables below summarize certain observed trading multiples and historical and projected financial performance, on an aggregate basis, of the selected public companies. The estimates for 2016, 2017 and 2018 in the tables below with respect to the selected public companies were derived based on information for the 12-month periods ending closest to the Company's fiscal year ends for which information was available. Data related to the Company's EBITDA were adjusted for purposes of this analysis to eliminate public company costs.

| | | Revenue Growth | | | | EBITDA Growth | | | | EBITDA Margin | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LTM[1] | 2016 | 2017 | 2018 | LTM | 2016 | 2017 | 2018 | LTM | 2016 | 2017 | 2018 |
| **US-Listed Chinese eCommerce Companies** | | | | | | | | | | | | |
| Group Median | 59.5% | 35.2% | 25.8% | 27.4% | 26.7% | 50.5% | 68.3% | 40.3% | 2.5% | 3.2% | 4.3% | 4.4% |
| **Global eCommerce Companies** | | | | | | | | | | | | |
| Group Median | 21.4% | 18.9% | 20.1% | 23.0% | 25.1% | 10.9% | 35.0% | 35.8% | 5.8% | 6.6% | 7.8% | 9.9% |
| **Aggregate** | | | | | | | | | | | | |
| Mean | 43.8% | 27.6% | 22.8% | 28.0% | 12.0% | 30.7% | 54.6% | 45.2% | 3.6% | 4.7% | 5.8% | 6.9% |
| Median | 46.8% | 32.4% | 24.9% | 25.2% | 25.1% | 24.8% | 41.6% | 38.1% | 4.1% | 5.2% | 6.3% | 6.9% |
| | | | | | | | | | | | | |
| E-Commerce China Dangdang Inc. | 9.6% | 6.6% | 10.3% | 11.5% | NM | 29.8% | 35.0% | 38.7% | 1.8% | 1.8% | 2.2% | 2.8% |

(1) Latest twelve months

51

| | LTM EBITDA | 2016 EBITDA | 2017 EBITDA | LTM EBIT | 2016 EBIT | 2017 EBIT | LTM Revenue | 2016 Revenue | 2017 Revenue |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Enterprise Value as a Multiple of | | | | |
| **US-Listed Chinese eCommerce Companies** | | | | | | | | | |
| Group Median | 12.8x | 9.2x | 8.8x | 15.7x | 11.3x | 7.5x | 0.93x | 0.73x | 0.55x |
| **Global eCommerce Companies** | | | | | | | | | |
| Group Median | 40.2x | 30.3x | 26.2x | 46.0x | 41.0x | 28.4x | 2.27x | 2.04x | 1.70x |
| **Aggregate** | | | | | | | | | |
| Mean | 31.9x | 23.1x | 20.5x | 30.8x | 32.6x | 23.5x | 1.46x | 1.35x | 1.09x |
| Median | 35.3x | 21.0x | 23.1x | 26.2x | 35.4x | 28.4x | 0.94x | 0.75x | 0.70x |

*Selected M&A Transactions Analysis.* Duff & Phelps compared the Company to the target companies involved in the selected merger and acquisition transactions listed in the tables below. The selection of these transactions was based on, among other things, the target company's industry, the relative size of the transaction compared to the merger and the availability of public information related to the transaction. The selected business to consumer e-commerce transactions indicated enterprise value to LTM EBITDA multiples ranging from 2.6x to 76.7x with a median of 16.7x, and enterprise value to LTM revenue multiples ranging from 0.14x to 4.88x with a median of 0.99x.

The Company is not directly comparable to the target companies in the selected M&A transactions analysis given certain characteristics of the transactions and the target companies, including business and industry comparability and lack of recent relevant transactions. Therefore, although reviewed, Duff & Phelps did not select valuation multiples for the Company based on the selected M&A transactions analysis.

| Date Announced | Acquirer Name | Target Name |
|---|---|---|
| 2/17/2016 | Mr. Leo Ou Chen; Mr. Yusen Dai; Sequoia Capital China | Jumei International Holding Limited (NYSE:JMEI) |
| 11/26/2015 | Rakuten, Inc. (TSE:4755) | Kenko.com Inc. |
| 11/4/2015 | Byggmax Group AB (publ) (OM:BMAX) | Skånska Byggvaror AB |
| 8/16/2015 | QVC, Inc. | zulily, llc |
| 7/21/2015 | ChinaEquity Group Inc. ;  ChinaEquity USD Fortune Co., Ltd. ;  Cnshangquan E-Commerce Co., Ltd. | Mecox Lane Limited |
| 6/18/2015 | KAISER+KRAFT EUROPA GmbH | BiGDUG Limited |
| 5/27/2015 | Zhejiang Conba Pharmaceutical Co.,Ltd. (SHSE:600572) | Zhejiang Zhencheng Pharmaceutical Online Co., Ltd. |
| 5/27/2015 | GameStop Corp. (NYSE:GME) | Geeknet, Inc. |
| 5/27/2015 | Bluestem Brands, Inc. | Orchard Brands Corporation |
| 5/6/2015 | Compagnie Generale DES Etablissements Michelin SCA (ENXTPA:ML) | Blackcircles.com Ltd. |
| 4/10/2015 | Majestic Wine plc (AIM:WINE) | www.nakedwines.com Limited |

52

| 2/19/2015 | Mixi, Inc. (TSE:2121) | MUSE & Co. Ltd. |
| 7/30/2014 | FTD Companies, Inc. (NasdaqGS:FTD) | Provide Commerce, Inc. |
| 7/11/2014 | Hardy Capital Partners | Shoes.com, Inc. |
| 7/1/2014 | The Kroger Co. (NYSE:KR) | Vitacost.com, Inc. |
| 6/11/2014 | Helen of Troy Limited (NasdaqGS:HELE) | Healthy Directions, LLC |
| 2/26/2014 | Essilor International SA (ENXTPA:EI) | Coastal Contacts Inc. |
| 1/29/2014 | Cnshangquan E-Commerce Co., Ltd. | Mecox Lane Limited |
| 11/18/2013 | Ensogo Limited (ASX:E88) | DEALGURU Holdings Pte Ltd |
| 7/31/2013 | Blucora, Inc. (NasdaqGS:BCOR) | Monoprice, Inc. |
| 5/30/2013 | internetstores GmbH | Addnature AB |
| 3/4/2013 | The Warehouse Group Limited (NZSE:WHS) | Torpedo7 Limited |
| 2/4/2013 | Rakuten, Inc. (TSE:4755) | Stylife Corporation |
| 1/30/2013 | NTT DOCOMO, Inc. (TSE:9437) | Magaseek Corporation |
| 11/13/2012 | Aéropostale, Inc. (OTCPK:AROP.Q) | GoJane LLC |
| 9/25/2012 | Suning Commerce Group Co., Ltd. (SZSE:002024) | Beijing RedBaby Information Technology Co., Ltd. |
| 7/30/2012 | MIH Allegro B.V. | Dante International S.A. |
| 6/4/2012 | Anthem, Inc. (NYSE:ANTM) | 1-800 CONTACTS, Inc. |
| 2/27/2012 | Koninklijke Ahold N.V. (ENXTAM:AH) | bol.com b.v. |

*Summary of Selected Public Companies / M&A Transactions Analyses*

In order to estimate a range of enterprise values for the Company, Duff & Phelps applied valuation multiples to the Company's projected EBITDA for the fiscal year ending December 31, 2016. Duff & Phelps' selected valuation multiple was as follow: the projected fiscal 2016 EBITDA multiple ranged from 11.00x to 14.00x. Valuation multiples were selected taking into consideration historical and projected financial performance metrics of the Company relative to such metrics of the selected public companies. Rather than applying the average or median multiple from the public company set, Duff & Phelps selected multiples that reflect the Company's size, growth outlook, capital requirements, profit margins, revenue mix, and other characteristics relative to the group. Duff & Phelps noted that while it reviewed the selected M&A transactions, it did not select valuation multiples for the Company based on the Selected M&A Transactions Analysis for the reasons described in the section titled "Selected M&A Transactions Analysis" above. As a result of the analysis of the selected valuation multiples described above, the selected public companies analysis indicated an estimated enterprise value for the Company of RMB1,992.4 million ($303.9 million) to RMB2,535.8 million ($386.8 million) and a range of implied values of the Company's ADSs of $5.81 to $6.79 per ADS.

*Summary of Analyses*

The range of estimated enterprise values for the Company that Duff & Phelps derived from its discounted cash flow analysis was RMB2,090.9 million ($318.9 million) to RMB2,727.7 million ($416.0 million), and the range of estimated enterprise values that Duff & Phelps derived from its selected public companies analysis was RMB1,992.4 million ($303.9 million) to RMB2,535.8 million ($386.8 million). Duff & Phelps concluded that the Company's enterprise value was within a range of RMB2,041.7 million ($311.4 million) to RMB2,631.8 million ($401.4 million) based on the analyses described above.

Based on the concluded enterprise value, Duff & Phelps estimated the range of common equity value of the Company to be RMB3,293.4 million ($502.3 million) to RMB3,884.6 million ($592.5 million) by:

- subtracting net working capital deficit of RMB120.6 million ($18.4 million) as of December 31, 2015;

53

- adding excess cash of RMB1,308.8 million ($199.6 million) as of December 31, 2015;

- adding the estimated cash proceeds from the exercise of in-the-money options of RMB 37.1 million ($5.7 million) to RMB38.2 million ($5.8 million); and

- adding equity method investments of RMB26.4 million ($4.0 million) as of December 31, 2015.

Based on the foregoing analysis, Duff & Phelps estimated the value of each ADS to range from $5.90 to $6.96. Duff & Phelps noted that the per Share merger consideration to be received by the holders of the Shares (other than the Excluded Shares, the Dissenting Shares and Class A common shares represented by ADSs) and the per ADS merger consideration to be received by the holders of the ADSs (other than ADSs representing the Excluded Shares) in the merger was within the range of the per ADS value indicated by its analyses.

Duff & Phelps' opinion was only one of the many factors considered by the Special Committee in its evaluation of the merger and should not be viewed as determinative of the views of the Special Committee.

*Fees and Expenses*

As compensation for Duff & Phelps' services in connection with the rendering of its opinion to the Special Committee, the Company agreed to pay Duff & Phelps a fee of $600,000, consisting of a nonrefundable retainer of $200,000 payable upon engagement, $300,000 payable upon Duff & Phelps in delivering to the special committee of its opinion in writing, and $100,000 payable upon closing of the merger.

The Special Committee also retained Duff & Phelps Securities, LLC ("DPS"), an affiliate of Duff & Phelps, to act as financial advisor to the Special Committee providing such financial and market related advice and assistance as deemed appropriate in connection with the merger, including assisting the Special Committee in initiating, soliciting and encouraging any alternative transaction proposals from third parties. For that engagement, the Company paid DPS a $100,000 nonrefundable retainer at the time that the market check was authorized by the Special Committee.

No portion of Duff & Phelps' fee is refundable or contingent upon the consummation of a transaction, including the merger, or the conclusion reached in the opinion. The Company has also agreed to indemnify Duff & Phelps and DPS for certain liabilities arising out of its engagement. In addition, the Company has agreed to reimburse Duff & Phelps and DPS for its reasonable out-of-pocket expenses incurred in connection with the rendering of its opinion not to exceed $50,000 without the Company's prior written consent.

The terms of the fee arrangements with Duff & Phelps and DPS, which the Company believes are customary in transactions of this nature, were negotiated at arm's length, and the Special Committee and the Board are aware of these fee arrangements. Other than the DPS engagement described above and Duff & Phelps engagement to render its opinion to the Special Committee, Duff & Phelps has not had any material relationship with any party to the merger for which compensation has been received or is intended to be received, nor is any such material relationship or related compensation mutually understood to be contemplated.

**Buyer Group's Purpose of and Reasons for the Merger**

Under the SEC rules governing going-private transactions, each member of the Buyer Group is required to express its reasons for the merger to the Company's unaffiliated security holders. The Buyer Group is making the statements included in this section solely for the purpose of complying with the requirements of Rule 13e-3 and related rules under the Exchange Act. For the Buyer Group, the purpose of the merger is to enable the Buyer Group to acquire 100% control of the Company in a transaction in which the Company's unaffiliated security holders will be cashed out in exchange for $6.70 per ADS or $1.34 per Share, so that the Buyer Group will benefit from the rewards and bear the risks of sole ownership of the Company after the merger, including any future earnings and growth of the Company as a result of improvements to the Company's operations or acquisitions of other businesses. In addition, the merger will allow members of the Buyer Group which are currently shareholders of the Company to maintain a significant portion of their investment in the Company through their respective indirect ownership in Parent as described under "—Interests of Certain Persons in the Merger—Interests of the Buyer Group and Mr. He" below beginning on page 67 and at the same time enable members of the Buyer Group to maintain their management leadership with the Company.

The Buyer Group believes that the operating environment has changed significantly since the Company's initial public offering, and the Company faces a number of challenges in the marketplace, including, among other things:

- there is increasing competition among e-commerce companies in China such as the Company;

54

- the Company plans to continue to invest in certain business initiatives, such as its mobile platform and digital reading platform, which requires continuous and substantial investments in the Company's managerial, operational, technological and other resources; and

- the recent economic slowdown in China and expected sustained macroeconomic challenges place substantial pressure on the Company's revenue growth, gross margin and other financial metrics.

These changes have increased the uncertainty and volatility inherent in the business models of companies similar to the Company. As a result, the Buyer Group is of the view that there is potential for considerably greater short- and medium-term volatility in the Company's earnings. Responding to current market challenges will require tolerance for volatility in the performance of the Company's business, and willingness to make business decisions focused on improving the Company's long-term profitability. The Buyer Group believes that these strategies would not be effectively implemented if the Company were to continue to be publicly traded in the United States. Following the merger, the Company's management will have greater flexibility to focus on improving long-term profitability without the pressures exerted by the U.S. public market's valuation of the Company and the emphasis on short-term period-to-period performance.

As a privately held company, the Company will be relieved of many of the other expenses, burdens and constraints imposed on companies that are subject to the public reporting requirements under the U.S. federal securities laws, including the Exchange Act and the Sarbanes-Oxley Act of 2002. The Company will no longer be required to publicly disclose a considerable amount of business information which may reduce the Company's competitive advantage or negotiation leverage against the Company's competitors, customers, lenders or vendors, as the case may be. The need for the management of the Company to be responsive to unaffiliated security holders' concerns and to engage in an ongoing dialogue with unaffiliated security holders can distract management's time and attention from the effective operation and improvement of the business.

The Buyer Group decided to undertake the going-private transaction at this time because it wants to take advantage of the benefits of the Company being a privately held company, as described above. In light of the Buyer Group's evaluation of the competitive landscape and the challenges faced by the Company as described above, including the pressure on the Company's financial performance as a result of the recent economic slowdown in China, the Buyer Group determined that a going-private transaction at this time would enable the Company to respond to these challenges more effectively and have greater flexibility to implement the Company's strategies to focus on long-term performance. In the course of considering the going-private transaction, the Buyer Group did not consider alternative transaction structures.

### Effect of the Merger on the Company

*Private Ownership*

ADSs representing Shares of the Company are currently listed on the NYSE under the symbol "DANG." It is expected that, immediately following the completion of the merger, the Company will cease to be a publicly traded company and will instead become a privately-held company beneficially owned by the Buyer Group and Mr. He. Following the completion of the merger, the ADSs will cease to be listed on the NYSE, and price quotations with respect to sales of the ADSs in the public market will no longer be available. In addition, registration of the ADSs and the underlying Shares under the Exchange Act may be terminated upon the Company's application to the SEC if the Shares are not listed on a national securities exchange and there are fewer than 300 registered holders of the Shares. Ninety days after the filing of Form 15 in connection with the completion of the merger or such longer period as may be determined by the SEC, registration of the ADSs and the underlying Shares under the Exchange Act will be terminated. At such time, the Company will no longer be required to file periodic reports with the SEC or otherwise be subject to the United States federal securities laws, including the Sarbanes-Oxley Act of 2002, applicable to public companies. After the completion of the merger, the Company's shareholders will no longer enjoy the rights or protections that the United States federal securities laws provide, including reporting obligations for directors, executive officers and principal securities holders of the Company. Furthermore, following the completion of the merger, the ADS program for Shares will terminate.

Under the terms and conditions of the merger agreement, if the merger is completed, at the Effective Time, each Share issued and outstanding immediately prior to the Effective Time, other than the Excluded Shares, the Dissenting Shares, and Class A common shares represented by ADSs, will be cancelled in exchange for the right to receive $1.34 in cash per Share without interest and net of any applicable withholding tax. At the Effective Time, each ADS issued and outstanding immediately prior to the Effective Time, other than ADSs representing the Excluded Shares, will be cancelled in exchange for the right to receive $6.70 in cash per ADS without interest and net of any applicable withholding taxes (less up to $0.05 per ADS cancellation fees and up to $0.02 per ADS depositary services fees). The Excluded Shares issued and outstanding immediately prior to the Effective Time will be cancelled for no consideration. The Dissenting Shares will be cancelled and each holder thereof will be entitled to receive only the payment of the fair value of such Dissenting Shares in accordance with the CICL.

In addition, at the Effective Time, the Company will terminate the Company's Share Incentive Plans, terminate all relevant award agreements applicable to the Share Incentive Plans, and cancel all the Company Options that are outstanding and unexercised, whether or not vested or exercisable.

At the Effective Time, each vested Company Option that remains outstanding immediately prior to the Effective Time will be cancelled in exchange for the right to receive from the surviving company or one of its subsidiaries, as soon as practicable after the Effective Time, cash in the amount equal to the product of (a) the number of Shares underlying such Company Option multiplied by (b) the excess, if any, of $1.34 over the exercise price payable per Share of such Company Option. If the exercise price per Share of any such Company Option is equal to or greater than $1.34, such Company Option will be cancelled for no consideration. At the Effective Time, each unvested Company Option will be cancelled for no consideration.

*Memorandum and Articles of Association of the Surviving Company; Directors and Management of the Surviving Company*

If the merger is completed, the current memorandum and articles of association of the Company will be replaced in its entirety by the memorandum and articles of association in the form attached as Annex B to the plan of merger (which is substantially the form of the memorandum and articles of association of Merger Sub, as in effect prior to the completion of the merger, except that at the Effective Time, the memorandum and articles of association shall refer to the name of the surviving company as "E-Commerce China Dangdang Inc." and all references to the share capital will be amended as necessary to correctly describe the share capital of the surviving company as approved in the plan of merger. In addition, the directors of Merger Sub immediately prior to the Effective Time (identified below in "Annex D – Directors and Executive Officers of each Filing Person") will become the directors of the surviving company and the executive officers of the Company immediately prior to the Effective Time will become the executive officers of the surviving company.

*Primary Benefits and Detriments of the Merger*

The primary benefits of the merger to the unaffiliated security holders include, without limitation, the following:

- the fact that the per Share merger consideration of $1.34 or the per ADS merger consideration of $6.70 represents (i) a premium of 2.9% over the Company's closing price of $6.51 per ADS on July 8, 2015, the last trading day prior to July 9, 2015, the date that the Company announced it had received a "going-private" proposal, (ii) a 11.1% premium over the closing price of $6.03 per ADS on May 27, 2016, the trading day immediately before the execution of the merger agreement, and (iii) a premium of 10.49% and 7.32% to the volume-weighted average closing price of the Company's ADSs during the 20 and 30 trading days prior to the announcement of the execution of the merger agreement, respectively; and

- the avoidance of the risk associated with any possible decrease in the Company's future revenues and free cash flow, growth or value, and the risks related to the Company's substantial leverage, following the merger.

The primary detriments of the merger to the unaffiliated security holders include, without limitation, the following:

- such security holders will cease to have an interest in the Company and, therefore, will no longer benefit from possible increases in the future revenues and free cash flow, growth or value of the Company or payment of dividends on the Shares, if any; and

- in general, for a U.S. Holder (as defined under "Special Factors – Material U.S. Federal Income Tax Consequences"), the receipt of cash pursuant to the merger will be a taxable transaction for U.S. federal income tax purposes and may also be a taxable transaction under other applicable tax laws. As a result, a U.S. Holder of the Shares or ADSs who receives cash in exchange for all of such U.S. Holder's Shares or ADSs in the merger generally will be required to recognize gain or loss equal to the difference, if any, between the amount of cash received and such U.S. Holder's aggregate adjusted tax basis in such Shares or ADSs.

56

The primary benefits of the merger to the Company's directors and executive officers (other than Ms. Yu, Mr. Li and Mr. Yao) include, without limitation, the following:

- the cash-out of vested Company Options beneficially owned by executive officers and directors of the Company;

- continued indemnification rights, rights to advancement of fees and directors and officers liability insurance to be provided by the surviving company to former directors and executive officers of the Company provided under the merger agreement;

- the monthly compensation of $10,000, which must not exceed $50,000 in aggregate, for each of the members of the Special Committee in exchange for their services in such capacity (or, in the case of the chairpersonman of the Special Committee, monthly compensation of $15,000, which must not exceed $100,000 in the aggregate) (the payment of which is not contingent upon the completion of the merger or the Special Committee's or the Board's recommendation of the merger); and

- the expected continuation of service of certain executive officers of the Company with the surviving company in positions that are substantially similar to their current positions.

The primary detriments of the merger to the Company's directors and executive officers (other than Ms. Yu, Mr. Li and Mr. Yao) include, without limitation, the following:

- certain directors and executive officers, to the extent and in their capacity as shareholders of the Company, will no longer benefit from possible increases in the future revenues and free cash flow, growth or value of the Company or payment of dividends on the Shares, if any; and

- in general, the receipt of cash pursuant to the merger will be a taxable transaction for U.S. federal income tax purposes and may also be a taxable transaction under other applicable tax laws.

The primary benefits of the merger to the Buyer Group include the following:

- if the Company successfully executes its business strategies, the value of the equity investment of the Buyer Group in the Parent could increase because of possible increases in future revenues and free cash flow, increases in the underlying value of the Company or the payment of dividends, if any, that will accrue to Parent;

- the Company will have more flexibility to change its capital spending and business strategies without public market scrutiny or the pressure to meet quarterly forecasts set by analysts. As a publicly traded company, the Company currently faces pressure from public shareholders and investment analysts to make decisions that may produce better short-term results, but which may not maximize its equity value over the long term;

- the Company will have more freedom to focus on long-term strategic planning in a highly competitive business; and

- there will be a reduction of the costs and administrative burden associated with operating the Company as an independent publicly traded company, including the costs associated with regulatory filings and compliance requirements. Such cost savings will benefit the Buyer Group following the Closing, and will be recurring in nature if and for so long as the Company remains private.

The primary detriments of the merger to the Buyer Group include the following:

- all of the risk of any possible decrease in the Company's revenues, free cash flow or value following the merger will be borne by the Buyer Group;

- risks associated with any legal or regulatory proceedings against the Company will be borne by the Buyer Group;

- the business risks faced by the Company will be borne by the Buyer Group; and

- an equity investment in the surviving company by the Buyer Group following the merger will involve substantial risk resulting from the limited liquidity of such an investment, and following the merger, there will be no trading market for the surviving company's equity securities.

### Effect of the Merger on the Company's Net Book Value and Net Earnings

Following consummation of the merger, Parent will own 100% of the outstanding share capital of the Company and will have a corresponding interest in our net book value and net earnings.

57

The Company had a net income of approximately $14.1 million as of December 31, 2015, and the Company's net book value as of December 31, 2015 was approximately $133.7 million.

The table below sets out the direct or indirect interest in the Company's net book value and net earnings for members of the Buyer Group before and immediately after the merger, based on the historical net book value and net earnings of the Company as of and for the year ended December 31, 2015.

| | Ownership Prior to the Merger | | | | Ownership After the Merger | | | |
| | Net Book Value | | Net Earnings | | Net Book Value | | Net Earnings | |
| Name | $'000 | %* | $'000 | %* | $'000 | % | $'000 | % |
|---|---|---|---|---|---|---|---|---|
| Parent | — | — | — | — | 133,717 | 100.00 | 14,133 | 100.00 |
| Holdco | — | — | — | — | 124,583 | 93.17 | 13,168 | 93.17 |
| Ms. Yu | 5,244 | 3.92 | 554 | 3.92 | 14,760 | 11.04 | 1,560 | 11.04 |
| Mr. Li | 39,020 | 29.18 | 4,124 | 29.18 | 109,823 | 82.13 | 11,608 | 82.13 |
| Kewen | 39,020 | 29.18 | 4,124 | 29.18 | 109,823 | 82.13 | 11,608 | 82.13 |
| SC International | 31,910 | 23.86 | 3,373 | 23.86 | 89,817.7 | 67.17 | 9,493.1 | 67.17 |
| First Profit | 98 | 0.07 | 10 | 0.07 | 8,731.7 | 6.67 | 922.9 | 6.67 |
| Mr. Yao | 98 | 0.07 | 10 | 0.07 | 150 | 0.11 | 16 | 0.11 |
| Mr. Chen | 15 | 0.01 | 2.6 | 0.01 | 42 | 0.03 | 4 | 0.03 |
| Mr. Kan | 23 | 0.02 | 2 | 0.02 | 64 | 0.05 | 7 | 0.05 |

Note:

\*     Ownership percentages are based on 411,434,410 Shares issued and outstanding as of the date of this proxy statement (excluding outstanding Company Options), including 6,607,115 Class A common shares issued to our depositary bank and reserved for future exercise and grants of incentive shares under our share incentive plans.

In addition, Mr. He does not own any equity interests in the Company prior to the merger and is expected to own approximately 0.11% of the equity interests in Parent immediately following the merger.

**Plans for the Company after the Merger**

After the Effective Time, the Buyer Group anticipates that the Company will continue to conduct its operations substantially as they are currently being conducted, except that the Company will cease to be a publicly traded company and will instead be a wholly-owned subsidiary of Parent.

The Buyer Group has advised the Company that, other than as described in this proxy statement, it does not have any present plans or proposals that relate to or would result in any of the following:

- an extraordinary corporate transaction involving the Company's corporate structure, business, or management, such as a merger, reorganization, liquidation, or relocation of any material operations;

- sale or transfer of a material amount of assets of the Company; or

- any other material changes in the Company's business.

However, after the Effective Time, the Buyer Group and the surviving company's management and the board of directors will continue to evaluate the surviving company's business and operations from time to time, and may propose or develop new plans and proposals, including any of the foregoing actions and any actions to address the challenges referred to under the heading "Special Factors—Purposes and Reasons for the Merger" above, in each case, which they consider to be in the best interests of the surviving company and its equity holders, including the possibility of relisting the Company or a substantial part of its business on another stock exchange. The Buyer Group expressly reserves the right to make any changes it deems appropriate to the operation of the surviving company in light of such evaluation and review as well as any future developments.

58

## Alternatives to the Merger

The Board did not independently determine to initiate a process for the sale of the Company. The Special Committee was formed on July 10, 2015, in response to the receipt of the going-private proposal letter from the Founders on July 9, 2015. During the period from August 27, 2015 to September 18, 2015, at the instruction of the Special Committee, Duff & Phelps conduct a limited market check to gauge the market interest in the Company. Duff & Phelps contacted 35 potential buyers, and as of September 18, 2015, the deadline previously notified by Duff & Phelps to those potential buyers, none of the potential investors showed an interest in pursuing an alternative transaction with the Company.

On March 9, 2016, Investor A announced that it submitted a preliminary non-binding proposal to acquire all of the outstanding Shares and ADSs of the Company in an all-cash transaction for $1.76 per Share or $8.8 per ADS. During the period from March 10, 2016 to May 28, 2016, on which the Company entered into the merger agreement with the Buyer Group, the Special Committee communicated with Investor A through Duff & Phelps, including conducting due diligence on Investor A and requesting it to provide information regarding its intention, background, transaction experience, capital commitment, proposed deal structure, timeline, source of funding of the proposed transaction and future plan with the Company and considered and evaluated Investor A's proposal with the assistance of its advisors. After prolonged discussion with Investor A, the Special Committee determined that Investor A's proposal lacks certainty with respect to financing and transaction structure. Please see "Special Factors– Background of the Merger" beginning on page 25 for additional information.

In light of (i) the Buyer Group's intention not to sell Shares owned by the Buyer Group to any third party and its beneficial ownership of approximately 35.3% of the outstanding Shares of the Company, representing approximately 83.6% of the total number of votes represented by the Company's outstanding Shares (as of the date of this proxy statement), (ii) the fact that, in the market check Duff & Phelps conducted under the direction of the Special Committee, all of the investors deemed to be potentially interested in acquiring the Company and contacted by Duff & Phelps declined or failed to respond to requests to engage in discussions with the Special Committee regarding any such acquisition, (iii) the substantial uncertainty associated with Investor A's proposal, and (iv) since the Company's receipt of the proposal letter from the Founders on July 9, 2015, none of the Company, the members of the Special Committee or its representatives has received any offer from any third party other than the proposal from Investor A for (a) a merger or consolidation of the Company with another company, (b) the sale or transfer of all or substantially all of the Company's assets or (c) the purchase of all or a substantial portion of the Shares that would enable such person to exercise control of or significant influence over the Company, the Special Committee determined that there was no better alternative to the proposed sale of the Company to the Buyer Group.

In addition, the Special Committee also considered the alternative for the Company to remain as a public company. However, the Special Committee did not believe such options to be equally or more favorable in enhancing shareholder value, after considering factors such as the forecasts of future financial performance prepared by management, the increased costs of regulatory compliance for public companies, the challenges to the Company's efforts to increase shareholder value as an independent publicly traded company, and the requirement, as an SEC-reporting company, to disclose a considerable amount of business information to the public which will limit the Company's ability to compete in the market. The Special Committee has concluded that it is more beneficial to the unaffiliated security holders to enter into the merger agreement and pursue the consummation of the transactions contemplated thereby, including the merger, and become a private company rather than to remain a public company.

## Effects on the Company if the Merger is not Completed

If the merger agreement and the plan of merger are not authorized and approved by the Company's shareholders or if the merger is not completed for any other reason, shareholders will not receive any payment for their Shares or ADSs in connection with the merger nor will the holders of any vested Company Options receive payment pursuant to the merger agreement. Instead, the Company will remain a publicly traded company, the ADSs will continue to be listed and traded on the NYSE, provided that the Company continues to meet the NYSE's listing requirements, and the Company will remain subject to SEC reporting obligations. Therefore, the Company's shareholders will continue to be subject to similar risks and opportunities as they currently are with respect to their ownership of the Shares or ADSs. Accordingly, if the merger is not completed, there can be no assurance as to the effect of these risks and opportunities on the future value of your Shares or ADSs, including the risk that the market price of the ADSs may decline to the extent that the current market price reflects a market assumption that the merger will be completed.

Under specified circumstances in which the merger agreement is terminated, the Company may be required to pay Parent a termination fee of $14,117,000, or Parent may be required to pay the Company a termination fee of $28,234,000, in each case, as described under the caption "The Merger Agreement and Plan of Merger – Termination Fee" beginning on page 97.

59

If the merger is not completed, from time to time, the Board will evaluate and review, among other things, the business, operations, dividend policy and capitalization of the Company and make such changes as are deemed appropriate and continue to seek to identify strategic alternatives to enhance shareholder value. If the merger agreement is not authorized and approved by the Company's shareholders or if the merger is not completed for any other reason, there can be no assurance that any other transaction acceptable to the Company will be offered, or that the business, prospects or results of operations of the Company will not be adversely impacted.

**Financing of the Merger**

The Company and the Buyer Group estimate that the total amount of funds necessary to complete the transactions contemplated by the merger agreement, including the merger, is approximately $_____ million (assuming no exercise of dissenter rights by shareholders of the Company). This amount includes the cash to be paid to the Company's shareholders and holders of ADSs (other than holders of the Excluded Shares) and holders of vested Company Options in the merger as well as the costs and expenses in connection with the transactions contemplated by the merger agreement, including the merger. It does not include the value of the Excluded Shares, which will be cancelled for no consideration in the merger.

The Buyer Group expects to fund the transactions contemplated by the merger agreement, including the merger, through a combination of (i) rollover financing from the Rollover Shareholders of 136,477,925 Shares (including Class A common shares represented by ADSs), (ii) the proceeds from a committed loan facility in an amount of up to $164 million (the "Facility"), which is agreed to be arranged by Bank of China Limited, Shanghai Pudong Development Zone Sub-Branch, pursuant to a debt commitment letter, (iii) cash contributions provided by First Profit and Mr. He, an individual unaffiliated with the Company, in the aggregate amount of $15.25 million, pursuant to two equity commitment letters, and (iv) available cash of the Company and its subsidiaries. As of the date of this proxy statement, there are no alternative financing arrangements or plans in place to obtain the funds necessary for the consummation of the transactions contemplated by the merger agreement, including the merger.

*Debt Financing*

Merger Sub received a debt commitment letter, dated May 28, 2016, from Bank of China Limited, Shanghai Pudong Development Zone Sub-Branch (the "Financing Bank"), pursuant to which the Financing Bank committed to provide the Facility, subject to terms and conditions set forth therein. The proceeds of the Facility will be used for the purposes of, among other things, financing the consideration of the merger and paying fees and expenses incurred in connection with the merger.

The borrower under the Facility is Merger Sub as of the date of the debt commitment letter, and on and from the date of the Closing, the surviving company will be the borrower.

The Facility Agreement has not been executed as of the date of this proxy statement and, accordingly, the actual terms of the Facility may differ from those described in this proxy statement. Merger Sub and the Financing Bank have undertaken to negotiate in good faith, to use reasonable best efforts and to allocate sufficient resources and personnel to ensure that they will enter into the Facility Agreement as soon as reasonably practicable following the date of the debt commitment letter but in no event later than eight months after the date of the merger agreement.

*Availability Period.* Subject to the terms and conditions in the debt commitment letter, the availability of the Facility will expire on the earlier of (i) the date falling five business days from the date on which the merger agreement is terminated in accordance with its terms, (ii) the date of the Closing and (iii) the date falling eight months from the date of the debt commitment letter.

*Conditions to Financing.* The Financing Bank's commitment to provide the debt financing is subject to, among other conditions:

• execution of a mutually acceptable facility agreement (the "Facility Agreement");

60

- compliance by Merger Sub in all material respects with the terms of the debt commitment letter and the Facility Agreement;

- receipt by the Financing Bank of certain documents from Parent, Merger Sub and Holdco, including constitutional documents, certificates of good standing, director resolutions and shareholder resolutions approving the terms of and the transactions contemplated by the Facility Agreement, the debt commitment letter, documentation relating to the security of the Facility, the merger agreement, the plan of merger and certain other documents relating to the Facility and the merger;

- receipt of certain executed transaction security documents as well as a copy of all notices required to be sent and acknowledgments to be delivered under the transaction security documents, a copy of all share certificates, all transfers and share transfer forms in relation to the assets subject to or expressed to be subject to the transaction security, and other documents of title and deliverables to be provided under the transaction security documents;

- receipt of certain documents in relation to the merger, including (a) a copy of each of the merger documents and other related agreements, (b) a certificate of Merger Sub detailing the estimated costs of the merger, (iii) a certificate of Merger Sub certifying the satisfaction or waiver of conditions under the merger documents and that no condition to completion of the merger has been amended, waived or treated as satisfied in any manner which would reasonably be expected to be materially adverse to the interests of the Financing Bank, (iv) a copy of the plan of merger and each of the other documents required to be filed with the Registrar of Companies of the Cayman Islands pursuant to the CICL in relation to the merger, and (v) evidence that the merger has been approved by all shareholders and board of directors of Merger Sub and the board of directors of the Company and receipt of the Requisite Company Vote;

- receipt of a certificate of Merger Sub certifying that Ms. Yu and Mr. Li and their respective affiliates, directly or indirectly, own at least 51% of the issued share capital of Merger Sub;

- evidence of receipt of certain cash contribution in accordance with the funds flow statement and a certificate of Merger Sub certifying there will be sufficient cash to pay the consideration of the merger and fees, costs and expenses in relation to the Facility and the merger;

- receipt of legal opinions from legal advisors to the Financing Bank;

- evidence that the fees, costs and expenses due to be paid by Merger Sub on or before the date of the borrowing pursuant to the Facility Agreement will have been paid by the date of the borrowing; and

- certain other conditions as set forth in the debt commitment letter.

*Interest Rate.* The interest rate of the term loan under the Facility is London interbank offered rate, or LIBOR, plus 2% per annum.

*Prepayments and Cancellation:*

Subject to a minimum amount and multiples to be agreed, the borrower may prepay all or part of the Facility at any time after the last day of the Availability Period upon providing a ten business days' prior notice. If any such prepayment is not made on the last day of an interest period, the borrower must pay break funding costs. Subject to a minimum amount and multiples to be agreed and subject to satisfactory evidence that sufficient funds are available to otherwise complete the merger, borrower may, on a ten business days' prior notice, cancel all or part of the unutilized amount of the Facility, but such cancelled amount cannot be reinstated.

Furthermore, the borrower is required to make mandatory prepayments of the Facility upon the occurrence of certain events as set forth in the debt commitment letter, including the following:

- any illegality event affecting any of the lenders under the Facility;

- the borrower may prepay and replace any lender under the Facility if such lender makes a claim under the provisions governing increased costs, tax gross-up and tax indemnity;

61

- a change of control event;

- if the borrower or any of its holding company or subsidiaries conducts a public offering of its equity interests or securities, the buyer shall use all the proceeds from such public offering to prepay the Facility;

- other than certain exceptions to be set forth in the Facility Agreement and to the extent not used to replace or reinstate the assets disposed of within 12 months, proceeds from the disposals of assets shall be used to prepay the Facility, subject to a threshold (less expenses and taxes incurred);

- To the extent not used to meet the relevant third-party claim, to cover the relevant operating losses, or to replace or reinstate the relevant asset within, in each case, 12 months for an amount up to $1,500,000, all proceeds of any insurance claim (less expenses), subject to customary exceptions, shall be applied to repay the Facility;

- To the extent not used to satisfy a liability of a member of the Company which arose as a result of the relevant claim or to replace or reinstate the relevant asset (the subject of the relevant claim) within, in each case, 12 months, all proceeds of any claim against any provider of the specified due diligence reports in relation to the merger under the merger agreement (less expenses and taxes incurred) shall be used to prepay the Facility;

- if the borrower receives any dividend payment or repayment of the shareholder loan by Beijing Dangdang Information Technology Co., Ltd. ("Beijing Dangdang"), it shall prepay the Facility unless, in each case, such payments are used to pay interests for the Facility and certain operational expenses;

- the Facility shall be repaid in full if the Closing does not take place within ten days of the date of first drawdown from the Facility; and

- disposal of equity interest in Beijing Dangdang.

Any prepayment shall be made with accrued interest on the amount prepaid. Subject to breakage costs, there will not be premium or penalty on the prepayment. Any amount prepaid may not be redrawn.

*Security.* The obligations of the borrower under the Facility will be secured by, to the extent possible, first-ranking security as follows, subject to the terms of the Facility Agreement and applicable laws:

*Prior to the Date of First Drawdown from the Facility:*

- guarantee provided by Parent;

- share charge over the share capital of Parent held by Holdco;

- share charge over the entire issued share capital of Merger Sub held by Parent, and

- fixed and floating charge over all assets of Merger Sub (including the debt service reserve account and loan proceeds account established for the purposes of the Facility).

As soon as reasonably practicable and in any event within an agreed timeframe after the date of the Closing:

- share charge over the entire issued share capital of the Company;

- fixed and floating charge over all assets of the Company;

- guarantee provided by each of the Company's material subsidiaries; and

- pledge of equity interest of each of the Company's material subsidiaries other than Beijing Dangdang Kewen E-Commerce Co., Ltd. ("Dangdang Kewen").

62

*Financial Covenants.* The surviving company will be subject under the Facility Agreement to certain financial covenants, including a maximum leverage ratio and a minimum interest cover ratio, to be tested semi-annually with respect to each 12-month period ending on the date of an annual financial statement or the semi-annual financial statements, beginning with the 12-month period ended December 31, 2016, and also certain other customary covenants.

*Repayment.* The Facility will be repaid by quarterly instalments of $30,000 beginning on the date falling the ninth month from the first date of utilization of the Facility, and all outstanding amount will be repaid at the end of the 24-month period from the first date of utilization of the Facility.

*Assignment.* The Financing Bank's commitments to provide the debt financing are not conditioned upon a successful syndication of the Facility with other financial institutions. Neither Merger Sub nor the financing bank may assign or transfer their rights or obligations under the debt commitment letter without the prior written consent of the other party. The financing bank and any other banks that may become lenders under the Facility Agreement may assign any of its rights to certain banks specified in the debt commitment letter.

*Other Major Terms.* The Facility Agreement will also contain customary representations and warranties, and affirmative and negative covenants, including, among other things, restrictions on change of business focus, indebtedness, disposal of assets, and dividends and other distributions. The Facility Agreement will also include customary events of default.

The Buyer Group currently plans to repay the debt incurred to finance the merger using the operating cash flow of the surviving company after the merger in accordance with the Facility Agreement.

*Equity Financing*

On June 17, 2016, Parent entered into an equity commitment letter with each of First Profit and Mr. He. Pursuant to the equity commitment letters, each of First Profit and Mr. He has committed to make, or cause one of their respective affiliates to make, subject to the terms and conditions therein, an equity contribution to Parent at or immediately prior to the Closing, in an amount of $15 million and $250,000, respectively. The proceeds of the equity contributions by First Profit and Mr. He are to be used to fund such portion of the amounts required to be paid pursuant to the merger agreement and related fees and expenses incurred by Parent under the merger agreement.

The equity contribution by each of First Profit and Mr. He under its or his equity commitment letters is conditioned upon the satisfaction, or waiver by Parent, of each of the conditions to Parent's and Merger Sub's obligations to effect the merger set forth in the merger agreement (other than those conditions that in their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such condition). In addition, the equity contribution by Mr. He is also conditioned upon the substantially contemporaneous consummation of the Closing and the debt financing having been funded at the Closing in accordance with the terms of the debt commitment letter if Mr. He's equity contribution is funded at the Closing.

The obligation of each of First Profit and Mr. He to fund the equity contribution under its or his equity commitment letter will terminate automatically and immediately upon the earliest to occur of (i) the Effective Time following the consummation of the merger in accordance with the terms of the merger agreement, at which time the commitment will be discharged, (ii) the valid termination of the merger agreement in accordance with its terms, (iii) the funding of the equity commitment, and (iv) 90 days following the termination date of the merger agreement, being the date falling eight months from the date of the merger agreement, unless Parent has commenced enforcement actions against First Profit or Mr. He, as applicable, by such date. However, if the Company, as the third-party beneficiary under each equity commitment letter, has filed any claim or suit to enforce the terms of the equity commitment letter prior to such termination, the obligations to fund the commitment and all other obligations of First Profit and Mr. He, as applicable, under the equity commitment letter shall not expire, and shall remain in full force and effect until any such claim or suit has been resolved in a final non-appealable decision by a court of competent jurisdiction.

The Company is an express third-party beneficiary of each of the equity commitment letters to the extent of its right to seek specific performance of each of the equity commitments under the circumstances in which the Company would be permitted by the merger agreement to obtain specific performance requiring Parent to enforce the equity commitments.

The obligation of First Profit and Mr. He to fund, or cause one of their respective affiliates to fund, the contribution may not be assigned or delegated. Parent must not assign either of the equity commitment letters nor any of the rights, interests or obligations thereunder without the prior written consents of the Company and First Profit or Mr. He, as applicable, which shall be granted at the sole discretion of the granting party.

### Rollover Financing

*Rollover Financing from Support Shareholders*

Pursuant to the terms of the Support Agreement dated May 28, 2016 by and among the Supporting Shareholders and Parent, the Supporting Shareholders will have an aggregate of 136,197,500 Shares held by them (excluding the Shares underlying any Company Options held by them), which represent 33.1% of the total issued and outstanding Shares as of the date of this proxy statement (without taking into account any Company Options), cancelled in the merger, which Shares will not be converted into the right to receive the per share merger consideration (including the Class A common shares represented by ADSs). See "Special Factors — Support Agreement" beginning on page 64.

*Rollover Financing from Rollover Shareholders other than Supporting Shareholders*

Pursuant to the terms of the Rollover Agreement dated May 28, 2016 by and among the Rollover Shareholders other than the Supporting Shareholders, including First Profit, Mr. Yao, Mr. Chen and Mr. Kan, and Parent, such shareholders will have an aggregate of 280,425 Shares held by them (excluding the Shares underlying any Company Options held by them), which represent 0.07% of the total issued and outstanding Shares as of the date of this proxy statement (without taking into account any Company Options), cancelled in the merger, which Shares will not be converted into the right to receive the per share merger consideration (including the Class A common shares represented by ADSs). Immediately prior to the Closing, Parent shall issue to each of First Profit, Mr. Yao, Mr. Chen and Mr. Kan, and each such shareholder or his or its affiliate shall subscribe for, newly issued ordinary shares of Parent. See "Special Factors — Rollover Agreement" beginning on page 66.

### Limited Guarantee

On May 28, 2016, concurrently with the execution of the Merger Agreement, Ms. Yu and Mr. Li entered into a limited guarantee with the Company, pursuant to which Ms. Yu and Mr. Li, jointly and severally, absolutely, irrevocably and unconditionally guarantee to the Company the due and punctual payment, performance and discharge of Parent's obligations to pay the Company (a) any termination fee payable by Parent pursuant to the merger agreement, and (b) certain of the payment obligations of Parent and/or Merger Sub pursuant to certain sections of the merger agreement as and when due, provided that the maximum aggregate liability of Ms. Yu and Mr. Li under the limited guarantee, individually or in the aggregate, shall not exceed $29 million.

The limited guarantee will terminate upon the earliest to occur of (i) the Effective Time, (ii) the payment in full of the guaranteed obligations thereunder, (iii) the termination of the merger agreement in accordance with its terms under circumstances in which Parent would not be required to make any payment of any guaranteed obligations, and (iv) six months after the termination of the merger agreement in accordance with its terms under circumstances in which Parent would be required to make a payment of the guaranteed obligations, unless by the end of such six-month period, the Company has initiated a claim or proceeding for payment of any of the guaranteed obligations.

### Support Agreement

On May 28, 2016, concurrently with the execution of the merger agreement, the Supporting Shareholders entered into the Support Agreement with Parent, pursuant to which each of the Supporting Shareholders agreed, among other things:

64

- from the date of the Support Agreement until the earlier of the Closing and the termination of the merger agreement, at any shareholders' meeting of the Company at which the matters listed from (a) to (e) below are considered, each Supporting Shareholder shall (i) cause his, her or its representative(s) to appear at such meeting or otherwise cause his, her or its securities to be counted as present at such meeting for purposes of determining whether a quorum is present, and (ii) vote or cause to be voted all of the securities owned by such Supporting Shareholder:

  (a) for the approval of the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger;

  (b) against any acquisition proposal or any other transaction, proposal, agreement or action made in opposition to, in competition with or inconsistent with the transactions contemplated by the merger agreement, including the merger;

  (c) against any other action, agreement or transaction that would materially impede, interfere with, delay, postpone, discourage or adversely affect the merger or any of the other transactions contemplated by the merger agreement, including the merger, or the Support Agreement, or the performance by such Rollover Shareholder of its obligations under its Support Agreement;

  (d) against any action, proposal, transaction or agreement that would result in a breach in any respect of any covenant, representation or warranty or any other obligation or agreement of the Company contained in the merger agreement, or of such Supporting Shareholder contained in the Support Agreement;

  (e) in favor of any adjournment or postponement of the shareholders' meeting as may be reasonably requested by Parent; and

  (f) in favor of any other matter necessary to effect the transactions contemplated by the merger agreement, including the merger.

- from the date of the Support Agreement until the termination of the merger agreement, each Supporting Shareholder shall not, directly or indirectly, (a) sell (constructively or otherwise), transfer, assign, tender in any tender or exchange offer, pledge, grant, encumber, hypothecate or similarly dispose of (by merger, testamentary disposition, operation of law or otherwise), either voluntarily or involuntarily, or enter into any contract, option or other arrangement or understanding with respect to the transfer of any securities of the Company, including, without limitation, any swap transaction, option, warrant, forward purchase or sale transaction, futures transaction, cap transaction, floor transaction, collar transaction or any other similar transaction (including any option with respect to any such transaction) or combination of any such transactions, in each case involving any securities of the Company and (i) has, or would reasonably be expected to have, the effect of reducing or limiting such Supporting Shareholder's economic interest in such Company securities and/or (ii) grants a third party the right to vote or direct the voting of such Company securities, (b) deposit any securities of the Company into a voting trust or enter into a voting agreement or arrangement or grant any proxy or power of attorney with respect thereto that is inconsistent with the Support Agreement, (c) convert or exchange, or take any action which would result in the conversion or exchange, of any securities of the Company, (d) knowingly take any action that would make any representation or warranty of such Supporting Shareholder set forth in the Support Agreement untrue or incorrect or have the effect of preventing, disabling, or delaying such Supporting Shareholder from performing any of its, his or her obligations under the Support Agreement, or (e) agree (whether or not in writing) to take any of the actions referred to in the foregoing clauses (a), (b) (c) or (d); and

- to receive no cash consideration with respect to certain number of Shares (including Class A common shares represented by ADSs) held by them as set forth in Annex B to the merger agreement, upon the terms and subject to the conditions of the Support Agreement.

The Support Agreement will terminate upon the earlier to occur of the Closing or the date of termination of the merger agreement in accordance with its terms.

65

**Rollover Agreement**

On May 28, 2016, concurrently with the execution of the merger agreement, First Profit, Mr. Yao, Mr. Chen and Mr. Kan entered into the Rollover Agreement with Parent. Pursuant to the Rollover Agreement, at the Closing, the Shares (including Class A common shares represented by ADSs) beneficially owned by each of First Profit, Mr. Yao, Mr. Chen and Mr. Kan will be cancelled without consideration. Immediately prior to the Closing, Parent shall issue to each of First Profit, Mr. Yao, Mr. Chen and Mr. Kan, and each such shareholder or his or its affiliate shall subscribe for, newly issued ordinary shares of Parent. Each of First Profit, Mr. Yao, Mr. Chen and Mr. Kan agrees that he or it shall have no right to any merger consideration in respect of his or its Shares.

From the date of the Rollover Agreement until its termination, none of First Profit, Mr. Yao, Mr. Chen or Mr. Kan shall, directly or indirectly:

- tender any equity securities of the Company into any tender or exchange offer;

- sell (constructively or otherwise), transfer, pledge, hypothecate, grant, encumber, assign or otherwise dispose of, or enter into any contract, option or other arrangement or understanding with respect to the transfer of, any Shares beneficially owned by such person or other equity securities of the Company or any right, title or interest thereto or therein (including by operation of law) including, without limitation, any swap transaction, option, warrant, forward purchase or sale transaction, futures transaction, cap transaction, floor transaction, collar transaction or any other similar transaction (including any option with respect to any such transaction) or combination of any such transactions, in each case involving any equity securities of the Company and (x) has, or would reasonably be expected to have, the effect of reducing or limiting the economic interest of such person in such Shares beneficially owned by such person or other equity securities of the Company and/or (y) grants a third party the right to vote or direct the voting of such Shares beneficially owned by such person or other equity securities of the Company;

- deposit the Shares beneficially owned by such person or any equity securities of the Company into a voting trust or grant any proxy or power of attorney or enter into a voting agreement with respect to any Shares beneficially owned by such person or other equity securities of the Company;

- knowingly take any action that would make any representation or warranty of such person set forth in the Rollover Agreement untrue or incorrect or have the effect of preventing, disabling, or delaying such person from performing any of his, her, or its obligations under the Rollover Agreement; or

- agree (whether or not in writing) to take any of the foregoing actions.

In addition, each of First Profit, Mr. Yao, Mr. Chen or Mr. Kan also agreed, among other things:

- prior to the Effective Time, not to knowingly take any action that would make any representation or warranty of such shareholder contained in the Rollover Agreement untrue or incorrect or which would otherwise adversely affect the performance by such shareholder of its obligations under the Rollover Agreement;

- to irrevocably waive any rights of appraisal or rights of dissent from the merger that such shareholder may have with respect to the Shares beneficially owned by such shareholder (including without limitation any rights under Section 238 of the Cayman Islands Companies Law) prior to the Effective Time;

- to bear and pay, reimburse, indemnify and hold harmless Parent, Merger Sub, the Company and any of their affiliates (collectively, the "Indemnified Parties") for, from and against (a) any liabilities for PRC taxes imposed upon, incurred by or asserted against any of the Indemnified Parties, arising from or attributable to (x) the receipt of any merger consideration by such shareholder or his or its affiliates pursuant to the merger agreement and/or (y) the receipt of newly issued ordinary shares of the Parent by the shareholder or his or its affiliates pursuant to the Rollover Agreement, and (b) any costs or expenses (including reasonable attorneys' fees), judgments, fines, losses, claims, interests, damages or liabilities incurred in connection with any claim, action, suit, proceeding or investigation, whether civil, criminal, administrative or investigative, arising out of the tax liabilities described under the foregoing clause (a).

The Rollover Agreement will terminate immediately upon the valid termination of the merger agreement.

66

## Remedies

The parties to the merger agreement may be entitled to the payment of a termination fee or the grant of specific performance of the terms of the merger agreement, including an injunction or injunctions to prevent breaches of the merger agreement, in addition to any other remedy at law or equity. Specifically, the Company is entitled to an injunction or injunctions, or other appropriate form of specific performance or equitable relief to enforce Parent's and Merger Sub's obligation to consummate the merger, but only in the event that each of the following conditions has been satisfied: (i) all conditions to the obligations of each party and conditions to the obligations of Parent and Merger Sub (other than those conditions that by their nature are to be satisfied at the Closing) have been satisfied or, if permissible, waived in accordance with the merger agreement, (ii) Parent and Merger Sub have failed to complete the Closing by the date the Closing should have occurred, (iii) the debt financing (or, if applicable, the alternative debt financing) has been funded or will be funded at the Closing in accordance with the terms thereof, and (iv) the Company has irrevocably confirmed by notice to Parent that if specific performance is granted and the debt financing (or, if applicable, the alternative debt financing) is funded, then the Closing will occur. The Company will not be entitled to enforce specially Parent's obligation to consummate the merger if the debt financing has not been funded in the absence of any breach by Parent or Merger Sub of the merger agreement or any financing document.

While the parties may pursue both a grant of specific performance (including an injunction and injunctions) and monetary damages until such time as the other party pays a termination fee (as applicable under the merger agreement), none of them will be permitted or entitled to receive both a grant of specific performance (including an injunction and injunctions) that results in the Closing and monetary damages.

Subject to the equitable remedies the parties may be entitled to as discussed above, the maximum aggregate liabilities of Parent, on the one hand, and the Company, on the other hand, for monetary damages in connection with the merger agreement are limited to the Parent termination fee of $28,234,000 and the Company termination fee of $14,117,000, respectively, and reimbursement of certain expenses accrued in the event that Company or Parent fails to pay the applicable termination fee when due and in accordance with the requirements of the merger agreement, as the case may be.

## Interests of Certain Persons in the Merger

In considering the recommendation of the Special Committee and the Board with respect to the merger, you should be aware that the Buyer Group has interests in the transaction that are different from, and/or in addition to, the interests of the Company's shareholders generally. The Board and the Special Committee were aware of such interests and considered them, among other matters, in reaching their decisions to authorize and approve the merger agreement, the plan of merger and the consummation of the transactions contemplated by the merger agreement, including the merger, and recommend that the Company's shareholders vote in favor of authorizing and approving the merger agreement, the plan of merger and the consummation of the transactions contemplated by the merger agreement, including the merger.

*Interests of the Buyer Group and Mr. He*

Immediately after the completion of the merger, the Buyer Group and Mr. He will beneficially own 100% of the equity interests in the surviving company.

Each member of the Buyer Group and Mr. He will directly or indirectly enjoy the benefits from any future earnings and growth of the Company after the merger which, if the Company is successfully managed, could result in an increase in the value of their investments in the Company. The Buyer Group and Mr. He will also bear the corresponding risks of any possible decreases in the future earnings, growth or value of the Company. As there will be no public trading market for the surviving company's shares, members of the Buyer Group and Mr. He will have no certainty of any future opportunity to sell such shares at an attractive price, or that any dividend paid by the surviving company will be sufficient to recover their respective investments in the Company.

The merger may also provide additional means to enhance shareholder value for the Buyer Group and Mr. He, including improved profitability due to the elimination of the expenses associated with public company reporting and compliance, increased flexibility and responsiveness in management of the business to achieve growth and respond to competition without the restrictions of short-term earnings comparisons, and additional means for making liquidity available to the Buyer Group and Mr. He, such as through dividends or other distributions.

https://www.sec.gov/Archives/edgar/data/1499744/000114420416108643/v442417_ex99a1.htm

*Treatment of Shares and Company Options Held by Directors and Executive Officers*

At the Effective Time, the Company will terminate the Company's Share Incentive Plans, terminate all relevant award agreements applicable to the Share Incentive Plans, and cancel all the Company Options that are outstanding and unexercised, whether or not vested or exercisable.

At the Effective Time, each vested Company Option that remains outstanding immediately prior to the Effective Time will be cancelled in exchange for the right to receive from the surviving company or one of its subsidiaries, as soon as practicable after the Effective Time, cash in the amount equal to the product of (a) the number of Shares underlying such Company Option multiplied by (b) the excess, if any, of $1.34 over the exercise price payable per Share of such Company Option. If the exercise price per Share of any such Company Option is equal to or greater than $1.34, such Company Option will be cancelled for no consideration. At the Effective Time, each unvested Company Option will be cancelled for no consideration.

As of the date of this proxy statement, Ms. Yu, Mr. Li and Mr. Yao collectively and beneficially own 35.5% issued and outstanding Shares, representing approximately 83.6% of the total number of votes represented by the issued and outstanding Shares. All such Shares beneficially owned by Ms. Yu, Mr. Li and Mr. Yao, excluding Shares underlying any vested Company Options held by such persons, will be cancelled in the merger and will not be converted into the right to receive the merger consideration at the Effective Time. After the completion of the merger, the maximum amount of cash payments that Ms. Yu, Mr. Li and Mr. Yao may receive in respect of their Shares and vested Company Options is approximately $10.7 million in the aggregate.

As of the date of this proxy statement, the directors and executive officers of the Company (as set forth in "Security Ownership of Certain Beneficial Owners and Management of the Company" beginning on page 106), as a group (other than Ms. Yu, Mr. Li and Mr. Yao), beneficially own outstanding and vested Company Options to purchase an aggregate of 441,125 Shares issued pursuant to the Share Incentive Plans. After the completion of the merger, the maximum amount of cash payments our directors and executive officers (other than Ms. Yu, Mr. Li and Mr. Yao) may receive in respect of their Shares and vested Company Options is approximately $0.2 million in the aggregate.

The table below sets forth, as of the date of this proxy statement, for each of the Company's directors and executive officers:

- the number of Shares owned and the number of Shares (other than any Rollover Shares) owned;

- the cash payment that will be made in respect of the Shares (other than any Rollover Shares) at the Effective Time;

- the number of Shares underlying the Company Options held by such person (including only vested Company Options with exercise price lower than the $1.34 per Share merger consideration) and the exercise price payable per Share for such Company Options;

- the cash payment that will be made in respect of the vested Company Options held by such person following the Effective Time;

- the total cash payment that will be made in respect of the outstanding Shares (other than any Rollover Shares) and vested Company Options held by such person.

| Names of Directors and Executive Officers | Shares | | Company Options [1] | | | Total Cash Payments ($) |
| | Shares Beneficially Owned (Excluding Rollover Shares) | Cash Payment Therefor (Excluding Rollover Shares) ($) | Shares Underlying | Exercise Price ($/Share) | Cash Payment Therefor ($) | |
| --- | --- | --- | --- | --- | --- | --- |
| Peggy Yu Yu | — | — | — | — | — | — |
| Guoqing Li | — | — | 10,455,770 | 0.065 – 0.93 | 9,979,677 | 9,979,677 |
| Ruby Rong Lu | — | — | 50,000 | 0.93 | 20,500 | 20,500 |
| Ke Zhang | — | — | 100,000 | 0.93 | 41,000 | 41,000 |

68

| Names of Directors and Executive Officers | Shares | | Company Options [1] | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Shares Beneficially Owned (Excluding Rollover Shares) | Cash Payment Therefor (Excluding Rollover Shares) ($) | Shares Underlying | Exercise Price ($/Share) | Cash Payment Therefor ($) | Total Cash Payments ($) |
| Xiaolong Li | — | — | 50,000 | 0.93 | 20,500 | 20,500 |
| Danqian Yao | — | — | 850,000 | 0.065 – 0.822 | 745,550 | 745,550 |
| Yue Wang | — | — | 241,125 | 0.822   0.93 | 120,461 | 120,461 |
| All directors and executive officers as a group | — | — | 13,121,895 | 0.065 – 0.93 | 10,927,688 | 10,927,688 |

(1)    Exclude Company Options that have an exercise price equal to or greater than the $1.34 per Share merger consideration.

*Indemnification and Insurance*

Pursuant to the merger agreement, it has been agreed, among other provisions, that:

- The memorandum and articles of association of the surviving company will contain provisions no less favorable with respect to exculpation and indemnification than are set forth in the memorandum and articles of association of the Company as in effect on the date of the merger agreement, and Parent shall cause such provisions not to be amended, repealed or otherwise modified for a period of six years from the Effective Time in any manner that would affect adversely the rights thereunder of individuals who, at or prior to the Effective Time, were directors, officers, employees, fiduciaries or agents of the Company, unless such modification shall be required by law. From and after the Effective Time, any agreement of any of persons covered by the current directors' and officers' liability insurance policies with the Company or any of its subsidiaries regarding exculpation or indemnification of liability shall be assumed by the surviving company, shall survive the merger and shall continue in full force and effect in accordance with and subject to its terms, and during the period of six years from the Effective Time, such indemnification agreements shall not be amended, repealed or otherwise in any manner that would adversely affect the rights of such indemnified parties thereunder.

- The surviving company shall, and Parent shall cause the surviving company to, maintain in effect for six years from the Effective Time, if available, the current directors' and officers' liability insurance policies maintained by the Company with respect to matters occurring prior to the Effective Time, including acts or omissions occurring in connection with the merger agreement and the consummation of the transactions contemplated by the merger agreement; provided, however, that the surviving company may substitute therefor policies of at least the same coverage containing terms and conditions that are no less favorable to the indemnified parties, and provided, further, that in no event shall the surviving company be required to expend more than an amount per year equal to 300% of current annual premiums paid by the Company for such insurance. In addition, the Company may and, at Parent's request, the Company shall, purchase a six-year "tail" prepaid policy prior to the Effective Time on terms and conditions no less advantageous to the indemnified parties than the existing directors' and officers' liability insurance maintained by the Company.

- From and after the Effective Time until the sixth anniversary of the Effective Time, the surviving company will comply with all of its obligations, and will cause its subsidiaries to comply with their respective obligations to indemnify and hold harmless (including any obligations to advance funds for expenses) (i) the present and former officers and directors thereof against any and all costs or expenses (including reasonable attorneys' fees and expenses), judgments, fines, losses, claims, damages, liabilities and amounts paid in settlement in connection with any actual or threatened action, whether civil, criminal, administrative or investigative, arising out of, relating to or in connection with any acts or omissions occurring or alleged to have occurred prior to or at the Effective Time, to the extent provided under the Company's or such subsidiaries' respective organizational and governing documents or agreements in effect on the date hereof and to the fullest extent permitted by the CICL or any other applicable law, including the approval of the merger agreement, the transactions contemplated by the merger agreement or arising out of or pertaining to the transactions, provided that such indemnification shall be subject to any limitation imposed from time to time under applicable law; and (ii) such persons against any and all damages arising out of acts or omissions in such persons' official capacity as an officer, director or other fiduciary in the Company or any subsidiary arising out of, relating to or in connection with any acts or omissions occurring or alleged to occur prior to or at the Effective Time in such person's capacity as a director or an officer of the Company or any of its subsidiaries.

69

*The Special Committee*

On July 10, 2015, the Board established a Special Committee to consider the proposal from the Buyer Group and to take any actions it deems appropriate to assess the fairness and viability of such proposal. The Special Committee is composed of three independent directors, Ms. Ruby Rong Lu, Mr. Ke Zhang and Mr. Xiaolong Li. All such directors are free from any affiliation with the Buyer Group, and none of such directors is or was ever an employee of the Company or any of its subsidiaries or has any financial interest in the merger that is different from that of the unaffiliated security holders other than (i) the director's receipt of board compensation in the ordinary course, (ii) Special Committee members' compensation in connection with its evaluation of the merger (which is not contingent upon the completion of the merger or the Special Committee's or the Board's recommendation of the merger), and (iii) the director's indemnification and liability insurance rights under the merger agreement. The Board did not place any limitations on the authority of the Special Committee regarding its investigation and evaluation of the merger.

The Company has compensated the members of the Special Committee in exchange for their service in such capacity at a rate of $10,000 per month, which must not exceed $50,000 in aggregate, for each of the members of the Special Committee (or, in the case of the chairperson of the Special Committee, at a rate of $15,000 per month, which must not exceed $100,000 in the aggregate) (the payment of which is not contingent upon the completion of the merger or the Special Committee's or the Board's recommendation of the merger).

*Position with the Surviving Company*

The directors of Merger Sub immediately prior to the Effective Time will become the directors of the surviving company unless otherwise determined by Parent prior to the Effective Time. It is anticipated that, after the consummation of the merger, the existing executive officers of the Company will hold positions with the surviving company that are substantially similar to their current positions.

**Related Party Transactions**

*Transactions with First Profit*

On August 18 and September 26, 2011, First Profit and the Company entered into two nominee shareholder agreements, pursuant to which First Profit agreed to hold 492,500 Class A common shares as nominee shareholder for and on behalf of persons to be designated by the Company. Pursuant to the agreements, upon request by the Company, First Profit shall transfer all or a portion of the Class A common shares that it holds as nominee shareholder to any person that may be designated by the Company to receive such shares as share incentive awards in exchange for services rendered to the Company by such person. First Profit is required not to transfer or otherwise dispose of the shares that it holds as nominee shareholder except at the request of the Company. As of the date of this proxy statement, First Profit holds an aggregate of 300,425 Class A common shares as nominee shareholder, of which 164,000, 46,425 and 90,000 Class A common shares are held for and on behalf of Mr. Yao, Mr. Chen and other persons to be designated by the Company to receive Class A common shares pursuant to share incentive awards, respectively.

*Other Related Party Transactions*

For a description of related party transactions for the years ended December 31, 2014 and 2015, see "Item 7. Major Shareholders and Related Party Transactions" included in the Company's annual report on Form 20-F for the fiscal year ended December 31, 2015, incorporated by reference into this proxy statement. See "Where You Can Find More Information" beginning on page 109 for a description of how to obtain a copy of the Company's annual report.

Except for the transactions discussed above under the caption titled "Related Party Transactions" and the arrangements in connection with the merger discussed elsewhere in this proxy statement, during the past two years, (i) there were no negotiations, transactions or material contacts between the Company and its affiliates, on the one hand, and any member of the Buyer Group, on the other hand, concerning any merger, consolidation, acquisition, tender offer for or other acquisition of any class of the Company's securities; election of the Company's directors or sale or other transfer of a material amount of assets of the Company; (ii) the Company and its affiliates did not enter into any other transaction with an aggregate value exceeding 1% of the Company's consolidated revenues with any member of the Buyer Group, and (iii) none of the Company's executive officers, directors or affiliates that is a natural person entered into any transaction during the past two years with an aggregate value (in respect of such transaction or series of similar transactions with that person) exceeding $60,000 with any member of the Buyer Group.

70

## Fees and Expenses

Fees and expenses incurred or to be incurred by the Company and the Buyer Group in connection with the merger are estimated at the date of this proxy statement and set forth in the table below. Such fees are subject to change pending completion of the merger.

| Description | Amount |
| --- | --- |
| Legal fees and expenses | $ |
| Financial advisory fees and expenses | $ |
| Special Committee fees | $ |
| Miscellaneous (including printing, filing fees, and mailing costs) | $ |
| Total | $ |

These expenses will not reduce the merger consideration to be received by the Company shareholders. If the merger is completed, the party incurring any costs and expenses in connection with the merger and the merger agreement will pay those costs and expenses.

## Voting by the Supporting Shareholders at the Extraordinary General Meeting

Pursuant to the Support Agreement, the Supporting Shareholders have agreed to vote all of the Shares (including Class A common shares represented by ADSs) they beneficially own in favor of the authorization and approval of the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger, at the extraordinary general meeting of shareholders of the Company. As of the Share record date, we expect that the Supporting Shareholders as a group will beneficially own, in the aggregate, _____ issued and outstanding Class A common shares (including Class A common shares represented by ADSs) and _____ Class B common shares, which represents approximately _____% of the total issued and outstanding Shares and approximately _____% of the total number of votes represented by the issued and outstanding Shares.

## Litigation Related to the Merger

The Company is not aware of any lawsuit that challenges the merger, the merger agreement or any of the transactions contemplated thereby.

## Accounting Treatment of the Merger

The merger is expected to be accounted for, at historical cost, as a merger of entities under common control in accordance with Accounting Standards Codification 805-50, "Business Combinations—Related Issues."

## Regulatory Matters

The Company does not believe that any material federal or state regulatory approvals, filings or notices are required in connection with the merger other than (i) the approvals, filings or notices required under the federal securities laws, and (ii) the registration of the plan of merger (and supporting documentation as specified in the CICL) with the Registrar of Companies of the Cayman Islands and, in the event the merger becomes effective, a copy of the certificate of merger being given to the shareholders and creditors of the Company and Merger Sub at the time of the filing of the plan of merger, and notification of the merger being published in the Cayman Islands Government Gazette.

71

**Dissenter Rights**

Please see "Dissenter Rights" beginning on page 100.

**Material U.S. Federal Income Tax Consequences**

The following is a general discussion of material U.S. federal income tax consequences to U.S. Holders (as defined below) of the exchange of Shares for cash pursuant to the merger agreement. For purposes of this discussion, except as otherwise noted, references to Shares include ownership interests in Shares through ADSs. This discussion is based on the U.S. Internal Revenue Code of 1986, as amended (the "Code"), final and temporary U.S. Treasury Regulations promulgated thereunder, the income tax treaty between the United States and the PRC (the "Treaty"), administrative pronouncements, and judicial decisions as of the date hereof, all of which are subject to change, possibly on a retroactive basis, and to differing interpretation, which may result in U.S. federal income tax consequences different from those described below. This discussion is not binding on the IRS, and the IRS or a court, in the event of an IRS dispute, may challenge any of the conclusions set forth below.

This discussion does not address any U.S. federal estate, gift, or other non-income tax, or any state, local, or non-U.S. tax consequences of the merger. This discussion is a summary for general information purposes only and does not consider all aspects of U.S. federal income taxation that may be relevant to particular shareholders in light of their individual investment circumstances or to certain types of shareholders subject to special tax rules, including (i) holders that are banks, financial institutions, or insurance companies; regulated investment companies, mutual funds, or real estate investment trusts; brokers or dealers in securities or currencies or traders in securities that elect to apply a mark-to-market accounting method; or tax-exempt organizations, (ii) holders that own Shares as part of a straddle, hedge, constructive sale, conversion transaction, or other integrated investment, (iii) holders that acquired Shares in connection with the exercise of employee share options or otherwise as compensation for services, (iv) holders that have a "functional currency" other than the U.S. dollar, (v) retirement plans, individual retirement accounts, or other tax-deferred accounts, (vi) U.S. expatriates, (vii) holders that are subject to alternative minimum tax, (viii) holders that actually or constructively own 10% or more of our voting stock, (ix) S corporations, or (x) partnerships or other entities classified as partnerships for U.S. federal income tax purposes. This discussion assumes that Shares are held as capital assets within the meaning of Section 1221 of the Code (generally, property held for investment) at all relevant times. This discussion applies only to U.S. Holders who completely terminate their interest in the Company following the merger, whether such interest is held directly or indirectly, including by application of attribution rules for U.S. federal income tax purposes. Attribution rules may apply, e.g., if such U.S. Holder holds interests in the Company indirectly through an interest owned by a family member (subject to certain exceptions and elective procedures) or a partnership or other related entity.

As used herein, a "U.S. Holder" is any beneficial owner of Shares that is (i) an individual citizen or resident of the United States for U.S. federal income tax purposes, (ii) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof, or the District of Columbia, (iii) an estate the income of which is subject to U.S. federal income taxation regardless of its source or (iv) a trust which (a) is subject to the primary jurisdiction of a court within the United States and for which one or more U.S. persons have authority to control all substantial decisions, or (b) has a valid election in effect under applicable U.S. Treasury Regulations to be treated as a U.S. person for U.S. federal income tax purposes.

If a partnership (including any entity classified as a partnership for U.S. federal income tax purposes) is a beneficial owner of Shares, the U.S. federal income tax treatment of a partner in the partnership generally will depend on the status of the partner and the activities of the partnership. A U.S. Holder that is a partner of a partnership holding Shares is urged to consult its own tax advisor.

**ALL HOLDERS OF SHARES SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE MERGER IN LIGHT OF THEIR PARTICULAR SITUATIONS, INCLUDING THE APPLICABILITY AND EFFECT OF U.S. FEDERAL, STATE, LOCAL, NON-U.S. AND OTHER LAWS.**

*Consequences of Participation in the Merger or an Exercise of Dissenter Rights*

The receipt of cash, either as consideration in the merger or as a result of a U.S. Holder exercising its Dissenter Rights (as described under the section entitled "Dissenter Rights"), will be a taxable transaction for U.S. federal income tax purposes, and a U.S. Holder who so exchanges Shares for cash will generally recognize gain or loss in an amount equal to the difference between (i) the amount of cash received and (ii) such U.S. Holder's adjusted tax basis in the Shares exchanged therefor. Subject to the discussion under "Passive Foreign Investment Company" below, such recognized gain or loss will generally be capital gain or loss, and will constitute long-term capital gain or loss if the U.S. Holder's holding period for the Shares exchanged is greater than one year at the Effective Time.

72

Long-term capital gains of non-corporate U.S. Holders are currently subject to U.S. federal income tax at a reduced rate. The ability to use any capital loss to offset other income or gain is subject to certain limitations under the Code. If a U.S. Holder acquired different blocks of Shares at different times and different prices, such U.S. Holder must determine the adjusted tax basis and holding period separately with respect to each such block of Shares.

Any gain or loss recognized by a U.S. Holder will upon the disposition of the Shares generally be treated as U.S. source gain or loss and generally will be treated as "passive" gain or loss for U.S. foreign tax credit purposes. However, in the event that we are deemed to be a PRC "resident enterprise" under PRC tax law and gain from the disposition of Shares is regarded as gain sourced from the PRC and is subject to tax in the PRC (Please see "—Material PRC Income Tax Consequences") or a U.S. Holder is subject to PRC income tax pursuant to Circular 698 or Bulletin 7 (as described below under "—Material PRC Income Tax Consequences"), such U.S. Holder may be eligible to elect to treat such gain as PRC source gain under the Treaty. If we are not eligible for the benefits of the Treaty or the U.S. Holder fails to make the election to treat any gain as PRC source, then the U.S. holder may not be able to use the foreign tax credit arising from any PRC tax imposed on the exchange of Shares pursuant to the merger unless such credit can be applied (subject to applicable limitations) against tax due on other income treated as derived from non-U.S. sources. U.S. Holders are urged to consult their tax advisors regarding the tax consequences if PRC tax is imposed on gain on a disposition of the Shares, including the availability of the foreign tax credit under their particular circumstances.

*Passive Foreign Investment Company*

Based on the quarterly average valuation of our assets, including goodwill for the taxable year ended on December, 31, 2015, we believe that we were not a passive foreign investment company or "PFIC" for our taxable year ended December 31, 2015 and we do not expect to be a PFIC in the current taxable year. However, because PFIC status is a fact-intensive determination made on an annual basis and dependent on the composition of our assets and income and the value of our assets from time-to-time, and because the IRS does not issue rulings with respect to PFIC status, there can be no assurance that we have not been a PFIC in prior years or that we will not be a PFIC for 2016. Further, if we were a PFIC in any previous taxable year during which a U.S. Holder held Shares or ADSs, the PFIC rules will generally apply to such U.S. Holder. In addition, although the law in this regard is unclear, we treat Dangdang Kewen as being owned by us for U.S. federal income tax purposes, not only because we retain control over its management decisions but also because we retain the economic risks and rewards of Dangdang Kewen. If it were determined, however, that we are not the owner of Dangdang Kewen for U.S. federal income tax purposes, we would be more likely to be treated as a PFIC for the current taxable year and prior taxable years.

In general, we will be classified as a PFIC in any taxable year if either (a) the average quarterly value of our gross assets that produce passive income or are held for the production of passive income is at least 50% of the average quarterly value of our total gross assets (the "asset test") or (b) at least 75% of our gross income for the taxable year is passive income (such as certain dividends, interest or royalties). For this purpose, we will be treated as owning our proportionate share of the assets and earning our proportionate share of the income in any other corporation in which we own, directly or indirectly, at least 25% (by value) of the stock. For purposes of the asset test: (a) any cash and cash invested in short-term, interest bearing debt instruments or bank deposits that are readily convertible into cash will generally count as producing passive income or held for the production of passive income, and (b) the total value of our assets is calculated based on our market capitalization.

If we are a PFIC for the current taxable year or have been a PFIC during any prior year in which a U.S. Holder held Shares and the U.S. Holder has not made a valid mark-to-market election, any gain recognized by a U.S. Holder on the disposition of a Share generally (a) would be allocated ratably to each day over such U.S. Holder's holding period for the Share, (b) the amount allocated to the current year and any tax year prior to the first taxable year in which we were a PFIC would be taxed as ordinary income in the current year, (c) the amount allocated to each other taxable year would be subject to tax at the highest applicable marginal rate in effect for that year, and an additional tax equal to an amount of interest which accrues at the rate for underpayments of taxes would be imposed on the resulting tax allocated to such period.

If we were a PFIC in any year in which a U.S. Holder held Shares and certain conditions relating to the regular trading of ADSs were satisfied, a U.S. Holder of ADSs may have been able to make a so-called "mark-to-market" election with respect to its ADSs. If a U.S. Holder made this election in a timely fashion, then instead of the tax treatment described in the preceding paragraph, any gain recognized by the U.S. Holder in the merger would generally be treated as ordinary income or ordinary loss (limited to the extent of the net amount of previously included income as a result of the mark-to-market election, if any). Since a mark-to-market election, as a technical matter, cannot be made for any of our subsidiaries that may have been PFICs, a U.S. Holder would continue to be subject to the PFIC rules with respect to its indirect interest in any investments held by us that are treated as an equity interest in a PFIC for U.S. federal income tax purposes.

73

We did not, and do not, intend to provide the information that U.S. Holders would need to make a qualified electing fund election for the current taxable year, and as such, the qualified electing fund election has not been, and will not be, available to U.S. Holders.

If we are a PFIC for the current taxable year or have been a PFIC during any prior year in which a U.S. Holder held Shares, a U.S. Holder generally would be required to file an IRS Form 8621 with respect to the disposition of Shares. U.S. Holders that are required to file such form and fail to do so are subject to penalties, and such failure may suspend the running of the statute of limitations period on the U.S. Holder's tax return for the applicable taxable year. The PFIC rules are complex, and each U.S. Holder should consult its own tax advisors regarding the applicable consequences of the merger to such U.S. Holder if we are a PFIC or have been a PFIC during any prior year in which a U.S. Holder held Shares.

*Information Reporting and Backup Withholding*

A U.S. Holder may be subject, under certain circumstances, to information reporting and backup withholding with respect to the amount of cash received in the merger. Under the backup withholding rules, a U.S. Holder may be subject to backup withholding unless the U.S. Holder is an exempt recipient and, when required, demonstrates this fact or provides a taxpayer identification number, makes certain certifications on an IRS Form W-9, and otherwise complies with the applicable requirements. A U.S. Holder that does not provide its correct taxpayer identification number may also be subject to penalties imposed by the IRS.

Backup withholding is not an additional tax and any amounts withheld under the backup withholding rules may be refunded or credited against a U.S. Holder's U.S. federal income tax liability, if any, provided that the required procedures are followed. U.S. Holders should consult their tax advisors as to their qualification for exemption from backup withholding and the procedure for obtaining such an exemption.

Certain U.S. Holders may be required to report information with respect to their investment in our Shares not held through a custodial account with a U.S. financial institution to the IRS. U.S. Holders that are required to submit such information to the IRS and fail to do so are subject to penalties, and such failure may suspend the running of the statute of limitations period on the U.S. Holder's tax return for the applicable taxable year. U.S. Holders should consult their tax advisors regarding their reporting obligation with respect to the disposition of their Shares.

*Medicare Tax*

A U.S. Holder that is an individual or estate, or a trust that does not fall into a special class of trusts that is exempt from such tax, will be subject to a 3.8% tax on the lesser of (i) such holder's "net investment income" (or undistributed "net investment income" in the case of an estate or trust) for the relevant taxable year and (ii) the excess of such holder's modified adjusted gross income for the taxable year over a certain threshold (which in the case of individuals will be between $125,000 and $250,000, depending on the individual's circumstances). A U.S. Holder's net investment income will generally include gains from the sale or other disposition of capital assets such as the Shares. U.S. Holders that are individuals, estates or trusts should consult their tax advisors regarding the effect, if any, of this tax on their ownership and disposition of Shares, including if we are a PFIC.

**Material PRC Income Tax Consequences**

Under the EIT Law, which took effect on January 1, 2008, enterprises established outside of China whose "de facto management bodies" are located in the PRC are considered "resident enterprises," and thus are generally be subject to the enterprise income tax at the rate of 25% on their global income. On December 6, 2007, the State Council adopted the Regulation on the Implementation of EIT Tax Law (the "Implementation Regulation"), effective as of January 1, 2008, which defines the "de facto management body" as an establishment that has substantial management and control over the business, personnel, accounts and properties of an enterprise. The State Administration of Taxation issued the Notice Regarding the Determination of Chinese-Controlled Offshore Incorporated Enterprises as PRC Tax Resident Enterprises on the Basis of De Facto Management Bodies ("Circular 82") on April 22, 2009. Circular 82 provides certain specific criteria for determining whether the "de facto management body" of a Chinese-controlled offshore incorporated enterprise is located in China. The term "non-resident enterprise" means an enterprise established under the laws of a jurisdiction other than the PRC and the actual administrative organization of which is not in the PRC, which has established offices or premises in the PRC, or which has not established any offices or premises in the PRC but the applicable income of which is derived from sources within the PRC.

74

As there has not been a definitive determination of the Company's status by the PRC tax authorities, the Company cannot confirm whether it would be considered a PRC resident enterprise under the EIT Law or whether the gain recognized on the receipt of consideration for Shares would otherwise be subject to PRC tax to holders of such Shares that are not PRC tax residents. If the PRC tax authorities were to determine that the Company should be considered a resident enterprise, then the gain recognized on the receipt of cash for the Company's Shares or ADSs by the holders of such ADSs or Shares that are not PRC tax residents could be treated as PRC-source income that would be subject to PRC income tax at a rate of 10% in the case of non-resident enterprises or 20% in the case of individuals (subject to applicable tax treaty relief, if any).

In addition, under the Circular on Strengthening the Administration of Enterprise Income Tax on Non-resident Enterprises' Equity Transfer Income ("Circular 698") issued by the State Administration of Taxation, which became effective as of January 1, 2008, the Circular Concerning Various Questions on the Administration of Enterprises Income Tax on Non-resident Enterprises issued by the State Administration of Taxation, which became effective as of April 1, 2011, and the Bulletin on Certain Issues Relating to Indirect Transfer of Assets by Non-resident Enterprises ("Bulletin 7") issued by the State Administration of Taxation, which became effective on February 3, 2015, if any non-resident enterprise transfers equity of a resident enterprise, the non-resident enterprise may be subject to a 10% income tax on the gain from such equity transfer. In addition, if a non-PRC resident enterprise indirectly transfers, referring to properties of an establishment or a place of business in China, real estate properties in China or equity investments in a PRC tax resident enterprise, by disposition of the equity interests in an overseas non-resident enterprise without a reasonable commercial purpose and resulting in the avoidance of PRC enterprise income tax, the transfer will be re-characterized as a direct transfer of the PRC Taxable Properties and gains derived from the transfer may be subject to PRC withholding tax of up to 10%. The transferee or other person who is obligated to pay for the transfer is obligated to withhold the applicable taxes.If PRC tax authorities were to invoke Circular 698 or Bulletin 7 and impose tax on the receipt of consideration for Shares or ADSs, then any gain recognized on the receipt of consideration for such Shares or ADSs pursuant to the merger by the Company's shareholders who are non-PRC resident enterprises could be treated as PRC-source income and thus be subject to PRC income tax at a rate of 10% (subject to applicable treaty relief). Parent is entitled under the merger agreement to withhold any tax arising in relation to filings required by Circular 698 or Bulletin 7. Neither Parent nor Merger Sub intends to withhold any PRC taxes on the consideration provided to non-PRC resident shareholders of the Company in connection with the merger.

You should consult your own tax advisor for a full understanding of the tax consequences of the merger to you, including any PRC tax consequences.

**Material Cayman Islands Tax Consequences**

The Cayman Islands currently has no form of income, corporate or capital gains tax and no estate duty, inheritance tax or gift tax. No taxes, fees or charges will payable (either by direct assessment or withholding) to the government or other taxing authority in the Cayman Islands under the laws of the Cayman Islands in respect of the merger or the receipt of cash for Shares and ADSs under the terms of the merger. This is subject to the qualification that (i) Cayman Islands stamp duty may be payable if any original transaction documents are brought into or executed or produced before a court in the Cayman Islands (for example, for enforcement), (ii) registration fees will be payable to the Registrar of Companies of the Cayman Islands to register the plan of merger and (iii) fees will be payable to the Cayman Islands Government Gazette Office to publish the notice of the merger in the Cayman Islands Government Gazette.

## MARKET PRICE OF THE ADSs, DIVIDENDS AND OTHER MATTERS

**Market Price of the ADSs**

The following table provides the high and low sales prices for the ADSs represented by Class A common shares of the Company on the NYSE under the symbol "DANG" for the periods indicated:

| | Sales Price Per ADS (in $) | |
| --- | --- | --- |
| | High | Low |
| 2014 | | |
| First quarter | 19.05 | 8.57 |
| Second quarter | 15.00 | 8.92 |
| Third quarter | 16.42 | 11.16 |
| Fourth quarter | 13.44 | 8.52 |
| 2015 | | |
| First quarter | 9.78 | 7.49 |
| Second quarter | 11.50 | 8.06 |
| Third quarter | 9.10 | 5.56 |
| Fourth quarter | 7.56 | 5.84 |
| 2016 | | |
| First quarter | 7.29 | 5.85 |
| Second quarter (through June 16, 2016) | 7.69 | 5.31 |

On July 8, 2015, the last trading day immediately prior to the Company's announcement on July 9, 2015 that it had received a going-private proposal, the reported closing price of the ADSs on the NYSE was $6.51 per ADS. The merger consideration of $1.34 per Share, or $6.70 per ADS, represents a premium of approximately 2.9% over that closing price. On June 16, 2016, the most recent practicable date before the date of this proxy statement, the high and low reported sales prices of the ADSs were $6.07 and $5.94, respectively. You are urged to obtain a current market price quotation for your Shares in connection with voting your Shares.

**Dividend Policy**

The Company did not declare or pay any dividends in 2014, 2015 or 2016 through the date of this proxy statement to its shareholders. The Company does not have any present plan to pay any cash dividends on its common shares in the foreseeable future. The Company currently intends to retain most, if not all, of the Company's available funds and any future earnings to operate and expand its business.

Under the terms and conditions of the merger agreement, the Company is not permitted to pay any dividends or repurchase any of the Shares pending consummation of the merger.

In the event the merger agreement is terminated for any reason and the merger is not consummated, the payment of future dividends will be subject to the discretion of the Board. Even if the Board decides to pay dividends, the form, frequency and amount will depend upon the Company's future operations and earnings, capital requirements and surplus, general financial condition, contractual restrictions and other factors that the Board may deem relevant. If the Company pays any dividends, the ADS depositary will distribute such payments to the Company's ADS holders to the same extent as holders of the Shares, subject to the terms of the deposit agreement, including the fees and expenses payable thereunder. Cash dividends on the Shares, if any, will be paid in U.S. dollars.

We are a holding company incorporated in the Cayman Islands. We rely on dividends from our subsidiaries in the PRC to fund our payment of dividends, if any, to our shareholders. Current PRC regulations permit our subsidiaries to pay dividends to us only out of their accumulated profits, if any, determined in accordance with PRC accounting standards and regulations. In addition, each of our subsidiaries in China is required to set aside a certain amount of its accumulated after-tax profits, if any, based on PRC accounting standards each year to their general reserves until the accumulative amount of such reserves reach a certain percent of their registered capital, to fund certain statutory reserves. These reserves may not be distributed as cash dividends. Further, if our subsidiaries in China incur debt on their own behalf, the instruments governing the debt may restrict their ability to pay dividends or make other payments to us. Furthermore, the EIT Law eliminates the exemption of enterprise income tax on dividends derived by foreign investors from foreign invested enterprises and imposes on our subsidiaries in China an obligation to withhold tax on dividend distributions to their non-PRC shareholders, provided that such non-PRC shareholders are not classified as resident enterprises.

76

# THE EXTRAORDINARY GENERAL MEETING

*We are furnishing this proxy statement to you, as a holder of the Shares, as part of the solicitation of proxies by the Board for use at the extraordinary general meeting described below.*

## Date, Time and Place of the Extraordinary General Meeting

The extraordinary general meeting of shareholders of E-Commerce China Dangdang Inc. (the "Company") will be held on _____, 2016, at [10:00 a.m.] (Beijing Time) at the Company's office at 21/F, Jing An Center, No. 8 North Third Ring Road East, Chaoyang District, Beijing 100028, People's Republic of China.

## Proposals to be Considered at the Extraordinary General Meeting

At the meeting, you will be asked to consider and vote upon:

• as special resolutions:

THAT the agreement and plan of merger, dated as of May 28, 2016 (the "merger agreement"), among the Company, Dangdang Holding Company Limited, an exempted company with limited liability incorporated under the laws of the Cayman Islands ("Parent") and Dangdang Merger Company Limited, an exempted company with limited liability incorporated under the laws of the Cayman Islands and a wholly owned subsidiary of Parent ("Merger Sub") (such merger agreement being in the form attached to the proxy statement accompanying this notice of extraordinary general meeting and which will be produced and made available for inspection at the extraordinary general meeting), the plan of merger (the "plan of merger") among the Company and Merger Sub required to be registered with the Registrar of Companies of the Cayman Islands for the purposes of the merger (such plan of merger being substantially in the form attached to the merger agreement and which will be produced and made available for inspection at the extraordinary general meeting), and the transactions contemplated by the merger agreement, including the merger (the "merger"), the amendment of the authorised share capital of the Company from $100,000 divided into 548,955,840 Class A common shares and 451,044,160 Class B common shares of a par value $0.0001 per share to $100,000 divided into 1,000,000,000 shares with a par value of $0.0001 each and the amendment and restatement of the existing memorandum and articles of association of the Company by their deletion in their entirety and the substitution in their place of a new memorandum and articles of association of the Company at the effective time of the merger, a copy of which is attached as Annex B to the plan of merger, be authorized and approved;

THAT each of the members of the Special Committee (as defined below) be authorized to do all things necessary to give effect to the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger; and

• if necessary, as an ordinary resolution:

THAT the extraordinary general meeting be adjourned in order to allow the Company to solicit additional proxies in the event that there are insufficient proxies received at the time of the extraordinary general meeting to pass the special resolutions to be proposed at the extraordinary general meeting.

Under the terms and conditions of the merger agreement, if the merger is completed, at the effective time of the merger (the "Effective Time"), each Share issued and outstanding immediately prior to the Effective Time, other than (a) 136,477,925 Shares, consisting of 3,135,840 Class A common shares and 13,000,000 Class B common shares held by Ms. Yu, 1,185,000 Class A common shares represented by 237,000 ADSs held by Mr. Li, 21,876,660 Class B common shares held by Kewen, 97,000,000 Class B common shares held by SC International, 210,425 Class A common shares held by First Profit (including 164,000 Class A common shares beneficially owned by Mr. Yao and 46,425 Class A common shares beneficially owned by Mr. Chen, in each case, held of record by First Profit as nominee shareholder), and 70,000 Class A common shares represented by 14,000 ADSs held by Mr. Kan (collectively, the "Rollover Shares"), (b) Shares held by Parent, the Company or any of their subsidiaries, (c) Shares (including Class A common shares represented by ADSs) held by the ADS depositary and reserved for future issuance pursuant to the Company's Share Incentive Plans (as defined below) (Shares described under (a) through (c) above are collectively referred to herein as the "Excluded Shares"), (d) Shares owned by shareholders who have validly exercised and not effectively withdrawn or lost their rights to dissent under the CICL (the "Dissenting Shares"), and (e) Class A common shares represented by ADSs, will be cancelled in exchange for the right to receive $1.34 in cash per Share without interest and net of any applicable withholding tax. At the Effective Time, each ADS issued and outstanding immediately prior to the Effective Time, other than ADSs representing the Excluded Shares, will be cancelled in exchange for the right to receive $6.70 in cash per ADS without interest and net of any applicable withholding taxes (less up to $0.05 per ADS cancellation fees and up to $0.02 per ADS depositary services fees pursuant to the terms and conditions of the deposit agreement, dated December 7, 2010 between the Company and The Bank of New York Mellon (the "ADS depositary") and the holders and beneficial owners from time to time of ADSs issued thereunder, as may be amended from time to time (the "Deposit Agreement")). The Excluded Shares issued and outstanding immediately prior to the Effective Time will be cancelled for no consideration. The Dissenting Shares will be cancelled and each holder thereof will be entitled to receive only the payment of the fair value of such Dissenting Shares in accordance with the CICL. Each common share, par value $1.00 per share, of Merger Sub issued and outstanding immediately prior to the Effective Time shall be converted into and become one validly issued, fully paid and non-assessable ordinary share, par value $0.0001 per share, of the surviving company.

77

In addition, at the Effective Time, the Company will terminate the Company's 2004 Share Incentive Plan and 2010 Share Incentive Plan, and all amendments and modifications thereto (collectively, the "Share Incentive Plans"), terminate all relevant award agreements applicable to the Share Incentive Plans, and cancel all options to purchase Shares granted under the Company's Share Incentive Plans (the "Company Options") that are outstanding and unexercised, whether or not vested or exercisable.

At the Effective Time, each vested Company Option that remains outstanding immediately prior to the Effective Time will be cancelled in exchange for the right to receive from the surviving company or one of its subsidiaries, as soon as practicable after the Effective Time, cash in the amount equal to the product of (a) the number of Shares underlying such Company Option multiplied by (b) the excess, if any, of $1.34 over the exercise price payable per Share of such Company Option. If the exercise price per Share of any such Company Option is equal to or greater than $1.34, such Company Option will be cancelled for no consideration. At the Effective Time, each unvested Company Option will be cancelled for no consideration.

**Our Board's Recommendation**

The Board (other than Ms. Yu and Mr. Li, members of the Buyer Group, who did not attend, participate in or vote upon matters discussed during the Board meeting, due to their interests in the proposed transaction), acting upon the unanimous recommendation of the Special Committee:

- determined that it was fair (both substantively and procedurally) to and in the best interests of the unaffiliated security holders, and declared it advisable, to enter into the merger agreement and the transaction agreements;

- authorized and approved the execution, delivery and performance of the merger agreement, the transaction agreements and the consummation of the transactions contemplated thereby, including the merger; and

- resolved to direct that the authorization and approval of the merger agreement, the plan of merger and the consummation of the transactions contemplated thereby, including the merger, be submitted to a vote at an extraordinary general meeting of shareholders of the Company with the recommendation of the Board that the shareholders of the Company authorize and approve by way of a special resolution the merger agreement, the plan of merger and the consummation of the transactions contemplated thereby, including the merger.

**Quorum**

The presence, in person or by proxy, of shareholders holding not less than one-third of the voting power represented by the issued and outstanding Shares on the Share record date will constitute a quorum for the extraordinary general meeting.

78

**Record Dates; Shares and ADSs Entitled to Vote**

       You are entitled to attend and vote at the extraordinary general meeting if you have Shares registered in your name in the Company's register of members at the close of business in the Cayman Islands on _____, 2016, the Share record date for voting at the extraordinary general meeting. If you own ADSs on _____, 2016, the ADS record date (and do not cancel such ADSs and become a registered holder of the Shares underlying such ADSs as explained below), you cannot vote at the extraordinary general meeting directly, but you may instruct the ADS depositary (as the holder of the Shares underlying the ADSs) on how to vote the Shares underlying your ADSs. The ADS depositary must receive your instructions no later than 5:00 p.m. (New York City Time) on _____, 2016 in order to ensure your Shares are properly voted at the extraordinary general meeting. Alternatively, if you own ADSs on the ADS record date, you may vote at the extraordinary general meeting by cancelling your ADSs (and certifying you have not instructed, and will not instruct, the ADS depositary to vote the Shares represented by your ADSs) before _____ (New York City Time) on _____, 2016 and becoming a registered holder of Shares prior to the close of business in the Cayman Islands not later than _____, 2016, the Share record date. Each outstanding Share on the Share record date entitles the holder to one vote for each Class A common share and ten votes for each Class B common share on each matter submitted to the shareholders for authorization and approval at the extraordinary general meeting and any adjournment thereof. We expect that, as of the Share record date, there will be _____ Shares issued and outstanding and entitled to vote at the extraordinary general meeting. If you have Shares registered in your name on the Share record date, the deadline for you to lodge your proxy card and vote is _____, 2016 at ____ a.m. (Beijing Time). Please see "Shareholders and ADS Holders Entitled to Vote; Voting Materials" below for additional information. If the merger is not completed, the Company would continue to be a public company in the U.S. and the ADSs would continue to be listed on The New York Stock Exchange ("NYSE"). The Company's Shares are not listed and cannot be traded on any stock exchange other than the NYSE, and in such case only in the form of ADSs. As a result, if you have cancelled your ADSs to attend the extraordinary general meeting and the merger is not completed and you wish to be able to sell your Shares on a stock exchange, you would need to deposit your Shares into the Company's American depositary shares program for the issuance of the corresponding number of ADSs, subject to the terms and conditions of applicable law and the ADS deposit agreement, including, among other things, payment of relevant fees of the ADS depositary for the issuance of ADSs (up to $5.00 per 100 ADSs (or portion thereof) issued) and any applicable stock transfer taxes (if any) and related charges pursuant to the ADS deposit agreement.

**Vote Required**

       We cannot complete the merger unless the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger, are authorized and approved by the affirmative vote of holders of Shares representing at least two-thirds of the voting rights of the Shares present and voting in person or by proxy as a single class at the shareholders' meeting (the "Requisite Company Vote") in accordance with Section 233(6) of the CICL. As of the date of this proxy statement, the Supporting Shareholders beneficially own approximately 35.2% of the total issued and outstanding Shares, representing approximately 83.5% of the total number of votes represented by the issued and outstanding Shares. Pursuant to the terms of the Support Agreement, the Shares owned by the Supporting Shareholders as of the date of the Support Agreement and acquired by them thereafter will be voted in favor of the authorization and approval of the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger, at the extraordinary general meeting of shareholders of the Company.

**Shareholders and ADS Holders Entitled to Vote; Voting Materials**

       Only holders of Shares entered in the register of members of the Company at the close of business on _____, 2016 (Cayman Islands Time), the Share record date, will receive the final proxy statement and proxy card directly from the Company. Shareholders registered in the register of members of the Company as of the Share record date or their proxy holders are entitled to vote and may participate in the extraordinary general meeting or any adjournment thereof. Shareholders who have acquired Shares after the close of business on the Share record date may not attend the extraordinary general meeting unless they receive a proxy from the person or entity who had sold them the Shares. Each holder has one vote for each Class A common share and ten votes for each Class B common share. Shareholders wanting to vote by proxy should indicate on their proxy card how they want to vote, sign and date the proxy card, and mail the proxy card in the return envelope as soon as possible but in any event so that it is received by the Company no later than _____ a.m. on _____, 2016 (Beijing Time). Shareholders can also attend the extraordinary general meeting and vote in person.

---

79

Holders of ADSs as of the close of business on _____, 2016 (New York City Time), the ADS record date, will receive the final proxy statement and ADS voting instructions card either directly from the ADS depositary (in the case of holders of ADSs who hold the ADSs in certificated form, i.e., in the form of ADRs) or these materials will be forwarded to them by a third party service provider (in the case of beneficial owners of ADSs who do not hold the ADSs in the form of ADRs). Holders of ADSs as of the close of business on _____, 2016 (New York City Time) (who do not cancel such ADSs and become a registered holder of the Shares underlying such ADSs as explained in the following paragraph) cannot attend or vote at the extraordinary general meeting directly, but may instruct the ADS depositary how to vote the Shares underlying the ADSs by completing and signing an ADS voting instructions card provided by the ADS depositary and returning it in accordance with the instructions printed on it. The ADS depositary must receive the ADS voting instructions card no later than _____ (New York City Time) on _____, 2016. The ADS depositary shall endeavor, in so far as practicable, to vote or cause to be voted the Class A common shares represented by ADSs in accordance with your voting instructions.

The ADS depositary has advised us that, pursuant to Section 4.07 of the Depositary Agreement, it will not vote or attempt to exercise the right to vote any Shares other than in accordance with signed voting instructions from the relevant ADS holder and, accordingly, Class A common shares represented by ADSs for which no timely voting instructions are received by the ADS Depositary will not be voted. If you hold your ADSs in a brokerage, bank or other nominee account, you must rely on the procedures of the broker, bank or other nominee through which you hold your ADSs if you wish to vote.

Holders of ADSs may vote at the extraordinary general meeting if they cancel their ADSs and become a holder of Shares by the close of business on _____, 2016 (Cayman Islands Time). ADS holders wanting to cancel their ADSs need to make arrangements to deliver their ADSs to the ADS depositary for cancellation before _____ (New York City Time) on _____, 2016 together with (a) delivery instructions for the corresponding Shares (name and address of person who will be the registered holder of Shares), (b) payment of the ADS cancellation fees (up to $5.00 per 100 ADSs (or portion thereof) to be cancelled), up to $0.02 per ADS depositary services fees and any applicable taxes, and (c) a certification that you held the ADSs as of the ADS record date and you have not given, and will not give, voting instructions to the ADS depositary as to the ADSs being cancelled or have given voting instructions to the ADS depositary as to the ADSs being cancelled but undertake not to vote the corresponding Shares at the extraordinary general meeting. Persons who hold ADSs in a brokerage, bank or nominee account, must contact their broker, bank or other nominee to find out what actions they need to take to instruct the broker, bank or other nominee to cancel the ADSs on their behalf.

Persons holding ADSs in a brokerage, bank or nominee account should consult with their broker, bank or other nominee to obtain directions on how to provide such broker, bank or other nominee with instructions on how to vote their ADSs.

Each ADS represents five Class A common shares of the Company. As of _____, 2016, there were _____ ADSs outstanding; subject to the cancellation procedures described above, none of the holders of these ADSs may vote in person at the extraordinary general meeting.

Persons who have acquired Shares and whose names are entered in the Company's register of members before the close of business on _____, 2016 (Cayman Islands Time) will receive the proxy form (including the voting material) before the extraordinary general meeting, and persons who are ADS holders as of the close of business on _____, 2016 (New York City Time) will receive the ADS voting instructions card from the ADS depositary before the extraordinary general meeting. Shareholders who have acquired Shares after the close of business on _____, 2016 (Cayman Islands Time) may not attend the extraordinary general meeting unless they receive a proxy from the person or entity who had sold them the Shares.

**Proxy Holders for Registered Shareholders**

Shareholders registered in the register of members of the Company as of the Share record date who are unable to attend the extraordinary general meeting may appoint another person (including another shareholder, a third party or the chairman of the meeting) as their proxy to attend the meeting and to vote their Shares on their behalf, by completing and returning the form of proxy in accordance with the instructions printed thereon. With regard to the items listed on the agenda and without any explicit instructions to the contrary, the Company as proxy holder will vote in favor of the resolutions proposed at the extraordinary general meeting according to the recommendation of the Board. If new proposals (other than those on the agenda) are put forth before the extraordinary general meeting, the Company as proxy holder will vote in accordance with the position of the Board.

80

**Voting of Proxies and Failure to Vote**

All Shares represented by valid proxies will be voted at the extraordinary general meeting in the manner specified by the holder. If a shareholder returns a properly signed proxy card but does not indicate how the shareholder wants to vote, Shares represented by that proxy card will be voted FOR the proposal to authorize and approve the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger, the amendment of the authorised share capital of the Company from $100,000 divided into 548,955,840 Class A common shares and 451,044,160 Class B common shares of a par value $0.0001 per share to $100.00 divided into 1,000,000,000 shares with a par value of $0.0001 each and the amendment and restatement of the existing memorandum and articles of association of the Company by their deletion in their entirety and the substitution in their place of a new memorandum and articles of association at the Effective Time, a copy of which is attached as Annex B to the plan of merger, FOR the proposal to authorize each of the members of the Special Committee to do all things necessary to give effect to the merger agreement, the plan of merger and the transactions contemplated by the merger agreement, including the merger, and FOR the proposal to adjourn the extraordinary general meeting in order to allow the Company to solicit additional proxies in the event that there are insufficient proxies received at the time of the extraordinary general meeting to pass the special resolutions to be proposed at the extraordinary general meeting. Shareholders who fail to cast their vote in person or by proxy will not have their votes counted.

If the ADS depositary timely receives voting instructions from an ADS holder which fail to specify the manner in which the ADS depositary is to vote the Shares represented by the holder's ADSs, or if an ADS holder does not timely deliver specific voting instructions to the ADS depositary, the corresponding number of Shares will not be voted.

**Revocability of Proxies**

Registered holders of the Company's Shares may revoke their proxies in one of three ways:

- first, a registered shareholder may revoke a proxy by written notice of revocation given to the chairman of the extraordinary general meeting before the extraordinary general meeting commences. Any written notice revoking a proxy should be sent to the Company at the Company's offices at 21/F, Jing An Center, No. 8 North Third Ring Road East, Chaoyang District, Beijing 100028, People's Republic of China;

- second, a registered shareholder may complete, date and submit a new proxy card bearing a later date than the proxy card sought to be revoked to the Company no less than 48 hours prior to the extraordinary general meeting; or

- third, a registered shareholder may attend the extraordinary general meeting and vote in person. Attendance, by itself, will not revoke a proxy. It will only be revoked if the shareholder actually votes at the extraordinary general meeting.

If you hold Shares through a broker, bank or other nominee and have instructed the broker, bank or other nominee to vote your Shares, you must follow directions received from the broker, bank or other nominee to change your instructions.

Holders of ADSs may revoke their voting instructions by notification to the ADS depositary in writing at any time prior to 5:00 p.m. (New York City Time) on _____, 2016. A holder of ADSs can do this in one of two ways:

- first, a holder of ADSs can revoke its voting instructions by written notice of revocation timely delivered to the ADS depositary; and

- second, a holder of ADSs can complete, date and submit a new ADS voting instructions card to the ADS depositary bearing a later date than the ADS voting instructions card sought to be revoked.

If you hold your ADSs through a broker, bank or other nominee and you have instructed your broker, bank or other nominee to give ADS voting instructions to the ADS depositary, you must follow the directions of your broker, bank or other nominee to change those instructions.

**Rights of Shareholders Who Object to the Merger**

Shareholders who dissent from the merger will have the right to receive payment of the fair value of their Shares if the merger is completed, but only if they deliver to the Company, before the vote on the merger is taken at the extraordinary general meeting, a written objection to the merger and subsequently comply with all procedures and requirements of Section 238 of the CICL for the exercise of dissenter rights. The fair value of your Shares as determined under that statute could be more than, the same as, or less than the merger consideration you would receive pursuant to the merger agreement if you do not exercise dissenter rights with respect to your Shares.

---

81

ADS HOLDERS WILL NOT HAVE THE RIGHT TO EXERCISE DISSENTER RIGHTS AND RECEIVE PAYMENT OF THE FAIR VALUE OF THE SHARES UNDERLYING THEIR ADSs. THE ADS DEPOSITARY WILL NOT EXERCISE OR ATTEMPT TO EXERCISE ANY DISSENTER RIGHTS WITH RESPECT TO ANY OF THE SHARES THAT IT HOLDS, EVEN IF AN ADS HOLDER REQUESTS THE ADS DEPOSITARY TO DO SO. ADS HOLDERS WISHING TO EXERCISE DISSENTER RIGHTS MUST SURRENDER THEIR ADSs TO THE ADS DEPOSITARY FOR CONVERSION INTO SHARES, PAY THE ADS DEPOSITARY'S FEES REQUIRED FOR THE CANCELLATION OF THEIR ADSs, PROVIDE INSTRUCTIONS FOR THE REGISTRATION OF THE CORRESPONDING SHARES IN THE COMPANY'S REGISTER OF MEMBERS, AND CERTIFY THAT THEY HELD THE ADSs AS OF THE ADS RECORD DATE AND HAVE NOT GIVEN, AND WILL NOT GIVE, VOTING INSTRUCTIONS AS TO THEIR ADSs BEFORE _____ (NEW YORK CITY TIME) ON _____, 2016, AND BECOME REGISTERED HOLDERS OF SHARES BEFORE THE VOTE TO AUTHORIZE AND APPROVE THE MERGER IS TAKEN AT THE EXTRAORDINARY GENERAL MEETING (FOR THE AVOIDANCE OF DOUBT, ANY ADS HOLDERS WHO CONVERT THEIR ADSs INTO SHARES AFTER THE SHARE RECORD DATE WILL NOT BE ENTITLED TO ATTEND OR TO VOTE AT THE EXTRAORDINARY GENERAL MEETING, BUT WILL BE ENTITLED TO EXERCISE DISSENTER RIGHTS IF THEY BECOME REGISTERED HOLDERS OF SHARES BEFORE THE VOTE IS TAKEN AT THE EXTRAORDINARY GENERAL MEETING). AFTER CONVERTING THEIR ADSs AND BECOMING REGISTERED HOLDERS OF SHARES, SUCH FORMER ADS HOLDERS MUST ALSO COMPLY WITH THE PROCEDURES AND REQUIREMENTS FOR EXERCISING DISSENTER RIGHTS WITH RESPECT TO THE SHARES UNDER SECTION 238 OF THE CAYMAN ISLANDS COMPANIES LAW. IF THE MERGER IS NOT COMPLETED, THE COMPANY WOULD CONTINUE TO BE A PUBLIC COMPANY IN THE U.S. AND THE ADSs WOULD CONTINUE TO BE LISTED ON THE NEW YORK STOCK EXCHANGE. THE COMPANY'S SHARES ARE NOT LISTED AND CANNOT BE TRADED ON ANY STOCK EXCHANGE OTHER THAN THE NEW YORK STOCK EXCHANGE, AND IN SUCH CASE ONLY IN THE FORM OF ADSs. AS A RESULT, IF A FORMER ADS HOLDER HAS CANCELLED HIS, HER OR ITS ADSs TO EXERCISE DISSENTER RIGHTS AND THE MERGER IS NOT COMPLETED AND SUCH FORMER ADS HOLDER WISHES TO BE ABLE TO SELL HIS, HER OR ITS SHARES ON A STOCK EXCHANGE, SUCH FORMER ADS HOLDER WOULD NEED TO DEPOSIT HIS, HER OR ITS SHARES INTO THE COMPANY'S AMERICAN DEPOSITARY SHARES PROGRAM FOR THE ISSUANCE OF THE CORRESPONDING NUMBER OF ADSs, SUBJECT TO THE TERMS AND CONDITIONS OF APPLICABLE LAW AND THE ADS DEPOSIT AGREEMENT, INCLUDING, AMONG OTHER THINGS, PAYMENT OF RELEVANT FEES OF THE ADS DEPOSITARY FOR THE ISSUANCE OF ADSs (UP TO $5.00 PER 100 ADSs (OR PORTION THEREOF) ISSUED) AND ANY APPLICABLE STOCK TRANSFER TAXES (IF ANY) AND RELATED CHARGES PURSUANT TO THE ADS DEPOSIT AGREEMENT.

### Whom to Call for Assistance

If you need assistance, including help in changing or revoking your proxy, please contact the Company's Investor Relations Department at +86-10 5799-2666, or by email at ir@dangdang.com.

### Solicitation of Proxies

The Company does not plan to engage a proxy solicitor to assist in the solicitation of proxies. Instead, proxies may be solicited by mail, in person, by telephone, via internet or by facsimile by certain of our executive officers, directors and employees. These persons will receive no additional compensation for solicitation of proxies but may be reimbursed for reasonable out-of-pocket expenses. We will reimburse banks, brokers, nominees, custodians and fiduciaries for their reasonable expenses in forwarding copies of this proxy statement to the beneficial owners of our Shares and in obtaining voting instructions from those owners. We will pay all expenses of filing, printing and mailing this proxy statement.

### Other Business

We are not currently aware of any business to be acted upon at the extraordinary general meeting other than the matters discussed in this proxy statement.

82

## THE MERGER AGREEMENT AND PLAN OF MERGER

*This section of the proxy statement describes the material terms of the merger agreement but does not purport to describe all of the terms of the merger agreement. The following summary is qualified in its entirety by reference to the complete text of the merger agreement, which is attached as Annex A to this proxy statement and incorporated into this proxy statement by reference. You should read the merger agreement in its entirety because it, and not this proxy statement, is the legal document that governs the merger. This description of the merger agreement has been included to provide you with information regarding its terms.*

### Structure and Completion of the Merger

The merger agreement provides for the merger of Merger Sub with and into the Company upon the terms, and subject to the conditions, of the merger agreement, with the Company as the surviving entity of the merger. If the merger is completed, the Company will cease to be a publicly traded company. Unless otherwise mutually agreed in writing between the Company, Parent and Merger Sub, the Closing will take place on the fifth business day after all the closing conditions have been satisfied or waived (other than those that by their nature are to be satisfied or waived at the Closing). As early as practical on the Closing date, Merger Sub and the Company will execute a plan of merger and file the plan of merger and other related documents with the Registrar of Companies of the Cayman Islands. The merger will become effective on either the date of such filing or within 90 days of the date of registration of the plan of merger by the Registrar of Companies of the Cayman Islands, as specified in the plan of merger.

We expect that the merger will be completed during the second half of 2016, after all conditions to the merger have been satisfied or waived. We cannot specify when, or assure you that, all conditions to the merger will be satisfied or waived; however, the parties intend to complete the merger as promptly as practicable.

### Memorandum and Articles of Association; Directors and Executive Officers of the Surviving Company

If the merger is completed, the current memorandum and articles of association of the Company will be replaced in its entirety by the memorandum and articles of association of Merger Sub, as in effect prior to the completion of the merger except that at the Effective Time, Article I of the memorandum of association of the surviving company shall be amended to read as: "The name of the company is E-Commerce China Dangdang Inc.," and the articles of association of the surviving company shall be amended to refer to the name of the surviving company as "E-Commerce China Dangdang Inc." and all references therein to "Dangdang Merger Company Limited" shall be replaced with "E-Commerce China Dangdang Inc.," and if necessary, references therein to the authorized share capital of the surviving company shall be amended as necessary to correctly describe the authorized share capital of the surviving company as approved in the plan of merger. In addition, the directors of Merger Sub immediately prior to the Effective Time will become the directors of the surviving company and the executive officers of the Company immediately prior to the Effective Time will become the executive officers of the surviving company, in each case, except as otherwise determined by Parent prior to the Effective Time.

### Merger Consideration

Under the terms and conditions of the merger agreement, if the merger is completed, at the Effective Time, each Share issued and outstanding immediately prior to the Effective Time, other than the Excluded Shares, the Dissenting Shares, and Class A common shares represented by ADSs, will be cancelled in exchange for the right to receive $1.34 in cash per Share without interest and net of any applicable withholding tax. At the Effective Time, each ADS issued and outstanding immediately prior to the Effective Time, other than ADSs representing the Excluded Shares, will be cancelled in exchange for the right to receive $6.70 in cash per ADS without interest and net of any applicable withholding taxes (less up to $0.05 per ADS cancellation fees and up to $0.02 per ADS depositary services fees pursuant to the terms and conditions of the Deposit Agreement). The Excluded Shares issued and outstanding immediately prior to the Effective Time will be cancelled for no consideration. The Dissenting Shares will be cancelled and each holder thereof will be entitled to receive only the payment of the fair value of such Dissenting Shares in accordance with the CICL. Please see "Dissenter Rights" beginning on page 100 for additional information.

83

At the Effective Time, each common share, par value $1.00 per share, of Merger Sub issued and outstanding immediately prior to the Effective Time shall be converted into and become one validly issued, fully paid and non-assessable ordinary share, par value $0.0001 per share, of the surviving company.

**Treatment of Company Options**

At the Effective Time, the Company will terminate the Company's Share Incentive Plans, terminate all relevant award agreements applicable to the Share Incentive Plans, and cancel all the Company Options that are outstanding and unexercised, whether or not vested or exercisable.

At the Effective Time, each vested Company Option that remains outstanding immediately prior to the Effective Time will be cancelled in exchange for the right to receive from the surviving company or one of its subsidiaries, as soon as practicable after the Effective Time, cash in the amount equal to the product of (a) the number of Shares underlying such Company Option multiplied by (b) the excess, if any, of $1.34 over the exercise price payable per Share of such Company Option. If the exercise price per Share of any such Company Option is equal to or greater than $1.34, such Company Option will be cancelled for no consideration. At the Effective Time, each unvested Company Option will be cancelled for no consideration.

**Exchange Procedures**

At or prior to the Effective Time, Parent shall deposit, or cause to be deposited with the paying agent, for the benefit of the holders of Shares, ADSs and Company Options (other than Excluded Shares), a cash amount in immediately available funds, which, together with the deposited available cash, shall be sufficient for the paying agent to make payments under the merger agreement. As promptly as practicable after the Effective Time and in any event within five business days in the case of registered holders, the surviving company shall cause the paying agent to mail, to each person who was, at the Effective Time, a registered holder of Shares entitled to receive the per share merger consideration (i) a letter of transmittal which shall be in customary form for a company incorporated in the Cayman Islands reasonably acceptable to Parent and the Company specifying the manner in which the delivery of the merger consideration to registered holders of Shares (other than the Excluded Shares and the Dissenting Shares) shall be effected and contain such other provisions as Parent and the Company (upon recommendation of the Special Committee) may reasonably agree; and (ii) instructions for effecting the surrender of any issued share certificates representing Shares (the "Share Certificates") (or affidavits and indemnities of loss in lieu of the Share Certificates) or non-certificated Shares represented by book entry ("Uncertificated Shares") and/or such other documents as may be required in exchange for the per share merger consideration. Promptly after a Dissenting Shareholder has effectively withdrawn or lost his, her or its appraisal rights under the CICL, Parent shall cause the paying agent to mail to such Dissenting Shareholder such letter of transmittal and instructions. Upon surrender of, if applicable, a Share Certificate (or affidavit and indemnity of loss in lieu of the Share Certificate) or Uncertificated Shares and/or such other documents as may be required pursuant to such instructions to the paying agent in accordance with the terms of such letter of transmittal, duly executed in accordance with the instructions thereto, each registered holder of Shares represented by such Share Certificate (or affidavits and indemnities of loss in lieu of the Share Certificates) and each registered holder of Uncertificated Shares shall be entitled to receive in exchange therefor a check, in the amount equal to (x) the number of Shares (other than Excluded Shares) represented by such Share Certificate (or affidavit and indemnity of loss in lieu of the Share Certificate) or the number of Uncertificated Shares multiplied by (y) the per share merger consideration, and the Share Certificate so surrendered shall forthwith be marked as cancelled.

Prior to the Effective Time, Parent and the Company (upon recommendation of the Special Committee) shall establish procedures with the paying agent and the Depositary to ensure that (A) the paying agent will transmit to the Depositary as promptly as reasonably practicable following the Effective Time an amount in cash in immediately available funds equal to the product of (x) the number of ADSs issued and outstanding immediately prior to the Effective Time (other than ADSs representing the Excluded Shares) and (y) the per ADS merger consideration, and (B) the Depositary will distribute the per ADS merger consideration to holders of ADSs pro rata to their holdings of ADSs (other than ADSs representing the Excluded Shares) upon surrender by them of the ADSs, less up to $0.05 per ADS cancellation fees and up to $0.02 per ADS depositary services fees pursuant to the terms and conditions of the Deposit Agreement, and any applicable taxes and expenses. No interest shall be paid or will accrue on any amount payable in respect of the Shares or ADSs.

84

**Representations and Warranties**

The merger agreement contains representations and warranties made by the Company to Parent and Merger Sub and representations and warranties made by Parent and Merger Sub to the Company, in each case, as of specific dates. The statements embodied in those representations and warranties were made for purposes of the merger agreement and are subject to important qualifications and limitations agreed by the parties in connection with negotiating the terms of the merger agreement. In addition, some of those representations and warranties may be subject to a contractual standard of materiality different from that generally applicable to shareholders, may have been made for the principal purposes of establishing the circumstances in which a party to the merger agreement may have the right not to close the merger if the representations and warranties of the other party prove to be untrue due to a change in circumstance or otherwise and allocating risks between the parties to the merger agreement rather than establishing matters as facts. Moreover, the representations and warranties made by the Company were qualified by its public disclosures with the SEC prior to the date of the merger agreement, a disclosure schedule delivered by the Company to Parent and Merger Sub prior to or contemporaneously with the execution of the merger agreement, and the knowledge of t Supporting Shareholders or any of their respective affiliates or representatives (other than the Company and its subsidiaries).

The representations and warranties made by the Company to Parent and Merger Sub include representations and warranties relating to, among other things:

- due organization, existence, good standing and authority to carry on the Company's businesses;

- the non-existence of any corporations, partnerships, joint ventures, associations, or entities through which the Group Company conducts business other than those disclosed in the Company disclosure schedule;

- the furnishing by the Company to Parent of complete and correct copy of memorandum and articles of association, and its compliance with the terms thereof;

- the Company's capitalization and the absence of options, warrants, preemptive or other similar rights with respect to securities of the Company and its subsidiaries, or any securities or encumbrances on Company securities that would give their holders the right to vote with the Company's shareholders;

- the compliance of company equity awards with applicable laws and the Company Share Incentive Plan;

- no outstanding contractual obligations of any Group Company to repurchase, redeem or acquire any share capital or registered capital of any Group Company;

- the outstanding share capital or registered capital, as the case may be, of each of the Company's subsidiaries is duly authorized, validly issued, fully paid and non-assessable, and the portion of the outstanding share capital or registered capital, as the case may be, of each of the Company's subsidiaries and each such other entity is owned by the relevant Group Company free and clear of all liens and encumbrances;

- the Company's corporate power and authority to execute and deliver, to perform its obligations under and to consummate the transactions under the merger agreement, and the enforceability of the merger agreement against the Company;

- the required vote of the Company's shareholders to adopt the merger agreement;

- the declaration of advisability and recommendation to the shareholders of the Company of the merger agreement, the plan of merger and the merger by the Special Committee and by the Board, and the authorization and approval of the merger agreement, the plan of merger and the transactions contemplated under the merger agreement, including the merger, by the Board;

- the receipt of a fairness opinion from the financial advisor to the Special Committee;

- the obtaining of all governmental consents and approvals in connection with the transactions contemplated by the merger agreement;

85