# EXHIBIT B

20-F 1 v436212_20f.htm FORM 20-F

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 20-F**

**(Mark One)**

☐ **Registration statement pursuant to Section 12(b) or 12(g) of the Securities Exchange Act of 1934**

**or**

☒ **Annual report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
**For the fiscal year ended December 31, 2015.**

**or**

☐ **Transition report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
**For the transition period from _____ to _____**

**or**

☐ **Shell company report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**
**Date of event requiring this shell company report**

Commission file number: 001-34982

**E-Commerce China Dangdang Inc.**
(Exact name of Registrant as specified in its charter)

N/A
(Translation of Registrant's name into English)

Cayman Islands
(Jurisdiction of incorporation or organization)
21/F, Jing An Center
No.8 North Third Ring Road East
Chaoyang District, Beijing 100028
People's Republic of China

(Address of principal executive offices)

Peggy Yu Yu, Executive Chairwoman
Telephone: (86 10) 5799-2666
Email: yuyu@dangdang.com
Facsimile: (86 10) 5799-2100

21/F, Jing An Center
No.8 North Third Ring Road East
Chaoyang District, Beijing 100028
People's Republic of China

(Name, Telephone, Email and/or Facsimile number and Address of Company Contact Person)

**Securities registered or to be registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| American depositary shares, each representing five Class A common shares | New York Stock Exchange |

| Common shares, par value US$0.0001 per share | New York Stock Exchange* |
|---|---|

\* Not for trading, but only in connection with the listing on The New York Stock Exchange of American depositary shares ("ADSs").

**Securities registered or to be registered pursuant to Section 12(g) of the Act:**

**None**

**(Title of Class)**

**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:**

**None**

**(Title of Class)**

Indicate the number of outstanding shares of each of the Issuer's classes of capital or common stock as of the close of the period covered by the annual report.

**279,557,750 Class A common shares, par value US$0.0001 per share, and 131,876,660 Class B common shares, par value US$0.0001 per share, as of December 31, 2015. The 279,557,750 Class A common shares include 6,607,115 Class A common shares issued to our depositary bank and reserved for future exercise and grants of incentive shares under our share incentive plans.**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. Yes ☐ No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐      Accelerated filer ☒      Non-accelerated filer ☐

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☒
International Financial Reporting Standards as issued by the International Accounting Standards
Board      ☐
Other      ☐

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow.

Item 17      ☐
Item 18      ☐

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

(APPLICABLE ONLY TO ISSUERS INVOLVED IN BANKRUPTCY PROCEEDINGS DURING THE PAST FIVE YEARS)

Indicate by check mark whether the registrant has filed all documents and reports required to be filed by Sections 12, 13 or 15(d) of the Securities Exchange Act of 1934 subsequent to the distribution of securities under a plan confirmed by a court. Yes ☐ No ☐

---

## TABLE OF CONTENTS

INTRODUCTION     1

FORWARD-LOOKING INFORMATION     2

PART I     1

Item 1.    Identity of Directors, Senior Management and Advisers     1

Item 2.    Offer Statistics and Expected Timetable     1

Item 3.    Key Information     1

Item 4.    Information on the Company     29

Item 4A.    Unresolved Staff Comments     46

Item 5.    Operating and Financial Review and Prospects     46

Item 6.    Directors, Senior Management and Employees     59

Item 7.    Major Shareholders and Related Party Transactions     66

Item 8.    Financial Information     67

Item 9.    The Offer and Listing     68

Item 10.    Additional Information     69

Item 11.    Quantitative and Qualitative Disclosures about Market Risk     76

Item 12.    Description of Securities Other than Equity Securities     77

PART II     78

Item 13.    Defaults, Dividend Arrearages and Delinquencies     78

Item 14.    Material Modifications to the Rights of Security Holders and Use of Proceeds     78

Item 15.    Controls and Procedures     78

Item 16A.    Audit Committee Financial Expert     80

Item 16B.    Code of Ethics     80

Item 16C.    Principal Accountant Fees and Services     80

Item 16D.    Exemptions from the Listing Standards for Audit Committees     80

Item 16E.    Purchases of Equity Securities by the Issuer and Affiliated Purchasers     80

Item 16F.    Change in Registrant's Certifying Accountant     80

Item 16G.    Corporate Governance     80

Item 16H.    Mine Safety Disclosure     81

| PART III | | | 81 |
| Item 17. | Financial Statements | | 81 |
| Item 18. | Financial Statements | | 81 |
| Item 19. | Exhibits | | 81 |
| SIGNATURES | | | 84 |

i

---

# INTRODUCTION

Except where the context otherwise requires and for the purpose of this annual report only:

- "we," "us," "our company," "our" or "Dangdang" refers to E-Commerce China Dangdang Inc., a Cayman Islands company, and its PRC subsidiaries, Beijing Dangdang Information Technology Co., Ltd., Wuxi Dangdang Information Technology Co., Ltd. and Dangdang Information Technology (Tianjin) Co., Ltd. and, in the context of describing our operations and consolidated financial information, also include its consolidated affiliated PRC entity, Beijing Dangdang Kewen E-Commerce Co., Ltd., and its subsidiaries;

- "China" or "PRC" refers to the People's Republic of China, excluding Taiwan, Hong Kong, and Macau;

- "shares" or "common shares" refers to our Class A and Class B common shares, par value US$0.0001 per share, and "preferred shares" refers to our series A, series B and series C convertible preferred shares, par value US$0.0001 per share, which were automatically converted into Class B common shares upon the completion of our company's initial public offering in December 2010; in November 2010, our shareholders approved a 1:10 share split of our authorized and outstanding share capital with retrospective effect. All presentation of share capital information in this annual report is shown giving effect to the 1:10 share split;

- "ADSs" refers to our American depositary shares, each of which represents five Class A common shares;

- "Our internet platform" refers to our *dangdang.com* website and our mobile shopping application.

- "RMB" or "Renminbi" refers to the legal currency of China; and

- "US$," "dollars" or "U.S. dollars" refers to the legal currency of the United States.

1

# FORWARD-LOOKING INFORMATION

This annual report contains forward-looking statements that involve risks and uncertainties. All statements other than statements of historical facts are forward-looking statements. These statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from those expressed or implied by the forward-looking statements.

You can identify these forward-looking statements by words or phrases such as "may," "will," "expect," "anticipate," "aim," "estimate," "intend," "plan," "believe," "likely to" or other similar expressions. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our financial condition, results of operations, business strategy and financial needs. These forward-looking statements include, but are not limited to, statements about:

- our growth strategies;

- our future business development, results of operations and financial condition;

- trends and competition in the business-to-consumer, or B2C, e-commerce market, and retail and online retail industries in China;

- expected changes in our revenues and certain cost and expense items; and

- assumptions underlying or related to any of the foregoing.

You should read thoroughly this annual report and the documents that we refer to in this annual report with the understanding that our actual future results may be materially different from and worse than what we expect. Other sections of this annual report include additional factors which could adversely impact our business and financial performance. Moreover, we operate in an evolving environment. New risk factors and uncertainties emerge from time to time and it is not possible for our management to predict all risk factors and uncertainties, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements. We qualify all of our forward-looking statements by these cautionary statements.

You should not rely upon forward-looking statements as predictions of future events. We undertake no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise.

2

---

# PART I

**Item 1.　　Identity of Directors, Senior Management and Advisers**

　　Not applicable.

**Item 2.　　Offer Statistics and Expected Timetable**

　　Not applicable.

**Item 3.　　Key Information**

**A.　　Selected Financial Data**

　　The following table presents the selected consolidated financial information for our company. The selected consolidated statements of comprehensive (loss) income data for the three years ended December 31, 2013, 2014 and 2015 and the consolidated balance sheet data as of December 31, 2014 and 2015 have been derived from our audited consolidated financial statements which are included in this annual report beginning on page F-1. The selected consolidated balance sheet data for the year ended December 31, 2013 have been derived from our audited consolidated balance sheet as of December 31, 2013, which is not included in this annual report. The selected consolidated statements of comprehensive (loss) income data for the years ended December 31, 2011 and 2012 and the selected consolidated balance sheet data as of December 31, 2011 and 2012 have been derived from our audited consolidated financial statements which are not included in this annual report. Our audited consolidated financial statements are prepared and presented in accordance with U.S. GAAP.

　　Our historical results for any period are not necessarily indicative of results to be expected for any future period. You should read the following selected financial information in conjunction with the consolidated financial statements and related notes and the information under "Item 5. Operating and Financial Review and Prospects" included elsewhere in this annual report.

| | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2011** | **2012** | **2013** | **2014** | **2015** | |
| | **RMB** | **RMB** | **RMB** | **RMB** | **RMB** | **US$** |
| | | | **(in thousands)** | | | |
| **Consolidated Statements of Comprehensive (Loss) Income Data:** | | | | | | |
| Net revenues: | | | | | | |
| 　Product revenue | | | | | | |
| 　　Media | 2,457,423 | 3,252,511 | 4,050,122 | 5,036,039 | 5,526,976 | 853,218 |
| 　　General Merchandise | 1,094,087 | 1,768,292 | 1,995,451 | 2,599,411 | 3,485,314 | 538,040 |
| | 3,551,510 | 5,020,803 | 6,045,573 | 7,635,450 | 9,012,290 | 1,391,258 |
| 　Other revenue | 67,462 | 173,006 | 279,425 | 321,513 | 299,745 | 46,273 |
| 　Total net revenues | 3,618,972 | 5,193,809 | 6,324,998 | 7,956,963 | 9,312,035 | 1,437,531 |
| Cost of revenues | (3,118,365) | (4,469,455) | (5,224,114) | (6,487,201) | (7,813,529) | (1,206,201) |
| Gross profit | 500,607 | 724,354 | 1,100,884 | 1,469,762 | 1,498,506 | 231,330 |
| Operating expenses: [(1)] | | | | | | |
| 　Fulfillment | (474,506) | (736,191) | (727,683) | (775,534) | (747,134) | (115,338) |
| 　Marketing | (150,313) | (195,938) | (260,988) | (374,227) | (313,627) | (48,416) |
| 　Technology and content | (89,616) | (153,267) | (180,158) | (208,214) | (242,112) | (37,376) |
| 　General and administrative | (84,113) | (137,473) | (148,919) | (165,284) | (198,554) | (30,651) |
| Government grants and value-added tax refunds | 13,603 | 9,216 | 21,392 | 113,781 | 73,194 | 11,299 |
| (Loss) income from operations | (284,338) | (489,299) | (195,472) | 60,284 | 70,273 | 10,848 |

1

https://www.sec.gov/Archives/edgar/data/1499744/000114420416097925/v436212_20f.htm

| | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2011 | 2012 | 2013 | 2014 | 2015 | |
| | RMB | RMB | RMB | RMB | RMB | US$ |
| | | | (in thousands) | | | |
| (Loss) income before income taxes | (204,161) | (443,851) | (142,865) | 88,117 | 76,548 | 11,817 |
| Income tax (expense) benefit | (24,326) | — | — | — | 15,000 | 2,316 |
| Net (loss) income | (228,487) | (443,851) | (142,865) | 88,117 | 91,548 | 14,133 |
| Deemed dividend on Series C convertible preferred shares | — | — | — | — | — | — |
| Net (loss) income attributable to common shareholders | (228,487) | (443,851) | (142,865) | 88,117 | 91,548 | 14,133 |
| (Loss) income per common share: | | | | | | |
| Basic | (0.58) | (1.11) | (0.36) | 0.22 | 0.23 | 0.04 |
| Diluted | (0.58) | (1.11) | (0.36) | 0.21 | 0.22 | 0.03 |
| Shares used in (loss) income per share computation: | | | | | | |
| Common shares: | | | | | | |
| Basic | | | | | | |
| Diluted | | | | | | |
| Class A common shares: | | | | | | |
| Basic | 188,572,218 | 267,707,132 | 269,520,110 | 271,445,384 | 272,491,397 | 272,491,397 |
| Diluted | 394,059,092 | 399,623,792 | 401,416,715 | 416,533,054 | 415,045,447 | 415,045,447 |
| Class B common shares: | | | | | | |
| Basic | 205,486,874 | 131,916,660 | 131,896,605 | 131,876,660 | 131,876,660 | 131,876,660 |
| Diluted | 205,486,874 | 131,916,660 | 131,896,605 | 131,876,660 | 131,876,660 | 131,876,660 |
| Other comprehensive (loss) income, net of tax of nil: | | | | | | |
| Foreign currency translation adjustment, net of taxes | (66,198) | (3,730) | (42,873) | 4,991 | 87,122 | 13,449 |
| Unrealized gain on available-for-sale investments, net of taxes | — | — | — | 2,541 | 15,894 | 2,454 |
| Transferred to statements of comprehensive (loss) income of realized gain on available-for-sale investments, net of taxes | — | — | — | (2,541) | (14,555) | (2,247) |
| Total other comprehensive (loss) income | (66,198) | (3,730) | (42,873) | 4,991 | 88,461 | 13,656 |
| Comprehensive (loss) income attributable to common shareholders | (294,685) | (447,581) | (185,738) | 93,108 | 180,009 | 27,789 |

(1)   Share-based compensation expenses were allocated in operating expenses as follows:

| | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2011 | 2012 | 2013 | 2014 | 2015 | |
| | RMB | RMB | RMB | RMB | RMB | US$ |
| | | | (in thousands) | | | |
| Fulfillment | 1,491 | 1,922 | 1,755 | 2,126 | 1,946 | 300 |
| Marketing | 300 | 332 | 412 | 509 | 638 | 98 |
| Technology and content | 1,372 | 1,015 | 964 | 1,075 | 1,138 | 176 |
| General and administrative | 8,294 | 7,918 | 7,977 | 6,707 | 4,875 | 753 |
| Total share-based compensation expenses | 11,457 | 11,187 | 11,108 | 10,417 | 8,597 | 1,327 |

The following table presents a summary of our consolidated balance sheet data as of the dates set forth below:

| | For the Year Ended December 31, | | | | | |
| | **2011** | **2012** | **2013** | **2014** | **2015** | |
| | **RMB** | **RMB** | **RMB** | **RMB** | **RMB** | **US$** |
| | | | | (in thousands) | | |
| **Summary Consolidated Balance Sheet Data** | | | | | | |
| Cash and cash equivalents | 192,962 | 432,703 | 353,273 | 350,946 | 1,107,612 | 170,986 |
| Restricted cash | — | 709,417 | 6,964 | 23,726 | 24,000 | 3,705 |
| Time deposits | 1,178,839 | 492,445 | 853,222 | 674,363 | — | — |
| Held-to-maturity investments | 20,000 | — | — | 350,000 | 72,000 | 11,115 |
| Available-for-sale investments | — | — | — | — | 166,339 | 25,678 |
| Inventories | 1,583,283 | 1,485,579 | 1,760,904 | 2,201,170 | 2,272,087 | 350,750 |
| Accounts receivable, net | 67,369 | 56,610 | 37,446 | 28,763 | 35,367 | 5,460 |
| Total assets | 3,285,742 | 3,583,126 | 3,634,457 | 4,514,967 | 4,621,030 | 713,364 |
| Accounts and notes payable | 1,485,943 | 1,563,787 | 1,970,651 | 2,479,314 | 2,703,190 | 417,301 |
| Non-current liabilities | 1,903 | 33,966 | 32,724 | 24,227 | 29,499 | 4,554 |
| Class A common shares | 197 | 200 | 201 | 201 | 201 | 31 |
| Class B common shares | 103 | 103 | 103 | 103 | 103 | 16 |
| Accumulated deficit | (580,051) | (1,023,902) | (1,166,767) | (1,078,650) | (987,102) | (152,382) |
| Total shareholders' (deficit) equity | 1,157,786 | 739,499 | 569,693 | 677,584 | 866,190 | 133,717 |

**Exchange Rate Information**

Our reporting currency is the Renminbi because our business is primarily conducted in China and substantially all of our revenues and expenses are denominated in Renminbi. This annual report contains translations of Renminbi amounts into U.S. dollars at specific rates solely for the convenience of the reader. The conversion of Renminbi into U.S. dollars in this annual report is based on the rate certified for customs purposes by the Federal Reserve Bank of New York. Unless otherwise noted, all translations from Renminbi to U.S. dollars and from U.S. dollars to Renminbi in this annual report were made at a rate of RMB6.4778 to US$1.00, the rate in effect as of December 31, 2015. We make no representation that any Renminbi or U.S. dollar amounts could have been, or could be, converted into U.S. dollars or Renminbi, as the case may be, at any particular rate, or at all. The PRC government imposes control over its foreign currency reserves in part through direct regulation of the conversion of Renminbi into foreign exchange and through restrictions on foreign trade. On April 22, 2016, the rate was RMB6.5004 to US$1.00.

2

The following table sets forth information concerning exchange rates between the Renminbi and the U.S. dollar for the periods indicated.

| | Certified Exchange Rate | | | |
| | Period End | Average [1] | Low | High |
|---|---|---|---|---|
| | | (RMB per US$1.00) | | |
| 2011 | 6.2939 | 6.4475 | 6.6364 | 6.2939 |
| 2012 | 6.2301 | 6.2990 | 6.3879 | 6.2221 |
| 2013 | 6.0537 | 6.1412 | 6.2438 | 6.0537 |
| 2014 | 6.2046 | 6.1704 | 6.2591 | 6.0402 |
| 2015 | 6.4778 | 6.2827 | 6.4896 | 6.1870 |
| October | 6.3180 | 6.3505 | 6.3591 | 6.3180 |
| November | 6.3883 | 6.3640 | 6.3945 | 6.3180 |
| December | 6.4778 | 6.4491 | 6.4896 | 6.3883 |
| 2016 | | | | |
| January | 6.5752 | 6.5726 | 6.5932 | 6.5219 |
| February | 6.5525 | 6.5501 | 6.5795 | 6.5154 |
| March | 6.4480 | 6.5027 | 6.5500 | 6.4480 |
| April (through April 22, 2016) | 6.5004 | 6.4726 | 6.5004 | 6.4571 |

*Source: Federal Reserve Statistical Release*

(1) Annual averages are calculated by using the average of the exchange rates on the last day of each month during the relevant year. Monthly averages are calculated by using the average of the daily rates during the relevant month.

**B.** **Capitalization and Indebtedness**

Not applicable.

**C.** **Reasons for the Offer and Use of Proceeds**

Not applicable.

**D.** **Risk Factors**

**Risks Related to Our Business**

***Our business depends heavily on the market recognition and reputation of our Dangdang brand, and any harm to our brand or failure to maintain and enhance our brand recognition may materially and adversely affect our business, financial condition and results of operations.***

We believe that the market recognition and reputation of our Dangdang brand have significantly contributed to the success of our business. Maintaining and enhancing the recognition and reputation of our brand are critical to our success and ability to compete. Many factors, some of which are beyond our control, are important to maintaining and enhancing our brand and may negatively impact our brand and reputation if not properly managed, such as:

- our ability to maintain a convenient and reliable user experience as consumer preferences evolve and as we expand into new product categories and new business lines;

- our ability to increase brand awareness among existing and potential customers through various means of marketing and promotional activities;

- the efficiency, reliability and service quality of our courier service providers;

- our ability to effectively control the product and service quality of third-party merchants and to monitor service performance of third parties as we continue to develop our marketplace program; and

- any negative media publicity about e-commerce, or the security or product quality problems of other e-commerce companies in China.

3

We have attracted negative publicity in the past. In March 2014, a live program broadcast by China Central Television Station, or CCTV, the national television broadcasting network owned by China's central government, reported that certain brands of cosmetics products sold by third party merchants through the marketplace on our internet platform were without proper authorization from the brand owners. Following the CCTV broadcast, many news outlets in China and overseas reported on CCTV's negative publicity about us. We immediately launched an investigation into the third-party merchants in question and closed their online stores on our marketplace. We also offered full refund for all the cosmetics products at issue. Despite our remedial efforts, CCTV has wide coverage and perceived authority over public opinion and the negative publicity by CCTV and other media about us may have adversely damaged our brand, public image and reputation, which may harm our ability to attract customers and result in an adverse impact on our results of operations and prospectus. In June 2014, the State Administration of Industry and Commerce, or the SAIC, launched Operation Red Shield, which was aimed at tackling counterfeit products on e-commerce platforms in China. Although products sold on our internet platform by us or third-party merchants were not involved in the SAIC action, we cannot assure you that, in the future, we will not attract negative publicity, regardless of its veracity, as a result of governmental or media campaigns against counterfeit products. A public perception that non-authentic, counterfeit or defective goods are sold on our internet platform by us or third-party merchants, or that we or third-party merchants do not provide satisfactory customer service, even if factually incorrect or based on isolated incidents, could damage our reputation, diminish the value of our brand, undermine the trust and credibility we have established and have a negative impact on our ability to attract new customers or retain our existing customers. If we are unable to preserve our reputation, further enhance our brand recognition and increase positive awareness of our internet platform, our results of operations may be materially and adversely affected.

### *We depend heavily on the continued success of our core business of selling books and other media products online, and any event that adversely affects our sales of books and other media products could harm our business and results of operations.*

From our inception, we have primarily focused on the sale of books online and a majority of our total net revenues have been derived from selling books and other media products online, which accounted for 64.0%, 63.3% and 59.4% of our total net revenues in 2013, 2014 and 2015, respectively. While we have increased the marketing of various general merchandise products and will continue to expand our product offerings to gradually diversify our revenue sources, sales of these new categories of products may not increase to a level that would reduce our dependence on books and other media products. If we cannot successfully attract or retain our book and other media product customers, the number of our customers for, and sales of, general merchandise products may decline. Furthermore, while we have developed and will continue to expand our own digital reading platform, the development and increasing popularity of electronic books and digital content, which have already achieved success in the U.S. and other countries, may negatively impact our book sales online. Our sales of books and other media products may also be materially and negatively affected by sales of pirated books or other media products, which is a continuing problem in China. Any event that results in a reduction in our sales of books and other media products could materially and adversely affect our business and results of operations.

### *We incurred net losses in the past. Although we generated a net profit in 2014 and 2015, we may experience future losses and may not be able to generate sufficient revenues in the future to sustain profitability.*

We incurred net losses in all periods prior to 2009 and from 2011 to 2013. We generated net income of US$14.2 million and US$14.1 million in 2014 and 2015, respectively. We cannot assure you that we can maintain profitability or avoid net losses in the future. Although we experienced significant revenue growth in recent periods, such growth rates may not be sustainable and may decrease in the future. Our ability to be profitable depends on the revenues that we can generate from our businesses, which are affected by factors out of our control, such as the level of price competition in the market, and our ability to control our costs and operating expenses. In 2016, we expect to continue to invest heavily in advertising and marketing programs and in technology and content spending, including continuing to invest in mobile technology and our digital reading platform, which may increase our costs and operating expenses, and as a result, adversely affect our ability to generate net income for the year. We incurred in the past and expect to continue to incur in future periods share-based compensation expenses, which will negatively impact our operating results. If competition remains intense and we fail to increase revenues at the rate we anticipate or if our costs and operating expenses increase without a commensurate increase in our revenues, our business, financial condition and results of operations will be negatively affected.

### *Our expansion in the general merchandise business, the third-party marketplace and other businesses may lower our profit margins and subject us to new risks and challenges.*

We have focused on selling books online and we have gradually expanded the product offerings on our internet platform to include other media products and selected general merchandise categories in recent years. In 2009, we launched the *dangdang.com* marketplace program to allow third-party merchants to sell certain general merchandise products alongside our products. We launched our e-book platform to further enhance our customers' shopping experience in December 2011, and we currently offer approximately

300,000 book titles through the e-book platform. We intend to further capitalize on our relationships with publishers to develop original content and drive growth of our e-book business. We also intend to further expand bulk sales, a new business initiative we pursued in 2014, which allows our customers to order books and general merchandise in bulk from our website.

4

Our new businesses involve risks and challenges different from those of book retailing. For example, as we intend to continue to expand our e-book platform, we could face claims that we should be responsible for any infringement of third-party intellectual property rights as a result of digital content published on our e-book platform. See "—We may incur liability or become subject to administrative penalties for counterfeit or unauthorized products, or for products sold or content posted or published on our internet platform that infringes on third-party intellectual property rights, or for other misconduct" below. In addition, bulk sales of books and general merchandise generally have lower profit margins than retail sales.

Compared with book suppliers, general merchandise suppliers usually give us shorter periods of payment credit, which requires us to upgrade our internal finance and accounting functions to adjust to such expedited payment cycles. Such expedited payment cycles also exert pressure on our operating cash flow. In addition, general merchandise products typically come in different sizes and shapes and therefore require more flexible warehouse storage spaces and fulfillment capacity as compared to books. Furthermore, because of the variety of quality standards, shapes, sizes, colors and styles of many general merchandise products, such as electronics and apparel, it is more difficult for us to inspect and control the quality and ensure the proper handling of the general merchandise products sold on our internet platform. We anticipate that we may experience a higher rate of return for, or complaints regarding, such products. The sale of general merchandise products may also expose us to risks related to product defects or other quality problems, which may result in costly product liability claims against us and harm to our brand and reputation. Pursuant to the relevant PRC laws and regulations, customers who have purchased general merchandise products on our internet platform can seek indemnification from us for any damages caused by defective products that we sell. In addition, the relevant government authorities can initiate investigation, confiscate any products with quality problems or any illegal income generated from selling such products, impose penalties, or, in serious cases, suspend licenses of the parties involved. General merchandise products generally have lower profit margins than books and other media products and we may need to price aggressively to gain market share or remain competitive in this new business, which may further reduce our profit margins. We also face challenges to address changes in customer demands and preferences and the associated inventory risks.

***Our dangdang.com marketplace is subject to risks associated with third-party merchants.***

We launched our *dangdang.com* marketplace program in 2009. As of December 31, 2015, there were approximately 3,000 third-party merchants who offered and sold products through our marketplace. We do not have as much control over the storage and delivery of products sold on our marketplace as we do over the products that we sell directly ourselves. Most of our third-party merchants use their own storage and delivery systems to store their products and deliver to our customers, which makes it more difficult for us to ensure that our customers get the same high quality service for all products sold on our internet platform. If any third-party merchant does not control the quality of the products that it sells on our internet platform, or if it fails to deliver the products on time or at all or delivers products that are of inferior quality, or if it sells counterfeit or unlicensed products on our internet platform, and we fail to discover or prevent the misbehavior, the reputation of our marketplace and our *Dangdang* brand may be materially and adversely affected, and we could face claims that we should be held liable for any losses incurred by our customers. In the event that any third-party merchant does not have authorization from the relevant brands to sell certain products to us, those merchants may be prevented from selling products on our internet platform, which may adversely affect our business and results of operations. In such event, we may also need to establish new third-party merchant relationships to ensure that we have access to a steady supply of products on acceptable commercial terms, and if we fail to do so, it may limit our ability to offer sufficient products sought by our customers, or to offer these products at prices acceptable to our customers. Moreover, some products sold on our marketplace may compete with the products we sell directly, which may lead to a decrease in the sales of our own products. In addition, the supplier relationships, customer acquisition dynamics and working capital requirements for our marketplace may not be the same as those for our self-procurement operations, which may complicate the management of our business. In order for our marketplace to be successful, we must continue to identify and attract third-party merchants, and we may not be successful in this regard.

Furthermore, third-party merchants may engage in fictitious transactions with themselves or collaborators in order to artificially inflate their own ratings on our *dangdang.com* marketplace, reputation and search results rankings, which may in turn harm other sellers by enabling the perpetrating seller to be favored over legitimate sellers and may harm our customers by deceiving them into believing that a seller is more reliable, popular or trusted than the seller actually is. Although we have implemented procedures to detect and prevent fictitious transactions, and historically such transactions have not had a material impact on our business, we cannot assure you that we will be able to successfully prevent or detect fictitious transactions in the future or respond to such transactions in a timely manner, which may materially and adversely affect our reputation, business, results of operations and financial condition.

5

***If we are unable to manage our growth or execute our strategies effectively, our business and prospects may be materially and adversely affected.***

Our business has placed, and continues to place, significant strain on our management and resources. We anticipate that we will need to implement a variety of new and upgraded operational and financial systems, procedures and controls, including the improvement of our accounting and other internal management systems. We will also need to continue to expand, train, manage and motivate our workforce and manage our relationships with customers, suppliers, third-party service providers and third-party merchants. Our strategies also include broadening our product offerings, including general merchandise product offerings in particular, which will require us to introduce new product categories and work with different groups of suppliers and address the needs of different kinds of consumers. Given our relative unfamiliarity with many of these new product offerings, we may incur significant costs in trying to expand our offerings into these new product categories or fail to successfully execute the roll-out of these new product offerings. In addition, as part of our growth strategy, we plan to leverage our unique position in the publishing industry to develop original content and further expand our e-book business. We will also increase our investment in our mobile platform to further drive monetization, and strive to continue to increase customers and orders on our mobile platform. Furthermore, we intend to further expand product offerings of certain categories, such as fashion and apparel, baby, children and maternity products, and home and lifestyle products. To satisfy the growing needs of our customer base, we broadened our sales formats by launching a flash sales channel named *Weipinhui* in May 2013 through which we offer multiple categories of products. We intend to further expand bulk sales, a new business initiative we pursued in 2014, which allows our customers to order books and general merchandise products in bulk from our website. All of these endeavors involve risks, and will require substantial management effort and significant additional expenditures. We cannot assure you that we will be able to manage our growth or execute our strategies effectively, and any failure to do so may have a material adverse effect on our business and prospects.

***Our success depends on our ability to identify and respond to constantly changing consumer preferences.***

The e-commerce and retail industries are subject to changing consumer preferences. Consequently, we must stay abreast of emerging lifestyle and consumer trends and anticipate trends that will appeal to existing and potential customers. If our customers cannot find their desired products on our internet platform, they may stop purchasing products on our internet platform, stop visiting our internet platform or visit less often. If we do not anticipate, identify and respond effectively to consumer preferences or changes in consumer trends at an early stage, we may not be able to generate the desired level of sales. Such circumstances could materially and adversely affect our business, financial condition and results of operations.

***We face intense competition, and if we do not compete successfully against existing and new competitors, we may lose market share and customers.***

The online retail environment for our products is intensely competitive. Our current or potential competitors include: (i) other online retailers and e-commerce platform companies, such as Alibaba Group, which operates Taobao.com and Tmall.com, Amazon China, which operates Amazon.cn, JD.com, Inc., which operates JD.com, and Jumei; (ii) physical retailers, catalog retailers, publishers, distributors and manufacturers of our products, many of which possess significant brand recognition, sales volume and customer bases, and some of which currently sell, or in the future may sell, products or services through the internet; (iii) a number of indirect competitors, including internet portals and internet search engines that are involved in e-commerce, either directly or in collaboration with other retailers; and (iv) providers of electronic books and digital content. In addition, new and enhanced technologies may increase the competition in the B2C e-commerce market and the online retail industry in general. New competitive business models may appear, for example, based on new forms of social media and social commerce.

We face a variety of competitive challenges including: sourcing products efficiently; pricing our products competitively; maintaining the quality of the products sold on our internet platform; anticipating and quickly responding to changing customer demands; maintaining favorable brand recognition; providing quality services; ensuring the timely delivery of our products; and conducting strong and effective marketing activities. As we further develop our *dangdang.com* marketplace program, we also face increasing challenges to compete for and retain high quality third-party merchants. If we cannot properly address these challenges, our business and prospects would be materially and adversely affected.

Some of our current and potential competitors have significantly greater financial, marketing and other resources than we do, including having their own delivery systems. In addition, other online retailers may be acquired by, receive investment from or enter into strategic relationships with, well-established and well-financed companies or investors which would help enhance their competitive positions. Certain of our competitors may be able to secure merchandise from suppliers on more favorable terms, devote greater resources to marketing and promotional campaigns, adopt more aggressive pricing or inventory availability policies and devote substantially more resources to internet platform and system development than us. Increased competition may reduce our operating

margins, market share and brand recognition, or force us to incur losses. There can be no assurance that we will be able to compete successfully against current and future competitors, and competitive pressures may have a material adverse effect on our business, prospects, financial condition and results of operations.

6

*Uncertainties regarding the growth and sustained profitability of the retail industry in China in general, and online retail and B2C e-commerce in particular, could adversely affect our net revenues and business prospects.*

A majority of our net revenues are from online retail. While online retail has existed in China since the 1990s, the e-commerce industry in China is constantly evolving, and the long-term viability and prospects of various e-commerce business models, including the flash sales model, and e-commerce generally, in China remain relatively untested. Our future operating results will depend on numerous factors affecting the development of e-commerce in China, which may be beyond our control. These factors include:

- the growth of personal computer, smartphone, internet and broadband usage and penetration in China, and the rate of any such growth;

- the trust and confidence level of consumers in online shopping in China, as well as changes in customer demographics and consumers' tastes and preferences;

- the selection, price and popularity of products that we and our competitors offer on internet platforms;

- whether alternative retail channels or business models that better address the needs of consumers emerge in China;

- the development of fulfillment, payment and other ancillary services associated with online purchases; and

- general economic conditions, particularly economic conditions affecting discretionary consumer spending.

A decline in the popularity of shopping on the internet in general, or any failure by us to adapt our internet platform and improve the online shopping experience of our customers in response to trends and consumer requirements, will adversely affect our net revenues and business prospects.

*Our growth and profitability depend on the level of consumer confidence and spending in China.*

Our results of operations are sensitive to changes in overall economic and political conditions that impact consumer spending. The retail industry, in particular, is very sensitive to broad economic changes, and retail purchases tend to decline during recessionary periods. Substantially all of our net revenues are derived from retail sales in China. Many factors affecting the Chinese economy in general that are outside of our control, including volatility of stock markets and property markets, inflation and deflation, interest rates, tax rates and other government policies, and unemployment rates can adversely affect consumer confidence and spending, which could in turn materially and adversely affect our growth and profitability. Unfavorable developments in domestic and international political environments, including military conflicts, political turmoil and social instability, may also adversely affect consumer confidence and reduce spending, which could in turn materially and adversely affect our growth and profitability.

*The proper functioning of our internet platform is essential to our business and any failure to maintain the satisfactory performance, security and integrity of our internet platform will materially and adversely affect our business, reputation, financial condition and results of operations.*

The satisfactory performance, reliability and availability of our internet platform, our transaction-processing systems and our network infrastructure are critical to our success and our ability to attract and retain customers and maintain adequate customer service levels. Our net revenues depend on the number of visitors who shop on our internet platform and the volume of orders we fulfill. Any system interruptions caused by telecommunications failures, computer viruses, hacking or other attempts to harm our systems that result in the unavailability or slowdown of our internet platform or reduced order fulfillment performance would reduce the volume of products sold and the attractiveness of product offerings on our internet platform. Our servers and IT network may also be vulnerable to computer viruses, physical or electronic break-ins and similar disruptions, which could lead to interruptions, delays, loss of data or the inability to accept and fulfill customer orders. We may also experience interruptions caused by reasons beyond our control. There can be no assurance that such unexpected interruptions will not happen again, and future occurrences could damage our reputation and result in a material decrease in our revenues. As a result of security breaches and hacking attacks, confidential information of our customers may also be subject to the risk of loss, unauthorized access and misappropriation. See "—Failure to protect confidential information of our customers and our network against security breaches could damage our reputation and brand and substantially harm our business and results of operations" below.

7

We use internally developed systems for our internet platform and substantially all aspects of transaction processing, including order management, cash, debit card and credit card processing, purchasing, inventory management and shipping. We periodically upgrade and expand our systems, and in the future, we intend to further upgrade and expand our systems and to integrate newly developed or purchased software with our existing systems to support increased transaction volume. Any inability to add additional software and hardware or to develop and upgrade our existing technology, transaction-processing systems or network infrastructure to accommodate increased traffic on our internet platform or increased sales volume through our transaction-processing systems may cause unanticipated system disruptions, slower response time, degradation in levels of customer service and impaired quality and speed of order fulfillment, which would have a material adverse effect on our business, reputation, financial condition and results of operations.

***If we fail to manage our relationships with our suppliers, our business and prospects may suffer.***

We source our products from domestic Chinese publishers, manufacturers and distributors. We have strong relationships with a network of suppliers across China. For books and other media products, we have fostered long-term relationships with numerous suppliers, including some strategically important suppliers who, in some cases, give us exclusive rights to sell online certain popular or hard-to-find books and other media products within certain prescribed periods. As compared to our book suppliers, our relationships with general merchandise suppliers are relatively recent and still developing, and maintaining strong relationships with these suppliers is also important to the growth of our business. Maintaining good relationships with suppliers that compete with each other can be difficult. For example, suppliers of similar products may compete for desirable virtual shelf space or priority exposure of their products on our internet platform to our customer base. There can be no assurance that our current suppliers will continue to sell merchandise to us on terms acceptable to us, or that we will be able to establish new or extend current supplier relationships to ensure a steady supply of merchandise in a timely and cost-efficient manner. If we are unable to develop and maintain good relationships with suppliers, it may inhibit our ability to offer products demanded by our customers, or to offer them in sufficient quantities and at prices acceptable to them. In addition, if our suppliers cease to provide us with favorable pricing or payment terms or return policies, our working capital requirements may increase and our operations may be materially and adversely affected. Any breakdown in our supplier relationships, or a failure to timely resolve disputes with or complaints from our suppliers, could materially and adversely affect our business, prospects and results of operations.

***If we fail to successfully adopt new technologies or adapt our internet platform, systems and our mobile applications to customer requirements or emerging industry standards, our business, prospects and financial results may be materially and adversely affected.***

To remain competitive, we must continue to enhance and improve the responsiveness, functionality and features of our internet platform. The internet and the online retail industry are characterized by rapid technological evolution, changes in user requirements and preferences, frequent introductions of new products and services embodying new technologies and the emergence of new industry standards and practices that could render our existing proprietary technologies and systems obsolete. Our success will depend, in part, on our ability to identify, develop, acquire or license leading technologies useful in our business, enhance our existing services, develop new services and technologies that address the increasingly sophisticated and varied needs of our existing and prospective customers, and respond to technological advances and emerging industry standards and practices on a cost-effective and timely basis.

Usage and consumption of digital content are increasingly shifting to mobile devices such as smartphones, tablets and other portable devices. We believe that the growth of our business depends in part on our ability to continue to drive monetization, and increase customers and orders, on our mobile platform. In the three months ended December 31, 2015, the number of mobile orders accounted for more than 45% of our total orders. In order to deliver a high quality mobile shopping experience, it is important that our mobile applications may need to interface with other mobile applications, and integrate with a range of mobile technologies, systems, networks and standards that we do not control. For example, we may not be successful in developing technologies with key participants in the mobile industry, or in developing mobile applications and technologies that operate effectively with mobile operating systems, technologies, networks or standards. In addition, key participants in the mobile industry, such as mobile application stores, may change their policies from time to time, as a result of which our mobile applications may not continue to be accessible to our customers.

The development of website, mobile applications and other proprietary technology entails significant technical and business risks. There can be no assurance that we will be able to use new technologies effectively or adapt our internet platform, proprietary technologies and transaction-processing systems to customer requirements or emerging industry standards. If we are unable to adapt in a cost-effective and timely manner in response to changing market conditions or customer requirements, whether for technical, legal,

financial or other reasons, our business, prospects, financial condition and results of operations would be materially and adversely affected.

8

*In order to deliver a high quality experience, any interruption in the operation of our data centers or logistics centers for an extended period may have an adverse impact on our business.*

Our ability to process and fulfill orders accurately and provide high-quality customer service depends on the efficient and uninterrupted operation of our data centers and logistics centers. Our data centers and logistics centers may be vulnerable to damage caused by fire, flood, power loss, telecommunications failure, break-ins, earthquake, human error and other events. In addition, we currently only have limited back-up systems and do not carry business interruption insurance to compensate for losses that may occur. The occurrence of any of the foregoing risks could have a material adverse effect on our business, prospects, financial condition and results of operations.

*Failure to protect confidential information of our customers and our network against security breaches could damage our reputation and brand and substantially harm our business and results of operations.*

A significant challenge to online commerce and communications is the secure transmission of confidential information over public networks. Currently, all product orders and, in some cases, payments for products we offer, are made through our internet platform. In addition, some online payments for our products are settled through third-party online payment services. In such transactions, maintaining complete security for the transmission of confidential information on our internet platform, such as customers' credit card numbers and expiration dates, personal information and billing addresses, is essential to maintain consumer confidence. We have limited influence over the security measures of third-party online payment service providers. In addition, we hold certain private information about our customers, such as their names, addresses, phone numbers and browsing and purchasing records.

Security breaches, computer viruses and hacking attacks have become more prevalent in the e-commerce industry. We have experienced in the past, and may experience in the future, security breaches and attacks, which could lead to interruptions, delays, loss of data or of personal or private information belonging to our customers or third-party merchants stored in our system, or the inability to accept and fulfill customer orders, although these breaches and attacks have not had a material adverse effect on our business or operating results in the past. We can provide no assurance that our current security mechanisms will be sufficient to protect our IT systems from any third-party intrusions, viruses or hacker attacks, information or data theft, break-ins or other similar activities. In addition, our third-party merchants and delivery service providers may violate their confidentiality obligations and disclose information about our customers. Any such future occurrences could cause losses to us, our customers or third-party merchants, reduce customer satisfaction, damage our reputation and result in a significant decrease in our net revenues, which could have a material adverse effect on our reputation, business, prospects, financial condition and results of operations.

In addition, additional capital and other resources may be required to protect against security breaches or to alleviate problems caused by such breaches. The methods used by hackers and others engaged in online criminal activity are increasingly sophisticated and constantly evolving. Even if we are successful in adapting to and preventing new security breaches, any perception by the public that online commerce and transactions, or the privacy of user information, are becoming increasingly unsafe or vulnerable to attack could inhibit the growth of e-commerce and other online services generally, which in turn may materially and adversely affect our business and results of operations.

*We depend on numerous third-party delivery service providers to deliver our products, and their failure to provide high-quality delivery services to our customers may negatively impact the shopping experience of our customers, damage our market reputation and materially and adversely affect our business and results of operations.*

We currently use a network of regional third-party inter-city transportation companies and local third-party courier companies to deliver parcels to our customers. For customers in remote areas not covered by our delivery network, we use China's postal services to deliver our products. Interacting with and coordinating the activities of so many delivery companies is complicated. Interruptions to or failures in these third parties' shipping services could prevent the timely or successful delivery of our products. These interruptions may be due to unforeseen events that are beyond our control or the control of these third-party delivery companies, such as inclement weather, natural disasters or labor unrest. In addition, in response to competition or for promotional purposes, we may from time to time promise even shorter delivery time to our customers, which will put increased pressure on our delivery network. If our products are not delivered on time or are delivered in a damaged state, customers may refuse to accept our products and have less confidence in our services. Thus, we may lose customers, and our financial condition and market reputation could suffer. In addition, as local courier companies tend to be small companies with limited capital resources, they may be more likely to go bankrupt, close down or encounter financial difficulties, in which case we may not be able to retrieve our products in their possession, arrange for delivery of those products by an alternative carrier, receive the payments the courier companies collect for us, or hold them accountable for the losses they cause us. Although the courier companies are generally required to provide cash deposits or payment guarantees to us before we let them provide services for us, such security may not be sufficient to cover the risks to which we are exposed. In addition, if the

courier companies cease to provide cash deposits to us or significantly reduce the amounts of such deposits, our working capital requirements may increase and our operating cash flow may be materially and adversely affected. We also expect gradual consolidation in the logistics industry, and we may experience disruption to our delivery network in areas covered by the companies undergoing acquisitions or integration, or we may experience difficulty in negotiating favorable terms with such companies. The occurrence of any of these problems, alone or together, could damage our reputation and materially and adversely affect our business and results of operations.

9

---

***The wide variety of payment methods that we accept subject us to third-party payment processing-related risks.***

We accept payments using a variety of methods, including cash-on-delivery, online payment with credit cards and debit cards issued by major banks in China, payment through third-party online payment platforms, wire transfer and postal remittance. For certain payment methods, including credit and debit cards, we pay interchange and other fees, which may increase over time and raise our operating costs and lower our profit margins. We may also be subject to fraud and other illegal activities in connection with the various payment methods we offer, including online payment and cash-on-delivery options. We also rely on third parties to provide payment processing services. We currently use a network of regional third-party inter-city transportation companies and local third-party courier companies to deliver parcels to our customers. Given that customers place their orders online but often choose the cash-on-delivery option, the delivery personnel of our contracted third-party couriers collect payments on behalf, and we require the contracted third-party couriers to remit the payment collected to us. If these companies fail to remit the payment collected to us in a timely fashion or at all, if they become unwilling or unable to provide these services to us, or if their service quality deteriorates, our business could be disrupted. We are also subject to various rules, regulations and requirements, regulatory or otherwise, governing electronic funds transfers, which could change or be reinterpreted to make it difficult or impossible for us to comply. If we fail to comply with these rules or requirements, we may be subject to fines and higher transaction fees and lose our ability to accept credit and debit card payments from our customers, process electronic funds transfers or facilitate other types of online payments, and our business, financial condition and results of operations could be materially and adversely affected.

***Our legal right to lease certain properties could be challenged by property owners or other third parties, which may cause interruptions to our business operations.***

We lease all of the premises used for our offices, warehouses and data centers, except that we own a warehouse in Tianjin that is currently being put into use. Some of our lessors have not been able to provide the relevant housing ownership certificates for the properties leased by us. In particular, four of our warehouses are located on collectively-owned land or military land, and the lessors have not been able to provide the relevant title certificates and approvals in relation to the leases, including the approvals from the military authorities or collective members. None of our leases of the properties has been filed for registration with the relevant government authorities, as required under PRC law. In addition, two of our leased premises were mortgaged by the owners before we entered into lease agreements with them. As of the date of this annual report, we are not aware of any actions, claims or investigations being contemplated by the competent government authorities with respect to the defects in our leased real properties or any challenges by third parties to our use of these properties. However, if third parties who purport to be property owners or beneficiaries of the mortgaged properties challenge our right to lease these properties, we may not be able to protect our leasehold interest and may be ordered to vacate the affected premises, which could in turn materially and adversely affect our business operations and results of operations.

***Failure to renew our current leases or locate desirable alternatives for our facilities could materially and adversely affect our business.***

All of our offices, warehouses and data centers are presently located on leased premises, except for a warehouse in Tianjin. At the end of each lease term, we may not be able to negotiate an extension of the lease and may therefore be forced to move to a different location, or the rent we pay may increase significantly. This could disrupt our operations and adversely affect our profitability. A number of our leases will expire in the near future and are subject to renewal at market prices, which could result in a substantial increase in the rent at the time of renewal. We compete with other businesses for premises at certain locations or of desirable sizes and some landlords may have entered into long-term leases with our competitors for such premises. As a result, we may not be able to obtain new leases at desirable locations or renew our existing leases on acceptable terms or at all, which could materially and adversely affect our business.

***We plan to expand our logistics center and distribution network. If we are not able to manage such expansion successfully, our growth potential, results of operations and business could be materially and adversely affected.***

We believe our strategically located central and regional logistics centers and our extensive distribution network are essential to our success. We completed the main parts of the construction of a warehouse in Tianjin, which is currently being put in use, and have been renovating some other warehouses. We cannot assure you that we will be able to lease suitable facilities at commercially acceptable terms in accordance with our expansion plan. In addition, the expansion of our logistics centers and distribution network will put pressure on our managerial, financial, operational and other resources. If we are unable to secure new facilities or effectively manage our expanded logistics operations and control increasing costs, our growth potential, results of operations and business could be materially and adversely affected.

*We may incur liability or become subject to administrative penalties for counterfeit or unauthorized products, or for products sold or content posted or published on our internet platform that infringes on third-party intellectual property rights, or for other misconduct.*

We sourced our products approximately 3,500 suppliers across China as of December 31, 2015. In connection with our *dangdang.com* marketplace program, third-party merchants are separately responsible for sourcing the products they sell on our internet platform. As of December 31, 2015, we had approximately 3,000 third-party merchants on our *dangdang.com* marketplace. Although we have adopted measures to verify the authenticity and authorization of products sold on our internet platform and minimize potential infringement of third-party intellectual property rights in the course of sourcing and selling products, we may not always be successful.

In the event that counterfeit, unauthorized or infringing products are sold on our internet platform, or infringing content is posted on our internet platform or published on our e-book platform, we could face claims that we should be held liable for selling counterfeit or unauthorized products or infringing on others' intellectual property rights. We have in the past received many intellectual property infringement claims, none of which have had a material adverse effect on our business or financial condition. Irrespective of the validity of such claims, we may incur significant costs and efforts in either defending against or settling such claims. If there is a successful claim against us, we might be required to pay substantial damages or refrain from further sale of the relevant products or provision of the relevant content. Potential liability under PRC law if we negligently participated or assisted in infringement activities associated with counterfeit or infringing goods or digital content includes injunctions to cease infringing activities, rectification, compensation, administrative penalties or even criminal liability. Moreover, regardless of whether we successfully defend against such claims, our reputation could be severely damaged by such third-party claims or administrative penalties. Any of these events could have a material adverse effect on our business, results of operations or financial condition.

Under our agreements with suppliers and third-party merchants, we require our suppliers or third-party merchants to indemnify us for any losses we suffer or any costs that we incur due to any products we source from such suppliers or any products sold by third-party merchants. However, not all of our agreements with suppliers and third-party merchants have such terms, and for those agreements that have such terms, we may not be able to successfully enforce our contractual rights and may need to initiate costly and lengthy legal proceedings in China to protect our rights. See "—Risks Related to Doing Business in China—Uncertainties in the interpretation and enforcement of Chinese laws and regulations could limit the legal protections available to you and us."

*Our business depends substantially on the continued efforts of our executive officers and our business may be severely disrupted if we lose their services.*

Our future success depends substantially on the continued efforts of our executive officers named in this annual report. If one or more of our executive officers were unable or unwilling to continue their employment with us, we might not be able to replace them easily, in a timely manner, or at all, and our business may be severely disrupted and our financial condition and results of operations may be materially and adversely affected. Competition for experienced management personnel is intense, the pool of qualified candidates is limited, and we may not be able to retain the services of our senior executives or key personnel or attract and retain high-quality senior executives or key personnel in the future. We may also incur additional expenses to recruit and retain qualified replacements. If any of our executive officers joins a competitor or forms a competing company, we may lose customers, suppliers, know-how and other personnel. Each of our executive officers has entered into an employment agreement with us, which contains non-compete provisions. However, if any dispute arises between our executive officers and us, we cannot assure you that we would be able to enforce these non-compete provisions in China, where these executive officers reside, in light of uncertainties with China's legal system. See "—Risks Related to Doing Business in China—Uncertainties in the interpretation and enforcement of Chinese laws and regulations could limit the legal protections available to you and us."

*If we are unable to attract, train and retain qualified personnel, our business may be materially and adversely affected.*

Our future success depends, to a significant extent, on our ability to attract, train and retain qualified personnel, particularly management, technical and marketing personnel with expertise in the e-commerce industry. Since our industry is characterized by high demand and intense competition for talent and labor, there can be no assurance that we will be able to attract or retain qualified staff or other highly skilled employees that we will need to achieve our strategic objectives. Our fulfillment operations are labor intensive and require a substantial number of blue-collar workers, and these positions tend to have higher than average turnover. We have observed an overall tightening of the labor market and an emerging trend of shortage of labor supply. Failure to obtain stable and dedicated warehousing, delivery and other labor support may lead to underperformance of these functions and cause disruption to our business. Labor costs in China have increased with China's economic development, particularly in the large cities where we operate our

fulfillment centers. In addition, our ability to train and integrate new employees into our operations may not meet the growing demands of our business. If we are unable to attract, train and retain qualified personnel, our business may be materially and adversely affected.

11

*Our existing shareholders have substantial influence over our company and their interests may not be aligned with the interests of our other shareholders.*

As of February 29, 2016, the most recent practicable date, our co-founders and directors, Mr. Guoqing Li and Ms. Peggy Yu Yu, who are husband and wife, together beneficially own an aggregate of 36.3% of our outstanding shares, representing 83.7% of the total voting power of our outstanding common shares, including shares that they had the right to acquire within 60 days. See "Item 6. Directors, Senior Management and Employees—E. Share Ownership." As a result, Mr. Li and Ms. Yu have substantial influence over our business, including decisions regarding mergers, consolidations and the sale of all or substantially all of our assets, election of directors and other significant corporate actions. They may take actions that are not in the best interest of us or our other shareholders. This concentration of ownership may discourage, delay or prevent a change in control of our company, which could deprive our shareholders of an opportunity to receive a premium for their shares as part of a sale of our company and may reduce the price of our ADSs. These actions may be taken even if they are opposed by our other shareholders, including those who purchase ADSs in our initial public offering and the public market. For more information regarding our principal shareholders and their affiliated entities, see "Item 7. Major Shareholders and Related Party Transactions."

*We may not be able to prevent others from unauthorized use of our intellectual property, which could harm our business and competitive position.*

We regard our trademarks, service marks, domain names, trade secrets, proprietary technologies and similar intellectual property as critical to our success, and we rely on trademark law, trade secret protection and confidentiality and license agreements with our employees, suppliers, partners and others to protect our proprietary rights. As of February 29, 2016, we had registered 119 domain names, including *dangdang.com*, *dangdang.com*.cn and *dangdang.cn*, one patent and 83 trademarks and service marks, and had 162 trademark applications pending in China. Our trademarks and service marks may be invalidated, circumvented or challenged. Trade secrets are difficult to protect, and our trade secrets may be leaked or otherwise become known or be independently discovered by competitors. Confidentiality agreements may be breached, and we may not have adequate remedies for any breach.

It is often difficult to create and enforce intellectual property rights in China. Even where adequate laws exist in China, it may not be possible to obtain swift and equitable enforcement of such laws, or to obtain enforcement of a court judgment or an arbitration award delivered in another jurisdiction, and accordingly, we may not be able to effectively protect our intellectual property rights or enforce agreements in China. Policing any unauthorized use of our intellectual property is difficult and costly and the steps we have taken may be inadequate to prevent the misappropriation of our technologies.

*We incur significant costs on a variety of marketing efforts designed to increase sales of our products and some marketing campaigns and methods may turn out to be ineffective.*

We rely on a variety of different marketing efforts tailored to our targeted customers to increase sales of our products, including affiliate marketing programs, TV advertisements and other marketing channels. Our marketing activities, which often involve significant costs, may not be well received by customers and may not result in the levels of product sales that we anticipate. Marketing approaches and tools in the consumer products market in China are evolving. This further requires us to enhance our marketing approaches and experiment with new marketing methods to keep pace with industry developments and customer preferences. Failure to refine our existing marketing approaches or to introduce new effective marketing approaches in a cost-effective manner could reduce our market share, cause our net revenues to decline and negatively impact our profitability.

*Our results of operations are subject to quarterly fluctuations due to a number of factors that could adversely affect our business and the trading price of our ADSs.*

We experience seasonality in our business, reflecting a combination of seasonal fluctuations in internet usage and traditional retail seasonality patterns. We generally experience less user traffic and acquire fewer customers during national holidays in China, in particular during the first quarter of each year due to the slow-down of businesses during the Chinese New Year holiday season that effectively lasts more than half a month. Furthermore, sales in the traditional retail industry are significantly higher in the fourth quarter of each calendar year than in the preceding three quarters.

Due to the foregoing factors, our operating results in one or more future quarters may fall below the expectations of securities analysts and investors. In such event, the trading price of our ADSs may be materially and adversely affected.

12

*Future strategic alliances or acquisitions may have a material adverse effect on our business, reputation and results of operations.*

We may in the future enter into strategic alliances with various third parties. Strategic alliances with third parties could subject us to a number of risks, including risks associated with sharing proprietary information, non-performance by the counter-party, and an increase in expenses incurred in establishing new strategic alliances, any of which may materially and adversely affect our business. We may have little ability to control or monitor their actions. To the extent strategic third parties suffer negative publicity or harm to their reputation from events relating to their business, we may also suffer negative publicity or harm to our reputation by virtue of our association with such third parties. Moreover, we may seek independent financing for certain of our business units, such as our e-book platform, to fund their expansion and growth. These financing efforts could be expensive and time consuming, distract our management from other responsibilities and growing our company as a whole, and disrupt our ongoing business.

In addition, although we have no current acquisition plans, if we are presented with appropriate opportunities, we may acquire additional assets, products, technologies or businesses that are complementary to our existing business. Future acquisitions and the subsequent integration of new assets and businesses into our own would require significant attention from our management and could result in a diversion of resources from our existing business, which in turn could have an adverse effect on our business operations. Acquired assets or businesses may not generate the financial results we expect. In addition, acquisitions could result in the use of substantial amounts of cash, potentially dilutive issuances of equity securities, the occurrence of significant goodwill impairment charges, amortization expenses for other intangible assets and exposure to potential unknown liabilities of the acquired business. Moreover, the costs of identifying and consummating acquisitions may be significant. In addition to possible shareholders' approval, we may also have to obtain approvals and licenses from the relevant government authorities in the PRC for the acquisitions and to comply with any applicable PRC laws and regulations, which could result in increased costs and delay.

*We may suffer losses if we are unable to efficiently manage our inventory risks.*

We must anticipate the popularity of products and purchase them before selling them to our customers. Under some of our current supply agreements, we enjoy flexible policies for returning the unsold items to our suppliers. In order to secure more favorable business terms, we have entered into and plan to continue to enter into purchase arrangements with our suppliers with more restrictive return policies. For example, some of our contracts with suppliers contain restrictions on our ability to return products, such as caps on the amount of products that can be returned, and we may lose preferential pricing terms for such products if we exceed these caps, which could materially affect our profit margins. In addition, under these arrangements, we will also incur increased inventory risks if we are unable to return unsold products to our suppliers. If we are unable to correctly predict demand for the products that we are committed to purchase, we will be responsible for covering the cost of the products that we are unable to sell, and our financial condition and results of operations would be adversely affected.

*Failure to maintain effective internal controls over financial reporting could cause us to inaccurately report our financial result or fail to prevent fraud and have a material and adverse effect on our business, results of operations and the trading price of our ADSs.*

We are subject to the reporting obligations under U.S. securities laws. Section 404 of the Sarbanes-Oxley Act of 2002 and related rules require public companies to include a report of management on their internal control over financial reporting in their annual reports. This report must contain an assessment by management of the effectiveness of a public company's internal control over financial reporting. In addition, an independent registered public accounting firm for a public company must attest to and report on the effectiveness of the company's internal control over financial reporting. Our efforts to implement standardized internal control procedures and develop the internal tests necessary to verify the proper application of the internal control procedures and their effectiveness are a key area of focus for our board of directors, our audit committee and senior management.

In connection with the evaluation of our internal control over financial reporting as of December 31, 2014, our management identified a "material weakness" comprising design deficiencies in our internal control over the revenue process of bulk sales to ensure that revenue was only recognized when all revenue recognition criteria were met. In 2015, we have made enhancements to our internal controls over financial reporting. See "Part II—Item 15. Controls and Procedures.—Remediation and Changes in Internal Control Over Financial Reporting." Based on these actions taken and our testing and evaluation of our internal controls, our management has concluded that the material weakness no longer existed as of December 31, 2015.

However, although our management concluded our internal control over financial reporting was effective as of December 31, 2015 and our independent registered public accounting firm has issued an attestation report, which concludes that our internal control over financial reporting was effective in all material aspects as of December 31, 2015, we cannot assure that we will maintain effective

internal control over financial reporting on an ongoing basis. If we fail to maintain effective internal control over financial reporting in the future, our management and our independent registered public accounting firm may not be able to conclude that we have effective internal control over financial reporting at a reasonable assurance level. Moreover, effective internal controls over financial reporting are necessary for us to produce reliable financial reports and are important to help prevent fraud. As a result, any failure to maintain effective internal controls over financial reporting could in turn result in the loss of investor confidence in the reliability of our financial statements and negatively impact the trading price of our ADSs. Furthermore, we have incurred and anticipate that we will continue to incur considerable costs, management time and other resources in an effort to continue to comply with Section 404 and other requirements of the Sarbanes-Oxley Act.

13

---

*We may need additional capital, and the sale of additional ADSs or other equity securities could result in additional dilution to our shareholders.*

We believe that our current cash and cash equivalents, time deposits and anticipated cash flows from operations will be sufficient to meet our anticipated working capital requirements and capital expenditures in the coming year. We may, however, require additional cash resources due to changed business conditions or other future developments, including any investments or acquisitions we may decide to pursue. If these resources are insufficient to satisfy our cash requirements, we may seek to sell additional equity or debt securities or obtain a credit facility. The sale of additional equity securities could result in additional dilution to our shareholders. The incurrence of indebtedness would result in increased debt service obligations and could result in operating and financing covenants that would restrict our operations. It is uncertain whether financing will be available in amounts or on terms acceptable to us, if at all.

*Our revenues and financial results may be adversely affected by any economic slowdown in China as well as globally.*

The success of our business ultimately depends on consumer spending. We derive substantially all of our revenues from China. As a result, our revenues and financial results are impacted to a significant extent by economic conditions in China and globally, as well as economic conditions specific to online retail. The global economy, markets and levels of consumer spending are influenced by many factors beyond our control, including consumer perception of current and future economic conditions, political uncertainty, levels of employment, inflation or deflation, real disposable income, interest rates, taxation and currency exchange rates. The PRC government has in recent years implemented a number of measures to control the rate of economic growth, which have contributed to a slowdown of the PRC economy. The growth of the Chinese economy has slowed since 2012 and such slowdown may continue. According to the National Bureau of Statistics of China, China's gross domestic product growth slowed to 6.9% in 2015. Any continuing or worsening slowdown could significantly reduce domestic commerce in China, including through the internet generally and through us. An economic downturn, whether actual or perceived, a further decrease in economic growth rates or an otherwise uncertain economic outlook in China or any other market in which we may operate could have a material adverse effect on our business, financial condition and results of operations.

*We have limited insurance coverage and may incur losses resulting from product liability claims or business interruptions.*

As the insurance industry in China is still in an early stage of development, insurance companies in China currently offer limited business insurance products. We do not have any product liability insurance or business interruption insurance. As we continue to expand our general merchandise product offerings, we may be increasingly exposed to product liability claims related to product defects in the design or manufacture of such general merchandise. Any product liability claims or business disruption, natural disaster could result in our incurring substantial costs and diversion of resources, which would have an adverse effect on our business and results of operations.

## Risks Related to Our Corporate Structure and Restrictions on Our Industry

*Substantial uncertainties and restrictions exist with respect to the interpretation and application of PRC laws and regulations relating to online commerce and the distribution of internet content in China. If the PRC government finds that the structure we have adopted for our business operation does not comply with PRC laws and regulations, we could be subject to severe penalties, including the shutting down of our internet platform.*

Foreign ownership of internet-based businesses is subject to significant restrictions under current PRC laws and regulations. The PRC government regulates internet access, the distribution of online information and the conduct of online commerce through strict business licensing requirements and other government regulations. These laws and regulations also include limitations on foreign ownership in PRC companies that provide internet content distribution services. Specifically, foreign investors are not allowed to own more than 50% of the equity interests in any entity conducting an internet content distribution business.

We are a Cayman Islands company and our PRC subsidiary, Beijing Dangdang Information Technology Co., Ltd., or Dangdang Information, is considered a foreign-invested enterprise. To comply with PRC laws and regulations, we conduct our operations in China through a series of contractual arrangements entered into between our PRC subsidiary, Dangdang Information, our affiliated PRC entity, Beijing Dangdang Kewen E-Commerce Co., Ltd., or Dangdang Kewen, and Dangdang Kewen's shareholders. Our affiliated PRC entity and its subsidiaries hold the licenses that are essential to the operation of our business. For a detailed description of these licenses and permits, see "Item 4. Information on the Company—B. Business Overview—PRC Regulation." Dangdang Kewen is a PRC limited liability company 50% owned by Mr. Guoqing Li and 50% owned by Ms. Peggy Yu Yu, husband and wife, both of whom are major shareholders, co-founders and directors of our company, and PRC citizens. As a result of these contractual arrangements, we exert control over Dangdang Kewen and consolidate its operating results in our financial statements

under U.S. GAAP. For a detailed description of these contractual arrangements, see "Item 4. Information on the Company—C. Organizational Structure." In 2013, 2014 and 2015, Dangdang Kewen and its subsidiaries contributed in aggregate 4.9%, 4.2% and 3.2%, respectively, of our consolidated net revenues.

14

In the opinion of Beijing DHH Law Firm, our PRC legal counsel, our current ownership structure and the ownership structure of our PRC subsidiary and our affiliated PRC entity are in compliance with existing PRC laws and regulations, and each of the control agreements under the contractual arrangements between our PRC subsidiary, our affiliated PRC entity and its shareholders, as described in this annual report, are valid, binding and enforceable in accordance with their respective terms based on currently effective PRC laws and regulations, and will not result in any violation of PRC laws or regulations currently in effect. There are, however, substantial uncertainties regarding the interpretation and application of current or future PRC laws and regulations. Accordingly, there can be no assurance that the PRC regulatory authorities will not in the future take a view that is contrary to the opinion of our PRC legal counsel.

If our ownership structure, contractual arrangements and businesses of our company, our PRC subsidiaries, or our affiliated PRC entity and its subsidiaries are found to be in violation of any existing or future PRC laws or regulations, the relevant governmental authorities would have broad discretion in dealing with such violation, including levying fines, confiscating our income or the income of our PRC subsidiaries or our affiliated PRC entity and its subsidiaries, revoking the business licenses or operating licenses of our PRC subsidiaries or our affiliated PRC entity and its subsidiaries, shutting down our servers or blocking our internet platform, discontinuing or placing restrictions or onerous conditions on our operations, requiring us to undergo a costly and disruptive restructuring, and taking other regulatory or enforcement actions that could be harmful to our business. Any of these actions could cause significant disruption to our business operations and severely damage our reputation, which would in turn materially and adversely affect our business, financial condition and results of operations. If any of these penalties results in our inability to direct the activities of Dangdang Kewen that most significantly impact its economic performance, and/or our failure to receive the economic benefits from Dangdang Kewen, we may not be able to consolidate the entity in our consolidated financial statements in accordance with U.S. GAAP.

***We rely on contractual arrangements with our affiliated PRC entity and its shareholders for the operation of our business, which may not be as effective as direct ownership.***

Because of PRC restrictions on foreign ownership ratio of internet-based businesses in China, we depend on contractual arrangements with our affiliated PRC entity, Dangdang Kewen, in which we have no ownership interest, to engage in the online retailing business. These contractual arrangements are intended to provide us with effective control over this entity and allow us to obtain economic benefits from it. Although we believe that these contractual arrangements are valid, binding and enforceable under current PRC laws, these contractual arrangements may not be as effective in providing control as direct ownership. For example, Dangdang Kewen and its shareholders could breach their contractual arrangements with us by, among other things, failing to operate our online retailing business in an acceptable manner or taking other actions that are detrimental to our interests. If we were the controlling shareholder of Dangdang Kewen with direct ownership, we would be able to exercise our rights as shareholders to effect changes to its board of directors, which in turn could implement changes at the management and operational level. However, under the current contractual arrangements, as a legal matter, if Dangdang Kewen or its shareholders fail to perform their obligations under these contractual arrangements, we may have to incur substantial costs to enforce such arrangements, and rely on legal remedies under PRC law, including seeking specific performance or injunctive relief and claiming damages, which may not be effective. All of these contractual arrangements are governed by PRC law and provide for the resolution of disputes through arbitration in the PRC. Accordingly, these agreements would be interpreted in accordance with PRC law and any disputes would be resolved in accordance with PRC legal procedures. The legal system in PRC is not as developed as in other jurisdictions, such as the United States. As a result, uncertainties in the PRC legal system could limit our ability to enforce the contractual arrangements. Under PRC law, rulings by arbitrators are final, parties cannot appeal the arbitration results in courts, and prevailing parties may only enforce the arbitration awards in PRC courts through arbitration award recognition proceedings, which would incur additional expenses and delay. In addition, since each of the two shareholders of Dangdang Kewen holds a 50% interest in it, any conflict between them as to Dangdang Kewen's operations would result in a deadlock that may be detrimental to our business.

If we are unable to enforce these contractual arrangements, or if we suffer significant delay or other obstacles in the process of enforcing these contractual arrangements, our business and operations could be severely disrupted, which could materially and adversely affect our results of operations and damage our reputation. See "—Risks Related to Doing Business in China—Uncertainties in the interpretation and enforcement of Chinese laws and regulations could limit the legal protections available to you and us." In the event we are unable to enforce the contractual arrangements, we may not be able to have the power to direct the activities that most significantly affect the economic performance of Dangdang Kewen, and our ability to conduct our business may be negatively affected, and we may not be able to consolidate the financial results of Dangdang Kewen into our consolidated financial statements in accordance with U.S. GAAP.

15

***The shareholders of our affiliated PRC entity have potential conflicts of interest with us, which may adversely affect our business.***

Mr. Guoqing Li and Ms. Peggy Yu Yu are husband and wife, and co-founders and directors of our company. They are also the shareholders of our affiliated PRC entity, Dangdang Kewen, each holding 50% in such entity. Thus, conflicts of interest between their duties to our company and their interests as the controlling shareholders of our affiliated PRC entity may arise. We cannot assure you that they will act entirely in our interests when conflicts of interest arise or that conflicts of interest will be resolved in our favor. In addition, Mr. Li and Ms. Yu could violate their non-competition or employment agreements with us or their legal duties by diverting business opportunities from us, resulting in our loss of corporate opportunities. If we are unable to resolve any such conflicts, or if we suffer significant delays or other obstacles as a result of such conflicts, our business and operations could be severely disrupted, which could materially and adversely affect our results of operations and damage our reputation. See "—Risks Related to Doing Business in China—Uncertainties in the interpretation and enforcement of Chinese laws and regulations could limit the legal protections available to you and us."

***We may lose the ability to use and enjoy assets held by our affiliated PRC entity and its subsidiaries that are important to the operation of our business if they go bankrupt or become subject to a dissolution or liquidation proceeding.***

As part of our contractual arrangements with our affiliated PRC entity, Dangdang Kewen, it holds certain assets that are important to the operation of our business. Some of these assets are held by Dangdang Kewen's subsidiary, Wuxi Dangdang Kewen E-Commerce Co., Ltd., or Wuxi Dangdang Kewen. If our affiliated PRC entity or its subsidiaries go bankrupt and all or part of their assets become subject to liens or rights of third-party creditors, we may be unable to continue some or all of our business activities, which could materially and adversely affect our business, financial condition and results of operations. If our affiliated PRC entity or its subsidiaries undergo a voluntary or involuntary liquidation proceeding, the unrelated third-party creditors may claim rights to some or all of these assets, thereby hindering our ability to operate our business, which could materially and adversely affect our business, financial condition and results of operations.

***Our contractual arrangements with Dangdang Kewen may result in adverse tax consequences to us.***

As a result of our corporate structure and the contractual arrangements between us and our affiliated PRC entity, Dangdang Kewen, we are effectively subject to the 5% PRC business tax, or 6% value-added tax, on net revenues derived from our contractual arrangements with Dangdang Kewen. We may be subject to adverse tax consequences if the PRC tax authorities were to determine that the contracts between us and Dangdang Kewen were not on an arm's length basis and therefore constitute a favorable transfer pricing arrangements. If this occurs, the PRC tax authorities could request that Dangdang Kewen adjust its taxable income, if any, upward for PRC tax purposes. Such a pricing adjustment could adversely affect us by increasing Dangdang Kewen's tax expenses without reducing our tax expenses, which could subject Dangdang Kewen to late payment fees and other penalties for underpayment of taxes. The PRC Enterprise Income Tax Law requires every enterprise in China to submit its annual enterprise income tax return together with a report on transactions with its related parties to the relevant tax authorities. The tax authorities may impose reasonable adjustments on taxation if they have identified any related party transactions that are inconsistent with arm's length principles. As a result, our contractual arrangements with Dangdang Kewen may result in adverse tax consequences to us. If the PRC tax authorities decide to make transfer pricing adjustments on its net income, our consolidated net income may be adversely affected.

***If our affiliated PRC entity and its subsidiaries fail to obtain and maintain the requisite assets, licenses and approvals required under the complex regulatory environment for internet-based businesses in China, our business, financial condition and results of operations may be materially and adversely affected.***

The internet industry in China is highly regulated by the PRC government and numerous regulatory authorities of the central PRC government are empowered to issue and implement regulations governing various aspects of the internet industry. See "Item 4. Information on the Company—B. Business Overview—PRC Regulation." Our affiliated PRC entity and its subsidiaries are required to obtain and maintain certain assets relevant to its business as well as applicable licenses or approvals from different regulatory authorities in order to provide its current services. These assets and licenses are essential to the operation of our business and are generally subject to annual review by the relevant governmental authorities. Furthermore, our affiliated PRC entity and its subsidiaries may be required to obtain additional licenses. If they fail to obtain or maintain any of the required, assets, licenses or approvals, their continued business operations in the internet industry may subject it to various penalties, such as confiscation of illegal net revenues, fines and the discontinuation or restriction of their operations. Any such disruption in the business operations of our affiliated PRC entity and its subsidiaries will materially and adversely affect our business, financial condition and results of operations.

***The draft PRC Foreign Investment Law, if enacted as proposed, may materially impact the viability of our current corporate structure, corporate governance, business operations and financial results.***

The Ministry of Commerce, or the MOC, published a discussion draft of the proposed Foreign Investment Law in January 2015 aiming to, upon its enactment, replace the trio of existing laws regulating foreign investment in China, namely, the Sino-foreign Equity Joint Venture Enterprise Law, the Sino-foreign Cooperative Joint Venture Enterprise Law and the Wholly Foreign-Invested Enterprise Law, together with their implementation rules and ancillary regulations. The draft Foreign Investment Law embodies an expected PRC regulatory trend to rationalize its foreign investment regulatory regime in line with prevailing international practice and the legislative efforts to unify the corporate legal requirements for both foreign and domestic investments. The comment solicitation period for this draft has concluded, and substantial uncertainties exist with respect to its enactment timetable, interpretation and implementation. The draft Foreign Investment Law, if enacted as proposed, may materially impact the viability of our current corporate structure, corporate governance, business operations and financial results.

Among other things, the draft Foreign Investment Law expands the definition of foreign investment and introduces the principle of "actual control" in determining whether a company is considered a foreign-invested enterprise, or an FIE. The draft Foreign Investment Law specifically provides that entities established in China but "controlled" by foreign investors will be treated as FIEs, whereas an entity incorporated in a jurisdiction outside China would nonetheless be, upon market entry clearance by the MOC or its local branches, treated as a PRC domestic investor, provided that the entity is "controlled" by PRC entities or citizens. In this connection, "control" is broadly defined in the draft law to cover, among others, having the power to exert decisive influence, via contractual or trust arrangements, over the subject entity's operations, financial matters or other key aspects of business operations. Once an entity is determined to be an FIE and its investment amount exceeds certain thresholds or its business operation falls within a "negative list," to be separately issued by the State Council in the future, market entry clearance by the MOC or its local branches would be required. Otherwise, all foreign investors may make investments on the same terms as Chinese investors without being subject to additional approval from governmental authorities as mandated by the current foreign investment legal regime.

The "variable interest entity" structure, or VIE structure, has been adopted by many PRC-based companies, including us, to obtain necessary licenses and permits in the industries that are currently subject to foreign investment restrictions in China. See "—Risks Related to Our Corporate Structure and Restrictions on Our Industry" and "Item 4. Information on the Company—D. Organizational Structure." Under the draft Foreign Investment Law, variable interest entities that are controlled via contractual arrangement would also be deemed as FIEs, if they are ultimately "controlled" by foreign investors. Therefore, for any companies with a VIE structure in an industry category that is included in the "negative list" as restricted industry, the VIE structure may be deemed legitimate only if the ultimate controlling person(s) is/are of PRC nationality (either PRC individual, or PRC government or its local branches or agencies). Conversely, if the actual controlling person(s) is/are of foreign nationalities, then the variable interest entities will be treated as FIEs and any operation in the industry category on the "negative list" without market entry clearance may be considered as illegal.

Through our dual-class share structure, our co-founders and directors, Mr. Guoqing Li and Ms. Peggy Yu Yu, who are both PRC citizens, collectively own approximately 83.7% of the voting power of our outstanding common shares as of February 29, 2016, including shares that they had the right to acquire within 60 days. However, the draft Foreign Investment Law has not taken a position on what actions shall be taken with respect to the existing companies with a VIE structure, although a few possible options were proffered at the comment solicitation stage. Under these options, a company with the VIE structure and in the business on the "negative list" at the time of enactment of the new Foreign Investment Law has either the option or obligation to disclose its corporate structure to the authorities, while the authorities, after reviewing the ultimate control structure of the company to dispose of its businesses and/or the VIE structure based on circumstantial considerations. Moreover, it is uncertain whether the internet and sales and distribution of audio and video products businesses, which our affiliated PRC entity operates, will be subject to the foreign investment restrictions or prohibitions set forth in the "negative list" to be issued. If the enacted version of the Foreign Investment Law and the final "negative list" mandate further actions, such as MOC market entry clearance, to be completed by companies with existing VIE structure such as us, we would face uncertainties as to whether such clearance can be timely obtained, or at all.

The draft Foreign Investment Law, if enacted as proposed, may also materially impact our corporate governance practice and increase our compliance costs. For instance, the draft Foreign Investment Law imposes stringent ad hoc and periodic information reporting requirements on foreign investors and the applicable FIEs. Aside from investment implementation report and investment amendment report that are required at each investment and alteration of investment specifics, an annual report is mandatory, and large foreign investors meeting certain criteria are required to report on a quarterly basis. Any company found to be non-compliant with these information reporting obligations may potentially be subject to fines and/or administrative or criminal liabilities, and the persons directly responsible may be subject to criminal liabilities.

**Risks Related to Doing Business in China**

*Changes in China's economic, political or social conditions or government policies could have a material adverse effect on our business and operations.*

Substantially all of our operating assets and almost all of our customers are located in China. Accordingly, our business, financial condition, results of operations and prospects may be influenced to a significant degree by political, economic and social conditions in China generally and by continued economic growth in China as a whole.

The Chinese economy differs from the economies of most developed countries in many respects, including the level of government involvement, level of development, growth rate, control of foreign exchange and allocation of resources. Although the Chinese government has implemented measures since the late 1970s emphasizing the utilization of market forces for economic reform, the reduction of state ownership of productive assets, and the establishment of improved corporate governance in business enterprises, a substantial portion of productive assets in China is still owned by the Chinese government. In addition, the Chinese government continues to play a significant role in regulating industry development by imposing industrial policies. The Chinese government also exercises significant control over the Chinese economic growth through allocating resources, controlling payment of foreign currency-denominated obligations, setting monetary policy, and providing preferential treatment to particular industries or companies.

While the Chinese economy has experienced significant growth over the past decades, growth has been uneven, both geographically and among various sectors of the economy. The Chinese government has implemented various measures to encourage economic growth and guide the allocation of resources. Some of these measures benefit the overall Chinese economy, but may also have a negative effect on us. The Chinese government has implemented certain measures, including interest rate increases, to control the pace of economic growth. These measures may cause decreased economic activity in China, which could in turn reduce the demand for our services and adversely affect our results of operations and financial condition.

*Uncertainties in the interpretation and enforcement of Chinese laws and regulations could limit the legal protections available to you and us.*

The Chinese legal system is based on written statutes. Unlike common law systems, it is a system in which legal cases have limited value as precedents. In the late 1970s, the Chinese government began to promulgate a comprehensive system of laws and regulations governing economic matters in general. The overall effect of legislation over the past three decades has significantly increased the protections afforded to various forms of foreign or private-sector investment in China. Our PRC subsidiaries are foreign-invested enterprises and are subject to laws and regulations applicable to foreign-invested enterprises as well as various Chinese laws and regulations generally applicable to companies in China. However, since these laws and regulations are relatively new and the PRC legal system continues to rapidly evolve, the interpretations of many laws, regulations and rules are not always uniform and enforcement of these laws, regulations and rules involves uncertainties.

From time to time, we may have to resort to administrative and court proceedings to enforce our legal rights. However, since PRC administrative and court authorities have significant discretion in interpreting and implementing statutory and contractual terms, it may be more difficult to evaluate the outcome of administrative and court proceedings and the level of legal protection we enjoy than in more developed legal systems. Furthermore, the PRC legal system is based in part on government policies and internal rules (some of which are not published in a timely manner or at all) that may have retroactive effect. As a result, we may not be aware of our violation of these policies and rules until sometime after the violation.

Under PRC law, a company that sets up a branch to conduct business in a location outside its registered address must register with the local administration for industry and commerce. However, it is not clear whether a warehouse or a call center, which is typically for storage or customer service purpose without direct business operation, is required to be registered. Administrations for industry and commerce in different locations may have different practices. Our wholly owned PRC subsidiary, Dangdang Information, currently has 37 warehouses, including 8 front delivery centers, and 1 call center located outside of its registered address, none of which has been registered. If the relevant local administration for industry and commerce deems that any of our warehouses or call center is actually a branch and thus subject to the registration requirement, we may be subject to penalties for failing to register it. These penalties include fines and disgorgement of gains. Because of the discretionary nature of regulatory enforcements in the PRC, we cannot assure you that we will not be subject to these penalties as a result of violation of the requirement, and these penalties may have a material adverse effect on our financial results for the relevant periods.

18

*We are subject to consumer protection laws that could require us to modify our current business practices and incur increased costs.*

We are subject to numerous PRC laws and regulations that regulate retailers generally or govern online retailers specifically, such as the Consumer Protection Law. If these regulations were to change or if we, suppliers or third-party merchants were to violate them, the costs of certain products or services could increase, or we could be subject to fines or penalties or suffer reputational harm, which could reduce demand for the products or services offered on our website and hurt our business and results of operations. For example, the amended Consumer Protection Law, which became effective in March 2014, further strengthens the protection of consumers and imposes more stringent requirements and obligations on business operators, especially on businesses that operate on the internet. Pursuant to the Consumer Protection Law, consumers are generally entitled to return goods purchased within seven days upon receipt without giving any reasons if they purchased the goods over the internet. Consumers whose interests have been damaged due to their purchase of goods or acceptance of services on online marketplace platforms may claim damages from sellers or service providers. Where the operators of an online marketplace platform are unable to provide the real names, addresses and valid contact details of the sellers or service providers, the consumers may also claim damages from the operators of the online marketplace platforms. Operators of online marketplace platforms that know or should have known that sellers or service providers use their platforms to infringe upon the legitimate rights and interests of consumers but fail to take necessary measures must bear joint and several liability with the sellers or service providers. Moreover, if business operators deceive consumers or knowingly sell substandard or defective products, they should not only compensate consumers for their losses, but also pay additional damages equal to three times the price of the goods or services. Legal requirements are frequently changed and subject to interpretation, and we are unable to predict the ultimate cost of compliance with these requirements or their effect on our operations. We may be required to make significant expenditures or modify our business practices to comply with existing or future laws and regulations, which may increase our costs and materially limit our ability to operate our business.

*Failure to make adequate contributions to various employee benefit plans as required by PRC regulations may subject us to penalties.*

Companies operating in China are required to participate in various government sponsored employee benefit plans, including certain social insurance, housing funds and other welfare-oriented payment obligations, and contribute to the plans in amounts equal to certain percentages of salaries, including bonuses and allowances, of our employees up to a maximum amount specified by the local government from time to time at locations where we operate our businesses. The requirement of employee benefit plans has not been implemented consistently by the local governments in China given the different levels of economic development in different locations. In the event that our PRC entities incorporated in various locations in China are determined by the local governments to fail to make adequate employee benefit payments, we may be required to make up the contributions for these plans as well as to pay late fees and fines. If we are subject to late fees or fines in relation to the underpaid employee benefits, our financial condition and results of operations may be adversely affected.

*Regulation and censorship of information distribution over the internet in China may adversely affect our business, and we may be liable for information displayed on, retrieved from or linked to our internet platform.*

China has enacted laws and regulations governing internet access and the distribution of products, services, news, information, audio-video programs and other content through the internet. In the past, the PRC government has prohibited the distribution of information through the internet that it deems to be in violation of PRC laws and regulations. If any of our internet content were deemed by the PRC government to violate any content restrictions, we would not be able to continue to display such content and could become subject to penalties, including confiscation of income, fines, suspension of business and revocation of required licenses, which could materially and adversely affect our business, financial condition and results of operations. We may also be subject to potential liability for any unlawful actions of our customers or users of our internet platform or for content we distribute that is deemed inappropriate. It may be difficult to determine the type of content that may result in liability to us, and if we are found to be liable, we may be prevented from operating our internet platform in China.

*Under the PRC Enterprise Income Tax Law, we may be classified as a PRC "resident enterprise," which could result in unfavorable tax consequences to us and our shareholders and have a material adverse effect on our results of operations and the value of your investment.*

Under the PRC Enterprise Income Tax Law that became effective on January 1, 2008, an enterprise established outside the PRC with "de facto management bodies" within the PRC is considered a "resident enterprise" for PRC enterprise income tax purposes and is generally subject to a uniform 25% enterprise income tax rate on its worldwide income. A circular issued by the State Administration of Taxation, or SAT, in April 2009 regarding the standards used to classify certain Chinese-invested enterprises

controlled by Chinese enterprises or Chinese enterprise groups and established outside of China as "resident enterprises" clarified that dividends and other income paid by such PRC "resident enterprises" will be considered PRC-source income and subject to PRC withholding tax, currently at a rate of 10%, when paid to non-PRC enterprise shareholders. This circular also subjects such PRC "resident enterprises" to various reporting requirements with the PRC tax authorities.

19

Under the implementation regulations to the PRC Enterprise Income Tax Law, a "de facto management body" is defined as a body that has material and overall management and control over the manufacturing and business operations, personnel and human resources, finances and properties of an enterprise. In addition, the tax circular mentioned above specifies that certain PRC-invested overseas enterprises controlled by a Chinese enterprise or a Chinese enterprise group in the PRC will be classified as PRC resident enterprises if the following are located or resident in the PRC: senior management personnel and departments that are responsible for daily production, operation and management; financial and personnel decision making bodies; key properties, accounting books, the company seal, and minutes of board meetings and shareholders' meetings; and half or more of the senior management or directors having voting rights. However, it remains unclear how the PRC authorities will treat overseas enterprises controlled by PRC individuals, as in our case.

If the PRC tax authorities determine that our Cayman holding company is a PRC resident enterprise for PRC enterprise income tax purposes, then our worldwide income could be subject to PRC tax at a rate of 25%. If we expand our business overseas and generate significant revenues and profits outside China in the future, the imposition of 25% PRC tax on our worldwide income could materially reduce our net income. In addition, we will also be subject to PRC enterprise income tax reporting obligations.

Furthermore, although dividends paid by one PRC tax resident to another PRC tax resident should qualify as "tax-exempt income" under the Enterprise Income Tax Law, we cannot assure you that dividends by our PRC subsidiaries to our Cayman holding company will not be subject to a 10% withholding tax, as the PRC foreign exchange control authorities, which enforce the withholding tax on dividends, and the PRC tax authorities have not yet issued guidance with respect to the processing of outbound remittances to entities that are treated as resident enterprises for PRC enterprise income tax purposes.

Finally, foreign ADS holders that are enterprises may be subject to PRC withholding tax on dividends payable by us and gains realized on the sale or other disposition of ADSs or Class A common shares, if such income is sourced from within the PRC. Although our holding company is incorporated in the Cayman Islands, it remains unclear whether dividends received and gains realized by our foreign ADS holders that are enterprises will be regarded as income from sources within the PRC if we are classified as a PRC resident enterprise. Any such tax will reduce the returns on your investment in our ADSs.

***We face uncertainties with respect to indirect transfers of equity interests in PRC resident enterprises by their non-PRC holding companies. Enhanced scrutiny over acquisition transactions by the PRC tax authorities may have a negative impact on potential acquisitions we may pursue in the future.***

Pursuant to the Notice on Strengthening Administration of Enterprise Income Tax for Share Transfers by Non-PRC Resident Enterprises, or Circular 698, issued by SAT, which became effective retroactively as of January 1, 2008, where a non-resident enterprise investor transfers equity interests in a PRC resident enterprise indirectly by way of disposing of equity interests in an overseas holding company, the non-resident enterprise investor, being the transferor, may be subject to PRC enterprise income tax, if the indirect transfer is considered to be an abusive use of company structure without reasonable commercial purposes. As a result, gains derived from such indirect transfer may be subject to PRC withholding tax at the rate of up to 10%. In addition, the PRC resident enterprise may be required to provide necessary assistance to support the enforcement of Circular 698.

On February 3, 2015, SAT issued a Public Notice Regarding Certain Corporate Income Tax Matters on Indirect Transfer of Properties by Non-Tax Resident Enterprises, or Public Notice 7. Public Notice 7 has introduced a new tax regime that is significantly different from that under Circular 698. Public Notice 7 extends its tax jurisdiction to not only indirect transfers set forth under Circular 698 but also transactions involving the transfer of other taxable assets, through the offshore transfer of a foreign intermediate holding company. In addition, Public Notice 7 provides clearer criteria than Circular 698 on how to assess reasonable commercial purposes and has introduced safe harbors for internal group restructurings and the purchase and sale of equity through a public securities market. Public Notice 7 also brings challenges to both the foreign transferor and transferee (or other person who is obligated to pay for the transfer) of the taxable assets. Where a non-resident enterprise conducts an "indirect transfer" by transferring the taxable assets indirectly by disposing of the equity interests of an overseas holding company, the non-resident enterprise being the transferor, or the transferee, or the PRC entity which directly owned the taxable assets may report to the relevant tax authority such indirect transfer. Using a "substance over form" principle, the PRC tax authority may re-characterize such indirect transfer as a direct transfer of the equity interests in the PRC tax resident enterprise and other properties in China. As a result, gains derived from such indirect transfer may be subject to PRC enterprise income tax, and the transferee or other person who is obligated to pay for the transfer is obligated to withhold the applicable taxes, currently at a rate of up to 10% for the transfer of equity interests in a PRC resident enterprise. Both the transferor and the transferee may be subject to penalties under PRC tax laws if the transferee fails to withhold the taxes and the transferor fails to pay the taxes.

We face uncertainties on the reporting and consequences on private equity financing transactions, share exchange or other transactions involving the transfer of shares in our Cayman holding company by investors that are non-PRC resident enterprises, or sale or purchase of other taxable assets by us. Our Cayman holding company our group may be subject to filing obligations or being taxed if our Cayman holding company is the transferor in such transactions, and may be subject to withholding obligations if our Cayman holding company is the transferee in such transactions, under Circular 698 and Public Notice 7. For the transfer of shares in our Cayman holding company by investors that are non-PRC resident enterprises, our PRC subsidiaries may be requested to assist in the filing under Circular 698 and Public Notice 7. As a result, we may be required to expend valuable resources to comply with Circular 698 and Public Notice 7 or to request the relevant transferors from whom we purchase taxable assets to comply with these circulars, or to establish that our Cayman holding company should not be taxed under these circulars, which may have a material adverse effect on our financial condition and results of operations.

The PRC tax authorities have the discretion under Circular 698 and Public Notice 7 to make adjustments to the taxable capital gains based on the difference between the fair value of the taxable assets transferred and the cost of investment. If the PRC tax authorities make adjustments to the taxable income of the transactions under Circular 698 and Public Notice 7, our income tax costs associated with such potential acquisitions will be increased, which may have an adverse effect on our financial condition and results of operations.

***PRC laws and regulations establish complex procedures for some acquisitions of Chinese companies by foreign investors, which could make it more difficult for us to pursue growth through acquisitions in China.***

PRC laws and regulations, such as the Regulations on Mergers and Acquisitions of Domestic Companies by Foreign Investors, or the M&A Rules, promulgated by six PRC regulatory agencies in 2006 and amended in 2009, the Anti-Monopoly Law promulgated by the PRC National People's Congress in 2007, the Circular on the Establishment of a National Security Review Mechanism for Mergers and Acquisitions of Domestic Enterprises by Foreign Investors promulgated by the General Office of the PRC State Council in 2011 and the Rules of Ministry of Commerce on Implementation of Security Review System of Mergers and Acquisitions of Domestic Enterprises by Foreign Investors promulgated by the MOC in 2011, establish procedures and requirements that could make some acquisitions of Chinese companies by foreign investors and companies more time-consuming and complex, including requirements in some instances that various governmental authorities be notified in advance of any change-of-control transaction in which a foreign investor takes control of a PRC domestic enterprise. We may expand our business in part by acquiring complementary businesses. Complying with the requirements of the relevant PRC laws and regulations to complete such transactions could be time-consuming, and any required approval processes may delay or inhibit our ability to complete such transactions, which could affect our ability to expand our business or maintain our market share.

***PRC regulations relating to the establishment of offshore special purpose companies by PRC residents may limit our ability to inject capital into our PRC subsidiaries, limit our subsidiaries' ability to increase their registered capital or distribute profits to us, or may otherwise adversely affect us.***

The PRC State Administration of Foreign Exchange, or SAFE, promulgated regulations in October 2005 that require PRC citizens or residents to register with SAFE or its local branch in connection with their establishment or control of an offshore entity established for the purpose of overseas equity financing involving a roundtrip investment whereby the offshore entity acquires or controls onshore assets or equity interests held by the PRC citizens or residents. In addition, such PRC citizens or residents must update their SAFE registrations when the offshore special purpose vehicle undergoes material events relating to increases or decreases in investment amount, transfers or exchanges of shares, mergers or divisions, long-term equity or debt investments, external guarantees, or other material events that do not involve roundtrip investments. SAFE promulgated the Circular on Relevant Issues Concerning Foreign Exchange Control on Domestic Residents' Offshore Investment and Financing and Roundtrip Investment through Special Purpose Vehicles, or SAFE Circular No. 37, on July 4, 2014, which replaced the previously effective Notice on Issues Relating to the Administration of Foreign Exchange in Fund-Raising and Round-Trip Investment Activities of Domestic Residents Conducted via Offshore Special Purpose Vehicle, or the SAFE Circular No. 75. SAFE Circular No. 37 requires PRC residents to register with local branches of SAFE in connection with their direct establishment or indirect control of an offshore entity, for the purpose of overseas investment and financing, with such PRC residents' legally owned assets or equity interests in domestic enterprises or offshore assets or interests, referred to in SAFE Circular No. 37 as a "special purpose vehicle." The term "control" under SAFE Circular No. 37 is broadly defined as the operation rights, beneficiary rights or decision-making rights acquired by the PRC residents in the offshore special purpose vehicles or PRC companies by such means as acquisition, trust, proxy, voting rights, repurchase, convertible bonds or other arrangements. SAFE Circular No. 37 further requires amendment to the registration in the event of any changes with respect to the basic information of the special purpose vehicle, such as changes in a PRC resident individual shareholder, name or operation period; or any significant changes with respect to the special purpose vehicle, such as increase or decrease of capital contributed by PRC individuals, share transfer or exchange, merger, division or other material event. We cannot assure you that our shareholders who

are PRC citizens or residents will make, obtain or update any applicable registration. If the shareholders of the offshore holding company who are PRC residents do not complete their registration with the local SAFE branches, the PRC subsidiaries may be prohibited from distributing their profits and proceeds from any reduction in capital, share transfer or liquidation to the offshore company, and the offshore company may be restricted in its ability to contribute additional capital to its PRC subsidiaries. Moreover, failure to comply with SAFE registration and amendment requirements described above could result in liability under PRC law for evasion of applicable foreign exchange restrictions. On February 28, 2015, SAFE promulgated a Notice on Further Simplifying and Improving Foreign Exchange Administration Policy on Direct Investment, or SAFE Notice 13, which became effective on June 1, 2015. After SAFE Notice 13 becomes effective, entities and individuals will be required to apply for foreign exchange registration of foreign direct investment and overseas direct investment, including those required under the SAFE Circular No. 37, with qualified banks, instead of SAFE. The qualified banks, under the supervision of SAFE, will directly examine the applications and conduct the registration.

21

Despite various interpretations issued by SAFE, some of the terms and provisions in the SAFE regulations remain unclear and implementation by central SAFE and local SAFE branches of the SAFE regulations has been inconsistent. Because of uncertainty over how the SAFE regulations will be interpreted and implemented, and how SAFE will apply them to us, we cannot predict how these regulations will affect our business operations or future strategies. For example, our present and prospective PRC subsidiaries' ability to conduct foreign exchange activities, such as the remittance of dividends, capital injection and foreign currency-denominated borrowings, may be subject to compliance in full with the SAFE regulations by our PRC resident shareholders. In addition, in some cases, we may have little control over either our present or prospective direct or indirect PRC resident shareholders or the outcome of such registration procedures. A failure by our PRC resident shareholders or future PRC resident shareholders to comply with the SAFE regulations, if SAFE requires it, could subject us to penalties or other legal sanctions, restrict our cross-border investment activities, restrict our ability to contribute additional capital into our PRC subsidiaries, including the transfer of the proceeds from our initial public offering into our PRC subsidiaries, or limit our subsidiary's ability to make distributions or pay dividends or affect our ownership structure, which could adversely affect our business, financial condition and prospects.

### *Failure to comply with PRC regulations regarding the registration requirements for employee stock ownership plans or share option plans may subject the PRC plan participants or us to fines and other legal or administrative sanctions.*

In February 2012, SAFE issued regulations requiring PRC residents who are granted share options by an overseas publicly listed company to register with SAFE through a Chinese agent (including without limitation a Chinese subsidiary of the overseas publicly-listed company) and complete certain other procedures. We and our PRC employees who have been granted share options are subject to these regulations. We and our PRC share option holders are in the process of registering with SAFE. Failure of our PRC share option holders or us to complete their SAFE registrations may subject such PRC residents or us to fines and legal sanctions and may also limit our ability to contribute additional capital into our PRC subsidiaries, limit our PRC subsidiaries' ability to distribute dividends to us, or otherwise materially adversely affect our business.

In addition, SAT has issued certain circulars concerning employee share options or restricted shares. Under these circulars, the employees working in the PRC who exercise share options or are granted restricted shares will be subject to PRC individual income tax. The PRC subsidiaries of such overseas listed company have obligations to file documents related to employee share options or restricted shares with relevant tax authorities and to withhold individual income taxes of those employees who exercise their share options. If the employees fail to pay or the PRC subsidiaries fail to withhold their income taxes according to relevant laws and regulations, the PRC subsidiaries may face sanctions imposed by the tax authorities or other PRC government authorities.

### *Our PRC subsidiaries and affiliated PRC entity are subject to restrictions on paying dividends or making other payments to us, which may restrict our ability to satisfy our liquidity requirements.*

We are a holding company incorporated in the Cayman Islands and rely on, in part, dividends paid from our PRC subsidiaries. Current PRC regulations permit our subsidiary to pay dividends to us only out of its accumulated profits, if any, determined in accordance with Chinese accounting standards and regulations. In addition, our PRC subsidiaries are required to set aside at least 10% of its accumulated profits each year, if any, to fund certain reserve funds until the total amount set aside reaches 50% of its registered capital. These reserves are not distributable as cash dividends. Since our PRC subsidiaries and our affiliated PRC entity and its subsidiaries were in an accumulated loss position in the three years ended December 31, 2013, 2014 and 2015, no such reserve fund was established for these three years. Further, if our PRC subsidiaries and affiliated PRC entity incur debt on their own behalf in the future, the instruments governing the debt may restrict their ability to pay dividends or make other payments to us, which may restrict our ability to satisfy our liquidity requirements.

22

***PRC regulations of loans to PRC entities and direct investment in PRC entities by offshore holding companies and government control of currency conversion may delay or prevent us from using the offshore proceeds to make loans to our wholly owned PRC subsidiary, which could materially and adversely affect our liquidity and our ability to fund and expand our business.***

We may transfer funds to our wholly owned PRC subsidiary or finance our wholly owned PRC subsidiary by means of shareholder loans or capital contributions. Any loans to our wholly owned PRC subsidiary, which is a foreign-invested enterprise, cannot exceed statutory limits based on the difference between the registered capital and the approved investment amount of such subsidiary, and must be registered with SAFE or its local counterparts. Furthermore, any capital contributions we make to our wholly owned PRC subsidiary must be approved by the MOC, or its local branch. We may not be able to obtain these government registrations or approvals on a timely basis, if at all. If we fail to receive such registrations or approvals, our ability to provide loans or capital contributions to our wholly owned PRC subsidiary in a timely manner may be negatively affected, which could materially and adversely affect our liquidity and our ability to fund and expand our business.

We may also decide to finance our wholly owned PRC subsidiary by means of capital contributions. These capital contributions must be approved by the MOC or its local branch, according to the PRC laws and regulations currently in effect. In addition, SAFE promulgated a SAFE Circular 142 in August 2008, and a further SAFE Circular 45 in November 2011 in order to clarify the application of SAFE Circular 142. Under SAFE Circular 142 and Circular 45, registered capital of a foreign-invested company settled in Renminbi converted from foreign currencies may only be used within the business scope approved by the applicable governmental authority and may not be used for equity investments in the PRC. In addition, foreign-invested companies may not change how they use such capital without SAFE's approval, and may not in any case use such capital to repay Renminbi loans if proceeds of such loans have not been utilized. Violations of Circular 142 or Circular 45 may result in severe penalties, including heavy fines.

On March 30, 2015, SAFE issued SAFE Circular No. 19, which will take effect and replace SAFE Circular No. 142 from June 1, 2015. Although SAFE Circular No. 19 allows for the use of Renminbi converted from the foreign currency-denominated capital for equity investments in the PRC, the restrictions will continue to apply as to foreign-invested enterprises' use of the converted Renminbi for purposes beyond the business scope, for entrusted loans or for inter-company Renminbi loans. The applicable circulars may significantly limit our ability to transfer any foreign currency we hold, including the net proceeds from our initial public offering and any subsequent offerings or financings, to our wholly owned PRC subsidiary, and we may not be able to convert the foreign currency into Renminbi, which may materially and adversely affect our liquidity and our ability to fund and expand our business in the PRC.

***Fluctuations in exchange rates could have a material adverse effect on our results of operations and the value of your investment.***

The conversion of Renminbi into foreign currencies, including U.S. dollars, is based on rates set by the People's Bank of China. The value of the Renminbi against the U.S. dollar and other currencies is affected by, among other things, changes in China's political and economic conditions and China's foreign exchange policies. The PRC government allowed the Renminbi to appreciate by more than 20% against the U.S. dollar between July 2005 and July 2008. Between July 2008 and June 2010, this appreciation halted and the exchange rate between the Renminbi and the U.S. dollar remained within a narrow band. Since June 2010, the PRC government has allowed the Renminbi to appreciate slowly against the U.S. dollar again, though there have been periods recently when the U.S. dollar has appreciated against the Renminbi as well, as it did for example during 2014. It is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between the RMB and the U.S. dollar in the future.

As we may receive dividends and other fees paid to us by our subsidiaries and our affiliated PRC entity and its subsidiaries, any significant revaluation of the Renminbi may materially and adversely affect our cash flows, revenues, earnings and financial position, and the value of, and any dividends payable on, our ADSs in U.S. dollars. Should we enter into transactions denominated in U.S. dollars, any appreciation of the Renminbi against the U.S. dollar will reduce the amount of Renminbi we receive in exchange for such U.S. dollars. Conversely, any depreciation of the Renminbi against the U.S. dollar will have a negative effect should we need to exchange our Renminbi into U.S. dollars for dividend payments or for other business purposes.

In addition, there are very limited hedging transactions available in China to reduce our exposure to exchange rate fluctuations. While we may decide to enter into hedging transactions in the future, the availability and effectiveness of such hedges may be limited and we may not be able to hedge our exposure adequately, or at all. In addition, our currency exchange losses may be magnified by any PRC exchange controls that restrict our ability to convert Renminbi into U.S. dollars.

23

*Governmental control of currency conversion may affect the value of your investment.*

The PRC government imposes controls on the convertibility of the Renminbi into foreign currencies and, in certain cases, the remittance of currency out of China. We receive substantially all of our revenues in Renminbi. Under our current corporate structure, our income is primarily derived from dividend payments from our PRC subsidiaries. Shortages in the availability of foreign currency may restrict the ability of our PRC subsidiaries to remit sufficient foreign currency to pay dividends or other payments to us, or otherwise satisfy their foreign currency denominated obligations. Under existing PRC foreign exchange regulations, payments of current account items, including profit distributions, interest payments and expenditures from trade-related transactions, can be made in foreign currencies without prior approval from the SAFE, by complying with certain procedural requirements. However, approval from appropriate government authorities is required where Renminbi is to be converted into foreign currency and remitted out of China to pay capital expenses such as the repayment of loans denominated in foreign currencies. The PRC government may also, at its discretion, restrict access in the future to foreign currencies for current account transactions. If the foreign exchange control system prevents us from obtaining sufficient foreign currency to satisfy our currency demands, we may not be able to pay dividends in foreign currencies to our shareholders, including holders of our ADSs.

*Our auditor, like other independent registered public accounting firms operating in China, is not permitted to be subject to inspection by Public Company Accounting Oversight Board, and as such, investors may be deprived of the benefits of such inspection.*

Our independent registered public accounting firm that issues the audit reports included in our annual reports filed with the SEC, as an auditor of companies that are traded publicly in the United States and a firm registered with the Public Company Accounting Oversight Board (United States), or PCAOB, is required by the laws of the United States to undergo regular inspections by PCAOB to assess its compliance with the laws of the United States and professional standards. Because our auditor is located in China, a jurisdiction where PCAOB is currently unable to conduct inspections without the approval of the PRC authorities, our auditor, like other independent registered public accounting firms operating in China, is currently not inspected by PCAOB.

Inspections of other firms that PCAOB has conducted outside of China have identified deficiencies in those firms' audit procedures and quality control procedures, which may be addressed as part of the inspection process to improve future audit quality. The inability of PCAOB to conduct inspections of independent registered public accounting firms operating in China makes it more difficult to evaluate the effectiveness of our auditor's audit procedures or quality control procedures. As a result, investors may be deprived of the benefits of PCAOB inspections.

*Proceedings instituted by the SEC against five PRC-based accounting firms, including our independent registered public accounting firm, could result in our financial statements being determined to not be in compliance with the requirements of the Securities Exchange Act of 1934, or the Exchange Act.*

In December 2012, the SEC brought administrative proceedings against five accounting firms in China, including our independent registered public accounting firm, alleging that they had refused to produce audit work papers and other documents related to certain other China-based companies under investigation by the SEC. On January 22, 2014, an initial administrative law decision was issued, censuring these accounting firms and suspending four of these firms from practicing before the SEC for a period of six months. The decision is neither final nor legally effective unless and until reviewed and approved by the SEC. On February 12, 2014, four of these PRC-based accounting firms appealed to the SEC against this decision. In February 2015, each of the four PRC-based accounting firms agreed to a censure and to pay a fine to the SEC to settle the dispute and avoid suspension of their ability to practice before the SEC. The settlement requires the firms to follow detailed procedures to seek to provide the SEC with access to Chinese firms' audit documents via the China Securities Regulatory Commission. If the firms do not follow these procedures, the SEC could impose penalties such as suspensions, or it could restart the administrative proceedings.

In the event that the SEC restarts the administrative proceedings, depending upon the final outcome, listed companies in the United States with major PRC operations may find it difficult or impossible to retain auditors in respect of their operations in the PRC, which could result in financial statements being determined to not be in compliance with the requirements of the Exchange Act, including possible delisting. Moreover, any negative news about the proceedings against these audit firms may cause investor uncertainty regarding China-based, United States-listed companies and the market price of our ADSs may be adversely affected.

If our independent registered public accounting firm were denied, even temporarily, the ability to practice before the SEC and we were unable to timely find another registered public accounting firm to audit and issue an opinion on our financial statements, our financial statements could be determined not to be in compliance with the requirements of the Exchange Act. Such a determination

could ultimately lead to our delisting from the New York Stock Exchange or deregistration from the SEC, or both, which would substantially reduce or effectively terminate the trading of our ADSs in the United States.

24

**Risks Related to Our ADSs**

*The trading prices of our ADSs are likely to be volatile, which could result in substantial losses to investors.*

The trading prices of our ADSs are likely to be volatile and could fluctuate widely due to factors beyond our control. This may happen because of broad market and industry factors, like the performance and fluctuation of the market prices of other companies with business operations located mainly in China that have listed their securities in the United States. A number of Chinese companies have listed or are in the process of listing their securities on U.S. stock markets. The securities of some of these companies, including ours, have experienced significant volatility, including price declines in connection with their initial public offerings. The trading performances of these Chinese companies' securities after their offerings may affect the attitudes of investors toward Chinese companies listed in the United States in general and consequently may continue to impact the trading performance of our ADSs, regardless of our actual operating performance.

In addition to market and industry factors, the price and trading volume for our ADSs may be highly volatile for factors specific to our own operations, including the following:

- variations in our net revenues, earnings and cash flows;

- announcements of new investments, acquisitions, strategic partnerships or joint ventures;

- announcements of new services and product category expansions by us or our competitors;

- fluctuations in market prices of our products;

- changes in financial estimates by securities analysts;

- additions or departures of key personnel;

- release of lock-up or other transfer restrictions on our outstanding equity securities or sales of additional equity securities; and

- potential litigation or regulatory investigations.

Any of these factors may result in large and sudden changes in the volume and price at which our ADSs will trade.

*There can be no assurance that any definitive offer will be made with respect to the going private transaction proposed by Ms. Peggy Yu Yu and Mr. Guoqing Li, that any agreement will be executed or that this or any other transaction will be approved or consummated.*

Our board of directors received a preliminary non-binding proposal letter dated July 9, 2015 from Ms. Peggy Yu Yu, chairwoman of our board of directors, and Mr. Guoqing Li, director and chief executive officer of our company, to acquire all of our outstanding common shares not already beneficially owned by them in a going private transaction for $7.812 in cash per ADS, each representing five Class A common shares. Our board of directors has formed a special committee comprised of three independent and disinterested directors, Ms. Ruby Rong Lu, Mr. Ke Zhang and Mr. Xiaolong Li, to consider the proposal and any other alternative proposals or other strategic alternatives that may be available to our company. The special committee has retained Duff & Phelps (Duff & Phelps, LLC and Duff & Phelps Securities, LLC) as its financial advisor and Shearman & Sterling LLP as its United States legal counsel in connection with its review and evaluation of the preliminary non-binding proposal. There can be no assurance that any definitive offer will be made, that any agreement will be executed or that this or any other transaction will be approved or consummated. These uncertainties may increase the volatility of the market price of our ADSs and have a material adverse effect on the market price of our ADSs.

*If securities or industry analysts do not publish research or reports about our business, or if they adversely change their recommendations regarding our ADSs, the market price for our ADSs and trading volume could decline.*

The trading market for our ADSs is influenced by research or reports that industry or securities analysts publish about our business. If one or more analysts who cover us downgrade our ADSs, the market price for our ADSs would likely decline. If one or more of these analysts cease to cover us or fail to regularly publish reports on us, we could lose visibility in the financial markets, which, in turn, could cause the market price or trading volume for our ADSs to decline.

11/13/2019

25

*Because we do not expect to pay dividends in the foreseeable future, you must rely on price appreciation of our ADSs for return on your investment.*

We currently intend to retain most, if not all, of our available funds and any future earnings to fund the development and growth of our business. As a result, we do not expect to pay any cash dividends in the foreseeable future. Therefore, you should not rely on an investment in our ADSs as a source for any future dividend income.

Our board of directors has complete discretion as to whether to distribute dividends subject to our memorandum and articles of association and certain restrictions under Cayman Islands law. Even if our board of directors decides to declare and pay dividends, the timing, amount and form of future dividends, if any, will depend on, among other things, our future results of operations and cash flow, our capital requirements and surplus, the amount of distributions, if any, received by us from our subsidiaries, our financial condition, contractual restrictions and other factors deemed relevant by our board of directors. Accordingly, the return on your investment in our ADSs will likely depend entirely upon any future price appreciation of our ADSs. There is no guarantee that our ADSs will appreciate in value or even maintain the price at which you purchased the ADSs. You may not realize a return on your investment in our ADSs and you may even lose your entire investment in our ADSs.

*The sale or availability for sale of substantial amounts of our ADSs could adversely affect their market price.*

Sales of substantial amounts of our ADSs in the public market, or the perception that these sales could occur, could adversely affect the market price of our ADSs and could materially impair our ability to raise capital through equity offerings in the future. The ADSs sold in our initial public offering are freely tradable without restriction or further registration under the Securities Act of 1933, as amended, or the Securities Act, and shares held by our existing shareholders may also be sold in the public market in the future subject to the restrictions in Rule 144 and Rule 701 under the Securities Act. We cannot predict what effect, if any, market sales of securities held by our significant shareholders or any other shareholder or the availability of these securities for future sale will have on the market price of our ADSs.

*We may be classified as a passive foreign investment company under U.S. tax law, which could result in adverse United States federal income tax consequences to U.S. holders of our ADSs.*

Depending upon the value of our assets based on the market value of our ADSs and Class A common shares and the nature of our assets and income over time, we could be classified as a passive foreign investment company, or PFIC, for United States federal income tax purposes. Based on our income and assets and the value of our ADSs and Class A common shares, we do not believe that we were a PFIC for the taxable year ended December 2015 and, although no assurances can be made in this regard, we do not expect to be a PFIC for the current taxable year or any subsequent taxable year.

We will be classified as a PFIC for any taxable year if either (i) 75% or more of our gross income for the taxable year is passive income or (ii) 50% or more of the value of our assets (determined on the basis of a quarterly average) is attributable to assets that produce or are held for the production of passive income. Although the law in this regard is unclear, we treat Dangdang Kewen as being owned by us for United States federal income tax purposes, not only because we exercise effective control over the operation of Dangdang Kewen but also because we are entitled to substantially all of its economic benefits, and, as a result, we consolidate its results of operations in our consolidated U.S. GAAP financial statements. If it were determined, however, that we are not the owner of Dangdang Kewen for United States federal income tax purposes, we would likely be treated as a PFIC for our current taxable year and any subsequent taxable year. Because of the uncertainties in the application of the relevant rules and PFIC status is a factual determination made annually after the close of each taxable year on the basis of the composition of our income and the value of our active versus passive assets, there can be no assurance that we will not be a PFIC for the current taxable year or any future taxable year. While we do not anticipate becoming a PFIC, changes in the nature of our income or assets or the value of our assets may cause us to become a PFIC for the current or any subsequent taxable year. In connection with filing an annual report with the SEC, we expect to disclose to our shareholders whether or not we expect to be a PFIC for the relevant year.

If we were to be or become classified as a PFIC, a U.S. Holder (as defined in "Taxation—United States Federal Income Tax Considerations—General") may be subject to reporting requirements and may incur significantly increased United States income tax on gain recognized on the sale or other disposition of our ADSs or Class A common shares and on the receipt of distributions on our ADSs or Class A common shares to the extent such gain or distribution is treated as an "excess distribution" under the United States federal income tax rules. Further, if we were a PFIC for any year during which a U.S. Holder held our ADSs or Class A common shares, we would continue to be treated as a PFIC for all succeeding years during which such U.S. Holder held our ADSs or Class A common shares. Each U.S. Holder is urged to consult its tax advisors concerning the United States federal income tax consequences of acquiring, holding, and disposing of our ADSs or Class A common shares if we are or become classified as a PFIC. For more

information see "Taxation—United States Federal Income Tax Considerations—Passive Foreign Investment Company Considerations."

26

***Our dual-class common share structure with different voting rights will limit your ability to influence corporate matters and could discourage others from pursuing any change of control transactions that holders of our Class A common shares and ADSs may view as beneficial.***

Our common shares are divided into Class A common shares and Class B common shares. Holders of Class A common shares are entitled to one vote per share, while holders of Class B common shares are entitled to ten votes per share. Each Class B common share is convertible into one Class A common share at any time by the holder thereof. Class A common shares are not convertible into Class B common shares under any circumstances. Upon any transfer of Class B common shares by a holder thereof to any person or entity which is not an affiliate of such holder, such Class B common shares shall be automatically and immediately converted into the equal number of Class A common shares. In addition, if at any time Ms. Peggy Yu Yu and Mr. Guoqing Li and their affiliates collectively own less than 5% of the total number of the issued and outstanding Class B common shares (taking into account all of the issued and outstanding preferred shares on an as-converted basis), each issued and outstanding Class B common share shall be automatically and immediately converted into one share of Class A common share, and we shall not issue any Class B common shares thereafter.

Due to the disparate voting powers attached to these two classes, as of February 29, 2016, Ms. Peggy Yu Yu and Mr. Guoqing Li collectively own approximately 83.7% of the voting power of our outstanding common shares, including shares that they had the right to acquire within 60 days, and have considerable influence over matters requiring shareholder approval, including election of directors and approval of corporate transactions, such as a merger or sale of our company or our assets. This concentrated ownership limits your ability to influence corporate matters and could discourage others from pursuing any potential merger, takeover or other change of control transactions that holders of Class A common shares and ADSs may view as beneficial.

***Our articles of association contain anti-takeover provisions that could have a material adverse effect on the rights of holders of our Class A common shares and ADSs.***

Our articles of association contain provisions to limit the ability of others to acquire control of our company or cause us to engage in change-of-control transactions. These provisions could have the effect of depriving our shareholders of an opportunity to sell their shares at a premium over prevailing market prices by discouraging third parties from seeking to obtain control of our company in a tender offer or similar transaction. For example, our board of directors has the authority, without further action by our shareholders, to issue preferred shares in one or more series and to fix their designations, powers, preferences, privileges, and relative participating, optional or special rights and the qualifications, limitations or restrictions, including dividend rights, conversion rights, voting rights, terms of redemption and liquidation preferences, any or all of which may be greater than the rights associated with our Class A common shares, in the form of ADS or otherwise. Preferred shares could be issued quickly with terms calculated to delay or prevent a change in control of our company or make removal of management more difficult. If our board of directors decides to issue preferred shares, the price of our ADSs may fall and the voting and other rights of the holders of our Class A common shares and ADSs may be materially and adversely affected.

***You may face difficulties in protecting your interests, and your ability to protect your rights through U.S. courts may be limited, because we are incorporated under Cayman Islands law.***

We are an exempted company incorporated under the laws of the Cayman Islands. Our corporate affairs are governed by our memorandum and articles of association, as amended and restated from time to time, the Companies Law (2013 Revision) of the Cayman Islands and the common law of the Cayman Islands. The rights of shareholders to take action against the directors, actions by minority shareholders and the fiduciary duties of our directors to us under Cayman Islands law are to a large extent governed by the common law of the Cayman Islands. The common law of the Cayman Islands is derived in part from comparatively limited judicial precedent in the Cayman Islands as well as from the English common law, the decisions of whose courts are of persuasive authority, but are not binding, on a court in the Cayman Islands. The rights of our shareholders and the fiduciary duties of our directors under Cayman Islands law are not as clearly established as they would be under statutes or judicial precedent in some jurisdictions in the United States. In particular, the Cayman Islands has a less developed body of securities laws than the United States. Some U.S. states, such as Delaware, have more fully developed and judicially interpreted bodies of corporate law than the Cayman Islands. In addition, shareholders of Cayman Islands companies may not have standing to initiate a shareholder derivative action in a federal court of the United States.

There is no statutory enforcement in the Cayman Islands of judgments obtained in the federal or state courts of the United States (and the Cayman Islands are not a party to any treaties for the reciprocal enforcement or recognition of such judgments), a judgment obtained in such jurisdiction will be recognized and enforced in the courts of the Cayman Islands at common law, without any re-examination of the merits of the underlying dispute, by an action commenced on the foreign judgment debt in the Grand Court

of the Cayman Islands, provided such judgment (a) is given by a foreign court of competent jurisdiction, (b) imposes on the judgment debtor a liability to pay a liquidated sum for which the judgment has been given, (c) is final, (d) is not in respect of taxes, a fine or a penalty, and (e) was not obtained in a manner and is not of a kind the enforcement of which is contrary to natural justice or the public policy of the Cayman Islands. However, the Cayman Islands courts are unlikely to enforce a judgment obtained from the U.S. courts under civil liability provisions of the U.S. federal securities law if such judgment is determined by the courts of the Cayman Islands to give rise to obligations to make payments that are penal or punitive in nature. Because such a determination has not yet been made by a court of the Cayman Islands, it is uncertain whether such civil liability judgments from U.S. courts would be enforceable in the Cayman Islands.

27

---

U.S. shareholders may be able to originate actions against us in the Cayman Islands under Cayman Islands laws. However, we do not have any substantial assets other than certain corporate documents and records in the Cayman Islands and it may be difficult for shareholders to enforce a judgment obtained in a Cayman Islands court in China, where substantially all of our operations are conducted.

As a result of all of the above, our public shareholders may have more difficulty in protecting their interests in the face of actions taken by management, members of the board of directors or controlling shareholders than they would as public shareholders of a company incorporated in the United States.

**_Certain judgments obtained against us by our shareholders may not be enforceable._**

We are a Cayman Islands company and all of our assets are located outside of the United States. Substantially all of our current operations are conducted in the China. In addition, a majority of our current directors and officers are nationals and residents of countries other than the United States. Substantially all of the assets of these persons are located outside the United States. As a result, it may be difficult or impossible for you to effect service of process within the United States upon us or these individuals to bring an action against us or against these individuals in the United States in the event that you believe that your rights have been infringed under the United States federal securities laws or otherwise. Even if you are successful in bringing an action of this kind, the laws of the Cayman Islands and of China may render you unable to enforce a judgment against our assets or the assets of our directors and officers.

**_The voting rights of holders of ADSs are limited by the terms of the deposit agreement, and you may not be able to exercise your right to vote your Class A common shares._**

As a holder of our ADSs, you will only be able to exercise the voting rights with respect to the underlying Class A common shares in accordance with the provisions of the deposit agreement. Under the deposit agreement, you must vote by giving voting instructions to the depositary. Upon receipt of your voting instructions, the depositary will vote the underlying Class A common shares in accordance with these instructions. You will not be able to directly exercise your right to vote with respect to the underlying shares unless you withdraw the shares. Under our memorandum and articles of association, the minimum notice period required for convening a general meeting is seven calendar days. When a general meeting is convened, you may not receive sufficient advance notice to withdraw the shares underlying your ADSs to allow you to vote with respect to any specific matter. If we ask for your instructions, we will give the depositary notice of any such meeting and details concerning the matters to be voted upon at least 30 days in advance of the meeting date and the depositary will send a notice to you about the upcoming vote and will arrange to deliver our voting materials to you. We cannot assure you that you will receive the voting materials in time to ensure that you can instruct the depositary to vote your shares. In addition, the depositary and its agents are not responsible for failing to carry out voting instructions or for their manner of carrying out your voting instructions. This means that you may not be able to exercise your right to vote and you may have no legal remedy if the shares underlying your ADSs are not voted as you requested.

**_The depositary for our ADSs will give us a discretionary proxy to vote our Class A common shares underlying your ADSs if you do not vote at shareholders' meetings, except in limited circumstances, which could adversely affect your interests._**

Under the deposit agreement for the ADSs, if you do not vote, the depositary will give us a discretionary proxy to vote our Class A common shares underlying your ADSs at shareholders' meetings unless:

- we have failed to timely provide the depositary with notice of meeting and related voting materials;

- we have instructed the depositary that we do not wish a discretionary proxy to be given;

- we have informed the depositary that there is substantial opposition as to a matter to be voted on at the meeting;

- a matter to be voted on at the meeting would have a material adverse impact on shareholders; or

- the voting at the meeting is to be made on a show of hands.

The effect of this discretionary proxy is that if you do not vote at shareholders' meetings, you cannot prevent our Class A common shares underlying your ADSs from being voted, except under the circumstances described above. This may make it more difficult for shareholders to influence the management of our company. Holders of our Class A common shares are not subject to this discretionary proxy.

28

*You may not receive dividends or other distributions on our Class A common shares and you may not receive any value for them, if it is illegal or impractical to make them available to you.*

The depositary of our ADSs has agreed to pay to you the cash dividends or other distributions it or the custodian receives on Class A common shares or other deposited securities underlying our ADSs, after deducting its fees and expenses. You will receive these distributions in proportion to the number of Class A common shares your ADSs represent. However, the depositary is not responsible if it decides that it is unlawful or impractical to make a distribution available to any holders of ADSs. For example, it would be unlawful to make a distribution to a holder of ADSs if it consists of securities that require registration under the Securities Act but that are not properly registered or distributed under an applicable exemption from registration. The depositary may also determine that it is not feasible to distribute certain property through the mail. Additionally, the value of certain distributions may be less than the cost of mailing them. In these cases, the depositary may determine not to distribute such property. We have no obligation to register under U.S. securities laws any ADSs, Class A common shares, rights or other securities received through such distributions. We also have no obligation to take any other action to permit the distribution of ADSs, Class A common shares, rights or anything else to holders of ADSs. This means that you may not receive distributions we make on our Class A common shares or any value for them if it is illegal or impractical for us to make them available to you. These restrictions may cause a material decline in the value of our ADSs.

*You may experience dilution of your holdings due to inability to participate in rights offering or as a result of additional securities issued under our share-based compensation plans.*

We may, from time to time, distribute rights to our shareholders, including rights to acquire securities. Under the deposit agreement, the depositary will not distribute rights to holders of ADSs unless the distribution and sale of rights and the securities to which these rights relate are either exempt from registration under the Securities Act with respect to all holders of ADSs, or are registered under the provisions of the Securities Act. The depositary may, but is not required to, attempt to sell these undistributed rights to third parties, and may allow the rights to lapse. We may be unable to establish an exemption from registration under the Securities Act, and we are under no obligation to file a registration statement with respect to these rights or underlying securities or to endeavor to have a registration statement declared effective. Accordingly, holders of ADSs may be unable to participate in our rights offerings and may experience dilution of their holdings as a result. In addition, we adopted a share-based compensation plan in 2004, or the 2004 plan, and another share incentive plan in 2010, or the 2010 plan. As of February 29, 2016, there were 17,784,750 options to purchase common shares outstanding under the 2004 plan and the 2010 plan. The additional securities we may issue under the 2010 plan or other share-based compensation plans we may adopt in future will dilute the ownership interests of our shareholders, including holders of our ADSs.

*You may be subject to limitations on transfer of your ADSs.*

Your ADSs are transferable on the books of the depositary. However, the depositary may close its books at any time or from time to time when it deems expedient in connection with the performance of its duties. The depositary may close its books from time to time for a number of reasons, including in connection with corporate events such as a rights offering, during which time the depositary needs to maintain an exact number of ADS holders on its books for a specified period. The depositary may also close its books in emergencies, and on weekends and public holidays. The depositary may refuse to deliver, transfer or register transfers of our ADSs generally when our share register or the books of the depositary are closed, or at any time if we or the depositary thinks it is advisable to do so because of any requirement of law or of any government or governmental body, or under any provision of the deposit agreement, or for any other reason.

## Item 4.        Information on the Company

## A.        History and Major Development of the Company

Ms. Peggy Yu Yu and Mr. Guoqing Li, our co-founders, established our holding company in the Cayman Islands in preparation for overseas fund raising in January 2000. We changed the name of our Cayman holding company to E-Commerce China Dangdang Inc. in June 2010. We refer to this entity in this annual report as Dangdang Holding. In April 2000, Dangdang Holding obtained control of Beijing Dangdang Information Technology Co., Ltd., or Dangdang Information, a PRC company.

29

Foreign ownership of internet-based businesses is subject to significant restrictions under current PRC laws and regulations. The PRC government regulates internet access, the distribution of online information and the conduct of online commerce through strict business licensing requirements and other government regulations. We are a Cayman Islands company and our PRC subsidiary, Dangdang Information, is considered a foreign-invested enterprise. As a wholly foreign-owned enterprise, Dangdang Information is restricted from holding the licenses that are necessary for our business operation in China, such as licenses for operating our internet platform. We approved a corporate structure plan and instructed Ms. Peggy Yu Yu and Mr. Guoqing Li, our co-founders, both of whom are PRC citizens, to establish Beijing Dangdang Kewen E-Commerce Co., Ltd., or Dangdang Kewen, in August 2004 in order to apply for and hold such licenses. To gain effective control over Dangdang Kewen and its subsidiaries, Dangdang Information entered into a series of contractual arrangements with Dangdang Kewen and its shareholders. Dangdang Information conducts a substantial portion of our business in China, including, for example, handling our product procurement and fulfillment operations and holding lease title to our warehouse facilities across China, while Dangdang Kewen holds the licenses for operating our internet platform that Dangdang Information is restricted from undertaking under PRC law. See the several risks discussed under "Item 3. Key Information—D. Risk Factors—Risks Related to Our Corporate Structure and Restrictions on Our Industry" for a comprehensive description of the various material risks related to our corporate structure. In particular, see "Item 3. Key Information—D. Risk Factors—Risks Related to Our Corporate Structure and Restrictions on Our Industry—Substantial uncertainties and restrictions exist with respect to the interpretation and application of PRC laws and regulations relating to online commerce and the distribution of internet content in China. If the PRC government finds that the structure we have adopted for our business operations does not comply with PRC laws and regulations, we could be subject to severe penalties, including the shutting down of our internet platform."

To further develop our business, Dangdang Information established a subsidiary, Wuxi Dangdang Information Technology, Co., Ltd., or Wuxi Dangdang Information, in Wuxi, China in August 2010. Wuxi Dangdang Information supports Dangdang Information in conducting our B2C e-commerce business in China. Dangdang Kewen established a wholly owned subsidiary, Wuxi Dangdang Kewen, in Wuxi in September 2010. Wuxi Dangdang Kewen supports Dangdang Kewen to in conducting our B2C e-commerce business in China. In September 2011, Dangdang Information established a subsidiary, Dangdang Information Technology (Tianjin) Co., Ltd., or Tianjin Dangdang Information, in Tianjin, China, to expand our sales and fulfillment capacities and further develop our business.

We and certain selling shareholders completed an initial public offering of 19,550,000 ADSs in December 2010. On December 8, 2010, we listed our ADSs on the New York Stock Exchange under the symbol "DANG."

Our board of directors received a preliminary non-binding proposal letter dated July 9, 2015 from Ms. Peggy Yu Yu and Mr. Guoqing Li to acquire all of our outstanding common shares not already beneficially owned by them in a going private transaction for $7.812 in cash per ADS, each representing five Class A common shares. Our board of directors has formed a special committee comprised of three independent and disinterested directors, Ms. Ruby Rong Lu, Mr. Ke Zhang and Mr. Xiaolong Li, to consider the proposal and any other alternative proposals or other strategic alternatives that may be available to our company. The special committee is continuing its evaluation of the proposed "going private" transaction. No definitive offer has been made, nor any definitive agreement has been executed, with respect to the proposed "going private" transaction.

Our principal executive offices are located at 21/F, Jing An Center, No. 8 North Third Ring Road East, Chaoyang District, Beijing 100028, People's Republic of China. Our telephone number at this address is (+86-10) 5799-2666. Our registered office in the Cayman Islands is located at the offices of Maples Corporate Services Limited, P.O. Box 309, Ugland House, KY1-1104, Grand Cayman, Cayman Islands.

**B.** **Business Overview**

We are a leading B2C e-commerce company in China. We have focused on selling books online. Based on publicly available information, we believe that we are the largest book retailer in China in terms of revenues. As of December 31, 2015, we offered approximately 1,200,000 book titles on our principal business, including more than 1,100,000 Chinese language titles, which we believe is one of the largest selections of Chinese language titles available both online and offline from a single retailer in China. We offer other media products and selected general merchandise categories on our internet platform, including fashion and apparel beauty and personal care products, home and lifestyle products, and baby, children and maternity products. We also offer the *dangdang.com* marketplace program, which allows third-party merchants to sell their general merchandise products alongside our products. To satisfy the growing needs of our customer base, we broadened our sales formats by launching a flash sales channel in May 2013. While our flash sales channel currently focuses mainly on apparel, we are in the process of broadening the product offerings to include books and other media products, as well as general merchandise.

We have developed a large and loyal customer base through our continuing focus on creating an enjoyable online shopping experience for our customers. We had 27.8 million active customers in 2015. Our average daily unique visitors were approximately 3.1 million in 2015. During 2015, we acquired approximately 17.6 million new customers. We believe that our wide product selection, competitive pricing, rapid and reliable fulfillment and user-friendly and intuitive interface customized for consumers in China are the key attributes of the *Dangdang* customer experience.

30

As a pioneer in China's e-commerce market with over a decade of operating history, we have developed deep supply chain management expertise and strong and, in some cases, strategic relationships with approximately 3,500 suppliers throughout China, which enable us to offer a wide selection of quality products at competitive prices. We have also built our nationwide fulfillment and delivery capabilities, high-quality customer service support and a scalable technology infrastructure to provide a compelling online shopping experience to our customers. Through our extensive fulfillment and delivery network, we offer cash-on-delivery payment service in approximately 3,000 cities and towns in China, a popular payment option for Chinese consumers. As of the end of 2015, we have also equipped our cash-on-delivery network with mobile payment terminals, enabling customers in approximately 2,600 cities and towns to pay with cards on the spot. We also offer our customers other payment options including online payment, wire transfer and postal remittance.

Since 2014, we have a new brand image and a new slogan "敢做敢当当" ("dare to do, and dare to be"). To broaden our service offerings and maintain our competitiveness, we are exploring a number of new business

- Digital reading and publishing—Leveraging our large and engaged customer base and our strong book selling business, we have launched Dangdang e-Reader, page flipping e-books, leisure reading, audio book and other products to cater to increasing customer demand for digital reading. We have developed interactive features on our digital reading platform, such as book review posting and personalized recommendations, to foster a sense of online community and increase customer loyalty. We are also expanding our digital publishing platform by capitalizing on our relationship with book publishers and enabling them to utilize our digital reading products for original content publishing.

- Mobile platform—Our consumers are increasingly using mobile devices for online shopping. In the three months ended December 31, 2015, mobile orders accounted for over 45% of our total orders. In 2015, we developed new features and upgraded our mobile application to enhance our customers' mobile shopping experience. We intend to continue to invest in mobile technology to deliver a convenient and reliable mobile shopping experience.

- Bulk sales—Our leading position in the e-commerce industry provides us with a promising opportunity to further broaden our sales channels. Since 2014, we expanded bulk sales as a new business initiative, which allows our customers to order books and general merchandise in bulk from our website. We intend to further expand our bulk sales business as it benefits us, our customers and business partners.

**Our Internet Platform**

Our internet platform consists of our *dangdang.com* website and our *Dangdang* mobile shopping application.

On our internet platform, we sell books and other media products and general merchandise that we source from publishers, manufacturers and distributors in China. In July 2009, we introduced the *dangdang.com* marketplace program, under which third-party merchants can sell general merchandise products alongside our products and customers can purchase these products through the same checkout process. In May 2013, we broadened our sales formats by launching a flash sales channel on our internet platform. Currently our flash sales channel focuses mainly on apparel products.

*Our Website*. Our website features a user-friendly and intuitive interface designed for consumers in China that allows them to conveniently search for, find and purchase the products they are looking for. In addition, we have a mobile version of our website. We have designed our website to create a reliable, secure, enjoyable and convenient online shopping experience for our customers in order to promote brand loyalty and repeat purchases.

*Our Mobile Application*. Our *Dangdang* mobile application for Android and iOS operating systems allows customers to efficiently view, select and purchase products on their mobile devices. The layout of products offered on our Dangdang application is intuitive and easy to use. Customers can conveniently browse and search for products based on product functionality and can sort product listings by popularity, consumer ratings, price and brand.

- *Browsing*. Our internet platform provides users with useful information on the products for sale, such as a description of the product and, in many cases, images of the product. Our internet platform also offers the following popular features: Flash Sales, *Dangdang* Best Sellers, Special Sale, Also Buy, Also View and Online Reading. Flash Sales features time-limited sales of in-season and off-season products that are limited in availability, which is particularly suited for consumers who seek products with good quality for value and enjoy exciting online shopping experience. The *Dangdang* Best Sellers feature allows users to view the most purchased items in the past. A user can sort the best-selling items by product category and by period of time. The Special Sale feature allows users to view promotional items with deep per-item or volume discounts or

free gifts on offer all on one webpage. The Also Buy and Also View features allow users who are interested in one particular product to obtain personalized recommendations based on the viewing or purchasing records of other customers who have also viewed or bought the same product. The Online Reading feature at *Dangdang* bookstore allows users to view the first several chapters of new arrival books, and to purchase and read e-books on PC as well as on Android phone, Android pad, iPhone and iPad mobile devices.

31

- *Searching and Sorting*. Our customers are able to search for more than thirty million stock keeping units, or SKUs, on our internet platform. For books, we provide a selection of search tools based on title, author, publisher, ISBN, price range and discount, publication date and on-shelf date. For other media products and general merchandise, we provide search tools based on different criteria such as product category, price, brand, size and color. Users can also sort products by popularity, price, arrival date and rating of third-party merchants.

- *Product Reviews and Online Community*. We encourage our customers to write and post their reviews and comments on products on the relevant product page after each purchase. These provide valuable and independent information to other customers who are interested in these products. Users of our Dangdang online community can read and post reviews on books, general merchandise, music, TV shows and movies and initiate or participate in discussions in different forums. The online community provides users of our internet platform with an interactive experience that is intended to encourage them to return to our internet platform frequently, which we believe in turn promotes user loyalty and increases repeat purchases.

- *Personalized Services*. We offer a personalized e-commerce experience by enabling our users to build online shopper profiles reflecting their tastes and interests and by delivering targeted product recommendations based on users' browsing and purchase histories and their wish lists. Each of our customers has a unique user name and password, which allows him or her to track order status and check bonus points accumulated from previous purchases. To facilitate our customers' checkout process, we generate their preferred delivery address, shipping method and payment option at checkout based on information they have previously provided. Even before customers log into their account, our system can recognize them by their browsing histories stored in the cookie and make personalized recommendations based on their browsing histories. We also analyze each customer's purchase patterns and send personalized e-mail notices periodically, updating them on new product launches and promotional and marketing events. We have developed additional personalized services that are tailored for users of our mobile applications, such as location-based recommendations.

- *Checking Out*. To purchase products on our internet platform, our customers simply click to add an item to their virtual shopping cart. Customers can add or remove items in their shopping cart before making a final purchase decision. First-time purchasers need to set up a *Dangdang* account and fill out contact information, shipping and payment details. Existing customers can access their preferred checkout options by logging into their accounts. Our information system automatically confirms each order by e-mail within seconds after the order is placed and updates customers by e-mail or mobile phone text message, or SMS, shortly after orders are shipped.

## Our Product Offerings

### Books and Other Media Products

We have focused on selling books online. As of December 31, 2015, we offered approximately 1,200,000 book titles on our principal business, including more than 1,100,000 Chinese language titles, which we believe is one of the largest selections of Chinese language titles available both online and offline from a single retailer in China. In December 2011, we launched an e-book platform to further enhance our customers' shopping experience. We currently offer approximately 300,000 book titles through the e-book platform.

We have introduced a mobile application to cater to the evolving reading habits of our customers. Our Dangdang Reader application allows customers to browse for, download, purchase and read e-books on Android phone, Android pad, iPhone and iPad mobile devices.

### General Merchandise

We have gradually expanded the product offerings on our internet platform from books and other media products to include several major categories of general merchandise in recent years, including: fashion and apparel; beauty and personal care products; home and lifestyle products; baby, children and maternity products; electronics; apparel and accessories; and footwear, handbags and luggage.

Among the several major categories of general merchandise available on our internet platform, we focus on expanding our own offerings in selected categories and we invite third-party merchants to sell selected product categories to our customers through our *dangdang.com* marketplace program, which generates revenues from commissions and annual listing fees charged to third-party merchants. We currently have approximately five million SKUs of general merchandise products we sell directly to customers or offered by third-party merchants.

To satisfy the growing needs of our customer base, we broadened our sales formats by launching a flash sales channel in May 2013. While our flash sales channel currently focuses mainly on apparel, we are in the process of broadening the product offerings to include books and other media products, as well as general merchandise.

32

We collect and analyze data on our existing and potential customers' purchase patterns and preferences to identify their needs and demands. The analysis of this data guides our selection of new product categories. In this way, we can improve our customers' shopping experience and satisfaction, generate online traffic and convert traffic into orders, and quickly increase sales for newly introduced products.

## Product Sourcing and Pricing

### Product Procurement

We source our products from domestic publishers, manufacturers and distributors. Our nationwide e-commerce distribution platform and comprehensive database of customer preferences and shopping habits enable us to provide significant value to our suppliers, helping them reach our sizeable customer base and target their product offerings more effectively. As a result, we have strong relationships with a network of approximately 3,500 suppliers across China. For our books and other media products, we have long-term relationships with a number of strategic suppliers, who, in some cases, have given us exclusive rights to sell certain popular or hard-to-find books and other media products on more favorable terms within certain prescribed periods. To obtain these favorable terms, we usually commit to meet certain minimum sales target requirements. Due to our large purchase volume, quick product turnover and timely payment, we are able to negotiate favorable supply terms, such as lower procurement prices and shorter lead times, from our suppliers. We typically negotiate and enter into supply agreements on an annual basis. None of our suppliers accounted for more than 10% of the total value of our products in any of the past three years ended December 31, 2015.

We have implemented a strict and methodical selection process for our suppliers. For books and other media products, we review the background of a distributor or a publisher including its qualifications, business operation licenses, reputation and product offerings. For general merchandise, we first review a manufacturer's or distributor's qualifications, business operation licenses and trademark registration certificates or license agreements in relation to any branded products, then conduct due diligence and background checks on the potential supplier's client base, sales and other financial performance. If a supplier satisfies our criteria, we will initiate discussions on the supply agreement and compare the terms with those offered by our other comparable suppliers. We generally enter into supply agreements with suppliers who can provide us with the most competitive prices, payment credit and product return terms.

For the *dangdang.com* marketplace program, our product management team is responsible for generating new ideas for developing and expanding product categories, or sub-categories under a product category. We apply the same selection criteria and review process to third-party merchants as we do to our own general merchandise suppliers. Our third-party merchants include distributors of well-known international consumer product brands.

In addition to the supplier selection process, we have adopted quality assurance and control procedures for our products and third-party products delivered through our fulfillment and delivery network. We inspect multiple product samples delivered to our logistics centers before accepting delivery and we inspect all products to be delivered from our logistics centers to our customers before making shipments. We reject or return products that are not in good condition or that we believe are defective. We believe that our strict supplier selection process and quality control procedures enable us to ensure product quality of products sold on our internet platform and enhance our brand image and help build customer loyalty.

### Pricing

We typically price our books or other media products at a meaningful discount to the cover price and other products at competitive discounts to comparable products sold in physical retail stores. Our competitive pricing is supported by the cost savings from our network of high-quality and reputable suppliers across China and the absence of physical retail space and related overhead. We also track prices of selected key items in both media and general merchandise categories that other online retailers also sell. If we find any major online retailer selling these items at lower prices, we will adjust our prices accordingly to ensure that we offer the best available prices for these key items to our customers.

## Payment and Fulfillment

### Payment and Delivery

We provide our customers the flexibility to choose from a number of payment and delivery options.

Our payment options include cash-on-delivery, online payment, wire transfer and postal remittance. Most of our customers prefer cash-on-delivery. Under this option, our third-party courier companies deliver products to customers' designated addresses and collect payment on site. We have built an extensive distribution network to deliver products and provide our cash-on-delivery payment option to customers in approximately 3,000 cities and towns across China. This payment method not only provides our customers with a secure and convenient payment option, but has also enabled us to reduce our operating expenses as we can combine payment and delivery services by using the same third-party courier companies without incurring additional fees. We have also equipped our cash-on-delivery network with mobile payment terminals, enabling customers in approximately 2,600 cities and towns to pay with cards on the spot. Our internet platform also supports online payment with credit cards and debit cards issued by major banks in China as well as payment through third-party online payment agents.

33

Our delivery options include courier delivery, slow delivery, ordinary mail delivery and express mail service, or EMS. Ordinary mail delivery and EMS are operated by China Post nationwide and provide the broadest coverage, including remote localities in China and places outside China. We usually charge our customers a per-parcel delivery fee based on the delivery method they choose and the size of each parcel and provide free shipping for each order exceeding a pre-determined amount. Customers may also opt to pick-up the products themselves.

Customers who choose cash on delivery can inspect products before payment and reject some or all of the products shipped. Third-party courier personnel collect payment only for the accepted products and return the remaining products to our logistics centers. We believe that our extensive cash on-delivery service, together with our on-site return policy, increase the attractiveness of shopping on our internet platform.

### Fulfillment

Our strategically located central and regional logistics centers and our extensive distribution network are essential to our success. We have 37 logistics centers, including 8 front delivery centers, in 12 cities. Our logistics centers have warehouse space totaling approximately 420,000 square meters in size. In most cases, orders are automatically allocated to a nearby logistics center for fulfillment and parcels are delivered directly to the customers from that center. In the event that a specific item in the order is not available in the nearby logistics center, the unfulfilled part of the order will be automatically routed through our computer system to the central logistics center and delivered separately from the central logistics center to the relevant regional logistics centers, and finally to the customers. In addition, we provide same-day delivery service to customers in 108 cities and next-day-delivery-service to customers in approximately 1,000 cities as well as door-to-door return and exchange service in 2,577 cities and towns.

We monitor each step of the fulfillment process from the time a product is inspected and stocked up to when the product is delivered to a customer to maintain a high level of shipping accuracy.

We had a nationwide delivery network that currently consists of third-party inter-city transportation companies and third-party courier companies, and China Post for ordinary mail delivery and EMS. We leverage our large scale of operations and reputation to obtain favorable contractual terms from third-party transportation and courier companies. In order to reduce the risk of reliance on any single service provider, we typically contract with two or more courier companies in each major city. We regularly monitor and review the third-party transportation and courier companies' performance and their compliance with our contractual terms. In addition, we typically require third-party transportation and courier companies to pay deposits or provide payment guarantees before providing services to us. We typically negotiate and enter into logistics agreements on an annual basis.

Third-party merchants participating our *dangdang.com* marketplace program can use our fulfillment service and cash-on-delivery coverage to deliver their products to customers for a fee or arrange delivery separately. If a third-party merchant chooses to arrange delivery separately, we will closely monitor the speed and service quality through customer surveys and feedback from our customers to ensure customer satisfaction.

## Customer Service

We believe that our ability to establish and maintain a large and loyal customer base and encourage repeat visits and purchases depends, in part, on the strength of our customer service operations. We value communication and feedback from our customers in order to continually improve our customers' shopping experience.

We provide our customers with an array of online self-service features. For example, a customer can use the "my-account" features on our internet platform to track the order and shipment status, review estimated delivery dates, cancel unshipped items, change delivery information and payment options, combine orders and return items.

In addition, our customers can contact customer service representatives through real-time online chat or through our customer service e-mail address around the clock, or through our customer service hotline 24 hours a day, seven days a week. Our customer service center, located in Beijing, had more than 410 employees as of December 31, 2015. They are trained to address customer inquiries, handle customers' requests to exchange or return products and resolve customer complaints. We maintain service quality by placing emphasis on careful selection of personnel and regularly monitoring the performance of our representatives. Each new representative is required to complete a two-month mandatory training program, including in-class instruction and exams and on-the-job coaching, and representatives also attend regular training sessions conducted by experienced managers on product knowledge, service attitude, complaint handling and communication skills.

We have a flexible product exchange and return policy. Our customers can exchange or return books and other media products purchased on our internet platform within fifteen days of receipt of the products or return other products within seven days of receipt. For most books and other media products, a customer does not need to give any reason for exchange or return. For electronics, a customer may typically exchange or return a product with quality problems after providing us with a quality verification report issued by a third-party quality verification agent. Once a customer submits an exchange or return application request online, and a quality verification report if needed, our customer service representatives will review and process the request or contact the customer by e-mail or by phone if there are any questions relating to the request. For customers in major cities in China, we will arrange courier pick-up for the returned products from the customer within three to seven working days after our customer service representatives process the request. Depending on the customer's payment method, we will either return the purchase amount in cash at the time of courier pick-up or credit the customer's credit card, debit card or *Dangdang* account.

## Marketing and Promotion

We seek to strengthen the *Dangdang* brand name and build strong customer loyalty through our marketing and promotional efforts.

We believe that the most efficient marketing method is to improve the customer experience, which drives word-of-mouth and repeat customer visits. We intend to build customer loyalty by delivering personalized services through innovative technologies as well as creative and flexible merchandising. We have accumulated extensive data on our customers over the past decade, and we analyze this data to predict their potential needs and purchasing trends, and direct different marketing campaigns to them. We believe that our sophisticated data analysis facilitates our targeted marketing efforts and increases repeat purchases and purchase value per customer.

In addition, we employ a variety of programs and marketing activities to promote our brand and our products:

- *Affiliate marketing program*. We expand our market presence through our affiliate marketing program, which enables affiliated websites to earn commissions by directing their users to purchase our products through embedded hyperlinks to our website.

- *Paid search*. We utilize various popular search engines and internet portals in China. We pay for keywords or phrases relevant to our business and products so that users who search for these keywords or phrases will be directed to our website or to our advertisements.

- *Loyalty program*. We provide a variety of incentives to our existing customers. Our customers can obtain bonus points for each purchase and receive information on our latest products and marketing events and may be eligible to receive free trial coupons for new products. When our customers' accumulated purchases within 12 months reach pre-set thresholds, they will be upgraded to gold or diamond member status and will be entitled to additional incentives such as special discounts on subsequent purchases or to convert certain kinds of coupons. We also periodically send personalized e-mails, SMS messages and mobile push notifications to our customers to draw their attention to our latest products and marketing events.

- *Social media and other tools*. We conduct marketing campaigns and offer special promotional discounts on products from time to time. In addition, we utilize the online community on our internet platform and that of popular social networking sites for customers to share their online shopping experience. We also employ other marketing channels to reach existing and potential customers.

## Competition

The online retail environment for our products is intensely competitive. Our current or potential competitors include: (i) online retailers and e-commerce platform companies, such as Alibaba Group, which operates Taobao.com and Tmall.com, Amazon China, which operates Amazon.cn, JD.com, Inc., which operates JD.com, and Jumei; (ii) physical retailers, catalog retailers, publishers, distributors and manufacturers of our products, many of which possess significant brand recognition, sales volume and customer bases, and some of which currently sell, or in the future may sell, products or services through the internet; (iii) a number of indirect competitors, including internet portals and internet search engines that are involved in e-commerce, either directly or in collaboration with other retailers; and (iv) providers of electronic books and digital content.

We believe that the principal competitive factors in our market segments include brand recognition, selection, price, convenience, customer service, speed of fulfillment capacities and ease of use. For services we offer to business and individual sellers under the *dangdang.com* marketplace program, additional competitive factors include the quality of our services and tools as well as

the speed of performance for our services. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Business—We face intense competition, and if we do not compete successfully against existing and new competitors, we may lose market share and customers."

35

## Intellectual Property

We regard our trademarks, service marks, domain names, trade secrets, proprietary technologies and similar intellectual property as critical to our success, and we rely on trademark law, trade secret protection and confidentiality and/or license agreements with our employees, suppliers, partners and others to protect our proprietary rights. As of February 29, 2016, we registered 119 domain names, including *dangdang.com*, *dangdang.com.cn* and *dangdang.cn*, 83 trademarks and service marks and one patent, and had 162 trademark applications pending in China.

## Insurance

We maintain various insurance policies to safeguard against risks and unexpected events. We have purchased all risk property insurance covering our equipment, facilities, inventories and other properties. In addition, we provide group accident insurance and supplementary medical insurance for our employees. We do not maintain business interruption insurance or general third-party liability insurance, nor do we maintain product liability insurance or key-man life insurance. We consider our insurance coverage to be sufficient for our business operations in China.

## Legal Proceedings

We are currently not a party to, and we are not aware of any threat of, any legal, arbitration or administrative proceedings that, in the opinion of our management, are likely to have a material adverse effect on our business, financial condition or results of operations. We may from time to time become a party to various legal, arbitration or administrative proceedings arising in the ordinary course of our business.

## PRC Regulation

Online commerce in China is subject to a number of laws and regulations. This section summarizes all material PRC regulations relevant to our business and operations in China and the key provisions of such regulations.

### Corporate Laws and Industry Catalogue Relating to Foreign Investment

The establishment, operation and management of corporate entities in China are governed by the Company Law of the PRC, or the Company Law. The Company Law is applicable to our PRC subsidiaries and our affiliated PRC entity and its subsidiaries unless the PRC laws on foreign investment have stipulated otherwise.

The establishment, approval, registered capital requirement and day-to-day operational matters of wholly foreign-owned enterprises, such as our PRC subsidiary, Dangdang Information, are regulated by the Wholly Foreign-owned Enterprise Law of the PRC and the Implementation Rules of the Wholly Foreign-owned Enterprise Law of the PRC.

Investment activities in the PRC by foreign investors are principally governed by the Guidance Catalogue of Industries for Foreign Investment, or the Catalogue, which was promulgated and is amended from time to time by the MOC, and the National Development and Reform Commission. The Catalogue divides industries into three categories: encouraged, restricted and prohibited. Industries not listed in the Catalogue are generally open to foreign investment unless specifically restricted by other PRC regulations.

Establishment of wholly foreign-owned enterprises is generally permitted in encouraged industries. Some restricted industries are limited to equity or contractual joint ventures, while in some cases Chinese partners are required to hold the majority interests in such joint ventures. For example, sales and distribution of audio and video products are among the restricted categories and only contractual joint ventures in which Chinese partners holding majority interests can engage in the distribution of audio and video products in China. In addition, restricted category projects are also subject to higher-level government approvals. Foreign investors are not allowed to invest in industries in the prohibited category.

### Regulations Relating to Foreign-invested Enterprises Engaging in Retail Businesses

As an online retailer, we are subject to regulations relating to foreign-invested enterprises engaging in the retail business. In April 2004, the MOC issued the Administrative Measures on Foreign Investment in Commercial Sectors, or the Measures. Pursuant to the Measures, foreign investors are permitted to engage in the distribution services by setting up commercial enterprises in accordance with the procedures and guidelines provided in the Measures.

**Regulations Relating to Telecommunications Services**

     In September 2000, the State Council issued the Regulations on Telecommunications of China, or the Telecommunications Regulations, to regulate telecommunications activities in China. The telecommunications industry in China is governed by a licensing system based on the classifications of telecommunications services set forth under the Telecommunications Regulations.

36

---

The Ministry of Industry and Information Technology, or the MIIT, previously known as the Ministry of Information Industry, together with the provincial-level communications administrative bureaus, supervises and regulates the telecommunications industry in China. The Telecommunications Regulations divide telecommunications services into two categories: infrastructure telecommunications services and value-added telecommunications services. The operation of value-added telecommunications services is subject to the examination, approval and the granting of licenses by the MIIT or the provincial-level communications administrative bureaus. According to the Catalogue of Classification of Telecommunications Businesses effective in April 2003, provision of information services through the internet, such as the operation of our *dangdang.com* website, is classified as value-added telecommunications services.

### Regulations Relating to Foreign Investment in Value-Added Telecommunications Industry

According to the Administrative Rules for Foreign Investment in Telecommunications Enterprises issued by the State Council, effective in January 2002 and as amended in September 2008, a foreign investor may hold no more than a 50% equity interest in a value-added telecommunications services provider in China and such foreign investor must have experience in providing value-added telecommunications services overseas and maintain a good track record.

The Circular on Strengthening the Administration of Foreign Investment in and Operation of Value-added Telecommunications Business, or the Circular, issued by the MIIT in July 2006, reiterated the regulations on foreign investment in telecommunications businesses, which require foreign investors to set up foreign-invested enterprises and obtain an internet content provider, or ICP, license to conduct any value-added telecommunications business in China. Under the Circular, a domestic company that holds an ICP license is prohibited from leasing, transferring or selling the license to foreign investors in any form, and from providing any assistance, including providing resources, sites or facilities, to foreign investors that conduct value-added telecommunications business illegally in China. Furthermore, certain relevant assets, such as the relevant trademarks and domain names that are used in the value-added telecommunications business must be owned by the local ICP license holder or its shareholders. The Circular further requires each ICP license holder to have the necessary facilities for its approved business operations and to maintain such facilities in the regions covered by its license. In addition, all value-added telecommunications service providers are required to maintain network and information security in accordance with the standards set forth under relevant PRC regulations. If an ICP license holder fails to comply with the requirements in the Circular and also fails to remedy such non-compliance within a specified period of time, the MIIT or its local counterparts have the discretion to take administrative measures against such license holder, including revoking its ICP license. To comply with the Circular, Dangdang Information has transferred certain domain names to Dangdang Kewen.

### Regulations Relating to Internet Information Services and Content of Internet Information

In September 2000, the State Council issued the Administrative Measures on Internet Information Services, or the Internet Measures, to regulate the provision of information services to online users through the internet. According to the Internet Measures, internet information services are divided into two categories: services of an operative nature and services of a non-operative nature. Our business conducted through our *dangdang.com* website involves operating internet information services, which requires us to obtain an ICP license. If an internet information service provider fails to obtain an ICP license, the relevant local branch of the MIIT may levy fines, confiscate its income or even block its website. Due to the PRC law restriction that foreign investors cannot hold more than a 50% equity interest in a value-added telecommunications services provider, we hold our ICP license through our affiliated PRC entity, Dangdang Kewen, and its subsidiaries. Each of Dangdang Kewen and Wuxi Dangdang Kewen currently holds an ICP license issued by the relevant local branches of the MIIT.

The Internet Measures further specify that the internet information services regarding, among others, news, publication, education, medical and health care, pharmacy and medical appliances are required to be examined, approved and regulated by the relevant authorities. Internet content providers are prohibited from providing services beyond that included in the scope of their business license or other required licenses or permits. Furthermore, the Internet Measures clearly specify a list of prohibited content. Internet content providers must monitor and control the information posted on their websites. If any prohibited content is found, they must remove the offending content immediately, keep a record and report to the relevant authorities.

In May 2010, the SAIC issued the Interim Measures for the Trading of Commodities and Services through the Internet effective in July 2010, which requires internet service providers that operate internet trading platforms to register and verify online shop owners' identities along with their business credentials, establish mechanisms to ensure safe online transactions, protect online shoppers' rights, and prevent the sale of counterfeit goods. We are subject to this rule as a result of our operation of the *dangdang.com* marketplace program.

To address issues related to the hearing of civil disputes concerning the infringement of the right of communication through information networks, the PRC Supreme People's Court issued the Provisions on Several Issues Concerning the Application of Law in Hearings of Civil Dispute Cases on the Infringement of Information Networking Transmission Rights, or the Supreme Court Provisions, which took effect as of January 1, 2013. The Supreme Court Provisions provide more detailed guidance as to the circumstances in which the provision by internet users or internet service providers of others' works, performances, and audio or video products without permission from the rights owner constitutes infringement of information network transmission rights. The Supreme Court Provisions provide that internet service providers will be jointly liable if they assist in the infringing activities or fail to remove infringing content from their websites once they become to know the infringement or receive notice from the rights holder. The Supreme Court Provisions also provide that where an internet service provider obtains economic advantage directly from the works, performances, and sound or visual recordings provided by the internet users, it owes higher duty of attention in terms of the infringement of network information transmission rights by internet users. We are an internet service provider because of our operation of *dangdang.com* and are therefore subject to the Supreme Court Provisions.

**Regulations Relating to Privacy Protection**

As an internet content provider, we are subject to regulations relating to protection of privacy. Under the Internet Measures, internet content providers are prohibited from producing, copying, publishing or distributing information that is humiliating or defamatory to others or that infringes the lawful rights and interests of others. Internet content providers that violate the prohibition may face criminal charges or administrative sanctions by PRC security authorities. In addition, relevant authorities may suspend their services, revoke their licenses or temporarily suspend or close down their websites. The regulation further authorizes relevant telecommunication authorities to order internet content providers to rectify any unauthorized disclosure. Internet content providers could be subject to legal liabilities if unauthorized disclosure causes damages or losses to internet users. However, the PRC government retains the power and authority to order internet content providers to provide the personal information of internet users if the users post any prohibited content or engage in illegal activities through the internet. We believe that we are currently in compliance with these regulations in all material aspects.

In December 2012, the Standing Committee of the National People's Congress of the PRC issued the Decision on Strengthening the Protection of Online Information, or the Decision. Most requirements under the Decision that are relevant to internet content providers are consistent with the requirements already established under the provisions as discussed above, though often more strict and broad. Under the Decision, if an internet content provider wishes to collect or use personal electronic information, it must do so in a lawful and appropriate manner, and may do so only if it is necessary for the services it provides. It must disclose the purpose, method and scope of any such collection or use, and must seek consent from the relevant individuals. Internet content providers are also required to publish their policies relating to information collection and use, must keep such information strictly confidential, and must take technological and other measures to ensure the safety of such information. Internet content providers are further prohibited from disclosing, distorting or destroying any such personal electronic information, or selling or proving such information to other parties. The Decision also requires that internet content providers providing information publishing services must collect from users their personal identification information, for registration. In very broad terms, the Decision provides that violators may face warnings, fines, confiscation of illegal gains, revocation of licenses, cancellation of filings and closure of websites. As an internet content provider, we are subject to the Decision.

**Regulations Relating to Internet Publishing**

We are subject to regulations relating to internet publishing. In June 2002, General Administration of Press and Publication and the MIIT jointly issued the Interim Provisions on Internet Publishing, or the Internet Publishing Regulations. The Internet Publishing Regulations require that all entities engaging in internet publishing, such as our company, obtain approval from General Administration of Press and Publication before conducting any internet publishing business. "Internet publishing" is broadly defined in the Internet Publishing Regulations as any act of online dissemination of works created by ICP license holders or others that such ICP license holders select, edit and process and subsequently post on the internet or transmit to users via the internet for browsing, reading, using or downloading by the public. These works include content from books, newspapers, periodicals, audio-video products, electronic publications that have already been formally published or works that have been made public in other media or from the browsed and processed works relating to literature, art, natural science, social science, engineering technology and others. The Internet Publishing Regulations include a requirement for internet publishing organizations to have professional editorial personnel examine the contents being published to ensure that they comply with applicable laws. If any entity engaging in internet publishing fails to obtain an internet publishing certificate from the General Administration of Press and Publication, the relevant press and publication authorities may terminate its business, levy fines or confiscate its income, or its facilities or other materials used for internet publishing. Dangdang Kewen currently holds an internet publishing certificate issued by the General Administration of Press and Publication.

**Regulations Relating to Wholesale and Retail of Books and Audio-Video Products**

We are also subject to regulations relating to the wholesaling and retailing of books and audio-video products. Under the Administrative Measures for the Publication Market promulgated by the General Administration of Press and Publication, effective in September 2003 and with the latest amendment in March 2011, any entity or individual engaging in wholesale or retail of books and audio-video products must obtain an approval from the competent press and publication administrative authority and receive the Publication Operation Permit. Dangdang Information, Dangdang Kewen, Wuxi Dangdang Information and Tianjin Dangdang Information have obtained a Publication Operation Permit for books, and Dangdang Kewen has obtained an Audio-Video Produced Business Permit.

Furthermore, according to the Notice on Promoting the Healthy Development of Online Distribution of Publications issued by the General Administration of Press and Publication in December 2010, any entities engaging in online publications distribution in China must apply for the Publications Operation Permit with the notation "online distribution." As of the date of this annual report, the Publication Operation Permits possessed by Dangdang Information and Tianjin Dangdang Information and the Audio-Video Product Business Permit possessed by Dangdang Kewen contain the "online distribution" notation. Wuxi Dangdang Information's Publication Operation Permit does not contain such a notation. Based on our informal communication with Wuxi local government, it is not mandatory for a company like Wuxi Dangdang Information to apply for "online distribution" notation in Wuxi. However, if the relevant local authority subsequently determines that Wuxi Dangdang Information is subject to such requirement, Wuxi Dangdang Information may be subject to penalties for failing to applying for such "online distribution" notation. These penalties may include fines and disgorgement of gains or revocation of business license of Wuxi Dangdang Information, although we believe that, as a matter of practice, government authorities typically impose an extreme penalty only after repeated warnings are ignored or where a violation is blatant and continuous.

**Regulations Relating to Taxation**

*PRC Enterprise Income Tax*

The PRC Enterprise Income Tax Law, effective January 1, 2008, applies a uniform 25% enterprise income tax rate to both foreign-invested enterprises and domestic enterprises, unless tax incentives are granted to special industries and projects. Under the PRC Enterprise Income Tax Law and its implementation regulations, dividends generated from the business of a PRC subsidiary after January 1, 2008 and payable to its foreign investor may be subject to a withholding tax rate of 10% if the PRC tax authorities determine that the foreign investor is a non-resident enterprise, unless there is a tax treaty with China that provides for a preferential withholding tax rate. Distributions of earnings generated before January 1, 2008 are exempt from PRC withholding tax.

Under the PRC Enterprise Income Tax Law, an enterprise established outside China with "de facto management bodies" within China is considered a "resident enterprise" for PRC enterprise income tax purposes and is generally subject to a uniform 25% enterprise income tax rate on its worldwide income. A circular issued by the State Administration of Taxation, or SAT, in April 2009, which is amended and supplemented by the Announcement Regarding the Determination of PRC Tax Resident Enterprises on the Basis of De Facto Management Bodies issued by SAT on January 29, 2014, regarding the standards used to classify certain Chinese-invested enterprises controlled by Chinese enterprises or Chinese enterprise groups and established outside of China as "resident enterprises" clarified that dividends and other income paid by such PRC "resident enterprises" will be considered PRC-source income and subject to PRC withholding tax, currently at a rate of 10%, when paid to non-PRC enterprise shareholders. This circular also subjects such PRC "resident enterprises" to various reporting requirements with the PRC tax authorities.

Under the implementation regulations to the PRC Enterprise Income Tax Law, a "de facto management body" is defined as a body that has material and overall management and control over the manufacturing and business operations, personnel and human resources, finances and properties of an enterprise. In addition, the tax circular mentioned above specifies that certain PRC-invested overseas enterprises controlled by a Chinese enterprise or a Chinese enterprise group in the PRC will be classified as PRC resident enterprises if the following are located or resident in the PRC: senior management personnel and departments that are responsible for daily production, operation and management; financial and personnel decision making bodies; key properties, accounting books, the company seal, and minutes of board meetings and shareholders' meetings; and half or more of the senior management or directors having voting rights.

Please see "Item 3. Key Information—D. Risk Factors—Risks Related to Doing Business in China—Under the PRC Enterprise Income Tax Law, we may be classified as a PRC 'resident enterprise,' which could result in unfavorable tax consequences to us and our shareholders and have a material adverse effect on our results of operations and the value of your investment."

In January 2009, SAT promulgated the Provisional Measures for the Administration of Withholding of Enterprise Income Tax for Non-resident Enterprises, or the Non-resident Enterprises Measures, pursuant to which, the entities which have the direct obligation to make certain payments to a non-resident enterprise shall be the relevant tax withholders for such non-resident enterprise. Further, the Non-resident Enterprises Measures provides that in case of an equity transfer between two non-resident enterprises which occurs outside China, the non-resident enterprise which receives the equity transfer payment shall, by itself or engage an agent to, file tax declaration with the PRC tax authority located at place of the PRC company whose equity has been transferred, and the PRC company whose equity has been transferred shall assist the tax authorities to collect taxes from the relevant non-resident enterprise. On April 30, 2009, the MOF and the SAT jointly issued the Notice on Issues Concerning Process of Enterprise Income Tax in Enterprise Restructuring Business, or Circular 59. On December 10, 2009, the SAT issued Circular 698. Both Circular 59 and SAT Circular 698 became effective retroactively as of January 1, 2008. By promulgating and implementing these two circulars, the PRC tax authorities have enhanced their scrutiny over the direct or indirect transfer of equity interests in a PRC resident enterprise by a non-resident enterprise.

In February 2015, the SAT issued Public Notice 7, to supersede tax rules in relation to the Indirect Transfer of Shares under Circular 698, while the other provisions of Circular 698 remain in force. Public Notice 7 covers transactions involving not only Indirect Transfer of Shares as set forth under Circular 698 but also transactions involving an overseas enterprise's indirect transfer of other property or assets (such as real properties) located in China, collectively, PRC Taxable Properties, through transfer of shares of an offshore intermediary company.

Pursuant to Public Notice 7, in the event that non-residential enterprises indirectly transfer PRC Taxable Properties without reasonable commercial reason in order to evade PRC enterprise income tax, such indirect transfer will be deemed as direct transfer of PRC Taxable Properties and, therefore, be subject to PRC enterprise income tax. In addition, Public Notice 7 provides clearer criteria on how to assess reasonable commercial purposes and allows for safe harbor scenarios applicable to internal group restructurings. Under Public Notice 7, subject to certain exceptions such as internal group restructurings and purchase and sale of shares of the same publicly-listed oversea enterprise in a public securities market, an indirect transfer of PRC Taxable Properties shall be directly deemed as having no reasonable commercial purposes if the following circumstances are satisfied: (i) more than 75% of the value of overseas enterprises' shares directly or indirectly comes from PRC Taxable Properties; (ii) at any time within one year before the indirect transfer of PRC Taxable Properties, more than 90% the total amount of overseas enterprises' assets (excluding cash) are directly or indirectly constituted by their investment within the PRC, or within one year before the indirect transfer of PRC Taxable Properties, more than 90% of the overseas enterprises' income directly or indirectly derive from the PRC; (iii) the overseas enterprises and their controlling enterprises which directly or indirectly hold PRC Taxable Properties, cannot justify the economic substance of the corporate structure; and (iv) overseas tax payment regarding indirect transfer of PRC Taxable Properties is lower than PRC tax payment regarding direct transfer of PRC Taxable Properties. Public Notice 7 also brings uncertainties to the offshore transferor and transferee of the indirect transfer of PRC Taxable Properties as they have to make self-assessment on whether the transaction should be subject to PRC tax and to file or withhold the PRC tax accordingly. As a result, where non-resident investors were involved in our private equity financing or share transfer between two or more offshore parties, if such transactions were determined by the tax authorities to lack reasonable commercial reason, we and our non-resident investors may become at risk of being taxed under Circular 698 and Public Notice 7 and may be required to expend valuable resources to comply with Circular 698 and Public Notice 7 or to establish that we should not be taxed under Circular 698 and Public Notice 7, which may have an adverse effect on our financial condition and results of operations.

The PRC tax authorities have considerable discretion under Circular 59, Circular 698 and Public Notice 7 to make adjustments to the taxable capital gains based on the difference between the fair value of the equity interests transferred and the cost of investment. We may pursue acquisitions in the future that may involve complex corporate structures. If we are considered a non-resident enterprise under the PRC Enterprise Income Tax Law and if the PRC tax authorities make adjustments to the taxable income of the transactions under Circular 698 and Public Notice 7, our income tax costs associated with such potential acquisitions may be increased. See "Item 3. Key Information—D. Risk Factors—Risks Related to Doing Business in China—We face uncertainties with respect to indirect transfers of equity interests in PRC resident enterprises by their non-PRC holding companies. Enhanced scrutiny over acquisition transactions by the PRC tax authorities may have a negative impact on potential acquisitions we may pursue in the future."

### PRC Business Tax and VAT

Pursuant to applicable PRC tax regulations, any entity or individual conducting business in the service industry is generally required to pay a business tax at the rate of 5% on the revenues generated from providing such services. However, if the services provided are related to technology development and transfer, business tax may be exempted subject to approval by the relevant tax authorities.

Pursuant to applicable PRC tax regulations, any entity engaging in sale of goods is generally required to pay a value-added tax at the rate of 17% or 13%, depending on the type of goods.

40

In November 2011, the Ministry of Finance and SAT promulgated the Pilot Program for Imposition of Value-Added Tax to Replace Business Tax. Pursuant to this program and relevant notices, from January 1, 2012, a VAT has been adopted to replace the business tax in the transport and shipping industry and some of the modern service industries in certain pilot regions. The pilot program initially applied only to the pilot industries in Shanghai, and has been expanded to eight additional regions, including, among others, Beijing, Tianjin and Jiangsu province, in 2012, and further expanded nationally in 2013. Under the pilot program, a VAT rate of 6% applies to some modern service industries, including our third-party marketplace business and online advertising service.

All of our PRC subsidiaries and our affiliated PRC entity and its subsidiaries, which are located in Beijing, Tianjin and Jiangsu province, fall within the scope of the pilot program and have been recognized as the VAT general taxpayers since September 1, 2012, December 1, 2012 and October 1, 2012, respectively, the effective date of the pilot program in each of the regions. From the applicable effective time onwards, these entities pay VAT instead of business tax for marketplace program revenues, online advertising services and other services at a rate of 6%.

Pursuant to the Notice Regarding the Continuation of Value-added Tax and Business Tax Preferential Policies for the Public Cultural Industry promulgated by the Ministry of Finance and SAT in December 2013, or Circular 87, value-added tax is exempted for the wholesale and retail of books from January 1, 2013 to December 31, 2017. According to Circular 87, the exempted value-added tax or business tax that have been collected before the issuance of Circular 87 can be used to offset future value-added tax and business tax, or be refunded. Our PRC subsidiaries and our affiliated PRC entity and its subsidiaries located in Beijing, Tianjin and Jiangsu have submitted the applications to the relevant governmental authorities and have been approved for value-added tax exemption from the wholesale and retail of books since January 1, 2014. We applied for and received value-added tax refunds from the relevant governmental authorities amounting to RMB106 thousand during 2014.

**Regulations Relating to Foreign Exchange**

Pursuant to the Regulations on the Administration of Foreign Exchange issued by the State Council, effective in 1996 and with the latest amendment in August 2008, current account transactions, such as sale or purchase of goods, are not subject to PRC governmental control or restrictions. Certain organizations in the PRC, including foreign-invested enterprises, may purchase, sell and/or remit foreign currencies at certain banks authorized to conduct foreign exchange business upon providing valid commercial documents. However, approval of the PRC State Administration of Foreign Exchange, or SAFE, is required for capital account transactions.

In August 2008, SAFE issued a circular on the conversion of foreign currency into Renminbi by a foreign-invested company that regulates how the converted Renminbi may be used. The circular requires that the registered capital of a foreign-invested enterprise converted into Renminbi from foreign currencies may only be utilized for purposes within its business scope. For example, such converted amounts may not be used for investments in or acquisitions of other companies, which can inhibit the ability of companies to consummate such transactions. In addition, SAFE strengthened its oversight of the flow and use of the Renminbi registered capital of foreign-invested enterprises converted from foreign currencies. The use of such Renminbi capital may not be changed without SAFE's approval, and may not in any case be used to repay Renminbi loans if the proceeds of such loans have not been utilized. Violations may result in severe penalties, such as heavy fines.

In November 2012, SAFE promulgated the Circular of Further Improving and Adjusting Foreign Exchange Administration Policies on Foreign Direct Investment which substantially amends and simplifies the current foreign exchange procedure. Pursuant to this circular, the opening of various special purpose foreign exchange accounts (*e.g.*, pre-establishment expenses account, foreign exchange capital account, guarantee account), the reinvestment of lawful incomes derived by foreign investors in the PRC (*e.g.*, profit, proceeds of equity transfer, capital reduction, liquidation and early repatriation of investment), and purchase and remittance of foreign exchange as a result of capital reduction, liquidation, early repatriation or share transfer in a foreign-invested enterprise no longer require SAFE approval, and multiple capital accounts for the same entity may be opened in different provinces, which was not possible before. In addition, SAFE promulgated the Circular on Printing and Distributing the Provisions on Foreign Exchange Administration over Domestic Direct Investment by Foreign Investors and the Supporting Documents in May 2013, which specifies that the administration by SAFE or its local branches over direct investment by foreign investors in the PRC shall be conducted by way of registration and banks shall process foreign exchange business relating to the direct investment in the PRC based on the registration information provided by SAFE and its branches.

On February 13, 2015, SAFE promulgated the Circular on Further Simplifying and Improving the Policies Concerning Foreign Exchange Control on Direct Investment, or SAFE Circular No. 13, which will take effect on June 1, 2015. SAFE Circular No. 13 delegates the authority to enforce the foreign exchange registration in connection with the inbound and outbound direct investment

under relevant SAFE rules to certain banks and therefore further simplifies the foreign exchange registration procedures for inbound and outbound direct investment.

41

### Regulations Relating to Labor

The Labor Contract Law, which became effective in January 2008, and its implementation rules, impose more restrictions on employers and have been deemed to increase labor costs for employers, compared to the Labor Law, which became effective in January 1995. For example, pursuant to the Labor Contract Law, an employer is obliged to sign labor contract with unlimited term with an employee if the employer continues to hire the employee after the expiration of two consecutive fixed-term labor contracts. The employer has to compensate the employee upon the expiration of a fixed-term labor contract, unless the employee refuses to renew such contract on terms the same as or more favorable to the employee than those contained in the expired contract. The employer also has to indemnify an employee if the employer terminates a labor contract without a cause permitted by law. In addition, under the Regulations on Paid Annual Leave for Employees, which became effective in January 2008, employees who have served more than one year for an employer are entitled to a paid vacation ranging from 5 to 15 days per year, depending on their length of service. Employees who waive such vacation time at the request of employers must be compensated for three times their regular salaries for each waived vacation day.

### Regulations on Dividend Distribution

Wholly foreign-owned companies in the PRC may pay dividends only out of their accumulated profits after tax as determined in accordance with PRC accounting standards. Remittance of dividends by a wholly foreign-owned enterprise out of China is subject to examination by the banks designated by SAFE. Wholly foreign-owned companies may not pay dividends unless they set aside at least 10% of their respective accumulated profits after tax each year, if any, to fund certain reserve funds, until such time as the accumulative amount of such fund reaches 50% of the wholly foreign-owned company's registered capital. In addition, these companies also may allocate a portion of their after-tax profits based on PRC accounting standards to staff welfare and bonus funds at their discretion. These reserve funds and staff welfare and bonus funds are not distributable as cash dividends.

### Regulations Relating to E-Commerce

China's e-commerce industry is at an early stage of development and there are few PRC laws or regulations specifically regulating the e-commerce industry. In May 2010, the SAIC adopted the Interim Measures for the Administration of Online Commodities Trading and Relevant Services, which took effect in July 2010. Under these measures, enterprises or other operators which engage in online commodities trading and other services and have been registered with the SAIC or its local branches must make the information stated in their business license available to the public or provide a link to their business license on their website. Online distributors must adopt measures to ensure safe online transactions, protect online shoppers' rights and prevent the sale of counterfeit goods. Information on products and transactions released by online distributors must be authentic, accurate, complete and sufficient.

In January 2014, the SAIC promulgated the Administrative Measures for Online Trading, which terminated the above interim measures and became effective in March 2014. The Administrative Measures for Online Trading further strengthen the protection of consumers and impose more stringent requirements and obligations on online business operators and third-party online marketplace operators. For example, online business operators are required to issue invoices to consumers for online products and services. Consumers are generally entitled to return products purchased from online business operators within seven days upon receipt, without giving any reason. Online business operators and third-party online marketplace operators are prohibited from collecting any information on consumers and business operators, or disclosing, selling or providing any such information to any third party, or sending commercial electronic messages to consumers, without their consent. Fictitious transactions, deletion of adverse comments and technical attacks on competitors' websites are prohibited as well. In addition, third-party online marketplace operators are required to examine and verify the identifications of the online business operators and set up and keep relevant records for at least two years. Moreover, any third-party online marketplace operator that simultaneously engages in online trading for products and services should clearly distinguish itself from other online business operators on the marketplace platform. We are subject to these measures as a result of our online direct sales and online marketplace.

### Regulations Relating to Product Quality and Consumer Protection

The Product Quality Law applies to all production and sale activities in China. Pursuant to this law, products offered for sale must satisfy relevant quality and safety standards. Enterprises may not produce or sell counterfeit products in any fashion, including forging brand labels or giving false information regarding a product's manufacturer. Violations of state or industrial standards for health and safety and any other related violations may result in civil liabilities and administrative penalties, such as compensation for damages, fines, suspension or shutdown of business, as well as confiscation of products illegally produced and sold and the proceeds from such sales. Severe violations may subject the responsible individual or enterprise to criminal liabilities. Where a defective product

11/13/2019
https://www.sec.gov/Archives/edgar/data/1499744/000114420416097925/v436212_20f.htm

causes physical injury to a person or damage to another person's property, the victim may claim compensation from the manufacturer or from the seller of the product. If the seller pays compensation and it is the manufacturer that should bear the liability, the seller has a right of recourse against the manufacturer. Similarly, if the manufacturer pays compensation and it is the seller that should bear the liability, the manufacturer has a right of recourse against the seller.

42

The Consumer Protection Law sets out the obligations of business operators and the rights and interests of the consumers in China. Pursuant to this law, business operators must guarantee that the commodities they sell satisfy the requirements for personal or property safety, provide consumers with authentic information about the commodities, and guarantee the quality, function, usage and term of validity of the commodities. Failure to comply with the Consumer Protection Law may subject business operators to civil liabilities such as refunding purchase prices, replacement of commodities, repairing, ceasing damages, compensation, and restoring reputation, and even subject the business operators or the responsible individuals to criminal penalties when personal damages are involved or if the circumstances are severe. The Consumer Protection Law was further amended in October 2013 and became effective in March 2014. The amended Consumer Protection Law further strengthen the protection of consumers and impose more stringent requirements and obligations on business operators, especially on the business operators through the internet. For example, the consumers are entitled to return the goods (except for certain specific goods) within seven days upon receipt without any reasons when they purchase the goods from business operators on the internet. The consumers whose interests have been damaged due to their purchase of goods or acceptance of services on online marketplace platforms may claim damages from sellers or service providers. Where the providers of the online marketplace platforms are unable to provide the real names, addresses and valid contact details of the sellers or service providers, the consumers may also claim damages from the providers of the online marketplace platforms. Providers of online marketplace platforms that know or should have known that sellers or service providers use their platforms to infringe upon the legitimate rights and interests of consumers but fail to take necessary measures must bear joint and several liabilities with the sellers or service providers. Moreover, if business operators deceive consumers or knowingly sell substandard or defective products, they should not only compensate consumers for their losses, but also pay additional damages equal to three times the price of the goods or services.

We are subject to the Product Quality Law and the Consumer Protection Law as an online supplier of commodities and a provider of online marketplace platform and believe that we are currently in compliance with these regulations in all material aspects.

**SAFE Regulations on Offshore Special Purpose Companies Held by PRC Residents or Citizens**

Pursuant to SAFE's Notice on Relevant Issues Concerning Foreign Exchange Administration for PRC Residents to Engage in Financing and Inbound Investment via Overseas Special Purpose Vehicles, or SAFE Circular No. 75, issued in October 2005, and a series of implementation rules and guidance, including the circular relating to operating procedures that came into effect in July 2011, PRC residents, including PRC resident natural persons or PRC companies, must register with local branches of SAFE in connection with their direct or indirect offshore investment in an overseas special purpose vehicle, or SPV, for the purposes of overseas equity financing activities, and to update such registration in the event of any significant changes with respect to that offshore company. SAFE promulgated the Circular on Relevant Issues Concerning Foreign Exchange Control on Domestic Residents' Offshore Investment and Financing and Roundtrip Investment through Special Purpose Vehicles, or SAFE Circular No. 37, on July 4, 2014, which replaced the SAFE Circular No. 75. SAFE Circular No. 37 requires PRC residents to register with local branches of SAFE in connection with their direct establishment or indirect control of an offshore entity, for the purpose of overseas investment and financing, with such PRC residents' legally owned assets or equity interests in domestic enterprises or offshore assets or interests, referred to in SAFE No. Circular No. 37 as a "special purpose vehicle." The term "control" under SAFE Circular No. 37 is broadly defined as the operation rights, beneficiary rights or decision-making rights acquired by the PRC residents in the offshore special purpose vehicles or PRC companies by such means as acquisition, trust, proxy, voting rights, repurchase, convertible bonds or other arrangements. SAFE Circular No. 37 further requires amendment to the registration in the event of any changes with respect to the basic information of the special purpose vehicle, such as changes in a PRC resident individual shareholder, name or operation period; or any significant changes with respect to the special purpose vehicle, such as increase or decrease of capital contributed by PRC individuals, share transfer or exchange, merger, division or other material event. If the shareholders of the offshore holding company who are PRC residents do not complete their registration with the local SAFE branches, the PRC subsidiaries may be prohibited from distributing their profits and proceeds from any reduction in capital, share transfer or liquidation to the offshore company, and the offshore company may be restricted in its ability to contribute additional capital to its PRC subsidiaries. Moreover, failure to comply with SAFE registration and amendment requirements described above could result in liability under PRC law for evasion of applicable foreign exchange restrictions. We have notified holders of common shares of our company whom we know are PRC residents to register with the local SAFE branch and update their registrations as required under the SAFE regulations described above. On February 28, 2015, SAFE promulgated a Notice on Further Simplifying and Improving Foreign Exchange Administration Policy on Direct Investment, or SAFE Notice 13, which will become effective on June 1, 2015. After SAFE Notice 13 becomes effective, entities and individuals will be required to apply for foreign exchange registration of foreign direct investment and overseas direct investment, including those required under the SAFE Circular No. 37, with qualified banks, instead of SAFE. The qualified banks, under the supervision of SAFE, will directly examine the applications and conduct the registration. We cannot provide any assurances that all of our shareholders who are PRC residents will file all applicable registrations or update previously filed registrations as required by these SAFE regulations. The failure or inability of our PRC resident shareholders to comply with the registration procedures may subject the PRC resident shareholders to fines and legal sanctions, restrict our cross-border investment activities, or limit our PRC subsidiaries' ability to

distribute dividends to or obtain foreign exchange-dominated loans from our company. See "Item 3. Key Information—D. Risk Factors —Risks Related to Doing Business in China—PRC regulations relating to the establishment of offshore special purpose companies by PRC residents may limit our ability to inject capital into our PRC subsidiaries, limit our subsidiaries' ability to increase their registered capital or distribute profits to us, or may otherwise adversely affect us."

43

**SAFE Regulations on Employee Share Options**

In February 2012, SAFE promulgated the Circular on Relevant Issues Concerning Foreign Exchange Administration for Domestic Individuals Participating in an Employees Share Incentive Plan of an Overseas-Listed Company, or the Share Option Rule. Pursuant to the Share Option Rule, PRC residents who are granted share options by an overseas publicly listed company are required to register with SAFE through a Chinese agent or Chinese subsidiary of the overseas publicly listed company and complete certain other procedures. The Rule further requires that an offshore agent should also be designated to handle matters in connection with the exercise or sale of share options and proceeds transferring for the share incentive plan participants. We and our PRC employees who have been granted share options are subject to these regulations. We and our PRC share option holders are in the process of registering with SAFE. Failure of our PRC share option holders or us to complete their SAFE registrations may subject these PRC employees or us to fines and legal sanctions and may also limit our ability to contribute additional capital into our PRC subsidiaries and limit our PRC subsidiaries' ability to distribute dividends to us. Please see "Item 3. Key Information—D. Risk Factors—Risks Related to Doing Business in China—Failure to comply with PRC regulations regarding the registration requirements for employee stock ownership plans or share option plans may subject the PRC plan participants or us to fines and other legal or administrative sanctions."

**C.**    <u>**Organizational Structure**</u>

The following diagram sets out details of our significant subsidiaries and affiliated entities:



_____

(1)   Each of Ms. Peggy Yu Yu and Mr. Guoqing Li, wife and husband, owns 50% of the equity interest in Dangdang Kewen.

44

Foreign ownership of internet-based businesses is subject to significant restrictions under current PRC laws and regulations. To comply with PRC laws and regulations, we conduct our operations in China through a series of contractual arrangements entered into between our PRC subsidiary, Dangdang Information, our affiliated PRC entity, Dangdang Kewen and Dangdang Kewen's shareholders. Through the contractual arrangements with Dangdang Kewen and its shareholders described below, we exercise effective control over the operations of Dangdang Kewen and receive economic benefits generated from shareholders' equity interests in this entity. Accordingly, we consolidate its financial results in our consolidated financial statements in accordance with U.S. GAAP. In 2013, 2014 and 2015, Dangdang Kewen and its subsidiaries contributed in aggregate 4.9%, 4.2% and 3.2%, respectively, of our consolidated net revenues.

*Loan Agreement*. The shareholders of Dangdang Kewen, namely Ms. Peggy Yu Yu and Mr. Guoqing Li, entered into a loan agreement with Dangdang Information in December 2004, as amended and restated in July 2010 and as further amended in August 2013. Under this loan agreement, as amended, Dangdang Information has granted an interest-free loan of RMB20 million to the Dangdang Kewen shareholders solely for their capital contributions to Dangdang Kewen. Dangdang Information may request repayment of the loan with 30 days' advance notice and may decide the loan to be repaid in cash or in other forms. The Dangdang Kewen shareholders may not, without the prior written consent of Dangdang Information, choose to repay the loan in advance. Dangdang Information may increase the amount of loan to the shareholders of Dangdang Kewen from time to time to support the continued development of Dangdang Information's business operations.

*Exclusive Call Option Agreement*. The shareholders of Dangdang Kewen entered into an exclusive call option agreement with Dangdang Information in December 2004, as first amended in July 2010 and as further amended in December 2012 and in August 2013, under which the shareholders jointly and severally granted to Dangdang Information an exclusive and irrevocable option to purchase their equity interests in Dangdang Kewen at a purchase price equal to the capital contribution amount, unless otherwise required by PRC law or agreed in writing by the relevant parties. The purchase price can be set off against the loan repayment under the loan agreement, as amended. Dangdang Information may exercise such option at any time until it has acquired all equity interests of Dangdang Kewen, subject to the applicable PRC laws. The term of the agreement will expire in December 2022, and may be extended for ten years upon Dangdang Information's written confirmation prior to the expiration of the initial term or the extension period thereof. Neither the shareholders of Dangdang Kewen nor Dangdang Information may unilaterally terminate this agreement at any time during the term and extension period of the agreement. If and when Dangdang Information proposes any amendments hereto, the shareholders of Dangdang Kewen shall agree with such amendments and execute the supplementary agreements.

*Exclusive Technical Support Service Agreement*. Dangdang Information and Dangdang Kewen entered into an exclusive technical support service agreement in May 2006, as first amended in July 2010 and as further amended in December 2012, under which Dangdang Kewen, including its subsidiaries or any companies or entities under its control, agrees to engage Dangdang Information as its exclusive provider of technical platform and technical support, maintenance and other services. Dangdang Kewen shall pay to Dangdang Information service fees at the request of Dangdang Information. The fees payable by Dangdang Kewen include (i) a performance fee equivalent to 5% of the total revenue of Dangdang Kewen in any fiscal year; (ii) amount of depreciation of equipment to be determined in accordance with the accounting rules of PRC; and (iii) annual service fee, the amount of which shall be the total revenue of the whole year minus fees set forth in (i) and (ii). Where the aggregate amount of the three items exceeds total net profit of the whole year of Dangdang Kewen, the annual service fee payable is limited to total net profit of Dangdang Kewen. Dangdang Information has the right to set and revise annually the service fee unilaterally with reference to the performance of Dangdang Kewen. Dangdang Information shall exclusively own any intellectual property arising from the performance of this agreement. This agreement has an unlimited term. Dangdang Kewen may not terminate the agreement early unless Dangdang Information commits gross negligence, fraud or other illegal actions or becomes bankrupt, while Dangdang Information has the right to terminate the agreement at any time at its sole discretion by giving a 30 days prior notice to Dangdang Kewen.

*Power of Attorney*. Each shareholder of Dangdang Kewen executed a restated irrevocable power of attorney in December 2012 to appoint Dangdang Information as the attorney-in-fact to act on his or her behalf on all matters pertaining to Dangdang Kewen and to exercise all of his or her rights as a shareholder of Dangdang Kewen, including the right to attend shareholders meeting, to exercise voting rights and to transfer all or a part of his or her equity interests in Dangdang Kewen pursuant to the exclusive call option agreement. The power of attorney with each shareholder will remain effective as long as the shareholder holds any equity interests in Dangdang Kewen.

45

*Equity Pledge Agreement.* The shareholders of Dangdang Kewen entered into an equity pledge agreement with Dangdang Information in December 2004, as first amended in July 2010 and as further amended in December 2012 and in August 2013, under which the shareholders pledged all of their equity interests in Dangdang Kewen to Dangdang Information as collateral for all of their payments due to Dangdang Information and to secure performance of all obligations of Dangdang Kewen and its shareholders under the above loan agreement, as amended, the exclusive technical support service agreement and the exclusive call option agreement, as amended. Dangdang Kewen is prohibited from declaring any dividend during the term of the pledge. However, to the extent there is a distribution, including but not limited to any loans, the shareholder of Dangdang Kewen have to remit such distribution in full to Dangdang Information immediately. The shareholders of Dangdang Kewen may not transfer or assign their equity interest in Dangdang Kewen, their rights and obligations under the equity pledge agreement or create or permit to create any pledges which may have an adverse effect on the rights or benefits of Dangdang Information without the prior written consent of Dangdang Information. Dangdang Information shall provide necessary financial support to Dangdang Kewen to fund any losses incurred during the term of the pledge and cannot request for repayment if Dangdang Kewen is unable to do so. If any event of default as provided for therein occurs, Dangdang Information, as the pledgee, will be entitled to request immediate repayment of the loan or to dispose of the pledged equity interests through transfer or assignment. This agreement shall not be terminated until all of the secured indebtedness has been fully discharged. The equity pledges between the shareholders of Dangdang Kewen and Dangdang Information have been registered with the local administration for industry and commerce.

In the opinion of Beijing DHH Law Firm, our PRC legal counsel, our current ownership structure and the ownership structure of our subsidiary and our affiliated PRC entity are in compliance with existing PRC laws and regulations, and each of the control agreements under the contractual arrangements between our subsidiary, our affiliated PRC entity and its shareholders, as described in this annual report, are valid, binding and enforceable in accordance with their respective terms based on currently effective PRC laws and regulations, and will not result in any violation of PRC laws or regulations currently in effect. There are, however, substantial uncertainties regarding the interpretation and application of current or future PRC laws and regulations. Accordingly, there can be no assurance that the PRC regulatory authorities will not in the future take a view that is contrary to the opinion of our PRC legal counsel. See the several risks discussed under "Item 3. Key Information—D. Risk Factors—Risks Related to Our Corporate Structure and Restrictions on Our Industry" for a comprehensive description of the various material risks related to our corporate structure. In particular, see "Item 3. Key Information—D. Risk Factors—Risks Related to Our Corporate Structure and Restrictions on Our Industry —Substantial uncertainties and restrictions exist with respect to the interpretation and application of PRC laws and regulations relating to online commerce and the distribution of internet content in China. If the PRC government finds that the structure we have adopted for our business operations does not comply with PRC laws and regulations, we could be subject to severe penalties, including the shutting down of our website."

### D.    Property, Plants and Equipment

Our headquarters are located in Beijing and we own warehouse facilities in Tianjin and maintain leased warehouse facilities in Beijing, Wuxi, Guangzhou, Chengdu, Wuhan, Zhengzhou, Jinan, Shenyang, Fuzhou, Qingdao and Shanghai. The following table sets forth a summary of the leased properties as of December 31, 2015:

| Location | Space | Usage of Property |
|---|---|---|
| | **(in thousands of square meters)** | |
| Beijing | 47.0 | Office space, Data centers and Warehouses |
| Wuxi | 49.5 | Warehouses |
| Wuhan | 34.1 | Warehouses |
| Guangzhou | 72.1 | Warehouses |
| Zhengzhou | 25.9 | Warehouses |
| Chengdu | 20.7 | Warehouses |
| Jinan | 21.2 | Warehouses |
| Shenyang | 19.1 | Warehouses |
| Fuzhou | 18.9 | Warehouses |
| Qingdao | 4.6 | Warehouses |
| Shanghai | 21.8 | Warehouses |
| Tianjin | 95.7 | Warehouses |

We believe that our existing facilities are adequate for our current requirements and we will be able to enter into lease arrangements on commercially reasonable terms for future expansion.

**Item 4A.**     **Unresolved Staff Comments**

        None.

**Item 5.**     **Operating and Financial Review and Prospects**

        The following discussion of our financial condition and results of operations is based upon, and should be read in conjunction with, our consolidated financial statements and the related notes included in this annual report on Form 20-F. This report contains forward-looking statements. See "Forward-Looking Information." In evaluating our business, you should carefully consider the information provided under the caption "Item 3. Key Information—D. Risk Factors" in this annual report on Form 20-F. We caution you that our businesses and financial performance are subject to substantial risks and uncertainties.

---

46

## A.    Operating Results

### Overview

We generate product revenues from selling books and other media products and general merchandise products to customers. Product revenues constituted most of our net revenues in the three years ended December 31, 2015. We have focused on selling books online. As of December 31, 2015, we offered approximately 1,200,000 book titles on our principal business, including more than 1,100,000 Chinese language titles, which we believe is one of the largest selections of Chinese language titles available both online and offline from a single retailer in China. We currently generate most of our product revenues from selling books and other media products. We also sell general merchandise products and have gradually expanded our general merchandise product offerings to fashion and apparel; beauty and personal care products, home and lifestyle products, and baby, children and maternity products and other products. Product revenues from selling general merchandise to our customers have comprised a relatively small portion of our product revenues in the past. We also offer the *dangdang.com* marketplace program, whereby we charge third-party merchants service fees for selling their general merchandise on our internet platform.

We have grown significantly since we commenced our operations.

Our total net revenues increased from RMB6,325.0 million in 2013 to RMB9,312.0 million (US$1,437.5 million) in 2015, representing a CAGR of 21.3%. In 2015, our total net revenues of RMB9,312.0 million (US$1,437.5 million), represented a 17.0% increase from RMB7,957.0 million for 2014. We achieved net income of RMB91.5 million (US$14.1 million) in 2015, compared to net come of RMB88.1 million in 2014 and net loss of RMB142.9 million in 2013.

### Factors Affecting Our Results of Operations

Our business and operating results are affected by general factors affecting China's B2C e-commerce market, and China's online retail and retail industries in general, which include China's overall economic growth, per capita disposable income and consumer spending, growth of internet penetration, B2C e-commerce and the online retail and retail industries in general, and government policies and initiatives affecting online commerce. Unfavorable changes in any of these general industry conditions could negatively affect demand for products and negatively and materially affect our results of operations.

Our operating results are more directly affected by company-specific factors, including:

- our ability to obtain new customers at reasonable cost;

- our ability to increase spending per customer;

- our ability to control product sourcing costs, fulfillment and other operating expenses;

- our product selection and pricing; and

- our ability to compete effectively.

### *Total net revenues*

We generate product revenues primarily through the sale of books and other media products, and to a lesser extent, the sale of general merchandise products directly to customers by us through our internet platform. Sales revenues from these products are recorded less discounts and return allowances. We also generate revenues from service fees charged to third-party merchants under our *dangdang.com* marketplace program and the advertising program on our internet platform. Our revenues are net of value-added and business taxes, if any.

To understand product revenues generated from our product sales, we monitor and strive to improve the following key business metrics:

- Total number of active customers. We define active customers for a given period as customers who have purchased products offered by us on our internet platform at least once during that period.

- Total number of orders. We closely monitor the total number of orders as an indicator of revenue trends.

47

Our revenues from product sales are classified into two categories: (i) media products, which includes books and other media products, and (ii) general merchandise. The following table sets forth our revenues derived from each of these categories as well as other revenues including revenue from third-party merchants, both in absolute amount and as a percentage of total net revenues, for the periods presented.

| | **2013** | | **2014** | | **2015** | | |
|---|---|---|---|---|---|---|---|
| | **RMB** | **%** | **RMB** | **%** | **RMB** | **US$** | **%** |
| | | | **(in thousands, except for percentages)** | | | | |
| Net revenues: | | | | | | | |
|   Product revenue | | | | | | | |
|     Media | 4,050,122 | 64.0 | 5,036,039 | 63.3 | 5,526,976 | 853,218 | 59.4 |
|     General merchandise | 1,995,451 | 31.6 | 2,599,411 | 32.7 | 3,485,314 | 538,040 | 37.4 |
| Other revenue | 279,425 | 4.4 | 321,513 | 4.0 | 299,745 | 46,273 | 3.2 |
| Total net revenues | 6,324,998 | 100.0 | 7,956,963 | 100.0 | 9,312,035 | 1,437,531 | 100.0 |

We primarily focus on selling books online and most of our total net revenues have been derived from the sale of books and other media products. We expect that sales of books and other media products will continue to grow and comprise a majority of our total net revenues in the near future. In the meantime, we have increased the marketing of various general merchandise products and will continue to expand our product offerings to gradually diversify our revenue sources. Since 2012, our other revenues, which include the marketplace program revenues and advertising revenues, have grown significantly. We expect continued growth of other revenue in the near future as we further develop our marketplace program and advertising business.

### Cost of Revenues

Our cost of revenues consists primarily of the cost of products sold by us and packaging material costs. We receive from certain of our suppliers' cash consideration, including rebates for products we sell over a period of time as well as promotion fees paid by the suppliers during the year. We record these rebate amounts as a reduction to cost of revenues when the volume thresholds are met and the amount of rebate is determinable. Promotion fees related to specific inventory sold are recorded as a reduction to cost of revenues when the item is sold. Rebates and promotion fees that are not linked to the volume of sales to our customers or specific inventory sold are allocated between cost of revenues and inventories based on purchases for the year. We anticipate that our cost of revenues will continue to increase as we further expand our business operations and product offerings.

### Operating Expenses

Our operating expenses consist of fulfillment expenses, marketing expenses, technology and content expenses, general and administrative expenses and others. Share-based compensation expenses are included in our operating expenses. Our operating expenses have been growing in absolute terms but have remained relatively flat as a percentage of our net revenues due to increased economies of scale. We expect that operating expenses will increase as we expand our product offerings and develop the third-party marketplace program, further promote our general merchandise products, further enhance our brand image, further improve our information technology systems, hire additional personnel and incur costs related to the anticipated growth of our business and our operation as a public company.

### Fulfillment

Fulfillment costs represent those costs incurred in outbound shipping and operating and staffing the our fulfillment and customer service centers, including costs attributable to buying, receiving, inspecting and warehousing inventories; picking, packaging and preparing customer orders for shipment; and responding to inquiries from customers. Fulfillment costs also include amounts payable to third parties that assist us in fulfillment and customer service operations.

### Marketing

Marketing expenses consist primarily of advertising costs, promotion costs, payroll and related expenses for personnel engaged in marketing, business development and selling activities.

### Technology and Content

Technology and content expenses consist primarily of payroll and related expenses for employees involved in editorial content and system support, as well as costs and depreciation expenses associated with the computing, storage and telecommunications infrastructure for internal use that supports our web services.

---

48

### General and Administrative

General and administrative expenses consist primarily of payroll and related expenses for employees involved in general corporate functions, including (i) accounting, finance, tax, legal and human relations, (ii) expenses associated with use by these functions of facilities and equipment, such as depreciation expenses and rentals, and (iii) professional fees and other general corporate expenses.

## Taxation

*Cayman Islands*. Our holding company in the Cayman Islands is not subject to income or capital gains tax. Dividend payments are not subject to withholding tax in the Cayman Islands.

*PRC*. The PRC Enterprise Income Tax Law applies a uniform 25% enterprise income tax rate to both foreign-invested enterprises and domestic enterprises, except where a special preferential rate applies. Our PRC subsidiaries and affiliated entities are both subject to income tax at a rate of 25%.

*Dividends*. Under the PRC Enterprise Income Tax Law, dividends from our PRC subsidiaries out of earnings generated are subject to a withholding tax of 20%, although under the detailed implementation rules to the PRC Enterprise Income Tax Law promulgated by the PRC State Council the withholding tax rate is currently 10%. Distributions of earnings generated before January 1, 2008 are exempt from PRC withholding tax.

*Tax residence*. Under the PRC Enterprise Income Tax Law, enterprises that are established under the laws of foreign countries or regions and whose "de facto management bodies" are located within PRC territory are considered PRC resident enterprises and are subject to the PRC enterprise income tax at the rate of 25% on their worldwide income. "De facto management bodies" are defined under the implementation rules as the bodies that have material and overall management and control over the manufacturing and business operations, personnel and human resources, finances and treasury, and acquisition and disposition of properties and other assets of an enterprise. We cannot assure you that we will not be deemed to be a PRC resident enterprise and subject to the PRC enterprise income tax at the rate of 25% on our worldwide income. See "Item 3.D. Key Information—Risk Factors—Risks Related to Doing Business in China—Under the PRC Enterprise Income Tax Law, we may be classified as a PRC 'resident enterprise,' which could result in unfavorable tax consequences to us and our shareholders and have a material adverse effect on our results of operations and the value of your investment."

## Critical Accounting Policies

We prepare our financial statements in conformity with U.S. GAAP, which requires us to make judgments, estimates and assumptions. We continually evaluate these estimates and assumptions based on the most recently available information, our own historical experience and various other assumptions that we believe to be reasonable under the circumstances. Since the use of estimates is an integral component of the financial reporting process, actual results could differ from our expectations as a result of changes in our estimates.

An accounting policy is considered critical if it requires an accounting estimate to be made based on assumptions about matters that are highly uncertain at the time such estimate is made, and if different accounting estimates that reasonably could have been used, or changes in the accounting estimates that are reasonably likely to occur periodically, could materially impact the consolidated financial statements. The selection of critical accounting policies, the judgments and other uncertainties affecting application of those policies, and the sensitivity of reported results to changes in conditions and assumptions are factors that should be considered when reviewing our consolidated financial statements. We believe that the following accounting policies involve a higher degree of judgment and complexity in their application and require us to make significant accounting estimates. The following descriptions of critical accounting policies, judgments and estimates should be read in conjunction with our consolidated financial statements and other disclosures included in this annual report.

### Consolidation of Affiliated Entities

Foreign ownership of internet-based businesses is subject to significant restrictions under current PRC laws and regulations. The PRC government regulates internet access, the distribution of online information and the conduct of online commerce through strict business licensing requirements and other government regulations. These laws and regulations also include limitations on foreign ownership in PRC companies that provide internet content distribution services.

To comply with PRC laws and regulations, we conduct our operations in China through a series of contractual arrangements entered into between our PRC subsidiary, Dangdang Information, our affiliated PRC entity, Dangdang Kewen and Dangdang Kewen's shareholders. These contractual arrangements are intended to enable us to direct the activities that most significantly affect the economic performance of the affiliated entities and allow us to obtain a majority of the residual returns from the affiliated entities' activities. Based on these contractual arrangements, we consolidate the affiliated entities as required by SEC Regulation SX-3A-02 and ASC topic 810, *Consolidation*, because we hold all the variable interests of the affiliated entities through our subsidiary, Dangdang information, which is the primary beneficiary of the affiliated entities. We will reconsider the initial determination of whether a legal entity is a consolidated affiliated entity upon certain events listed in ASC 810-10-35-4 occurred. We will also continuously reconsider whether we are the primary beneficiary of our affiliated entities as facts and circumstances change. See "Item 3. Key Information—D. Risk Factors—Risks Related to Our Corporate Structure and Restrictions on Our Industry."

### Inventories

Inventories, consisting of products available for sale and packaging material, are accounted for using the first-in first-out method, and are valued at the lower of cost and net realizable value. Net realizable value is the estimated selling price in the ordinary course of business, less reasonably predictable costs of completion, disposal, and transportation. We have early adopted ASU 2015-11, *Simplifying the Measurement of Inventory*, for inventory measurement in the year ended December 31, 2015. Previously, inventories were valued at the lower of cost or market. The early adoption did not have a material impact on our consolidated financial statements. This valuation requires us to make judgments, based on currently available information, about the likely method of disposition, such as through sales to individual customers, returns to product vendors, or liquidations, and expected recoverable values of each disposition category.

There was no significant change in the estimates of the obsolescence for the years ended December 31, 2013 , 2014 and 2015.

### Share-Based Compensation

We have adopted Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 718, *Compensation-Stock Compensation*, to account for employee share-based compensation. In accordance with ASC 718, we determine whether a share option should be classified and accounted for as a liability award or equity award. All grants of share-based awards to employees classified as equity awards are recognized in the financial statements based on their grant date fair values which are calculated using an option pricing model. We have elected to recognize compensation expense using the straight-line method for all employee equity awards granted with graded vesting based on service conditions provided that the amount of compensation cost recognized at any date is at least equal to the portion of the grant-date value of the options that are vested at that date. To the extent the required vesting conditions are not met resulting in the forfeiture of the share-based awards, previously recognized compensation expense relating to those awards are reversed. ASC 718 requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from initial estimates. Share-based compensation expense was recorded net of estimated forfeitures such that expense is recorded only for those share-based awards that are expected to vest.

In accordance with ASC 718, we record the incremental fair value, if any, of the modified award as compensation cost on the date of modification for vested awards or over the remaining vesting period for unvested awards. The incremental compensation cost is the excess of the fair value of the modified award on the date of modification over the fair value of the original award immediately before the modification.

We have adopted two share incentive plans in 2004 and 2010, respectively. Under the 2004 plan, we may issue option awards to our directors, employees and other eligible persons. The exercise price, vesting and other conditions of individual awards are determined by the board of directors of our company and our executive chairwoman within the scope authorized by the board. Typically the awards are subject to three to four years' service vesting condition and expire approximately seven to ten years after the grant date. We suspended implementing the 2004 plan on November 15, 2010, the date of effectiveness of our 2010 plan. On November 12, 2012, our shareholders approved and ratified our resumption of implementing the 2004 plan, only to the extent that the Class A common shares underlying the awards forfeited after November 15, 2010 shall revive and be available for issuance pursuant to future awards under the 2004 plan, and with amendments made to the 2004 plan. Under the 2010 plan, we may issue restricted share units, restricted shares and options awards to our directors, employees and other eligible persons.

We had the following option grants in 2013, 2014 and 2015 under the 2004 and 2010 plans:

| Grant Date | Number of Class A | Exercise Price Per Share | Fair Value Per Class A |
|---|---|---|---|

| | Common Shares Underlying Options Granted | (US$) | Common Share at the Grant Date (US$) |
|---|---|---|---|
| July 16, 2013 | 1,053,500 | 1.40 | 0.79 |
| August 26, 2013 | 2,850,000 | 1.572 | 1.11 |
| February 25, 2014 | 1,550,000 | 1.58 | 1.10 |
| August 1, 2014 | 663,500 | 1.58 | 1.76 |
| February 2, 2015 | 400,000 | 1.58 | 0.87 |

50

The fair value of each option award was estimated by us using the binomial option pricing model, with assistance from an independent third-party appraiser. We are ultimately responsible for the determination of all amounts related to share-based compensation recorded in the financial statements. The volatility assumption was calculated based on the price of the underlying common shares over the expected term of the option and the price volatility of the shares of comparable companies. The risk-free rate was based on the market yield of U.S. Treasury Bills with maturity terms equal to the term of the option awards. The sub optimal early exercise factor was estimated based on the vesting and contractual terms of the awards and management's expectation of exercise behavior of the grantees. Forfeitures were estimated based on historical experience.

On February 9, 2015, the exercise price of certain share options was adjusted downwards from US$1.996 and US$2.714 per share to US$1.58 per share. The total incremental share-based compensation expense resulting from the modification was RMB975 thousand (US$151 thousand), with RMB269 thousand (US$42 thousand) recognized as additional share-based compensation expense in 2015 and RMB706 thousand (US$109 thousand) to be recognized over the remaining vesting period.

The following table presents the assumptions used to estimate the fair values of the share options granted/modified in the periods presented:

|  | 2013 | 2014 | 2015 |
|---|---|---|---|
| Expected volatility range | 73.73%-74.20% | 74.86%-75.0% | 61.0%-64.0% |
| Risk-free interest rate | 2.00%-2.25% | 2.14%-2.17% | 1.46%-1.52% |
| Dividend yield | 0% | 0% | 0% |
| Sub optimal early exercise factor | 1.5-2.5 | 1.5-2.8 | 1.5-2.8 |

The total share-based compensation expense during the years ended December 31, 2013, 2014 and 2015 was RMB11.1 million, RMB10.4 million and RMB8.6 million (US$1.3 million), respectively.

**Income Taxes**

We follow the liability method of accounting for income taxes. Under this method, deferred tax assets and liabilities are determined based on the difference between the financial reporting and tax bases of assets and liabilities using enacted tax rates that will be in effect in the period in which the differences are expected to reverse. We record a valuation allowance to offset deferred tax assets if based on the weight of available evidence, it is more-likely-than-not that some portion, or all, of the deferred tax assets will not be realized. The effect on deferred taxes of a change in tax rate is recognized in tax expense in the period that includes the enactment date of the change in tax rate. We have elected to classify interest and penalties related to an uncertain tax position, if and when required, as part of income tax expense in the consolidated statements of comprehensive loss.

In accordance with the provisions of ASC 740, Income Taxes, we recognize in our financial statements the impact of a tax position if a tax return position or future tax position is "more likely than not" to prevail based on the facts and technical merits of the position. Tax positions that meet the "more likely than not" recognition threshold are measured, using a cumulative probability approach, at the largest amount of tax benefit that has a greater than fifty percent likelihood of being realized upon settlement. Our estimated liability for unrecognized tax benefits, included in the income tax expenses for the three years ended December 31, 2015 may be affected by changing interpretations of laws, rulings by tax authorities, changes and/or developments with respect to tax audits, and expiration of the statute of limitations. The outcome for a particular audit cannot be determined with certainty prior to the conclusion of the audit and, in some cases, appeal or litigation process. The actual benefits ultimately realized may differ from our estimates. As each audit is concluded, adjustments, if any, are recorded in our financial statements. Additionally, in future periods, changes in facts, circumstances, and new information may require us to adjust the recognition and measurement estimates with regard to individual tax positions. Changes in recognition and measurement estimates are recognized in the period in which the changes occur.

**Results of Operations**

The following table sets forth a summary of our consolidated results of operations for the periods indicated. This information should be read together with our consolidated financial statements and related notes included elsewhere in this annual report. The results of operations in any period are not necessarily indicative of the results that may be expected for any future period.

51

| | For the Year Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2013** | | **2014** | | **2015** | | |
| | **RMB** | **% of Total Revenues** | **RMB** | **% of Total Revenues** | **RMB** | **US$** | **% of Total Revenues** |
| | (in thousands, except for percentages) | | | | | | |
| Net revenues: | | | | | | | |
| Product revenue | | | | | | | |
| Media | 4,050,122 | 64.0% | 5,036,039 | 63.3% | 5,526,976 | 853,218 | 59.4% |
| General merchandise | 1,995,451 | 31.6% | 2,599,411 | 32.7% | 3,485,314 | 538,040 | 37.4% |
| | 6,045,573 | 95.6% | 7,635,450 | 96.0% | 9,012,290 | 1,391,258 | 96.8% |
| Other revenue | 279,425 | 4.4% | 321,513 | 4.0% | 299,745 | 46,273 | 3.2% |
| Total net revenues | 6,324,998 | 100.0% | 7,956,963 | 100.0% | 9,312,035 | 1,437,531 | 100.0% |
| Cost of revenues | (5,224,114) | (82.6)% | (6,487,201) | (81.5)% | (7,813,529) | (1,206,201) | 83.9% |
| Gross profit | 1,100,884 | 17.4% | 1,469,762 | 18.5% | 1,498,506 | 231,330 | 16.1% |
| Operating expenses [1] : | | | | | | | |
| Fulfillment | (727,683) | (11.5)% | (775,534) | (9.7)% | (747,134) | (115,338) | (8.0)% |
| Marketing | (260,988) | (4.1)% | (374,227) | (4.7)% | (313,627) | (48,416) | (3.4)% |
| Technology and content | (180,158) | (2.8)% | (208,214) | (2.6)% | (242,112) | (37,376) | (2.6)% |
| General and administrative | (148,919) | (2.4)% | (165,284) | (2.1)% | (198,554) | (30,651) | (2.1)% |
| Government grants and value-added tax refunds | 21,392 | 0.3% | 113,781 | 1.4% | 73,194 | 11,299 | 0.8% |
| Total operating expenses | (1,296,356) | (20.5)% | (1,409,478) | (17.7)% | (1,428,233) | (220,482) | (15.3)% |
| (Loss) income from operations | (195,472) | (3.1)% | 60,284 | 0.8% | 70,273 | 10,848 | 0.8% |
| Interest income | 30,727 | 0.5% | 44,839 | 0.5% | 47,328 | 7,306 | 0.5% |
| Interest expense | (6,042) | (0.1)% | — | — | — | — | — |
| Other income (expense), net | 27,922 | 0.4% | (17,006) | (0.2)% | (41,053) | (6,337) | (0.4)% |
| Total non-operating income | 52,607 | 0.8% | 27,833 | 0.3% | 6,275 | 969 | 0.1% |
| (Loss) income before income taxes | (142,865) | (2.3)% | 88,117 | 1.1% | 76,548 | 11,817 | 0.8% |
| Income tax benefit | — | — | — | — | 15,000 | 2,316 | 0.2% |
| Net (loss) income attributable to common shareholders | (142,865) | (2.3)% | 88,117 | 1.1% | 91,548 | 14,133 | 1.0% |

(1)  Includes share-based compensation expenses as follows:

| | For the Year Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2013** | | **2014** | | **2015** | | |
| | **RMB** | **% of Total Revenues** | **RMB** | **% of Total Revenues** | **RMB** | **US$** | **% of Total Revenues** |
| | (in thousands, except for percentages) | | | | | | |
| Fulfillment | 1,755 | 0.0% | 2,126 | 0.0% | 1,946 | 300 | 0.0% |
| Marketing | 412 | 0.0% | 509 | 0.0% | 638 | 98 | 0.0% |
| Technology and content | 964 | 0.0% | 1,075 | 0.0% | 1,138 | 176 | 0.0% |
| General and administrative | 7,977 | 0.2% | 6,707 | 0.1% | 4,875 | 753 | 0.1% |
| Total share-based compensation expenses | 11,108 | 0.2% | 10,417 | 0.1% | 8,597 | 1,327 | 0.1% |

***Year Ended December 31, 2015 Compared to Year Ended December 31, 2014***

   *Total net revenues.* Our total net revenues increased by 17.0% from RMB7,957.0 million in 2014 to RMB9,312.0 million (US$1,437.5 million) in 2015. This increase was primarily attributable to increases in product revenues from our principal business.

Revenues from sales of books and other media products increased by 9.7% from RMB5,036.0 million in 2014 to RMB5,527.0 million (US$853.2 million) in 2015. Product revenues from sales of general merchandise products increased by 34.1% from RMB2,599.4 million in 2014 to RMB3,485.3 million (US$538.0 million) in 2015. Other revenue including revenues from third-party merchants decreased by 6.8% from RMB321.5 million in 2014 to RMB299.7 million (US$46.3 million) in 2015.

52

The increase in revenues was primarily attributable to the increased number of active customers and orders and larger order size. The total number of active customers and orders amounted to 27.8 million and 79.7 million, respectively, in 2015, compared to 24.3 million and 72.1 million, respectively, in 2014. The increase in the number of active customers was largely due to an increase in the number of new customers from 13.3 million in 2014 to 15.3 million in 2015 and the enlarged active customer base as a result of our ability to retain existing customers.

*Cost of revenues*. Our cost of revenues increased by 20.4% from RMB6,487.2 million in 2014 to RMB7,813.5 million (US$1,206.2 million) in 2015, primarily due to increases in the volume of media and general merchandise products we sold.

*Gross profit*. Our gross profit increased by 2.0% from RMB1,469.8 million in 2014 to RMB1,498.5 million (US$231.3 million) in 2015 and our gross margin decreased from 18.5% to 16.1% during the same period. The decrease in gross margin was primarily due to the decrease in gross margin from books and the decrease in other revenue.

*Fulfillment expenses*. Our fulfillment expenses decreased by 3.7% from RMB775.5 million in 2014 to RMB747.1 million (US$115.3 million) in 2015. Our fulfillment expenses as a percentage of total net revenues decreased from 9.7% to 8.0% during the same period, primarily due to the increase in employee productivity, more efficient warehouse operation and larger order size.

*Marketing expenses*. Our marketing expenses decreased by 16.2% from RMB374.2 million in 2014 to RMB313.6 million (US$48.4 million) in 2015. Our marketing expenses as a percentage of total net revenues decreased from 4.7% to 3.4% during the same periods, primarily due to decreased expenditures on advertisements and online marketing programs.

*Technology and content expenses*. Our technology and content expenses increased by 16.3% from RMB208.2 million in 2014 to RMB242.1 million (US$37.4 million) in 2015. Our technology and content expenses as a percentage of total net revenues remained at 2.6% during the same periods.

*General and administrative expenses*. Our general and administrative expenses increased by 20.1% from RMB165.3 million in 2014 to RMB198.6 million (US$30.7 million) in 2015. Our general and administrative expenses as a percentage of total net revenues remained at 2.1% during the same periods.

*Government grants*. Our government grants in 2015 totaled RMB73.2 million (US$11.3 million), attributable to a tax subsidy and other government subsidies we received in 2015.

*Interest income*. Our interest income increased by 5.6% from RMB44.8 million in 2014 to RMB47.3 million (US$7.3 million) in 2015, primarily due to our increased cash balances in interest-bearing accounts.

*Other expenses, net*. Our other expenses increased from RMB17.0 million in 2014 to RMB41.1 million (US$6.3 million) in 2015, primarily due to the exchange loss.

*Tax benefit*. Our tax benefit for the year ended December 31, 2015 is RMB15 million (US$2.3 million), primarily due to the utilization of accumulated tax losses to offset taxable income in 2015 and the release of certain valuation allowance during 2015. In the meantime, as we believe that it is more likely than not that the entire amount of deferred tax assets will not be realized in the future, we recognized certain valuation allowance against deferred tax assets in 2015. If we subsequently expect we will be able to generate sufficient taxable income in the future, the valuation allowance will be further released, resulting in a tax benefit at that time.

*Net income*. As a result of the above, we achieved a net income of RMB91.5 million (US$14.1 million) or 1.0% of total net revenues in 2015, compared to a net income of RMB88.1 million or 1.1% of total net revenues in 2014.

**Year Ended December 31, 2014 Compared to Year Ended December 31, 2013**

*Total net revenues*. Our total net revenues increased by 25.8% from RMB6,325.0 million in 2013 to RMB7,957.0 million in 2014. This increase was primarily attributable to increases in product revenues from our principal business and other revenue generated from third-party merchants participating in our marketplace program.

Revenues from sales of books and other media products increased by 24.3% from RMB4,050.1 million in 2013 to RMB5,036.0 million in 2014. Product revenues from sales of general merchandise products increased by 30.3% from RMB1,995.5 million in 2013 to RMB2,599.4 million in 2014. Other revenue including revenues from third-party merchants increased by 15.1% from RMB279.4 million in 2013 to RMB321.5 million in 2014.

The increase in revenues was primarily attributable to the increased number of active customers and orders and larger order size. The total number of active customers and orders amounted to 24.3 million and 72.1 million, respectively, in 2014, compared to 20.9 million and 63.6 million, respectively, in 2013. The increase in the number of active customers was largely due to an increase in the number of new customers from 10.7 million in 2013 to 13.3 million in 2014 and the enlarged active customer base as a result of our ability to retain existing customers.

53

*Cost of revenues*. Our cost of revenues increased by 24.2% from RMB5,224.1 million in 2013 to RMB6,487.2 million in 2014, primarily due to increases in the volume of media and general merchandise products we sold.

*Gross profit*. Our gross profit increased by 33.5% from RMB1,100.9 million in 2013 to RMB1,469.8 million in 2014 and our gross margin increased from 17.4% to 18.5% during the same period. The increase in gross margin was primarily due to the strong gross margin contribution from books and media products and the increase in other revenue, representing the sustained scaling of the marketplace, under which the revenue is recognized on a net basis.

*Fulfillment expenses*. Our fulfillment expenses increased by 6.6% from RMB727.7 million in 2013 to RMB775.5 million in 2014. Our fulfillment expenses as a percentage of total net revenues decreased from 11.5% to 9.7% during the same period, primarily due to the increase in employee productivity, more efficient warehouse operation and larger order size.

*Marketing expenses*. Our marketing expenses increased by 43.4% from RMB261.0 million in 2013 to RMB374.2 million in 2014. Our marketing expenses as a percentage of total net revenues increased from 4.1% to 4.7% during the same periods, primarily due to increased investments in online marketing programs to build awareness of a number of strategically important product categories offered on our internet platform and to promote our mobile application.

*Technology and content expenses*. Our technology and content expenses increased by 15.6% from RMB180.2 million in 2013 to RMB208.2 million in 2014. Our technology and content expenses as a percentage of total net revenues decreased from 2.8% to 2.6% during the same periods. The decrease in our technology and content expenses as a percentage of total net revenues was primarily due to operating leverage.

*General and administrative expenses*. Our general and administrative expenses increased by 11.0% from RMB148.9 million in 2013 to RMB165.3 million in 2014. Our general and administrative expenses as a percentage of total net revenues decreased from 2.4% to 2.1% during the same periods. The decrease in general and administrative expenses as a percentage of total net revenues was primarily due to large scale and improved management efficiency.

*Government grants and value-added tax refunds*. Our government grants and value-added tax refunds in 2014 totaled RMB113.8 million, attributable to value-added tax refunds and other government subsidies we received in 2014.

*Interest income*. Our interest income increased by 45.9% from RMB30.7 million in 2013 to RMB44.8 million in 2014, primarily due to our increased cash balances in interest-bearing accounts.

*Interest expense*. Our interest expense decreased from RMB6.0 million in 2013 to RMB nil in 2014, primarily attributable to our decreased short-term bank loans.

*Other income (expenses), net*. Our other income (expenses) decreased from income of RMB27.9 million in 2013 to expenses of RMB17.0 million in 2014, primarily due to the exchange loss.

*Tax expense*. Our tax expense for the year ended December 31, 2014 is nil, primarily due to the utilization of accumulated tax losses to offset taxable income in 2014. In the meantime, as we believe that it is more likely than not that the entire amount of deferred tax assets will not be realized in the future, we recognized a full valuation allowance against deferred tax assets in 2014. If we subsequently expect we will be able to generate sufficient taxable income in the future, the valuation allowance will be released, resulting in a tax benefit at that time.

*Net income*. As a result of the above, we achieved a net income of RMB88.1 million, or 1.1% of total net revenues in 2014, as compared to a net loss of RMB142.9 million or (2.3)% of total net revenues in 2013.

**Recent Accounting Pronouncements**

In May 2014, the Financial Accounting Standards Board ("FASB") issued *ASU No. 2014-09 ("ASU 2014-09")*, Revenue from Contracts with Customers. *ASU 2014-09* supersedes the revenue recognition requirements in ASC 605, and requires entities to recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled to in exchange for those goods or services. *ASU 2014-09* is originally effective for the annual reporting periods beginning after December 15, 2016, including interim periods within that reporting period. *ASU 2015-14*, Revenue from Contracts with Customers, defers the effective date of *ASU 2014-09* by one year. As a result, *ASU 2014-09* is effective for annual reporting periods beginning after December 15, 2017 and interim periods therein. Early adoption is permitted to the original effective

date. We are currently evaluating the timing of adoption and the impact of adopting the new revenue standard on our consolidated financial statements and considering additional disclosure requirements.

54

In July 2015, the FASB issued *ASU 2015-11, Simplifying the Measurement of Inventory*, which modifies the accounting for inventory. Under this ASU, the measurement principle for inventory will change from lower of cost or market value to lower of cost and net realizable value. The ASU defines net realizable value as the estimated selling price in the ordinary course of business, less reasonably predictable costs of completion, disposal, and transportation. The *ASU 2015-11* eliminates the guidance that entities consider replacement cost and net realizable value less an approximately normal profit margin in the subsequent measurement of inventory when cost is determined on a first-in, first-out or average cost basis. The ASU is effective for reporting periods after December 15, 2016, with early adoption permitted. We elected to early adopt *ASU 2015-11* for the year ended December 31, 2015 on a prospective basis and the adoption had no material effect on our consolidated financial statements.

In November 2015, the FASB issued *ASU 2015-17, Balance Sheet Classification of Deferred Taxes*, which amends the accounting for income taxes and requiring all deferred tax assets and liabilities to be classified as non-current in the consolidated balance sheets. The ASU is effective for reporting periods beginning after December 15, 2016, with early adoption permitted. The ASU may be adopted either prospectively or retrospectively. We are currently evaluating the impact of adopting this guidance on our consolidated financial statements.

In February 2016, the FASB issued *ASU 2016-02, Leases*, which introduces a new lessee model that brings substantially all leases in the balance sheets. This standard will be effective for us beginning the first quarter of fiscal year 2019. We are currently evaluating the impact of adopting this guidance on our consolidated financial statements.

**Inflation**

Since our inception, inflation in China has not materially impacted our results of operations. According to the National Bureau of Statistics of China, the annual average percent changes in the consumer price index in China for 2013, 2014 and 2015 were increases of 2.6%, 1.5% and 1.6%, respectively. Although we have not been materially affected by inflation in the past, we can provide no assurance that we will not be affected in the future by higher rates of inflation in China. For example, certain operating costs and expenses, such as employee compensation and rental expenses may increase as a result of higher inflation. Additionally, high inflation could significantly reduce the value and purchasing power of our cash and cash equivalents. We are not able to hedge our exposure to higher inflation in China.

**B.**    **Liquidity and Capital Resources**

We have financed our operations primarily through investments from our shareholders, cash flows from operations and short-term bank loans. We believe that our current cash and cash equivalents, time deposits and anticipated cash flows from operations will be sufficient to meet our anticipated working capital requirements and capital expenditures in the coming year. As of December 31, 2015, we had RMB1,107.6 million (US$171.0 million) in cash and cash equivalents. Our cash and cash equivalents primarily consist of cash on hand, bank deposits that are unrestricted as to withdrawal and use, and highly liquid investments with original stated maturities of three months or less. We had RMB24.0 million (US$3.7 million) in restricted cash as of December 31, 2015. Restricted cash represents deposit not readily available to us, mainly relating to the cash pledged as security deposit of bankers' acceptance notes as of December 31, 2015. In addition, we had RMB72.0 million (US$11.1 million) in held-to-maturity investments and RMB166.3 million (US$25.7 million) in available-for-sale investments as of December 31, 2015. Held-to-maturity investments are investments with maturity terms of less than twelve months, which are subject to limited risks of principal loss.

As of December 31, 2015, we had no outstanding short-term or long-term loans.

The following table sets forth a summary of our cash flows for the periods indicated:

| | For the Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2013** | **2014** | **2015** | |
| | **RMB** | **RMB** | **RMB** | **US$** |
| | | (in thousands) | | |
| Net cash provided by operating activities | 272,708 | 264,974 | 1,122 | 173 |
| Net cash (used in) provided by investing activities | (454,462) | (272,618) | 743,538 | 114,783 |
| Net cash provided by financing activities | 114,241 | 4,366 | — | — |
| Net (decrease) increase in cash and cash equivalents | (79,430) | (2,327) | 756,666 | 116,809 |
| Cash and cash equivalents at beginning of year | 432,703 | 353,273 | 350,946 | 54,177 |
| Cash and cash equivalents at end of year | 353,273 | 350,946 | 1,107,612 | 170,986 |

### Operating Activities

Net cash provided by operating activities amounted to RMB1.1 million (US$0.2 million) in 2015, which was primarily attributable to net income of RMB91.5 million (US$14.1 million), adjusted for certain non-cash expenses consisting primarily of depreciation expense of RMB58.3 million (US$9.0 million) and share-based compensation expense of RMB8.6 million (US$1.3 million) and a decrease in working capital of RMB205.7 million (US$31.8 million). The decrease in working capital was primarily attributable to the decrease in trade payables of RMB223.9 million (US$34.6 million), the decrease in deferred revenue of RMB207.6 million (US$32.0 million), the decrease in accrued expenses and other current liabilities amounting to RMB84.3 million (US$13.0 million), partially offset by the increase in inventories of RMB70.9 million (US$10.9 million) and the increase in prepaid expenses and other current assets of RMB38.4 million (US$5.9 million). The decrease in accrued expenses and other current liabilities was primarily attributable to the decrease in accrued expenses of RMB49.7 million (US$7.7 million). The increase in prepaid expenses and other current assets was primarily attributable to the increase of rebates and promotion fees receivable of RMB82.7 million (US$12.8 million) and the decrease of prepayments to suppliers of RMB64.1 million (US$9.9 million).

Net cash provided by operating activities amounted to RMB265.0 million in 2014, which was primarily attributable to net income of RMB88.1 million, adjusted for certain non-cash expenses consisting primarily of depreciation expense of RMB53.5 million and share-based compensation expense of RMB10.4 million and decrease in working capital. The decrease in working capital was primarily attributable to the increase in trade payables of RMB508.7 million, the increase in deferred revenue of RMB211.9 million, the increase in accrued expenses and other current liabilities amounting to RMB83.1 million, partially offset by the increase in inventories of RMB440.3 million, and the increase in prepaid expenses and other current assets of RMB242.5 million. The increase in accrued expenses and other current liabilities was primarily attributable to the increase in deposits from service providers of RMB48.7 million. The increase in prepaid expenses and other current assets was primarily attributable to the increase of prepayments to suppliers of RMB200.5 million. The amount of deposits from delivery service providers and merchants in the marketplace program increased from RMB96.1 million as of December 31, 2013 to RMB144.8 million as of December 31, 2014. Such an increase in deposits from service providers and merchants was primarily attributable to the increase of approximately RMB51.0 million in deposits received from merchants in the marketplace program, partially offset by the decrease of approximately RMB2.3 million in deposits from delivery service providers in 2014. The number of deposit-paying merchants increased by over 1500, or over 29%, from 2013 to 2014. The amount of prepayment to suppliers increased from RMB88.3 million as of December 31, 2013 to RMB288.8 million as of December 31, 2014. Prepayments to suppliers are primarily related to advance payments that we made to suppliers of products under certain general merchandise categories. We make such prepayments to secure better pricing and on-time delivery. Such an increase in prepayment to suppliers was primarily attributable to the increased sales volume of certain general merchandise categories, where suppliers generally require prepayments for popular or new products.

Net cash provided by operating activities amounted to RMB272.7 million in 2013, which was primarily attributable to net loss of RMB142.9 million, adjusted for certain non-cash expenses consisting primarily of depreciation expense of RMB48.0 million and share-based compensation expense of RMB11.1 million and decrease in working capital. The decrease in working capital was primarily attributable to the increase in trade payables of RMB406.9 million, the increase in deferred revenue of RMB177.8 million, the increase in accrued expenses and other current liabilities amounting to RMB186.9 million, partially offset by the increase in inventories of RMB275.3 million, and the increase in prepaid expenses and other current assets of RMB128.9 million. The increase in accrued expenses and other current liabilities was primarily attributable to the increase in deposits from service providers of RMB33.5 million and the increase in prepaid expenses and other current assets was primarily attributable to the increase of prepayments to suppliers of RMB64.9 million. The amount of deposits from delivery service providers and merchants in the marketplace program increased from RMB62.6 million as of December 31, 2012 to RMB96.1 million as of December 31, 2013. Such an increase in deposits from service providers was primarily attributable to the increase of approximately RMB29.5 million in deposits received from merchants in the marketplace program and the increase of approximately RMB4.0 million in deposits from logistic providers in 2013. The number of deposit-paying merchants increased by over 1,800, or over 76%, from 2012 to 2013. The amount of prepayment to suppliers increased from RMB23.4 million as of December 31, 2012 to RMB88.3 million as of December 31, 2013. Such an increase in prepayment to suppliers was primarily attributable to the increased sales volume of certain general merchandise categories, where suppliers generally require prepayments for popular or new products.

### Investing Activities

Net cash provided by investing activities amounted to RMB743.5 million (US$114.8 million) in 2015, which was primarily attributable to proceeds received from available-for-sale investments of RMB3,498.7 million (US$540.1 million), short-term time deposits of RMB2,026.9 million (US$312.9 million) and held-to-maturity investments of RMB1,067.0 million (US$164.7 million), partially offset by purchases of available-for-sale investments of RMB3,663.7 million (US$565.6 million), short-term time deposits of

RMB1,338.1 million (US$206.6 million) and held-to-maturity investments of RMB789.0 million (US$121.8 million) and purchases of plant and equipment of RMB56.4 million (US$8.7 million).

56

Net cash used in investing activities amounted to RMB272.6 million in 2014, which was primarily attributable to purchases of held-to-maturity investments of RMB1,760.0 million, short-term time deposits of RMB1,189.9 million and available-for-sale investments of RMB100.0 million, partially offset by proceeds from maturity of held-to-maturity investments of RMB1,410.0 million, maturity of short-term time deposits of RMB1,368.7 million, proceeds received from available-for-sale investments of RMB100.0 million, and purchases of plant and equipment of RMB101.5 million, which included the deposit paid for the purchases of plant and equipment.

Net cash used in investing activities amounted to RMB454.5 million in 2013, which was primarily attributable to short-term time deposit of RMB943.2 million, which was partially offset by maturity of short-term deposits of RMB582.4 million, and purchases of plant and equipment of RMB93.7 million which included the deposit paid for the purchases of plant and equipment.

### *Financing Activities*

There were no cash financing activities in 2015.

Net cash provided by financing activities amounted to RMB4.4 million in 2014, which was attributable to the proceeds from exercise of share options.

Net cash provided by financing activities amounted to RMB114.2 million in 2013, which was primarily attributable to the release of restricted cash placed with financial institutions in the amount of RMB709.4 million and repayment of short-term bank loans in the amount of RMB648.4 million, offset by the proceeds from short-term bank loans in the amount of RMB48.4 million.

## Holding Company Structure

E-Commerce China Dangdang Inc. is a holding company with no operations of its own. We conduct our operations in China primarily through our subsidiaries and consolidated affiliated entities in China. As a result, E-Commerce China Dangdang Inc.'s ability to pay dividends and to finance any debt it may incur may depend upon dividends paid by our PRC subsidiaries and service fees paid by our PRC consolidated affiliated entities. If our PRC subsidiaries incur debt on their own behalf in the future, the instruments governing such debt may restrict their ability to pay dividends to E-Commerce China Dangdang Inc. Relevant PRC laws and regulations permit payments of dividends by our PRC subsidiaries and consolidated affiliated entities only out of their respective retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. In addition, our PRC subsidiaries and consolidated affiliated entities are required to set aside certain statutory reserve funds, which are not distributable as cash dividends except in the event of a solvent liquidation of the companies.

Our PRC subsidiaries, being foreign-invested enterprises established in China, are required to set aside certain statutory reserves, namely, a general reserve fund, an enterprise expansion fund, a staff welfare fund and a bonus fund, all of which are appropriated from net profit as reported in their PRC statutory accounts. Our PRC subsidiaries are required to allocate at least 10% of their after-tax profits to a general reserve fund until such fund has reached 50% of their respective registered capital. Appropriations to the enterprise expansion fund and staff welfare and bonus funds are at the discretion of the board of directors of the PRC subsidiaries. Since Dangdang Information and Wuxi Dangdang Information were in an accumulated loss position, no such reserve fund was appropriated for the three years ended December 31, 2013, 2014 and 2015. As Tianjin Dangdang Information was established in 2011 and was in an accumulated loss position in 2013, 2014 and 2015, no such reserve fund was appropriated for the years ended December 31, 2013, 2014 and 2015.

Our consolidated affiliated entities must make appropriations from their after-tax profits as reported in their PRC statutory accounts to non-distributable reserve funds, namely a statutory surplus fund, a statutory public welfare fund and a discretionary surplus fund. Our consolidated affiliated entities are required to allocate at least 10% of its after-tax profits to the statutory surplus fund until such fund has reached 50% of their respective registered capital. Effective from January 1, 2006, under the amended PRC Company Law, appropriation to the statutory public welfare fund is no longer mandatory. Appropriations to the discretionary surplus fund are made at the discretion of our consolidated affiliated entities. Since Dangdang Kewen and Wuxi Dangdang Kewen were in an accumulated loss position, no such reserve fund was appropriated for the three years ended December 31, 2013, 2014 and 2015.

Under PRC laws and regulations, our PRC subsidiaries and consolidated affiliated entities are subject to certain restrictions with respect to paying dividends or otherwise transferring any of their net assets to us. As of December 31, 2015, the total net assets of our PRC subsidiaries and our consolidated affiliated entities were negative.

Furthermore, cash transfers from our PRC subsidiaries to our Cayman holding company outside of China are subject to PRC government control of currency conversion. Shortages in the availability of foreign currency may restrict the ability of our PRC subsidiaries and consolidated affiliated entities to remit sufficient foreign currency to pay dividends or other payments to us, or otherwise satisfy their foreign currency denominated obligations. See "Item 3. Key Information—D. Risk Factors—Risks Related to Doing Business in China—Governmental control of currency conversion may affect the value of your investment."

57

**Capital Expenditures**

In 2013, 2014 and 2015, our capital expenditures amounted to RMB93.7 million, RMB101.5 million and RMB56.4 million (US$8.7 million), respectively. In the past, our capital expenditures consisted principally of expansion and updates of our fulfillment network and IT infrastructure. We paid our capital expenditures in these areas in 2015. We plan to fund capital expenditures primarily through current cash and cash equivalents and time deposits.

In October 2012, we commenced construction of a warehouse and office building in Tianjin, which will serve as our headquarter for the northern region. We completed the main parts of the construction in May 2014. We have paid approximately RMB44.7 million for the land use right, which was treated as prepaid land lease payments in our consolidated financial statements in accordance with U.S. GAAP. Our capital expenditure in connection with the construction of this warehouse and office building in Tianjin was RMB67.2 million, RMB45.1 million and RMB12.7 million (US$2.0 million) in 2013, 2014 and 2015, respectively.

**C.　　Research and Development**

We have implemented numerous website and mobile application management, search, customer interaction, and order processing and fulfillment services and systems using a combination of our own proprietary technologies and commercially available licensed technologies. We focus our internal development efforts on creating and enhancing the features and functionality of our internet platform and order processing and fulfillment systems to deliver a high-quality customer experience.

We have adopted a service-oriented architecture and distributed data processing technologies in our systems. Our systems are mainly composed of front-end and back-end modules with different functions. Each module operates independently and is not affected by the performance of other modules.

Our technology and content expenses consist primarily of payroll and related expenses for employees involved in editorial content and system support, as well as costs and depreciation expenses associated with the computing, storage and telecommunications infrastructure for internal use that supports our web services. We incurred RMB180.2 million, RMB208.2 million and RMB242.1 million (US$37.4 million) in technology and content expenses in 2013, 2014and 2015, respectively.

**D.　　Trend Information**

Other than as disclosed elsewhere in this annual report, we are not aware of any trends, uncertainties, demands, commitments or events for the year ended December 31, 2015 that are reasonably likely to have a material adverse effect on our net revenues, income, profitability, liquidity or capital resources, or that would cause the disclosed financial information to be not necessarily indicative of future operating results or financial conditions.

**E.　　Off-Balance Sheet Arrangements**

We have not entered into any financial guarantees or other commitments to guarantee the payment obligations of any third parties. We have not entered into any derivative contracts that are indexed to our shares and classified as shareholder's equity, or that are not reflected in our consolidated financial statements. Furthermore, we do not have any retained or contingent interest in assets transferred to an unconsolidated entity that serves as credit, liquidity or market risk support to such entity. We do not have any variable interest in any unconsolidated entity that provides financing, liquidity, market risk or credit support to us or engages in leasing, hedging or research and development services with us.

**F.　　Tabular Disclosure of Contractual Obligations**

The following table sets forth our contractual obligations by specified categories as of December 31, 2015:

| | Payment Due by Period | | | | |
| | | Less than 1 | | | More than 5 |
| | Total | Year | 1-3 Years | 3-5 Years | Years |
| | | | (in RMB thousands) | | |
| Operating lease obligations | 329,304 | 110,048 | 145,723 | 49,510 | 24,023 |
| Capital expenditure obligations | 7,491 | 7,491 | — | — | — |
| Unconditional purchase obligations | 66,000 | 3,208 | 31,167 | 31,620 | — |
| Other | 15,114 | 15,114 | — | — | — |

**G.**    <u>**Safe Harbor**</u>

See "Forward-Looking Information" on pages 1 and 2 of this annual report.

---

58

https://www.sec.gov/Archives/edgar/data/1499744/000114420416097925/v436212_20f.htm

## Item 6. Directors, Senior Management and Employees

### A. <u>Directors and Senior Management</u>

The following table sets forth information regarding our executive officers and directors as of the date of this annual report.

| Directors and Executive Officers | Age | Position/Title |
| --- | --- | --- |
| Peggy Yu Yu [1] | 51 | Co-Founder, Executive Chairwoman and Director |
| Guoqing Li | 52 | Co-Founder, Director and Chief Executive Officer |
| Ruby Rong Lu | 46 | Independent Director |
| Ke Zhang | 63 | Independent Director |
| Xiaolong Li | 52 | Independent Director |
| Danqian Yao | 46 | Senior Vice President |
| Yue Wang | 50 | Chief Editor |

Note:

(1) Ms. Peggy Yu Yu has acted as our interim chief financial officer since April 2014.

*Ms. Peggy Yu Yu* is our co-founder and director and has been our executive chairwoman since our inception. Prior to that, Ms. Yu served as the vice president of Beijing Science & Culture Publishing Co. Ltd. from 1996 to 1999 and steered the company's transition from trade to professional publishing. She worked as an independent financial advisor on various corporate finance transactions for China Non-Ferrous Metals Import & Export Co., China Science Group and other corporations between 1992 and 1996. Between 1986 and 1991, she worked for UPS, Garick Corporation, Babcock & Wilcox in the US and China. Ms. Yu received an MBA degree from New York University in 1992 and a bachelor's degree in English from the Branch Campus of Beijing Foreign Language Institute in China.

*Mr. Guoqing Li* is our co-founder and director and has been our chief executive officer since our inception. Mr. Li has extensive experience in China's publishing industry. Prior to co-founding our company, he was the editor-in-chief of several book series and introduced many international titles to China. From 1987 to 1992, he worked in the Rural Development Research Center of the PRC State Council and the Ministry of Agriculture, where he conducted studies on China's various social issues. Mr. Li received his bachelor's degree in sociology from Peking University in China.

*Ms. Ruby Rong Lu* has been a director of our company since 2006. Ms. Lu is a general partner at DCM, a venture capital investment company headquartered in Silicon Valley. Ms. Lu also serves on the board of directors of several DCM portfolio companies, including Pactera Technology International Ltd., a NASDAQ-listed IT outsourcing company. Prior to joining DCM in 2003, Ms. Lu was a vice president in the technology, media and telecommunications investment banking group of Goldman Sachs & Co. Ms. Lu received her master's degree in international economics and energy, environment, science and technology from Johns Hopkins University, School of Advanced International Studies and bachelor's degree in economics with honors from the University of Maryland.

*Mr. Ke Zhang* has been our director since November 2010. Mr. Zhang has also been the chairman and chief partner of Shine Wing Certified Public Accountants since 1999. From 1993 to 1999, Mr. Zhang was deputy managing partner and managing partner of Coopers & Lybrand CIEC. Prior to that, Mr. Zhang served as the managing director of CITIC Certified Public Accountants from 1987 to 1992 and project manager and director of China International Economic Consultants Inc., a member of CITIC Group, from 1982 to 1986. Mr. Zhang currently serves as an independent director of SEEC Media Group Limited, a company listed on the Hong Kong Stock Exchange. Mr. Zhang is also currently an outside director of China National Salt Industry Corporation. Mr. Zhang received his bachelor's degree in economics from Renmin University of China in China.

*Mr. Xiaolong Li* has been our independent director since December 2010. Mr. Li currently serves as a director of two privately held companies, one in China and the other in the United States. Mr. Li has more than 20 years of experience in the industry of information technology and telecommunications. He founded 263 Network Communication Company Limited, a company currently listed on the Shenzhen Stock Exchange, in 1999 and has been its chairman since then. Prior to that, he founded Beijing Jingxun Public Information Technology Company Limited in 1997 and was its executive director until 1999. In 1992, he founded Beijing Haicheng Telecommunication Technology Company Limited and was its chairman until 1997. Since December 2013, Mr. Li has served as an

independent director of KongZhong Corporation, a leading online games publisher and developer in China listed on Nasdaq. Mr. Li attended the undergraduate program in software engineering in Beijing University of Technology.

*Mr. Danqian Yao* has served as the senior vice president of our Publications Department, Children's Books Department, Digital Music and E-Books Department, and General Merchandise and Electronics Department since December 2011. Prior to this, he worked as the vice president of Mobile Business Department from January 2010. From March 2006 to 2009, Mr. Yao led a team to provide procurement services of media products when he was employed by Beijing Kewen Cambridge Book Co., Ltd., a company he joined in 1997. Mr. Yao received his bachelor's degree of management information systems from Huazhong University of Science and Technology.

59

*Ms. Yue Wang* has served as our chief editor, responsible for children's book publishing from Feburary 2015. From January 2013 to January 2015, Ms. Wang served as our vice president of Children's Books Department. From April 2011 to January 2013, Ms. Wang served as our vice president of the Baby, Children and Maternity Department. From May 2009 to April 2011, Ms. Wang was a senior director of the Children's Books section of our Media Department, where she had previously served as a chief editor from January 2006 to April 2009. She served as a director of editorial department in Beijing Kewen Guolue Co., Ltd. from May 2000 to December 2005. Ms. Wang received her bachelor's degree in optics from Liaoning University in China.

**B.    Compensation**

For the fiscal year ended December 31, 2015, we paid an aggregate of approximately RMB5.1 million (US$0.8 million) in cash to our executive officers and non-executive directors. Neither we nor our subsidiaries or affiliated entities have entered into any service contracts with our directors which provided for benefits upon termination of their services. For share incentive grants to our officers and directors, see "—Share Incentive Plans."

**Share Incentive Plans**

We have adopted two share incentive plans, namely, the 2004 plan and the 2010 plan. The purpose of these two share incentive plans is to motivate, retain and attract certain officers, employees, directors and other eligible persons by linking their personal interests with the success of our business and with those of our shareholders.

**The 2010 Plan**

Under the 2010 plan, the maximum number of shares in respect of which options, restricted shares, or restricted share units may be granted is 10,362,270 shares. As of February 29, 2016, there were options to purchase 367,385 shares outstanding under the 2010 plan.

The following paragraphs summarize the terms of the 2010 plan.

*Types of Awards.* The following briefly describe the principal features of the various awards that may be granted under the 2010 plan.

- *Options.* Options provide for the right to purchase a specified number of our Class A common shares at a specified price and usually will become exercisable at the discretion of our plan administrator in one or more installments after the grant date. The option exercise price may be paid, subject to the discretion of the plan administrator, in cash or check, in our Class A common shares which have been held by the option holder for such period of time as may be required to avoid adverse accounting consequences, in other property with value equal to the exercise price, through a broker-assisted cashless exercise, or by any combination of the foregoing.

- *Restricted Shares.* A restricted share award is the grant of our Class A common shares which are subject to certain restrictions and may be subject to risk of forfeiture. Unless otherwise determined by our plan administrator, a restricted share is nontransferable and may be forfeited or repurchased by us upon termination of employment or service during a restricted period. Our plan administrator may also impose other restrictions on the restricted shares, such as limitations on the right to vote or the right to receive dividends.

- *Restricted Share Units.* Restricted share units represent the right to receive our Class A common shares at a specified date in the future, subject to forfeiture of such right upon termination of employment or service during the applicable restriction period. If the restricted share units have not been forfeited, then subject to the discretion of the plan administrator, we shall pay the holder in the form of cash or unrestricted Class A common shares or a combination of both after the last day of the restriction period as specified in the award agreement.

*Plan Administration.* The plan administrator is our board or a committee of one or more members of our board.

*Award Agreement.* Options, restricted shares, or restricted share units granted under the plan are evidenced by an award agreement that sets forth the terms, conditions, and limitations for each grant.

*Option Exercise Price.* The exercise price subject to an option shall be determined by the plan administrator and set forth in the award agreement. The exercise price may be amended or adjusted in the absolute discretion of the plan administrator, the

determination of which shall be final, binding and conclusive. To the extent not prohibited by applicable laws or the rules of any exchange on which our securities are listed, a downward adjustment of the exercise prices of options shall be effective without the approval of the shareholders or the approval of the affected participants.

60

https://www.sec.gov/Archives/edgar/data/1499744/000114420416097925/v436212_20f.htm

*Eligibility*. We may grant awards to our employees, directors, consultants, and advisers or those of any related entities.

*Term of the Awards*. The term of each option grant shall be stated in the award agreement, provided that the term shall not exceed 10 years from the date of the grant. As for the restricted shares and restricted share units, the plan administrator shall determine and specify the period of restriction in the award agreement.

*Vesting Schedule*. In general, the plan administrator determines the vesting schedule, which is set forth in the award agreement.

*Transfer Restrictions*. Awards for options, restricted shares or restricted share units may not be transferred in any manner by the award holder and may be exercised only by such holders, subject to limited exceptions. Restricted shares and restricted share units may not be transferred during the period of restriction.

*Termination of Employment or Service*. In the event that an award recipient ceases employment with us or ceases to provide services to us, any unvested options will automatically terminate and any vested options will generally terminate after a period of time following the termination of employment or service if the award recipient does not exercise the options during this period. Any restricted shares and restricted share units that are at the time of termination subject to restrictions will generally be forfeited and automatically transferred to and reacquired by us at no cost to us.

*Termination and Amendment of the Plan*. Unless terminated earlier, the 2010 plan will terminate automatically in 2020. Our board of directors has the authority to amend or terminate the plan subject to shareholder approval with respect to certain amendments. However, no such action may adversely affect in any material way any awards previously granted unless agreed by the recipient.

**The 2004 Plan**

Under the 2004 plan, the maximum number of shares in respect of which options, restricted shares, or unrestricted shares may be granted is 53,286,540. We suspended implementing the 2004 plan on November 15, 2010, the date of effectiveness of our 2010 plan. At the annual general meeting on November 12, 2012, our shareholders approved and ratified our resumption of implementing the 2004 plan, only to the extent that the Class A common shares underlying the awards forfeited after November 15, 2010 shall revive and be available for issuance pursuant to future awards under the 2004 plan, and with amendments made to the 2004 plan, reflecting (i) the extension of the term of the 2004 plan and the maximum term of the options and other incentive shares that may be granted thereunder, and (ii) other changes necessary and appropriate for us being a public company. As of February 29, 2016, total options to purchase an aggregate number of 17,417,365 Class A common shares have been granted and are outstanding under the 2004 plan.

The following paragraphs summarize the terms of the 2004 plan.

*Types of Awards*. The following briefly describe the principal features of the various awards that may be granted under the 2004 plan.

- *Option awards*. Options provide for the right to purchase a specified number of our common shares at a specified price and usually will become exercisable in the discretion of our plan administrator in one or more installments after the grant date. Subject to the discretion of the plan administrator, the option exercise price may be paid, in cash, in our Class A common shares which have been held by the option holder for at least six months, by a reduction in the number of common shares otherwise deliverable pursuant to the options, through a cashless exercise, by a promissory note or by any combination of the foregoing.

- *Share awards*. Two types of share awards are available under the 2004 plan, restricted share awards and unrestricted share awards. A restricted share award is the grant of our Class A common shares which are subject to certain restrictions and may be repurchased by us upon termination of employment or service before vesting. Unless otherwise determined by our plan administrator, holders of restricted shares shall be entitled to cash dividend and voting rights associated with being our shareholders. Participants may also be granted unrestricted share awards, and any such shares are not subject to any conditions and/or restrictions.

*Plan Administration*. The plan administrator is our board of directors, or one or more committees designated by our board of directors or another committee (within its designated authority). The plan administrator will determine the provisions and terms and conditions of each grant.

https://www.sec.gov/Archives/edgar/data/1499744/000114420416097925/v436212_20f.htm

*Award Agreement*. Options, restricted shares, or unrestricted shares granted under the plan are evidenced by an award agreement that sets forth the terms, conditions, and limitations for each grant.

61

---

*Option Exercise Price*. The exercise price subject to an option shall be determined by the plan administrator and set forth in the award agreement. The exercise price may be amended or adjusted by the administrator for the benefit of any eligible person.

*Eligibility*. We may grant awards to our directors, officers, employees, consultants and advisers or those of any related entities.

*Term of the Awards*. The term of each option grant, restricted share award and unrestricted share award shall not exceed 15 years from the date of the grant.

*Vesting Schedule*. In general, the plan administrator determines the vesting schedule or conditions, which is set forth in the award agreement.

*Transfer Restrictions*. Awards for options, restricted shares or unrestricted shares may not be transferred in any manner by the award holders and may be exercised only by such holders, subject to limited exceptions. Restricted shares may be subject to transfer restrictions as set forth in the award agreement during the period of restriction.

*Termination of Employment or Service*. In the event that an award recipient ceases employment with us or ceases to provide services to us, any unvested options will automatically terminate and any vested options will generally terminate after a period of time following the termination of employment if the award recipient does not exercise the options during this period, and any restricted shares that are at the time subject to restrictions will generally be forfeited or repurchased in accordance with the award agreement.

*Termination and Amendment of the Plan*. Unless terminated earlier, the 2004 plan will terminate automatically in 2019. Our board of directors has the authority to amend or terminate the plan subject to shareholder approval with respect to certain amendments. However, no such action may adversely affect in any material way any awards previously granted unless agreed by the recipient.

The following table summarizes, as of February 29, 2016, the outstanding options that our executive officers and directors beneficially own under our share incentive plans.

| Name | Class A Common Shares Underlying Options Awarded | Exercise Price (US$/Share) | Date of Grant | Date of Expiration |
|---|---|---|---|---|
| Guoqing Li | 2,311,450 | 0.065 | December 20, 2004 | December 20, 2019 |
| | 4,944,320 | 0.183 | December 20, 2004 | December 20, 2019 |
| | 3,200,000 | 0.93 | June 30, 2010 | June 30, 2020 |
| | 2,500,000 | 1.572 | August 26, 2013 | August 26, 2020 |
| Danqian Yao | * | 0.065 | December 20, 2004 | December 20, 2019 |
| | * | 0.183 | December 20, 2004 | December 20, 2019 |
| | * | 0.822 | May 21, 2009 | December 31, 2018 |
| | * | 0.822 | December 31, 2009 | December 31, 2019 |
| Yue Wang | * | 0.822 | December 31, 2008 | December 31, 2018 |
| | * | 0.93 | June 30, 2010 | June 30, 2020 |
| | * | 0.93 | July 1, 2011 | July 1, 2021 |
| Ke Zhang | * | 0.93 | July 1, 2011 | July 1, 2021 |
| Ruby Rong Lu | * | 0.93 | July 1, 2011 | July 1, 2021 |
| Xiaolong Li | * | 0.93 | July 1, 2011 | July 1, 2021 |
| Total | 14,351,895 | | | |

* Less than one percent of our total outstanding share capital and together holding stock options exercisable for 1,396,125 Class A common shares.

As of February 29, 2016, other individuals as a group held options to purchase 3,432,855 Class A common shares of our company, with exercise prices ranging from US$0.065 to US$1.58 per Class A common share.

## C.  Board Practices

Our board of directors currently consists of five directors, including three independent directors. A director is not required to hold any shares in our company to qualify to serve as a director. A director may vote with respect to any contract, proposed contract, or

arrangement in which he or she is interested. A director who is interested in a contract must declare the nature of his or her interest at a meeting of the board of directors. A director may exercise all the powers of the company to borrow money, to mortgage or charge its business, property and uncalled capital, and to issue debentures or other securities whenever money is borrowed or as security for any debt, liability or obligation of the company or of any third party.

---

62

---

**Committees of the Board of Directors**

*Audit Committee*. Our audit committee consists of Mr. Ke Zhang, Mr. Xiaolong Li and Ms. Ruby Rong Lu, and is chaired by Mr. Ke Zhang. Mr. Ke Zhang, Ms. Ruby Rong Lu and Mr. Xiaolong Li satisfy the "independence" requirements of Section 303A of the Corporate Governance Rules of the New York Stock Exchange and meet the independence standards under Rule 10A-3 under the Securities Exchange Act of 1934, as amended. We have determined that Mr. Ke Zhang qualifies as an "audit committee financial expert." The audit committee will oversee our accounting and financial reporting processes and the audits of the financial statements of our company. The audit committee will be responsible for, among other things:

- selecting the independent registered public accounting firm and pre-approving all auditing and non-auditing services permitted to be performed by the independent registered public accounting firm;

- reviewing with the independent registered public accounting firm any audit problems or difficulties and management's response;

- reviewing and approving all proposed related party transactions, as defined in Item 404 of Regulation S-K under the Securities Act;

- discussing the annual audited financial statements with management and the independent registered public accounting firm;

- reviewing major issues as to the adequacy of our internal controls and any special audit steps adopted in light of material control deficiencies;

- annually reviewing and reassessing the adequacy of our audit committee charter;

- meeting separately and periodically with management and the independent registered public accounting firm; and

- reporting regularly to the board.

In 2015, our audit committee held meetings or passed resolutions by unanimous written consent five times.

*Compensation Committee*. Our compensation committee consists of Ms. Ruby Rong Lu, Mr. Ke Zhang and Mr. Xiaolong Li, and is chaired by Ms. Ruby Rong Lu. Mr. Ke Zhang and Mr. Xiaolong Li satisfy the "independence" requirements of Section 303A of the Corporate Governance Rules of the New York Stock Exchange. The compensation committee will assist the board in reviewing and approving the compensation structure, including all forms of compensation, relating to our directors and executive officers. Our chief executive officer may not be present at any committee meeting during which their compensation is deliberated upon. The compensation committee will be responsible for, among other things:

- reviewing the total compensation package for our executive officers and making recommendations to the board with respect to it;

- approving and overseeing the total compensation package for our executives other than the three most senior executives;

- reviewing the compensation of our directors and making recommendations to the board with respect to it; and

- periodically reviewing and approving any long-term incentive compensation or equity plans, programs or similar arrangements, annual bonuses, and employee pension and welfare benefit plans.

In 2015, our compensation committee held meetings or passed resolutions by unanimous written consent one time.

*Corporate Governance and Nominating Committee*. Our corporate governance and nominating committee consist of Ms. Ruby Rong Lu, Mr. Ke Zhang and Mr. Xiaolong Li, and is chaired by Ms. Ruby Rong Lu. Ms. Ruby Rong Lu, Mr. Ke Zhang and Mr. Xiaolong Li satisfy the "independence" requirements of Section 303A of the Corporate Governance Rules of the New York Stock Exchange. The corporate governance and nominating committee will assist the board of directors in identifying individuals qualified to become our directors and in determining the composition of the board and its committees. The corporate governance and nominating committee will be responsible for, among other things:

- identifying and recommending to the board nominees for election or re-election to the board, or for appointment to fill any vacancy;

- reviewing annually with the board the current composition of the board in light of the characteristics of independence, age, skills, experience and availability of service to us;

- identifying and recommending to the board the directors to serve as members of the board's committees;

- advising the board periodically with respect to significant developments in the law and practice of corporate governance as well as our compliance with applicable laws and regulations, and making recommendations to the board on all matters of corporate governance and on any corrective action to be taken; and

- monitoring compliance with our code of business conduct and ethics, including reviewing the adequacy and effectiveness of our procedures to ensure proper compliance.

In 2015, our corporate governance and nominating committee passed resolutions by unanimous written consent one time.

**Duties of Directors**

Under Cayman Islands law, our directors owe fiduciary duties to act honestly in good faith and with a view to our best interests. Our directors also owe to our company a duty to act with skill and care. It was previously considered that a director need not exhibit in the performance of his duties a greater degree of skill than may reasonably be expected from a person of his knowledge and experience. However, English and commonwealth courts have moved towards an objective standard with regard to the required skill and care and these authorities are likely to be followed in the Cayman Islands. In fulfilling their duty of care to us, our directors must ensure compliance with our memorandum and articles of association. Our company has the right to seek damages if a duty owed by our directors is breached.

**Terms of Directors and Officers**

Our officers are elected by and serve at the discretion of the board. Our directors are not subject to a term of office and hold office until such time as they are removed from office by special resolution of our shareholders.

**Employment Agreements**

We have entered into employment agreements with each of our senior executive officers. We may terminate a senior executive officer's employment for cause at any time without remuneration for certain acts, such as a criminal conviction or guilty plea to a felony or to an act of fraud, misappropriation or embezzlement, willful misconduct or gross negligence to our detriment, or a material failure to perform his or her duties. We may also terminate a senior executive officer's employment without cause upon written notice with immediate effect. A senior executive officer is entitled to severance payments and benefits if his or her employment agreement is terminated without cause or, in some cases, due to a change of control event involving our company.

Each senior executive officer has agreed to hold any trade secrets, proprietary information, inventions or technical secrets of our company in strict confidence during and after his or her employment. Each officer also agrees that we shall own all the intellectual property developed by such officer during his or her employment. If an officer breaches the above contractual obligations in relation with confidentiality and intellectual property, we are entitled to seek legal remedies.

**D.      Employees**

As of December 31, 2015, we had 2,917 full-time employees, including 2,113 in fulfillment, 35 in marketing, 467 in technology and content and 302 in general and administrative. We had a total of 3,210 and 2,390 employees as of December 31, 2014 and 2013, respectively. We also employ independent contractors and temporary personnel from time to time. As of December 31, 2015, we employed approximately 2,110 temporary personnel through third-party contractors.

Our success depends on our ability to attract, retain and motivate qualified personnel. We believe we offer our employees competitive compensation packages and an environment that encourages initiative and self-development, and as a result, we have generally been able to attract and retain qualified personnel and maintain a stable core management team.

We design and implement in-house training programs tailored to each job function and set of responsibilities to enhance performance. Specific training is provided to new employees at orientation to familiarize them with our working environment and operational procedures.

As required by regulations in China, we participate in various employee social security plans that are organized by municipal and provincial governments, including pension, unemployment insurance, childbirth insurance, work-related injury insurance, medical insurance and housing insurance. We are required under PRC law to make contributions to employee benefit plans at specified percentages of the salaries, bonuses and certain allowances of our employees, up to a maximum amount specified by the local government from time to time.

We believe that we maintain a good working relationship with our employees and we have not experienced any significant labor disputes.

**E.　　Share Ownership**

The following tables set forth information concerning the beneficial ownership of our common shares by different classes as of February 29, 2016, the most recent practicable date, by:

- each of our directors and executive officers; and

- each person known to us to beneficially own more than 5% of our common shares.

The calculations in the table below are based on 411,434,410 common shares outstanding as of February 29, 2016, including 6,607,115 Class A common shares issued to our depositary bank and reserved for future exercise and grants of incentive shares under our share incentive plans.

**Class A Common Shares**

As of February 29, 2016, we have 279,557,750 Class A common shares outstanding including 276,964,910 Class A common shares represented by 55,392,982 ADSs. In addition, as of February 29, 2016, options to purchase a total of 17,754,750 Class A common shares granted to our directors, executive officers and other employees and issued and outstanding.

**Class B Common Shares**

As of February 29, 2016, we have 131,876,660 Class B common shares outstanding.

Beneficial ownership is determined in accordance with the rules and regulations of the SEC. In computing the number of shares beneficially owned by a person and the percentage ownership of that person, we have included shares that the person has the right to acquire within 60 days after February 29, 2016, the most recent practicable date, including through the exercise of any option, warrant, or other right or the conversion of any other security. These shares, however, are not included in the computation of the percentage ownership of any other person.

| | Class A Common Shares Beneficially Owned Number | % (1) | Class B Common Shares Beneficially Owned Number | % (2) | Total Common Shares Beneficially Owned Number (3) | % (4) | Total Voting Power % (5) |
|---|---|---|---|---|---|---|---|
| **Directors and Executive Officers:**** | | | | | | | |
| Peggy Yu Yu | 3,469,170(6) | 1.2 | 13,000,000(7) | 9.9 | 16,469,170 | 4.0 | 8.4 |
| Guoqing Li | 14,211,600(8) | 5.1 | 118,876,660(9) | 90.1 | 133,088,260 | 32.3 | 75.3 |
| Ruby Rong Lu (10) | * | * | — | | * | * | * |
| Ke Zhang (11) | * | * | — | | * | * | * |
| Xiaolong Li (12) | * | * | — | | * | * | * |
| Danqian Yao | * | * | — | | * | * | * |
| Yue Wang | * | * | — | | * | * | * |
| All directors and | 18,971,895 | 6.8 | 131,876,660 | 100 | 150,848,555 | 36.7 | 83.7 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| executive officers as a group | | | | | | | |
| **Principal Shareholders:** | | | | | | | |
| Science & Culture International Limited (13) | 1,185,000 | 0.4 | 97,000,000 | 73.5 | 98,185,000 | 23.9 | 60.8 |
| Kewen Holding Co. Limited [(14)] | 8,529,450 | 3.1 | 118,876,660 | 90.1 | 127,406,110 | 31.0 | 75.0 |

Notes:

\*      Less than 1% of our outstanding share capital.

\*\*    Except for Ms. Ruby Rong Lu, Mr. Xiaolong Li and Mr. Ke Zhang, the business address of our directors and executive officers is c/o 21/F, Jing An Center, No. 8 North Third Ring Road East, Chaoyang District, Beijing 100028, People's Republic of China.

65

(1) For each person and group included in this column, percentage ownership is calculated by dividing the number of Class A common shares beneficially owned by such person or group, including shares that such person or group has the right to acquire within 60 days of February 28, 2016, by the sum of 279,557,750, being the total number of Class A common shares outstanding, and the number of Class A common shares underlying share options held by such person or group that are exercisable within 60 days of February 28, 2016.

(2) For each person and group included in this column, percentage ownership is calculated by dividing the number of Class B common shares beneficially owned by such person or group, including Class B common shares that such person or group has the right to acquire within 60 days of February 28, 2016, by 131,876,660, being the total number of Class B common shares outstanding.

(3) Represents the sum of Class A common shares and Class B common shares beneficially owned by such person or group.

(4) For each person and group included in this column, percentage ownership is calculated by dividing the number of total common shares beneficially owned by such person or group, by the sum of 411,434,410, being the total number of common shares outstanding, and the number of common shares that such person or group has the right to acquire within 60 days of February 28, 2016, including through the exercise of any option.

(5) For each person or group included in this column, percentage of total voting power represents voting power based on both Class A and Class B common shares held by such person or group with respect to all outstanding shares of our Class A and Class B common shares as a single class. Each holder of Class A common shares is entitled to one vote per Class A common share. Each holder of our Class B common shares is entitled to ten votes per Class B common share. Our Class B common shares are convertible at any time by the holder into Class A common shares on a share-for-share basis.

(6) Represents 3,469,170 Class A common shares held by Ms. Yu, including 333,330 Class A common shares issuable to Ms. Yu upon exercise of options within 60 days after February 29, 2016.

(7) Represents 13,000,000 Class B common shares held by Ms. Yu.

(8) Represents 1,333,330 Class A common shares issuable to Guoqing Li upon exercise of options within 60 days after February 29, 2016; 3,111,320 Class A common shares issuable to Dyna-Best Corp upon exercise of options within 60 days after February 29, 2016, 8,581,950 Class A common shares issuable to Kewen Holding Co. Limited upon exercise of options within 60 days after February 29, 2016 and 237,000 ADSs representing 1,185,000 Class A common shares held by Science & Culture International Limited. Dyna-Best Corp is a British Virgin Islands company wholly owned by Mr. Li. Mr. Li is the sole director and beneficial owner of Kewen Holding Co. Limited, which holds 60% of the shares in Science & Culture International Limited. Mr. Li disclaims beneficial ownership with respect to the shares held by Science & Culture International Limited except to the extent of his pecuniary interest therein.

(9) Represents 21,876,660 Class B common shares held by Mr. Li through Kewen Holding Co. Limited and 97,000,000 Class B common shares held by Science & Culture International Limited.

(10) The business address for Ms. Lu is Unit 1, Level 10, Tower W2 Oriental Plaza, No. 1 East Chang An Ave., Dong Cheng District, Beijing, China.

(11) The business address for Mr. Zhang is c/o 9th Floor, Fu Hua Mansion, 8 Chaoyangmen North Avenue, Dongcheng District, Beijing 100027, China.

(12) The business address for Mr. Li is 16/F, Jianda Building, 14 Dongtucheng Road, Chaoyang District, Beijing, China.

(13) The business address of Science & Culture International Limited is Offshore Incorporation Limited, P.O. Box 957, Offshore Incorporations Centre, Road Town, Tortola, British Virgin Islands.

(14) The business address of Kewen Holding Co. Limited is Offshore Incorporations Limited, P.O. Box 957, Offshore Incorporations Center, Road Town, Tortola, British Virgin Islands.

As of February 29, 2016, 411,434,410 of our common shares were issued and outstanding. Based on a review of the register of members maintained by our Cayman Islands registrar, we believe that as of February 29, 2016, 275,664,410 common shares, or

67.0% of our total outstanding common shares, were held by one record shareholder in the United States, The Bank of New York Mellon, the depositary of our ADS program. The number of beneficial owners of our ADSs in the United States is likely to be much larger than the number of record holders of our common shares in the United States.

Our shares are divided into Class A common shares and Class B common shares. Holders of Class A common shares are entitled to one vote per share, while holders of Class B common shares are entitled to ten votes per share. We are not aware of any arrangement that may, at a subsequent date, result in a change of control of our company.

**Item 7.**     **Major Shareholders and Related Party Transactions**

**A.**     <u>**Major Shareholders**</u>

See "Item 6. Directors, Senior Management and Employees—E. Share Ownership."

66

## B.     Related Party Transactions

**Contractual Arrangements**

    See "Item 4. Information on the Company—C. Organizational Structure."

**Transactions with Affiliates**

    In March 2006, our PRC subsidiary Dangdang Information entered into an operation agreement with Kewen Cambridge, pursuant to which we engaged Kewen Cambridge to distribute media products related to economics and management, and children on our *dangdang.com* website from January 1, 2006 to December 31, 2010, which automatically renews for subsequent three year terms. Pursuant to an amendment to the operation agreement, Beijing Kewen Guolue Information Technology Co., Ltd., or Kewen Guolue, assumed part of Kewen Cambridge's responsibilities under the operation agreement during the contract years from 2007 to 2009, and was added as a party to the operation agreement. Kewen Guolue is an entity indirectly controlled by family members of Mr. Guoqing Li. Pursuant to the operation agreement and its amendments, we agreed to pay Kewen Cambridge and Kewen Guolue service fees equal to 3% of the revenues of the related media products sold on our website. We paid service fees totaling RMB3.7 million to Kewen Cambridge in 2010 and service fees of RMB5.9 million to Kewen Guolue in 2010. In August 2010, we entered into an amendment to the operation agreement to modify the service scope of Kewen Cambridge and Kewen Guolue and to revise the service fees from a percentage of our relevant revenues to a fixed amount of RMB28.9 million plus remuneration of employees of these two entities for the period from January 1, 2010 to December 31, 2012. Pursuant to the amendment, the operation agreement terminated on December 31, 2012 and will not be renewed. We paid service fees totaling RMB3.7 million and RMB5.9 million to Kewen Cambridge and Kewen Guolue, respectively, in 2012. We did not pay any service fees to either Kewen Cambridge or Kewen Guolue in 2013. In January 2014, we entered into a service agreement with Kewen Guolue for the period from January 1, 2014 to December 31, 2014 and charged RMB60 thousand for administrative service in 2014. In 2015, the related party transactions mainly represented ordinary services provided by us to Beijing Baoma Diary Technology Ltd. and Beijing Hechuang Technology Ltd., which are our equity method investees, totaling RMB619 thousand (US$96 thousand).

    In January 2000, we entered into two separate advisory agreements with each of Tripod Enterprises Holding Limited and Kewen Holdings Co., Ltd., pursuant to which we engaged Tripod Enterprises and Kewen Holdings to provide certain advisory services in reviewing and revising financing documentation and assisting in our potential initial public offering. A direct family member of Ms. Peggy Yu Yu is the sole director and shareholder of Tripod Enterprises. Mr. Guoqing Li is the sole director and shareholder of Kewen Holdings. The two advisory agreements were terminated effective from January 2, 2010. In 2012, we paid RMB5.2 million and RMB5.0 million to Tripod Enterprises and Kewen Holdings, respectively, to settle the outstanding consulting fees. No amount was due to either Tripod Enterprises or Kewen Holdings as of December 31, 2013, 2014 and 2015.

**Employment Agreements**

    See "Item 6. Directors, Senior Management and Employees—C. Board Practice" for a description of the employment agreements we have entered into with our senior executive officers.

**Share Incentives**

    See "Item 6. Directors, Senior Management and Employees—B. Compensation" for a description of share-based compensation awards we have granted to our directors, officers and other individuals as a group.

## C.     Interests of Experts and Counsel

    Not applicable.

## Item 8.     Financial Information

**Consolidated Statements and Other Financial Information**

    See "Item 18. Financial Statements."

## Dividend Policy

We have not previously declared or paid cash dividends. We currently intend to retain most, if not all, of our available funds and any future earnings to operate and expand our business.

We are a holding company incorporated in the Cayman Islands. We rely principally on dividends from our subsidiaries in the British Virgin Islands and Hong Kong for our cash requirements, including any payment of dividends to our shareholders. PRC regulations may restrict the ability of our PRC subsidiaries to pay dividends to us. See "Item 4. Information on the Company—B. Business Overview—PRC Regulation—Regulations on Dividend Distribution."

Subject to our memorandum and articles of association and the laws of the Cayman Islands, our board of directors has complete discretion as to whether to distribute dividends. In addition, our shareholders may by ordinary resolution declare a dividend, but no dividend may exceed the amount recommended by our directors. Even if our board of directors decides to pay dividends, the form, frequency and amount will depend upon our future operations and earnings, capital requirements and surplus, general financial condition, contractual restrictions and other factors that the board of directors may deem relevant. If we pay any dividends, we will pay our ADS holders to the same extent as holders of our common shares, subject to the terms of the deposit agreement, including the fees and expenses payable thereunder. Cash dividends on our ordinary shares, if any, will be paid in U.S. dollars.

A.      **Significant Changes**

Except as disclosed elsewhere in this annual report, we have not experienced any significant changes since the date of our audited consolidated financial statements included in this annual report.

## Item 9.       The Offer and Listing

A.      **Offering and Listing Details.**

See "—C. Markets" and "Item 12. Description of Securities Other than Equity Securities—D. American Depositary Shares."

B.      **Plan of Distribution**

Not applicable.

C.      **Markets**

Our ADSs, each representing five Class A common shares, have been listed on the New York Stock Exchange since December 8, 2010 and trade under the symbol "DANG." The following table provides the high and low trading prices for our ADSs on the New York Stock Exchange for the periods indicated.

|  | Trading Price | |
| --- | --- | --- |
|  | **High** | **Low** |
|  | US$ | US$ |
| **Annual High and Low** | | |
| Fiscal Year 2013 | 12.19 | 3.70 |
| Fiscal Year 2014 | 19.05 | 8.52 |
| Fiscal Year 2015 | 11.50 | 5.56 |
| **Quarterly Highs and Lows** | | |
| First Fiscal Quarter of 2014 | 19.05 | 8.57 |
| Second Fiscal Quarter of 2014 | 15.00 | 8.92 |
| Third Fiscal Quarter of 2014 | 16.42 | 11.16 |
| Fourth Fiscal Quarter of 2014 | 13.44 | 8.52 |
| First Fiscal Quarter of 2015 | 9.78 | 7.49 |
| Second Fiscal Quarter of 2015 | 11.50 | 8.06 |
| Third Fiscal Quarter of 2015 | 9.10 | 5.56 |
| Fourth Fiscal Quarter of 2015 | 7.56 | 5.84 |
| **Monthly Highs and Lows** | | |
| October 2015 | 6.97 | 5.84 |

| | | |
|---|---|---|
| November 2015 | 7.20 | 6.38 |
| December 2015 | 7.56 | 6.86 |
| January 2016 | 7.29 | 5.89 |
| February 2016 | 6.79 | 5.85 |
| March 2016 | 7.26 | 6.56 |
| April 2016 (through April 27) | 7.69 | 7.08 |

68

**D.  Selling Shareholders**

Not applicable.

**E.  Dilution**

Not applicable.

**F.  Expenses of the Issue**

Not applicable.

**Item 10.    Additional Information**

**A.  Share Capital**

Not applicable.

**B.  Memorandum and Articles of Association**

We are a Cayman Islands company and our affairs are governed by our memorandum and articles of association, as amended and restated from time to time, and the Companies Law (2013 Revision) of the Cayman Islands, which we refer to as the Companies Law below, and the common law of the Cayman Islands.

As of the date hereof, our authorized share capital is divided into 1,000,000,000 common shares with a par value of US$0.0001 each, of which 686,505,790 common shares are designated as Class A common shares and 313,494,210 are designated as Class B common shares. As of February 29, 2016, the most recent practicable date, there are 279,557,750 Class A common shares and 131,876,660 Class B common shares outstanding.

The following are summaries of material provisions of our sixth amended and restated memorandum and articles of association and the Companies Law insofar as they relate to the material terms of our common shares.

**Registered Office and Objects**

The registered office of our company is at the offices of Maples Corporate Services Limited, PO Box 309, Ugland House, KY1-1104, Grand Cayman, Cayman Islands or at such other place as our board of directors may from time to time decide. The objects for which our company is established are unrestricted and we have full power and authority to carry out any object not prohibited by the Companies Law (2013 Revision), as amended from time to time, or any other law of the Cayman Islands.

**Board of Directors**

See "Item 6. Board Practices—C. Board of Directors."

**Common Shares**

*General*. Our common shares are divided into Class A common shares and Class B common shares. Holders of Class A common shares and Class B common shares have the same rights except for voting and conversion rights. All of our issued and outstanding common shares are fully paid. Our common shares are issued in registered form and are issued when registered in our register of members. Our shareholders who are not residents of the Cayman Islands may freely hold and vote their shares.

*Dividends*. The holders of our common shares are entitled to receive such dividends as may be declared by our board of directors subject to our memorandum and articles of association and the Companies Law. Dividends may be paid only out of profits, which include net earnings and retained earnings undistributed in prior years, and out of share premium, a concept analogous to paid-in surplus in the United States. No dividend may be declared and paid unless our directors determine that we have funds lawfully available for such purpose and immediately after the payment, we will be able to pay our debts as they become due in the ordinary course of business.

*Conversion*. Each Class B common share is convertible into one Class A common share at any time by the holder thereof. Class A common shares are not convertible into Class B common shares under any circumstances. Upon any transfer of Class B common shares by a holder thereof to any person or entity which is not an affiliate of such holder (as defined in our articles of association), such Class B common shares shall be automatically and immediately converted into the equal number of Class A common shares. In addition, if at any time Ms. Peggy Yu Yu and Mr. Guoqing Li and their affiliates collectively own less than 5% of the total number of the issued and outstanding Class B common shares (taking into account all of the issued and outstanding preferred shares on an as-converted basis), each issued and outstanding Class B common share shall be automatically and immediately converted into one share of Class A common share, and we shall not issue any Class B common shares thereafter.

69

*Voting Rights*. In respect of matters requiring shareholders' vote, each Class A common share is entitled to one vote, and each Class B common share is entitled to ten votes. Voting at any shareholders' meeting is by show of hands unless a poll is demanded. A poll may be demanded by any one or more shareholder together holding at least 10% of the shares given a right to vote at the meeting, present in person or by proxy. Shareholders may attend any shareholders' meeting in person or by proxy, or if a corporation or other non-natural person, by its duly authorized representative or proxy. We currently do not allow shareholders to vote electronically.

A quorum required for a meeting of shareholders consists of at least one shareholder present in person or by proxy or, if a corporation or other non-natural person, by its duly authorized representative, who hold not less than one-third of our voting share capital. Shareholders' meetings may be held annually and may be convened by our board of directors. Advance notice of at least seven calendar days is required for the convening of shareholders' meetings.

An ordinary resolution to be passed by the shareholders requires the affirmative vote of a simple majority of the votes of the common shares cast in a general meeting, while a special resolution requires the affirmative vote of no less than two-thirds of the votes cast attaching to the common shares. A special resolution is required for important matters such as a change of name. Holders of the common shares may effect certain changes by ordinary resolution, including increasing the amount of our authorized share capital, consolidate and divide all or any of our share capital into shares of larger amount than our existing shares, and cancel any authorized but unissued shares.

*Transfer of Shares*. Subject to the restrictions set out in our memorandum and articles of association, our shareholders may transfer all or any of their common shares by an instrument of transfer in the usual or common form or any other form approved by our board of directors.

Our board of directors may decline to register any transfer of any common share which is not fully paid up or on which we have a lien. Our board may also decline to register any transfer of any common share unless (a) the instrument of transfer is lodged with us, accompanied by the certificate for the common shares to which it relates and such other evidence as our board may reasonably require to show the right of the transferor to make the transfer; and (b) a fee of such maximum sum as the New York Stock Exchange may determine to be payable, or such lesser sum as our board may from time to time require, is paid to us in respect thereof.

If our board of directors refuses to register a transfer it shall, within two months after the date on which the instrument of transfer was lodged, send to each of the transferor and the transferee notice of such refusal. The registration of transfers may be suspended on 14 days' notice being given by advertisement in such one or more newspapers or by electronic means and the register closed at such times and for such periods as our board may from time to time determine, provided, however, that the registration of transfers shall not be suspended nor the register closed for more than 30 days in any calendar year.

*Liquidation*. On a return of capital on winding up or otherwise (other than on conversion, redemption or purchase of shares), assets available for distribution among the holders of common shares shall be distributed among the holders of common shares on a pro-rata basis, or otherwise as determined by the liquidator with the sanction of an ordinary resolution of the shareholders.

*Calls on Shares and Forfeiture of Shares*. Our board of directors may from time to time make calls upon shareholders for any amounts unpaid on their shares in a notice served to such shareholders at least 14 calendar days prior to the specified time of payment. Shares that have been called upon and remain unpaid on the specified time are subject to forfeiture.

*Redemption of Shares*. Under the Companies Law, we may issue shares on terms that are subject to redemption, at our option or at the option of the holders, on such terms and in such manner as may, before the issue of such shares, be determined by a special resolution, provided:

(a)  no share can be redeemed unless it is fully paid up;

(b)  no share can be redeemed such that there are no shares outstanding; and

(c)  no share can be redeemed after we have commenced liquidation.

The payment of the redemption price may be made out of profits, or, subject to us being able to pay our debts as they fall due in the ordinary course of business immediately after such payment, be made out of the share premium account or capital (including capital redemption reserve).

*Variations of Rights of Shares.* All or any of the special rights attached to any class of shares may, unless otherwise provided by the terms of issue of the shares of that class, be varied either with the written consent of the holders of a majority of the issued shares of that class or with the sanction of a special resolution passed at a general meeting of the holders of the shares of that class.

*Inspection of Books and Records.* Holders of our common shares will have no general right under Cayman Islands law to inspect or obtain copies of our list of shareholders or our corporate records. However, we will provide our shareholders with annual audited financial statements.

## C.     Material Contracts

We have not entered into any material contracts other than in the ordinary course of business and other than those described in "Item 4. Information on the Company" or elsewhere in this annual report on Form 20-F.

## D.     Exchange Controls

See "Item 4. Information on the Company—B. Business Overview—PRC Regulation—Regulations Relating to Foreign Exchange."

## E.     Taxation

The following discussion of material Cayman Islands, PRC and United States federal income tax consequences of an investment in our ADSs or Class A common shares is based upon laws and relevant interpretations thereof in effect as of the date of this annual report, all of which are subject to change. This discussion does not deal with all possible tax consequences relating to an investment in our ADSs or Class A common shares, such as the tax consequences under state, local and other tax laws.

**Cayman Islands Taxation**

The Cayman Islands currently levies no taxes on individuals or corporations based upon profits, income, gains or appreciation and there is no taxation in the nature of inheritance tax or estate duty. There are no other taxes likely to be material to us levied by the Government of the Cayman Islands except for stamp duties which may be applicable on instruments executed in, or brought within the jurisdiction of, the Cayman Islands, or produced before a court of the Cayman Islands. There are no exchange control regulations or currency restrictions in the Cayman Islands.

**People's Republic of China Taxation**

Under the PRC Enterprise Income Tax Law, an enterprise established outside China with "de facto management bodies" within the PRC is considered a "resident enterprise" for PRC enterprise income tax purposes and is generally subject to a uniform 25% enterprise income tax rate on its worldwide income. A circular issued by the State Administration of Taxation in April 2009 clarified that dividends and other income paid by such "resident enterprises" will be considered PRC-source income and subject to PRC withholding tax, currently at a rate of 10%, when paid to non-PRC enterprise shareholders. Under the PRC implementation regulations to the Enterprise Income Tax Law, a "de facto management body" is defined as a body that has material and overall management and control over the manufacturing and business operations, personnel and human resources, finances and properties of an enterprise. In addition, the circular mentioned above specifies that certain PRC-invested enterprises controlled by Chinese enterprises or Chinese enterprise groups will be classified as PRC resident enterprises if the following are located or resident in the PRC: senior management personnel and departments that are responsible for daily production, operation and management; financial and personnel decision making bodies; key properties, accounting books, the company seal, and minutes of board meetings and shareholders' meetings; and half or more of the senior management or directors having voting rights. Although substantially all of our operations and management are currently based in the PRC, given that our Cayman holding company is incorporated and controlled by PRC individuals instead of PRC enterprises, it is unclear whether PRC tax authorities would treat our Cayman holding company as a PRC resident enterprise for PRC enterprise income tax purposes. To our knowledge, there is a lack of clear guidance regarding the criteria pursuant to which the PRC tax authorities will determine the tax residency of an overseas company controlled by PRC individuals, as in our case, under the applicable PRC laws and regulations. As a result, we cannot be certain as to whether we will be classified as a PRC resident enterprise. If the PRC tax authorities determine that Dangdang Holding, our Cayman Islands holding company, is a PRC resident enterprise for enterprise income tax purposes, our world-wide income could be subject to PRC tax at a rate of 25%. In addition, we will also be subject to PRC enterprise income tax reporting obligations. Furthermore, although dividends paid by one PRC tax resident to another PRC tax resident should qualify as "tax-exempt income" under the PRC Enterprise Income Tax Law, we cannot assure you that dividends by our PRC subsidiaries to our Cayman holding company will not be subject to a 10% withholding tax, as the PRC foreign

exchange control authorities, which enforce the withholding tax on dividends, and the PRC tax authorities have not yet issued guidance with respect to the processing of outbound remittances to entities that are treated as resident enterprises for PRC enterprise income tax purposes. In addition, ADS holders may be subject to PRC withholding tax on dividends payable by us and gains realized on the sale or other disposition of ADSs or Class A common shares, if the PRC tax authorities determine that our Cayman Islands holding company is a PRC resident enterprise for enterprise income tax purposes.

71

## United States Federal Income Tax Considerations

The following discussion is a summary of the principal United States federal income tax considerations relating to the acquisition, ownership, and disposition of our ADSs or Class A common shares by a U.S. Holder (as defined below) that will hold our ADSs or Class A common shares as "capital assets" (generally, property held for investment) under the United States Internal Revenue Code of 1986, as amended (the "Code"). This summary is based upon the provisions of the Code and regulations, rulings and decisions thereunder as of the date hereof, all of which are subject to differing interpretations or change, possibly with retroactive effect. No ruling has been sought from the IRS with respect to any United States federal income tax consequences described below, and there can be no assurance that the IRS or a court will not take a contrary position. This summary does not discuss all aspects of United States federal income taxation that may be important to particular investors in light of their individual investment circumstances, including investors subject to special tax rules (for example, financial institutions, insurance companies, broker-dealers, traders in securities that elect mark-to-market treatment, partnerships and their partners, pension plans, regulated investment companies, real estate investment trusts, cooperatives, tax-exempt organizations (including private foundations), holders who are not U.S. Holders, holders that own (directly, indirectly, or constructively) 10% or more of our voting stock, holders that will hold ADSs or Class A common shares as part of a straddle, hedge, conversion, constructive sale, or other integrated transaction for United States federal income tax purposes, U.S. expatriates, or holders that have a functional currency other than the United States dollar), all of whom may be subject to tax rules that differ significantly from those summarized below.

In addition, this summary does not discuss any state, local or estate or gift tax considerations and, except for the limited instances where PRC tax law and potential PRC taxes are discussed below, does not discuss any non-United States tax considerations. Each U.S. Holder is urged to consult its tax advisors regarding the United States federal, state, local, and non-United States income and other tax considerations of an investment in our ADSs or Class A common shares.

### General

For purposes of this summary, a "U.S. Holder" is a beneficial owner of our ADSs or Class A common shares that is, for United States federal income tax purposes, (i) an individual who is a citizen or resident of the United States, (ii) a corporation (or other entity treated as a corporation for United States federal income tax purposes) created in, or organized under the law of the United States or any state thereof or the District of Columbia, (iii) an estate the income of which is includible in gross income for United States federal income tax purposes regardless of its source, or (iv) a trust (A) the administration of which is subject to the primary supervision of a United States court and which has one or more United States persons who have the authority to control all substantial decisions of the trust or (B) that has otherwise elected to be treated as a United States person under the Code.

If a partnership (including any pass-through or other entity treated as a partnership for United States federal income tax purposes) is a beneficial owner of our ADSs or Class A common shares, the tax treatment of a partner in the partnership will generally depend upon the status of the partner and the activities of the partnership. If a U.S. Holder is a partner of a partnership holding our ADSs or Class A common shares, the U.S. Holder is urged to consult its tax advisors regarding an investment in our ADSs or Class A common shares.

For United States federal income tax purposes, U.S. Holders of ADSs will be treated as the beneficial owners of the underlying shares represented by the ADSs. The discussion below assumes that the representations contained in the deposit agreement are true and that the obligations in the deposit agreement and any related agreement have been and will be complied with in accordance with the terms.

### Passive Foreign Investment Company Considerations

A non-United States corporation, such as our company, will be classified as a passive foreign investment company, or PFIC, for United States federal income tax purposes for any taxable year, if either (i) 75% or more of its gross income for such year consists of certain types of "passive" income or (ii) 50% or more of the value of its assets (determined on the basis of a quarterly average) during such year is attributable to assets that produce or are held for the production of passive income. For this purpose, passive income includes dividends, interest, royalties and rents (other than royalties and rents derived in the active conduct of a trade or business and not derived from a related person), annuities, net gains from the sale or exchange of property producing such income, net gains from commodity transactions, net foreign currency gains and income from notional principal contracts. In addition, cash and assets readily convertible into cash are categorized as passive assets and the company's unbooked intangibles are taken into account for determining the value of its assets. We will be treated as owning our proportionate share of the assets and earning our proportionate share of the income of any other corporation in which we own, directly or indirectly, more than 25% (by value) of the stock.

Although the law in this regard is unclear, we treat Dangdang Kewen as being owned by us for United States federal income tax purposes, not only because we exercise effective control over the operation of Dangdang Kewen but also because we are entitled to substantially all of its economic benefits, and, as a result, we consolidate its results of operations in our consolidated, U.S. GAAP financial statements. If it were determined, however, that we are not the owner of Dangdang Kewen for United States federal income tax purposes, we would likely be treated as a PFIC for our current taxable year and any subsequent taxable year.

Accordingly, assuming that we are the owner of Dangdang Kewen for United States federal income tax purposes, we believe that we primarily operate an active online retailing business in China and, based on our income and assets and value of our ADSs and Class A common shares, we do not believe that we were a PFIC for the taxable year ended December 2015 and, although no assurances can be made in this regard, we do not expect to be a PFIC for the current taxable year or any subsequent taxable year. Because PFIC status is a fact-intensive determination made on an annual basis and will depend upon the composition of our assets and income and the value of our tangible and intangible assets from time to time, no assurance can be given that we are not, or will not become, classified as a PFIC. We could be a PFIC, for example, if our market capitalization at any time in the future is lower than projected, or if our business and assets evolve in ways that are different from what we currently anticipate.

Furthermore, because there are uncertainties in the application of the relevant rules as described above, it is possible that the U.S. Internal Revenue Service may successfully challenge our classification of certain income and assets as non-passive or our valuation of our tangible and intangible assets, each of which may result in our company becoming classified as a PFIC for the current or subsequent taxable years. If we were classified as a PFIC for any year during which a U.S. Holder held our ADSs or Class A common shares, we generally will continue to be treated as a PFIC for all succeeding years during which such U.S. Holder holds our ADSs or Class A common shares unless we cease to be a PFIC and the U.S. Holder makes a "deemed sale" election with respect to the ADSs or Class A common shares.

The discussion below under "—Dividends" and "—Sale or Other Disposition of ADSs or Class A Common Shares" is written on the basis that we will not be classified as a PFIC for United States federal income tax purposes. The United States federal income tax rules that apply if we are classified as a PFIC for the current taxable year or any subsequent taxable year are discussed below under "—Passive Foreign Investment Company Rules."

### *Dividends*

Subject to the PFIC rules discussed below, any cash distributions (including the amount of any PRC tax withheld) paid on our ADSs or Class A common shares out of our current or accumulated earnings and profits, as determined under United States federal income tax principles, will be includible in the gross income of a U.S. Holder as dividend income on the day actually or constructively received by the U.S. Holder, in the case of Class A common shares, or by the Depositary, in the case of ADSs. Because we do not intend to determine our earnings and profits on the basis of United States federal income tax principles, any distribution paid will generally be treated as a "dividend" for United States federal income tax purposes. A non-corporate recipient of dividend income will be subject to tax on dividend income from a "qualified foreign corporation" at a reduced United States federal tax rate rather than the marginal tax rates applicable to ordinary income provided that certain holding period requirements are met.

A non-United States corporation (other than a corporation that is classified as a PFIC for the taxable year in which the dividend is paid or the preceding taxable year) will be considered to be a qualified foreign corporation (i) if it is eligible for the benefits of a comprehensive tax treaty with the United States which the Secretary of the Treasury of the United States determines is satisfactory for purposes of this provision and which includes an exchange of information program, or (ii) with respect to any dividend it pays on stock (or ADSs in respect of such stock) which is readily tradable on an established securities market in the United States. The U.S. Treasury Department has determined that the Agreement Between the Government of the United States of America and the Government of the People's Republic of China for the Avoidance of Double Taxation and the Prevention of Tax Evasion with respect to Taxes on Income, or the U.S.-PRC Tax Treaty, meets the requirements described above. We believe that we are a qualified foreign corporation for United States federal income tax purposes because our ADSs are readily tradable on the New York Stock Exchange, which is an established securities market in the United States. Furthermore, we believe that we will qualify for the benefits under the U.S.-PRC Tax Treaty and that we are not currently, and are not likely to become in the near future, a PFIC. However, the eligibility requirements for foreign corporations are technical and uncertain and, therefore, each U.S. Holder is urged to consult its tax advisor regarding the impact of these provisions and the availability of the preferential rate in their particular circumstances.

73

In the event that we are deemed to be a PRC "resident enterprise" under PRC Enterprise Income Tax Law, we may be eligible for the benefits of the U.S.-PRC Tax Treaty. See "—Peoples' Republic of China Taxation." If we are eligible for such benefits, dividends we pay on our common shares, regardless of whether such shares are represented by the ADSs, would be eligible for the reduced rates of taxation. In addition, in the event that we are deemed to be a PRC "resident enterprise" under PRC tax law, a U.S. Holder may be subject to PRC withholding taxes on dividends paid, if any, on our ADSs or Class A common shares. U.S. Holders are urged to consult their tax advisors regarding the availability under the U.S.-PRC Tax Treaty of a reduced withholding tax rate on dividends in their particular circumstances. Dividends received on the ADSs or Class A common shares will not be eligible for the dividends received deduction allowed to corporations.

For United States foreign tax credit purposes, dividends will generally be treated as income from foreign sources and will constitute passive category income. Depending on the U.S. Holder's particular facts and circumstances, the U.S. Holder may be eligible to claim a foreign tax credit in respect of any foreign withholding taxes imposed on dividends received on our ADSs or Class A common shares. A U.S. Holder who does not elect to claim a foreign tax credit for foreign tax withheld is permitted instead to claim a deduction, for United States federal income tax purposes, in respect of such withholdings, but only for a year in which such U.S. Holder elects to do so for all creditable foreign income taxes. The rules governing the foreign tax credit are complex and their outcome depends in large part on the U.S. Holder's particular facts and circumstances. Accordingly, U.S. Holders are urged to consult their tax advisors regarding the availability of the foreign tax credit under their particular circumstances.

### Sale or Other Disposition of ADSs or Class A Common Shares

Subject to the PFIC rules discussed below, a U.S. Holder will recognize capital gain or loss upon the sale or other disposition of our ADSs or Class A common shares in an amount equal to the difference, if any, between the amount realized upon the disposition and the U.S. Holder's adjusted tax basis in such ADSs or Class A common shares. Any capital gain or loss will be long-term if our ADSs or Class A common shares have been held for more than one year and will generally be United States source gain or loss for United States foreign tax credit purposes. In the event that we are deemed to be a PRC "resident enterprise" under the PRC Enterprise Income Tax Law and gain from the disposition of the ADSs or Class A common shares is subject to tax in the PRC, such gain may be treated as PRC source gain for foreign tax credit purposes under the U.S.-PRC income tax treaty. If such gain is not treated as PRC source gain, however, a U.S. Holder will not be able to obtain a United States foreign tax credit for any PRC tax withheld or imposed unless such U.S. Holder has other foreign source income in the appropriate category for the applicable tax year. Net long-term capital gains of non-corporate U.S. Holders are eligible for reduced rates of taxation. The deductibility of a capital loss may be subject to limitations. U.S. Holders are urged to consult their tax advisors regarding the tax consequences if a foreign tax is imposed on a disposition of our ADSs or Class A common shares, including the availability of the foreign tax credit under their particular circumstances.

### Passive Foreign Investment Company Rules

If we are classified as a PFIC for any taxable year during which a U.S. Holder holds our ADSs or Class A common shares, unless the U.S. Holder makes a mark-to-market election (as described below), the U.S. Holder will be subject to special tax rules that have a penalizing effect, regardless of whether we remain a PFIC, on (i) any excess distribution that we make to the U.S. Holder (which means any distribution paid during a taxable year to a U.S. Holder that is greater than 125% of the average annual distributions paid in the three preceding taxable years or, if shorter, the U.S. Holder's holding period for the ADSs or Class A common shares), and (ii) any gain realized on the sale or other disposition, including, under certain circumstances, a pledge, of ADSs or Class A common shares. Under the PFIC rules:

- the excess distribution and/or gain will be allocated ratably over the U.S. Holder's holding period for the ADSs or Class A common shares;

- the amount allocated to the current taxable year and any taxable year in the U.S. Holder's holding period prior to the first taxable year in which we are a PFIC, or pre-PFIC year, will be subject to tax as ordinary income;

- the amount allocated to each of the other taxable years would be subject to tax at the highest rate of tax in effect for the applicable class of taxpayer for such year and would be increased by an additional tax equal to interest on the resulting tax deemed deferred with respect to each such other taxable year.

If we are a PFIC for any taxable year during which a U.S. Holder holds our ADSs or Class A common shares and any of our non-United States subsidiaries is also a PFIC, such U.S. Holder would be treated as owning a proportionate amount (by value) of the shares of the lower-tier PFIC and would be subject to the rules described above on certain distributions by a lower-tier PFIC and a

disposition of shares of a lower-tier PFIC even though such U.S. Holder would not receive the proceeds of those distributions or dispositions. U.S. Holders are urged to consult their tax advisors regarding the application of the PFIC rules to any of our subsidiaries.

74

As an alternative to the foregoing rules, a U.S. Holder of "marketable stock" in a PFIC may make a mark-to-market election with respect to our ADSs, but not our Class A common shares, provided that our ADSs continue to be listed on the New York Stock Exchange and that ADSs are regularly traded. We believe that our ADSs qualify as regularly traded, but no assurances may be given in this regard. If a U.S. Holder makes this election, the U.S. Holder will generally (i) include as ordinary income for each taxable year that we are a PFIC the excess, if any, of the fair market value of our ADSs held at the end of the taxable year over the adjusted tax basis of such ADSs and (ii) deduct as an ordinary loss the excess, if any, of the adjusted tax basis of our ADSs over the fair market value of such ADSs held at the end of the taxable year, but only to the extent of the net amount previously included in income as a result of the mark-to-market election. The U.S. Holder's adjusted tax basis in our ADSs would be adjusted to reflect any income or loss resulting from the mark-to-market election. If a U.S. Holder makes a mark-to-market election in respect of a corporation classified as a PFIC and such corporation ceases to be classified as a PFIC, the U.S. Holder will not be required to take into account the mark-to-market gain or loss described above during any period that such corporation is not classified as a PFIC. If a U.S. Holder makes a mark-to-market election, any gain such U.S. Holder recognizes upon the sale or other disposition of our ADSs in a year that we are a PFIC will be treated as ordinary income and any loss will be treated as ordinary loss, but only to the extent of the net amount previously included in income as a result of the mark-to-market election.

Because, as a technical matter, a mark-to-market election cannot be made for any lower-tier PFICs that we may own, a U.S. Holder will continue to be subject to the PFIC rules with respect to such U.S. Holder's indirect interest in any investments held by us that are treated as an equity interest in a PFIC for United States federal income tax purposes.

We do not intend to provide information necessary for U.S. Holders to make qualified electing fund, or QEF, elections, which, if available, would result in tax treatment different from, and generally less adverse than, the general tax treatment for PFICs described above.

If a U.S. Holder holds our ADSs or Class A common shares during any taxable year that we are a PFIC, the holder must file an annual report with the U.S. Internal Revenue Service.

In the case of a U.S. Holder who has held our ADSs or Class A common shares during any taxable year in respect of which we were classified as a PFIC and continue to hold such ADSs or Class A common shares (or any portion thereof), and has not previously determined to make a mark-to-market election, and who later considers making a mark-to-market election, special tax rules may apply relating to purging the PFIC taint of such ADSs or Class A common shares. Each U.S. Holder is urged to consult its tax advisor concerning the United States federal income tax consequences of purchasing, holding and disposing of our ADSs or Class A common shares if we are or become classified as a PFIC, including the possibility of making a mark-to-market election and the unavailability of the QEF election.

### Medicare Tax

Recently enacted legislation generally imposes a 3.8% Medicare tax on a portion or all of the net investment income of certain individuals with a modified adjusted gross income of over $200,000 (or $250,000 in the case of joint filers or $125,000 in the case of married individuals filing separately) and on the undistributed net investment income of certain estates and trusts. For these purposes, "net investment income" generally includes interest, dividends (including dividends paid with respect to our ADSs or Class A common shares), annuities, royalties, rents, net gain attributable to the disposition of property not held in a trade or business (including net gain from the sale, exchange or other taxable disposition of an ADS or Class A common share) and certain other come, reduced by any deductions properly allocable to such income or net gain. U.S. holders are urged to consult their tax advisors regarding the applicability of the Medicare tax to their income and gains in respect of their investment in the ADSs or Class A common shares.

### Information Reporting and Backup Withholding

Individual U.S. Holders and certain entities may be required to submit certain information to the U.S. Internal Revenue Service with respect to his or her beneficial ownership of our ADSs or Class A common shares, if such ADSs or Class A common shares are not held on his or her behalf by a financial institution. Penalties are also imposed if an individual U.S. Holder is required to submit such information to the U.S. Internal Revenue Service and fails to do so. U.S. Holders are urged to consult their tax advisors regarding their tax filing requirements with respect to an investment in our ADSs or Class A common shares.

In addition, dividend payments with respect to our ADSs or Class A common shares and proceeds from the sale, exchange or redemption of our ADSs or Class A common shares may be subject to information reporting to the Internal Revenue Service and United States backup withholding at a rate of 28%. Backup withholding will not apply, however, to a U.S. Holder who furnishes a correct taxpayer identification number and makes any other required certification, or who is otherwise exempt from backup

withholding. U.S. Holders are urged to consult their tax advisors regarding the application of the United States information reporting and backup withholding rules.

---

75

---

Backup withholding is not an additional tax. Amounts withheld as backup withholding may be credited against a U.S. Holder's United States federal income tax liability, and a U.S. Holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing the appropriate claim for refund with the U.S. Internal Revenue Service in a timely manner and furnishing any required information.

**F.**　　**Dividends and Paying Agents**

Not applicable.

**G.**　　**Statement by Experts**

Not applicable.

**H.**　　**Documents on Display**

We previously filed with the SEC a registration statement on Form F-1 under the Securities Act with respect to our initial public offering of our Class A common shares represented by ADSs.

We are subject to the periodic reporting and other informational requirements of the Securities Exchange Act of 1934 or the Exchange Act. Under the Exchange Act, we are required to file reports and other information with the SEC. Specifically, we are required to file annually a Form 20-F within four months after the end of each fiscal year, which is December 31. The SEC maintains a website at www.sec.gov that contains reports, proxy and information statements, and other information regarding registrants that make electronic filings with the SEC using its EDGAR system. Copies of reports and other information, when filed, may also be inspected without charge and may be obtained at prescribed rates at the public reference facilities maintained by the SEC at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. The public may obtain information regarding the Washington, D.C. Public Reference Room by calling the SEC at 1-800-SEC-0330. As a foreign private issuer, we are exempt from the rules under the Exchange Act prescribing the furnishing and content of quarterly reports and proxy statements, and officers, directors and principal shareholders are exempt from the reporting and short-swing profit recovery provisions contained in Section 16 of the Exchange Act.

We will furnish The Bank of New York Mellon, the depositary of our ADSs, with our annual reports, which will include a review of operations and annual audited consolidated financial statements prepared in conformity with U.S. GAAP, and all notices of shareholders' meetings and other reports and communications that are made generally available to our shareholders. The depositary will make such notices, reports and communications available to holders of ADSs and, upon our request, will mail to all record holders of ADSs the information contained in any notice of a shareholders' meeting received by the depositary from us.

**I.**　　**Subsidiary Information**

For a listing of our subsidiaries, see "Item 4. Information on the Company—C. Organizational Structure."

**Item 11.**　　**Quantitative and Qualitative Disclosures about Market Risk**

*Interest Rate Risk*

Our exposure to interest rate risk primarily relates to the interest income generated by excess cash held in interest-bearing bank deposits and interest expenses attributable to short-term bank loans. Interest earning instruments and short-term bank loans carry a degree of interest rate risk. As of December 31, 2015, we held certain time deposits, restricted cash and held-to-maturity investments with limited risk of principal loss. We have not used any derivative financial instruments to manage our interest risk exposure. We have not been exposed to material risks due to changes in interest rates. However, our future interest income may be lower or our interest expenses may be higher than expected due to changes in market interest rates.

*Foreign Exchange Risk*

Substantially all of our revenues and expenses are denominated in Renminbi. Our exposure to foreign exchange risk primarily relates to the U.S. dollar proceeds of our initial public offering, most of which were converted into Renminbi in 2011. The impact of foreign currency risk on our operations was not material in the past and the risk has been further reduced as a result of the conversion of the proceeds from our initial public offering into Renminbi.

The value of your investment in our ADSs may be affected by the foreign exchange rate between U.S. dollars and Renminbi, because we use Renminbi as our functional and reporting currency while the ADSs will be traded in U.S. dollars.

76

The conversion of Renminbi into foreign currencies, including U.S. dollars, is based on rates set by the People's Bank of China. The PRC government allowed the Renminbi to appreciate by more than 20% against the U.S. dollar between July 2005 and July 2008. Between July 2008 and June 2010, this appreciation halted and the exchange rate between the Renminbi and the U.S. dollar remained within a narrow band. Since June 2010, the PRC government has allowed the Renminbi to appreciate slowly against the U.S. dollar again, though at times the Renminbi has depreciated against the U.S. dollar as well. It is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between the Renminbi and the U.S. dollar in the future.

To the extent that we need to convert U.S. dollars into Renminbi for our operations, acquisitions, or other uses within the PRC, appreciation of the Renminbi against the U.S. dollar would have an adverse effect on the Renminbi amount we receive from the conversion. As of December 31, 2015, we had RMB-denominated cash and time deposit balances of RMB388.8 million (US$60.0 million) and U.S. dollar-denominated cash balances of US$114.4 million as well as small amounts of cash balances denominated in Euro and Hong Kong dollar. Assuming we had converted the U.S. dollar denominated cash balance of $114.4 million as of December 31, 2015 into RMB at the exchange rate of $1.00 for RMB6.4778 as of December 31, 2015, this cash balance would have been RMB741.1 million. Assuming a further 1% appreciation of the RMB against the U.S. dollar, this cash balance would have decreased to RMB733.7 million as of December 31, 2015. Conversely, if we decide to convert our RMB into U.S. dollars for the purpose of making payments for dividends on our common shares or ADSs or for other business purposes, appreciation of the U.S. dollar against the RMB would have a negative effect on the U.S. dollar amount available to us. Assuming we had converted the RMB-denominated cash balance of RMB388.8 million into U.S. dollars at the exchange rate of $1.00 for RMB6.4778 as of December 31, 2015, this cash balance would have been US$60.0 million. Assuming a 1% depreciation of the RMB against the U.S. dollar, this cash balance would have decreased to US$59.4 million.

**Item 12.**     **Description of Securities Other than Equity Securities**

**A.**     **Debt Securities**

Not applicable.

**B.**     **Warrants and Rights**

Not applicable.

**C.**     **Other Securities**

Not applicable.

**D.**     **American Depositary Shares**

**Fees and Expenses**

As an ADS holder, you will be required to pay the following service fees to the depositary:

| Fees: | Service: |
| --- | --- |
| US$5.00 (or less) per 100 ADSs (or portion of 100 ADSs) | • Issuance of ADSs, including issuances resulting from a distribution of shares or rights or other property<br><br>• Cancellation of ADSs for the purpose of withdrawal, including if the deposit agreement terminates |
| US$0.05 (or less) per ADS | • Any cash distribution to ADS holders |
| A fee equivalent to the fee that would be payable if securities distributed to you had been Class A common shares and the Class A common shares had been deposited for issuance of ADSs | • Distribution of securities distributed to holders of deposited securities which are distributed by the depositary to ADS holders |
| US$0.05 (or less) per ADSs per calendar year | • Depositary services |

| | |
|---|---|
| Registration or transfer fees | • Transfer and registration of Class A common shares on our share register to or from the name of the depositary or its agent when you deposit or withdraw Class A common shares |
| Expenses of the depositary | • Cable, telex and facsimile transmissions (when expressly provided in the deposit agreement) |

77

| Fees: | Service: |
|---|---|
| | • converting foreign currency to U.S. dollars |
| Taxes and other governmental charges the depositary or the custodian have to pay on any ADS or Class A common share underlying an ADS, for example, stock transfer taxes, stamp duty or withholding taxes | • As necessary |
| Any charges incurred by the depositary or its agents for servicing the deposited securities | • As necessary |

The depositary collects its fees for delivery and surrender of ADSs directly from investors depositing Class A common shares or surrendering ADSs for the purpose of withdrawal or from intermediaries acting for them. The depositary collects fees for making distributions to investors by deducting those fees from the amounts distributed or by selling a portion of distributable property to pay the fees. The depositary may collect its annual fee for depositary services by deduction from cash distributions or by directly billing investors or by charging the book-entry system accounts of participants acting for them. The depositary may generally refuse to provide fee-attracting services until its fees for those services are paid.

The Bank of New York, as depositary, has agreed to reimburse us for expenses we incur that are related to establishment and maintenance of the ADS program, including investor relations expenses and stock market application and listing fees. There are limits on the amount of expenses for which the depositary will reimburse us, but the amount of reimbursement available to us is not related to the amounts of fees the depositary collects from investors. From January 1, 2015 to the date of this annual report, we did not receive any reimbursement from the depositary for expenses related to the ADS program.

PART II

**Item 13.        Defaults, Dividend Arrearages and Delinquencies**

None.

**Item 14.        Material Modifications to the Rights of Security Holders and Use of Proceeds**

Not applicable.

**Item 15.        Controls and Procedures**

**Disclosure Controls and Procedures**

Our management, with the participation of our chief executive officer and chief financial officer, has performed an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) as of the end of the period covered by this report, as required by Rule 13a-15(b) under the Exchange Act.

Based upon that evaluation, our management has concluded that, as of December 31, 2015, our disclosure controls and procedures were effective in ensuring that the information required to be disclosed by us in the reports that we file and furnish under the Exchange Act was recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that the information required to be disclosed by us in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our chief executive officer and chief financial officer, to allow timely decisions regarding required disclosure.

**Management's Annual Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) under the Exchange Act. Our management evaluated the effectiveness of our internal control over financial reporting, as required by Rule 13a-15(c) under the Exchange Act, based on criteria established in the framework in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), or COSO.

Based on this evaluation, our management has concluded that our internal control over financial reporting was effective as of December 31, 2015 based on the criteria established in Internal Control—Integrated Framework issued by COSO (2013 framework).

Our independent registered public accounting firm, Ernst & Young Hua Ming LLP, has audited the effectiveness of our internal control over financial reporting as of December 31, 2015, as stated in its report, which appears herein.

**Report of Independent Registered Public Accounting Firm**

The Board of Directors and Shareholders of
E-Commerce China Dangdang Inc.:

We have audited E-Commerce China Dangdang Inc.'s internal control over financial reporting as of December 31, 2015, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) (the COSO criteria). E-Commerce China Dangdang Inc.'s management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, E-Commerce China Dangdang Inc. maintained, in all material respects, effective internal control over financial reporting as of December 31, 2015, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of E-Commerce China Dangdang Inc. as of December 31, 2015 and 2014, and the related consolidated statements of comprehensive (loss) income, changes in shareholders' equity and cash flows for each of the three years in the period ended December 31, 2015 of E-Commerce China Dangdang Inc. and our report dated April 29, 2016 expressed an unqualified opinion thereon.

/s/ Ernst & Young Hua Ming LLP
Beijing, the People's Republic of China
April 29, 2016

**Remediation and Changes in Internal Control over Financial Reporting**

To remediate the material weakness in our internal controls over financial reporting that existed as of December 31, 2014, we have made several improvements on our revenue process of bulk sales. We have undergone a thorough review of the design of internal

control procedures with respect to revenue recognition for bulk sales transactions, and have designed and implemented new controls to collect, record and analyze the information that may affect revenue recognize for bulk sales.

---

79

Other than the changes noted above to remediate the previously reported material weakness, there were no changes in our internal controls over financial reporting that occurred during the period covered by this annual report on Form 20-F that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## Item 16A.    Audit Committee Financial Expert

We have determined that Mr. Ke Zhang, an independent director (under the standards set forth in Section 303A of the Corporate Governance Rules of the New York Stock Exchange and Rule 10A-3 under the Securities Exchange Act of 1934, as amended), qualifies as an "audit committee financial expert."

## Item 16B.    Code of Ethics

Our board has adopted a code of business conduct and ethics that provides that our directors and officers are expected to avoid any action, position or interest that conflicts with the interests of our company or gives the appearance of a conflict. Directors and officers have an obligation under our code of business conduct and ethics to advance our company's interests when the opportunity to do so arises. We have posted a copy of our code of business conduct and ethics on our website at http://ir.dangdang.com.

## Item 16C.    Principal Accountant Fees and Services

The following table sets forth the aggregate fees by categories specified below in connection with certain professional services rendered by Ernst & Young Hua Ming LLP, our principal external auditors, for the periods indicated. We did not pay any other fees to our auditors during the periods indicated below.

| | For the Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2014** | | **2015** | |
| Audit fees [(1)] | RMB | 3,250,000 | RMB | 3,250,000 |
| Audit-related fees [(2)] | RMB | 1,350,000 | RMB | 1,350,000 |

(1)  "Audit fees" means the aggregate fees billed or unbilled in each of the fiscal years listed for professional services rendered by our principal auditors for the audit of our annual financial statements.

(2)  "Audit-related fees" means the aggregate fees billed in each of the fiscal years listed for assurance and related services by our principal auditors that are reasonably related to the performance of the audit or review of our financial statements and are not reported under "Audit fees."

All audit and non-audit services provided by our independent auditors must be pre-approved by our audit committee.

## Item 16D.    Exemptions from the Listing Standards for Audit Committees

Not applicable.

## Item 16E.    Purchases of Equity Securities by the Issuer and Affiliated Purchasers

None.

## Item 16F.    Change in Registrant's Certifying Accountant

Not applicable.

## Item 16G.    Corporate Governance

Certain corporate governance practices in the Cayman Islands, which is our home country, differ significantly from the New York Stock Exchange corporate governance listing standards. For example, neither the Companies Law of the Cayman Islands nor our memorandum and articles of association requires a majority of our directors to be independent and we could include non-independent directors as members of our compensation committee and nominating committee, and our independent directors would not necessarily hold regularly scheduled meetings at which only independent directors are present. Currently, we do not plan to rely on home country

practice with respect to our corporate governance. However, if we choose to follow home country practice in the future, our shareholders may be afforded less protection than they otherwise would under the New York Stock Exchange corporate governance listing standards applicable to U.S. domestic issuers.

80

## Item 16H.　Mine Safety Disclosure

Not applicable.

## PART III

## Item 17.　Financial Statements

We have elected to provide financial statements pursuant to Item 18.

## Item 18.　Financial Statements

The consolidated financial statements of E-Commerce China Dangdang Inc., its subsidiaries and affiliated entities are included at the end of this annual report.

## Item 19.　Exhibits

| Exhibit Number | Description of Document |
| --- | --- |
| 1.1 | Sixth Amended and Restated Memorandum and Articles of Association of the Registrant (incorporated by reference to Exhibit 3.2 to our Form F-1 Registration Statement (file no. 333-170663) filed with the Securities and Exchange Commission on November 17, 2010) |
| 2.1 | Registrant's Specimen Certificate for Class A common shares (incorporated by reference to Exhibit 4.2 of Form F-1 (file no. 333-170663) filed with the Securities and Exchange Commission on November 17, 2010) |
| 2.2 | Form of Deposit Agreement among the Registrant, the depositary and holder of the American Depositary Receipts (incorporated by reference to Exhibit 4.3 to our Amendment to Form F-1 Registration Statement (file no. 333-170663) filed with the Securities and Exchange Commission on November 23, 2010) |
| 2.3 | Registrant's Specimen American Depositary Receipt (incorporated by reference to Exhibit 4.1 to our Amendment to Form F-1 Registration Statement (file no. 333-170663) filed with the Securities and Exchange Commission on November 23, 2010) |
| 2.4 | Second Amended and Restated Shareholders Agreement dated as of June 27, 2006 among the Registrant, Beijing Dangdang Information Technology Co., Ltd. (previously known as Beijing Kewen Shuye Information Technology Co., Ltd.), its common shareholders and preferred shareholders. (incorporated by reference to Exhibit 4.4 to our Amendment to Form F-1 Registration Statement (file no. 333-170663) filed with the Securities and Exchange Commission on November 17, 2010) |
| 4.1 | 2004 Share Incentive Plan, as amended (incorporated by reference to Exhibit 10.1 of Form F-1 (file no. 333-170663) filed with the Securities and Exchange Commission on November 17, 2010 and to Exhibit 99.2 to Form 6-K furnished to the Securities and Exchange Commission on October 24, 2012) |
| 4.2 | 2010 Share Incentive Plan (incorporated by reference to Exhibit 10.2 of Form F-1 (file no. 333-170663) filed with the Securities and Exchange Commission on November 17, 2010) |
| 4.3 | Form of Indemnification Agreement with the Registrant's directors (incorporated by reference to Exhibit 10.3 of Form F-1 (file no. 333-170663) filed with the Securities and Exchange Commission on November 17, 2010) |
| 4.4 | Form of Employment Agreement between the Registrant and an Executive Officer of the Registrant (incorporated by reference to Exhibit 10.4 of Form F-1 (file no. 333-170663) filed with the Securities and Exchange Commission on November 17, 2010) |
| 4.5 | English translation of Amended and Restated Loan Agreement between Beijing Dangdang Information Technology Co., Ltd. and the shareholders of Beijing Dangdang Kewen E-Commerce Co., Ltd. dated July 23, |

2010 (incorporated by reference to Exhibit 10.5 of Form F-1 (file no. 333-170663) filed with the Securities and Exchange Commission on November 17, 2010)

81

| Exhibit Number | Description of Document |
| --- | --- |
| 4.6 | English translation of Amended and Restated Exclusive Call Option Agreement between Beijing Dangdang Information Technology Co., Ltd. and the shareholders of Beijing Dangdang Kewen E-Commerce Co., Ltd. dated July 23, 2010 (incorporated by reference to Exhibit 10.6 of Form F-1 (file no. 333-170663) filed with the Securities and Exchange Commission on November 17, 2010) |
| 4.7 | English translation of Amended and Restated Exclusive Technical Support Service Agreement between Beijing Dangdang Information Technology Co., Ltd. and Beijing Dangdang Kewen E-Commerce Co., Ltd. dated July 23, 2010 (incorporated by reference to Exhibit 10.7 of Form F-1 (file no. 333-170663) filed with the Securities and Exchange Commission on November 17, 2010) |
| 4.8 | English translation of Power of Attorney issued by each shareholder of Beijing Dangdang Kewen E-Commerce Co., Ltd. dated July 23, 2010 (incorporated by reference to Exhibit 10.8 of Form F-1 (file no. 333-170663) filed with the Securities and Exchange Commission on November 17, 2010) |
| 4.9 | English translation of Amended and Restated Equity Pledge Agreement between Beijing Dangdang Information Technology Co., Ltd. and the shareholders of Beijing Dangdang Kewen E-Commerce Co., Ltd. dated July 23, 2010 (incorporated by reference to Exhibit 10.9 of Form F-1 (file no. 333-170663) filed with the Securities and Exchange Commission on November 17, 2010) |
| 4.10 | English translation of Supplementary Agreement to the Amended and Restated Exclusive Call Option Agreement between Beijing Dangdang Information Technology Co., Ltd. and the shareholders of Beijing Dangdang Kewen E-Commerce Co., Ltd. dated December 30, 2012 (incorporated by reference to Exhibit 4.10 of Form 20-F (file no. 001-34982) filed with the Securities and Exchange Commission on April. 10, 2013) |
| 4.11 | English translation of Supplementary Agreement to the Amended and Restated Exclusive Technical Support Service Agreement between Beijing Dangdang Information Technology Co., Ltd. and Beijing Dangdang Kewen E-Commerce Co., Ltd. dated December 30, 2012 (incorporated by reference to Exhibit 4.11 of Form 20-F (file no. 001-34982) filed with the Securities and Exchange Commission on April. 10, 2013) |
| 4.12 | English translation of Power of Attorney issued by each shareholder of Beijing Dangdang Kewen E-Commerce Co., Ltd. dated December 30, 2012 (incorporated by reference to Exhibit 4.12 of Form 20-F (file no. 001-34982) filed with the Securities and Exchange Commission on April. 10, 2013) |
| 4.13 | English translation of Supplementary Agreement to the Amended and Restated Equity Pledge Agreement between Beijing Dangdang Information Technology Co., Ltd. and the shareholders of Beijing Dangdang Kewen E-Commerce Co., Ltd. dated December 30, 2012 (incorporated by reference to Exhibit 4.13 of Form 20-F (file no. 001-34982) filed with the Securities and Exchange Commission on April. 10, 2013) |
| 4.14 | English translation of Supplementary Agreement to the Amended and Restated Loan Agreement between Beijing Dangdang Information Technology Co., Ltd. and the shareholders of Beijing Dangdang Kewen E-Commerce Co., Ltd. dated August 1, 2013 (incorporated by reference to Exhibit 4.14 of Form 20-F (file no. 001-34982) filed with the Securities and Exchange Commission on April 9, 2014) |
| 4.15 | English translation of Supplementary Agreement to the Amended and Restated Exclusive Call Option Agreement between Beijing Dangdang Information Technology Co., Ltd. and the shareholders of Beijing Dangdang Kewen E-Commerce Co., Ltd. dated August 1, 2013 (incorporated by reference to Exhibit 4.15 of Form 20-F (file no. 001-34982) filed with the Securities and Exchange Commission on April 9, 2014) |
| 4.16 | English translation of Supplementary Agreement to the Amended and Restated Equity Pledge Agreement between Beijing Dangdang Information Technology Co., Ltd. and the shareholders of Beijing Dangdang Kewen E-Commerce Co., Ltd. dated August 1, 2013  (incorporated by reference to Exhibit 4.16 of Form 20-F (file no. 001-34982) filed with the Securities and Exchange Commission on April 9, 2014) |

| Exhibit Number | Description of Document |
| --- | --- |
| 8.1* | List of Consolidated Entities |
| 11.1 | Code of Business Conduct and Ethics (incorporated by reference to Exhibit 99.1 of Form F-1 (file no. 333-170663) filed with the Securities and Exchange Commission on November 17, 2010) |
| 12.1* | Certification by Principal Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 12.2* | Certification by Principal Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 |
| 13.1** | Certification by Principal Executive Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 13.2** | Certification by Principal Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 15.1* | Consent of Ernst & Young Hua Ming LLP |
| 15.2* | Consent of Beijing DHH Law Firm |
| 101.INS* | XBRL Instance Document |
| 101.SCH* | XBRL Taxonomy Extension Schema Document |
| 101.CAL* | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB* | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE* | XBRL Taxonomy Extension Presentation Linkbase Document |

\*    Filed herewith

\*\*    Furnished herewith

## SIGNATURES

The registrant hereby certifies that it meets all of the requirements for filing its annual report on Form 20-F and that it has duly caused and authorized the undersigned to sign this annual report on its behalf.

E-Commerce China Dangdang Inc.

By: /s/ Peggy Yu Yu
Name:   Peggy Yu Yu
Title:    Executive Chairwoman

Date:    April 29, 2016

84

# E-COMMERCE CHINA DANGDANG INC.
## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets as of December 31, 2014 and 2015 | F-3 |
| Consolidated Statements of Comprehensive (Loss) Income for the years ended December 31, 2013, 2014 and 2015 | F-5 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2013, 2014 and 2015 | F-6 |
| Consolidated Statements of Changes in Shareholders' Equity for the years ended December 31, 2013, 2014 and 2015 | F-8 |
| Notes to Consolidated Financial Statements | F-11 |

F-1

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

The Board of Directors and Shareholders of
E-Commerce China Dangdang Inc.:

We have audited the accompanying consolidated balance sheets of E-Commerce China Dangdang Inc. ("the Company") as of December 31, 2015 and 2014, and the related consolidated statements of comprehensive (loss) income, changes in shareholders' equity and cash flows for each of the three years in the period ended December 31, 2015. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of E-Commerce China Dangdang Inc. at December 31, 2015 and 2014, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2015, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), E-Commerce China Dangdang Inc.'s internal control over financial reporting as of December 31, 2015, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated April 29, 2016, expressed an unqualified opinion thereon.

/s/ Ernst & Young Hua Ming LLP
Beijing, the People's Republic of China
April 29, 2016

F-2

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**CONSOLIDATED BALANCE SHEETS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

| | Notes | As of December 31, 2014 | As of December 31, 2015 | |
| --- | --- | --- | --- | --- |
| | | RMB | RMB | US$ |
| **ASSETS** | | | | |
| **Current assets:** | | | | |
| Cash and cash equivalents | | 350,946 | 1,107,612 | 170,986 |
| Restricted cash | | 23,726 | 24,000 | 3,705 |
| Time deposits | | 674,363 | — | — |
| Held-to-maturity investments | | 350,000 | 72,000 | 11,115 |
| Available-for-sale investments | | — | 166,339 | 25,678 |
| Inventories | 4 | 2,201,170 | 2,272,087 | 350,750 |
| Accounts receivable (net of allowance for doubtful accounts of RMB nil (US$ nil) as of December 31, 2014 and 2015) | | 28,763 | 35,367 | 5,460 |
| Prepaid expenses and other current assets | 5 | 575,646 | 607,785 | 93,826 |
| Amounts due from related parties | 14 | 375 | 509 | 78 |
| Deferred tax assets, net | 13 | — | 15,000 | 2,316 |
| **Total current assets** | | 4,204,989 | 4,300,699 | 663,914 |
| Equity method investments | 6 | — | 1,393 | 215 |
| Fixed assets, net | 7 | 252,966 | 236,111 | 36,449 |
| Prepaid land lease payments | 8 | 42,423 | 41,530 | 6,411 |
| Prepaid expenses and deposits | | 14,589 | 16,274 | 2,512 |
| Other non-current assets | | — | 25,023 | 3,863 |
| **Total non-current assets** | | 309,978 | 320,331 | 49,450 |
| **Total assets** | | 4,514,967 | 4,621,030 | 713,364 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | |
| **Current Liabilities:** | | | | |
| Accounts and notes payable (including accounts payable of Beijing Dangdang Kewen E-Commerce Co., Ltd. and its subsidiaries without recourse to E-Commerce China Dangdang Inc. of RMB170,630 and RMB161,443 (US$24,923) as of December 31, 2014 and 2015, respectively) | 9 | 2,479,314 | 2,703,190 | 417,301 |
| Deferred revenue (including deferred revenue of Beijing Dangdang Kewen E-Commerce Co., Ltd. and its subsidiaries without recourse to E-Commerce China Dangdang Inc. of RMB35,878 and RMB35,035 (US$5,408) as of December 31, 2014 and 2015, respectively) | | 627,122 | 414,208 | 63,943 |
| Accrued expenses and other current liabilities (including accrued expenses and other current liabilities of Beijing Dangdang Kewen E-Commerce Co., Ltd. and its subsidiaries without recourse to E-Commerce China Dangdang Inc. of RMB394,117 and RMB372,581 (US$57,517) as of December 31, 2014 and 2015, respectively) | 10 | 704,483 | 605,663 | 93,498 |
| Amounts due to related parties | 14 | 2,237 | 2,280 | 352 |
| **Total current liabilities** | | 3,813,156 | 3,725,341 | 575,094 |
| Non-current liabilities (including non-current liabilities of Beijing | | 24,227 | 29,499 | 4,553 |

Dangdang Kewen E-Commerce Co., Ltd. and its subsidiaries
without recourse to E-Commerce China Dangdang Inc. of
RMB3,317 and RMB2,488 (US$384) as of December 31, 2014
and 2015, respectively)

| | | | |
|---|---|---|---|
| **Total liabilities** | 3,837,383 | 3,754,840 | 579,647 |

F-3

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**CONSOLIDATED BALANCE SHEETS (continued)**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

| | Notes | As of December 31, | | |
| --- | --- | --- | --- | --- |
| | | **2014** | **2015** | |
| | | RMB | RMB | US$ |
| **Commitments and contingencies** | 16 | | | |
| **Shareholders' equity:** | | | | |
| Class A common shares (par value of US$0.0001 per share; 686,505,790 shares authorized; 272,092,590 and 272,950,460 shares issued and outstanding as of December 31, 2014 and 2015, respectively) | 17 | 201 | 201 | 31 |
| Class B common shares (par value of US$0.0001 per share; 313,494,210 shares authorized; 131,876,660 shares issued and outstanding as of December 31, 2014 and 2015) | 17 | 103 | 103 | 16 |
| Additional paid-in capital | | 1,885,878 | 1,894,475 | 292,457 |
| Accumulated other comprehensive loss | | (129,948) | (41,487) | (6,405) |
| Accumulated deficit | | (1,078,650) | (987,102) | (152,382) |
| **Total shareholders' equity** | | 677,584 | 866,190 | 133,717 |
| **Total liabilities and shareholders' equity** | | 4,514,967 | 4,621,030 | 713,364 |

See accompanying notes to consolidated financial statements.

F-4

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE (LOSS) INCOME**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

| | Notes | Year Ended December 31, | | | |
| --- | --- | --- | --- | --- | --- |
| | | **2013** | **2014** | **2015** | |
| | | RMB | RMB | RMB | US$ |
| **Net revenues** | | | | | |
| Product revenue | 11 | 6,045,573 | 7,635,450 | 9,012,290 | 1,391,258 |
| Other revenue including services rendered to equity method investees amounting to RMB nil, RMB nil and RMB619 (US$96) for the years ended December 31, 2013, 2014 and 2015, respectively) | | 279,425 | 321,513 | 299,745 | 46,273 |
| Total net revenues | | 6,324,998 | 7,956,963 | 9,312,035 | 1,437,531 |
| **Cost of revenues** | | | | | |
| Total cost of revenues | | (5,224,114) | (6,487,201) | (7,813,529) | (1,206,201) |
| **Gross profit** | | 1,100,884 | 1,469,762 | 1,498,506 | 231,330 |
| **Operating expenses:** | | | | | |
| Fulfillment | | (727,683) | (775,534) | (747,134) | (115,338) |
| Marketing | | (260,988) | (374,227) | (313,627) | (48,416) |
| Technology and content | | (180,158) | (208,214) | (242,112) | (37,376) |
| General and administrative | | (148,919) | (165,284) | (198,554) | (30,651) |
| Government grants and value-added tax refunds | | 21,392 | 113,781 | 73,194 | 11,299 |
| **(Loss) income from operations** | | (195,472) | 60,284 | 70,273 | 10,848 |
| Interest income | | 30,727 | 44,839 | 47,328 | 7,306 |
| Interest expense | 9 | (6,042) | — | — | — |
| Other income (expenses), net | 12 | 27,922 | (17,006) | (41,053) | (6,337) |
| **(Loss) income before income taxes** | | (142,865) | 88,117 | 76,548 | 11,817 |
| Income tax benefit | 13 | — | — | 15,000 | 2,316 |
| **Net (loss) income** | | (142,865) | 88,117 | 91,548 | 14,133 |
| **Net (loss) income attributable to common shareholders** | | (142,865) | 88,117 | 91,548 | 14,133 |
| (Loss) income per common share: | | | | | |
| Basic | 18 | (0.36) | 0.22 | 0.23 | 0.04 |
| Diluted | 18 | (0.36) | 0.21 | 0.22 | 0.03 |
| Shares used in (loss) income per common share computation: | | | | | |
| Class A common shares: | | | | | |
| Basic | 18 | 269,520,110 | 271,445,384 | 272,491,397 | 272,491,397 |
| Diluted | 18 | 401,416,715 | 416,533,054 | 415,045,447 | 415,045,447 |
| Class B common shares: | | | | | |
| Basic | 18 | 131,896,605 | 131,876,660 | 131,876,660 | 131,876,660 |
| Diluted | 18 | 131,896,605 | 131,876,660 | 131,876,660 | 131,876,660 |
| Other comprehensive (loss) income | | | | | |
| Foreign currency translation adjustment, net of taxes | | (42,873) | 4,991 | 87,122 | 13,449 |
| Unrealized gain on available-for-sale investment, | | — | 2,541 | 15,894 | 2,454 |

| | | | | |
|---|---|---|---|---|
| net of taxes | | | | |
| Transferred to statements of comprehensive (loss) income of realized gain on available-for-sale investments, net of taxes | — | (2,541) | (14,555) | (2,247) |
| Total other comprehensive (loss) income | (42,873) | 4,991 | 88,461 | 13,656 |
| Comprehensive (loss) income attributable to common shareholders | (185,738) | 93,108 | 180,009 | 27,789 |

See accompanying notes to consolidated financial statements.

F-5

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | **2013** | **2014** | **2015** | |
| | RMB | RMB | RMB | US$ |
| Cash flows from operating activities: | | | | |
| Net (loss) income | (142,865) | 88,117 | 91,548 | 14,133 |
| Adjustments to reconcile net (loss) income to net cash from operating activities: | | | | |
| Allowance for doubtful receivables | 2,490 | (1,253) | 1,267 | 196 |
| Depreciation of fixed assets | 48,036 | 53,456 | 58,333 | 9,005 |
| Amortization of prepaid land lease payments | 893 | 893 | 893 | 138 |
| Share-based compensation | 11,108 | 10,417 | 8,597 | 1,327 |
| Loss of equity method investments | — | — | 407 | 63 |
| Unrealized foreign currency exchange (income) loss | (30,822) | 3,996 | 60,735 | 9,376 |
| Changes in operating assets and liabilities: | | | | |
| Increase in restricted cash | (6,264) | (16,325) | (274) | (42) |
| Increase in inventories | (275,325) | (440,266) | (70,917) | (10,948) |
| Decrease (increase) in accounts receivable | 19,188 | 10,714 | (6,604) | (1,019) |
| Increase in prepaid expenses and other current assets | (128,949) | (242,494) | (38,406) | (5,929) |
| (Increase) decrease in due from related parties | (2,371) | 2,316 | (134) | (21) |
| Increase in deferred tax assets, net | — | — | (15,000) | (2,316) |
| Decrease (increase) in other non-current assets | 5,160 | (7,240) | (21,346) | (3,295) |
| Increase in accounts and notes payable | 406,864 | 508,663 | 223,876 | 34,560 |
| Increase (decrease) in deferred revenue | 177,787 | 211,868 | (207,641) | (32,054) |
| Increase (decrease) in accrued expenses and other current liabilities | 186,929 | 83,057 | (84,255) | (13,007) |
| Increase (decrease) in amounts due to related parties | 849 | (945) | 43 | 6 |
| Net cash provided by operating activities | 272,708 | 264,974 | 1,122 | 173 |
| | | | | |
| Cash flows from investing activities: | | | | |
| Purchase of fixed assets | (93,685) | (101,477) | (56,406) | (8,708) |
| Equity method investments | — | — | (1,800) | (278) |
| Proceeds received from maturity of held-to-maturity investments | 1,360,000 | 1,410,000 | 1,066,964 | 164,711 |
| Purchases of held-to-maturity investments | (1,360,000) | (1,760,000) | (788,964) | (121,795) |
| Time deposits placed with financial institutions | (943,222) | (1,189,881) | (1,338,134) | (206,572) |
| Maturity of time deposits | 582,445 | 1,368,740 | 2,026,878 | 312,896 |
| Proceeds received from available-for-sale investments | — | 100,000 | 3,498,723 | 540,110 |
| Purchases of available-for-sale investments | — | (100,000) | (3,663,723) | (565,581) |
| Net cash (used in) provided by investing activities | (454,462) | (272,618) | 743,538 | 114,783 |

F-6

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS (continued)**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | **2013** | **2014** | **2015** | |
| | RMB | RMB | RMB | US$ |
| Cash flows from financing activities: | | | | |
| Proceeds from short-term bank loans | 48,408 | — | 14 | 2 |
| Repayment of short-term bank loans | (648,408) | — | (14) | (2) |
| Release of restricted cash | 709,417 | — | — | — |
| Proceeds from exercise of share options* | 4,824 | 4,366 | — | — |
| Net cash provided by financing activities | 114,241 | 4,366 | — | — |
| | | | | |
| Effect of exchange rate changes on cash and cash equivalents | (11,917) | 951 | 12,006 | 1,853 |
| Net (decrease) increase in cash and cash equivalents | (79,430) | (2,327) | 756,666 | 116,809 |
| Cash and cash equivalents at beginning of the year | 432,703 | 353,273 | 350,946 | 54,177 |
| Cash and cash equivalents at end of the year | 353,273 | 350,946 | 1,107,612 | 170,986 |
| Supplementary disclosures of cash flow information: | | | | |
| Payable for purchases of fixed assets | 57,955 | 27,932 | 13,366 | 2,063 |
| Interest paid | 6,998 | — | — | — |

See accompanying notes to consolidated financial statements.

* Proceeds from exercise of share options collected on behalf by the appointed agent and remitted to the Company after year end were RMB7,969 (US$1,230).

F-7

Table of Contents

### E-COMMERCE CHINA DANGDANG INC.
### CONSOLIDATED STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY
#### (Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")
#### except for number of shares)

| | Class A common shares | | Class B common shares | | Additional paid-in capital | Accumulated other comprehensive loss | Accumulated deficit | Total shareholders' equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| | | RMB | | RMB | RMB | RMB | RMB | RMB |
| Balance at January 1, 2013 | 268,919,350 | 200 | 131,916,660 | 103 | 1,855,164 | (92,066) | (1,023,902) | 739,499 |
| Net loss | — | — | — | — | — | — | (142,865) | (142,865) |
| Other comprehensive loss | — | — | — | — | — | (42,873) | — | (42,873) |
| Share-based compensation | — | — | — | — | 11,108 | — | — | 11,108 |
| Conversion of Class B common shares into Class A common shares | 40,000 | — | (40,000) | — | — | — | — | — |
| Exercise of stock options | 1,507,470 | 1 | — | — | 4,823 | — | — | 4,824 |
| Balance at December 31, 2013 | 270,466,820 | 201 | 131,876,660 | 103 | 1,871,095 | (134,939) | (1,166,767) | 569,693 |

F-8

**E-COMMERCE CHINA DANGDANG INC.**
**CONSOLIDATED STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY (continued)**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares)**

| | Class A common shares | | Class B common shares | | Additional paid-in capital | Accumulated other comprehensive loss | Accumulated deficit | Total shareholders' equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| | | RMB | | RMB | RMB | RMB | RMB | RMB |
| Balance at January 1, 2014 | 270,466,820 | 201 | 131,876,660 | 103 | 1,871,095 | (134,939) | (1,166,767) | 569,693 |
| Net income | — | — | — | — | — | — | 88,117 | 88,117 |
| Other comprehensive income | — | — | — | — | — | 4,991 | — | 4,991 |
| Share-based compensation | — | — | — | — | 10,417 | — | — | 10,417 |
| Exercise of stock options | 1,625,770 | — | — | — | 4,366 | — | — | 4,366 |
| Balance at December 31, 2014 | 272,092,590 | 201 | 131,876,660 | 103 | 1,885,878 | (129,948) | (1,078,650) | 677,584 |

F-9

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**CONSOLIDATED STATEMENTS OF CHANGES IN SHAREHOLDERS' EQUITY (continued)**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares)**

| | Class A common shares | | Class B common shares | | Additional paid-in capital | Accumulated other comprehensive loss | Accumulated deficit | Total shareholders' equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| | | RMB | | RMB | RMB | RMB | RMB | RMB |
| Balance at January 1, 2015 | 272,092,590 | 201 | 131,876,660 | 103 | 1,885,878 | (129,948) | (1,078,650) | 677,584 |
| Net income | — | — | — | — | — | — | 91,548 | 91,548 |
| Other comprehensive income | — | — | — | — | — | 88,461 | — | 88,461 |
| Share-based compensation | — | — | — | — | 8,597 | — | — | 8,597 |
| Exercise of stock options | 857,870 | — | — | — | — | — | — | — |
| Balance at December 31, 2015 | 272,950,460 | 201 | 131,876,660 | 103 | 1,894,475 | (41,487) | (987,102) | 866,190 |
| Balance at December 31, 2015 in US$ | | 31 | | 16 | 292,457 | (6,405) | (152,382) | 133,717 |

See accompanying notes to consolidated financial statements.

F-10

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

## Note 1—ORGANIZATION AND BASIS OF PRESENTATION

E-Commerce China Dangdang Inc. (the "Company") is a limited company incorporated on January 7, 2000 and domiciled in the Cayman Islands. The accompanying consolidated financial statements include the financial statements of the Company, its subsidiaries and affiliated PRC entities ("Affiliated PRC Entities"), entities controlled through contractual arrangements.

The Company is principally engaged in the sales of books, audio-visual products, periodicals, consumer electronics and other general merchandise. The Company's principal operations and geographic markets are in the People's Republic of China ("PRC").

Details of the Company's principal subsidiaries and its Affiliated PRC Entities as of December 31, 2015 are as follows:

| Name | Date of Establishment | Place of Establishment | Percentage of Ownership by the Company | Principal Activities |
|---|---|---|---|---|
| Beijing Dangdang Information Technology Co., Ltd. ("Dangdang Information") | July 8, 1997 | PRC | 100% | Sales of books on the internet |
| Wuxi Dangdang Information Technology Co., Ltd. ("Wuxi Dangdang Information") | August 11, 2010 | PRC | 99% (1% owned by Dangdang Kewen) | Sales of books, periodicals, electronic publications, consumer electronics and other general merchandise on the internet |
| Dangdang Information Technology (Tianjin) Co., Ltd. ("Tianjin Dangdang Information"), a wholly owned subsidiary of Dangdang Information | September 8, 2011 | PRC | 99% (1% owned by Dangdang Kewen) | Sales of books, periodicals, electronic publications, consumer electronics and other general merchandise on the internet |
| Dangdang Information Technology (Sichuan) Co., Ltd. ("Sichuan Dangdang Information"), a wholly owned subsidiary of Dangdang Information | April 23, 2015 | PRC | 100% | Sales of books, periodicals, electronic publications, consumer electronics and other general merchandise on the interne |
| Dangdang Information Technology (Shaanxi) Co., Ltd. ("Shaanxi Dangdang Information"), a wholly owned subsidiary of Dangdang Information | May 18, 2015 | PRC | 100% | Sales of books, periodicals, electronic publications, consumer electronics and other general merchandise on the interne |
| Dangdang Information Technology (Jiangsu) Co., Ltd. ("Jiangsu Dangdang Information"), a wholly owned subsidiary of Dangdang Information | August 3, 2015 | PRC | 100% | Sales of books, periodicals, electronic publications, consumer electronics and other general merchandise on the interne |
| Dangdang Information Technology (Guizhou) Co., Ltd. ("Guizhou Dangdang Information"), a wholly | August 10, 2015 | PRC | 100% | Sales of books, periodicals, electronic publications, consumer electronics and other |

| | | | | |
|---|---|---|---|---|
| owned subsidiary of Dangdang Information | | | | general merchandise on the internet |
| Beijing Dangdang Kewen E-Commerce Co., Ltd. ("Dangdang Kewen") | August 24, 2004 | PRC | Nil | Sales of audio-visual products, periodicals, consumer electronics and other general merchandise on the internet and operate the marketplace program |
| Wuxi Dangdang Kewen E-Commerce Co., Ltd. ("Wuxi Dangdang Kewen"), a wholly owned subsidiary of Dangdang Kewen | September 20, 2010 | PRC | Nil | Sales of consumer electronics and other general merchandise on the internet |

Note: Dynamic Tech Holdings Ltd. and Dangdang E-commerce International Ltd., which were incorporated in 2011, have been omitted from this list since they are dormant companies and had no significant accounting transactions for the years ended December 31, 2013, 2014 and 2015.

E-commerce China Logistics Ltd., Galaxy Logistics Deyang Ltd., Jupiter Logistics Deyang Ltd., Galaxy Logistics Xianyang Ltd., Mars Logistics Xianyang Ltd., Deyang Jupiter Logistics Ltd., Xianyang Galaxy Logistics Ltd., Dangdang E-commerce (Shanghai) International Ltd. and Dangdang Digital Media (Wuhan) E-Commerce Co., Ltd., which were incorporated in 2015, have been omitted from this list since they had no significant transactions for the year ended December 31, 2015.

In order to comply with the PRC law and regulations which prohibit foreign control of companies involved in internet content, the Company operates its internet platform and provides online sales and services on the marketplace in the PRC through Dangdang Kewen. The equity interests of Dangdang Kewen are legally held directly by Ms. Peggy Yu Yu and Mr. Guoqing Li, shareholders and directors of the Company. The effective control of Dangdang Kewen is held by Dangdang Information through a series of contractual arrangements (the "Contractual Agreements"). As a result of the Contractual Agreements, Dangdang Information maintains the ability to control Dangdang Kewen, is entitled to substantially all of the economic benefits from Dangdang Kewen and is obligated to absorb all of Dangdang Kewen's expected losses.

Therefore, the Company consolidates Dangdang Kewen in accordance with SEC Regulation SX-3A-02 and Accounting Standards Codification ("ASC") 810, *Consolidation*.

F-11

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

**Note 1—ORGANIZATION AND BASIS OF PRESENTATION (continued)**

The following is a summary of the Contractual Agreements, which may be amended by Dangdang Information if and when proposed and is not subject to Dangdang Kewen's consent:

*Loan agreement*

The shareholders of Dangdang Kewen, namely Ms. Peggy Yu Yu and Mr. Guoqing Li, entered into a loan agreement with Dangdang Information in December 2004, as amended and restated in July 2010 and as further amended in August 2013. Under this loan agreement, as amended, Dangdang Information has granted an interest-free loan of RMB20 million to the Dangdang Kewen shareholders solely for their capital contributions to Dangdang Kewen. Dangdang Information may request repayment of the loan with 30 days' advance notice and may decide the loan to be repaid in cash or in other forms. The Dangdang Kewen shareholders may not, without the prior written consent of Dangdang Information, choose to repay the loan in advance. Dangdang Information may increase the amount of loan to the shareholders of Dangdang Kewen from time to time to support the continued development of its business operations.

*Exclusive call option agreement*

The shareholders of Dangdang Kewen entered into an exclusive call option agreement with Dangdang Information in December 2004, as first amended in July 2010 and as further amended in December 2012 and in August 2013, under which the shareholders jointly and severally granted to Dangdang Information an exclusive and irrevocable option to purchase their equity interests in Dangdang Kewen at a purchase price equal to the capital contribution amount, unless otherwise required by PRC law or agreed in writing by the relevant parties. The purchase price can be set off against the loan repayment under the loan agreement, as amended. Dangdang Information may exercise such option at any time until it has acquired all equity interests of Dangdang Kewen, subject to the applicable PRC laws. The term of the agreement will expire in December 2022, and may be extended for ten years upon Dangdang Information's written confirmation prior to the expiration of the initial term or the extension period thereof. Neither the shareholders of Dangdang Kewen nor Dangdang Information may unilaterally terminate this agreement at any time during the term and extension period of the agreement. If and when Dangdang Information proposes any amendments hereto, the shareholders of Dangdang Kewen shall agree with such amendments and execute the supplementary agreements.

*Exclusive technical support service agreement*

Dangdang Information and Dangdang Kewen entered into an exclusive technical support service agreement in May 2006, as first amended in July 2010 and as further amended in December 2012, under which Dangdang Kewen, including its subsidiaries or any companies or entities under its control, agrees to engage Dangdang Information as its exclusive provider of technical platform and technical support, maintenance and other services. Dangdang Kewen shall pay to Dangdang Information service fees at the request of Dangdang Information. The fees payable by Dangdang Kewen include (i) a performance fee equivalent to 5% of the total revenue of Dangdang Kewen in any fiscal year; (ii) amount of depreciation of equipment to be determined in accordance with the accounting rules of PRC; and (iii) annual service fee, the amount of which shall be the total revenue of the whole year minus fees set forth in (i) and (ii). Where the aggregate amount of the three items exceeds total net profit of the whole year of Dangdang Kewen, the annual service fee payable is limited to total net profit of Dangdang Kewen. Dangdang Information has the right to set and revise annually the service fee unilaterally with reference to the performance of Dangdang Kewen. Dangdang Information shall exclusively own any intellectual property arising from the performance of this agreement. This agreement has an unlimited term. Dangdang Kewen may not terminate the agreement early unless Dangdang Information commits gross negligence, fraud or other illegal actions or becomes bankrupt, while Dangdang Information has the right to terminate the agreement at any time at its sole discretion by giving a 30 days prior notice to Dangdang Kewen.

*Equity pledge agreement*

The shareholders of Dangdang Kewen entered into an equity pledge agreement with Dangdang Information in December 2004, as first amended in July 2010 and as further amended in December 2012 and in August 2013, under which the shareholders pledged all of their equity interests in Dangdang Kewen to Dangdang Information as collateral for all of their payments due to Dangdang Information and

to secure performance of all obligations of Dangdang Kewen and its shareholders under the above loan agreement, as amended, the exclusive technical support service agreement and the exclusive call option agreement, as amended. Dangdang Kewen is prohibited from declaring any dividend during the term of the pledge. However, to the extent there is a distribution, including but not limited to any loans, the shareholders of Dangdang Kewen have to remit such distribution in full to Dangdang Information immediately. The shareholders of Dangdang Kewen may not transfer or assign their equity interest in Dangdang Kewen, their rights and obligations under the equity pledge agreement or create or permit to create any pledges which may have an adverse effect on the rights or benefits of Dangdang Information without the prior written consent of Dangdang Information. Dangdang Information shall provide necessary financial support to Dangdang Kewen to fund any losses incurred during the term of the pledge and shall not request for repayment if Dangdang Kewen is unable to do so. If any event of default as provided for therein occurs, Dangdang Information, as the pledgee, will be entitled to request immediate repayment of the loan or to dispose of the pledged equity interests through transfer or assignment. This agreement cannot be terminated until all of the secured indebtedness has been fully discharged or all the equity interests have been purchased pursuant to the exclusive call option agreement.

F-12

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

## Note 1—ORGANIZATION AND BASIS OF PRESENTATION (continued)

*Power of attorney*

Each shareholder of Dangdang Kewen executed a restated irrevocable power of attorney in December 2012 to appoint Dangdang Information as the attorney-in-fact to act on his or her behalf on all matters pertaining to Dangdang Kewen and to exercise all of his or her rights as a shareholder of Dangdang Kewen, including the right to attend shareholders meeting, to exercise voting rights and to transfer all or a part of his or her equity interests in Dangdang Kewen pursuant to the exclusive call option agreement. The power of attorney with each shareholder will remain effective as long as the shareholder holds any equity interests in Dangdang Kewen.

Due to the consolidation of the Affiliated PRC Entities, the Company reflected the following in the consolidated financial statements:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | |
| | RMB | RMB | US$ |
| Current assets | 969,831 | 573,590 | 88,547 |
| Non-current assets | 22,293 | 45,636 | 7,045 |
| **Total assets** | 992,124 | 619,226 | 95,592 |
| Current liabilities | 600,625 | 569,059 | 87,848 |
| Non-current liabilities | 3,317 | 2,488 | 384 |
| **Total liabilities** | 603,942 | 571,547 | 88,232 |

| | Year Ended December 31 | | | |
| --- | --- | --- | --- | --- |
| | 2013 | 2014 | 2015 | |
| | RMB | RMB | RMB | US$ |
| Net revenues | 311,950 | 336,568 | 296,030 | 45,699 |
| Net loss | (29,118) | (151,589) | (82,637) | (12,757) |
| Net cash provided by (used in) operating activities | 104,006 | (631,178) | 264,267 | 40,796 |
| Net cash used in investing activities | (161) | (125,043) | (3,048) | (471) |
| Net cash provided by financing activities | 18,000 | — | — | — |

For the years ended December 31, 2013, 2014 and 2015, the Affiliated PRC Entities contributed in aggregate 4.9 %, 4.2% and 3.2%, respectively, of the Company's consolidated net revenues.

As of December 31, 2014 and 2015, there were no pledges or collateralizations of the assets of Affiliated PRC Entities except for restricted cash amounting to RMB5,639 and RMB nil (US$ nil) as of December 31, 2014 and 2015, respectively, which were the security deposit of bankers' acceptances and Dangdang Information has not provided any financial support that it was not previously contractually required to provide to Dangdang Kewen. There were no assets of Affiliated PRC Entities that can only be used to settle its obligations. Creditors of Affiliated PRC Entities have no recourse to the general credit of Dangdang Information, which is the primary beneficiary of Dangdang Kewen.

F-13

https://www.sec.gov/Archives/edgar/data/1499744/000114420416097925/v436212_20f.htm

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

## Note 2—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of presentation

The accompanying consolidated financial statements have been prepared in accordance with United States generally accepted accounting principles ("U.S. GAAP").

### Principles of consolidation

The consolidated financial statements of the Company include the financial statements of the Company, its subsidiaries and its Affiliated PRC Entities in which it has a controlling financial interest. A controlling financial interest is typically determined when the Company holds a majority of the voting equity interest in an entity. However, as Dangdang Information demonstrates its ability to control Dangdang Kewen through the Company's rights to all the residual benefits of Dangdang Kewen and its obligation to fund losses of Dangdang Kewen, its subsidiaries and Affiliated PRC Entities are included in the consolidated financial statements. All significant intercompany balances and transactions between the Company, its subsidiaries and Affiliated PRC Entities have been eliminated in consolidation.

### Use of estimates

The preparation of the consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosures of contingent assets and liabilities at the balance sheet dates and the reported amounts of revenues and expenses during the reporting periods. Significant estimates and assumptions reflected in the Company's financial statements include, but are not limited to, sales returns, vendor and customer incentives, fair value of available-for-sale investments, allowances for doubtful accounts, lower of cost and net realizable value of inventories, useful lives of long-lived assets, realization of deferred tax assets, share-based compensation expense and uncertain tax positions. Actual results could materially differ from those estimates.

### Foreign currency translation and transactions

The functional currency of the Company is the United States dollar ("US$"). The Company's subsidiaries and Affiliated PRC Entities determined their functional currency to be the Chinese Renminbi ("RMB"). The determination of the respective functional currency is based on the criteria of ASC 830, *Foreign Currency Matters*. The Company uses the RMB as its reporting currency. The Company uses the monthly average exchange rate for the year and the exchange rate at the balance sheet date to translate the operating results and financial position, respectively. Translation differences are recorded in accumulated other comprehensive loss, a component of shareholders' equity.

Transactions denominated in foreign currencies are remeasured into the functional currency at the exchange rates prevailing on the transaction dates. Foreign currency denominated financial assets and liabilities are remeasured at the exchange rates prevailing at the balance sheet date. Foreign exchange gains and losses are included in the consolidated statements of comprehensive (loss) income.

### Convenience translation

Amounts in U.S. dollars ("US$") are presented for the convenience of the reader and are translated at the noon buying rate of RMB6.4778 to US$1.00 on December 31, 2015 in the City of New York for cable transfers of RMB as certified for customs purposes by the Federal Reserve Bank of New York. No representation is made that the RMB amounts could have been, or could be, converted into US$ at such rate.

### Cash and cash equivalents

Cash and cash equivalents consist of cash on hand and bank deposits, which are unrestricted as to withdrawal and use. All highly liquid investments that are readily convertible to known amounts of cash with original stated maturities of three months or less are classified as cash equivalents.

F-14

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

**Note 2—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

*Restricted cash*

Restricted cash represents deposits not readily available to the Company. Restricted cash as at December 31, 2014 and 2015 mainly represented cash pledged as security deposits of bankers' acceptance notes.

*Time deposits*

Time deposits represent interest-bearing deposits held in commercial banks with original stated maturities of more than three months.

*Investments*

The Company accounts for its investments in accordance with ASC 320, *Investments-Debt and Equity Securities* ("ASC 320"). According to ASC 320, the investments in debt securities are accounted for as either "held-to-maturity", "trading" or "available-for-sale".

Debt securities that the Company has positive intent and ability to hold until maturity are classified as held-to-maturity securities and are stated at amortized cost. The fair value of the Company's held-to-maturity investments as disclosed are determined based on the discount cash flow model using the discount curve of market interest rates. For individual securities classified as held-to-maturity securities, the Company evaluates whether a decline in fair value below the amortized cost basis is other than temporary in accordance to ASC 320. If the decline in fair value is judged to be other than temporary, the cost basis of the individual security would be written down to its fair value as a charge to the consolidated statements of comprehensive (loss) income. No impairment loss was recognized on the held-to-maturity securities for any of years presented.

The securities that are bought and held principally for the purpose of selling them in the near term are classified as trading securities. Unrealized holding gains and losses for trading securities are included in earnings.

Investments not classified as trading or as held-to-maturity are classified as available-for-sale securities. Available-for-sale investment is reported at fair value, with unrealized gains and losses recorded in accumulated other comprehensive (loss) income. Realized gains or losses are included in earnings during the period in which the gain or loss is realized. An impairment loss on the available-for-sale securities would be recognized in the consolidated statements of comprehensive (loss) income when the decline in value is determined to be other-than-temporary. During the year ended December 31, 2015, realized gain on the available-for-sale investments upon their sales were reclassified out of accumulated other comprehensive income in its entirety and were then recorded in "interest income" in the consolidated statement of comprehensive (loss) income totaled RMB14,555 (US$2,247).

| | As of December 31, 2014 | | | |
| | Amortized cost | Gross holding unrealized gain* | Fair value | |
| | RMB | RMB | RMB | US$ |
|---|---|---|---|---|
| **Held-to-maturity investments** | | | | |
| Fixed-rate investment | 100,000 | 437 | 100,437 | 16,187 |
| Adjustable-rate investment | 250,000 | 3,830 | 253,830 | 40,910 |

| | As of December 31, 2015 | | | |
| | Amortized cost | Gross holding unrealized gain* | Fair value | |
| | RMB | RMB | RMB | US$ |
|---|---|---|---|---|
| **Held-to-maturity investments\*\*** | | | | |
| Adjustable-rate investment | 72,000 | 209 | 72,209 | 11,147 |
| **Available-for-sale investments** | | | | |
| Adjustable-rate investment | 165,000 | 1,339 | 166,339 | 25,678 |

*The gross holding unrealized gain of held-to maturity investments was interest income. The gross holding unrealized gain of available-for-sale investments was other comprehensive (loss) income.

**As of December 31, 2015, held-to-maturity investments were pledged to Ping An Bank as security deposits of bankers' acceptance notes until the maturity dates on February 5, 2016 and March 10, 2016 respectively.

### Inventories

Inventories, consisting of products available-for-sale and packaging material, are accounted for using the first-in first-out method, and are valued at the lower of cost and net realizable value. Net realizable value is the estimated selling price in the ordinary course of business, less reasonably predictable costs of completion, disposal, and transportation. The Company has early adopted ASU 2015-11, *Simplifying the Measurement of Inventory*, for inventory measurement in the year ended December 31, 2015. Previously, inventories were valued at the lower of cost or market. The early adoption did not have a material impact on the Company's consolidated financial statements. This valuation requires the Company to make judgments, based on currently available information, about the likely method of disposition, such as through sales to individual customers, returns to product vendors, or liquidations, and expected recoverable values of each disposition category.

### Investments in equity investees

The investments in entities over which the Company has the ability to exercise significant influence are accounted for using the equity method. Significant influence is generally considered to exist when the Company has an ownership interest in the voting stock of the investee between 20% and 50%. Other factors, such as representation on the investee's board of directors and the impact of commercial arrangements, are also considered in determining whether the equity method of accounting is appropriate.

Under the equity method, original investments are recorded at cost and adjusted by the Company's share of undistributed earnings or losses of these entities, by the amortization of any basis difference between the amount of the Company's investment and its share of the net assets of the investee, and by dividend distributions or subsequent investments. Unrealized inter-company profits and losses related to equity investees are eliminated. An impairment charge, being the difference between the carrying amount and the fair value of the equity investee, is recognized in the consolidated statements of comprehensive income when the decline in value is considered other than temporary.

There was no impairment loss on investments in equity investees for the year ended December 31, 2015.

### Fixed assets, net

Fixed assets are stated at cost and are depreciated using the straight-line method over the estimated useful lives of the assets, as follows:

| Category | Estimated useful life | Residual value |
|---|---|---|
| Electronic equipment | 3 years | 0% |
| Other office and warehouse equipment | 3-8 years | 0% |
| Vehicles | 3 years | 0% |
| Leasehold improvements | The shorter of the expected life of leasehold improvements of 3-5 years and the lease term | 0% |
| Buildings | 40 years | 0% |

Repair and maintenance costs are charged to expense as incurred, whereas the cost of renewals and betterment that extends the useful lives of plant and equipment are capitalized as additions to the related assets. Retirements, sales and disposals of assets are recorded by removing the cost and accumulated depreciation from the cost and accumulated depreciation accounts with any resulting gain or loss reflected in the consolidated statements of comprehensive (loss) income.

F-15

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

**Note 2—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

*Fixed assets, net* **(continued)**

The Company constructs certain of its fixed assets. All direct and indirect costs that are related to the construction of fixed assets and incurred before the assets are ready for their intended use are capitalized as construction in progress. Construction in progress is transferred to specific fixed asset items and depreciation of these assets commences when they are ready for their intended use.

*Impairment of long-lived assets*

The Company evaluates its long-lived assets or asset group with finite lives for impairment whenever events or changes in circumstances (such as a significant adverse change to market conditions that will impact the future use of the assets) indicate that the carrying amount of a group of long-lived assets may not be fully recoverable. When these events occur, the Company evaluates the impairment by comparing the carrying amount of the assets to future undiscounted cash flows expected to result from the use of the assets and their eventual disposition. If the sum of the expected undiscounted cash flows is less than the carrying amount of the assets, the Company recognizes an impairment loss based on the excess of the carrying amount of the asset group over its fair value. Fair value is generally determined by discounting the cash flows expected to be generated by the assets when the market prices are not readily available for the long-lived assets. No impairment charge was recognized for any of the years presented.

*Prepaid land lease payments*

Prepaid land lease payments represent amount paid for the right to use land in the PRC and is recorded at purchase cost less accumulated amortization. Amortization is provided on a straight line basis over the term of the land use right agreement, which is 50 years.

*Fair value measurement of financial instruments*

ASC 820, *Fair Value Measurements and Disclosures* ("ASC 820") defines fair value, establishes a framework for measuring fair value and expands disclosures about fair value measurements. Although the adoption of ASC 820 did not impact the Company's financial condition, results of operations, or cash flows, ASC 820 requires additional disclosures to be provided on fair value measurement.

ASC 820 establishes a three-tier fair value hierarchy, which prioritizes the inputs used in measuring fair value as follows:

Level 1 — Observable inputs that reflect quoted prices (unadjusted) for identical assets or liabilities in active markets.

Level 2 — Include other inputs that are directly or indirectly observable in the marketplace.

Level 3 — Unobservable inputs which are supported by little or no market activity.

ASC 820 describes three main approaches to measuring the fair value of assets and liabilities: (1) market approach; (2) income approach and (3) cost approach. The market approach uses prices and other relevant information generated from market transactions involving identical or comparable assets or liabilities. The income approach uses valuation techniques to convert future amounts to a single present value amount. The measurement is based on the value indicated by current market expectations about those future amounts. The cost approach is based on the amount that would currently be required to replace an asset.

The carrying values of the Company's financial instruments are mainly in the form of cash and cash equivalents, restricted cash, time deposits, held-to-maturity investments, available-for-sale investments, accounts receivable, amounts due from and due to related parties, other receivables, accounts payable, and other current liabilities. The carrying amounts of these financial instruments, except for cash and cash equivalents, restricted cash, time deposits, available-for-sale investments and held-to-maturity investments, approximate their fair values because of their generally short maturities under level 2. Available-for-sale investments were adjusted to fair value at each reporting date.

**E-COMMERCE CHINA DANGDANG INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

**Note 2—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

*Revenue*

*Revenue recognition*

The Company's principal business is to sell media products and general merchandise sourced from publishers, manufacturers and distributors in China, operate the dangdang.com marketplace program, under which third-party merchants sell general merchandise as well as render advertising services on the Company's internet platform. In accordance with ASC 605, *Revenue Recognition* ("ASC 605"), the Company records product sales and related costs on a gross basis when it is the primary obligor in a transaction. When the Company is not the primary obligor in a transaction and is instead acting as an agent, such as in transactions on the Company's marketplace program and certain bulk sales as discussed below, fees earned are recorded on a net basis.

Revenue is recorded net of value-added tax.

*Product revenue*

Consistent with the criteria of Staff Accounting Bulletin No. 104, *Revenue Recognition* ("SAB 104"), the Company recognizes revenue when the following four revenue recognition criteria are met: (i) persuasive evidence of an arrangement exists, (ii) delivery has occurred or services have been rendered, (iii) the selling price is fixed or determinable, and (iv) collectability is reasonably assured.

Customers place their orders for products online fixing the related selling price and shipping charge. Payment for the purchased product is made either before delivery or upon delivery. The Company has more recently expanded its bulk sales capability to broaden the Company's sales channels and allow customers to purchase media products and general merchandise in bulk. The selling price is negotiated separately and usually received in advance before the order is confirmed and delivered. Revenue, net of discounts and return allowances, is recorded when title passes to customers upon delivery. Return allowances, which reduce product revenue, are estimated based on historical experience. Shipping charges to customers are included in product revenue and totaled RMB48,407, RMB53,828 and RMB69,537 (US$10,735) for the years ended December 31, 2013, 2014 and 2015, respectively.

During the year ended December 31, 2015, the Company entered into certain bulk sales transactions with third party customers where the sales price was based on the actual purchase price and a fixed margin. The Company considered ASC 605-45, *Revenue Recognition, Principal Agent Considerations,* and concluded that the related revenue should be reported in net as the Company was not the primary obligor.

*Other revenue*

Other revenue primarily consists of fees charged to third-party merchants participating in the Company's marketplace program as well as advertising revenue. The fees are derived from a service charge to participate in the program for a designated period of time, a percentage of the transaction value and a fixed commission. Fee revenue is recognized ratably over the period of the arrangement, generally up to one year. Fees from transactions are recognized when the transaction is completed and collectability is reasonably assured. The Company recognizes advertising revenue based on the revenue recognition criteria in accordance with SAB 104.

*Discount coupons*

The Company periodically provides discount coupons to its customers for use in purchases that require a minimum transaction value. Coupons may be granted to customers to incentivize a current purchase. Discounts for current purchases are treated as a reduction of revenue for the related transaction. Coupons may also be given to a customer that has made a purchase of a minimum value but for which may only be used in a future purchase. During the years ended December 31, 2014 and 2015, the Company made extensive use of such coupons to incentivize future purchases. When the right to purchase discounted products in the future does not represent a significant and incremental discount to the customer, such right is not considered an element of an arrangement within the scope of the multiple-element arrangements guidance in ASC 605. The discounts for future purchases, when accepted by the customer, are treated as a reduction of revenue when the future transaction is recognized. When the right to discounts for future purchases represents a

significant and incremental discount to the customer, such right is accounted for as a separate element under ASC 605. As of December 31, 2014 and 2015, the outstanding coupons did not represent a significant and incremental discount to the customers.

F-17

Table of Contents

## E-COMMERCE CHINA DANGDANG INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

**Note 2—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

*Gift cards*

The Company records deferred revenue when it sells gift cards. The Company records revenue when a customer redeems the gift card and unredeemed amounts are recorded in other revenue when the gift card expires.

*Loyalty programs*

Customers may earn loyalty points from the purchase of merchandise from the Company. Points are earned based on the amount and types of merchandise purchased and expire at the end of the next calendar year. Up to April 2015, customers could redeem the loyalty points for discount coupons to be used on future purchases of selected items on the Company's internet platform or exchanged for discount coupons for third-party products or services. The Company did not pay nor has any obligations to the third-party providers. Instead, such program allows third-party providers a channel to the Company's customers. The Company accrues for the estimated incremental cost of redeeming the benefits at the time the benefits are earned by the customer. Estimated incremental costs were historically insignificant. In April 2015, the Company revised the policy of loyalty points. According to the new policy, customers may also redeem the loyalty points for cash used for future purchase. As of December 31, 2015, considering that the Company did not have sufficient experience to reliably estimate the breakage under the new policy, the Company accrued for the maximum potential impact using the incremental cost approach.

In addition, customers may attain a tiered membership status based on the value of merchandise purchased over the past twelve months. Membership status entitles the holder to certain discounts on future purchases of selected items on the Company's internet platform. Membership status is subject to renewal every twelve months. The estimated incremental costs have been insignificant since the inception of the tiered membership scheme.

*Value-added tax*

Pursuant to *the Notice Regarding the Continuation of Value-added Tax and Business Tax Preferential Policies for the Public Cultural Industry* promulgated by the Ministry of Finance and the State Administration of Taxation in December 2013, or Circular 87, value-added tax is exempted for the wholesale and retail of books from January 1, 2013 to December 31, 2017. According to Circular 87, the exempted value-added tax or business tax that have been collected before the issuance of Circular 87 can be used to offset future value-added tax and business tax, or be refunded. The Company's PRC subsidiaries and Affiliated PRC Entities have been approved for value-added tax exemption from the wholesale and retail of books since January 1, 2014. As for the value-added tax that had been paid in 2013, such entities applied for tax refunds and received value-added tax refunds from the relevant governmental authorities amounting to RMB106,025 during the year ended December 31, 2014 . The value-added tax refunds are included in government grants and value-added tax refunded in the consolidated statements of comprehensive (loss) income.

*Cost of revenue*

Cost of revenue represents cost of goods sold including the purchase price of consumer products and content sold by the Company as well as packaging supplies. Dangdang Information is subject to other surcharges related to value-added tax on the revenue earned for exclusive technical support provided to Dangdang Kewen, pursuant to the Contractual Agreements (note 1). Such other surcharges related to value-added tax have been insignificant for the years presented.

*Rebates and promotion fees*

The Company has agreements to receive consideration from certain of its vendors, including rebates for products it sells over a period of time as well as for promoting vendors' products during the year. The rebates are not sufficiently separable from the Company's purchase of the vendors' products and they do not represent a reimbursement of costs incurred by the Company to sell vendors' products. Rebates which are based on the volume of sales to the Company's customers for a specified period are accounted for as a reduction of "cost of revenues" when the volume thresholds are met and the amount of rebate is determinable. Promotion fees related to specific inventory sold are recorded as a reduction of "cost of revenues" when the item is sold. Rebates and promotion fees that are

not linked to the volume of sales to the Company's customers or specific inventory sold are allocated between "cost of revenues" and "inventories" based on purchases for the year. Rebates and promotion fees recorded as a reduction of "cost of revenues" totaled RMB390,855, RMB556,811 and RMB780,203 (US$120,443) for the years ended December 31, 2013, 2014 and 2015, respectively.

F-18

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

## Note 2—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)

### Fulfillment

Fulfillment costs represent those costs incurred in out-bound shipping and operating and staffing the Company's fulfillment and customer service centers, including costs attributable to buying, receiving, inspecting, and warehousing inventories; picking, packaging, and preparing customer orders for shipment; and responding to inquiries from customers. Fulfillment costs also include amounts payable to third parties that assist the Company in fulfillment and customer service operations. Out-bound shipping costs totaled RMB368,517, RMB363,000 and RMB335,859 (US$51,848) for the years ended December 31, 2013, 2014 and 2015, respectively.

### Marketing

Marketing costs consist primarily of advertising costs, promotion costs relating to marketing activities and payroll and related expenses for personnel engaged in marketing, business development and selling activities.

Advertising costs, expensed as incurred, totaled RMB250,068, RMB363,018 and RMB300,263 (US$46,353), in the years ended December 31, 2013, 2014 and 2015, respectively.

### Technology and content

Technology and content expenses consist principally of research and development activities, payroll and related expenses for employees involved in category expansion, application development and platform development. Research and development include expenses related to editorial content, and systems support, as well as costs and depreciation associated with the computing, storage and telecommunications infrastructure used internally and supporting online activities.

Technology and content costs are expensed as incurred. Software development costs are also expensed as incurred as the costs qualifying for capitalization have been insignificant.

### General and administrative

General and administrative expenses consist of payroll and related expenses for employees involved in general corporate functions, including accounting, finance, tax, legal, and human relations, among others; costs associated with use by these functions of facilities and equipment, such as depreciation expense and rent; bad debt expenses and other general corporate costs.

### Leases

The Company enters into operating leases wherein payments are recognized as an expense on a straight-line basis over the lease term. The Company had no capital leases for any of the years stated herein.

### Comprehensive (loss) income

Comprehensive (loss) income is defined as the changes in equity of the Company during a period from transactions and other events and circumstances excluding transactions resulting from investments by owners and distributions to owners. Among other disclosures, ASC 220, *Comprehensive Income*, requires that all items that are required to be recognized under current accounting standards as components of comprehensive (loss) income be reported in a financial statement that is displayed with the same prominence as other financial statements. For each of the periods presented, the Company's comprehensive (loss) income includes net (loss) income, unrealized gains on available-for-sale investments and foreign currency translation adjustments and is presented in the consolidated statement of comprehensive (loss) income. The Company adopted Accounting Standards Update ("ASU") No. 2013-02 ("ASU 2013-02"), *Comprehensive Income (Topic 220), Reporting of Amounts Reclassified Out of Accumulated Other Comprehensive Income*, by presenting items of net (loss) income and other comprehensive (loss) income in one single continuous statement.

Before January 1, 2015, the balance of accumulated other comprehensive loss and the movements thereof were solely related to foreign currency translation adjustments. Foreign currency translation adjustment and unrealized gain on available-for-sale investments recorded in accumulated other comprehensive loss were RMB87,122 (US$13,449) and RMB15,894 (US$2,454) for the year ended December 31, 2015, respectively. Amounts reclassified out of accumulated other comprehensive loss of realized gain on available-for-sale investments during the year ended December 31, 2015 were RMB14,555 (US$2,247). Foreign currency translation adjustment and unrealized gain on available-for-sale investments were RMB42,826 (US$6,611) and RMB1,339 (US$206) as of December 31, 2015, respectively.

F-19

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

**Note 2—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

*Government grants*

Government grants received in connection with the business achievements reward or return of taxation contribution made by the Company are recognized as other operating income when received and when the Company has no further obligation.

Government grants received in connection with the maintenance of the Company's operations in specific locations are recognized as deferred government grants when received and recorded as other operating income over the period the attached conditions are met and the government grants are earned.

If the purpose of the government grant is specifically defined in the terms and conditions of the contract, the grant received is recorded as an offset to the specified expense. The amount recorded to offset fulfillment expenses for the year ended December 31, 2013, 2014 and 2015 was RMB10,000, RMB nil and RMB nil (US$ nil), respectively.

*Income tax*

The Company follows the liability method of accounting for income taxes. Under this method, deferred tax assets and liabilities are determined based on the difference between the financial reporting and tax bases of assets and liabilities using enacted tax rates that will be in effect in the period in which the differences are expected to reverse. The Company records a valuation allowance to offset deferred tax assets if based on the weight of available evidence, it is more-likely-than-not that some portion, or all, of the deferred tax assets will not be realized. The effect on deferred taxes of a change in tax rate is recognized in tax expense in the period that includes the enactment date of the change in tax rate. The Company has elected to classify interest and penalties related to an uncertain tax position, if and when required, as part of income tax expense in the consolidated statement of comprehensive (loss) income.

In accordance with the provisions of ASC 740, *Income Taxes*, the Company recognizes in its financial statements the benefit of a tax position if the tax position is "more likely than not" to prevail based on the facts and technical merits of the position. Tax positions that meet the "more likely than not" recognition threshold are measured, using a cumulative probability approach, at the largest amount of tax benefit that has a greater than fifty percent likelihood of being realized upon settlement. The Company estimates its liability for unrecognized tax benefits which are periodically assessed and may be affected by changing interpretations of laws, rulings by tax authorities, changes and/or developments with respect to tax audits, and expiration of the statute of limitations. The ultimate outcome for a particular tax position may not be determined with certainty prior to the conclusion of a tax audit and, in some cases, appeal or litigation process. The actual benefits ultimately realized may differ from the Company's estimates. As each audit is concluded, adjustments, if any, are recorded in the Company's financial statements. Additionally, in future periods, changes in facts, circumstances and new information may require the Company to adjust the recognition and measurement estimates with regard to individual tax positions. Changes in recognition and measurement estimates are recognized in the period in which the changes occur.

*Share-based compensation*

The Company's employees and directors participate in the Company's 2004 and 2010 Share Incentive Plan. The Company applies ASC 718, *Compensation-Stock Compensation* ("ASC 718")*,* to account for its employee share-based payments.

In accordance with ASC 718, the Company determines whether a share option should be classified and accounted for as a liability award or equity award. All grants of share-based awards to employees classified as equity awards are recognized in the financial statements based on their grant date fair values which are calculated using an option pricing model. The Company has elected to recognize compensation expense using the straight-line method for all employee equity awards granted with graded vesting based on service conditions provided that the amount of compensation cost recognized at any date is at least equal to the portion of the grant-date value of the options that are vested at that date. To the extent the required vesting conditions are not met resulting in the forfeiture of the share-based awards, previously recognized compensation expense relating to those awards are reversed. ASC 718 requires forfeitures to be estimated at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from initial estimates. Share-based compensation expense is recorded net of estimated forfeitures such that expense is recorded only for those share-based awards that are expected to vest.

In accordance with ASC 718, the Company records the incremental fair value, if any, of the modified award, as compensation cost on the date of modification for vested awards or over the remaining vesting period for unvested awards. The incremental compensation cost is the excess of the fair value of the modified award on the date of modification over the fair value of the original award immediately before the modification.

F-20

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

**Note 2—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

*(Loss) income per share*

(Loss) income per share is calculated in accordance with ASC 260, *Earnings Per Share* ("ASC 260"). Basic (loss) income per common share is computed by dividing net (loss) income attributable to holders of common shares by the weighted average number of common shares outstanding during the period using the two-class method. Under the two-class method, net (loss) income is allocated between the Class A and Class B common shares and other participating securities based on their participating rights. Diluted (loss) income per common share reflects the potential dilution that could occur if securities to issue common shares were exercised. The dilutive effect of outstanding share-based awards is reflected in the diluted (loss) income per share by application of the treasury stock method. Dilutive equivalent shares are excluded from the computation of diluted (loss) income per share if their effects would be anti-dilutive. The computation of the dilutive net (loss) income per share of Class A common share assumes the conversion of Class B common shares, while the diluted income per share of Class B common share does not assume the conversion of those shares.

The rights of the holders of the Company's Class A and Class B common shares are identical, except with respect to voting rights and conversion rights. In accordance with ASC 260, the undistributed income for each year is allocated based on the contractual participation rights of the Class A and Class B common shares as if the income for the year had been distributed. As the liquidation and dividend rights are identical, the undistributed income is allocated on the proportionate basis of the weighted average number of respective common shares.

*Segment reporting*

The Company follows ASC 280, *Segment Reporting*. The Company's chief operating decision maker, who has been identified as the executive chairwoman of the board of directors, reviews the consolidated results when making decisions about allocating resources and assessing performance of the Company as a whole and hence, the Company has only one reportable segment. The Company operates and manages its business as a single segment through the provision of a single class of global services for accelerating and improving the delivery of content and applications over the internet. As the Company's long-lived assets are substantially all located in the PRC and substantially all the Company's revenues are derived from within the PRC, no geographical segments are presented.

*Concentration of risks*

*Concentration of credit risk*

Assets that potentially subject the Company to significant concentration of credit risk primarily consist of cash and cash equivalents, restricted cash, time deposits, available-for-sale investments, held to maturity investments, accounts receivable and other receivables. The maximum exposure of such assets to credit risk is their carrying amounts as of the balance sheet dates. As of December 31, 2015, substantially all of the Company's cash and cash equivalents, restricted cash, time deposits, available-for-sale investments and held to maturity investments were managed by financial institutions of Mainland China and Hong Kong, which management believes are of high credit quality. As of December 31, 2014 and 2015, the Company had RMB476,770 and RMB398,963 (US$61,589) in cash and cash equivalents, restricted cash, available-for-sale investments, held-to-maturity investments and time deposits in branches located in the Mainland China and also had RMB922,265 and RMB970,988 (US$149,895) located outside Mainland China, respectively.

F-21

https://www.sec.gov/Archives/edgar/data/1499744/000114420416097925/v436212_20f.htm

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

**Note 2— SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

*Concentration of risks (continued)*

*Concentration of credit risk (continued)*

Accounts receivable are typically unsecured and are derived from revenue earned from customers and collected on behalf by third party couriers in the PRC. The risk with respect to accounts receivable is mitigated by credit evaluations the Company performs on its couriers and its ongoing monitoring process of outstanding balances.

*Concentration of customers and suppliers*

There are no revenues from customers or purchases from suppliers which individually represent greater than 10% of the total revenues and purchases for the years ended December 31, 2013, 2014 and 2015.

*Currency convertibility risk*

The Company transacts all of its business in RMB, which is not freely convertible into foreign currencies. On January 1, 1994, the PRC government abolished the dual rate system and introduced a single rate of exchange as quoted daily by the People's Bank of China (the "PBOC"). However, the unification of the exchange rates does not imply that the RMB may be readily convertible into United States dollars or other foreign currencies. All foreign exchange transactions continue to take place either through the PBOC or other banks authorized to buy and sell foreign currencies at the exchange rates quoted by the PBOC. Approval of foreign currency payments by the PBOC or other institutions requires submitting a payment application form together with suppliers' invoices, shipping documents and signed contracts.

Additionally, the value of the RMB is subject to changes in central government policies and international economic and political developments affecting supply and demand in the PRC foreign exchange trading system market.

*Foreign currency exchange rate risk*

From July 21, 2005, the RMB is permitted to fluctuate within a narrow and managed band against a basket of certain foreign currencies. The depreciation and appreciation of the U.S. dollar against RMB was approximately 0.81% and -1.39% in 2014 and 2015. It is difficult to predict how market forces or PRC or U.S. government policy may impact the exchange rate between the Renminbi and the U.S. dollar in the future.

*Business risk*

Foreign ownership of internet-based businesses is subject to significant restrictions under current PRC laws and regulations. Foreign investors are not allowed to own more than 50% equity interest in any entity with an Internet content distribution business. Currently, the Company conducts its operations in China through a series of contractual arrangements entered into among Dangdang Information, Dangdang Kewen and its shareholders.

In the opinion of the Company's management and Beijing DHH Law Firm, the Company's PRC legal counsel, (i) the ownership structure of the Company's PRC subsidiaries and the Affiliated PRC Entities is in compliance with PRC laws, (ii) each of the Company's PRC subsidiaries and Affiliated PRC Entities has the corporate power, authority and legal right to enter into, execute, deliver and perform its obligations under each of the Contractual Agreements to which it is a party, (iii) each of the Contractual Agreements, to which any of the Company's PRC subsidiaries, the Affiliated PRC Entities or Peggy Yu Yu and Guoqing Li is a party, constitute legal, valid and binding obligation of such party, and enforceable against such party in accordance with their respective terms, (iv) the execution, delivery and performance by each of the Company's PRC subsidiaries, the Affiliated PRC Entities or Peggy Yu Yu and Guoqing Li of each of the Contractual Agreements to which it/he/she is a party do not result in: in case of any of the Company's PRC subsidiaries or the Affiliated PRC Entities, any violation of the provisions of the articles of association or business

licenses of such PRC subsidiaries or such Affiliated PRC Entities, and any violation of any explicit provisions of the applicable PRC laws.

There are, however, substantial uncertainties regarding the interpretation and application of current or future PRC laws and regulations. Accordingly, there can be no assurance that the PRC regulatory authorities will not in the future take a view that is contrary to the opinion of our PRC legal counsel.

If the Company's ownership structure and the Contractual Arrangements were found to be in violation of any existing or future PRC laws or regulations by the relevant regulatory authorities, the Company may be subject to penalties, which may include but not be limited to, revocation of the business licenses or operating licenses of the Company's PRC subsidiaries or Affiliated PRC Entities, being required to restructure the Company's operations or discontinue the Company's operating activities. If any of these penalties results in the Company's inability to direct the activities of Dangdang Kewen that most significantly impact its economic performance, and/or the Company's failure to receive the economic benefits from Dangdang Kewen, the Company may not be able to consolidate the entity in our consolidated financial statements in accordance with U.S. GAAP.

F-22

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

**Note 2— SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (continued)**

*Business risk (continued)*

In addition, if Dangdang Kewen and its subsidiaries or their shareholders fail to perform their obligations under the Contractual Arrangements, the Company may have to incur substantial costs and expend resources to enforce the Company's rights under the contracts. The Company may have to rely on legal remedies under PRC law, including seeking specific performance or injunctive relief and claiming damages, which may not be effective. All of these Contractual Arrangements are governed by PRC law and provide for the resolution of disputes through arbitration in the PRC. Accordingly, these contracts would be interpreted in accordance with PRC law and any disputes would be resolved in accordance with PRC legal procedures. The legal system in PRC is not as developed as in other jurisdictions, such as the United States. As a result, uncertainties in the PRC legal system could limit the Company's ability to enforce these Contractual Arrangements. Under PRC law, rulings by arbitrators are final, parties cannot appeal the arbitration results in courts, and prevailing parties may only enforce the arbitration awards in PRC courts through arbitration award recognition proceedings, which would incur additional expenses and delay. In the event the Company is unable to enforce these Contractual Arrangements, the Company may not be able to exert effective control over its PRC Affiliated Entities, and the Company's ability to conduct its business may be negatively affected.

*Recent accounting pronouncements*

In May 2014, the Financial Accounting Standards Board ("FASB") issued ASU No. 2014-09 ("ASU 2014-09"), Revenue from Contracts with Customers. ASU 2014-09 supersedes the revenue recognition requirements in ASC 605, and requires entities to recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled to in exchange for those goods or services. ASU 2014-09 is originally effective for the annual reporting periods beginning after December 15, 2016, including interim periods within that reporting period. ASU 2015-14, Revenue from Contracts with Customers, defers the effective date of ASU 2014-09 by one year. As a result, ASU 2014-09 is effective for annual reporting periods beginning after December 15, 2017 and interim periods therein. Early adoption is permitted to the original effective date. The Company is currently evaluating the timing of its adoption and the impact of adopting the new revenue standard on its consolidated financial statements and considering additional disclosure requirements.

In July 2015, the FASB issued ASU 2015-11, *Simplifying the Measurement of Inventory*, which modifies the accounting for inventory. Under this ASU, the measurement principle for inventory will change from lower of cost or market value to lower of cost and net realizable value. The ASU defines net realizable value as the estimated selling price in the ordinary course of business, less reasonably predictable costs of completion, disposal, and transportation. The ASU 2015-11 eliminates the guidance that entities consider replacement cost and net realizable value less an approximately normal profit margin in the subsequent measurement of inventory when cost is determined on a first-in, first-out or average cost basis. The ASU is effective for reporting periods after December 15, 2016, with early adoption permitted. The Company elected to early adopt ASU 2015-11 for the year ended December 31, 2015, on a prospective basis and the adoption had no material effect on its consolidated financial statements.

In November 2015, the FASB issued ASU 2015-17, *Balance Sheet Classification of Deferred Taxes*, which amends the accounting for income taxes and requiring all deferred tax assets and liabilities to be classified as non-current in the consolidated balance sheets. The ASU is effective for reporting periods beginning after December 15, 2016, with early adoption permitted. The ASU may be adopted either prospectively or retrospectively. The Company is currently evaluating the impact of adopting this guidance on our consolidated financial statements.

In February 2016, the FASB issued ASU 2016-02, *Leases*, which introduces a new lessee model that brings substantially all leases in the balance sheets. This standard will be effective for the Company beginning the first quarter of fiscal year 2019. The Company is currently evaluating the impact of adopting this guidance on our consolidated financial statements.

**Note 3—FAIR VALUE MEASUREMENT**

The fair value of the Company's available-for-sale investments as disclosed are determined utilizing valuation techniques, including discounted cash flow model using the discount curve of market interest rates. Except for that, the Company did not have

significant financial instruments that were measured at fair value on a recurring basis or non-recurring basis as of December 31, 2014 and 2015.

The following table sets forth the available-for-sale investments, measured at fair value, by level within the fair value hierarchy as of December 31, 2015:

| | Total | | Quoted Prices in Active Market for Identical Assets (Level 1) | | Significant Other Observable Inputs (Level 2) | | Significant Unobservable Inputs (Level 3) | |
|---|---|---|---|---|---|---|---|---|
| | **RMB** | **US$** | **RMB** | **US$** | **RMB** | **US$** | **RMB** | **US$** |
| Available-for-sale investments* | 166,339 | 25,678 | — | — | 166,339 | 25,678 | — | — |
| Total | 166,339 | 25,678 | — | — | 166,339 | 25,678 | — | — |

*Some of available-for-sale investments are redeemable at the Company's option amounting to RMB50,000 (US$7,719), the rest of available-for-sale investments have matured in January 2016.

F-23

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

## Note 4—INVENTORIES

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | |
| | RMB | RMB | US$ |
| Media products | 1,996,795 | 2,038,922 | 314,755 |
| General merchandise | 194,047 | 223,791 | 34,548 |
| Packing materials and others | 10,328 | 9,374 | 1,447 |
| | 2,201,170 | 2,272,087 | 350,750 |

## Note 5—PREPAID EXPENSES AND OTHER CURRENT ASSETS

Prepaid expenses and other current assets consist of the following:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | |
| | RMB | RMB | US$ |
| Prepayments to suppliers | 288,763 | 224,692 | 34,687 |
| Rental, insurance and other prepayments | 30,794 | 14,089 | 2,175 |
| Rebates and promotion fees receivable | 195,814 | 278,548 | 43,000 |
| Warehouse and other deposits | 8,355 | 4,004 | 618 |
| Interest receivables | 13,752 | 1,203 | 186 |
| Value-added tax recoverable | 14,762 | 64,066 | 9,890 |
| Other receivables (net of provision for doubtful receivables of RMB3,293 and RMB4,560 (US$704) as of December 31, 2014 and 2015) | 23,406 | 21,183 | 3,270 |
| | 575,646 | 607,785 | 93,826 |

Bad debt expenses were RMB2,513, RMB3,293 and RMB4,560 (US$704) for the years ended December 31, 2013, 2014 and 2015, respectively.

## Note 6—EQUITY METHOD INVESTMENTS

The following investments were accounted for under the equity method:

| December 31, 2015 | Interest held | Investment, at cost, less impairment | share of undistributed profits | Total | |
| --- | --- | --- | --- | --- | --- |
| | | RMB | RMB | RMB | US$ |
| **Equity method** | | | | | |
| Beijing Baoma Diary Technology Ltd. | 45% | 900 | (167) | 733 | 113 |
| Beijing Hechuang Technology Ltd. | 45% | 900 | (240) | 660 | 102 |
| | | 1,800 | (407) | 1,393 | 215 |

## Note 7—FIXED ASSETS, NET

Fixed assets consist of the following:

| | As of December 31, | |
| --- | --- | --- |
| | 2014 | 2015 |

| | RMB | RMB | US$ |
|---|---|---|---|
| Electronic equipment | 185,034 | 212,237 | 32,764 |
| Other office and warehouse equipment | 106,035 | 112,522 | 17,370 |
| Vehicles | 2,447 | 2,447 | 378 |
| Leasehold improvements | 20,245 | 20,792 | 3,210 |
| Buildings | 138,447 | 139,934 | 21,602 |
| Construction in progress | 4,658 | 3,088 | 476 |
| Total | 456,866 | 491,020 | 75,800 |
| Less: accumulated depreciation | (203,900) | (254,909) | (39,351) |
| Fixed assets, net | 252,966 | 236,111 | 36,449 |

Depreciation expenses were RMB48,036, RMB53,456 and RMB58,333 (US$9,005) for the years ended December 31, 2013, 2014 and 2015, respectively.

## Note 8—PREPAID LAND LEASE PAYMENTS

| | As of December 31, | | |
|---|---|---|---|
| | 2014 | 2015 | |
| | RMB | RMB | US$ |
| Prepaid land lease payments | 44,656 | 44,656 | 6,894 |
| Less: accumulated amortization | (2,233) | (3,126) | (483) |
| Net carrying value | 42,423 | 41,530 | 6,411 |

Amortization expenses for prepaid land lease payments for the years ended December 2013, 2014 and 2015 were RMB893, RMB893 and RMB893 (US$138), respectively. The Company expects to recognize RMB893 (US$138) in amortization expenses for each of the next five years.

F-24

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

**Note 9—SHORT-TERM BANK LOANS AND NOTES PAYABLE**

There were no outstanding short-term bank loans as of December 31, 2014 and 2015. Interest expenses relating to the short-term bank loans recognized in the consolidated statement of comprehensive (loss) income were RMB6,042, RMB nil and RMB nil (US$ nil) for the years ended December 31, 2013, 2014 and 2015, respectively.

Notes payable do not carry a stated interest rate, but have a specific due date usually for a period of three or six months. These notes are negotiable documents issued by bankers on the Company's behalf to vendors. These notes are short-term in nature. The Company had outstanding bankers acceptance notes payables of RMB63,024 and RMB150,064 (US$23,166) as of December 31, 2014 and December 31, 2015, respectively.

**Note 10—ACCRUED EXPENSES AND OTHER CURRENT LIABILITIES**

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | |
| | RMB | RMB | US$ |
| Accrued expenses | 202,707 | 152,960 | 23,613 |
| Accrued payroll | 66,926 | 51,954 | 8,020 |
| Taxes payable | 16,872 | 5,330 | 823 |
| Deposits from delivery service providers and merchants in the marketplace program | 144,772 | 153,462 | 23,690 |
| Payables to merchants participating in the marketplace program | 203,938 | 161,465 | 24,926 |
| Sales refund payables | 13,755 | 28,577 | 4,412 |
| Payables for purchases of fixed assets | 27,932 | 13,366 | 2,063 |
| Other payables | 27,581 | 38,549 | 5,951 |
| | 704,483 | 605,663 | 93,498 |

**Note 11—PRODUCT REVENUE**

| | Year Ended December 31 | | | |
| --- | --- | --- | --- | --- |
| | 2013 | 2014 | 2015 | |
| | RMB | RMB | RMB | US$ |
| Media products | 4,050,122 | 5,036,039 | 5,526,976 | 853,218 |
| General merchandise | 1,995,451 | 2,599,411 | 3,485,314 | 538,040 |
| | 6,045,573 | 7,635,450 | 9,012,290 | 1,391,258 |

**Note 12—OTHER INCOME (EXPENSES), NET**

| | Year Ended December 31 | | | |
| --- | --- | --- | --- | --- |
| | 2013 | 2014 | 2015 | |
| | RMB | RMB | RMB | US$ |
| Exchange income (loss), net | 30,822 | (3,996) | (60,735) | (9,375) |
| Forward foreign currency contract gain (loss) | 8,565 | (7,680) | — | — |
| Share of net loss of equity investees | — | — | (407) | (63) |
| Other non-operating income | 8,558 | 11,880 | 26,010 | 4,015 |
| Other non-operating expenses | (20,023) | (17,210) | (5,921) | (914) |
| | 27,922 | (17,006) | (41,053) | (6,337) |

F-25

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

**Note 13—INCOME TAX EXPENSES**

*Cayman Islands and British Virgin Islands*

Under the current laws of the Cayman Islands and British Virgin Islands, the Company is not subject to tax on income or capital gains. In addition, upon payments of dividends by the Company to its shareholders, no Cayman Islands and British Virgin Islands withholding tax will be imposed.

*Hong Kong*

Under the Hong Kong tax laws, subsidiaries in Hong Kong are exempted from income tax on their foreign-derived income and there are no withholding taxes in Hong Kong on remittance of dividends.

*China*

The Company's PRC subsidiaries and PRC Affiliated Entities are subject to the statutory rate of 25% in accordance with the enterprise income tax law ("EIT Law") which was effective on January 1, 2008.

Dividends paid by PRC subsidiaries of the Company out of the profits earned after December 31, 2007 to non-PRC tax resident investors would be subject to PRC withholding tax. The withholding tax is 10%, unless a foreign investor's tax jurisdiction has a tax treaty with China that provides for a lower withholding tax rate.

(Loss) income before income taxes consists of:

|  | Year Ended December 31 | | | |
|  | 2013 | 2014 | 2015 | |
|  | RMB | RMB | RMB | US$ |
|---|---|---|---|---|
| Non-PRC | 52,418 | 9,245 | (45,497) | (7,024) |
| PRC | (195,283) | 78,872 | 122,045 | 18,841 |
|  | (142,865) | 88,117 | 76,548 | 11,817 |

Income taxes consist of:

|  | Year Ended December 31 | | | |
|  | 2013 | 2014 | 2015 | |
|  | RMB | RMB | RMB | US$ |
|---|---|---|---|---|
| Current income tax | — | — | — | — |
| Deferred income tax benefit | — | — | 15,000 | 2,316 |
|  | — | — | 15,000 | 2,316 |

A reconciliation of the differences between the statutory tax rate and the effective tax rate for enterprise income tax is as follows:

|  | Year Ended December 31 | | | |
|  | 2013 | 2014 | 2015 | |
|  | RMB | RMB | RMB | US$ |
|---|---|---|---|---|
| Income tax computed at PRC statutory tax rate (25%) | (35,716) | 22,029 | 19,137 | 2,954 |
| Effect of different tax rates in different jurisdictions | (13,105) | (2,311) | 11,374 | 1,756 |
| Non-deductible expenses | 757 | 1,251 | 1,648 | 254 |
| Research and development super deduction | — | (13,562) | — | — |
| Effect of expired tax losses | 452 | — | — | — |
| Other adjustments | (238) | 82 | (184) | (28) |

| | | | | |
|---|---|---|---|---|
| Changes in valuation allowance | 47,850 | (7,489) | (46,975) | (7,252) |
| | — | — | (15,000) | (2,316) |

F-26

[Table of Contents](#)

**E-COMMERCE CHINA DANGDANG INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

## Note 13—INCOME TAX EXPENSES (continued)

The components of deferred taxes are as follows:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | |
| | RMB | RMB | US$ |
| Deferred tax assets, current portion: | | | |
| Accrued expenses and other current liabilities | 39,318 | 31,582 | 4,875 |
| Inventories | 10,099 | 11,456 | 1,768 |
| Provisions | 1,506 | 1,423 | 220 |
| Net operating losses | — | 15,000 | 2,316 |
| Total deferred tax assets, current portion | 50,923 | 59,461 | 9,179 |
| Valuation allowance | (50,923) | (44,461) | (6,863) |
| Deferred tax assets, current portion, net | — | 15,000 | 2,316 |
| Deferred tax assets, non-current portion: | | | |
| Fixed assets | 1,291 | 1,440 | 222 |
| Net operating losses | 214,211 | 173,548 | 26,791 |
| Total deferred tax assets, non-current portion | 215,502 | 174,988 | 27,013 |
| Valuation allowance | (215,502) | (174,988) | (27,013) |
| Deferred tax assets, non-current portion, net | — | — | — |

F-27

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

**Note 13—INCOME TAX EXPENSES (continued)**

During the year ended December 31, 2015, the Company reassessed the realizability of deferred tax assets and concluded that it is more likely than not all of deferred tax assets will be realized. Therefore, the Company recognized a certain valuation allowance against deferred tax assets as of December 31, 2015.

As of December 31, 2015, the Company had net operating losses of approximately RMB701,004 (US$108,216) per income tax returns, which can be carried forward to offset future taxable incomes. The net operating losses will expire between 2017 and 2020 if not utilized.

The changes in unrecognized tax benefits are as follows:

| | As of December 31, | | | |
|---|---|---|---|---|
| | 2013 | 2014 | 2015 | |
| | RMB | RMB | RMB | US$ |
| Balance at January 1 | 282 | 244 | 244 | 38 |
| Additions based on tax positions related to the prior years | — | — | — | — |
| Reductions for tax positions of prior years | (38) | — | — | — |
| Balance at December 31 | 244 | 244 | 244 | 38 |

At December 31, 2013, 2014, and 2015, the Company had approximately RMB244, RMB244 and RMB244 (US$38) of unrecognized tax benefits related to uncertain tax positions. None of the unrecognized tax benefits would, if recognized, affect the effective tax rate. The Company does not anticipate any material changes to its uncertain tax positions in the next 12 months.

There is no interest or penalty associated with the unrecognized tax benefits, and, accordingly, no such accruals have been made in the Company's consolidated financial statements.

The PRC tax law provides a 3-5 years statute of limitation and the open tax years for which the Company's PRC subsidiaries and PRC Affiliated Entities' income tax returns are subject to examination by the PRC tax authorities from 2010 to 2015.

**Note 14—RELATED PARTY TRANSACTIONS**

a) Related parties

| Name of related parties | Relationship with the Company |
|---|---|
| Beijing Kewen Cambridge Book Co., Ltd. ("BKCB") | Entity indirectly controlled by family members of Mr. Guoqing Li, shareholder, director and chief executive officer of the Company |
| Beijing Kewen Guolue Information Technology Co., Ltd. ("BKGI") | Entity indirectly controlled by family members of Mr. Guoqing Li |
| Beijing Baoma Diary Technology Ltd. ("Baoma") | Equity method investee |
| Beijing Hechuang Technology Ltd. ("Hechuang") | Equity method investee |

F-28

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

**Note 14—RELATED PARTY TRANSACTIONS (continued)**

b)

In January 2014, the Company entered into a service agreement with BKGI for the period from January 1, 2014 to December 31, 2014 and the Company charged BKGI RMB60 for administrative service in the year ended December 31, 2014.

For the year ended December 31, 2015, the related party transactions mainly represented ordinary services provided by the Company to equity method investees amounting to RMB619 (US$96).

The balances between the Company and its related parties as of December 31, 2014 and 2015 are listed below:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | 2014 | 2015 | |
| | RMB | RMB | US$ |
| Due from related parties: | | | |
| BKCB | 258 | 331 | 51 |
| BKGI | 117 | 177 | 27 |
| Baoma | — | 1 | — |
| | 375 | 509 | 78 |
| Due to related parties: | | | |
| BKCB | 2,237 | 2,166 | 334 |
| Baoma | | 37 | 6 |
| Hechuang | — | 77 | 12 |
| | 2,237 | 2,280 | 352 |

Outstanding balances at the balance sheet dates were unsecured, interest-free, and had no specified repayment terms. There were no guarantees provided for or received from any related party receivables or payables.

F-29

**E-COMMERCE CHINA DANGDANG INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

## Note 15—EMPLOYEE BENEFITS

Full time employees of the Company in the PRC participate in a government mandated defined contribution plan, pursuant to which certain pension benefits, medical care, employee housing fund and other welfare benefits are provided to employees. Chinese labor regulations require that the PRC subsidiaries and Affiliated PRC Entities of the Company make contributions to the government for these benefits based on certain percentages of the employees' salaries. The Company has no legal obligation for the benefits beyond the contributions made. The total amounts for such employee benefits, which were expensed as incurred, were RMB86,616, RMB104,373 and RMB115,297 (US$17,799) for the years ended December 31, 2013, 2014 and 2015, respectively.

## Note 16—COMMITMENTS AND CONTINGENCIES

*Operating lease commitments*

The Company leases office and fulfillment centers under non-cancelable operating leases. Some of these lease agreements provide for periodic rental increases based on contractually agreed rates. Rental expenses under the operating leases were RMB90,085, RMB84,862 and RMB104,078 (US$16,067) for the years ended December 31, 2013, 2014 and 2015, respectively.

Future minimum lease payments under non-cancelable operating leases with initial terms of one year or more consist of the following:

| Year ended December 31, | RMB | US$ |
| --- | --- | --- |
| 2016 | 110,048 | 16,989 |
| 2017 | 92,512 | 14,281 |
| 2018 | 53,211 | 8,214 |
| 2019 | 31,537 | 4,868 |
| 2020 | 17,973 | 2,775 |
| Thereafter | 24,023 | 3,709 |
| | 329,304 | 50,836 |

*Litigation, claims and assessments*

The Company is subject to periodic legal or administrative proceedings in the ordinary course of business. Management does not expect the results of any of these actions to have a material adverse effect on the Company's business, results of operations or financial position. As of December 31, 2015, the Company has not accrued any contingent losses regarding such claims as the estimated costs were insignificant.

*Capital commitments*

The Company entered into construction agreements in connection with the construction of the proposed warehouse and office building in Tianjin, PRC. Total capital commitments contracted and reflected in the consolidated financial statements amounted to RMB7, 491 (US$1,156) as of December 31, 2015. All of these capital commitments are to be fulfilled by December 31, 2016.
As of December 31, 2015, future minimum capital commitments under non-cancelable construction contracts were as follows:

| Year ended December 31, | RMB | US$ |
| --- | --- | --- |
| 2016 | 7,491 | 1,156 |
| | 7,491 | 1,156 |

F-30

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

**Note 16—COMMITMENTS AND CONTINGENCIES (continued)**

*Copyright contract*

The Company entered into copyright contract to acquire sole agency of some books and will be required to pay minimum committed amount during the contract period. This agreement will mature in November 2020.

| Year ended December 31, | RMB | US$ |
|---|---|---|
| 2016 | 3,208 | 496 |
| 2017 | 14,667 | 2,264 |
| 2018 | 16,500 | 2,547 |
| 2019 | 16,500 | 2,547 |
| 2020 | 15,125 | 2,335 |
| | 66,000 | 10,189 |

**Note 17—COMMON SHARES**

On September 10, 2010, the shareholders of the Company approved a dual-class common share structure, and Class A and Class B common shares have identical rights except for different voting rights and conversion rights; the holders of each Class A common share issued and outstanding are entitled to one vote per share and the holders of each Class B common share issued and outstanding are entitled to ten votes per share. Each Class B common share is convertible to one Class A common share at any time whereas Class A common shares are not convertible into Class B common shares under any circumstances. In addition, if at any time Ms. Peggy Yu Yu, executive chairwoman of the Company, Mr. Guoqing Li, chief executive officer of the Company, and their affiliates collectively own less than 5% of the total number of the issued and outstanding Class B common shares (taking into account all of the issued and outstanding preferred shares on an as-converted basis), each issued and outstanding Class B common share will be automatically and immediately converted into one share of Class A common share, and the Company will not issue any Class B common shares thereafter the re-registration of common shares as Class B common shares were accounted for under the carry over basis.

F-31

[Table of Contents](#)

**E-COMMERCE CHINA DANGDANG INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

### Note 18—(LOSS) INCOME PER SHARE

Basic (loss) income per share for the years ended December 31, 2013, 2014 and 2015 is calculated as follows:

| | Year Ended December 31, | | | | | | | |
| | 2013 | | 2014 | | 2015 | | | |
| | Class A | Class B | Class A | Class B | Class A | Class A | Class B | Class B |
| | RMB | RMB | RMB | RMB | RMB | US$ | RMB | US$ |
| Basic (loss) income per share: | | | | | | | | |
| Numerator: | | | | | | | | |
| Net (loss) income attributable to Class A and Class B common shareholders for computing basic loss per Class A and Class B common share | (95,923) | (46,942) | 59,305 | 28,812 | 61,691 | 9,523 | 29,857 | 4,609 |
| Denominator: | | | | | | | | |
| Weighted average number of Class A and Class B common shares outstanding for computing basic loss per Class A and Class B common share | 269,520,110 | 131,896,605 | 271,445,384 | 131,876,660 | 272,491,397 | 272,491,397 | 131,876,660 | 131,876,660 |
| Basic (loss) income per Class A and Class B common shares | (0.36) | (0.36) | 0.22 | 0.22 | 0.23 | 0.04 | 0.23 | 0.04 |

F-32

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

### Note 18—(LOSS) INCOME PER SHARE (continued)

Diluted (loss) income per share for the years ended December 31, 2013, 2014 and 2015 is calculated as follows:

| | Year Ended December 31, | | | | | | | |
| | 2013 | | 2014 | | 2015 | | | |
| | Class A | Class B | Class A | Class B | Class A | Class B | Class B | Class B |
| | RMB | RMB | RMB | RMB | RMB | US$ | RMB | US$ |
|---|---|---|---|---|---|---|---|---|
| Diluted (loss) income per share: | | | | | | | | |
| Numerator: | | | | | | | | |
| Allocation of undistributed (loss) income for diluted net (loss) income per Class A and Class B common share computation | (95,923) | (46,942) | 60,219 | 27,898 | 62,460 | 9,642 | 29,088 | 4,491 |
| Reallocation of undistributed (loss) income as a result of conversion of Class B to Class A common shares | (46,942) | — | 27,898 | — | 29,088 | 4,491 | — | — |
| Net (loss) income attributable to Class A and Class B common shareholders for computing diluted (loss) income per Class A and Class B common share | (142,865) | (46,942) | 88,117 | 27,898 | 91,548 | 14,133 | 29,088 | 4,491 |
| Denominator: | | | | | | | | |
| Weighted average number of Class A and Class B common shares outstanding for computing basic loss per Class A and Class B common share | 269,520,110 | 131,896,605 | 271,445,384 | 131,876,660 | 272,491,397 | 272,491,397 | 131,876,660 | 131,876,660 |
| Conversion of Class B to Class A common shares | 131,896,605 | — | 131,876,660 | — | 131,876,660 | 131,876,660 | — | — |
| Dilutive options | — | — | 13,211,010 | — | 10,677,390 | 10,677,390 | — | — |
| Weighted average number of Class A and Class B common shares outstanding for computing diluted loss per Class A and Class B common share | 401,416,715 | 131,896,605 | 416,533,054 | 131,876,660 | 415,045,447 | 415,045,447 | 131,876,660 | 131,876,660 |
| Diluted (loss) income per Class A and Class B common share | (0.36) | (0.36) | 0.21 | 0.21 | 0.22 | 0.03 | 0.22 | 0.03 |

The effect of share options has been excluded from the computation of diluted loss per share for the year ended December 31, 2013, 2014 and 2015 to the extent that as the effect would be anti-dilutive.

F-33

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

**Note 19—SHARE-BASED COMPENSATION**

The Company's shareholders approved two share incentive plans in 2004 and 2010, respectively. Under the 2004 plan, the Company may issue option awards to its directors, employees and other eligible persons. The exercise price, vesting and other conditions of individual awards are determined by the board of directors of the Company and its executive chairwoman within the scope authorized by the board. The Company suspended implementing the 2004 plan on November 15, 2010, the date of effectiveness of the 2010 plan. On November 12, 2012, the Company's shareholders approved and ratified the resumption of implementing the 2004 plan, only to the extent that the Class A common shares underlying the awards forfeited after November 15, 2010 shall revive and be available for issuance pursuant to future awards under the 2004 plan, and with amendments made to the 2004 plan. Under the 2010 plan, the Company may issue restricted share units, restricted shares and options awards to the directors, employees and other eligible persons. Typically the awards are subject to a 3 to 4 year service vesting condition and expire 7 to 10 years after the grant date.

The following table summarizes the share option activity under the 2004 and 2010 Plans for the year ended December 31, 2015:

| | Number of shares | Weighted Average Per Share Exercise Price (US$) | Weighted-Average Grant-Date Fair Value Per Share (US$) | Weighted Average Remaining Contractual Term (years) | Aggregate Intrinsic Value (US$) |
|---|---|---|---|---|---|
| Outstanding, January 1, 2015 | 20,184,270 | 0.78 | 0.44 | — | — |
| Granted | 400,000 | 1.58 | 0.87 | — | — |
| Exercised | (857,870) | 0.92 | 0.70 | — | — |
| Expired | (301,405) | 1.36 | 0.92 | — | — |
| Forfeited | (1,133,745) | 1.48 | 1.15 | — | — |
| Outstanding, December 31, 2015 | 18,291,250 | 0.66 | 0.41 | 2.17 | 14,691 |
| Vested and expected to vest at December 31, 2015 | 17,766,690 | 0.65 | 0.39 | 2.11 | 14,552 |
| Exercisable at December 31, 2015 | 15,930,435 | 0.54 | 0.31 | 1.78 | 14,537 |

The aggregate intrinsic value in the table above represents the difference between the fair value of the Company's common shares as of December 31, 2015 and the exercise prices of the equity awards.

On February 9, 2015, the exercise price of certain share options was adjusted downwards from US$1.996 and US$2.714 per share to US$1.58 per share. The total incremental share-based compensation expense resulting from the modification was RMB975 (US$151), with RMB269 (US$42) recognized as additional share-based compensation expense in 2015 and RMB706 (US$109) to be recognized over the remaining vesting period.

As of December 31, 2015, there was RMB15,123 (US$2,335) of unrecognized share-based compensation costs related to equity awards that is expected to be recognized over a weighted-average vesting period of 2.08 years. To the extent the actual forfeiture rate is different from the Company's estimate; actual share-based compensation costs related to these awards may be different from the expectation.

The fair value of each option award was estimated using the binomial option pricing model by the Company, with the assistance from an independent third-party appraiser. The Company is ultimately responsible for the determination of all amounts related to share-based compensation recorded in the consolidated financial statements. The volatility assumption was calculated based on the price of the underlying common shares over the expected term of the option and the price volatility of the shares of the Company and comparable companies. The risk-free rate was based on the market yield of U.S. Treasury Bills with maturity terms equal to the expected term of the option awards. The sub optimal early exercise factor was estimated based on the vesting and contractual terms of the awards and management's expectation of exercise behavior of the grantees. Forfeitures were estimated based on historical experience.

F-34

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

**Note 19—SHARE-BASED COMPENSATION (continued)**

The following table presents the assumptions used to estimate the fair values of the share options granted/modified in the years presented:

|  | 2013 | 2014 | 2015 |
|---|---|---|---|
| Expected volatility range | 73.73%-74.20% | 74.86%-75.0% | 61.0%-64.0% |
| Risk-free interest rate | 2.0%-2.25% | 2.14%-2.17% | 1.46%-1.52% |
| Dividend yield | 0% | 0% | 0% |
| Sub optimal early exercise factor | 1.5-2.5 | 1.5-2.8 | 1.5-2.8 |

The aggregate intrinsic value of the equity awards exercised for the three years ended December 31, 2013, 2014 and 2015, was RMB1,971, RMB2,013 and RMB452 (US$70), respectively. The total fair value of the equity awards vested during the years ended December 31, 2013, 2014 and 2015 was RMB12,711, RMB15,451, and RMB16,232 (US$2,506), respectively.

The weighted-average grant-date fair value of options granted during the years ended December 31, 2013, 2014, and 2015 was US$1.03, US$1.18 and US$0.87, respectively.

Total share-based compensation expenses relating to options granted to employees and directors for the years ended December 31, 2013, 2014 and 2015 are included in:

|  | 2013 | 2014 | 2015 | |
|---|---|---|---|---|
|  | RMB | RMB | RMB | US$ |
| Fulfillment | 1,755 | 2,126 | 1,946 | 300 |
| Marketing | 412 | 509 | 638 | 98 |
| Technology and content | 964 | 1,075 | 1,138 | 176 |
| General and administrative | 7,977 | 6,707 | 4,875 | 753 |

F-35

Table of Contents

**E-COMMERCE CHINA DANGDANG INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(Amounts in thousands of Renminbi ("RMB") and US Dollar ("US$")**
**except for number of shares and per share data)**

### Note 20—RESTRICTED NET ASSETS

The Company's ability to pay dividends is primarily dependent on the Company receiving distributions of funds from its subsidiaries. Relevant PRC statutory laws and regulations permit payments of dividends by the Company's subsidiaries only out of its retained earnings, if any, as determined in accordance with PRC accounting standards and regulations. The results of operations reflected in the financial statements prepared in accordance with U.S. GAAP differ from those reflected in the statutory financial statements of the Company's subsidiaries.

In accordance with the PRC Regulations on Enterprises with Foreign Investment and their articles of association, a foreign invested enterprise established in the PRC is required to provide certain statutory reserves, namely general reserve fund, the enterprise expansion fund and staff welfare and bonus fund which are appropriated from net profit as reported in the enterprise's PRC statutory accounts. A foreign invested enterprise is required to allocate at least 10% of its annual after-tax profit to the general reserve until such reserve has reached 50% of its respective registered capital based on the enterprise's PRC statutory accounts. Appropriations to the enterprise expansion fund and staff welfare and bonus fund are at the discretion of the board of directors for all foreign invested enterprises. The aforementioned reserves can only be used for specific purposes and are not distributable as cash dividends. Dangdang Information, Wuxi Dangdang Information and Tianjin Dangdang Information were established as foreign invested enterprises and therefore are subject to the above mandated restrictions on distributable profits. Furthermore, cash transfers from subsidiaries to the Company outside of China are subject to PRC government control of currency conversion.

Additionally, in accordance with the Company Law of the PRC, a domestic enterprise is required to provide at least 10% of its annual after-tax profit to the statutory common reserve until such reserve has reached 50% of its respective registered capital based on the enterprise's PRC statutory accounts. A domestic enterprise is also required to provide discretionary surplus reserve, at the discretion of the board of directors, from the profits determined in accordance with the enterprise's PRC statutory accounts. The aforementioned reserves can only be used for specific purposes and are not distributable as cash dividends. Dangdang Kewen and Wuxi Dangdang Kewen were established as a domestic invested enterprise and therefore are subject to the above mentioned restrictions on distributable profits.

As a result of these PRC laws and regulations that require annual appropriations of 10% of after-tax income to be set aside prior to payment of dividends as general reserve fund, the Company's PRC subsidiaries are restricted in their ability to transfer a portion of their net assets to the Company. Since Dangdang Information, Dangdang Kewen, Wuxi Dangdang Information, Wuxi Dangdang Kewen, Tianjin Dangdang Information, Sichuan Dangdang Information, Shaanxi Dangdang Information, Jiangsu Dangdang Information, Guizhou Dangdang Information and Wuhan Dangdang Kewen were in an accumulated loss position, no such reserve fund was appropriated for the three years ended December 31, 2013, 2014 and 2015.

As of December 31, 2014 and 2015, the total net assets of the Company's PRC subsidiaries including the Affiliated PRC Entities were negative. Therefore, condensed financial information of the Company is not presented.

F-36