UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOE FASANO; ALTIMEO OPTIMUM FUND; and
ALTIMEO ASSET MANAGEMENT, individually and
on behalf of all others similarly situated,

Plaintiffs,

v.

GUOQING LI; PEGGY YU YU; DANGDANG
HOLDING COMPANY, LTD.; E-COMMERCE
CHINA DANGDANG INC.; KEWEN HOLDING CO.
LTD.; SCIENCE & CULTURE LTD.; FIRST PROFIT
MANAGEMENT, LTD.; DANQIAN YAO; LIJUN
CHEN; MIN KAN; RUBY RONG LU; KE ZHANG;
and XIAOLONG LI,

Defendants.

16 Civ. 8759 (KPF)

---

**MEMORANDUM OF LAW IN SUPPORT OF
<u>DEFENDANTS' MOTION TO VACATE CLAUSE CONSTRUCTION AWARD</u>**

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

Bradley A. Klein (pro hac vice)
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7000

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

Scott D. Musoff
Timothy G. Nelson
Christopher R. Fredmonski
One Manhattan West
New York, New York 10001
(212) 735-3000

*Attorneys for Defendants
E-Commerce China Dangdang, Inc.;
Dangdang Holding Company Ltd.;
Kewen Holding Co. Ltd.; Science & Culture
International Ltd.; First Profit Management,
Ltd.; Guoqing Li; Peggy Yu Yu; Danqian
Yao; Lijun Chen; and Min Kan*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 3

    A.    Factual Background .................................................................................. 3

    B.    Procedural History ................................................................................... 4

        1.    The Previous Federal Court Proceedings ................................................ 4

        2.    The Arbitration Proceedings ................................................................. 6

ARGUMENT ......................................................................................................... 7

I.    The Clause Construction Award Should Be
Vacated Because the Tribunal Exceeded Its Powers ......................................... 7

    A.    Applicable FAA Standards ......................................................................... 7

        1.    Individualized Arbitration, Not Class Arbitration, Is the Default .............. 8

        2.    Consent to Class Arbitration May
Not Be Presumed from Silence or Ambiguity .......................................... 10

    B.    The Tribunal Improperly Imposed Its Own View of Sound Policy ..................... 12

        1.    The Tribunal Created a New Rule of Decision from Which It
Inferred Consent to Class Arbitration from Silence or Ambiguity ........... 13

        2.    The Tribunal's Other Contractual Analysis
Cannot Obscure that Its Decision Was Policy-Based ............................... 18

    C.    The Arbitration Clause Itself Prohibits the Clause Construction Award .............. 21

II.    The Clause Construction Award Should Also Be Vacated Because the
Tribunal Manifestly Disregarded Controlling Supreme Court Precedent ......................... 23

III.    The New York Convention Also Supports Vacatur ......................................... 24

CONCLUSION ....................................................................................................... 24

i

## TABLE OF AUTHORITIES

**CASES**

*Anwar v. Fairfield Greenwich Ltd.*,
  950 F. Supp. 2d 633 (S.D.N.Y. 2013)...................................................................20

*Aspic Engineering & Construction Co. v. ECC Centcom Constructors LLC*,
  913 F.3d 1162 (9th Cir. 2019) .............................................................................21

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011).............................................................................................8, 9

*Breed v. Insurance Co. of North America*,
  46 N.Y.2d 351 (1978) ............................................................................................17

*Catamaran Corp. v. Towncrest Pharmacy*,
  864 F.3d 966 (8th Cir. 2017) ................................................................................11

*Catamaran Corp. v. Towncrest Pharmacy*,
  946 F.3d 1020 (8th Cir. 2020) ..............................................................................20

*CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*,
  850 F.3d 58 (2d Cir. 2017)....................................................................................24

*Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*,
  17 N.Y.3d 269 (2011) ............................................................................................17

*Cobarruviaz v. Maplebear, Inc.*,
  143 F. Supp. 3d 930 (N.D. Cal. 2015) ..................................................................20

*Dewan v. Walia*,
  544 F. App'x 240 (4th Cir. 2013) ..........................................................................18

*Donohue v. Cuomo*,
  38 N.Y.3d 1 (2022) ................................................................................................17

*Dorman v. Cohen*,
  66 A.D.2d 411 (1st Dep't 1979) ...........................................................................16

*Drip Capital, Inc. v. M/S. Goodwill Apparels*,
  665 F. Supp. 3d 511 (S.D.N.Y. 2023)...................................................................24

*EEOC v. Waffle House, Inc.*,
  534 U.S. 279 (2002)................................................................................................8

*Epic Systems Corp. v. Lewis*,
  584 U.S. 497 (2018)..............................................................................................8, 9

*Fahnestock & Co. v. Waltman*,
　935 F.2d 512 (2d Cir. 1991)...................................................................24

*Fasano v. Li*,
　47 F.4th 91 (2d Cir. 2022) ......................................................................5

*Fasano v. Yu Yu*,
　921 F.3d 333 (2d Cir. 2019)......................................................................5

*First Options of Chicago, Inc. v. Kaplan*,
　514 U.S. 938 (1995)...........................................................................11, 12

*Green Tree Financial Corp. v. Bazzle*,
　539 U.S. 444 (2003)................................................................................11

*Halligan v. Piper Jaffray, Inc.*,
　148 F.3d 197 (2d Cir. 1998)....................................................................23

*Heckman v. Live Nation Entertainment, Inc.*,
　120 F.4th 670 (9th Cir. 2024) .................................................................9

*Hunter v. Kaiser Foundation Health Plan, Inc.*,
　434 F. Supp. 3d 764 (N.D. Cal. 2020) ..................................................19

*Jock v. Sterling Jewelers Inc.*,
　942 F.3d 617 (2d Cir. 2019)....................................................................12

*Jock v. Sterling Jewelers Inc.*,
　646 F.3d 113 (2d Cir. 2011)...............................................................7, 21

*KLS Diversified Master Fund, L.P. v. McDevitt*,
　507 F. Supp. 3d 508 (S.D.N.Y. 2020), *aff'd*,
　No. 21-1263, 2022 WL 2759055 (2d Cir. July 13, 2022)....................16

*Lamps Plus, Inc. v. Varela*,
　587 U.S. 176 (2019)...................................................................... passim

*Maison Lazard et Compagnie v. Manfra, Tordella & Brooks, Inc.*,
　585 F. Supp. 1286 (S.D.N.Y. 1984)........................................................17

*New York Telephone Co. v. Communications Workers of America Local 1100*,
　256 F.3d 89 (2d Cir. 2001)......................................................................23

*New York University v. Factory Mutual Insurance Co.*,
　374 F. Supp. 3d 315 (S.D.N.Y. 2019), *aff'd*,
　No. 20-1093-cv, 2021 WL 3136078 (2d Cir. July 26, 2021).............17

*NCR Corp. v. Jones*,
    157 F. Supp. 3d 460 (W.D.N.C. 2016) ...........................................................22

*Oxford Health Plans LLC v. Sutter*,
    569 U.S. 564 (2013) ......................................................................................2, 14

*Parsons & Whittemore Overseas Co. v. Societe Generale*
    *De L'Industrie Du Papier (RAKTA)*,
    508 F.2d 969 (2d Cir. 1974).............................................................................24

*Quadrant Structured Products Co. v. Vertin*,
    23 N.Y.3d 549 (2014) ......................................................................................17

*Reed Elsevier, Inc. v. Crockett*,
    734 F.3d 594 (6th Cir. 2013) ...........................................................................20

*Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*,
    559 U.S. 662 (2010)................................................................................. passim

*U.S. Bank National Association v. DLJ Mortgage Capital, Inc.*,
    38 N.Y.3d 169 (2022) ......................................................................................18

*Varela v. Lamps Plus, Inc.*,
    No. CV 16-577-DMG (KSx), 2016 WL 9110161 (C.D. Cal. July 7, 2016),
    *rev'd*, 701 F. App'x 670 (9th Cir. 2017), *rev'd*, 587 U.S. 176 (2019)..............18

*Viking River Cruises, Inc. v. Moriana*,
    596 U.S. 639 (2022).........................................................................................9

*Weiss v. Sallie Mae, Inc.*,
    939 F.3d 105 (2d Cir. 2019).............................................................................23

*Wells Fargo Advisors, LLC v. Sappington*,
    884 F.3d 392 (2d Cir. 2018).............................................................................18

*Wells Fargo Advisors, LLC v. Tucker*,
    373 F. Supp. 3d 418 (S.D.N.Y. 2019)..............................................................15

*Wilko v. Swan*,
    346 U.S. 427 (1953), *overruled on other grounds by Rodriguez de Quijas v.*
    *Shearson/American Express, Inc.*, 490 U.S. 477 (1989) ...................................7

## STATUTES

9 U.S.C. § 10(a)(4).............................................................................7, 13, 18, 21

9 U.S.C. § 10(b) ...............................................................................................24

9 U.S.C. §§ 201-208 ........................................................................................................24

**SECONDARY SOURCES**

22 N.Y. Jur. 2d Contracts § 204 (2d ed. Nov. 2024 Update).........................................17

AAA-ICDR® Clause Drafting, Standard Arbitration Clause (International), American
    Arbitration Association, https://www.adr.org/Clauses .......................................19

JAMS Standard Arbitration Clause for International Commercial Contracts, JAMS,
    https://www.jamsadr.com/clauses/#Standard .....................................................19

Defendants E-Commerce China Dangdang Inc. ("Dangdang"); Dangdang Holding Company Ltd.; Kewen Holding Company Ltd.; Science & Culture International Ltd.; First Profit Management, Ltd.; Guoqing Li; Peggy Yu Yu; Danqian Yao; Lijun Chen; and Min Kan (collectively "Defendants") submit this memorandum of law in support of their motion to vacate an October 22, 2024 partial final award (the "Clause Construction Award") that, by a 2-1 majority, construed the parties' arbitration clause as permitting class arbitration.[1]

## <u>INTRODUCTION</u>

The Federal Arbitration Act ("FAA") "imposes certain rules of fundamental importance, including the basic precept that arbitration is a matter of consent, not coercion." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010). It also "presume[s]" that parties have not consented to class arbitration—and thereby "undermine[d] the central benefits of arbitration itself"—without an unambiguous, "affirmative contractual basis for concluding that the part[ies] *agreed* to" resolve disputes through classwide arbitration. *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 185-86 (2019) (emphasis in original). An arbitration agreement's silence or ambiguity on the issue of class arbitration "is not enough; the FAA requires more." *Id.* at 185.

Within the confines of these established "rule[s] of decision," supplemented by any applicable state-law "default rule[s]," an arbitrator's task is simple: "ensure that private agreements to arbitrate are enforced according to their terms." *Stolt-Nielsen*, 599 U.S. at 673, 682. For it is the parties—not arbitrators—who decide "with whom they will arbitrate, the issues subject to arbitration, the rules by which they will arbitrate, and the arbitrators who will resolve their disputes." *Lamps Plus*, 587 U.S. at 184. And while the FAA generally provides for limited judicial

---

[1]    Reference herein is made to the Joint Local Rule 56.1 Statement of Facts ("SOF") and the exhibits attached to the Declaration of Timothy G. Nelson dated November 20, 2024, filed herewith. Unless otherwise noted, all emphasis is added and internal citations and quotations marks are omitted.

review of arbitral awards, it also ensures that arbitrators do not exceed the powers delegated to them by the parties. Arbitration awards must be vacated when the arbitrators "stray[] from interpretation and application of the agreement and effectively dispense[] [their] own brand of industrial justice." *Stolt-Nielsen*, 559 U.S. at 671.

That is precisely what happened here. A three-member arbitration panel (the "Tribunal"), by a divided vote, concluded that a standard agreement to arbitrate—one that tracks the standard language recommended by the American Arbitration Association ("AAA") and JAMS, incorporates default AAA arbitration rules, and makes no mention of class arbitration at all— somehow evidences *unambiguous* consent to arbitrate class claims. The Tribunal majority's conclusion is foreclosed by the FAA, Supreme Court precedent, New York law, and the parties' agreement itself.

The Clause Construction Award does not reflect mere "mistakes" in applying the law or interpreting the contract. *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 572 (2013). It disregards controlling Supreme Court precedent and effectively flips the default presumption against class arbitration on its head. If upheld, the Clause Construction Award would require class arbitration any time an arbitration clause incorporates standard arbitration language and would effectively place the burden on the party or parties opposing class arbitration to *disprove* consent to class procedures. Judge David F. Levi (Ret.), the only former federal judge on the Tribunal, observed in his dissenting opinion that the Tribunal majority's decision is "convoluted," "illogical," and "inconsistent with the holding and reasoning of *Stolt-Nielsen*." (Ex. 2 at 19-20.) As in *Stolt-Nielsen*, "[t]he conclusion is inescapable that the [Tribunal majority] simply imposed its own conception of sound policy," 559 U.S. at 675—*i.e.*, that class arbitrations presumptively should be favored in cases like this one. The Clause Construction Award should be vacated.

## BACKGROUND

### A.    Factual Background

This action follows a September 20, 2016 going-private transaction (the "Merger"), through which a buyer group with 83.6% voting power cashed out Plaintiffs and other minority holders of Dangdang's American Depositary Shares ("ADSs") at a premium over the then-market price for Dangdang's ADSs. (*See* SOF ¶¶ 2, 8; ECF No. 79 ¶¶ 1-5, 52.) The buyer group held enough votes to approve the Merger itself, and so the votes of Plaintiffs and the putative class members were not required to approve the Merger. (*See* ECF No. 79 ¶¶ 1, 19, 54, 78-80.) Dangdang is a leading e-commerce company based in China and incorporated under the laws of the Cayman Islands. (*See* SOF ¶ 1.) Dangdang's corporate parent, Dangdang Holding Company Ltd., is also incorporated in the Cayman Islands and based in China. (*See id.* ¶ 9.) The individual defendants were directors and officers of Dangdang at the time of the Merger. (*See id.* ¶ 10.) The remaining defendants are investment vehicles that are incorporated under the laws of the British Virgin Islands and allegedly controlled by certain of the defendants. (*See id.* ¶ 11.)

Dangdang went public in 2010, and its ADSs traded on the New York Stock Exchange. (*See id.* ¶ 2.) Ownership of the ADSs was governed by a Deposit Agreement and evidenced by American Depositary Receipts ("ADRs"), a form of which is attached as Exhibit A to the Deposit Agreement. (*See id.* ¶ 3.) By acquiring Dangdang's ADSs, Plaintiffs agreed to the following arbitration clause:

> Any controversy, claim or cause of action brought by any party hereto against the Company arising out of or relating to the Shares or other Deposited Securities, the American Depositary Shares, the Receipts or the Deposit Agreement, or the breach thereof, shall be settled by arbitration in accordance with the International Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof; provided, however, that in the event of any third-party litigation to which the Depositary is a party and to which the Company may properly be joined, the Company may be so joined in any court in which such litigation is proceeding; and

provided, further, that any such controversy, claim or cause of action brought by a party hereto against the Company relating to or based upon the provisions of the Federal securities laws of the United States or the rules and regulations promulgated thereunder shall be submitted to arbitration as provided in Section 7.06 of the Deposit Agreement if, but only if, so elected by the claimant.

The place of the arbitration shall be The City of New York, State of New York, United States of America, and the language of the arbitration shall be English.

The number of arbitrators shall be three, each of whom shall be disinterested in the dispute or controversy, shall have no connection with any party thereto, and shall be an attorney experienced in international securities transactions. Each party shall appoint one arbitrator and the two arbitrators shall select a third arbitrator who shall serve as chairperson of the tribunal. If a dispute, controversy, or cause of action shall involve more than two parties, the parties shall attempt to align themselves in two sides (i.e., claimant(s) and respondent(s)), each of which shall appoint one arbitrator as if there were only two parties to such dispute, controversy or cause of action. If such alignment or appointment shall not have occurred within thirty (30) calendar days after the initiating party serves the arbitration demand, the American Arbitration Association shall appoint the three arbitrators, each of whom shall have the qualifications described above. The parties and the American Arbitration Association may appoint from among the nationals of any country, whether or not a party is a national of that country.

The arbitral tribunal shall have no authority to award any consequential, special or punitive damages or other damages not measured by the prevailing party's actual damages and may not, in any event, make any ruling, finding or award that does not conform to the terms and conditions of this Deposit Agreement.

(Ex. 4 at Ex. A § 23(a) (the "Arbitration Clause").) As this Court has recognized, the Arbitration Clause "is silent on the issue of class arbitrability." (ECF No. 130 at 27.)

## B.    **Procedural History**

### 1.    **The Previous Federal Court Proceedings**

Plaintiffs filed this action on November 10, 2016, on behalf of themselves and a putative class of former ADS holders. (*See* SOF ¶ 13.) They claim to have been "cashed out at artificially deflated prices" due to certain "misrepresentations and legal violations" allegedly made by Defendants. (ECF No. 79 ¶¶ 2, 143.) In their original complaint, Plaintiffs asserted claims for violation of Section 13(e) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule

13e-3 promulgated thereunder, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligent misrepresentation, and "quasi-appraisal." (*See* SOF ¶ 13.)

Defendants moved to dismiss the original complaint on *forum non conveniens* grounds, and this Court granted that motion. (*See id.* ¶ 14.) On appeal, the Second Circuit vacated the Court's dismissal order and remanded for the Court to consider the "scope and enforceability" of the Arbitration Clause. *Fasano v. Yu Yu*, 921 F.3d 333, 337 (2d Cir. 2019).

On remand, Plaintiffs filed their Amended Complaint, which remains the operative complaint. (*See* SOF ¶ 17.) The Amended Complaint contains the same factual allegations as did the original complaint but includes different causes of action. Plaintiffs now assert claims for violations of Sections 10(b), 13(e), and 20(a) of the Exchange Act and Rules 10b-5 and 13e-3 promulgated thereunder, as well as for negligent misrepresentation under New York law, breach of "heightened fiduciary duties" under the "Sarbanes-Oxley Act Code of Conduct and NYSE Listing Standards," and aiding and abetting breach of fiduciary duties. (*See id.*)

Defendants renewed their motion to dismiss on *forum non conveniens* grounds and also moved to dismiss the Amended Complaint for failure to state a claim under Rule 12(b)(6). (*See id.* ¶ 18.) The Court again dismissed the action for *forum non conveniens* and concluded that the alternative Rule 12(b)(6) motion had been rendered moot. (*See id.* ¶ 19.) On appeal, the Second Circuit vacated the Court's dismissal order and remanded for the Court "to consider Defendants' motion to dismiss for failure to state a claim." *Fasano v. Li*, 47 F.4th 91, 105 (2d Cir. 2022). In its opinion, the Second Circuit observed that, based on the Arbitration Clause, Plaintiffs' "common-law claims can be pursued only in a New York arbitration." *Id.* Two weeks later, Plaintiffs filed a Notice of Arbitration with the International Centre for Dispute Resolution ("ICDR"), the international division of the AAA, seeking to arbitrate their common-law claims. (*See* SOF ¶ 22.)

On remand, Defendants renewed their Rule 12(b)(6) motion and also moved to stay the arbitration. (*See id.* ¶ 24.) Plaintiffs cross-moved to compel arbitration of their common-law claims. (*See id.* ¶ 25.) On September 27, 2023, this Court granted Plaintiffs' motion to compel, denied Defendants' motion to dismiss without prejudice to its renewal after arbitration, and stayed this case pending the outcome of the arbitration. (*See id.* ¶ 26.) In its opinion and order, the Court held that, pursuant to the Arbitration Clause, the arbitrators (and not the Court) must decide in the first instance whether Plaintiffs' common-law claims are arbitrable as class claims (as opposed to merely individual claims). (*See* ECF No. 130 at 26-30.)

### 2.     The Arbitration Proceedings

With the federal case stayed, the parties turned to the arbitration of Plaintiffs' common-law claims before the ICDR. Pursuant to the Arbitration Clause, the parties appointed the Tribunal comprised of: (1) Hon. David F. Levi, former Dean of Duke School of Law, Chief Judge for the U.S. District Court for the Eastern District of California, and United States Attorney for the Eastern District of California; (2) William H. Narwold, Esq.; and (3) Charles J. Moxley, Jr., Esq., who was appointed as the Tribunal chair. (*See* SOF ¶ 27.)

Before the Tribunal, the parties disputed whether the Arbitration Clause permits class arbitration. (*See id.* ¶ 28.) In a partial final award dated October 22, 2024, a majority of the Tribunal (Messrs. Moxley and Narwold) concluded that it does. (*See id.* ¶ 30.) The Tribunal majority found that "the unambiguous language of the Arbitration Agreement"—which they defined as the entire Deposit Agreement and the form ADR attached to it—reflected that the parties "agreed to class arbitration." (Ex. 1 ¶ 38; *see also id.* ¶¶ 2, 120 (defining "Arbitration Agreement").) It relied in particular on the canon of construction *expressio unius est exclusio alterius*, which it said "leads to the same conclusion." (*Id.* ¶ 38.)

Judge Levi issued a vigorous, 22-page dissent. (*See* SOF ¶ 31.) Judge Levi concluded that

the Arbitration Clause provides "no basis on which to find 'affirmative' unambiguous contractual language consenting to class proceedings." (Ex. 2 at 12.) Indeed, he found that the Arbitration Clause's "silence" on the class-arbitration issue was "deafening." (*Id.* at 9.) Judge Levi opined that the Tribunal majority's reasoning was "convoluted," "illogical," and "inconsistent with the holding and reasoning of *Stolt-Nielsen*." (*Id.* at 19-20.) He explained that "contractual language that is consistent with a broadly stated but non-class arbitration agreement is not an affirmative, unambiguous basis on which to infer consent to a class arbitration." (*Id.* at 3.) With regard to the Tribunal majority's reliance on the *expressio unius* canon, Judge Levi explained that "the absence of a disclaimer of consent to arbitration is not an affirmative indication of consent," since "the default is non-class arbitration and not the other way around." (*Id.*)

Pursuant to Rule 3 of the AAA's Supplementary Rules for Class Arbitrations (the "AAA Class Rules"), the Tribunal stayed the arbitration for 30 days to allow either party to move to confirm or vacate the Clause Construction Award. (*See* SOF ¶ 32.) This motion followed.

## ARGUMENT

### I.    The Clause Construction Award Should Be Vacated Because the Tribunal Exceeded Its Powers

### A.    Applicable FAA Standards

The FAA expressly authorizes vacatur of an arbitration award "where the arbitrators exceeded their powers." 9 U.S.C. § 10(a)(4). Arbitrators "exceed [their] authority" when they "reach[] issues clearly prohibited by law or by the terms of the parties' agreement." *Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 122 (2d Cir. 2011) ("*Jock I*"); *see also Wilko v. Swan*, 346 U.S. 427, 436 (1953) ("failure of the arbitrators to decide in accordance with" applicable law can "constitute grounds for vacating [an] award"), *overruled on other grounds by Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477 (1989). This standard is met when the arbitrators "stray[]

from interpretation and application" of the parties' agreement and "effectively dispense[] [their] own brand of industrial justice" or "impose[] [their] own conception of sound policy." *Stolt-Nielsen*, 559 U.S. at 671, 675. Under the FAA, "the task of an arbitrator is to interpret and enforce a contract, not to make public policy." *Id.* at 672.

As shown below, the Tribunal exceeded its powers in issuing the Clause Construction Award, which runs counter to the express limitations established by the Supreme Court and is foreclosed by the plain text of the Arbitration Clause itself. It authorized class arbitration based only on a broadly worded arbitration clause that requires arbitration (and precludes litigation) of non-securities claims arising out of or relating to Dangdang's ADSs, but does not even mention class arbitration. Yet the Supreme Court has repeatedly held that a party may not be forced into class arbitration without an unambiguous, affirmative contractual basis showing consent to class arbitration. *See Lamps Plus*, 587 U.S. at 185; *Stolt-Nielsen*, 559 U.S. at 687. And because class proceedings are inconsistent with the ordinary workings of arbitration, such consent may not be inferred from a mere agreement to arbitrate or an ambiguous contract. *See Lamps Plus*, 587 U.S. at 185. The Clause Construction Award should be vacated under *Stolt-Nielsen* and *Lamps Plus*.

### 1.    Individualized Arbitration, Not Class Arbitration, Is the Default

Congress enacted the FAA to "manifest a liberal federal policy favoring arbitration agreements." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002). The "virtues Congress originally saw in arbitration" are "its speed and simplicity and inexpensiveness." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 509 (2018). "[P]arties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 348 (2011).

Consistent with these virtues, the Supreme Court has repeatedly recognized that "one of

arbitration's fundamental attributes" is its "*individualized* nature." *Epic Sys.*, 584 U.S. at 508; *see also Concepcion*, 563 U.S. at 349 ("[C]lass arbitration was not even envisioned by Congress when it passed the FAA in 1925[.]"). Indeed, "individualized" arbitration—unlike "class or collective arbitration"—is "the prototype" of the "informal form of arbitration" that the FAA protects. *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 656, 658 (2022). While the "absence of multilayered review makes it more likely that errors will go uncorrected," "[d]efendants are willing to accept the costs of these errors in arbitration, since their impact is limited to the size of individual disputes, and presumably outweighed by savings from avoiding the courts." *Concepcion*, 563 U.S. at 350.

Class arbitration, on the other hand, "undermines the most important benefits of" arbitration "and makes the process slower, more costly, and more likely to generate procedural morass than final judgment." *Lamps Plus*, 587 U.S. at 183, 185. In fact, "class arbitration *requires* procedural formality"—so much so that the AAA Class Rules "mimic the Federal Rules of Civil Procedure for class litigation." *Concepcion*, 563 U.S. at 349 (emphasis in original). Otherwise, class arbitration would "raise[] serious due process concerns by adjudicating the rights of absent members of the plaintiff class . . . with only limited judicial review." *Lamps Plus*, 587 U.S. at 185. Thus, class arbitration then ends up looking just "like the litigation it was meant to displace." *Epic Sys.*, 584 U.S. at 509. Class arbitration also "greatly increases risks to defendants," particularly given the limited bases for vacating an arbitration award. *Concepcion*, 563 U.S. at 350. "[W]hen damages allegedly owed to tens of thousands of potential claimants are aggregated and decided at once, the risk of an error will often become unacceptable" to defendants. *Id.* And these risks may "pressure[]" defendants "into settling questionable claims." *Id.*

In light of these problems, "[t]he Supreme Court has consistently disparaged the use of aggregation in arbitration." *Heckman v. Live Nation Entm't, Inc.*, 120 F.4th 670, 690 (9th Cir.

2024). It is against this backdrop that "courts and arbitrators must give effect to the contractual rights and expectations of the parties." *Stolt-Nielsen*, 559 U.S. at 682. Given "the 'fundamental' difference between class arbitration and the individualized form of arbitration envisioned by the FAA," the Supreme Court has "refus[ed] to infer consent" to class arbitration. *Lamps Plus*, 587 U.S. at 184-85. Indeed, as a "default rule," the FAA "presumes that parties have *not* authorized" class arbitration. *Id.* at 185, 189; *see also Stolt-Nielsen*, 559 U.S. at 685-86 (there is "reason to doubt the parties' mutual consent to resolve disputes through class-wide arbitration").

### 2. Consent to Class Arbitration May Not Be Presumed from Silence or Ambiguity

Because arbitration eschews the "procedural rigor and appellate review of the courts," the "first principle" of the Supreme Court's FAA jurisprudence is that "arbitration is strictly a matter of consent." *Lamps Plus*, 587 U.S. at 184. Arbitrators "derive their powers from the parties' agreement to forgo the legal process and submit their disputes to private dispute resolution," and thus "wield only the authority they are given." *Id.* Arbitrators exceed "their limited powers under the FAA," and thus are subject to vacatur, when they "presume" that an arbitration agreement's "mere silence on the issue of class-action arbitration constitutes consent" to class proceedings. *Stolt-Nielsen*, 559 U.S. at 687.

In *Stolt-Nielsen*, the Supreme Court held that the Second Circuit should have affirmed the District Court's vacatur of an arbitration award that imposed class arbitration on parties whose agreement was "silent" on that issue. *Id.* at 667, 687. The arbitration clause in *Stolt-Nielsen* required arbitration of "[a]ny dispute arising from the making, performance or termination" of the parties' shipping contract; it said nothing about class procedures. *Id.* at 667. Based on that agreement, the Supreme Court held that "the arbitrators' proper task was to identify the rule of law that governs in that situation"—either the FAA, maritime law, or New York law. *Id.* at 673. The

arbitration panel "exceeded its powers" by instead "proceed[ing] as if it had the authority of a common-law court to develop what it viewed as the best rule to be applied" and construed the arbitration clause "as allowing class arbitration in the absence of express consent." *Id.* at 673-74. According to the Supreme Court, "[t]he conclusion [was] inescapable that the panel simply imposed its own conception of sound policy." *Id.* at 675.[2]

The same is true if arbitrators infer consent to class arbitration from "an ambiguous agreement." *Lamps Plus*, 587 U.S. at 189. In *Lamps Plus*, the Supreme Court held "the FAA similarly bars an order requiring class arbitration when an agreement is not silent, but rather 'ambiguous' about the availability of such arbitration." *Id.* at 179. In so holding, the Supreme Court reversed the Ninth Circuit's determination that an arbitration clause that it viewed as "ambiguous" under California law could be construed against the drafter and interpreted as authorizing class arbitration. *See id.* at 179-80, 189. *Lamps Plus* confirmed that arbitrators "may not infer consent to participate in class arbitration absent an affirmative 'contractual basis for concluding that the party *agreed* to do so.'" *Id.* at 185 (emphasis in original) (quoting *Stolt-Nielsen*, 559 U.S. at 684). The affirmative, textual evidence of consent to class arbitration must be "clear and unmistakable." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). An agreement

---

[2]    *Stolt-Nielsen* answered a question left open in *Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444 (2003) (cited in Ex. 1 ¶¶ 42, 44-45), and established a "rule to be applied in deciding whether class arbitration is permitted." *Stolt-Nielsen*, 559 U.S. at 680. In *Bazzle*, the Supreme Court vacated a judgment of the South Carolina Supreme Court that interpreted an arbitration clause that was "silent as to whether arbitration might take the form of class arbitration" as "permitting class arbitration" under South Carolina law. *Bazzle*, 539 U.S. at 447 (plurality opinion). "[N]o single rationale commanded a majority," and Justice Stevens "concurred in the judgment vacating and remanding because otherwise there would have been 'no controlling judgment of the Court,' but he did not endorse the plurality's rationale." *Stolt-Nielsen*, 559 U.S. at 678-79 (quoting *Bazzle*, 539 U.S. at 455). As recognized by the Eight Circuit, the Supreme Court has since "disavowed the *Bazzle* plurality's decision" in *Stolt-Nielsen* and *Oxford Health*. *Catamaran Corp. v. Towncrest Pharm.*, 864 F.3d 966, 971 (8th Cir. 2017).

that is silent on class arbitration, or that is ambiguous on this issue, does not suffice.[3]

The Second Circuit has stated in dicta that *Stolt-Nielsen* does not preclude finding "implicit consent to class procedures" in an arbitration agreement. *Jock v. Sterling Jewelers Inc.*, 942 F.3d 617, 626 (2d Cir. 2019) ("*Jock II*"). It is not clear, however, that this proposition can be squared with the Supreme Court's ruling in *Lamps Plus*. But even assuming that a theory of "implicit consent" were potentially viable, the Supreme Court's class-arbitration decisions make clear that such consent must be both affirmative and unambiguous; it may not be inferred from "silence" or "ambiguity," *Lamps Plus*, 587 U.S. at 185, or "solely from the fact of the parties' agreement to arbitrate," *Stolt-Nielsen*, 559 U.S. at 685. And when "state contract principles" conflict with the FAA's requirement of "*affirmative*," unambiguous consent to class arbitration, such principles are "preempted." *Lamps Plus*, 587 U.S. at 183, 185 (citing *Concepcion*, 563 U.S. at 352).[4]

## B.    The Tribunal Improperly Imposed Its Own View of Sound Policy

As in *Stolt-Nielsen*, the conclusion is "inescapable" that the Tribunal exceeded its authority by imposing its "own conception of sound policy," *Stolt-Nielsen*, 559 U.S. at 675, instead of applying the "default" rules provided by the Supreme Court and New York law, which governs

---

[3]    Although *First Options* addressed a different issue—namely, "who" (court or arbitrator) should decide questions of arbitrability, *see* 514 U.S. at 942-45—*Lamps Plus* drew on the "same reasoning" underlying this "fundamental arbitration question[]" to "refus[e] to infer consent" to class arbitration. 587 U.S. at 185-86.

[4]    The Supreme Court itself has never held that consent to class arbitration may be "implicit." *Jock II*, 942 F.3d at 626. To the contrary, in the context of why "it cannot be presumed [that] parties consented to [class-action arbitration] by simply agreeing to submit their disputes to an arbitrator," *Stolt-Nielsen* stated that an arbitrator *may not* infer an "implicit agreement to authorize class-action arbitration . . . solely from the fact of the parties' agreement to arbitrate." 559 U.S. at 686. While *Stolt-Nielsen* had "no occasion to decide what contractual basis may support a finding that the parties agreed to authorize class-action arbitration," *id.* at 687 n.10, *Lamps Plus* held that any such contractual basis must be "affirmative" and unambiguous. 587 U.S. at 185; *see also Stolt-Nielsen*, 559 U.S. at 682 (the "primary purpose of the FAA is to ensure that private agreements to arbitrate are enforced *according to their terms*" (emphasis added)).

the Deposit Agreement and the ADRs. (*See* Ex. 4 § 7.08.) The Arbitration Clause undeniably "is silent on the issue of class arbitrability," as this Court already concluded. (ECF No. 130 at 27.) Indeed, the word "class" does not appear anywhere in the Arbitration Clause. (*See* Ex. 4 at Ex. A § 23(a); *see also* Ex. 2 at 9 ("Quite simply, there is no reference whatsoever in [section 23(a)] to class arbitration.").) Thus, the Tribunal was required to apply the "default rule" under the FAA and Supreme Court precedent against class arbitration. *Stolt-Nielsen*, 559 U.S. at 673. Instead, the Tribunal majority (like the arbitration panel that exceeded its powers in *Stolt-Nielsen*) "proceeded as if it had the authority of a common-law court to develop what it viewed as the best rule to be applied," *id.* at 673-74—namely, a new default presumption in favor of class arbitration. In so doing, the Tribunal "exceeded its powers." 9 U.S.C. § 10(a)(4).

### 1. The Tribunal Created a New Rule of Decision from Which It Inferred Consent to Class Arbitration from Silence or Ambiguity

Had the Tribunal majority undertaken its "proper task" of "identify[ing] the rule of law that governs" the Arbitration Clause and applying it, the "rule of decision" would have been obvious, *Stolt-Nielsen*, 559 U.S. at 673—the Arbitration Clause's silence (or at best ambiguity) on the class-arbitration issue precludes any inference of "consent to participate in class arbitration." *Lamps Plus*, 587 U.S. at 185-86. Rather than apply that clear rule of decision, the Tribunal majority engaged in a lengthy and convoluted attempt to cabin *Stolt-Nielsen* and *Lamps Plus*, claiming that they "communicate[] what can only be characterized as at best a skeptical view of class arbitration and a wariness that that is what parties have agreed to." (Ex. 1 ¶ 98.) No objective reading of those two decisions could lead to that conclusion.

Contrary to the Tribunal majority's characterization, "[s]ilence in the *Stolt-Nielsen* sense" is not limited to cases in which parties have stipulated that "there's been no agreement" on the class-arbitration issue. (*Id.* ¶¶ 46-47, 56.) In fact, *Lamps Plus* expressly rejected the Ninth Circuit's

conclusion that *Stolt-Nielsen* is controlling only in cases featuring such a stipulation. *See* 587 U.S. at 180, 185.[5] Nor did *Lamps Plus* solely "reject[] *contra proferentem* as a legally sufficient mode of" inferring consent to class arbitration, thereby approving application of all other canons of construction, like *expressio unius*, as the Tribunal majority claims. (Ex. 1 ¶ 67; *see also id.* ¶¶ 66, 70, 74-76, 99, 118.) To the contrary, *Lamps Plus* laid down an unequivocal and universal rule: only an "affirmative," *unambiguous* agreement to class arbitration can constitute the requisite consent. 587 U.S. at 189. Nothing in *Lamps Plus* limits this core principle just to cases involving the canon of *contra proferentem*. Indeed, doing so would make the rule arbitrary and illogical.

Further, although cases like *Oxford Health* and *Jock II* have confirmed that the grounds for vacatur of a clause construction award are necessarily limited, those cases have left undisturbed *Stolt-Nielsen*'s core tenet that a clause construction award is subject to vacatur when it "lack[s] *any* contractual basis for ordering class procedures" and instead reflects that "the panel simply imposed its own conception of sound policy" by ordering class proceedings. *Oxford Health*, 569 U.S. at 571 (quoting *Stolt-Nielsen*, 559 U.S. at 675). And, critically, *Oxford Health* predates *Lamps Plus* by six years. Thus, any vacatur analysis under *Stolt-Nielsen* and *Oxford Health* must take into account the Supreme Court's intervening command in *Lamps Plus* that consent to class arbitration

---

[5]      Justice Kagan actually urged in her dissenting opinion in *Lamps Plus* that the Court should limit *Stolt-Nielsen* to its facts. *See Lamps Plus*, 587 U.S. at 213 (Kagan, J., dissenting) ("Far from 'controlling' this case, [*Stolt-Nielsen*] addressed a different situation— . . . not the mere absence of express language about class arbitration, but a joint avowal that the parties had never resolved the issue." (cleaned up)). The Court did not adopt Justice Kagan's view, meaning that it affirmatively intended its decision to be one of general application. *See id.* at 185 ("Our reasoning in *Stolt-Nielsen* controls the question we face today."); *see also id.* at 190-91 (Thomas, J., concurring) ("[T]he arbitration agreement between Varela and Lamps Plus is silent as to class arbitration. . . . This agreement provides 'no contractual basis' for concluding that the parties agreed to class arbitration, and I would therefore reverse on that basis.").

may not be inferred from contractual silence or ambiguity.[6]

The Tribunal majority's decision simply disregarded these precepts, and in some cases inverted them entirely. It asserted that the absence of explicit consent—or even any mention of class arbitration—can be overcome by the canon of construction *expressio unius est exclusio alterius*. (*See* Ex. 1 ¶¶ 37, 67, 70, 74-76, 97, 118; *see also id.* ¶ 66 (describing the availability of *expressio unius* as a "central issue").) It started with its belief that the Arbitration Clause's general agreement to arbitrate "[a]ny controversy, claim or cause of action" "arising out of or relating to" the ADS is "broad." (*Id.* ¶¶ 122, 128-30.) The Tribunal majority then analyzed all the ways that it believed the parties "act[ed] intentionally to exercise control and establish a comprehensive dispute resolution regime concerning any disputes that might arise among them." (*Id.* ¶ 159.) According to the Tribunal majority, the "Arbitration Agreement" (i) includes a jury trial waiver and a waiver of certain immunities, (ii) limits the types of damages that may be awarded, (iii) selects an authorized agent for service of process, (iv) selects New York as the forum for any disputes, and (v) gives potential claimants the option of whether to pursue federal securities claims in court or arbitration. (*See, e.g.*, *id.* ¶¶ 20, 22-23, 153, 159, 171.) Again and again, the Tribunal majority opined that these "controls" evidenced a "bespoke" dispute-resolution agreement. (*Id.*

---

[6]    The Tribunal majority also cited Judge Engelmayer's decision in *Wells Fargo Advisors LLC v. Tucker*, 373 F. Supp. 3d 418 (S.D.N.Y. 2019). (*See* Ex. 1 ¶¶ 43, 102.) In *Tucker*, the court denied a petition to vacate a clause construction award that authorized class-wide arbitration. *See* 373 F. Supp. 3d at 421-22. Like *Oxford Health*, *Tucker* predates *Lamps Plus*. Thus, at the time, the arbitrator's clause construction award could avoid vacatur based on a perceived absence of "definitive Supreme Court guidance as to exactly what is needed to constitute an adequate contractual basis for class arbitration" and the fact that a sophisticated commercial party drafted the arbitration agreement. *Tucker*, 373 F. Supp. 3d 425-26; *cf. id.* at 427 ("[I]n the absence of controlling case authority, the Arbitrator was within her authority to take a different view."). That is no longer the case after *Lamps Plus*, which provided the missing definitive guidance and foreclosed the use of canons like *contra proferentem* as a "substitute for the requisite affirmative contractual basis for concluding that the parties *agreed* to class arbitration." 587 U.S. at 189 (cleaned up) (emphasis in original)

¶¶ 145, 159, 171.) It then concluded that, in light of these "controls," the parties could have expressly excluded class claims from the Arbitration Clause if they had intended that result. (*See id.* ¶¶ 159-60; *see also id.* ¶ 170 ("[T]he Parties knew how to express themselves . . . when they wanted to exclude or limit certain types of disputes or issues from the broad language used to describe the scope of the matters to be arbitrated.").)

This application of *expressio unius* gets the default presumption prescribed by the Supreme Court exactly backwards. As Judge Levi pointed out in his dissenting opinion, "the default is non-class arbitration and not the other way around: the absence of a disclaimer of consent to arbitration is not an affirmative indication of consent." (Ex. 2 at 3.) The provisions that the Tribunal majority highlights do not even mention class arbitration, much less address issues specific to it. (*See id.* at 10-11, 14-17.) It would be one thing if other provisions of the Arbitration Clause referred to class procedures (or, better yet, excluded them) and the Arbitration Clause did not. But the supposed "controls" do nothing of the sort, and they are entirely consistent with the FAA's default of individualized, non-class arbitration. Thus, they cannot be used to infer consent even under the Tribunal majority's own improper use of *expressio unius*. *See KLS Diversified Master Fund, L.P. v. McDevitt*, 507 F. Supp. 3d 508, 542 (S.D.N.Y. 2020) ("Under the doctrine of *expressio unius est exclusio alterius*, when a term is *expressly included* in a contractual provision, its exclusion from other provisions within the same contract reflects the parties' intent that the omission was intentional."), *aff'd*, No. 21-1263, 2022 WL 2759055 (2d Cir. July 13, 2022) (summary order).

The Tribunal majority's analysis also conflicts with New York law, which governs the Arbitration Clause. As Defendants explained to the Tribunal during oral argument (*see, e.g.*, Ex. 8 at 130:3-134:8, 176:17-185:7), under New York law, "rules of construction are to be applied to interpret language *of ambiguous or doubtful meaning only*." *Dorman v. Cohen*, 66 A.D.2d 411,

414 (1st Dep't 1979); *accord* 22 N.Y. Jur. 2d Contracts § 204 (2d. ed. Nov. 2024 Update). Thus, the Tribunal majority's resort to *expressio unius* itself confirms that, as a matter of New York law, the Arbitration Clause is ambiguous.[7]

New York law thus leads directly back to the grounds for vacatur here: *Lamps Plus* sets up an unequivocal rule that silence—even silence that might be said to lead to an "ambiguous" contract—will *never* show consent to class arbitration. 587 U.S. at 185. This rule makes sense, since an ambiguous contract, by definition, "*fails to disclose . . . the parties' intent.*" *Donohue v. Cuomo*, 38 N.Y.3d 1, 13 (2022). Thus, contrary to the rule that the Tribunal majority seemingly cut from whole cloth, "the necessary affirmative contractual basis" may *not* be found "through application of *expressio unius* or such other canon of construction." (Ex. 1 ¶ 97; *cf.* Ex. 6 ¶¶ 69-73 (arguing that canons of construction cannot themselves create consent to class arbitration).) *Lamps Plus* confirmed that canons of construction "cannot substitute for the requisite affirmative contractual basis for concluding that the parties *agreed* to class arbitration." 587 U.S. at 189.

The *Sappington* case cited by the Tribunal majority further confirms the impropriety of its

---

[7]     "[W]hile New York law recognizes the *expressio unius* canon of contract construction," it also recognizes "the general principle that interpretive tools need not be deployed when the contract is unambiguous" and that "*expressio unius* should not be applied to create ambiguity where none would otherwise exist." *N.Y. Univ. v. Factory Mut. Ins. Co.*, 374 F. Supp. 3d 315, 323-24 (S.D.N.Y. 2019), *aff'd*, No. 20-1093-cv, 2021 WL 3136078 (2d Cir. July 26, 2021) (summary order). Put differently, "before the rules governing the construction of ambiguous contracts"—like *expressio unius*—"are triggered, the court must first find ambiguity" in the contract. *Breed v. Ins. Co.*, 46 N.Y.2d 351, 355 (1978); *cf. Quadrant Structured Prods. Co. v. Vertin*, 23 N.Y.3d 549, 560 (2014) ("[t]he maxim *expressio unius est exclusio alterius*, as used in the interpretation of contracts," can be used to determine party intent "where there is ambiguity"). The Court of Appeals has cautioned that "courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include." *Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.*, 17 N.Y.3d 269, 277 (2011); *see also Maison Lazard et Compagnie v. Manfra, Tordella & Brooks, Inc.*, 585 F. Supp. 1286, 1289 (S.D.N.Y. 1984) ("[T]he [*expressio unius*] doctrine is at best an unreliable basis for ascertaining intention, assuming too much foresight in the draftsmen.").

decision. *See Wells Fargo Advisors, LLC v. Sappington*, 884 F.3d 392 (2d Cir. 2018) (cited in Ex. 1 ¶¶ 102-05). In that case, the Second Circuit applied *Missouri law* to determine whether the parties intended "to arbitrate all questions of arbitrability, including the availability of class arbitration." *Id.* at 396. In that posture, both the Second Circuit and Missouri Supreme Court have provided a default rule of decision: "when parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Id.* at 396 (citing *Contec Corp. v. Remote Sol. Co.*, 398 F.3d 205, 208 (2d Cir. 2005), and *Missouri ex rel. Pinkerton v. Fahnestock*, 531 S.W.3d 36, 45-58 (Mo. 2017) (en banc)).

Here, by contrast, the FAA, the Supreme Court, and New York law provide a "rule of decision" *opposite* to the one employed by the Tribunal majority. *Stolt-Nielsen*, 559 U.S. at 673. The Tribunal is empowered to interpret the Arbitration Clause, but not to create new presumptions or rules of decision that contradict Supreme Court precedent and New York law. The Tribunal here exceeded its powers by doing so. *See* 9 U.S.C. § 10(a)(4).

### 2. The Tribunal's Other Contractual Analysis Cannot Obscure that Its Decision Was Policy-Based

Beyond its improper application of *expressio unius*, the rest of the Tribunal majority's decision confirms that it merely implemented its new rule of decision to achieve a result prohibited by governing law. (*See* Ex. 1 ¶¶ 119-172.) Under both federal and New York law, arbitrators may not employ "linguistic gymnastics" to rewrite a contract under the guise of construing it. *Dewan v. Walia*, 544 F. App'x 240, 248 (4th Cir. 2013) (holding that the district court should have vacated arbitration award); *see also U.S. Bank Nat'l Ass'n v. DLJ Mortg. Cap., Inc.*, 38 N.Y.3d 169, 178 (2022) ("[C]ourts may not by construction add or excise terms . . . and thereby make a new contract for the parties under the guise of interpreting the writing."). The Tribunal majority did just that.

Take the Tribunal majority's unremarkable observation that the language of the Arbitration Clause is "broad." (Ex. 1 ¶¶ 122, 128, 130, 134, 148, 153.) However broad the language, it reflects no more than an agreement to arbitrate disputes concerning the ADSs. (*See* Ex. 2 at 3, 14-15.) The Arbitration Clause references claims brought by "any party" or "a party," and not collective claims by classes of "parties" (Ex. 4 at Ex. A § 23(a)), which suggests individual (not class) arbitration. *Cf., e.g.*, *Hunter v. Kaiser Found. Health Plan, Inc.*, 434 F. Supp. 3d 764, 780 (N.D. Cal. 2020) (even "references to plural parties or claimants, at best, only create the kind of ambiguity that the Supreme Court addressed in *Lamps Plus*"). Indeed, the Arbitration Clause is no broader than the language that supported vacatur in *Stolt-Nielsen* and the bilateral clause construction in *Lamps Plus*.[8] It also tracks the standard language recommended by the AAA and JAMS:[9]

| The Arbitration Clause | AAA Standard Arbitration Clause | JAMS Standard Arbitration Clause |
|---|---|---|
| *Any controversy, claim or cause of action* brought by any party hereto against the Company *arising out of or relating to* the [ADSs] . . . shall be settled by arbitration in accordance with the International Rules of the American Arbitration Association . . . . | *Any controversy or claim arising out of or relating to* this contract, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association in accordance with its International Arbitration Rules. | *Any dispute, controversy or claim arising out of or relating to* this contract, including the formation, interpretation, breach or termination thereof, including whether the claims asserted are arbitrable, will be referred to and finally determined by arbitration in accordance with the JAMS International Arbitration Rules. |

---

[8]    *See Stolt-Nielsen*, 559 U.S. at 667 (agreement to arbitrate "[a]ny dispute arising from the making, performance or termination of" shipping contract); *Varela v. Lamps Plus, Inc.*, No. CV 16-577-DMG (KSx), 2016 WL 9110161, at *1 (C.D. Cal. July 7, 2016) (agreement to arbitrate "any and all disputes, claims, or controversies arising out of or relating to" employment agreement), *rev'd*, 701 F. App'x 670 (9th Cir. 2017), *rev'd*, 587 U.S. 176 (2019).

[9]    *See* JAMS Standard Arbitration Clause for International Commercial Contracts, JAMS, https://www.jamsadr.com/clauses/#Standard; AAA-ICDR® Clause Drafting, Standard Arbitration Clause (International), Am. Arbitration Ass'n, https://www.adr.org/Clauses.

Thus, if the Tribunal majority is correct, then every contract incorporating standard AAA and JAMS language would authorize class arbitration. This is the *opposite* of the default presumption against class arbitration required by the Supreme Court under the FAA. And while the "potential for class arbitration" may have been "evident" at the time the Deposit Agreement became effective (Ex. 1 ¶ 162), so too was the requirement for an affirmative contractual basis showing that "the parties *agreed to authorize* class arbitration" set forth in *Stolt-Nielsen*. 559 U.S. at 684, 687 (emphasis in original).[10]

Finally, the Tribunal majority points to language in the optional exclusion for federal securities claims, which it notes is "as broad as" the Arbitration Clause's mandatory language. (Ex. 1 ¶ 138.) Per the Tribunal majority, the phrase "any controversy, claim or cause of action" "must, in each instance, either include or not include class actions." (*Id.* ¶ 144.) And because federal securities claims "are typically brought on a class-action basis," the Tribunal majority concluded that the Arbitration Clause must encompass class claims in both cases. (*Id.* ¶ 146.)

Again, the Tribunal majority simply assumes its own improper conclusion. Viewed from the required individual-arbitration "default," the federal-securities carveout is entirely consistent with individual arbitration. It provides that if potential federal securities claimants want to pursue

---

[10]    Courts have uniformly held that a standard agreement like the one reflected in the Arbitration Clause does not demonstrate consent to class arbitration. *See, e.g.*, *Anwar v. Fairfield Greenwich Ltd.*, 950 F. Supp. 2d 633, 636 (S.D.N.Y. 2013) ("[A]n agreement to arbitrate 'any and all disputes, controversies, or claims arising out of' [an] agreement does not in and of itself authorize class arbitration if there is 'no provision in the contract which contemplates class-arbitration.'" (quoting *Sanders v. Forex Ca. Mkts., LLC*, No. 11 Civ. 0864(CM), 2011 WL 5980202, at *11 (S.D.N.Y. Nov. 29, 2011))); *see also, e.g.*, *Catamaran Corp. v. Towncrest Pharm.*, 946 F.3d 1020, 1022 (8th Cir. 2020) (agreement to arbitrate "any controversy or claims arising out of or relating to" reimbursement agreements); *Reed Elsevier, Inc. v. Crockett*, 734 F.3d 594, 599 (6th Cir. 2013) (agreement to arbitrate "any controversy, claim or counterclaim . . . arising out of or in connection with" LexisNexis subscription); *Cobarruviaz v. Maplebear, Inc.*, 143 F. Supp. 3d 930, 940 (N.D. Cal. 2015) (agreement to arbitrate "any controversy, dispute, or claim arising out of or related to" contractor agreement).

a class action, they must do so in court; otherwise, they must arbitrate their claims individually (or with any other ADS holders that choose to join the arbitration). But the claimants cannot assert representative claims in arbitration on behalf of absent class members. (*See* Ex. 2 at 19-22.) The Tribunal exceeded its powers by concluding otherwise. *See* 9 U.S.C. § 10(a)(4).

## C.    The Arbitration Clause Itself Prohibits the Clause Construction Award

The Clause Construction Award should also be vacated because it is prohibited by the Arbitration Clause itself. *See Jock I*, 646 F.3d at 122; *see also Aspic Eng'g & Constr. Co. v. ECC Centcom Constructors LLC*, 913 F.3d 1162, 1168-69 (9th Cir. 2019) (affirming vacatur of arbitration award when arbitrator "disregard[ed] the plain text of a contract without legal justification" to "achieve a desired outcome"). The Arbitration Clause states that the Tribunal "shall have *no authority*" to (i) "award any . . . damages not measured by the prevailing party's actual damages" or (ii) "make any ruling, finding or award that does not conform to the terms and conditions of th[e] Deposit Agreement." (Ex. 4 at Ex. A § 23(a) (emphasis added).) The Clause Construction Award violates both of these prohibitions.

*First*, by authorizing class proceedings, the Tribunal has authorized damages that are "not measured by the prevailing party's actual damages." (*Id.*) Although it is of course true that all ADS holders are parties to the Deposit Agreement (*see id.* at 2 (preamble)), the Arbitration Clause is actually contained in the ADRs, which are specific to each ADS holder. (*See id.* at Ex. A § 1.) The Arbitration Clause is triggered when "any party hereto" (*i.e.*, a single ADS holder) brings "[a]ny controversy, claim or cause of action . . . against the Company." (*Id.* § 23(a).) That "party" must bring any such controversy, claim, or cause of action "by arbitration in accordance with the International Arbitration Rules" of the AAA. Those rules in turn provide that a party "brings" an arbitration by giving written notice to the ICDR. (Ex. 9 at 17-18, art. 2(1).)

Here, only Plaintiffs have brought an arbitration against Dangdang pursuant to the AAA's

International Arbitration Rules; none of the absent class members have done so. (*See* SOF ¶ 22; Ex. 3.) Thus, Plaintiffs are the only "part[ies]" by which "actual damages" may be measured. (Ex. 4 at Ex. A § 23(a).) By interpreting the Arbitration Clause as authorizing Plaintiffs to potentially seek damages on behalf of the absent putative class members (*i.e.*, non-parties), the Tribunal exceeded its delegated authority under the Arbitration Clause. (*See, e.g.*, Ex. 3 at 41-42 (seeking damages on behalf of "Claimants and the members of the Class").)

*Second*, by authorizing class proceedings, the Tribunal issued an "award that does not conform to the terms and conditions of the Deposit Agreement." (Ex. 4 at Ex. A § 23(a).) The Arbitration Clause requires that "[i]f a dispute, controversy or cause of action shall involve more than two parties," the parties must "attempt to align themselves in two sides (*i.e.*, claimant(s) and respondent(s))." (*Id.*) Put differently, if more than two ADS holders bring an arbitration against Dangdang under the AAA's International Arbitration Rules, those parties must pick sides. Then, "each [side] shall appoint one arbitrator as if there were only two parties to [the] dispute, controversy or cause of action." (*Id.*) Party alignment must happen *before* the arbitrators are appointed to ensure that all parties can participate in the arbitrator selection process. If absent class members are brought in as parties *after* the arbitrators have been appointed (*e.g.*, after class certification), those absent class members will have been deprived of their contractual participation right and will be stuck with arbitrators that they did not select. *See, e.g.*, *NCR Corp. v. Jones*, 157 F. Supp. 3d 460, 468 (W.D.N.C. 2016) (right of parties to participate in arbitrator-selection process indicated an intent "to resolve disputes on an individual basis and in conformance with the arbitration procedures described in the contract"). That outcome would not "conform to the terms and conditions of the Deposit Agreement." (Ex. 4 at Ex. A § 23(a).)

## II.    The Clause Construction Award Should Also Be Vacated Because the Tribunal Manifestly Disregarded Controlling Supreme Court Precedent

The Clause Construction Award should also be vacated because "it was rendered in manifest disregard of the law." *Weiss v. Sallie Mae, Inc.*, 939 F.3d 105, 109 (2d Cir. 2019). Under this standard, vacatur is warranted when "(1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." *N.Y. Tel. Co. v. Commc'ns Workers of Am. Loc. 1100*, 256 F.3d 89, 91 (2d Cir. 2001); *see also Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197, 202 (2d Cir. 1998) (district court erred by "refusing to vacate" award when "arbitrators engaged in manifest disregard" of law). The Tribunal majority's manifest disregard of *Lamps Plus* readily satisfies this standard.

The Tribunal majority was clearly aware that "*Lamps Plus* emphasized the need for an affirmative contractual basis for concluding that the objecting party agreed to class arbitration" because class arbitration "undermines the most important benefits" of "the traditional individualized arbitration contemplated by the FAA." (Ex. 1 ¶¶ 60, 64 (quoting *Lamps Plus*, 587 U.S. at 183, 85).) It was also aware that the arbitration agreement in *Lamps Plus* did not mention class arbitration and was "capable of two or more constructions" on that issue, and thus was "ambiguous." *Lamps Plus*, 587 U.S. at 182. And the Tribunal majority was aware that *Lamps Plus* prohibits construing arbitration agreements that are silent or ambiguous on class arbitration against the drafter in favor of class arbitration. (*See, e.g.*, Ex. 1 ¶¶ 59-63.)

The principles set out in *Lamps Plus* and acknowledged by the Tribunal majority are "well defined, explicit, and clearly applicable" here. *N.Y. Tel. Co.*, 256 F.3d at 91. Yet the Tribunal majority refused to apply them. Instead, it disregarded the Supreme Court's directives and imposed its own policy choice—a default rule in favor of class arbitration—by construing an agreement

that is silent (or at best ambiguous) on the class-arbitration issue against the drafter (Dangdang). (*See supra* Part I.B.1.) This was not a "mere error in the law or failure on the part of the arbitrators to understand or apply the law." *Fahnestock & Co. v. Waltman*, 935 F.2d 512, 516 (2d Cir. 1991). Rather, the Tribunal majority "understood and correctly stated the law but proceeded to ignore it." *Id.* The Clause Construction Award cannot stand.

## III.   The New York Convention Also Supports Vacatur

Finally, the Clause Construction Award should be vacated under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention"). *See* 9 U.S.C. §§ 201-208; *see also CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 73 (2d Cir. 2017) (explaining when the New York Convention applies to arbitration awards). Under the New York Convention, "[r]ecognition and enforcement of [an] award may be refused" if, among other things, "the award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration." *Drip Cap., Inc. v. M/S. Goodwill Apparels*, 665 F. Supp. 3d 511, 518 (S.D.N.Y. 2023). This provision "tracks in more detailed form" the standard for vacating an award under the FAA "where the arbitrators exceeded their powers." *Parsons & Whittemore Overseas Co. v. Societe Generale De L'Indusrie Du Papier (RAKTA)*, 508 F.2d 969, 976 (2d Cir. 1974).

As shown above (*see supra* Part I), the Tribunal exceeded its powers by issuing the Clause Construction Award. The New York Convention thus provides an independent basis for vacatur. *See Parsons*, 508 F.2d at 976.

## CONCLUSION

For the reasons set forth above, the Court should vacate the Clause Construction Award and decline to direct a rehearing by the Tribunal. *See* 9 U.S.C. § 10(b); *see also Stolt-Nielsen*, 559

U.S. at 677 ("Because we conclude that there can be only one possible outcome on the facts before us, we see no need to direct a rehearing by the arbitrators.").

Dated: New York, New York
        November 20, 2024

Respectfully submitted,

SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP

  /s/ Timothy G. Nelson
Scott D. Musoff
Timothy G. Nelson
Christopher R. Fredmonski
One Manhattan West
New York, New York 10001
(212) 735-3000
scott.musoff@skadden.com
timothy.g.nelson@skadden.com
christopher.fredmonski@skadden.com

Bradley A. Klein (pro hac vice)
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7000
bradley.klein@skadden.com

*Attorneys for Defendants*
*E-Commerce China Dangdang, Inc.;*
*Dangdang Holding Company Ltd.;*
*Kewen Holding Co. Ltd.; Science & Culture*
*International Ltd.; First Profit Management,*
*Ltd.; Guoqing Li; Peggy Yu Yu; Danqian*
*Yao; Lijun Chen; and Min Kan*